**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>TRIBUNE COMPANY, et al.,<br>Debtors. | Chapter 11<br><br>Cases No. 08-13141 (KJC)<br>Jointly Administered |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TRIBUNE COMPANY, on behalf of TRIBUNE COMPANY, et al.,<br>Plaintiff,<br>-against-<br>DENNIS J. FITZSIMONS, ENRIQUE HERNANDEZ JR., BETSY D. HOLDEN, ROBERT S. MORRISON, WILLIAM A. OSBORN, CHRISTOPHER REYES, DUDLEY S. TAFT, MILES D. WHITE, JEFFREY CHANDLER, ROGER GOODAN, WILLIAM STINEHART JR., CHANDLER BIGELOW, DONALD C. GRENESKO, MARK W. HIANIK, DANIEL G. KAZAN, CRANE H. KENNEY, THOMAS D. LEACH, LUIS E. LEWIN, R. MARK MALLORY, RUTHELLYN MUSIL, HARRY AMSDEN, STEPHEN D. CARVER, THOMAS S. FINKE, ROBERT GREMILLION, DAVID DEAN HILLER, TIMOTHY P. KNIGHT, TIMOTHY J. LANDON, RICHARD H. MALONE, DURHAM J. MONSMA, IRVING L. QUIMBY, JOHN E. REARDON, SCOTT C. SMITH, JOHN J. VITANOVEC, KATHLEEN M. WALTZ, DAVID D. WILLIAMS, JOHN D. WORTHINGTON IV, CHANDLER TRUST NO. 1, CHANDLER TRUST NO. 2, ROBERT R. McCORMICK FOUNDATION, CANTIGNY FOUNDATION, SAMUEL ZELL, EQUITY GROUP INVESTMENTS, L.L.C., EGI-TRB, L.L.C., SAM INVESTMENT TRUST, TOWER CH, L.L.C., TOWER DC, L.L.C., TOWER DL, L.L.C., TOWER EH, L.L.C., TOWER GREENSPUN DGSPT, LLC, TOWER GREENSPUN JGGSTP, LLC, TOWER GREENSPUN SGFFT, LLC, TOWER GREENSPUN, L.L.C., TOWER HZ, L.L.C., TOWER JB, L.L.C., TOWER JK, L.L.C., TOWER JP, L.L.C., TOWER JS, L.L.C., TOWER KS, L.L.C., TOWER LL, L.L.C., TOWER LM, L.L.C., TOWER LZ, L.L.C., TOWER MH, L.L.C., TOWER MS, L.L.C., TOWER MZ, L.L.C., TOWER NL, L.L.C., TOWER PH, L.L.C., TOWER PT, L.L.C., TOWER SF, L.L.C., TOWER TT, L.L.C., TOWER VC, L.L.C., TOWER WP, L.L.C., GREATBANC TRUST COMPANY, DUFF & PHELPS, LLC, VALUATION RESEARCH CORPORATION, DOES 1-25, MORGAN STANLEY & CO. INC., MORGAN STANLEY CAPITAL SERVICES, INC., MERRILL, LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS, INC.,<br>-and-<br>THE DFA INVESTMENT TRUST COMPANY, DFA INVESTMENT DIMENSIONS GROUP, INC., THE ALLIANCE BERNSTEIN PORTFOLIOS, FRANK W. DENIUS, DONALD M. HINMAN JR., LEWIS TAMAN, and WILLIAM F. WARCHOL, on behalf of themselves and a class of similarly situated persons and legal entities, including but not limited to those listed in the attached Exhibit A,<br>Defendants. | Adv. Pro. No. _________ |

# COMPLAINT

Plaintiff, The Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee") of the debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, "Debtors"),[1] on behalf of the Debtors' Chapter 11 estates, respectfully alleges as follows:

## NATURE OF THE ACTION

1. The Committee brings this action to hold accountable the persons and entities responsible for crippling the Tribune Company ("Tribune" or "the Company"), once one of the country's most venerable companies. Through a leveraged buyout transaction ("LBO Transaction") tainted from start to finish, that venerable company lost billions of dollars in value

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

between the closing of the LBO Transaction and the Company's bankruptcy filing less than a year later. This LBO Transaction is among the worst in American corporate history. One of the engineers of the deal referred to it in the following apt terms: "This is like carrying a fat person up Everest, hopefully it doesn't kill us." Predictably, the LBO Transaction killed the Company soon enough.

2. The LBO was designed to cash out the large shareholders of Tribune, and to line the pockets of defendant Samuel Zell ("Zell") and Tribune's directors and officers. Faced with a severe decline in Tribune's stock price, starting in 2005, and continuing through the relevant time period, certain large shareholders of Tribune that collectively owned 33% of its shares began exerting extreme pressure on the Company to take prompt action to maximize the value of their investment.

3. In response to this pressure from the dominant shareholders, in September 2006, Tribune began a strategic review process to solicit and consider proposals that would alter the Company's future. In February 2007, billionaire Zell masterminded a plan in which he used very little of his own assets to acquire control of Tribune while shifting the risk that the transaction would fail onto the Company's shareholders. Zell's plan used an employee stock ownership plan ("ESOP") as the takeover vehicle, and leveraged Tribune to the hilt to buy out all of its publicly owned shares. To accomplish his plan, Zell induced those charged with running and protecting Tribune to turn a blind eye to the unsustainable level of debt that would inevitably cause Tribune's demise. Among other things, Zell succeeded by enticing Tribune's directors and officers with tens of millions of dollars in stock sale proceeds and special incentives to close his deal.

4. Caving to the pressure from large shareholders and the lure of substantial financial incentives, Tribune's management facilitated the transaction. On April 1, 2007, in dereliction of its duties to safeguard the Company's future, Tribune's board approved Zell's bid to acquire Tribune through the highly leveraged LBO Transaction, and as a result, the Tribune executed the first step of the transaction, paying its shareholders approximately $4.3 billion for 50% shares using proceeds of a loan that the Company was obligated to repay. At the end of 2007, acting with knowledge, recklessness, or gross negligence, the directors and officers facilitated the closing of the second step of the LBO, in complete disregard of the Tribune's deteriorating financial condition and business operations. Using proceeds of loans that the Company was obligated to repay, Tribune paid approximately $4 billion to shareholders holding the remaining 50% of the Tribune's outstanding shares. As a result of the LBO Transaction, Tribune's debt increased to a staggering $13 billion. The Tribune's large shareholders achieved their goal of exiting from the Tribune, while Zell took control of the Company with little risk to him and stood to reap huge gains if the gamble paid off. The directors and officers received extraordinary payments. And the Company and its creditors bore the lion's share of the risk that the gamble would not pay off for Zell.

5. By imposing a crushing debt load on Tribune and structuring the transaction through an ESOP, Zell acquired control over a company once worth many billions of dollars while putting up only $315 million of his own money (a mere 2.6% of the total consideration) and without incurring any substantial personal risk. In addition, Tribune's large shareholders collected billions of dollars and then – finally satisfied with the enormous value they had extracted from their stock – walked away from the ruined Company.

6. The Company's interests were egregiously subverted through the LBO Transaction. The level of debt required to consummate the transaction rendered Tribune insolvent – a result that the director and officer defendants and the large shareholders that held sway over the Company's future did foresee or should have foreseen. Indeed, the devastating results of the LBO Transaction were widely forecast by financial analysts. Nevertheless, the director and officer defendants recklessly agreed to and approved a clearly imprudent transaction, in part because many had financial motivation to do so, and the large shareholders were quite content to reap the significant benefits of a "cash-out" transaction they had actively pursued.

7. Predictably, Tribune filed for bankruptcy protection less than a year after the LBO Transaction closed. Thus, through the orchestration, negotiation and consummation of a foolish and destructive transaction, defendants brought financial ruin to Tribune within a year. This lawsuit seeks redress for that unprecedented injury.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the District of Delaware referring to the Bankruptcy Judges of this District all cases and proceedings arising under the Bankruptcy Code.

9. This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A). In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by this Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

10. Venue in this District is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases pending under title 11 of the United States Code (the "Bankruptcy Code").

**THE PARTIES**

11. Plaintiff is the Official Committee of Unsecured Creditors duly appointed on December 18, 2008 in the Debtors' Chapter 11 cases by the Office of the United States Trustee for the District of Delaware. The Committee has been granted standing and authority by this Court to commence, prosecute and settle this action on behalf of the Debtors' estates.

12. Defendant Dennis J. FitzSimons ("FitzSimons") was the President and Chief Executive Officer ("CEO") of Tribune and the Chairman of Tribune's Board of Directors ("Board") at the time of the LBO Transaction. As a director, FitzSimons approved the LBO Transaction. Upon information and belief, FitzSimons sold 481,296 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $16,364,064 in cash proceeds. Upon information and belief, FitzSimons' total earnings from the LBO Transaction, including severance payments and other special incentives, were approximately $47 million. Also at the time of the LBO Transaction, FitzSimons was the Chairman of the Robert R. McCormick Foundation (the "McCormick Foundation"), one of Tribune's largest shareholders prior to the LBO Transaction. Through that position, which he still holds, FitzSimons effectively controlled the McCormick Foundation. At the time of the transaction, FitzSimons was also a member of the board of directors of the Cantigny Foundation, an affiliate of the McCormick Foundation, and still holds that position. FitzSimons was also a director of one or more of the Subsidiary Guarantors (defined below) at that time. Upon information and

belief, FitzSimons lives in Illinois. Upon information and belief, FitzSimons has filed at least one proof of claim in the Debtors' Chapter 11 cases.

13. Defendant Enrique Hernandez Jr. ("Hernandez") was a director of Tribune at the time of the LBO Transaction. As a director, Hernandez approved the LBO Transaction. Hernandez also served as a member of the special committee (the "Special Committee") of the Tribune Board that was formed in September 2006 to oversee management's exploration of alternatives and which ultimately recommended that the full Board approve the LBO Transaction. Upon information and belief, Hernandez sold 13,608 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $462,672 in cash proceeds. Upon information and belief, Hernandez lives in California.

14. Defendant Betsy D. Holden ("Holden") was a director of Tribune at the time of the LBO Transaction and remains a director. As a director, Holden approved the LBO Transaction. Holden also served as a member of the Special Committee that recommended that the full Board approve the LBO Transaction. Upon information and belief, Holden sold 10,939 shares of Tribune stock in connection with the LBO Transaction from which she received approximately $371,926 in cash proceeds. Upon information and belief, Holden lives in Illinois. Upon information and belief, the Debtors have listed Holden as a holder of an unsecured claim on the Debtor's schedules of assets and liabilities ("the Debtors' Schedules").

15. Defendant Robert S. Morrison ("Morrison") was a director of Tribune at the time of the LBO Transaction. As a director, Morrison approved the LBO Transaction. Morrison also served as a member of the Special Committee. Upon information and belief, Morrison sold 15,427 shares of Tribune stock in connection with the LBO Transaction from

which he received approximately $524,518 in cash proceeds. Upon information and belief, Morrison lives in Illinois.

16. Defendant William A. Osborn ("Osborn") was a director of Tribune at the time of the LBO Transaction and is a current director. As a director, Osborn approved the LBO Transaction. Osborn also served as Chair of the Special Committee. Upon information and belief, Osborn sold 14,237 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $484,058 in cash proceeds. Upon information and belief, Osborn lives in Illinois.

17. Defendant Christopher Reyes ("Reyes") was a director of Tribune at the time of the LBO Transaction. As a director, Reyes approved the LBO Transaction. Reyes also served as a member of the Special Committee. Upon information and belief, Reyes sold 17,248 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $586,432 in cash proceeds. Upon information and belief, Reyes lives in Illinois.

18. Defendant Dudley S. Taft ("Taft") was a director of Tribune at the time of the LBO Transaction. Taft also served as a member of the Special Committee. Upon information and belief, Taft sold 100,938 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $3,431,892 in cash proceeds. Upon information and belief, Taft lives in Ohio.

19. Defendant Miles D. White ("White") was a director of Tribune at the time of the LBO Transaction. As a director, White approved the LBO Transaction. White also served as a member of the Special Committee. Upon information and belief, White sold 8,698 shares

of Tribune stock in connection with the LBO Transaction from which he received approximately $295,732 in cash proceeds. Upon information and belief, White lives in Illinois.

20. Defendant Jeffrey Chandler ("Chandler") was a director of Tribune at the time of the LBO Transaction and until his resignation on or about June 4, 2007, the date on which the first step of the LBO Transaction closed. Chandler served on the Board as a representative of the Chandler Trusts (defined below), of which he is a trustee and beneficiary. The Chandler Trusts were at that time among Tribune's largest shareholders. Upon information and belief, Chandler sold 11,187 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $380,358 in cash proceeds. Upon information and belief, Chandler lives in California.

21. Defendant Roger Goodan ("Goodan") was a director of Tribune at the time of the LBO Transaction and until his resignation on or about June 4, 2007. Goodan served on the Board as a representative of the Chandler Trusts, of which he is a trustee and beneficiary. Upon information and belief, Goodan sold 13,125 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $434,706 in cash proceeds. Upon information and belief, Goodan lives in California.

22. Defendant William Stinehart Jr. ("Stinehart") was a director of Tribune at the time of the LBO Transaction and until his resignation on or about June 4, 2007. Stinehart served on the Board as a representative of the Chandler Trusts, of which he is a trustee. Upon information and belief, Stinehart sold 12,650 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $430,100 in cash proceeds. Upon information and belief, Stinehart lives in California.

23. The defendants named above in ¶¶ 20-22 are sometimes collectively referred to herein as the "Chandler Trust Representatives." The defendants named above in ¶¶ 12-22 are sometimes collectively referred to herein as the "Director Defendants."

24. Defendant Chandler Bigelow ("Bigelow") was Tribune's Treasurer at the time of the LBO Transaction, and currently is Tribune's Chief Financial Officer. Bigelow was also the Vice President and Treasurer of one or more of the Subsidiary Guarantors at that time. Upon information and belief, Bigelow received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Bigelow lives in Illinois. Upon information and belief, the Debtors have listed Bigelow as the holder of one or more unsecured claims on the Debtors' Schedules.

25. Defendant Donald C. Grenesko ("Grenesko") was Tribune's Senior Vice President of Finance and Administration at the time of the LBO Transaction. Upon information and belief, Grenesko sold 242,357 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $8,240,138 in cash proceeds. Upon information and belief, Grenesko also received additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Grenesko lives in Illinois. Upon information and belief, Grenesko has filed at least one proof of claim in the Debtors' Chapter 11 cases.

26. Defendant Mark W. Hianik ("Hianik") was Tribune's Assistant General Counsel and Assistant Secretary at the time of the LBO Transaction. Hianik was also the Assistant Secretary of one or more of the Subsidiary Guarantors at that time. Upon information

and belief, Hianik received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Hianik lives in Illinois.

27. Defendant Daniel G. Kazan ("Kazan") was Tribune's Vice President of Development at the time of the LBO Transaction, and currently is Tribune's Senior Vice President, Corporate Development. Upon information and belief, Kazan received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Kazan lives in Illinois. Upon information and belief, the Debtors have listed Kazan as the holder of one or more unsecured claims on the Debtors' Schedules.

28. Defendant Crane H. Kenney ("Kenney") was Tribune's Senior Vice President, General Counsel and Secretary at the time of the LBO Transaction. Kenney was also a director of one or more of the Subsidiary Guarantors at that time. Upon information and belief, Kenney sold 51,668 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $1,756,712 in cash proceeds. Upon information and belief, Kenney also received additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Kenney lives in Illinois. Upon information and belief, Kenney has filed at least one proof of claim in the Debtors' Chapter 11 cases. In addition, upon information and belief, the Debtors have listed Kenney as the holder of one or more unsecured claims on the Debtors' Schedules.

29. Defendant Thomas D. Leach ("Leach") was Tribune's Senior Vice President of Development at the time of the LBO Transaction. Upon information and belief, Leach sold 50,740 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $1,725,160 in cash proceeds. Upon information and belief, Leach also received

additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Leach lives in Illinois.

30. Defendant Luis E. Lewin ("Lewin") was Tribune's Senior Vice President of Human Resources at the time of the LBO Transaction. Upon information and belief, Lewin sold 22,814 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $775,676 in cash proceeds. Upon information and belief, Lewin also received additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Lewin lives in Illinois.

31. Defendant R. Mark Mallory ("Mallory") was Tribune's Vice President and Controller at the time of the LBO Transaction. Upon information and belief, Mallory sold 108,570 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $3,691,380 in cash proceeds. Upon information and belief, Mallory also received additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Mallory lives in Illinois. Upon information and belief, Mallory has filed at least one proof of claim in the Debtors' Chapter 11 cases.

32. Defendant Ruthellyn Musil ("Musil") was Tribune's Senior Vice President of Corporate Relations at the time of the LBO Transaction. Upon information and belief, Musil sold 65,391 shares of Tribune stock in connection with the LBO Transaction from which she received approximately $2,185,875 in cash proceeds. Upon information and belief, Musil also received additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Musil lives in Illinois.

33. The defendants named above in ¶¶ 24-32 (along with FitzSimons) are sometimes collectively referred to herein as the "Officer Defendants." Collectively, the Director Defendants and the Officer Defendants will be referred to herein as the "D&O Defendants." All claims of the D&O Defendants reflected on the Debtors' Schedules or any proofs of claim filed by, or on behalf of, any of the D&O Defendants are collectively referred to herein as the "D&O Creditor Claims."

34. Upon information and belief, defendant Harry Amsden ("Amsden") was the Vice President of Finance of Tribune Publishing Company, a subsidiary of Tribune, at the time of the LBO Transaction, and is currently Tribune's Senior Vice President of Financial Operations. Upon information and belief, Amsden received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Amsden lives in Illinois. Upon information and belief, Amsden has filed a proof of claim reflecting at least two proofs of claim in the Debtors' Chapter 11 cases. In addition, upon information and belief, the Debtors have listed Amsden as the holder of one or more unsecured claims on the Debtors' Schedules.

35. Defendant Stephen D. Carver ("Carver") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Carver received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Carver lives in Connecticut. Upon information and belief, the Debtors have listed Carver as the holder of one or more unsecured claims on the Debtors' Schedules.

36. Defendant Thomas S. Finke ("Finke") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Finke received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Finke lives in Illinois.

37. Defendant Robert Gremillion ("Gremillion") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Gremillion received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Gremillion lives in Illinois. Upon information and belief, the Debtors have listed Gremillion as the holder of one or more unsecured claims on the Debtors' Schedules.

38. Defendant David Dean Hiller ("Hiller") was the publisher of the Los Angeles Times and a member of the boards of directors of the McCormick Foundation and the Cantigny Foundation at the time of the LBO Transaction. Hiller is currently the President and CEO of the McCormick Foundation. Hiller was also a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Hiller received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Hiller lives in Illinois. Upon information and belief, the Debtors have listed Hiller as the holder of one or more unsecured claims on the Debtors' Schedules.

39. Defendant Timothy P. Knight ("Knight") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Knight received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Knight lives in New York. Upon information and belief, the

Debtors have listed Knight as the holder of one or more unsecured claims on the Debtors' Schedules.

40. Defendant Timothy Landon ("Landon") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Landon sold 45,981 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $1,563,354 in cash proceeds. Upon information and belief, Landon also received additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Landon lives in Illinois.

41. Defendant Richard H. Malone ("Malone") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Malone received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Malone lives in Illinois.

42. Defendant Durham J. Monsma ("Monsma") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Monsma lives in Connecticut. Upon information and belief, Monsma has filed at least one proof of claim in the Debtors' Chapter 11 cases.

43. Defendant Irving L. Quimby ("Quimby") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Quimby received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Quimby lives in Maryland.

44. Defendant John E. Reardon ("Reardon") was the President of Tribune Broadcasting Company, a subsidiary of Tribune, at the time of the LBO Transaction. Reardon

was also a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Reardon sold 63,837 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $2,170,458 in cash proceeds. Upon information and belief, Reardon also received additional monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Reardon lives in Illinois.

45. Defendant Scott C. Smith ("Smith") was the President of Tribune Publishing Company, a subsidiary of Tribune, at the time of the LBO Transaction. Smith was also a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Smith sold 225,271 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $7,659,214 in cash proceeds. Upon information and belief, Smith also received additional monetary special incentives in connection with consummation of the LBO Transaction. At the time of the LBO Transaction, Smith was also a member of the boards of directors of the McCormick Foundation and the Cantigny Foundation, and still holds those positions. Upon information and belief, Smith lives in Illinois. Upon information and belief, the Debtors have listed Smith as the holder of one or more unsecured claims on the Debtors' Schedules.

46. Defendant John J. Vitanovec ("Vitanovec") was the Executive Vice President of Tribune Broadcasting Company, a subsidiary of Tribune at the time of the LBO Transaction. Vitanovec was also a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Vitanovec received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and

belief, Vitanovec lives in Illinois. Upon information and belief, the Debtors have listed Vitanovec as the holder of one or more unsecured claims on the Debtors' Schedules.

47. Defendant Kathleen M. Waltz ("Waltz") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Waltz received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Waltz lives in Florida.

48. Defendant David D. Williams ("Williams") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Williams received monetary special incentives in connection with consummation of the LBO Transaction. Upon information and belief, Williams lives in Illinois. Upon information and belief, the Debtors have listed Williams as the holder of one or more unsecured claims on the Debtors' Schedules.

49. Defendant John D. Worthington, IV ("Worthington") was a director of one or more of the Subsidiary Guarantors at the time of the LBO Transaction. Upon information and belief, Worthington lives in Maryland.

50. The defendants named above in ¶¶ 34-49 (along with FitzSimons, Bigelow, Hianik, and Kenney) are collectively referred to herein as the "Subsidiary Defendants." All claims of the Subsidiary Defendants reflected on the Debtors' Schedules or any proofs of claim filed by, or on behalf of, any of the Subsidiary Defendants are collectively referred to herein as the "Subsidiary Creditor Claims."

51. Defendants Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts") are California trusts established for the benefit of the Chandler family. The

Chandler Trusts were at the time of the LBO Transaction among Tribune's largest shareholders. At the time of the LBO Transaction, the Chandler Trust Representatives represented the Chandler Trusts' interests on the Tribune Board. Upon information and belief, the Chandler Trusts sold 48,716,163 shares of Tribune stock in connection with the LBO Transaction, from which they received approximately $1,656,349,542 in cash proceeds.

52. Defendant Robert R. McCormick Foundation (the "McCormick Foundation") is a tax-exempt charitable foundation located in Illinois. At the time of the LBO Transaction, the McCormick Foundation was among Tribune's largest shareholders. The investment and voting power of the McCormick Foundation is vested in a board of five directors, all of whom are current or former Tribune executives, and included defendants FitzSimons, Hiller and Smith at the time of the LBO Transaction. Upon information and belief, the McCormick Foundation sold 28,023,788 shares of Tribune stock in connection with the LBO Transaction, from which it received approximately $952,808,792 in cash proceeds.

53. Defendant Cantigny Foundation is a tax-exempt charitable foundation located in Illinois. At the time of the LBO Transaction, the Cantigny Foundation held shares of Tribune. The investment and voting power of the Cantigny Foundation is vested in a board of five directors, all of whom are current or former Tribune executives, and included defendants FitzSimons, Hiller and Smith at the time of the LBO Transaction. The Cantigny Foundation is institutionally associated with the McCormick Foundation (together, the "Foundations"), and collectively the Foundations were at least the second largest shareholder of Tribune at the time of the LBO Transaction. Upon information and belief, the Cantigny Foundation sold 3,259,000

shares of Tribune stock in connection with the LBO Transaction, from which it received approximately $110,806,000 in cash proceeds.

54. The defendants named above in ¶¶ 51-53 are collectively referred to as the "Large Shareholders." The Large Shareholders held at least 33% of Tribune's stock immediately prior to the LBO Transaction.

55. Defendant Samuel Zell is a billionaire investor who is the controlling party of the entity that entered into an Agreement and Plan of Merger with Tribune on April 1, 2007. Zell was elected to Tribune's Board on May 9, 2007, before consummation of the LBO Transaction, and became the Chairman of the Board as well as Tribune's President and Chief Executive Officer in December 2007 upon completion of the deal. Upon information and belief, Zell sold 2,278 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $77,452 in cash proceeds. Upon information and belief, Zell lives in Illinois.

56. Defendant Equity Group Investments, L.L.C. ("EGI") is a private investment company located in Illinois. Defendant Zell holds a controlling interest in EGI and is its President and Chairman. Upon information and belief, EGI has filed at least one proof of claim in the Debtors' Chapter 11 cases.

57. Defendant EGI-TRB, L.L.C. ("EGI-TRB") is a Delaware limited liability company that was formed solely for the purpose of entering into and consummating the LBO Transaction. Defendant Zell is the founder and President of EGI-TRB. Upon information and belief, EGI-TRB is wholly owned by Sam Investment Trust, an Illinois trust established for the benefit of defendant Zell and his family. EGI-TRB has no board of directors or similar board of

managers. Upon information and belief, at all relevant times, there existed a unity of interest between Zell and EGI-TRB such that any individuality or separateness between Zell and EGI-TRB ceased, and EGI-TRB was Zell's alter ego. Upon information and belief, Zell controls EGI-TRB. Upon information and belief, EGI-TRB sold 1,470,588 shares of Tribune stock in connection with the LBO Transaction, from which it received approximately $50,000,000 in cash proceeds (the "EGI-TRB Cash Proceeds"). In or about December 2007 and in connection with the LBO Transaction, Tribune also repaid an unsecured subordinated exchangeable promissory note, dated April 23, 2007, that EGI-TRB had acquired from Tribune in the principal amount of $200 million (the "Exchangeable Note"). Tribune paid approximately $206,418,859 including interest to EGI-TRB on the Exchangeable Note (the "Exchangeable Note Transfer"). In addition, Tribune made payments to EGI-TRB for its legal fees and other expenses in connection with the LBO Transaction (the "EGI-TRB Fee Payments," together with the EGI-TRB Cash Proceeds and the Exchangeable Note Transfer, the "EGI-TRB Transfers"), in an amount to be determined at trial but approximately $5,000,000.

58. On December 20, 2007, EGI-TRB purchased from Tribune a $225 million subordinated promissory note due December 20, 2018 (the "Subordinated Note"). Pursuant to the subordination agreement dated as of December 20, 2007, entered into by EGI-TRB (the "Subordination Agreement"), the claims arising from the Subordinated Note, including principal and interest and all other obligations and liabilities of Tribune to EGI-TRB, are subordinate and junior to all obligations, indebtedness and other liabilities of Tribune with certain inapplicable exceptions. Following execution of the Subordination Agreement, EGI-TRB assigned minority interests in the Subordinated Note to certain assignees. Upon information and belief, EGI-TRB

has filed at least one proof of claim in the Debtors' Chapter 11 cases (the "EGI-TRB Proofs of Claim"). In addition, upon information and belief, the Debtors have listed EGI-TRB as the holder of one or more unsecured claims on the Debtors' Schedules. All claims of EGI-TRB reflected on the Debtors' Schedules or the EGI-TRB Proofs of Claim are collectively referred to herein as the "EGI-TRB Creditor Claims."

59. Defendant Sam Investment Trust is an Illinois trust established for the benefit of Zell and his family. Sam Investment Trust wholly owns defendant EGI-TRB.

60. The defendants named above in ¶¶ 55-59 are collectively referred to as the "Zell Defendants." All claims of the Zell Defendants (other than the EGI-TRB Creditor Claims) reflected on the Debtors' Schedules or any proofs of claim filed by, or on behalf of, any of the Zell Defendants (other than EGI-TRB) are collectively referred to herein as the "Zell Creditor Claims."

61. Upon information and belief, defendants Tower CH, L.L.C., Tower DC, L.L.C., Tower DL, L.L.C., Tower EH, L.L.C., Tower Greenspun DGSPT, LLC, Tower Greenspun JGGSTP, LLC, Tower Greenspun SGFFT, LLC, Tower Greenspun, L.LC., Tower HZ, L.L.C., Tower JB, L.L.C., Tower JK, L.L.C., Tower JP, L.L.C., Tower JS, L.L.C., Tower KS, L.L.C., Tower LL, L.L.C., Tower LM, L.L.C., Tower LZ, L.L.C., Tower MH, L.L.C., Tower MS, L.L.C., Tower MZ, L.L.C., Tower NL, L.L.C., Tower PH, L.L.C., Tower PT, L.L.C., Tower SF, L.L.C., Tower TT, L.L.C., Tower VC, L.L.C., and Tower WP, L.L.C. (collectively, the "Tower Defendants") are assignees of EGI-TRB's interests in the Subordinated Note. Upon information and belief, the Tower Defendants are affiliated or closely aligned with EGI and EGI-TRB. Upon information and belief, each of the Tower Defendants

has filed at least one proof of claim in the Debtors' Chapter 11 cases (the "Tower Proofs of Claim"). All claims of the Tower Defendants reflected on the Debtors' Schedules or the Tower Proofs of Claim are collectively referred to herein as the "Tower Creditor Claims."

62. Defendant GreatBanc Trust Company ("GreatBanc") was engaged by Tribune as trustee of its ESOP Trust in connection with the LBO Transaction. GreatBanc negotiated the terms of the ESOP's investment in the LBO Transaction, including the price to be paid by the ESOP for the shares of Tribune Common Stock to be purchased by the ESOP. On April 1, 2007, Tribune entered into the ESOP Purchase Agreement with GreatBanc (on behalf of the ESOP), pursuant to which Tribune sold 8,928,571 shares of Tribune Common Stock to the ESOP at a price of $28 per share

63. Defendant Duff & Phelps, LLC, was initially engaged by Tribune to provide a solvency opinion to Tribune in connection with either a spin-off of the Company's broadcasting operations or the LBO Transaction. Tribune and the Special Committee then engaged Duff & Phelps to explore Tribune's adoption of an ESOP and such ESOP's potential participation in the proposed LBO Transaction. Shortly thereafter, GreatBanc engaged Duff & Phelps as its financial advisor in connection with the LBO Transaction. Tribune and the ESOP agreed that if a solvency opinion was required, Duff & Phelps would render the solvency opinion directly to the ESOP, and the Tribune Board would be given the right to rely on the opinion. On March 29, 2007, Duff & Phelps delivered a preliminary report to GreatBanc, in which it reviewed the terms of the LBO Transaction and indicated that "in its opinion, on a post-transaction basis, taking into account the S corporation tax shield, the fair salable value of [Tribune's] assets is greater than its liabilities." Duff & Phelps cautioned, however, that it was

"able to issue its financing opinion because of the anticipated benefits of the S corporation tax shield. If those tax benefits [were] not considered, [Duff & Phelps] would be unable to render its opinion." The ESOP subsequently revised the terms of Duff & Phelps' engagement to provide for Duff & Phelps to deliver an opinion as to "the financial viability of [Tribune], as a going concern, and on a going-forward basis," following the close of the LBO Transactions. On April 1, 2007, as a condition to closing under the ESOP Purchase Agreement, Duff & Phelps delivered a fairness opinion to GreatBanc in which it stated, among other things, that the price of $28.00 per share to be paid by the ESOP for shares of Tribune's common stock was not greater than fair market value, and that the terms and conditions of the LBO Transaction were fair and reasonable to the ESOP from a financial point of view.

64. Defendant Valuation Research Corporation ("VRC") is a financial advisory firm that provides fairness and solvency opinions in support of transactions. VRC is headquartered in Wisconsin. Tribune retained VRC to provide solvency opinions, and VRC provided solvency opinions, in connection with the LBO Transaction. VRC received payments from Tribune for certain fees and expenses in connection with the LBO Transaction (the "VRC Transfers"), in an amount to be determined at trial but no less than $1,500,000.

65. Upon information and belief, defendant The DFA Investment Trust Company is a Delaware statutory trust that sold at least 1,291,158 shares of Tribune stock in connection with the LBO Transaction from which it received a minimum of $43,889,372 in cash proceeds.

66. Upon information and belief, defendant DFA Investment Dimensions Group, Inc. is a Maryland corporation that sold at least 73,351 shares of Tribune stock in connection with the LBO Transaction from which it received a minimum of $2,493,934 in cash proceeds.

67. Upon information and belief, defendant The AllianceBernstein Portfolios is a Massachusetts business trust that sold at least 22,825 shares of Tribune stock in connection with the LBO Transaction from which it received a minimum of $776,050 in cash proceeds.

68. Upon information and belief, defendant Frank W. Denius lives in Texas and sold 52,882 shares of Tribune stock in connection with the LBO Transaction from which he received $1,797,988 in cash proceeds.

69. Upon information and belief, defendant Donald M. Hinman Jr. lives in Illinois and sold 43,000 shares of Tribune stock in connection with the LBO Transaction from which he received approximately $1,462,000 in cash proceeds.

70. Upon information and belief, defendant Lewis Taman lives in Illinois and sold approximately 67,888 shares of Tribune stock in connection with the LBO Transaction from which he received $2,308,198.67 in cash proceeds.

71. Upon information and belief, defendant William F. Warchol lives in Illinois and sold 48,000 shares of Tribune stock in connection with the LBO Transaction from which he received $1,632,000 in cash proceeds.

72. Does 1-25 (the "Additional Parties") are persons and legal entities – including but not limited to consultants, advisors and/or other shareholders, directors and officers of Tribune and its subsidiaries and affiliates – who aided and abetted, benefited from, or otherwise participated directly or indirectly in the wrongful acts alleged in this complaint. The identities of the Additional Parties will be determined through discovery in this proceeding.

73. Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was engaged by the Company to act as a financial advisor to the Special Committee of the Tribune Board in

connection with the LBO. In addition, Morgan Stanley acted as a financial advisor to the Company in late 2008, immediately before the Petition Date. Morgan Stanley or one of its affiliates was also one of the lenders on the 2006 Bank Debt and the LBO Debt.

74. Defendant Morgan Stanley Capital Services, Inc. ("MSCS") is an affiliate of Morgan Stanley that entered into an interest rate swap with The Times Mirror Company, a predecessor of the Company, in 1994.

75. Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") acted as financial advisor to the Tribune Company in connection with the LBO (together with Merrill Lynch Capital Corporation, "Merrill Lynch") and served as one of the lead arrangers for the Senior Credit Facility and the Bridge Facility.

76. Defendant Citigroup Global Markets, Inc. ("CGMI") acted as financial advisor to the Company in connection with the LBO and served as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility.

## CLASS ALLEGATIONS

77. Pursuant to Rule 23(b)(1) & (b)(3) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7023 of the Federal Rules of Bankruptcy Procedure, the claims set forth in Count Thirteen of this Complaint are brought against the defendants named above in ¶¶ 65-71 (collectively, the "Shareholder Defendants") individually and as representatives of a defendant class of similarly situated persons and legal entities (the "Shareholder Class").

78. The Shareholder Class is comprised of all persons or legal entities who were the beneficial or legal owners of at least 35 shares of Tribune stock that were purchased,

repurchased, or redeemed by Tribune in connection with the LBO Transaction, and who therefore were the beneficial or legal recipients of in excess of $1,175 in payments by Tribune, excluding the D&O Defendants, the Subsidiary Defendants, the Large Shareholders, Zell, and EGI-TRB.

79. Tribune's total payments to the D&O Defendants, the Subsidiary Defendants, the Large Shareholders, Zell, EGI-TRB, the Shareholder Defendants, and the Shareholder Class in connection with the LBO Transaction for the purchase, repurchase, or redemption of the approximately 243,121,164 outstanding shares of Tribune stock exceeded $8 billion (the "Shareholder Transfers").

80. A list of the more than 3,000 members of the Shareholder Class that have been identified by the Committee to date is incorporated herein by reference and attached hereto as Exhibit A. Upon information and belief, the Shareholder Class is comprised of thousands of additional members. Accordingly, the Shareholder Class is so numerous that joinder of all of its members is impracticable.

81. There are questions of law and fact common to the Shareholder Class, which predominate over any issues that may involve individual members of the Shareholder Class, including without limitation:

(a) Whether Tribune, by and through its officers and directors acting individually and collectively, made the Shareholder Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors;

(b) Whether Tribune received less than reasonably equivalent value in exchange for the Shareholder Transfers;

(c) Whether Tribune was insolvent at the time of the Shareholder Transfers or became insolvent as a result of the Shareholder Transfers;

(d) Whether, at the time of the Shareholder Transfers, Tribune was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and

(e) Whether, at the time of the Shareholder Transfers, Tribune intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

82. Any possible defenses of the Shareholder Defendants are typical of those of the Shareholder Class.

83. If the Committee obtains a judgment in its favor on the claims set forth in Count Thirteen herein, the Shareholder Transfers will be avoided and the amounts paid will be recovered from the Shareholder Class. The Shareholder Defendants collectively face a risk of loss of a minimum of $54,359,542.67 on those claims. The Shareholder Defendants will fairly and adequately protect the interests of the entire Shareholder Class.

84. The prosecution of separate actions against the individual members of the Shareholder Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Shareholder Class that would establish incompatible standards of conduct, and/or (b) adjudications with respect to individual members of the Shareholder Class that, as a practical matter, would be dispositive of the interests of the other members not parties

to the individual adjudications or would substantially impair or impede their ability to protect their interests.

85. A defendant class action is superior to other available methods for fairly and efficiently adjudicating this controversy because, inter alia, it avoids a multiplicity of individual adjudications with respect to the many thousands of individual members of the Shareholder Class, thereby conserving the resources of the Debtors' estates and of the Court.

## FACTUAL BACKGROUND

### I. Corporate Structure

86. Founded in 1847, Tribune is America's largest employee-owned media and entertainment company, reaching more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings. Headquartered in Chicago, Illinois, Tribune's operations are conducted through two primary business segments: (i) publishing, and (ii) broadcasting and entertainment. Tribune's publishing segment owns major newspapers in many of the most significant markets in the United States, including the Chicago Tribune, the Los Angeles Times, the Baltimore Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, and the Hartford Courant. Tribune's broadcasting and entertainment segment owns numerous radio and television stations in major markets.

87. As of the date Tribune initiated its bankruptcy cases, the publishing segment employed approximately 12,000 full-time equivalent employees, and the broadcasting and entertainment segment employed an additional 2,600 full-time equivalent employees.

## II. Tribune's Financial Condition Deteriorated And The Large Shareholders Began Agitating For Change

### (A) The Chandler Trusts

88. In June 2000, Tribune merged with the Times Mirror Company, which was owned by the Chandler family. As a result of this merger, the Chandler family became Tribune's second largest shareholder and was awarded three seats on Tribune's Board. Until June 2007, defendants Chandler, Goodan and Stinehart represented the Chandler family interests on the Board.

89. Shortly after the June 2000 merger with the Times Mirror Company, Tribune began experiencing financial difficulties and a steady decline in its stock price.

90. Beginning in late 2005, the Company's Board undertook a strategic review of the broadcasting and entertainment sector of the Company's business and considered possible changes to the structure and ownership of its properties. The Company retained the services of Merrill on or about October 17, 2005, to assist in this evaluation and approved in advance Merrill Lynch's participation in financial transactions that might develop from the strategic review. The Company later retained CGMI to assist in the evaluation as well and provided to CGMI the same advance approval to participate in financial transactions resulting from the review. Pursuant to their advisory engagements with the Company, both Merrill and CGMI stood to reap millions of dollars in fees, which would increase if the Company entered into a transaction at the recommendation of Merrill and CGMI.

91. In or about February 2006, the Chandler Trusts began to complain about Tribune's performance and criticize the Board. The Chandler Trusts admonished the Board

that, absent some progress with respect to performance of Tribune's stock price, the Chandler Trusts would themselves begin exploring a "fundamental transaction" involving Tribune.

92. In May 2006, the Board, with the advice of Merrill and CGMI, decided to engage in a leveraged recapitalization transaction pursuant to which it would borrow money to repurchase up to 75 million shares of its common stock. The Chandler Trusts' three representatives on the Board voted against the transaction. The Company nonetheless elected to proceed with the repurchase of 55 million shares for a total of nearly $1.8 billion through a public tender offer and a private transaction with the Robert R. McCormick Tribune Foundation and the Cantigny Foundation (the "Foundations") (the "2006 Repurchase"). As a result of the share repurchases, the Chandler Trusts would become the Company's largest stockholders. The Foundations would continue to be major shareholders.

93. In a publicly filed letter to the Tribune Board on June 13, 2006, which was signed by defendant Stinehart – who was himself a member of the Board – the Chandler Trusts advised the Board that they would not participate in the 2006 Repurchase because it would not accomplish their objectives. The Chandler Trusts complained that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different." The Chandler Trusts explained that the "[t]he gravity of management's failure to address fundamental strategic issues is apparent from the precipitous decline in stock value over the past three and a half years. . . . [S]ince the beginning of 2003 (when current management of Tribune was put into place), the value of Tribune's stock has declined over 38% – substantially worse than both the newspaper peer group (down 8.8%)

and the broadcasting peer group (down 29%)." The Chandler Trusts added that "it is the time for prompt, comprehensive action."

94. In their letter, the Chandler Trusts pointedly reminded the Board that "the Trusts are the largest investor in the Company, and, more than any other shareholder, it is in their interest to see that either current value is maximized or a value enhancing strategic repositioning occurs." To that end, the Chandler Trusts demanded that the Board "promptly appoint a committee of independent directors to oversee a thorough review of the issues facing Tribune and to take prompt decisive action to enhance stockholder value." The Chandler Trusts concluded by stating that "[w]e are prepared to work directly and cooperatively with such a committee to further our common objective of maximizing value." They also threatened, however, "to begin actively purs[uing] possible changes in Tribune's management and other transactions to enhance value realized by all Tribune stockholders" if timely action were not taken by the Board.

95. On June 27, 2006, Tribune announced that through the 2006 Repurchase it had repurchased a total of 55 million shares at a cost of nearly $1.8 billion in debt. Defendant FitzSimons reported that "[t]his leveraged recapitalization represents a very meaningful step in our plan to enhance value for shareholders." As a result of the 2006 Repurchase and the Chandler Trusts' decision not to tender any shares, the Chandler Trusts replaced the Foundations as Tribune's largest stockholder and increased their percentage ownership in Tribune to approximately 20%. The Foundations collectively remained Tribune's second largest shareholder, with approximately 13% of the Company's shares.

96. Notwithstanding FitzSimons' public statement, the 2006 Repurchase was undersubscribed and failed to raise Tribune's stock price. Prior to the 2006 Repurchase, Tribune was well positioned to manage its relatively modest level of debt. Indeed, Tribune's $8 billion in assets provided a healthy cushion over its $2 billion in debt. However, as a result of the 2006 Repurchase, Tribune's debt nearly doubled. Shortly after the 2006 Repurchase was announced, Moody's Investors Service cut Tribune's bond rating to "junk" status due to the amount of debt that would be incurred in connection with the 2006 Repurchase.

97. As a result of the failure of the 2006 Repurchase, the Chandler Trusts stepped up their efforts to effect change at Tribune that would maximize the value of the Chandler Trusts' own investment in the Company. An agenda of "talking points" prepared by the Chandler Trusts on or about July 17, 2006 for the next Tribune Board meeting underscores the Chandler Trusts' extreme dissatisfaction with the Company's state of affairs and their preoccupation with their own interests: "The Chandler Trusts have seen almost 40% of the value of their Tribune holdings evaporate into thin air. We believe action must be taken to recover as much as possible of this loss, for the Trusts and for all Tribune stockholders. That is the overriding priority of the Trusts." The Chandler Trusts, through Board member Stinehart as their spokesperson, planned to demand that the Board promptly respond to the 40% decline in stock value by appointing a strategy committee to recommend ways to maximize shareholder value. The Chandler Trusts made clear that they expected that Tribune would take expedited action. The agenda states that "[t]he Trusts want the company to take steps to maximize the value to all stockholders in a short timeframe. As Tribune is not a growth company, time is not on our side. Consequently, we have a real sense of urgency about action."

98. In light of the Chandler Trusts' publicly expressed discontent and their increasing pressure on the Board, in September 2006 the Board announced that it had established the Special Committee to oversee management's exploration of alternatives. Defendants Hernandez, Holden, Morrison, Osborn, Reyes, Taft, and White were named to the Special Committee.

99. On October 2, 2006, Stinehart again wrote to Tribune's Board on behalf of the Chandler Trusts regarding the Special Committee: "We appreciate Bill Osborn's call to [me] last week . . . . We believe such collaboration is important to assure that the Chandler Trusts will be in a position to support the conclusions of the special committee. This is especially important since several of the alternatives under consideration would likely require a vote of the stockholders and possibly other affirmative action by the [Chandler] Trusts." Stinehart advised the Board that the Chandler Trust Representatives would agree not to participate in the Special Committee "provided that they are assured full and bona fide cooperation and regular communication between the special committee and its advisors and the Chandler Trusts and their advisors. This must include, at a minimum, the opportunity to discuss with the special committee and its advisors important issues . . . in order that the views of the Chandler Trusts may be considered by the special committee as it proceeds."

100. Through their public outcries and insistent demands that the Board act urgently to maximize the value of their Tribune stock holdings, the Chandler Trusts set in motion the process that, within months, would lead to consideration and approval of the calamitous LBO Transaction.

101. In or around October 2006, the Company retained Morgan Stanley to act as the financial advisor to the Special Committee. The Company agreed to, and did, pay Morgan Stanley $10 million in fees for serving in that role.

102. Although Morgan Stanley was the Special Committee's financial advisor, it was Merrill and CGMI that solicited third parties to express interest in a buyout of the Company. By October 2006, 17 potential outside purchasers had expressed interest in the Company. Merrill and CGMI acted as advisors to the Company in evaluating these proposals. However, Merrill and CGMI each had an inherent conflict of interest. If any of the transactions went forward, Merrill and CGMI were highly likely to participate in financing the transactions and stood to make tens of millions of dollars in fees from such financing. If no transactions took place, they would still receive millions of dollars in advisory fees, but much less than the financing fees associated with a large transaction. Merrill and CGMI thus had a strong financial incentive to advise the Company to agree to a substantial sale or recapitalization even if doing so was not in the best interest of the Company. Both Merrill and CGMI were in fact strong advocates for the LBO.

**(B) <u>The Foundations</u>**

103. At the beginning of 2007, dominant shareholder pressure on the Board intensified when Tribune's second largest shareholder group, the McCormick and Cantigny Foundations – affiliated entities that share the same board members, all of whom are current or former Tribune executives as mandated by the Foundations' incorporation documents – also began advocating for change that would serve their own interests.

104. On or about January 4, 2007, the Foundations announced that they had retained Blackstone Group L.P. ("Blackstone") to advise them in connection with their investment in Tribune. At the time, Blackstone was working on a separate multi-billion dollar deal with Zell, who would soon set his sights on acquiring control of Tribune.

105. As the Chandler Trusts had done, the Foundations also wasted no time in making their position – and clout – clear to the Company's leadership. On or about January 10, 2007, the McCormick Foundation, in a thinly veiled threat, pointed out to the Special Committee that without the support of the Large Shareholders, who collectively owned 33% of Tribune, it would be "difficult to do a transaction." That same day, the Foundations' motivation and will to exert their substantial influence over Tribune's future – and their intent to consolidate their influence with that of the Chandler Trusts – was laid bare in an internal e-mail among the McCormick Foundation's advisors. That e-mail stated that the Special Committee needed to "know[] very specifically what the goals and objectives of 33 percent of the owners [are] . . . . The independence of the special committee of the board has been important up till now. But it is time for everyone to declare their intentions."

106. A few days later, the McCormick Foundation's advisors discussed an internal "strategy call" that was scheduled for January 15. The advisors reiterated that "it is important to make the Foundations' interest and objectives known at the very least to the special committee of the board and Dennis [FitzSimons] . . . . [We] also feel, to the degree possible, that management should be aware of [the McCormick Foundation's] perspective and that they are in support of the position(s) we take."

107. In furtherance of the objective to amass and then exert the combined clout of the Large Shareholders, on January 22, 2007, the Chandler Trusts reached out to the Foundations and advised them that the Chandler Trusts "thought it would be a good idea to have the two largest stockholders of the Tribune talk with each other" regarding Tribune's future direction. There was no doubt that the Large Shareholders recognized from the beginning of the process through which the Company's future would be decided that, by virtue of their positions, they were able to exert enormous influence over the Board. Acting upon and exploiting this reality, the Large Shareholders decided to act together to force the Board to meet their needs. From the outset, the Large Shareholders made it crystal clear that the Board needed their support to achieve any transaction, and that management was to support the "interest and objectives" of the Large Shareholders. Accordingly, the Large Shareholders functioned in practice as Tribune's controlling shareholders with respect to any substantial transaction, with the capacity to block or preclude transactions that they deemed adverse to their own interests.

108. Indeed, the Large Shareholders did not sit back idly and let management and the Special Committee pursue options at their own discretion. Rather, the Large Shareholders interjected themselves at every step of the decision-making process. Minutes from Special Committee meetings in early 2007 reveal that the Special Committee spent significant time reporting on and discussing conversations with the Foundations and the Chandler Trusts as well as reviewing letters received from the Large Shareholders. The Large Shareholders' advisors were also engaged in direct discussions with Tribune's management. For example, on or about January 30, 2007, Blackstone met with Tribune at its offices to discuss "possible paths." This meeting prompted the reproach from one of Tribune's financial advisors that "[t]here are some

fairly well defined rules in this process including contacts with Tribune[;] would appreciate you sticking to those [rules] as other potential bidders are."

## III. Zell Masterminded The LBO Transaction

109. In late January 2007, billionaire investor Zell emerged as a potential bidder for Tribune. On information and belief, Zell reached out to the Large Shareholders prior to making a proposal to Tribune. Blackstone was retained by the Foundations at about the same time that Blackstone was bidding for – and ultimately succeeded in acquiring – a Zell company. On February 7, 2007, one day after Zell sent his initial proposal to the Board, the Chicago Tribune reported that he had spoken with the McCormick Foundation about his interest in structuring a proposal for Tribune. The article recognized that Zell would need the McCormick Foundation's support to make any deal work. Zell similarly reached out to the Chandler Trusts regarding his proposed deal. The minutes of the February 12, 2007 Special Committee meeting reveal that the Special Committee discussed a letter addressed to it from the Chandler Trusts concerning their meetings with Zell representatives in connection with Zell's proposal.

110. Prior to Zell's emergence on the scene, the Board had been considering transactional alternatives to placate the Large Shareholders, including a possible sale of the entire Company, or select assets, to an investor and a self-help plan or internal recapitalization. Zell proposed a wholly new option. On or about February 6, 2007, Zell wrote to the Board and proposed to acquire Tribune using a leveraged ESOP structure, an arrangement typically used by much smaller companies. Under Zell's go-private proposal, Tribune would borrow over $12 billion to buy out its public shareholders and become wholly owned by a newly formed ESOP. Under the ESOP plan, Zell's company, defendant EGI, would invest $225 million (eventually

increased to $315 million) in exchange for warrants entitling EGI to buy up to 40% of Tribune. Zell's financial engineering would allow him to acquire *de facto* control over Tribune – in a deal valued at almost $8.3 billion – by putting up only $315 million of his company's money.

111. Thus, defendants Zell and EGI masterminded what ultimately became the ruinous LBO Transaction. Zell and EGI designed the transaction's key features, including the use of a highly-leveraged ESOP as the takeover vehicle, and enticed the Board to approve it. The unique ESOP structure was Zell's brainchild. On or about February 3, 2007, Tribune's financial advisor asked EGI whether the Zell team would consider a "straight investment in the company . . . without the esop [sic] structure." EGI responded that Zell's representatives were "opposed to a straight investment and that the tax structure [provided by the ESOP] is the only thing that made [the deal] financially attractive for us." Defendant FitzSimons also later acknowledged Zell's instrumental role in proposing and crafting the LBO Transaction by stating that "[i]t was Sam's creativity, personal commitment and investment that made this transaction possible."

112. As EGI acknowledged, the ESOP arrangement would provide Zell with distinct tax advantages. Those tax benefits, however, did not rest exclusively with Zell. The Large Shareholders and D&O Defendants stood to reap windfalls of millions of dollars through the deferral of capital gains on the sale of their Tribune stock. Indeed, in a research report published on March 30, 2007, a Wachovia Securities analyst inferred that the deal was being structured as an ESOP precisely to capture those tax gains: "We think this benefit [i.e., the potential to defer capital gains] could be one of the reasons that the company has been favoring

the Zell bid, as the Chandler[] [Trusts], the McCormick [Foundation], and management could all potentially benefit from this."

113. Those potential financial benefits were not lost upon the D&O Defendants – virtually all of whom owned Tribune stock. The same day that the Wachovia report was published, defendant Musil forwarded a summary of it spelling out those tax advantages to defendants Bigelow, Smith, FitzSimons, Grenesko, Kenney, Landon, Leach, Lewin, and Reardon. Zell's plan to employ the ESOP vehicle as a means of seizing control of Tribune at little cost to himself therefore had the additional benefit of advancing the financial interests and incentives of Tribune's Board and management.

## IV. The Large Shareholders And Chandler Trust Representatives Were At All Times Intimately Involved In Facilitating The LBO Transaction

114. At all relevant times, the Large Shareholders were kept abreast of the essential details of Zell's proposed LBO Transaction. As stated above, in early February 2007, both the Chandler Trusts and the McCormick Foundation met with Zell and/or his representatives in connection with his proposal. Moreover, the Special Committee specifically sought out the views of the Large Shareholders with respect to Zell's proposal. On March 1, 2007, the McCormick Foundation wrote to the Special Committee to weigh in on the Zell proposal in response to Tribune's request.

115. The Large Shareholders' intimate familiarity with the status and evolution of the LBO Transaction continued throughout the course of the transaction. On February 28, 2007, Tribune's financial advisors sent the Large Shareholders information and documents related to Zell's proposal. On March 7, 2007, Tribune's financial advisors advised the McCormick Foundation that the structure of the Zell proposal had changed somewhat and disclosed the

details of the revised proposal. On March 10, 2007, FitzSimons and Kenney were advised by Tribune's financial advisors that the "Chandler[] [Trusts] and the Foundation [were] looking for [an] update." On March 25, 2007, Tribune's financial advisors sent the McCormick Foundation a summary of the transaction steps of the Zell proposal. On March 27, 2007, the McCormick Foundation was provided with the latest drafts of the principal deal documents related to the LBO Transaction that reflected Tribune's most recent markups.

116. Thus, throughout the process, the Large Shareholders were aware of the key terms of the deal, were kept informed of the ongoing negotiations on a real-time basis, and exerted significant – indeed, dispositive – influence over the direction the Company could and would take.

117. As already noted, starting as early as mid-2006 the Chandler Trust Representatives were key players in forging the process that facilitated the LBO Transaction. As representatives of Tribune's largest shareholders, they were intent on persuading their fellow Tribune Board members that a prompt return of cash to shareholders was the optimal strategic option. Of course, that up-front cash payout to shareholders would provide the greatest benefit to the Chandler Trusts whose interests the Chandler Trust Representatives promoted. The Large Shareholders and their representatives on the Tribune Board were thus bent on dictating an expeditious cash-out transaction, without regard for the destructive consequences to the Company and its creditors from an overly leveraged deal.

## V. <u>Zell Induced The D&O Defendants To Enter Into The LBO Transaction</u>

118. The official decision-makers at Tribune, the D&O Defendants, held stock in Tribune and stood to collect cash proceeds of hundreds of thousands of dollars – and, in some

cases, tens of millions of dollars – from their stock sales resulting from the LBO Transaction. As described above, Zell's ESOP structure would also ramp up the value of those cash proceeds by allowing the deferral of capital gains taxes on the stock sales. The Officer Defendants, however, wanted more, and, anxious to get their deal done, Zell and EGI complied. In connection with the LBO Transaction, the Board and Zell agreed that certain corporate insiders, including CEO FitzSimons and the other Officer Defendants, would receive millions of dollars in special incentives for closing the deal.

119. Zell and his representatives were heavily involved in negotiating and structuring those special financial benefits from the outset. On February 16, 2007, at EGI/Zell's apparent instruction, counsel for the Zell team prepared a "Summary Term Sheet" that set forth preliminary details of a management equity incentive plan (the "Incentive Plan"). This plan would provide to key members of Tribune's management phantom shares (share equivalents with a future economic value tantamount to actual common stock) with an economic value equal to a percentage of Tribune's outstanding capital stock (eventually set at 5%). On February 19, 2007, EGI forwarded the Summary Term Sheet to, among others, Grenesko and Kenney at Tribune, copying Zell on the communication. This Summary Term Sheet was then forwarded on to FitzSimons and Bigelow, two of Tribune's key executives helping to facilitate the deal. On February 27, 2007, a top EGI executive authored a note regarding "deal points," which included using a 5% stock option plan for management as leverage for Tribune management's verification that $100 million in cash savings could be effected through the deal. It was clear that from the outset EGI/Zell used the lure of financial incentives to entice Tribune's management to support the LBO Transaction.

120. Not surprisingly; management actively pursued the Incentive Plan. On March 16, 2007, Bigelow instructed Tribune's financial advisors to make several changes to the "Zell model," including to increase the change of control payments by $20 million for possible transitional compensation because Tribune management was considering having the "$37 million for 'management deal fees' rolling in the deal as phantom equity." On March 26, 2007, Kazan e-mailed Bigelow regarding the "management equity plan," and noted that Osborne, Chair of the Special Committee, "was supposed to talk to Zell today." The next day, Kazan sent another e-mail to Bigelow to advise him that negotiations with Zell over the management equity pool were ongoing and that management was pushing for a 10% pool, rather than the 5% pool reflected in the original term sheet. Kazan concluded that because grants under the new plan would likely be in the form of "phantom stock," there "will be cash distributions down the road."

121. These financial incentive negotiations ultimately yielded substantial benefits to Tribune's management. At a meeting held on April 1, 2007, the Board approved "special incentive awards" to recognize the performance of top management in negotiating the LBO Transaction. These awards included both a cash award component and phantom stock that would be distributed to management in connection with consummation of the LBO Transaction.

122. Under the Incentive Plan, select executives who played critical roles in the LBO Transaction received phantom stock with cash equivalent awards worth millions of dollars. This phantom stock allowed management to reap the economic benefits of ownership without holding actual ownership for tax purposes. Moreover, the managers who received the phantom

stock were allowed to cash in the stock before ordinary employees could withdraw money from the ESOP.

123. The plan provided that two tranches of phantom stock were to be awarded upon consummation of the merger. The first tranche of awards included phantom stock with an economic value equal to 5% of Tribune's common stock. Under the plan, awards under the 5% pool would vest ratably over a 3-year period beginning on the date of grant and, subject to a redeferral election, would be payable in cash on the fifth anniversary of the grant date. The second tranche of awards included shares of phantom stock with an economic value equal to 3% of Tribune's common stock. Fifty percent of the second tranche awards would be fully vested upon the grant – i.e., upon consummation of the merger – and the remaining half would vest on the one-year anniversary of the grant date.

124. The pools of phantom stock were awarded to members of Tribune's management who played critical roles ensuring consummation of the LBO Transaction. Upon information and belief, several defendants benefited from this plan, including defendant FitzSimons, who received nearly $3 million in phantom stock, and defendant Smith, who received over $2 million in phantom stock. Each of defendants Bigelow, Grenesko, Hiller, Kazan, Kenney, Knight, Amsden, Gremillion, Landon, Leach, Reardon, Vitanovec, and Waltz also received phantom stock immediately upon close of the LBO Transaction.

125. The Board also approved $6.5 million (later reduced to approximately $5 million) in cash "success bonuses" to be paid out to executives and employees of Tribune and/or its subsidiaries who played "a critical role in overseeing the completion of the transaction." Upon information and belief, under this plan, cash awards were made to several defendants

upon consummation of the LBO Transaction, including Kenney ($600,000), Bigelow ($400,000), Grenesko ($400,000), Leach ($400,000), Landon ($300,000), Reardon ($200,000), Amsden ($150,000), Mallory ($75,000), Lewin ($50,000), and Musil ($50,000). Defendants Kazan, Vitanovec, Gremillion, Knight, and Waltz also received such awards.

126. The D&O Defendants, Zell, and EGI were also aware that these newly adopted "special incentive awards" and "success bonuses" were not the only financial incentives pushing the D&O Defendants and Subsidiary Defendants toward approving and facilitating the LBO Transaction. For example, the consummation of the LBO Transaction would (and did) activate the premature vesting of millions of dollars in restricted stock units and stock options through an incentive compensation plan. Upon information and belief, several of the defendants directly benefited from these payments, including FitzSimons ($6,869,559), Grenesko ($2,699,026), Smith ($2,665,784), Reardon ($2,005,265), Lewin ($1,300,699), Bigelow ($880,645), Amsden ($717,323), Hianik ($634,019), and other D&O Defendants.

127. Upon information and belief, certain of the D&O Defendants and Subsidiary Defendants received additional non-salary payments and transfers from Tribune at or after consummation of the LBO Transaction (together with the payments and transfers described at ¶¶ 118-26, the "D&O Transfers").

128. Upon information and belief, Zell and EGI communicated to certain of the D&O Defendants that they would be rewarded with a future role at Tribune if they helped facilitate the LBO Transaction. For example, upon information and belief, Zell and/or his subordinates at EGI signaled to Bigelow that, in the event that the LBO Transaction were to

close, Bigelow would eventually be promoted to Chief Financial Officer of Tribune. Bigelow indeed was promoted to Chief Financial Officer of Tribune in or around March 2008.

129. By structuring or agreeing to these financial incentives, which constituted benefits to management in addition to and different from those received by other shareholders, Zell enticed the Officer Defendants to approve, facilitate and recommend the LBO Transaction. In a memorandum outlining the benefits that the McCormick Foundation's board members were expected to receive upon consummation of the LBO Transaction, the McCormick Foundation's counsel acknowledged that "[a]s officers of the Company, Messrs. FitzSimons, Hiller and Smith will receive certain benefits, in addition to the benefits they receive as holders of Company common stock." This memorandum explicitly recognized that the special incentive awards were "conditioned upon the consummation of the Merger."

130. At the same time that they dangled lucrative financial incentives in front of the D&O Defendants, Zell and EGI sought to gain advantage by pressuring others who they believed could facilitate – or were seen as hampering – their deal. For example, on or about March 27, 2007, Zell "made some contact at a senior level" at Moody's in an effort to obtain a favorable debt rating for the prospective LBO Transaction. On March 29, 2007, Zell called Houlihan Lokey Howard & Zukin ("Houlihan"), a solvency opinion firm that had decided not to bid for the engagement to deliver a solvency opinion for Tribune, and demanded an explanation for why Houlihan was "holding up his deal." Finally, on or about March 30, 2007, EGI advised Bigelow that it had "made some progress with our friendly bankers" in connection with obtaining a favorable financing package for the LBO Transaction.

131. The D&O Defendants succumbed both to continuing pressure from the Large Shareholders to complete a transaction and to the allure of the "cash-out" benefits and special incentives offered by Zell. (As noted above at ¶ 12, defendant FitzSimons – simultaneously the CEO of Tribune, Chairman of Tribune's Board, Chairman of the McCormick Foundation, and a director of the Cantigny Foundation – alone received benefits and incentives of approximately $41 million in connection with the LBO Transaction.) At a Special Committee meeting held on March 30, FitzSimons reported that it was "management's recommendation that the Company proceed with Mr. Zell's proposal." Constrained and hemmed in by the objectives and preferences pressed by the Large Shareholders, the Special Committee recommended that the full Board approve the LBO Transaction. The D&O Defendants thus cast their support for a highly leveraged and hazardous deal designed to promptly cash out the Large Shareholders at the expense of Tribune's corporate interests and future health.

## VI. The Company's Financial Advisors Were Conflicted.

132. The Company's financial advisors, Merrill and CGMI, advised the Company with respect to Zell's proposal. Their inherent conflict of interest as advisors and potential lenders crystallized as the Zell proposal moved forward. At the same time Merrill and CGMI were advising the Company on Zell's proposal, they were already negotiating for themselves or their affiliates to provide financing for the LBO Transaction from which they would receive millions of dollars in fees and interest at premium rates far higher than the 2006 Bank Debt. Because Zell's proposal called for refinancing the 2006 Bank Debt, Merrill and CGMI also stood to benefit, to the extent that they participated in the 2006 Bank Debt, from increased interest rates and improved security in the form of subsidiary guarantees. They were thus

inherently biased in favor of the LBO Transaction without regard to whether it was in the Company's interests.

133. The Company purportedly recognized its advisors' conflicts and sought to mitigate them through the Company's retention of Morgan Stanley to advise the Special Committee on the transaction. But Morgan Stanley also suffered from a conflict of interest. It was a documentation agent and one of the lenders on the 2006 Bank Debt. At the time Morgan Stanley was advising the Special Committee on the LBO Transaction, it knew that the 2006 Bank Debt would be refinanced as part of the LBO Transaction at higher interest rates and would obtain priority over the Non-Bank Debt. Moreover, Morgan Stanley's engagement letter provided for a discretionary success fee in addition to its fixed fee. Morgan Stanley later aggressively sought such a discretionary fee, although the Company declined to pay it. Like Merrill and CGMI, Morgan Stanley therefore stood to gain substantially more if the LBO proceeded than if no transaction were consummated.

134. On March 10, 2007, the Company informed Zell that it was reconsidering whether to proceed with his LBO proposal because, among other things, of the high degree of leverage under that proposal. Thereafter, the Company discussed with the Chandler Trusts and the Foundations the possibility of pursuing a recapitalization and spin-off transaction with a lower per share dividend to reduce the leverage required for that transaction.

135. The pause in the Company's interest in the Zell LBO transaction was brief. After the other remaining third-party bidder failed to develop a satisfactory competing proposal, and notwithstanding concerns about the leverage contemplated by the Zell LBO proposal, the Board, acting with advice from Merrill, CGMI and Morgan Stanley (through its

recommendations to the Special Committee), approved the LBO proposed by Zell at a final price of $34 per share at a meeting on April 1, 2007.

## VII. Structure Of The LBO Transaction

136. On Sunday evening, April 1, 2007, following management's endorsement and the Special Committee's recommendation, the Director Defendants (other than Taft who was absent and the Chandler Trust Representatives who abstained from voting) agreed to Zell's proposal and entered into a merger agreement that contemplated that the LBO would proceed in a two-step transaction. In step one, Tribune agreed to purchase approximately 50% of the Company's outstanding shares (126,000,000 shares) in a tender offer for $34.00 per share ("Step One"). Tribune would incur approximately $7.015 billion in debt to achieve Step One. At step two, Tribune committed to purchase its remaining outstanding shares for $34.00 per share in the go-private merger following certain regulatory and shareholder approvals ("Step Two"). Tribune would incur approximately $4 billion in additional debt to complete Step Two.[2]

---

[2] The following Tribune subsidiaries (the "Subsidiary Guarantors") guaranteed the full indebtedness incurred in connection with the LBO Transaction: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Chicago National League Ball Club, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; http://forsalebyowner.com/ corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; The Hartford Courant Company; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; The Morning Call, Inc.; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings,

(Cont'd on following page)

137. The Subsidiary Defendants approved guarantees on behalf of the Subsidiary Guarantors that guaranteed the obligations incurred in connection with the LBO Transaction. Upon information and belief, there were no separate board meetings for any of the individual Subsidiary Guarantors to consider the matter, and all actions relating to the Guarantees were approved on unanimous consent.

138. The April 1, 2007 Board minutes reflect that, although the Chandler Trust Representatives abstained from the Board vote on the proposed LBO Transaction, the Chandler Trusts had already agreed to vote in favor of the merger at the upcoming special shareholders' meeting. By entering into a voting agreement that guaranteed sale of their stock, the Chandler Trusts effectively ensured that the LBO Transaction received the green light to proceed and would secure shareholder approval. Therefore, the Chandler Trust Representatives' longstanding advocacy had successfully garnered for the Large Shareholders the benefits of a full and prompt cash out from a struggling company.

139. On April 2, 2007, Tribune publicly announced that it had agreed to the Zell proposal. Tribune's press release had the following headline: "Tribune to Go Private for $34 Per Share; Employee Stock Ownership Plan (ESOP) Created; Sam Zell to Invest, Join Board; Chicago Cubs and Comcast SportsNet Interest to be Sold," and stated in relevant part:

> With the completion of its strategic review process, Tribune Company today announced a transaction which will result in the company going private and Tribune shareholders receiving $34 per share. Sam Zell is supporting the transaction with a $315 million investment. Shareholders will receive their consideration in a two-stage transaction.

---

(Cont'd from preceding page)

Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WTXX Inc.

> Upon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan ('ESOP') holding all of Tribune's then-outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40 percent of Tribune's common stock. Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.
>
> The first stage of the transaction was a cash tender offer for approximately 126 million shares at $34 per share. The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell . . . .
>
> The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share. Zell will make an additional investment of $65 million in connection with the merger, bringing his investment in Tribune to $315 million.

140. Upon the Board's April 1, 2007 approval, the agreements between the parties to the LBO Transaction required Tribune to proceed towards closing both steps of the transaction. At all relevant times, Tribune did so proceed.

141. The primary structural mechanism used to execute the LBO Transaction was to create a private S-corporation entity wholly owned by the Tribune ESOP so as to generate tax benefits. Those benefits could only be realized upon consummation of Step Two of the transaction. EGI confirmed the central importance of the S-Corp/ESOP structure to the LBO Transaction, stating that "the tax structure is the only thing that made [the ESOP] financially attractive for us." The LBO Transaction made economic sense only if Step Two closed and the anticipated tax savings resulting from the predicate ESOP structure could be realized.

142. On April 5, 2007, Tribune publicly disclosed that Zell would effectively have power to veto major transactions, even though he was only a minority shareholder. Under the terms of the deal, transactions with a value of more than $250 million, among others, would require the approval of the Board, which would include two directors of Zell's choice. Such transactions, along with any changes to the Company's by-laws, would require approval of a

majority of the Board's independent directors as well as that of one of Zell's Board appointees. On May 9, 2007, Zell was appointed a member of the Board, before even Step One of the LBO Transaction had been consummated.

143. Accordingly, although the LBO Transaction contained a fiduciary "out" that granted the Board limited discretion to abandon the Zell deal if a superior offer surfaced by paying a break-up fee to Zell, the Board did not consider or pursue any alternatives to the Zell deal after approving the LBO Transaction in April 2007.

144. The commitment letters that were executed at Step One committed Merrill Lynch Capital Corporation ("MLCC"), CGMI and JPMorgan Chase Bank N.A. (the "Lenders") to provide the requisite financing for the entire transaction. On March 28, 2007, Bigelow instructed that a draft press release should state that "Tribune has received committed financing from Citigroup, Merrill Lynch and JPMorgan sufficient to complete both steps of the transaction."

145. As already noted, and as widely acknowledged by the parties involved, shareholder approval for the LBO Transaction was effectively secured from its inception. The voting agreement with the Chandler Trusts virtually guaranteed shareholder approval. After Tribune shares were tendered during Step One, close to 50% of the remaining outstanding shares were held by the Large Shareholders and those directly under Zell's control. Accordingly, only a trivial percentage of the holders of the remaining shares needed to vote in favor of the merger for shareholder approval to be secured. As consistently recognized by Tribune management, obtaining shareholder approval was never a significant hurdle. On March 24, 2007, after being asked by an S&P analyst what would happen if all of the shares

contemplated for tender in the Step One tender offer were not actually tendered, Bigelow responded that "a smaller first step tender . . . would simply make the second step larger . . . ." Bigelow added that "[w]e would have all of the voting agreements in place, merger agreement signed and would fully expected [sic] to close the deal." In fact, approximately 90% of Tribune's outstanding shares were tendered into the first stage of the tender offer.

146. The parties also believed that FCC approval, another condition of consummation of the deal, would be obtained because the LBO Transaction entailed no new combination of assets, and therefore the merger merely involved the renewal of existing cross-ownership waivers. As recognized by rating agencies and news analysts, FCC approval in these circumstances was expected. On May 3, 2007, for example, Fitch Ratings reported its view that the necessary regulatory approvals associated with Step Two would be obtained. Upon information and belief, in June 2007 Zell accompanied FitzSimons to Washington, D.C., and lobbied congressional leaders in order to facilitate FCC approval.

## VIII. The D&O Defendants Turned A Blind Eye To The Foreseeable And Unavoidable Disastrous Consequences Of The LBO Transaction

147. In response to the considerable pressure for a quick payday exerted by the Large Shareholders and/or enticed by the personal financial benefits that the deal would provide them, the D&O Defendants agreed to and facilitated the LBO Transaction even though they knew, were reckless in not knowing, or reasonably should have known that it would bury the Company under a crushing mountain of debt. Already beset by deteriorating financial performance in a declining industry, Tribune was pushed by the LBO Transaction into insolvency and, within a year, bankruptcy. Having turned a blind eye to the foreseeable consequences of the LBO Transaction in effecting Step One, the D&O Defendants remained, at minimum, willfully blind in guiding the toxic deal to closure.

148. As made clear by contemporaneous reports and ratings downgrades, the consequences of the LBO Transaction were not lost upon professional analysts or rating agencies. The generally unfavorable reaction to the LBO Transaction came swiftly.

149. On April 3, 2007 – one day after the deal was announced – a Goldman Sachs analyst reported that "with estimated annual interest expense of over $1bn/yr and estimated EBITDA of $1.3bn, the transaction leaves little room for error, particularly in this challenging newspaper operating environment." The analyst pointed out that the high leverage from the deal left Tribune in a "precarious financial position."

150. In an April 4, 2007 article entitled "How Will Tribune Pay Its Debts?" the Wall Street Journal quoted a Barclays Capital analyst as stating: "We think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."

151. A Lehman Brothers analyst reported on April 26, 2007 that the "[p]roposed deal leaves TRB with debt-to-2007E-EBITDA of 11.5x . . . which we believe is far too high for secularly declining businesses. . . . Debt payments should overwhelm EBITDA, by our calculations."

152. On March 16, 2007, that same Lehman Brothers analyst warned that "putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy with or without the added tax savings from the ESOP financing."

153. Standard & Poor's ("S&P") had a similar prediction and sent a letter to Bigelow on March 29, 2007 stating that it would downgrade Tribune's credit rating and, further, that "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."

154. On August 14, 2007, the Lehman Brothers analyst once again warned that "[i]f the privatization deal does end up going through [as a result of Step Two], we continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% – given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs. . . . So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year." The analyst's cautionary warnings, of course, proved accurate.

155. Moreover, Tribune's debt was consistently and continuously downgraded by ratings agencies from the time the deal was announced on April 1, 2007 until the Chapter 11 filing in December 2008.

156. For example, upon announcement of the merger agreement in April 2007, Fitch downgraded Tribune's bond ratings. Citing the increased debt Tribune planned to take on by virtue of the LBO Transaction, Fitch expressed its belief that the deal would be "detrimental to bondholders." Fitch accordingly maintained a negative outlook on the Company. Also upon the announcement of Tribune's plan to move forward with the LBO Transaction, S&P downgraded Tribune's corporate credit rating from BB+ to BB-, and Moody's placed Tribune on "negative watch" for both its corporate family rating and probability of default ratings, indicating a high probability of a future downgrade.

157. On April 19, 2007, S&P downgraded Tribune's credit rating on its unsecured notes to CCC+ indicating a high default risk. S&P reported that "given the amount of priority debt ahead of these notes, we will assign them a recovery rating of '5' upon the close of the proposed bank transaction, indicating the expectation for negligible (0% - 25%) recovery of principal in the event of a payment default."

158. On April 23, 2007, Moody's lowered Tribune's corporate family and probability of default ratings to Ba3 from Ba1, citing the "significant increase in leverage" that would result from Tribune's plan to repurchase $4.2 billion in common stock through Step One of the LBO Transaction. Moody's maintained a negative watch for both ratings.

159. On May 3, 2007, Fitch announced that Tribune's ratings would remain on "rating watch negative." The downgrading reflected the "significant debt burden the announced

transaction places on the company's balance sheet while its revenue and cash flow have been declining," especially in light of "meaningful secular headwinds that could lead to more cash flow volatility in the future." Fitch believed that "these factors could impair the company's ability to service its debt, particularly if coupled with a cyclical downturn."

160. On August 20, 2007, S&P lowered Tribune's corporate credit rating one notch to B+ from BB- and the bank loan rating to BB from BB+. The negative outlook "reflect[ed] deterioration in expected operating performance and cash flow generation compared to previous expectations."

161. Finally, upon consummation of the LBO Transaction on December 20, 2007, Fitch lowered the Company's issuer default rating from B+ to B- in light of the Company's "significant debt burden" and declining cash flows. Fitch also noted that the Company's estimated fixed-charge coverage ratio left "very little room to endure a cyclical downturn."

162. At all relevant times, the D&O Defendants confronted this harsh – and worsening – economic reality and either knew, were reckless in not knowing, or should have foreseen that the prospective LBO Transaction would render Tribune insolvent. For example, on February 21, 2007, Kazan e-mailed Bigelow regarding concerns about Tribune's financial health: "If I'm reading this correctly, our plan has us being $47 million below 2006 for the first half. I don't know what the bankers will base their threshold number on, but it suggests we really need to get to the bottom of that. Otherwise, we are already half-way towards not being able to meet the covenant (which enables us to do the spin)."

163. Indeed, Tribune's management had already been advised that a deal with the level of leverage contemplated by the LBO Transaction would be imprudent. On January 22,

2007, Bigelow told Grenesko that one of the bankers had advised Bigelow that a similar competing bid had "too much leverage and that a self help route would be more prudent." Moreover, in a March 10, 2007 e-mail, counsel for the McCormick Foundation reported that "[t]he Company has apparently concluded that they are not comfortable in . . . the leverage in the Zell proposal. . . ."

164. On March 24, 2007, only a week before the LBO Transaction was announced, a Tribune employee wrote to Bigelow after reviewing financial projections: "[I]f I am reading this right, we have a pretty narrow band for success under the ESOP – i.e., if we are off plan by 2% we have no value in the ESOP for 5 years." Bigelow responded and confirmed: "yes, if we hit the down 2 case there is no equity value in the first 5 yrs."

165. Therefore, Tribune's management orchestrating the LBO Transaction understood that the Company essentially would be rendered insolvent by actual performance a mere 2% below the financial projections that buttressed the deal. On March 25, 2007, Tribune management learned that both revenue and operating cash flow for the Company's publishing business for the first quarter of 2007 were, in fact, 2% below plan. Thus, when the LBO Transaction was announced on April 1, 2007, Tribune's management was well aware that the Company was already underperforming its own projections by more than 2%, a gap that only widened with time.

166. In light of this deteriorating financial performance, the Lenders became concerned about their ability to syndicate the more than $4 billion in additional debt associated with Step Two of the LBO Transaction. Upon information and belief, Zell and EGI took steps to reassure the Lenders that the LBO Transaction remained sound and that Tribune was

somehow still solvent, meeting with representatives of the Lenders on several occasions. For example, on December 19, 2007, in the final days before consummation of Step Two, Zell spoke with James Lee of JPMorgan Chase Bank N.A. and, upon information and belief, assured Mr. Lee that Tribune was and would remain solvent.

## IX. Tribune Retained A Solvency Opinion Firm To Provide Custom-Made Opinions

167. The D&O Defendants recognized that one of the conditions for consummation of the LBO Transaction – the Company's ability to secure viable solvency opinions in connection with both Step One and Step Two of the transaction – could jeopardize the transaction. The D&O Defendants took steps to ensure that Tribune would obtain the confirmation of solvency that would allow the deal to proceed, but in so doing they secured deeply flawed solvency analyses.

168. Finding a solvency opinion firm to provide the requisite opinions turned out to be no easy task. VRC, a financial advisory firm that provides fairness and solvency opinions in support of transactions, became the last-ditch choice for Tribune after other solvency opinion firms declined the engagement to provide the requested solvency opinions. Prior to approaching VRC, Tribune first approached Houlihan, a prominent solvency opinion firm. Houlihan expressed internal reservations regarding the solvency work associated with the proposed LBO Transaction and declined to accept the engagement. A Houlihan witness has testified that he believed it would have been difficult for Houlihan to find Tribune solvent based on the preliminary information to which Houlihan had access at the time.

169. On March 29, 2007, Houlihan informed Tribune that it would not bid for the engagement to deliver a solvency opinion for Tribune. Houlihan's decision caused Tribune to

scramble to find another firm to provide the opinions. On March 30, 2007, Bigelow e-mailed VRC and stated that he "would very much like to speak with someone about solvency opinion work," and requested that VRC respond to him that very day. Later that same day, Bigelow provided preliminary information to VRC. Internal VRC e-mails reveal that VRC reviewed the proposed deal and acknowledged that it looked "quite leveraged" and that, consequently, VRC would "need to be compensated" accordingly.

170. VRC was aware of Houlihan's reservations about the proposed LBO Transaction prior to accepting the Tribune engagement and recognized that the reluctance expressed by Houlihan raised the risk profile associated with the project. Due to the risk attached to the highly leveraged deal and Houlihan's disinclination to get involved in the high-profile Tribune solvency engagement, VRC was able to demand and obtain a high fee for its solvency opinions. Tribune's fee to VRC was among the highest fees VRC had ever received for solvency opinion work. In exchange for that risk-justified high fee, VRC provided the Board with written opinions, dated May 9, 2007 and May 24, 2007, as to the solvency and capital adequacy of Tribune after giving effect to Step One as of those dates. VRC also provided a solvency opinion, dated December 20, 2007, in connection with consummation of Step Two of the transaction.

**(A) VRC Uncritically Employed Outdated, Unreasonable And Unwarranted Financial Projections In Its Solvency Analyses**

171. The D&O Defendants took steps to ensure that Tribune obtained favorable solvency opinions in connection with both Step One and Step Two of the LBO Transaction by providing VRC with skewed financial projections, upon which VRC unjustifiably relied.

172. VRC's Step One solvency analysis was based on Tribune's financial projections finalized by management and approved by the Board in February 2007 (the "February Projections"). The February Projections were substantially higher than Tribune's actual operating results. For example, Tribune's actual publishing revenues for March 2007 were 4.3% below those in the February Projections. Similarly, actual publishing revenues for April and May were, respectively, 4.9% and 8.6% below plan. Tribune's broadcasting revenues over the three-month period fared little better. For March 2007, actual broadcasting revenue was 3.0% below plan. In May, broadcasting revenues were 6.4% below the projections. In the aggregate, for the three months of March through May, publishing revenues were $55 million below those in the February Projections, and broadcasting revenues were $9 million below plan.

173. Tribune managers facilitating the LBO Transaction were fully aware that the February Projections were outdated and unreliable almost immediately after they were finalized and approved. Tribune received weekly "flash reports" that showed the February Projections to be stale soon after dissemination. Despite this awareness, Tribune management persistently declined to revise and update the February Projections until long after Step One – predicated on VRC's two accompanying solvency opinions based on those flawed projections – had closed.

174. For example, on March 5, 2007, Tribune's financial advisor asked Kazan if the Company wanted to revisit the projections as a result of recent data. Kazan responded that

he was inclined to keep the projections "as is for now." Further, on March 20, 2007, an EGI executive disclosed to the EGI team that "Chandler [Bigelow] indicated on [March] 9th that management needed to sit down and refine their projections for 2007." On March 21, 2007, Bigelow told Tribune's financial advisors that "I am working on whether our full-year projections will change and let you know in the morning, but I suspect that for the full-year we are probably about $25M lower than our original plan." Also on March 21, Tribune circulated a document showing actual results for January and February compared to the plan. Kazan stated to Bigelow that they needed to discuss the results with Grenesko before including them in a rating agency presentation or showing them to EGI, as "[t]his is tricky b/c we've told Nils [Larsen of EGI] that we aren?t [sic] changing our plan based on the results from the first two periods."

175. Notwithstanding management's acknowledgements that Tribune's actual performance results were meaningfully lagging the February Projections, those projections were not updated before VRC's Step One solvency opinions were issued. Indeed, Tribune failed to provide any updated financial projections to VRC until late September 2007.

176. Tribune's financial projections were finally updated by management and presented, in part, to the Board in October 2007 (the "October Projections"). The October Projections were, to some degree and in the near-term, downwardly revised. However, despite the continued deterioration of Tribune's performance after Step One of the LBO Transaction closed, certain key forecasts in the October Projections were dramatically revised upward from the February Projections.

177. For example, the October Projections assumed that, as early as 2009, Tribune's Interactive (i.e., Internet-based) business would begin to generate significantly greater revenues than anticipated by the February Projections and thereby mitigate the ongoing decline in Tribune's traditional publishing business. This assumption was unwarranted, particularly because the Interactive business had performed at more than 4% below expectations in 2007. Even Tim Landon, the former head of Tribune's Interactive business, admitted under oath that this assumption underlying management's October Projections was illogical: "I'm disappointed in these numbers. It's not what I would have expected. These are the only numbers that I've looked at today that I don't feel good about. The other ones were ok, even though they might've turned out wrong. But I don't believe in the logic behind this."

178. Moreover, the October Projections forecast that, beginning in 2013 and accelerating through 2017, Tribune's revenue would significantly outperform the February Projections on a consolidated basis. Specifically, the October Projections anticipated an improved 2.4% revenue growth rate in the 2012 presidential election year and — without any good faith basis or justification — assumed that this 2.4% growth spurt would be duplicated in 2013 through 2017. In other words, the October Projections improperly assumed that each of the five years following the 2012 presidential election year would also enjoy the benefit of a growth bump occasioned by an election year.

179. As a result of the foregoing, the October Projections were unreliable. Nonetheless, VRC uncritically relied on those October Projections when preparing its Step Two solvency opinion. For example, by adopting the unjustifiable "election year" growth rate assumptions for 2013-2017 from the October Projections, VRC's valuation at Step Two was

upwardly revised by approximately $613 million. VRC's reliance on and wholesale adoption of management's October Projections was unreasonable, and ignored the more pessimistic (and realistic) forecast that VRC had prepared internally.

### (B) Tribune Instructed VRC To Employ Unsound Methodologies In Its Solvency Opinions

180. The D&O Defendants prevailed upon VRC to use a series of improper methodologies when preparing its solvency opinions in connection with Step One and Step Two of the LBO Transaction. While each of these (and other) flaws rendered VRC's analysis unreliable, the sum of them certainly did. A solvency analysis free from these biased assumptions would have concluded that the LBO Transaction would render Tribune insolvent. Yet, enticed by the high fees that only a conclusion of solvency would yield, VRC produced the solvency opinions that allowed the LBO Transaction to proceed to completion.

#### (i) At Tribune's Direction, VRC Artificially Separated The Two Steps for Purposes of Its Step One Solvency Analysis

181. As outlined above, the legal and economic reality of the LBO Transaction required that the total debt incurred through the transaction be considered in any solvency analysis conducted as of Step One. The LBO Transaction was – from beginning to end of the process – conceived of and promoted, first to Tribune and then to the public, as a single, integrated transaction for which financing was fully committed.

182. Had the full debt obligations from the entire LBO Transaction been considered in the Step One solvency analysis, it would have been apparent that Tribune would be rendered insolvent, as early as the closing of Step One. VRC's Step One solvency opinions

circumvented this conclusion by employing erroneous assumptions and relying on the outdated and unreasonable February Projections.

183. As an outcome-driven measure to ensure closing of the deal, Tribune executives instructed VRC to exclude consideration of the Step Two debt from its Step One solvency analysis. As a result, in part, of following Tribune's instructions, VRC issued distorted opinions that wrongly portrayed Tribune as solvent.

184. VRC itself realized that the aggregate amount of debt at both steps of the transaction should be considered in its Step One solvency analysis. Draft VRC solvency opinions related to the Step One solvency analysis assume consolidation of the aggregate debt related to both steps of the LBO Transaction.

185. A VRC witness has testified that VRC initially believed that it should consider both Step One and Step Two debt as part of its Step One solvency analysis. That changed, however, when Tribune revised VRC's draft solvency opinion and instructed VRC to consider only Step One debt for purposes of its May solvency opinions. Despite expressing internal reservations about Tribune's defective approach, VRC complied with Tribune's instruction so as not to jeopardize the high engagement fee it had bargained for in connection with a transaction that VRC viewed as risky.

**(ii) VRC's Step One Solvency Analysis <u>Ignored The Proper Definition of "Fair Market Value"</u>**

186. In addition to indulging Tribune's improper instruction to neglect approximately $4 billion of transactional debt in its Step One analysis, VRC included several other fundamental defects in its analysis that permitted it to opine in favor of solvency.

187. VRC departed from the standard definition of "fair market value" – i.e., what a willing buyer and a willing seller would agree to in a fair exchange – and instead utilized an idiosyncratic definition peculiar to the LBO Transaction. VRC agreed to opine on Tribune's solvency assuming that the "fair market" buyer would be structured to receive the same favorable tax treatment as the ESOP utilized for the LBO Transaction – that is, another ESOP. VRC had never worked on another solvency opinion that contained such a modification to the standard definition of "fair market value" so as to facilitate consideration of the anomalous ESOP S-corporation tax savings. Had the standard "fair market value" definition been used, VRC would not have been able to deliver the solvency opinions that Tribune needed.

188. Among other flaws or skewed assumptions, including those related to its comparable company analysis and terminal multiples, VRC also changed how it weighted the discounted cash flow ("DCF") valuation methodology in its overall analysis. The DCF valuation approach yielded a value for Tribune that was significantly lower than that obtained through other valuation methods. Several drafts of VRC's Step One solvency analysis weighted the DCF method more heavily than the other valuation methodologies. At the same time, VRC initially gave relatively little weight to the "comparable transactions" method, which yielded a much higher valuation figure. However, in its final Step One solvency analysis, VRC reduced the weight given to the low DCF valuation and increased the weight given to the high comparable transactions value, thereby increasing Tribune's overall valuation figure. This shift in VRC's methodological weighting also tipped the balance in favor of finding Tribune solvent at Step One.

**(iii) VRC's Step Two Solvency Analysis Adopted <u>Management's Unrealistic October 2007 Projections</u>**

189. Faced with the even more daunting task of delivering a solvency opinion in connection with Step Two of the LBO Transaction – which would saddle Tribune with billions of dollars of additional debt in a deteriorating financial environment – VRC resorted to employing even more dubious methods of analysis.

190. As alleged above, Tribune management's October Projections unreasonably assumed that the 2.4% revenue growth rate forecast for the 2012 presidential election year would be duplicated in each of the following five years. VRC's solvency analysis incorporated management's "election year" assumption by extending the time period over which VRC calculated the discounted present value of projected cash flows from five years (as in VRC's Step One solvency analysis) to ten years. Tribune provided VRC with a specific, separate representation letter, signed by Grenesko and dated December 20, 2007, which purported to justify this change in methodology. As a result of this change, VRC's valuation at Step Two was upwardly revised by approximately $613 million.

191. Moreover, VRC's Step Two solvency analysis carried over many of the same flaws and skewed assumptions from VRC's Step One solvency analysis, including VRC's novel and unjustified definition of "fair market value" and the improper equal weighting that VRC assigned to its different valuation methodologies.

**(C) Tribune Misrepresented To VRC That An Outside <u>Financial Advisor Agreed With Certain Of Tribune's Assumptions</u>**

192. VRC's opinion letter committee established certain prerequisites that needed to be satisfied before VRC could issue a solvency opinion in connection with Step Two of the LBO Transaction. Among other requirements, VRC needed to obtain an adequate representation from Tribune that it would have the capability to refinance approximately $8

billion of debt arising from the LBO Transaction that would otherwise come due in 2014 and 2015. Accordingly, Tribune's ability to refinance this massive debt was essential to VRC's solvency analysis and its willingness to issue a solvency opinion in connection with Step Two.

193. On or about December 1, 2007, Mose Rucker, a VRC Managing Director, placed a telephone call to Bigelow, then Tribune's Treasurer, and advised that any representation from Tribune as to the reasonableness of assuming that Tribune would have the ability to refinance its debt should indicate that an outside financial advisor to Tribune agreed with any such assumption.

194. On or about December 2, 2007, certain of the D&O Defendants, including Bigelow, Grenesko, and Kenney, placed a telephone call to Bryan Browning, a VRC Senior Vice President and Professional Services Manager. During that conversation, Bigelow and/or Grenesko stated that Morgan Stanley, financial advisor to the Special Committee, had agreed that Tribune could refinance its debt in 2014 even in a "downside" scenario. Upon information and belief, however, Morgan Stanley had never definitively represented that it agreed with management's refinancing assumptions.

195. After Step One of the LBO Transaction, the two outside financial advisors that had previously been retained to advise Tribune withdrew from advising the Company with respect to Step Two. Accordingly, neither of those two outside financial advisors evaluated the reasonableness of VRC's Step Two solvency opinion or any of the representations and projections of Tribune's management upon which VRC relied in connection therewith.

196. Nonetheless, a Tribune representation letter to VRC, signed by Grenesko and dated December 20, 2007, stated in part: "Based upon (i) management's best understanding of

the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for VRC to assume that Tribune . . . would be able to refinance." VRC's Step Two solvency opinion relied on that representation letter, expressly citing management's purported discussions with Morgan Stanley regarding the Company's ability to refinance its debt when it came due.

## X. The Tribune Board And Special Committee Failed To Satisfy Their Duties With Respect To VRC's Solvency Opinions

197. After Tribune management procured a series of fundamentally flawed solvency opinions from an all too cooperative and uncritical VRC, the members of the Tribune Board and Special Committee had a duty to evaluate those solvency opinions critically. The Director Defendants utterly failed to satisfy their responsibilities. As noted above, the outside financial advisors that had previously been retained to advise Tribune withdrew from advising the Company with respect to Step Two of the LBO Transaction. Thus, the Director Defendants took up the critical question of whether the consummation of Step Two would render Tribune insolvent without formally retaining an outside advisor for the Board to evaluate management's projections or VRC's work.

198. The facts and circumstances known or ascertainable by the Director Defendants made it imperative that they carefully evaluate the Step Two solvency opinion delivered by VRC. They knew, were reckless in not knowing, or reasonably should have known that: (i) Tribune's financial performance had deteriorated appreciably after Step One and that the closing of Step Two would subject Tribune to more than $4 billion in additional debt; (ii) management's February Projections had missed the mark only shortly after they were issued; (iii) members of senior management were to receive significant additional compensation if Step

Two closed and might be looking for continued employment under the auspices of the new owners; (iv) VRC was relying on management's projections as a critical underpinning of its solvency opinion; (v) VRC had agreed to use a definition of "fair market value" that was contrary to long-established principles of sound valuation and that directly affected VRC's solvency conclusions at Step Two; and (vi) market indicia were strongly suggesting that, in the event Tribune was somehow not already insolvent, the additional Step Two debt would render it insolvent. All of these circumstances served, or should have served, as red flags to the Director Defendants. They completely failed to heed those red flags.

199. On December 18, 2007, Tribune's Special Committee, entrusted to monitor the LBO Transaction, met to consider VRC's Step Two solvency opinion for the first and only time. Upon information and belief, that meeting lasted no more than fifteen minutes. The Special Committee failed even to approve or finalize any minutes from that meeting.

200. Although representatives of Morgan Stanley apparently participated in the December 18, 2007 meeting of Tribune's Special Committee, Morgan Stanley did not present a comprehensive evaluation of VRC's Step Two solvency opinion. Moreover, neither Morgan Stanley nor any other financial advisor presented any evaluation of Tribune's October Projections, the good faith and reasonableness of which were a foundation of VRC's Step Two solvency analysis.

201. Later that day, and despite the inadequate consideration given by Tribune's Special Committee to evaluating VRC's Step Two solvency opinion, the Tribune Board quickly reconvened and decided that it could rely on that opinion.

202. Subsequently, the Subsidiary Defendants, by written unanimous consents dated as of December 20, 2007, authorized certain guarantees that were necessary for Step Two to close, without holding even a single meeting to consider the execution of the guarantees or the effect they would have on the solvency of the Subsidiary Guarantors.

## XI. Morgan Stanley [redacted]

[redacted]

[redacted]

206. [redacted] Notably, Morgan Stanley representatives were present at a meeting of the Company's Board of Directors on the same day, October 17, 2007, [redacted]

207. Morgan Stanley representatives were also present at several other meetings of the Company's Board between October 17 and December 18, 2007, when they attended a meeting of the Special Committee of the Board. [redacted]

208. [redacted] By May 2007, Morgan Stanley had already been paid the full $10 million due it under its engagement agreement for work relating to the LBO. It was owed no further payments for work it performed on the LBO after that date, although its engagement letter did provide for a possible discretionary fee. Obtaining the additional discretionary payment was the principal way for Morgan Stanley to receive additional compensation for its work on the LBO. [redacted]

[redacted] In December 2007, Morgan Stanley in fact aggressively sought a discretionary fee from the Company, but the Company ultimately declined Morgan Stanley's request.

209. On December 12, 2007, Mr. Bigelow forwarded to Morgan Stanley an e-mail containing certain follow-up questions from the lead banks financing the LBO. Those questions included the following:

> Reference is made to VRC's answer to Question 18 in the Response in which VRC indicates that it is relying, in part, on a representation from Tribune which states that based upon recent discussions with Morgan Stanley, the Company would be able to refinance debt in its downside forecasts without the need for additional assets sales. Did VRC meet with someone from Morgan Stanley and does VRC know whether Morgan Stanley understands that Tribune is relying upon its view?

210. Morgan Stanley thus had notice that the Company was relying on Morgan Stanley in representing to VRC that the Company would be able to refinance the LBO Debt. Morgan Stanley now takes the position that it never told the Company's management that Morgan Stanley believed, or concurred with any belief by management, that Tribune would be able to refinance the LBO Debt. But Morgan Stanley did not tell the Board or the Special Committee prior to the closing of Step Two that management's or VRC's reliance on Morgan Stanley was misplaced. Instead, Morgan Stanley remained silent on this issue with the Board and the Special Committee. Morgan Stanley had the same incentive not to upset an important basis for VRC's Step Two solvency opinion as it did with respect to [redacted]: disclosure could jeopardize the LBO and thus Morgan Stanley's ability to obtain a discretionary fee payment from the Company.

## XII. The LBO Transaction Closed <u>And Tribune Collapsed From Its Massive Debt Burden</u>

211. After the Director Defendants gave their blessing to VRC's Step Two solvency opinion, the final step remaining for the consummation of the LBO Transaction was the delivery of certificates representing that Tribune was supposedly solvent. On December 20, 2007, Defendants Bigelow and Grenesko delivered the required solvency certificates on behalf of Tribune, thereby consummating the closing of the LBO Transaction.

212. As designed, the LBO Transaction cashed out Tribune's Large Shareholders at the expense of Tribune and its other stakeholders. Tribune's total funded debt rose from under $4 billion to nearly $13 billion. This staggering debt load brought the once venerable Company to its knees in under one year.

213. Deterioration caused by the massive debt burden followed in rapid fashion after the LBO Transaction closed in December 2007. On July 14, 2008, for example, the Associated Press reported that the Los Angeles Times planned to cut 250 positions. The report explained that "[l]ast December, Tribune bought out its public shareholders in an $8.2 billion deal orchestrated by real estate mogul Sam Zell. Now, he and the Tribune are struggling to service that debt." None of Tribune's cost-cutting measures, however, could forestall the inevitable.

214. On December 8, 2008 (the "Petition Date"), Tribune filed voluntary petitions for relief under the Bankruptcy Code. As of the Petition Date, Tribune owed approximately $13 billion in total funded debt.

## XII. <u>Morgan Stanley's Insider Trading</u>.

215. On December 19, 1994, Morgan Stanley Capital Services, Inc. ("MSCS"), an affiliate of Morgan Stanley, and The Times Mirror Company, a predecessor to the Company, entered into an interest rate swap in respect of a $100 million notional amount. The swap was memorialized in an ISDA Master Agreement, dated as of August 5, 1994, and a Confirmation to such agreement, dated December 19, 1994 (collectively, the "Swap Agreement").

216. The Swap Agreement obligated MSCS to make certain payments to Tribune calculated using a fixed rate of interest in return for payments by Tribune to MSCS calculated using a floating rate of interest. If Tribune declared bankruptcy, that was an "Event of Default" under the Swap Agreement that permitted MSCS to select an "Early Termination Date." On the Early Termination Date, the Swap Agreement provided for a calculation of the amount due from MSCS to the Company in respect of the future fixed rate payments MSCS was obligated to make to the Company under the Swap Agreement. In certain circumstances, MSCS was permitted to reduce its final payment to the Company by amounts that the Company owed MSCS or its affiliates.

217. The Swap Agreement afforded Morgan Stanley and MSCS the opportunity, if they believed there was a substantial risk that the Company would file for bankruptcy, to make substantial financial gains by purchasing the Company's publicly traded debt at a discount to its face value. MSCS could then seek to set off the full face value of Tribune public debt – which it had acquired at a deep discount – against the amount it owed Tribune in the event of a bankruptcy.

218. On April 11 and 15, 2008 Morgan Stanley purchased a total of $18,865,000 face value of Tribune 7.5% Debentures for $7,840,000 – less than 42% of face value. On April

21, 2008, Morgan Stanley transferred these debentures to MSCS. At the time of these purchases, Morgan Stanley was in possession of material non-public information relating to the likelihood that the Company would have to file for bankruptcy, information that Morgan Stanley obtained in its capacity as the Company's and Special Committee's financial advisor in 2007. Morgan Stanley also advised the Company on a transaction in mid-2008.

219. On or about November 10, 2008, the Company engaged Morgan Stanley to provide financial advisory services relating to a possible bankruptcy filing by the Company. The Company provided Morgan Stanley, in its capacity as professional financial advisor, with confidential financial information relating to the Company and its consideration of a bankruptcy filing in the near term.

220. On November 20, 2008 Morgan Stanley purchased $5,000,000 in face amount of Tribune 7.5% Debentures for $601,041. Morgan Stanley transferred these debentures to MSCS on the same day.

221. On November 26, 2008, Morgan Stanley purchased $5,000,000 in face amount of Tribune 7.5% Debentures for $644,795 – less than 13% of face value. On approximately March 20, 2009 – after the commencement of Tribune's chapter 11 case – Morgan Stanley transferred these debentures to MSCS.

222. At the times it purchased Tribune 7.5% Debentures on November 20 and 26, 2008, Morgan Stanley was in possession of material non-public information concerning the Company's active planning for a bankruptcy filing in the very near term, information that Morgan Stanley obtained in its capacity as financial advisor to the Company.

223. Because Morgan Stanley had material confidential information from Tribune on this issue, it could and did decide to buy the Debentures with confidence that it would profit as a result.

224. At the December 1, 2008 meeting of Tribune's Board of Directors, the Board terminated Morgan Stanley's engagement as financial advisor to Tribune.

225. Tribune's bankruptcy filing on December 8, 2008, was an Event of Default under the Swap Agreement, and MSCS designated December 9, 2008 as the Early Termination Date for the interest rate swap under the Swap Agreement.

226. By letter dated December 18, 2008, MSCS informed Tribune that it had set off $38,365,000 in principal amount of Tribune 7.5% Debentures (this amount includes some $9,500,000 in principal amount of debentures that Morgan Stanley acquired before it was a financial advisor to the Company), plus accrued interest and expenses, against the $50,433,470 MSCS had determined, as the non-defaulting party under the Swap Agreement, was owing by MSCS to Tribune. MSCS asserted that such setoff was permitted pursuant to the Bankruptcy Code's "safe harbors."

227. By letter dated March 20, 2009, MSCS advised that the correct amount owing to Tribune under the Swap Agreement was $51,945,000 (the "Termination Amount"), and that the prior figure was the result of a calculation error. MSCS again informed Tribune that it had set off $38,365,000 in principal amount of Tribune 7.5% Debentures (plus accrued interest and expenses) against the Termination Amount. By reason of its improper purchase of Tribune 7.5% Debentures while in possession of material non-public information from the Company, Morgan Stanley deprived the Company of nearly $29,000,000 (plus accrued interest

and expenses) in payments that it would otherwise have received under the Swap Agreement, and thereby damaged the Company in that amount.

228. MSCS has filed a proof of claim in the Tribune's chapter 11 case in the principal amount of $38,365,000 (the "MSCS Claim"). Among other claims, the MSCS Claim asserts a protective claim of not less than $41,074,528.00 in the event that MSCS's setoff is successfully challenged.

**COUNT ONE**
**(Breach Of Fiduciary Duty Against The D&O Defendants)**

229. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-228 as though fully set forth herein.

230. As directors and officers of Tribune, the D&O Defendants owed Tribune fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or placed in the zone of insolvency as a result of the LBO Transaction, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full. Upon information and belief, most or all of the D&O Defendants owned shares in Tribune prior to and after approval of the LBO Transaction. Indeed, most of the D&O Defendants received cash proceeds of at least several hundred thousand dollars from the sale of their stock in connection with the LBO Transaction, and many of the them received several million dollars from their stock sales. In addition, the Officer Defendants collectively received millions of dollars in special incentives for completing the LBO Transaction above and beyond benefits received by other shareholders. Due to these direct financial benefits, the D&O Defendants were interested in, or lacked independence with respect to, the LBO Transaction.

231. The LBO Transaction favored Tribune's Board of Directors, officers and Large Shareholders at the expense of Tribune and its other stakeholders. Under the circumstances, the D&O Defendants acted in their own interests, and/or in the interests of the Large Shareholders and Zell Defendants, in approving and/or facilitating the LBO Transaction even though they knew or were reckless in not knowing that it would result in harm to Tribune. At a minimum, the D&O Defendants were willfully blind to the foreseeable disastrous consequences of the LBO Transaction, and acted grossly negligently and/or recklessly in approving and/or facilitating a transaction that in short order would result in disaster for the Company.

232. The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty, by, among other things:

(a) agreeing to, approving and/or facilitating the imprudent and highly leveraged LBO Transaction that rendered Tribune insolvent, and knowingly, recklessly, grossly negligently and/or willfully blindly disregarding the foreseeable disastrous consequences of the LBO Transaction;

(b) succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO Transaction, which favored interests other than those of the company they were obligated to serve;

(c) knowingly, recklessly, grossly negligently and/or willfully blindly disregarding, and instructing VRC to disregard, the total amount of debt that would be incurred by Tribune in connection with the LBO Transaction and approving the LBO Transaction in conscious, grossly negligent and/or willfully blind disregard of their duties to take the aggregate debt into consideration;

(d) knowingly, recklessly, grossly negligently and/or willfully blindly failing to provide updated and reasonable financial projections to VRC in pursuit of the requisite solvency opinions;

(e) knowingly, recklessly, grossly negligently and/or willfully blindly misrepresenting to VRC that an outside financial advisor had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt; and

(f) knowingly, recklessly, grossly negligently and/or willfully blindly failing to ensure that reliance on VRC's advice was reasonably justified under the circumstances.

233. The D&O Defendants are not entitled to the protection of the business judgment rule for the breach of their duties. The D&O Defendants failed to act in good faith and instead acted in their own interests or in the interests of entities other than Tribune's, or in a manner that cannot be attributed to a rational business purpose. Finally, in reaching the decisions complained of herein, the D&O Defendants were grossly negligent and/or willfully blind by, among other things, failing to consider all material facts reasonably available and

completely and willfully or recklessly ignoring their duties owed to Tribune and to all of Tribune's stakeholders, including creditors.

234. Indeed, in taking the actions described above with respect to the LBO Transaction, at least some of the D&O Defendants abandoned Tribune's interests altogether. Those D&O Defendants knowingly and intentionally acted in the sole pursuit of their personal individual interests (such as receiving cash proceeds, severance payments and other monetary special incentives from the LBO Transaction) or in the interests of the Large Shareholders and/or Zell Defendants. They did not act in order to achieve any benefit, or accomplish any legitimate corporate purpose, for Tribune, either short-term or long-term. To the contrary, they engaged in actions that did not confer any benefit upon or serve any corporate purpose for Tribune and that could never have conferred any such benefit or served any such purpose. The events that unfolded show that the actions they took were entirely adverse to Tribune's interests, both short-term and long-term. Notwithstanding the positions of trust that the D&O Defendants occupied and the fiduciary duties they owed to Tribune, at least some acted in service of interests wholly separate and distinct from those of the company they were obligated to serve.

235. By reason of the foregoing actions, the D&O Defendants, acting both individually and collectively, engaged in self-dealing, did not act in good faith, and breached their respective fiduciary duties.

236. Tribune has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the D&O Defendants.

237. Accordingly, Plaintiff is entitled to judgment against the D&O Defendants jointly and severally in an amount to be determined at trial.

**COUNT TWO**
**(Breach Of Fiduciary Duty Against Zell)**

238. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-237 as though fully set forth herein.

239. As a director of Tribune, Zell owed Tribune fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or placed in the zone of insolvency as a result of the LBO Transaction, Zell owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

240. Zell proposed, negotiated, and facilitated the LBO Transaction. Zell controlled EGI-TRB, which entered into the Agreement and Plan of Merger with Tribune on April 1, 2007. As a result, Zell was interested in, or lacked independence with respect to, the LBO Transaction.

241. Zell acted in his own interests, and/or in the interests of entities other than Tribune, in facilitating consummation of the LBO Transaction even though he knew or should have known it would result in harm to Tribune. At a minimum, Zell was willfully blind to the foreseeable disastrous consequences of the LBO Transaction, and acted grossly negligently and/or recklessly in advocating for and facilitating consummation of a transaction that in short order would result in disaster for the Company.

242. Zell, acting both individually and collectively with the D&O Defendants, failed to exercise the necessary care, and breached his duties of good faith, care and loyalty, by, among other things:

(a) advocating for and facilitating consummation of the imprudent and highly leveraged LBO Transaction that rendered Tribune insolvent,

and knowingly, recklessly, grossly negligently and/or willfully blindly disregarding the foreseeable disastrous consequences of the LBO Transaction;

(b) advocating for and facilitating consummation of the LBO Transaction even though it favored interests other than those of the company that he was obligated to serve;

(c) knowingly, recklessly, grossly negligently and/or willfully blindly failing to provide updated and reasonable financial projections to VRC in pursuit of the requisite solvency opinions; and

(d) knowingly, recklessly, grossly negligently and/or willfully blindly failing to ensure that reliance on VRC's advice was reasonably justified under the circumstances.

243. Zell is not entitled to the protection of the business judgment rule for the breach of his duties. Zell failed to act in good faith and instead acted in his own interests or in the interests of entities other than Tribune, or in a manner that cannot be attributed to a rational business purpose. Finally, in taking the actions complained of herein, Zell was grossly negligent and/or willfully blind by, among other things, failing to consider all material facts reasonably available and completely and willfully or recklessly ignoring his duties owed to Tribune and to all of Tribune's stakeholders, including creditors.

244. Indeed, in taking the actions described above with respect to the LBO Transaction, Zell abandoned Tribune's interests altogether. Zell knowingly and intentionally acted in the sole pursuit of his personal interests and/or in the interests of entities other than

Tribune. Zell did not act in order to achieve any benefit, or accomplish any legitimate corporate purpose, for Tribune, either short-term or long-term. To the contrary, Zell engaged in actions that did not confer any benefit upon or serve any corporate purpose for Tribune and that could never have conferred any such benefit or served any such purpose. The events that unfolded show that the actions Zell took were entirely adverse to Tribune's interests, both short-term and long-term. Notwithstanding the high position of trust that Zell occupied and the fiduciary duties he owed to Tribune, he acted in service of interests wholly separate and distinct from those of the company he was obligated to serve.

245. By reason of the foregoing actions, Zell, acting both individually and collectively with the D&O Defendants, engaged in self-dealing, did not act in good faith, and breached his fiduciary duties.

246. Tribune has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Zell.

247. Accordingly, Plaintiff is entitled to judgment against Zell jointly and severally in an amount to be determined at trial.

**COUNT THREE**
**(Breach Of Fiduciary Duty Against The Subsidiary Defendants)**

248. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-247 as though fully set forth herein.

249. The Subsidiary Defendants owed duties of good faith, loyalty and due care to Tribune and/or the Subsidiary Guarantors.

250. The Subsidiary Defendants approved the subsidiary guarantees and liens given by such corporations guaranteeing the obligations incurred in connection with the LBO Transaction.

251. Upon information and belief, the Subsidiary Defendants did not conduct any independent investigation on behalf of the Subsidiary Guarantors in connection with the approval of the subsidiary guarantees.

252. The Subsidiary Defendants, acting both individually and collectively, breached their respective fiduciary duties, and those Subsidiary Defendants who received monetary special incentives in connection with consummation of the LBO Transaction also engaged in self-dealing and did not act in good faith.

253. The Subsidiary Defendants are not entitled to the protection of the business judgment rule for the breach of their duties. The Subsidiary Defendants failed to act in good faith and instead acted in their own interests or in the interests of entities other than Tribune's, or in a manner that cannot be attributed to a rational business purpose. Finally, in reaching the decisions complained of herein, the Subsidiary Defendants were grossly negligent and/or willfully blind by, among other things, failing to consider all material facts reasonably available and completely and willfully ignoring their duties owed to Tribune and to all of Tribune's stakeholders, including creditors.

254. Tribune and the Subsidiary Guarantors have been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the Subsidiary Defendants. Accordingly, Plaintiff is entitled to judgment against the Subsidiary Defendants jointly and severally in an amount to be determined at trial.

**COUNT FOUR**
**(Aiding And Abetting Breach Of**
**Fiduciary Duty Against The Subsidiary Defendants)**

255. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-254 as though fully set forth herein.

256. As directors and officers of Tribune, the D&O Defendants owed Tribune and its stockholders fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or placed in the zone of insolvency as a result of the LBO Transaction, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

257. The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty as set forth fully herein.

258. The Subsidiary Defendants knew that the D&O Defendants had the fiduciary duties alleged herein.

259. The Subsidiary Defendants colluded in or aided and abetted the breaches of fiduciary duties of the D&O Defendants, and were active and knowing participants in those breaches of fiduciary duties by, among other things, approving the subsidiary guarantees and liens given by such corporations guaranteeing the obligations incurred in connection with the LBO Transaction, and failing to conduct any independent investigation on behalf of the Subsidiary Guarantors in connection with the approval of the subsidiary guarantees.

260. Tribune and the Subsidiary Guarantors have been substantially damaged as a direct and proximate result of the actions of the Subsidiary Defendants in aiding and abetting the breaches of fiduciary duties set forth fully herein.

261. Accordingly, Plaintiff is entitled to judgment against the Subsidiary Defendants jointly and severally in an amount to be determined at trial.

**COUNT FIVE**
**(Breach Of Fiduciary Duty Against The Large Shareholders)**

262. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-261 as though fully set forth herein.

263. The Large Shareholders functioned as controlling shareholders with respect to the LBO Transaction and effectively had the capacity to block or preclude the transaction if they deemed it was not in their own interests. The Large Shareholders collectively owned 33% of Tribune's stock and, by virtue of their substantial stock holdings, made clear to the Board that it had to comply with their demands and advance their objectives. Indeed, the Large Shareholders threatened the Board with certain adverse consequences if the Board failed to comport with their demands. In addition, the Large Shareholders each had representatives on Tribune's Board, and through FitzSimons' roles at both the Foundations and Tribune, the Foundations had senior managerial presence at Tribune. Thus, for all practical purposes, the Large Shareholders had the power to veto the Board's decision with respect to the LBO Transaction or to ensure its successful implementation, and therefore were controlling shareholders with respect to the transaction.

264. As controlling shareholders of Tribune, the Large Shareholders owed Tribune fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or

placed in the zone of insolvency as a result of the LBO Transaction, the Large Shareholders owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

265. The Large Shareholders, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty, by, among other things, intentionally steering the D&O Defendants toward a corporate strategy aimed at enhancing exclusively the interests of the Large Shareholders at the expense of Tribune and its other stakeholders, and by interposing themselves in the Board's decision-making process and exerting undue influence over the D&O Defendants in connection with the LBO Transaction by, among other things, threatening the Board if it failed to pursue their desired course of action. As controlling shareholders of Tribune, the Large Shareholders were not entitled to consider only their own interests in assessing the propriety of the LBO Transaction. Rather, in deciding whether to participate in the LBO Transaction and thereby help ensure its effectuation, the Large Shareholders were obligated to consider the interests of Tribune and all its stakeholders. By exclusively focusing on, pressing and pursuing their own interests, and by their other aforementioned acts and omissions, the Large Shareholders breached their fiduciary obligations.

266. The Large Shareholders are not entitled to the protection of the business judgment rule for the breach of their duties. The Large Shareholders failed to act in good faith and instead acted solely in their own interests. Indeed, the Large Shareholders abandoned Tribune's interests altogether, and took actions that were entirely adverse to Tribune's interests, both short-term and long-term.

267. By and through the LBO Transaction, the Large Shareholders received substantial proceeds for their Tribune stock that were funded by debt that rendered the Company insolvent.

268. Tribune has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the Large Shareholders.

269. Accordingly, Plaintiff is entitled to judgment against the Large Shareholders jointly and severally in an amount to be determined at trial.

**COUNT SIX**
**(Aiding And Abetting Breach Of Fiduciary Duty**
**<u>Against The Chandler Trust Representatives And The Large Shareholders)</u>**

270. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-269 as though fully set forth herein.

271. As directors and officers of Tribune, the D&O Defendants owed Tribune and its stockholders fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or placed in the zone of insolvency as a result of the LBO Transaction, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors who were harmed due to Tribune's inability to pay them in full.

272. The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty as set forth fully herein.

273. The Chandler Trust Representatives and the Large Shareholders knew that the D&O Defendants had the fiduciary duties alleged herein. To the extent that the Large Shareholders are determined not to be controlling shareholders with respect to the LBO

Transaction, the Large Shareholders are nonetheless liable for aiding and abetting the D&O Defendants' fiduciary breaches as set forth herein.

274. The Chandler Trust Representatives and the Large Shareholders colluded in or aided and abetted the D&O Defendants' breaches of fiduciary duties, and were active and knowing participants in those breaches of fiduciary duties by, among other things, intentionally steering the D&O Defendants toward a corporate strategy aimed at enhancing exclusively the interests of the Large Shareholders, and by interposing themselves in the Board's decision-making process and exerting undue influence over the D&O Defendants in connection with the LBO Transaction by, among other things, threatening the Board if it failed to pursue their desired course of action.

275. By and through the LBO Transaction, the Chandler Trust Representatives and the Large Shareholders received substantial proceeds for their Tribune stock that were funded by debt that rendered the Company insolvent.

276. Tribune has been substantially damaged as a direct and proximate result of the actions of the Chandler Trust Representatives and the Large Shareholders in aiding and abetting the breaches of fiduciary duties set forth fully herein.

277. Accordingly, Plaintiff is entitled to judgment against the Chandler Trust Representatives and the Large Shareholders jointly and severally in an amount to be determined at trial.

**COUNT SEVEN**
**(Aiding And Abetting Breach Of Fiduciary Duty**
**Against The Zell Defendants)**

278. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-277 as though fully set forth herein.

279. As officers and directors of Tribune, the D&O Defendants owed Tribune and its stockholders fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or placed in the zone of insolvency as a result of the LBO Transaction, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

280. The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty as set forth fully herein.

281. The Zell Defendants knew that the D&O Defendants had the fiduciary duties alleged herein.

282. The Zell Defendants colluded in or aided and abetted the breaches of fiduciary duties of the D&O Defendants, and were active and knowing participants in those breaches of fiduciary duties by, among other things, proposing and orchestrating the imprudent and inevitably ruinous LBO Transaction, and exerting undue influence over the decision-making of the D&O Defendants by enticing and inducing them to enter into the LBO Transaction by agreeing to pay them substantial financial incentives.

283. Tribune has been substantially damaged as a direct and proximate result of the actions of the Zell Defendants in aiding and abetting the breaches of fiduciary duties set forth fully herein.

284. Accordingly, Plaintiff is entitled to judgment against the Zell Defendants in an amount to be determined at trial.

## COUNT EIGHT
## (Aiding And Abetting Breach Of Fiduciary Duty Against VRC)

285. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-284 as though fully set forth herein.

286. As officers and directors of Tribune, the D&O Defendants owed Tribune and its stockholders fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or placed in the zone of insolvency as a result of the LBO Transaction, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

287. The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty as set forth fully herein.

288. VRC knew that the D&O Defendants had the fiduciary duties alleged herein.

289. VRC colluded in or aided and abetted the D&O Defendants' breaches of fiduciary duties, and was an active and knowing participant in those breaches of fiduciary duties by, among other things, failing to use reasonable professional judgment in reaching its solvency determinations; failing to use appropriate valuation and financial practices in its solvency determinations; ignoring or failing to give effect to information known by or made known or

available to VRC that should have been considered under reasonable valuation and financial practices; and being induced to provide solvency opinions that cannot be justified in light of applicable professional standards.

290. Tribune has been substantially damaged as a direct and proximate result of VRC's aiding and abetting the breaches of fiduciary duties set forth fully herein.

291. Accordingly, Plaintiff is entitled to judgment against VRC in an amount to be determined at trial.

**COUNT NINE**
**(Professional Malpractice Against VRC)**

292. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-291 as though fully set forth herein.

293. VRC was retained by Tribune to serve as one of Tribune's professional financial advisors in connection with the LBO Transaction and to, among other things, provide a series of solvency opinions with respect thereto.

294. As Tribune's professional financial advisor, VRC had a duty to use the same degree of knowledge, skill, and ability as would an ordinarily careful professional in similar circumstances.

295. VRC deviated from the standard of care expected of a professional financial advisor or solvency opinion provider under these circumstances, and acted in bad faith, engaged in willful misconduct, and/or was grossly negligent, by, among other things, failing to use reasonable professional judgment in reaching its solvency determinations; failing to use appropriate valuation and financial practices in its solvency determinations; ignoring or failing to give effect to information known by or made known or available to VRC that should have

been considered under reasonable valuation and financial practices; and being induced to provide solvency opinions that cannot be justified in light of applicable professional standards.

296. Tribune has been substantially damaged as a direct and proximate result of VRC's professional malpractice, as set forth fully herein.

297. Accordingly, Plaintiff is entitled to judgment against VRC in an amount to be determined at trial.

**COUNT TEN**
**(Aiding And Abetting Breach Of Fiduciary Duty**
**Against GreatBanc and Duff & Phelps)**

298. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-297 as though fully set forth herein.

299. As officers and directors of Tribune, the D&O Defendants owed Tribune fiduciary duties of good faith, care and loyalty. As Tribune was either rendered insolvent or placed in the zone of insolvency as a result of the LBO Transaction, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

300. The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty as set forth fully herein.

301. GreatBanc and Duff & Phelps knew that the D&O Defendants had the fiduciary duties alleged herein.

302. GreatBanc and Duff & Phelps colluded in or aided and abetted the D&O Defendants' breaches of fiduciary duties, and were active and knowing participants in those

breaches of fiduciary duties by, among other things, knowingly using inappropriate valuation practices in their solvency, financing and fairness determinations to render and rely upon opinions that could not have been rendered using reasonable and appropriate techniques; ignoring or failing to give effect to information known by or made known or available to GreatBanc and Duff & Phelps that should have been considered under reasonable valuation and financial practices; and being induced to proceed with the LBO Transaction in the face of the aforementioned breaches.

303. Tribune has been substantially damaged as a direct and proximate result of GreatBanc's and Duff & Phelps' aiding and abetting the breaches of fiduciary duties set forth fully herein.

304. Accordingly, Plaintiff is entitled to judgment against GreatBanc and Duff & Phelps in an amount to be determined at trial.

**COUNT ELEVEN**
**(Violations Of Delaware General Corporation Law**
**Sections 160 And/Or 173 Against The Director Defendants And Zell)**

305. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-304 as though fully set forth herein.

306. Section 160(a)(1) of the Delaware General Corporation Law (the "DGCL") provides, in relevant part, that: "[N]o corporation shall: (1) [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation[.]"

307. Section 173 of the DGCL provides that "[n]o corporation shall pay dividends except in accordance with this chapter."

308. Pursuant to Section 174 of the DGCL, the directors of a corporation are jointly and severally liable for "willful or negligent violation of § 160 or § 173."

309. Tribune provided cash and/or property to its shareholders as a result of the LBO Transaction. The payments made by Tribune in connection with the LBO Transaction were, in substance, unlawful dividends and/or stock purchases in violation of sections 160 and/or 173 of the DGCL. The Director Defendants and Zell are jointly and severally liable for the amount of such dividends and/or stock purchases due to their willful or negligent approval and/or facilitation of the transfer of the payments, while Tribune lacked a sufficient surplus or net profits or was otherwise insolvent, in violation of Delaware's General Corporation Law, including without limitation sections 160, 173, and 174.

310. Tribune has been substantially damaged as a direct and proximate result of the Director Defendants' and Zell's violations of DGCL sections 160, 173 and 174.

311. Accordingly, Plaintiff is entitled to judgment against the Director Defendants and Zell in an amount to be determined at trial.

**COUNT TWELVE**
**(Unjust Enrichment Against The D&O Defendants,**
**The Subsidiary Defendants, The Large Shareholders,**
**The Zell Defendants, The Tower Defendants, And VRC)**

312. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-311 as though fully set forth herein.

313. By their wrongful acts and omissions, and through the wrongful receipt of proceeds from the LBO Transaction, the defendants have unjustly retained benefits that belong

to Tribune, and defendants' retention of those benefits violates fundamental principles of justice, equity and good conscience.

314. Defendants are therefore liable to Tribune for unjust enrichment.

315. Plaintiff seeks restitution from the defendants and an order of this Court disgorging all payments, profits, fees, benefits, incentives and other compensation obtained by the defendants as a result of their wrongful conduct and breaches of fiduciary duties.

316. By virtue of the foregoing, the defendants are liable to reimburse Tribune's estates the amount of the payments, profits, fees, benefits, incentives and other compensation they received in connection with the LBO Transaction.

**COUNT THIRTEEN**
**(Intentional Fraudulent Transfer Against The D&O Defendants, The Subsidiary Defendants, The Large Shareholders, Zell, EGI-TRB, The Shareholder Defendants, And The Shareholder Class)**

317. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-316 as though fully set forth herein.

318. The Shareholder Transfers were made within two years of the Petition Date.

319. Tribune, by and through its officers and directors acting individually and collectively, made the Shareholder Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the D&O Defendants':

(a) agreeing to, approving and/or facilitating the imprudent and highly leveraged LBO Transaction that rendered Tribune insolvent, and knowingly disregarding the foreseeable disastrous consequences of the LBO Transaction;

(b) succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO Transaction, which favored interests other than those of the company they were obligated to serve;

(c) willfully disregarding, and instructing VRC to disregard, the total amount of debt that would be incurred by Tribune in connection with the LBO Transaction and approving the LBO Transaction in conscious disregard of their duties to take the aggregate debt into consideration;

(d) knowingly failing to provide updated and reasonable financial projections to VRC in pursuit of the requisite solvency opinions;

(e) knowingly misrepresenting to VRC that an outside financial advisor had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt;

(f) knowingly failing to ensure that reliance on VRC's advice was reasonably justified under the circumstances; and

(g) failing to exercise due care in adequately informing themselves before approving and/or facilitating the LBO Transaction and acting with inadequate or erroneous information such that their decisions were unreasonable and reckless.

320. Accordingly, the Shareholder Transfers should be avoided and recovered pursuant to Bankruptcy Code sections 544(b), 548(a)(1)(A) & 550(a).

**COUNT FOURTEEN**
**(Constructive And/Or Intentional Fraudulent Transfer**
**Against The D&O Defendants And The Subsidiary Defendants)**

321. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-320 as though fully set forth herein.

322. The D&O Transfers were made within two years of the Petition Date.

323. Tribune received less than reasonably equivalent value in exchange for the D&O Transfers.

324. At the time of the D&O Transfers, Tribune (i) was insolvent or became insolvent as a result of the D&O Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

325. Tribune, by and through its officers and directors acting individually and collectively, made the D&O Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the D&O Defendants':

(a) agreeing to, approving and/or facilitating the imprudent and highly leveraged LBO Transaction that rendered Tribune insolvent, and knowingly disregarding the foreseeable disastrous consequences of the LBO Transaction;

(b) succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO Transaction, which favored

interests other than those of the company they were obligated to serve;

(c) willfully disregarding, and instructing VRC to disregard, the total amount of debt that would be incurred by Tribune in connection with the LBO Transaction and approving the LBO Transaction in conscious disregard of their duties to take the aggregate debt into consideration;

(d) knowingly failing to provide updated and reasonable financial projections to VRC in pursuit of the requisite solvency opinions;

(e) knowingly misrepresenting to VRC that an outside financial advisor had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt;

(f) knowingly failing to ensure that reliance on VRC's advice was reasonably justified under the circumstances; and

(g) failing to exercise due care in adequately informing themselves before approving and/or facilitating the LBO Transaction and acting with inadequate or erroneous information such that their decisions were unreasonable and reckless.

326. At all times relevant hereto, the D&O Defendants and the Subsidiary Defendants knew, were reckless in not knowing, or reasonably should have known that the D&O Transfers were fraudulent.

327. Accordingly, the D&O Transfers should be avoided and recovered pursuant to Bankruptcy Code sections 544(b), 548(a)(1)(A)-(B) & 550(a).

**COUNT FIFTEEN**
**(Preference Against The D&O Defendants And The Subsidiary Defendants)**

328. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-327 as though fully set forth herein.

329. The D&O Defendants and Subsidiary Defendants were insiders of Tribune at the time of the D&O Transfers.

330. The D&O Transfers were made within one year of the Petition Date.

331. The D&O Transfers were made for the benefit of the D&O Defendants and Subsidiary Defendants, for or on account of antecedent debts, and were made while Tribune was insolvent.

332. The D&O Transfers enabled the D&O Defendants and Subsidiary Defendants to receive more than they would receive if these cases were under chapter 7 of the Bankruptcy Code, the D&O Transfers had not been made, and they received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

333. The D&O Transfers should be avoided and recovered pursuant to Bankruptcy Code sections 547(b) & 550(a).

**COUNT SIXTEEN**
**(Constructive And/Or Intentional Fraudulent Transfer Against VRC)**

334. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-333 as though fully set forth herein.

335. The VRC Transfers were made within two years of the Petition Date.

336. Tribune received less than reasonably equivalent value in exchange for the VRC Transfers.

337. At the time of the VRC Transfers, Tribune (i) was insolvent or became insolvent as a result of the VRC Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

338. Tribune, by and through its officers and directors acting individually and collectively, made the VRC Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the D&O Defendants':

(a) agreeing to, approving and/or facilitating the imprudent and highly leveraged LBO Transaction that rendered Tribune insolvent, and knowingly disregarding the foreseeable disastrous consequences of the LBO Transaction;

(b) succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO Transaction, which favored interests other than those of the company they were obligated to serve;

(c) willfully disregarding, and instructing VRC to disregard, the total amount of debt that would be incurred by Tribune in connection with the LBO Transaction and approving the LBO Transaction in

conscious disregard of their duties to take the aggregate debt into consideration;

(d) knowingly failing to provide updated and reasonable financial projections to VRC in pursuit of the requisite solvency opinions;

(e) knowingly misrepresenting to VRC that an outside financial advisor had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt;

(f) knowingly failing to ensure that reliance on VRC's advice was reasonably justified under the circumstances; and

(g) failing to exercise due care in adequately informing themselves before approving and/or facilitating the LBO Transaction and acting with inadequate or erroneous information such that their decisions were unreasonable and reckless.

339. At all times relevant hereto, VRC knew, was reckless in not knowing, or reasonably should have known that the VRC Transfers were fraudulent.

340. Accordingly, the VRC Transfers should be avoided and recovered pursuant to Bankruptcy Code sections 544(b), 548(a)(1)(A)-(B) & 550(a).

**COUNT SEVENTEEN**
**(Recharacterization Of The Exchangeable Note As Equity Pursuant To 11 U.S.C. § 105)**

341. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-340 as though fully set forth herein.

342. By contributing $200 million to Tribune and acquiring the Exchangeable Note, EGI-TRB attempted to elevate its status from that of a shareholder to a creditor. EGI-TRB, however, was not a true creditor nor was the Exchangeable Note a true debt instrument.

343. EGI-TRB was a holder of both the Exchangeable Note and 1,470,588 shares of Tribune stock.

344. The Exchangeable Note was unsecured and deeply subordinated to the right of payment to all "Senior Obligations," which term was defined therein as "all obligations, indebtedness and other liabilities of [Tribune] other [than] any such obligations, indebtedness or liabilities that by its express terms ranks pari passu or junior to [Tribune's] obligations under this Note, in each case, whether incurred on or prior to the date hereof or hereafter incurred." Thus, the Exchangeable Note was subordinate to all of the debt incurred by Tribune in connection with the LBO Transaction.

345. Tribune had the option to exchange any portion of the outstanding principal amount owed on the Exchangeable Note for shares of Tribune stock at any time. Moreover, if Step Two of the LBO Transaction failed to close, the outstanding principal amount owed on the Exchangeable Note would be automatically exchanged for shares of Tribune stock without any further action by Tribune or EGI-TRB.

346. Based on the real nature of the Exchangeable Note, the Exchangeable Note should be recharacterized as equity pursuant to 11 U.S.C. § 105.

## COUNT EIGHTEEN
**(Constructive And/Or Intentional Fraudulent Transfer Against Zell and EGI-TRB)**

347. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-346 as though fully set forth herein.

348. The EGI-TRB Transfers were made within two years of the Petition Date.

349. Tribune received less than reasonably equivalent value in exchange for the EGI-TRB Transfers.

350. At the time of the EGI-TRB Transfers, Tribune (i) was insolvent or became insolvent as a result of the EGI-TRB Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

351. Tribune, by and through its officers and directors acting individually and collectively, made the EGI-TRB Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the D&O Defendants':

(a) agreeing to, approving and/or facilitating the imprudent and highly leveraged LBO Transaction that rendered Tribune insolvent, and knowingly disregarding the foreseeable disastrous consequences of the LBO Transaction;

(b) succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO Transaction, which favored

interests other than those of the company they were obligated to serve;

(c) willfully disregarding, and instructing VRC to disregard, the total amount of debt that would be incurred by Tribune in connection with the LBO Transaction and approving the LBO Transaction in conscious disregard of their duties to take the aggregate debt into consideration;

(d) knowingly failing to provide updated and reasonable financial projections to VRC in pursuit of the requisite solvency opinions;

(e) knowingly misrepresenting to VRC that an outside financial advisor had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt;

(f) knowingly failing to ensure that reliance on VRC's advice was reasonably justified under the circumstances; and

(g) failing to exercise due care in adequately informing themselves before approving and/or facilitating the LBO Transaction and acting with inadequate or erroneous information such that their decisions were unreasonable and reckless.

352. At all relevant times, there existed a unity of interest between Zell and EGI-TRB such that any individuality or separateness between Zell and EGI-TRB ceased, and EGI-TRB was Zell's alter ego.

353. At all times relevant hereto, Zell and EGI-TRB knew, was reckless in not knowing, or reasonably should have known that the EGI-TRB Transfers were fraudulent.

354. Accordingly, the EGI-TRB Transfers should be avoided and recovered pursuant to Bankruptcy Code sections 544(b), 548(a)(1)(A)-(B) & 550(a).

**COUNT NINETEEN**
**(Preference Against Zell And EGI-TRB)**

355. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-354 as though fully set forth herein.

356. EGI-TRB is an alter ego of Zell, who was an insider of Tribune at the time of the Exchangeable Note Transfer and EGI-TRB Fee Payments.

357. The Exchangeable Note Transfer and EGI-TRB Fee Payments were made within one year of the Petition Date.

358. The Exchangeable Note Transfer and EGI-TRB Fee Payments were made for the benefit of Zell and/or EGI-TRB, for or on account of antecedent debt and made while Tribune was insolvent.

359. The Exchangeable Note Transfer and EGI-TRB Fee Payments enabled Zell and/or EGI-TRB to receive more than they would receive if these cases were under chapter 7 of the Bankruptcy Code, the payment had not been made and they received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

360. Accordingly, the Exchangeable Note Transfer and EGI-TRB Fee Payments should be avoided and recovered pursuant to Bankruptcy Code sections 547(b) & 550(a).

**COUNT TWENTY**
**(Mandatory Subordination Of Certain D&O**
**Creditor Claims And Subsidiary Creditor Claims)**

361. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-360 as though fully set forth herein.

362. The Bankruptcy Code requires the subordination of certain types of claims.

363. Section 510(b) of the Bankruptcy Code specifically provides that:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

364. The D&O Creditor Claims and Subsidiary Creditor Claims that relate directly to the LBO Transaction arise "from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim" and should be subordinated under section 510(b) of the Bankruptcy Code.

365. Accordingly, all D&O Creditor Claims and Subsidiary Creditor Claims (other than those that are unrelated to the LBO Transaction) are subject to mandatory subordination.

**COUNT TWENTY-ONE**
**(Equitable Subordination And Disallowance Of The D&O Creditor Claims, Subsidiary Creditor Claims, Zell Creditor Claims, EGI-TRB Creditor Claims, And Tower Creditor Claims)**

366. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-365 as though fully set forth herein.

367. The D&O Defendants, Subsidiary Defendants, and Zell Defendants engaged in a pattern of misconduct to enrich themselves at the expense of the Debtors and their estates and stakeholders, including creditors, by causing the Debtors to enter into the LBO Transaction.

368. The misconduct of the D&O Defendants, Subsidiary Defendants, and Zell Defendants described herein was inequitable and resulted in injury to the Debtors' stakeholders, including creditors.

369. Any claims arising from the Subordinated Note, including principal and interest and all other obligations and liabilities of Tribune to EGI-TRB or the Tower Defendants, are contractually subordinate and junior to all obligations, indebtedness and other liabilities of Tribune with certain inapplicable exceptions. To the extent that any such claims are not already fully contractually subordinated, however, Plaintiff requests the equitable subordination of such claims.

370. Under the principles of equitable subordination, each Tower Creditor Claim, if it had not been assigned to the Tower Defendants and instead had been asserted by, on behalf of, or for the benefit of EGI-TRB, would have been subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

371. Any Tower Creditor Claim should be subordinated and disallowed to the same extent as if EGI-TRB had continued to hold such claim.

372. Equitable subordination and disallowance of the D&O Creditor Claims, Subsidiary Creditor Claims, Zell Creditor Claims, EGI-TRB Creditor Claims, and Tower Creditor Claims is consistent with the provisions and purposes of the Bankruptcy Code.

373. Accordingly, the D&O Creditor Claims, Subsidiary Creditor Claims, Zell Creditor Claims, EGI-TRB Creditor Claims, and Tower Creditor Claims are subject to equitable subordination and/or disallowance.

**COUNT TWENTY-TWO**
**(Constructive Fraud Against Merrill, CGMI, And Morgan Stanley To Avoid And Recover Payment Of Financial Advisory Fees**
**(11 U.S.C. §§ 544(b), 548(A)(1)(B) And 550(A))**

374. Plaintiff incorporates by reference paragraphs 1-373 of this Complaint as if set forth again in full.

375. By October 2006, the Company engaged Merrill and CGMI to advise it in connection with a potential financial transaction.

376. By October 2006, the Company engaged Morgan Stanley to advise the Special Committee to the Tribune Board in connection with a potential financial transaction.

377. Pursuant to the Company's engagement of Merrill, CGMI, and Morgan Stanley, the Debtors transferred or caused to be transferred over $30 million in advisory fees in connection with the LBO Financing to Merrill, CGMI, and Morgan Stanley (the "Advisory Fees").

378. The Debtors did not receive reasonably equivalent value in exchange for payment of the Advisory Fees.

379. At the time of payment of the Advisory Fees, taking into consideration the LBO as a whole, the Company's obligations under the Merger Agreement and otherwise to complete the LBO, reasonable projections of the performance of the Company's businesses and the fair value of its assets and liabilities, the Debtors were insolvent within the meaning of 11 U.S.C. § 101(32)(A).

380. The Debtors were left with unreasonably small capital to operate its business as a result of and following the closing of the Step One Financing.

381. At the time of the closing of the Step One Financing, the Debtors intended to incur or believed they would incur debts beyond the Debtors' ability to pay as such debts matured.

382. Accordingly, the Advisory Fees should be avoided and recovered pursuant to Bankruptcy Code sections 547(b) & 550(a) for the benefit of the Non-Bank Claims.

**COUNT TWENTY-THREE**
**(Professional Malpractice Against Morgan Stanley)**

383. Plaintiff incorporates by reference paragraphs 1-382 of this Complaint as if set forth again in full.

384. Morgan Stanley [redacted] continued to provide advice to the Special Committee in connection with Step Two.

385. In providing professional financial advice to the Company and the Special Committee, Morgan Stanley had a duty to use the same degree of knowledge, skill, and ability as would an ordinarily prudent professional in similar circumstances.

386. Morgan Stanley deviated from the standard of care expected of a professional financial advisor under these circumstances by, among other things, [redacted] and failing to inform the Company or the Special Committee of its position on the Company's ability to refinance the LBO Debt.

387. Accordingly, Plaintiff is entitled to judgment against Morgan Stanley for damages in an amount to be determined at trial.

**COUNT TWENTY-FOUR**
**(Aiding And Abetting Breach Of Fiduciary Duty**
**<u>Against Morgan Stanley)</u>**

388. Plaintiff incorporates by reference paragraphs 1-387 of this Complaint as if set forth again in full.

389. The officers of Tribune, including Messrs. Grenesko and Bigelow, owed Tribune and its stockholders a fiduciary duty of good faith, care and loyalty.

390. The Company's management, including Messrs. Grenesko and Bigelow, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty by, among other things, (a) making unjustifiable assumptions for the Company's October 2007 financial projections and instructing VRC to use such unreliable projections, which VRC did uncritically; (b) instructing VRC to make unjustifiable and unreasonable assumptions in connection with its Step Two solvency opinion, which VRC agreed to do; (c) representing to VRC that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO when, on information and belief,

Morgan Stanley had not so agreed; (d) representing to VRC that the Company would be solvent after giving effect to Step Two without a reasonable basis for such representation; and (e) failing to advise the Board that they had represented to VRC that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO Debt when, on information and belief, Morgan Stanley had not agreed.

391. Morgan Stanley knew that the Company's officers had the fiduciary duties alleged herein.

392. Morgan Stanley, as professional financial adviser to the Company and Special Committee, had an obligation to advise them of facts relevant to the scope of its engagement, [redacted]. Morgan Stanley aided and abetted the breaches of fiduciary duties by Company management, including Messrs. Grenesko and Bigelow, and was an active and knowing participant in those breaches of fiduciary duties by, among other things, failing to disclose to the Board or the Special Committee (a) [redacted]; (b) that the representations by Messrs. Grenesko and/or Bigelow to VRC that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO Debt were incorrect; and (c) [redacted].

393. The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's aiding and abetting the breaches of fiduciary duties set forth herein.

394. Accordingly, is entitled to recover damages from Morgan Stanley in an amount to be determined at trial.

**COUNT TWENTY-FIVE**
**(Insider Trading Against Morgan Stanley**
**(15 U.S.C. § 78j(b) and Rule 10b-5 (17 C.F.R. § 240.10b-5))**

395. Plaintiff incorporates by reference paragraphs 8-11, 73-74, 101-102, 133, 135, 194-196, 200-210, and 215-228, and 374-394 of this Complaint as if set forth again in full.

396. Morgan Stanley was engaged by the Company to advise the Special Committee in 2006-07, and again by the Company in 2008, as a financial advisor. In that capacity, Morgan Stanley received highly confidential financial information concerning the Company, including internal financial projections.

397. In its role as financial advisor to the Company and Special Committee in 2007, and then as an advisor to the Company on bankruptcy issues in 2008, Morgan Stanley occupied a special position of trust and confidence in relation to the Company and in the conduct of the Company's business. Accordingly, Morgan Stanley was a "temporary insider" that had an express or implied duty to maintain the confidentiality of non-public information the Company provided to it solely for corporate purposes, and a duty not to use such information for its own financial benefit.

[redacted]

399. The Company had a reasonable expectation that Morgan Stanley would maintain the confidentiality of such non-public information, and relied on Morgan Stanley not

to misuse non-public information of the Company to the Company's detriment or Morgan Stanley's benefit.

400. Morgan Stanley breached its duty to the Company and engaged in insider trading, as detailed above, by knowingly or recklessly using material non-public information concerning the likelihood that Tribune would file for bankruptcy in deciding to purchase Tribune 7.5% Debentures in April and November 2008. When it made these purchases, Morgan Stanley knew that, in the event of a Company bankruptcy, it would attempt to set off the face amount of the debentures against MSCS's obligations under the Swap Agreement and stood to make enormous profits as a result – more than seven times its investment with respect to the debentures purchased in November.

401. The Debentures were a "security" within the meaning of 15 U.S.C. § 78c(a)(10).

402. To execute its manipulative and deceptive insider trading, Morgan Stanley used instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange.

403. Morgan Stanley's insider trading injured the Company because it caused the Company to receive substantially less in a final payment under the Swap Agreement from Morgan Stanley.

404. Accordingly, Plaintiff is entitled to recover damages from Morgan Stanley in an amount to be determined at trial.

**COUNT TWENTY-SIX**
**(Breach Of Duty Of Loyalty Against Morgan Stanley)**

405. Plaintiff incorporates by reference paragraphs 1-404 of this Complaint as if set forth again in full.

406. As described above, Morgan Stanley was engaged by the Company in 2006 as a financial advisor to advise the Special Committee with respect to various issues relating to the LBO and other potential restructuring transactions [redacted]. In late 2007, Morgan Stanley also agreed to advise the Company with respect to various issues relating to the LBO. In its role as financial advisor to the Company and Special Committee from 2006 to 2007, and as financial advisor to the Company in 2008, Morgan Stanley occupied a special position of trust and confidence in relation to the Company and in the conduct of the Company's business and thereby owed fiduciary obligations to the Company and the Special Committee, including the duty of loyalty.

407. [redacted].

408. The Company provided Morgan Stanley, in its capacity as financial advisor, with highly confidential financial information concerning the Company, including internal financial projections.

409. As part of its duty of loyalty, Morgan Stanley had an express or implied duty not to misuse non-public information the Company provided to it in its role as financial advisor in 2007 and 2008 for its own financial benefit and to the Company's detriment.

410. Morgan Stanley also breached its fiduciary duty of loyalty by engaging in insider trading.

411. Morgan Stanley used confidential information concerning the likelihood that Tribune would file for bankruptcy in deciding to purchase Tribune 7.5% Debentures in April and November 2008 for its own financial benefit and to the Company's detriment. When it made these purchases, Morgan Stanley knew that it would transfer the debentures to MSCS so that it could, in the event of a Company bankruptcy, set off the face amount of the debentures against MSCS' obligations under the Swap Agreement and make enormous profits as a result – more than seven times its investment with respect to the debentures purchased in November. Because Morgan Stanley had confidential information from Tribune on its financial predicament, Morgan Stanley could and did decide to buy the Debentures when it did with confidence that it would profit as a result.

412. The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's breaches of fiduciary duties set forth herein.

413. Accordingly, Plaintiff is entitled to recover damages from Morgan Stanley and MSCS in an amount to be determined at trial.

**COUNT TWENTY-SEVEN**
**(Aiding and Abetting Breach Of Duty Of Loyalty Against MSCS)**

414. Plaintiff incorporates by reference paragraphs 1-414 of this Complaint as if set forth again in full.

415. MSCS aided and abetted the breach of fiduciary duties by Morgan Stanley, and was an active and knowing participant in those breaches of fiduciary duties by,

among other things, (a) receiving an assignment or transfer of Tribune 7.5% Debentures purchased by Morgan Stanley for the purpose of utilizing them to offset amounts owing to the Company under the Swap Agreement in the event of a Company bankruptcy, and (b) offsetting such amounts after the Company commenced its bankruptcy case.

416. The Company has been substantially damaged as a direct and proximate result of MSCS's aiding and abetting the breaches of fiduciary duties set forth herein.

417. Accordingly, Plaintiff is entitled to judgment against MSCS for damages in an amount to be determined at trial.

**COUNT TWENTY-EIGHT**
**(Willful Violation of the Automatic Stay Against MSCS)**

418. Plaintiff incorporates by reference paragraphs 215-228 and 374-417 of this Complaint as if set forth again in full.

419. With full knowledge of Tribune's chapter 11 case, MSCS willfully violated the automatic stay under 11 U.S.C. § 362(a)(7) by offsetting the amount of the Tribune 7.5% Debentures purchased by Morgan Stanley and thereafter transferred to MSCS against amounts owed by MSCS to the Company under the Swap Agreement.

420. MSCS's violation of the automatic stay caused Tribune to incur actual damages, including costs and attorney's fees.

421. Accordingly, Plaintiff is entitled to judgment against MSCS for damages in an amount to be determined at trial, plus costs, punitive damages and attorney's fees.

**COUNT TWENTY-NINE**
**(Equitable Subordination Against MSCS)**

422. Plaintiff incorporates by reference paragraphs 215-228 and 374-421 of this Complaint as if set forth again in full.

423. MSCS acted inequitably in aiding and abetting Morgan Stanley in its breach of fiduciary duties and by willfully violating the automatic stay to effect a setoff of amounts owed under the Swap Agreement. The Company's stakeholders, including creditors, were injured as a result.

424. MSCS is affiliated with Morgan Stanley, which is an insider of the Company as a result of its engagement as financial advisor by Tribune in 2008 and by its possession of material non-public information about its financial predicament from its engagement as financial advisor to the Special Committee in 2006 and 2007.

425. The purchase of Tribune 7.5% Debentures by Morgan Stanley and, in most cases, immediate transfer by Morgan Stanley to MSCS was a coordinated scheme by two affiliates that sought to allow an affiliated non-insider to prosper as a result of an insider's acts. Accordingly, equity dictates that MSCS be treated as an insider as well.

426. Equitable subordination of the MSCS Claim is consistent with the provisions and purposes of the Bankruptcy Code.

427. Accordingly, the MSCS Claim should be equitable subordinated.

**COUNT THIRTY**
**(Turnover Against MSCS)**

428. Plaintiff incorporates by reference paragraphs 215-228 and 374-427 of this Complaint as if set forth again in full.

429. MSCS owes a matured and payable debt to the Company under the Swap Agreement that is property of the estate and not susceptible to setoff.

430. Accordingly, MSCS should pay that debt to the Company without further delay.

**RESERVATION OF RIGHTS**

431. The Committee reserves the right, to the extent permitted under the Bankruptcy Code or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtors and their estates against any third party.

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

(a) certifying the Shareholder Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) awarding Plaintiff damages in an amount to be determined at trial;

(c) imposing a constructive trust on assets of the defendants in the amount of all proceeds received by each such defendant in connection with the LBO Transaction;

(d) recharacterizing the Exchangeable Note as equity;

(e) avoiding the Shareholder Transfers, D&O Transfers, VRC Transfers, and EGI-TRB Transfers;

(f) granting recovery of all amounts paid in connection with the Shareholder Transfers, D&O Transfers, VRC Transfers, and EGI-TRB Transfers;

(g) awarding Plaintiff its attorneys' fees, costs and other expenses incurred in this action;

(h) awarding Plaintiff pre-and post-judgment interest at the legal rate; and

(i) awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: November 1, 2010
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Daniel B. Rath (No. 3022)
Rebecca L. Butcher (No. 3816)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- and -

Thomas G. Macauley (No. 3411)
**ZUCKERMAN SPAEDER LLP**
919 Market Street, Suite 990
Wilmington, Delaware 19801
Telephone: (302) 427-0400
Facsimile: (302) 428-8242

Graeme W. Bush
James Sottile
Andrew N. Goldfarb
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106