IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION | Consolidated Multidistrict Action |
| | No. 11 MD 2296 (RJS) |
| MARC S. KIRSCHNER, as Litigation Trustee for the TRIBUNE LITIGATION TRUST, | No. 12 MC 2296 (RJS) |
| Plaintiff, | |
| -against- | |
| DENNIS J. FITZSIMONS, ENRIQUE HERNANDEZ JR., BETSY D. HOLDEN, ROBERT S. MORRISON, WILLIAM A. OSBORN, J. CHRISTOPHER REYES, DUDLEY S. TAFT, MILES D. WHITE, JEFFREY CHANDLER, ROGER GOODAN, WILLIAM STINEHART JR., CHANDLER BIGELOW, DONALD C. GRENESKO, MARK W. HIANIK, DANIEL G. KAZAN, CRANE H. KENNEY, THOMAS D. LEACH, LUIS E. LEWIN, R. MARK MALLORY, HARRY AMSDEN, STEPHEN D. CARVER, THOMAS S. FINKE, ROBERT GREMILLION, DAVID DEAN HILLER, TIMOTHY P. KNIGHT, TIMOTHY J. LANDON, RICHARD H. MALONE, DURHAM J. MONSMA, IRVING L. QUIMBY, JOHN E. REARDON, SCOTT C. SMITH, JOHN J. VITANOVEC, KATHLEEN M. WALTZ, DAVID D. WILLIAMS, JOHN D. WORTHINGTON IV, CHANDLER TRUST NO. 1, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES; CHANDLER TRUST NO. 2 AND CHANDLER SUB-TRUSTS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES; PHILIP CHANDLER RESIDUARY TRUST NO. 2, MAY C. GOODAN TRUST NO. 2, RUTH C. VON PLATEN TRUST NO. 2, DOROTHY B. CHANDLER MARITAL TRUST NO. 2, DOROTHY B. CHANDLER RESIDUARY TRUST NO. 2, HOC TRUST NO. 2 FBO SCOTT HASKINS, HOC TRUST NO. 2 FBO JOHN HASKINS, HOC TRUST NO. 2 FBO ELIZA HASKINS, HOC GST EXEMPT TRUST NO. 2. FBO SCOTT HASKINS, HOC GST EXEMPT TRUST NO. 2. FBO JOHN HASKINS, HOC GST EXEMPT TRUST NO. 2. FBO ELIZA HASKINS, ALBERTA W. CHANDLER MARITAL TRUST NO. 2, EARL E. CROWE TRUST NO. 2, PATRICIA CROWE WARREN | No. 12 CV 2652 (RJS) **FIFTH AMENDED COMPLAINT** |

RESIDUARY TRUST NO. 2, HELEN GARLAND TRUST NO. 2 (FOR GWENDOLYN GARLAND BABCOCK), HELEN GARLAND TRUST NO. 2 (FOR WILLIAM M. GARLAND III), HELEN GARLAND TRUST NO. 2 (FOR HILLARY DUQUE GARLAND), GARLAND FOUNDATION TRUST NO. 2, MARIAN OTIS CHANDLER TRUST NO. 2, ROBERT R. MCCORMICK FOUNDATION, CANTIGNY FOUNDATION, SAMUEL ZELL, EQUITY GROUP INVESTMENTS, L.L.C., EGI-TRB, L.L.C., SAM INVESTMENT TRUST, TOWER CH, L.L.C., TOWER DC, L.L.C., TOWER DL, L.L.C., TOWER EH, L.L.C., TOWER GREENSPUN DGSPT, LLC, TOWER GREENSPUN JGGSTP, LLC, TOWER GREENSPUN SGFFT, LLC, TOWER GREENSPUN, L.L.C., TOWER HZ, L.L.C., TOWER JB, L.L.C., TOWER JK, L.L.C., TOWER JP, L.L.C., TOWER JS, L.L.C., TOWER KS, L.L.C., TOWER LL, L.L.C., TOWER LM, L.L.C., TOWER LZ, L.L.C., TOWER MH, L.L.C., TOWER MS, L.L.C., TOWER MZ, L.L.C., TOWER NL, L.L.C., TOWER PH, L.L.C., TOWER PT, L.L.C., TOWER SF, L.L.C., TOWER TT, L.L.C., TOWER VC, L.L.C., TOWER WP, L.L.C., GREATBANC TRUST COMPANY, DUFF & PHELPS, LLC, VALUATION RESEARCH CORPORATION, MORGAN STANLEY & CO. LLC f/k/a MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY CAPITAL SERVICES, INC., and the defendants listed in the attached Exhibit A,

-and-

AUTOMOBILE MECHANICS' LOCAL 701 PENSION FUND a/k/a AUTOMOBILE MECHANICS' LOCAL NO. 701 UNION AND INDUSTRY PENSION FUND, FRANK W. DENIUS, THE DFA INVESTMENT TRUST COMPANY, GDK INC., HUSSMAN STRATEGIC GROWTH FUND a/k/a THE HUSSMAN INVESTMENT TRUST, JOHN P. HUSSMAN, TRUSTEE, EDWIN R LABUZ IRA, AMERIPRISE TRUST COMPANY f/k/a H&R BLOCK FINANCIAL ADVISORS, CUSTODIAN, DENISE MECK, NATIONWIDE S&P 500 INDEX FUND, A SERIES OF NATIONWIDE MUTUAL FUNDS, NEW YORK STATE TEACHERS RETIREMENT SYSTEM, DOROTHY C. PATTERSON IRREVOCABLE TRUST #2 U/A/D 12-21-93, THE NORTHERN TRUST COMPANY, AS SUCCESSOR TRUSTEE, BLANDINA ROJEK, and VTRADER PRO, LLC, on behalf of themselves and a class of similarly situated persons and legal entities,

Defendants.

# TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................2

JURISDICTION AND VENUE .............................................................................10

THE PARTIES .......................................................................................................11

    A.    The Director Defendants ................................................................11

    B.    The Officer Defendants ...................................................................16

    C.    Additional Officers Who Received Monetary Transfers Related To The LBO ...................................................................................................19

    D.    The Subsidiary D&O Defendants ....................................................19

    E.    The Controlling Shareholder Defendants .........................................24

    F.    The Zell Defendants .........................................................................26

    G.    The Advisor Defendants ..................................................................30

    H.    The Shareholder Defendants ............................................................32

    I.    The Class Representative Defendants ...............................................32

CLASS ALLEGATIONS .......................................................................................34

FACTS ...................................................................................................................36

I.    Tribune's Business And Its Operations .....................................................36

II.    Overview Of The Tribune LBO .................................................................37

III.    Prior To The LBO, The Secular Decline In The Publishing Industry And Tribune's Deteriorating Performance Led The Controlling Shareholders To Begin Looking For An Exit Plan From The Company ...................................................................39

    A.    The Publishing Industry—And Tribune To A Greater Extent—Were In The Midst Of A Deep Secular Decline During The Period Leading Up To The LBO .................................................................................................39

    B.    The Chandler Trusts Voice Serious Concerns About The Company's Future And Begin Agitating For Change ..........................................42

    C.    The Tribune Board Acquiesces In The Chandler Trusts' Demands, And The Controlling Shareholders Inject Themselves Into The Special Committee Process ........................................................................46

IV.    Zell Proposes The Highly-Leveraged LBO, And Structures It To Respond To The Controlling Shareholders' Concerns ...................................................49

V.    Wall Street Derides Zell's Proposal As The Company's Performance Continues To Deteriorate .................................................................................................52

    A.    Rating Agencies And Analysts Raise Concerns About The Zell Proposal ...........52

    B.    The Company's Performance Raises Even More Concerns Among Certain Of The Defendants .............................................................................53

VI.   The Parties Charged With Protecting The Company Are Lured By Financial
      Incentives To Support Zell's Proposal ................................................54

      A.    Zell Induces The Officer Defendants And Subsidiary D&O Defendants To
            Recommend And Facilitate The LBO..............................................54

      B.    The Company's Financial Advisors Are Incentivized To Favor The LBO...........57

VII.  Incentivized To Favor The LBO, The Officer Defendants Create Fraudulent,
      Unrealistic Projections ............................................................59

VIII. The Company Struggles To Find A Firm Willing To Opine That The Company
      Would Be Solvent Following The LBO.................................................63

      A.    Duff & Phelps Declines To Provide Tribune With A Solvency Opinion For
            The LBO, Instead Providing The ESOP With A "Viability Opinion" ...............63

      B.    Tribune Retains VRC To Issue A Solvency Opinion After Houlihan Lokey
            Voices Concerns Over The LBO.................................................71

IX.   Lured By The Financial Incentives Associated With The LBO, The Controlling
      Shareholders And Tribune Directors Facilitate And Approve The Transaction ...........73

      A.    Zell Induces The Controlling Shareholders And Chandler Trust
            Representatives To Support The LBO By Proposing A Higher Purchase
            Price For Shareholders.......................................................73

      B.    The Special Committee And Tribune Board Breach Their Fiduciary Duties
            By Approving The LBO.........................................................76

X.    The Company Begins Implementing The Disastrous LBO Amid A Growing
      Chorus Of Criticism Of The Transaction ............................................82

      A.    Tribune Announces The LBO And Begins Taking The Steps Necessary To
            Consummate The Transaction...................................................82

      B.    In Connection With The LBO, Tribune Enters Into Loan Agreements That
            Are Designed To Hinder, Delay, And Defraud Its Existing Creditors .................83

      C.    The LBO Was A Single Unitary Transaction With Two Steps............................86

      D.    Rating Agencies, Wall Street Analysts, News Publications, And Investors
            React Negatively To The LBO..................................................89

XI.   The Company Engages In Intentional Fraud In Order To Close Step One.......................92

      A.    The D&O Defendants, Controlling Shareholders, Zell, And Advisor
            Defendants Purport To Rely On The Outdated, Unreasonably Optimistic
            February 2007 Projections In Order To Obtain A Step One Solvency
            Opinion .....................................................................92

      B.    The Officer Defendants Instruct VRC To Deviate From Industry Practice
            In Issuing Its Solvency Opinions ............................................98

XII.    VRC Improperly Renders The Step One Solvency Opinion ............................................99

XIII.   The Company's Fiduciaries Ignore The Company's Performance And The Cacophony Of Voices Warning Against The LBO And Permit The Transaction To Proceed....................................................................................................................101

     A.      The Special Committee And The Tribune Board Breach Their Fiduciary Duties In Connection With Step One ..................................................101

     B.      The Subsidiary D&O Defendants Approve The Subsidiary Guarantees Through A Grossly Deficient And Conflicted Process .......................................102

     C.      Step One Of The LBO Closes.................................................................104

XIV.   The Publishing Industry And Tribune Continue To Decline Between The Close Of Step One And Step Two .........................................................................................105

     A.      The Secular Decline In The Publishing Industry Worsens ....................105

     B.      Tribune Significantly Underperforms The February 2007 Projections And Is Further Downgraded ........................................................................106

XV.    The LBO Lenders Begin To Question The Company's Solvency ...................107

XVI.   The Company Engages In Intentional Fraud In Order To Close Step Two ...................110

     A.      The Officer Defendants Create Unreliable, Overly Optimistic Projections In Order To Obtain A Solvency Opinion At Step Two.........................110

     B.      The Officer Defendants Reap The Benefits Of Altering The Definition Of Fair Value, And Instruct VRC To Artificially Lower The Amount Of Company Debt When Assessing Balance Sheet Solvency ..................113

     C.      Certain Officer Defendants Misrepresent To VRC That An Outside Financial Advisor Agreed That Tribune Would Be Able To Refinance Its Debt.....................................................................................................115

XVII.   VRC Ignores Its Own Internal Analysis And Adopts Management's Inflated October 2007 Projections In Issuing Its Step Two Solvency Opinion...........................116

XVIII. Tribune's Fiduciaries Fail, Once Again, To Protect The Company ................119

     A.      The Tribune Board And Special Committee Breach Their Fiduciary Duties In Connection With VRC's Step Two Solvency Opinion ....................119

     B.      Morgan Stanley Fails To Inform Tribune of Its Concerns That Tribune Would Be Insolvent If Step Two Closed............................................121

     C.      Zell Uses His Influence To Ensure That The LBO Is Consummated .................125

XIX.  The LBO Closes And Tribune Collapses Under Its Massive Debt Burden ....................128

XX.  Morgan Stanley's Insider Trading .................................................................................131

GROUNDS FOR RELIEF ...........................................................................................................134

COUNT ONE:
Avoidance And Recovery Of The Shareholder Transfers (Of At Least $8 Billion) As Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And 550(a) Of The Bankruptcy Code Against The Shareholder Defendants And The Shareholder Class ...........................................................................134

COUNT TWO:
Violations Of Delaware General Corporation Law Sections 160 And/Or 173 Against The Director Defendants And Zell....................................................138

COUNT THREE:
Breach Of Fiduciary Duty Against The Director Defendants............................139

COUNT FOUR:
Breach Of Fiduciary Duty Against The Officer Defendants...............................142

COUNT FIVE:
Breach Of Fiduciary Duty Against Zell ............................................................145

COUNT SIX:
Aiding And Abetting Breaches Of Fiduciary Duty By The D&O Defendants And By The Controlling Shareholder Defendants Against The Zell Defendants ...................................................................................................147

COUNT SEVEN:
Avoidance And Recovery Of The EGI-TRB Transfers (Of At Least $258,918,859) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against EGI-TRB ................................................................................................150

COUNT EIGHT:
Alter Ego Liability Against EGI, Sam Investment Trust, And Zell ....................151

COUNT NINE:
Preference Against Zell And EGI-TRB To Recover The Exchangeable Note Transfer (Of At Least $206,418,859) And The EGI-TRB Fee Transfers (Of At Least $2.5 Million) ................................................................153

COUNT TEN:
Preference Against EGI To Recover The EGI Reimbursements (Of At Least $586,759)....................................................................................................154

COUNT ELEVEN:
Avoidance And Recovery Of The EGI Reimbursements (Of At Least $586,759) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against EGI .....................................................................................................154

COUNT TWELVE:
    Breach Of Fiduciary Duty Against The Subsidiary D&O Defendants ...............155

COUNT THIRTEEN:
    Aiding And Abetting Breach Of Fiduciary Duty Against The Subsidiary
    D&O Defendants And Amsden..........................................................................158

COUNT FOURTEEN:
    Breach Of Fiduciary Duty Against The Chandler Trusts And The
    Foundations.....................................................................................................159

COUNT FIFTEEN:
    Aiding And Abetting Breach Of Fiduciary Duty Against The Chandler
    Trust Representatives And The Controlling Shareholders..................................163

COUNT SIXTEEN:
    Aiding And Abetting Breach Of Fiduciary Duty Against VRC.........................164

COUNT SEVENTEEN:
    Professional Malpractice Against VRC ............................................................166

COUNT EIGHTEEN:
    Avoidance And Recovery Of The VRC Transfers (Of At Least $1.5
    Million) As Constructive And/Or Actual Fraudulent Transfers Under
    Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code
    Against VRC ...................................................................................................167

COUNT NINETEEN:
    Aiding And Abetting Breach Of Fiduciary Duty Against GreatBanc And
    Duff & Phelps .................................................................................................168

COUNT TWENTY:
    Avoidance And Recovery Of The Morgan Stanley Advisor Fees (At Least
    $10 Million) As Constructive And/Or Actual Fraudulent Transfers Under
    Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code
    Against Morgan Stanley....................................................................................170

COUNT TWENTY ONE:
    Aiding And Abetting Breach Of Fiduciary Duty Against Morgan Stanley .........171

COUNT TWENTY TWO:
    Professional Malpractice Against Morgan Stanley ............................................173

COUNT TWENTY THREE:
    Preference Against Morgan Stanley To Recover The Morgan Stanley
    Reimbursement (Of At Least $46,020)..............................................................174

COUNT TWENTY FOUR:
    Fraud/Insider Trading Against Morgan Stanley.................................................175

COUNT TWENTY FIVE:
    Breach Of Fiduciary Duty Against Morgan Stanley ..........................................176

COUNT TWENTY SIX:
    Aiding And Abetting Breach Of Fiduciary Duty Against MSCS .......................178

COUNT TWENTY SEVEN:
    Breach Of Contract, Including Breach Of Covenant Of Good Faith And
    Fair Dealing, Against MSCS................................................................................178

COUNT TWENTY EIGHT:
    Willful Violation Of The Automatic Stay Against MSCS ...................................179

COUNT TWENTY NINE:
    Equitable Subordination And Disallowance Of The MSCS Claim And
    Denial Of Setoff Against MSCS .........................................................................180

COUNT THIRTY:
    Turnover To Recover Under The Swap Agreement (Of At Least $59.6
    Million) Against MSCS .......................................................................................180

COUNT THIRTY ONE:
    Unjust Enrichment Against The D&O Defendants, Subsidiary D&O
    Defendants, Controlling Shareholders, Zell Defendants, Tower
    Defendants, VRC, GreatBanc, Duff & Phelps, And Morgan Stanley.................181

COUNT THIRTY TWO:
    Recharacterization Of The Exchangeable Note As Equity Pursuant To 11
    U.S.C. § 105........................................................................................................182

COUNT THIRTY THREE:
    Equitable Subordination And Disallowance Of The D&O Creditor Claims,
    Subsidiary Creditor Claims, Zell Claims, EGI-TRB Claims, And Tower
    Claims .................................................................................................................184

COUNT THIRTY FOUR:
    Avoidance And Recovery Of The Insider Payments (Of At Least $81
    Million) As Constructive And/Or Actual Fraudulent Transfers Under
    Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code
    Against The Defendants Listed Herein And In Exhibit C ...................................186

COUNT THIRTY FIVE:
    Preference Against The D&O Defendants, The Subsidiary D&O
    Defendants, And The Additional Officer Recipients To Recover The
    Insider Payments (Of At Least $81 Million).......................................................188

COUNT THIRTY SIX:
    Avoidance Of The Indemnification Obligations As Constructive And/Or
    Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And
    550(a) Of The Bankruptcy Code Against The D&O Defendants, The
    Subsidiary D&O Defendants, And The Additional Officer Recipients ...............189

RESERVATION OF RIGHTS .................................................................................191

PRAYER FOR RELIEF............................................................................................191

Plaintiff, Marc S. Kirschner, as Litigation Trustee (the "Litigation Trustee") for the Tribune Litigation Trust (the "Litigation Trust"), on behalf of the Chapter 11 estates of the debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"),[1] respectfully alleges as follows:

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, were: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (I507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each of these Debtors is 435 North Michigan Avenue, Chicago, Illinois 60611.

## NATURE OF THE ACTION

*"[W]hat the Trusts saw was a four-star black-diamond run headed straight downhill. . . . [W]e wanted off the ski slope."*

> – William Stinehart, member of Tribune's Board of Directors and representative of the Chandler Trusts, Tribune's largest shareholder, describing Tribune's prospects prior to the leveraged buyout that rescued the Trusts and their fellow shareholders, but buried the Company in ruinous debt.

*"God understands, but may not forgive us for what are bout to do to good Olde TRB."*

> – Joseph Hays, of the McCormick Foundation, Tribune's second largest shareholder, on the day Tribune's Board approved the Company's LBO.

1.      This lawsuit arises out of the destruction of Tribune Company by greed, fraud, and financial chicanery.  The facts of this case show how a desire to make fast bucks for shareholders led to the bankruptcy of one of America's most venerable media companies, with massive job cuts and huge losses for Tribune's creditors.  Under the law, those creditors, which lent billions of dollars to Tribune, were supposed to be paid before the shareholders of the Company.  Instead, the wealthy trusts and foundations that controlled Tribune instigated a leveraged buyout that funneled more than $8 billion to them, other corporate insiders, and thousands of fellow shareholders, enriched the Company's management with tens of millions of dollars of bonuses and other financial incentives, and paid huge fees to Wall Street advisors. Tribune was left an insolvent wreck, and filed for bankruptcy less than one year after the transaction was completed.

2.      By this action, Tribune's Litigation Trustee seeks to hold responsible those who orchestrated and benefited from what defendant Samuel Zell, the Chicago billionaire at the center of the debacle, called "the deal from hell."  Substantial fault, ranging from gross

negligence to intentional fraud, can be laid at the feet of virtually every participant in the transaction. Consumed by self-interest, these defendants cared not what happened to Tribune and its existing creditors so long as they got their own money out or their fees paid.

3.     The defendants here include the members of Tribune's Board of Directors, who collectively received more than $28 million in LBO proceeds. These directors breached their fiduciary duties of care, loyalty, and good faith in approving a transaction that loaded Tribune with unsustainable levels of debt in order to finance payments to shareholders, including themselves.

4.     The Tribune officers named as defendants were rewarded even more richly than Tribune's Board, receiving collectively more than $79 million in LBO proceeds and special compensation, all contingent on consummation of the LBO. In order to reap this massive windfall, Tribune's managers created and clung to patently unrealistic projections of future earnings to give the illusion that Tribune would be able to handle the avalanche of debt it would incur in the LBO, despite the Company's underperformance in a declining industry. Tribune's financial advisors turned a blind eye to management's transparent manipulations so the advisors could collect the large fees that would be due them only if the deal proceeded. These advisors knew, or were reckless or grossly negligent in not knowing, that the LBO would render Tribune insolvent, but decided to pretend otherwise or keep silent.

5.     The directors and officers of Tribune's operating subsidiaries—the entities that owned virtually all of Tribune's assets—permitted the subsidiaries to guarantee the LBO debt incurred by Tribune without so much as a meeting or board vote, despite the fact that the subsidiaries received no value of any kind in exchange for their guarantees. The subsidiary directors and officers thereby advanced the LBO lenders' quest to unfairly prime Tribune's pre-

existing creditors in the event of a bankruptcy, breached their own fiduciary duties to the subsidiaries, and aided and abetted breaches of duties owed by the other defendants.

6.     But the biggest beneficiaries of the LBO were Tribune's shareholders who, after seeing their shares drop in value by one-third from 2003 to 2006, were cashed out at a premium price of $34 per share, with roughly half the shares purchased in June 2007 and the rest in December 2007.  Topping the list of the shareholders were the Chandler Trusts, which got $1.5 billion for their shares.  They were followed by the McCormick and Cantigny Foundations—led by Tribune's Chief Executive Officer, Dennis J. FitzSimons—which received more than $1 billion.  Billions of dollars more were distributed to investment funds, trusts, pension funds, wealthy individuals, and others, all of whom "jumped the line" in order improperly to bail out of Tribune ahead of its lawful creditors.  (Although there were tens of thousands of shareholders, only the largest ones—those who received at least $50,000 each—are individually named in this complaint and are included in a proposed defendant class.)

7.     From the outset, Tribune was a terrible candidate for a highly leveraged buyout, a form of transaction in which a company's shares are purchased with money borrowed by the corporation itself.  Because an LBO encumbers a company with substantial—or, in this case, massive—debt, it is risky even under the best of circumstances.  As was contemporaneously acknowledged by many observers, Tribune's LBO was doomed to fail from its inception, as it was effectuated during a time of dramatic, relentless, and irreversible declines in the newspaper industry, which was seeing both advertisers and subscribers abandon traditional print media and migrate to online alternatives.  The resulting drop in revenues and profits was universally regarded by industry experts and analysts as a fundamental shift from which the industry could not expect to recover.  Tribune, which relied on newspaper publishing for 75% of its revenue,

was suffering not only from this industry-wide decline, but also from Company-specific obstacles that rendered it one of the worst-performing businesses in its sector.

8.     Alarmed by the declining value of its investment, Tribune's largest shareholder, the Chandler Trusts, began agitating in 2006 for the Company to consummate a strategic transaction designed to provide value to shareholders.  The Trusts were painfully aware of the headwinds facing Tribune.  Indeed, one of the Trusts' representatives on Tribune's Board argued that the Company's performance would not improve in the foreseeable future, and that the projections prepared by Tribune management were overly optimistic and unsupportable.  The Chandler Trusts warned that if the Tribune Board failed to take prompt action, the Trusts would "begin actively purs[uing] possible changes in Tribune's management."

9.     The Company responded in September 2006 by appointing a special committee of directors to explore strategic alternatives.  The Special Committee initially concentrated on transactions that would involve the Company incurring relatively modest amounts of additional debt to fund a stock dividend or other deal that would leave Tribune's shareholders—including Tribune's directors and officers—still owning the Company.  During this period, while Tribune's fiduciaries still believed they had "skin in the game," the Board and management focused intently on the quality of the Company's financial projections, and sought to ensure that Tribune would be able to service the debt associated with any proposed transaction.  Yet these fiduciaries' approach quickly changed when the risk of insolvency was shifted entirely away from themselves and onto Tribune's creditors through the LBO proposed by Zell.

10.     Zell submitted his LBO bid for Tribune in February 2007, proposing an unusual takeover structure that would ultimately enable him to obtain control of the multibillion-dollar corporation while investing only $306 million of his own money in the Company.  Zell's deal

called for the Company to increase its total debt from approximately $5.6 billion to a whopping $13.7 billion to purchase or redeem its outstanding shares, refinance its existing bank debt, and pay investment banking fees and other costs associated with the transaction.  Immediately upon the Company's announcement that it was contemplating the LBO, Wall Street analysts and rating agencies uniformly derided the deal, characterizing it as "way too risky," with many explicitly predicting the LBO would "put the company into bankruptcy."

11.     Although Zell's proposal was far riskier to the Company than any transaction the Board and Special Committee had seriously considered in the past, the LBO provided that Tribune's directors, officers, and other shareholders would no longer bear the risk of the Company's failure, since they would be cashed out of the Company entirely.  Suddenly, the attitude of Tribune's Board and management toward increased leverage changed.  They now became concerned only with ensuring that shareholders would be paid a high price for their shares, regardless of whether the increased share price burdened the Company and its creditors with an unsustainable level of debt.  Once presented with an escape route from the Company, Tribune's directors, officers, and controlling shareholders no longer cared about Tribune's survival.

12.     In order to give the false impression that the Company's future earnings would be sufficient to service its enormous debt load following the LBO, certain of Tribune's officers prepared fraudulent "base case" financial projections in February 2007, predicting a miraculous, near-term financial recovery by Tribune notwithstanding the deteriorating state of the publishing industry and of Tribune's own business.  Seeking to perpetuate the illusion of sound financial health, senior management concealed their projections from many of the executives responsible

for Tribune's day-to-day operations, fearing that such executives would disavow senior management's wildly optimistic, "hockey stick" projections for the coming year.

13. Management's pie-in-the-sky projections were obviously wrong even when they first were circulated in February 2007. Their unreliability was confirmed by the time the first step of the LBO was about to close in June 2007. By then, Tribune's actual results for most of the first two quarters were in. Those results showed that Tribune's performance was already lagging management's 2007 base case by a significant margin, and that meeting management's February projections would have required the Company to first miraculously reverse its decline, and then suddenly and substantially outperform its 2006 performance. Nevertheless, management refused for months to revise the discredited February projections. When Tribune management finally prepared a modified set of projections in October 2007, they offset the expected lower financial performance for the remainder of 2007 by fraudulently increasing the Company's projected growth rate for 2008 and beyond. Tribune's directors, officers, advisors, and Zell continued to cite the rosy projections as a justification for closing the LBO, even after the Company's progressive deterioration showed that it would be virtually impossible for the Company to achieve them.

14. Company advisors Merrill, Lynch, Pierce, Fenner & Smith Incorporated and Citigroup Global Markets, Inc. were incentivized to promote the LBO over other proposals being considered by the Company because their retention agreements expressly provided that they could participate as lenders in the transaction. Providing such financing would enable these banks to reap tens of millions of dollars in financing fees on top of the tens of millions of dollars they were already being paid for their advisory services. They were thus heavily biased in favor of the LBO, which they zealously advocated to the Tribune Board and Special Committee,

notwithstanding that they had significant misgivings about the transaction. Not only did these banks acquiesce in what they knew were unreasonable and unreliable projections engineered by management at both steps of the LBO, Citigroup played an active role in preparing the financial modeling that underlay those inflated projections.

15.     Morgan Stanley similarly abdicated its duty in pursuit of an enhanced payday. As a trusted advisor to the Company's Board and its Special Committee, by May 2007 it had been paid more than $10 million in fees for work relating to the LBO. But Morgan Stanley wanted more—in the form of a discretionary fee spelled out in its engagement letter—and it knew that if the LBO did not proceed, it would get paid nothing else. So while its senior representatives were participating in numerous meetings of the Board and Special Committee concerning the LBO in the fall of 2007, they were simultaneously concealing Morgan Stanley's own internal analyses showing that the Company faced insolvency if the LBO were consummated. With the hope of garnering a discretionary fee upon closing if it kept quiet about the LBO's likely devastating impact, Morgan Stanley chose to abandon its fiduciary duties.

16.     Morgan Stanley and its affiliate, Morgan Stanley Capital Services, compounded this wrongful conduct by engaging in an insider trading scheme in which Morgan Stanley, while in possession of material non-public information concerning Tribune's financial condition and bankruptcy plans, purchased the Company's publicly traded debt at a steep discount, with the intent to set off the full face value of the debt against the amount the affiliate owed Tribune under a swap agreement in the event of Tribune's bankruptcy.

17.     Both steps of the LBO were conditioned upon the issuance of solvency opinions stating that the Company would be balance-sheet solvent, adequately capitalized, and able to pay its debts as they came due following consummation. This was an opportunity for Tribune's

fiduciaries to halt the LBO if it became apparent that the transaction posed unacceptable risks to the Company. Yet instead of treating the solvency opinion requirement as an opportunity to fully vet the wisdom of the LBO given the Company's steadily worsening financial condition, Tribune's management and the Company's advisors treated it only as an obstacle to circumvent.

18.     Tribune originally approached Duff & Phelps to provide a solvency opinion in the event of an LBO, but Duff & Phelps determined it could not do so without violating accepted practices for analyzing company solvency. Still eager for fees, Duff & Phelps agreed to repackage its analysis as a "viability opinion," which it provided to the trustee of the Tribune employee stock ownership plan ("ESOP") that would become the new owner of Tribune after the LBO. With the Duff & Phelps opinion in hand, the ESOP trustee facilitated the LBO by voting all of the ESOP's shares in favor of the transaction instead of seeking to stop it.

19.     After yet another firm refused the solvency opinion engagement based on its conclusion that it could not opine that Tribune would be solvent following the LBO, Tribune's management hastily agreed to pay a third firm, Valuation Research Corporation ("VRC"), the highest fee VRC had ever earned for issuing solvency opinions. Tribune's management directed VRC not only to rely on the Company's tainted projections, but also to depart from the accepted definition of fair value—something VRC had never done before—to enable VRC to inflate the Company's value for purposes of finding solvency. Management also instructed VRC to discount the amount of Tribune's subordinated debt obligations for purposes of the solvency analysis. In addition, to induce VRC to issue its solvency opinion at the second step of the LBO, certain Tribune officers misrepresented to VRC that Morgan Stanley had agreed that Tribune would be able to refinance approximately $8 billion of debt in 2014 and 2015 even if the Company was underperforming its base case projections.

20.    The LBO imposed nearly $14 billion of debt on a Company that, at the time the second step of the LBO closed in December 2007, was worth no more than $10.4 billion and that, by its own admission, was worth no more than $7 billion just months later.  As many in the financial and newspaper publishing industries predicted, the Company filed for bankruptcy less than one year later, causing enormous loss to the Company and its pre-LBO creditors, who received only cents on the dollar.  The goal (and natural consequence) of the LBO—to hinder, delay, and defraud the Company's existing creditors in order to provide value to the Company's shareholders ahead of those creditors—had been achieved.

21.    The Litigation Trustee therefore brings this action in order to remedy the harm caused by this fraudulent scheme, by compensating Tribune and its unpaid creditors for the wrongs committed by Zell, Tribune's controlling shareholders, and the director, officer, and advisor defendants in connection with the LBO, and by requiring Tribune's shareholders to restore to Tribune's unpaid creditors the priority of payment to which they are legally entitled.

## JURISDICTION AND VENUE

22.    The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the District of Delaware (the "District of Delaware") referring to the Bankruptcy Judges of the District of Delaware all cases and proceedings arising under title 11 of the United States Code (the "Bankruptcy Code").

23.    This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.  Plaintiff also consents to the entry of final orders or judgments by the Bankruptcy

Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

24.     Venue in the District of Delaware, the transferor district, is and was proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

25.     Venue in this Court presently is proper under 28 U.S.C. § 1407 and an order of the Judicial Panel on Multidistrict Litigation ("JPML") transferring this action to this Court for pre-trial administration.

## THE PARTIES

26.     Plaintiff is the Litigation Trustee of the Tribune Litigation Trust, which was created pursuant to the Fourth Amended Plan of Reorganization (the "Plan") for the Tribune Company ("Tribune" or the "Company") and its related Debtor subsidiaries.  Following an evidentiary confirmation hearing respecting a prior version of the Plan that lasted more than two weeks, and a subsequent confirmation hearing respecting the Plan, the Bankruptcy Court confirmed the Plan on July 23, 2012.  Pursuant to the Plan, certain causes of action commenced on behalf of the Debtors' estates, including those asserted herein, were transferred to the Litigation Trust.  The Litigation Trustee has been granted authority and standing to pursue those causes of action on behalf of the beneficiaries of the Litigation Trust, the Debtors' creditors, which received only a fraction of their allowed claims against the Debtors in the Debtors' bankruptcy proceeding.

### A.     The Director Defendants

27.     Defendant Dennis J. FitzSimons ("FitzSimons") was the President and Chief Executive Officer ("CEO") of Tribune and the Chairman of Tribune's Board of Directors (the "Tribune Board") at the time of the LBO.  As an officer of Tribune, FitzSimons was integrally

involved in planning, negotiating, and facilitating the LBO. As a director of Tribune, FitzSimons voted in favor of the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that FitzSimons knew, or was reckless or grossly negligent in not knowing, were materially flawed. Also at the time of the LBO, FitzSimons was the Chairman of the Robert R. McCormick Foundation (the "McCormick Foundation"), one of Tribune's largest shareholders prior to the LBO. Through that position, which he still holds, FitzSimons effectively controlled the McCormick Foundation. At the time of the transaction, FitzSimons was also a member of the board of directors of the Cantigny Foundation (the "Cantigny Foundation," and together with the McCormick Foundation, the "Foundations"), another of Tribune's largest shareholders, and an affiliate of the McCormick Foundation, and still holds that position. FitzSimons was also a director of one or more of the Subsidiary Guarantors (defined below) at the time of the LBO. Upon information and belief, FitzSimons lives in Illinois. FitzSimons filed three proofs of claim in the Debtors' Chapter 11 cases.

28.     Defendant Enrique Hernandez Jr. ("Hernandez") was a director of Tribune at the time of the LBO. As a director, Hernandez approved the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that Hernandez knew, or was reckless or grossly negligent in not knowing, were materially flawed. Hernandez also served as a member of the special committee (the "Special Committee") of the Tribune Board that was formed in September 2006 to oversee the Company's exploration of alternatives and which ultimately recommended that the full Tribune Board approve the LBO. Upon information and belief, Hernandez lives in California. Hernandez filed one proof of claim in the Debtors' Chapter 11 cases.

29.     Defendant Betsy D. Holden ("Holden") was a director of Tribune at the time of the LBO and remains a director.  As a director, Holden approved the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that Holden knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Holden also served as a member of the Special Committee that recommended that the full Tribune Board approve the LBO.  Upon information and belief, Holden lives in Illinois.  Holden filed one proof of claim in the Debtors' Chapter 11 cases.

30.     Defendant Robert S. Morrison ("Morrison") was a director of Tribune at the time of the LBO.  As a director, Morrison approved the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that Morrison knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Morrison also served as a member of the Special Committee.  Upon information and belief, Morrison lives in Illinois.  Morrison filed one proof of claim in the Debtors' Chapter 11 cases.

31.     Defendant William A. Osborn ("Osborn") was a director of Tribune at the time of the LBO.  As a director, Osborn approved the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that Osborn knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Osborn also served as Chair of the Special Committee.  Upon information and belief, Osborn lives in Illinois.  Osborn filed one proof of claim in the Debtors' Chapter 11 cases.

32.     Defendant J. Christopher Reyes ("Reyes") was a director of Tribune at the time of the LBO.  As a director, Reyes approved the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that Reyes knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Reyes also served as a member of the Special

Committee. Upon information and belief, Reyes lives in Illinois. Reyes filed one proof of claim in the Debtors' Chapter 11 cases.

33.     Defendant Dudley S. Taft ("Taft") was a director of Tribune at the time of the LBO. As a director, Taft advocated in favor of the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that Taft knew, or was reckless or grossly negligent in not knowing, were materially flawed. Taft also served as a member of the Special Committee. Upon information and belief, Taft lives in Ohio. Taft filed one proof of claim in the Debtors' Chapter 11 cases.

34.     Defendant Miles D. White ("White") was a director of Tribune at the time of the LBO. As a director, White approved the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that White knew, or was reckless or grossly negligent in not knowing, were materially flawed. White also served as a member of the Special Committee. Upon information and belief, White lives in Illinois. White filed one proof of claim in the Debtors' Chapter 11 cases.

35.     Defendant Jeffrey Chandler ("Chandler") was a director of Tribune at the time of the LBO and until his resignation on or about June 4, 2007, the date on which the first step of the LBO closed. Chandler served on the Tribune Board as a representative of the Chandler Trusts (defined below), of which he is a trustee and beneficiary. The Chandler Trusts were at that time among Tribune's largest shareholders. As a director, Chandler discussed and advocated in favor of the LBO, and caused the Company to purportedly rely on financial projections and a solvency opinion that Chandler knew, or was reckless or grossly negligent in not knowing, were materially flawed. Upon information and belief, Chandler lives in California.

36.     Defendant Roger Goodan ("Goodan") was a director of Tribune at the time of the LBO and until his resignation on or about June 4, 2007.  Goodan served on the Tribune Board as a representative of the Chandler Trusts, of which he is a trustee and beneficiary.  As a director, Goodan discussed and advocated in favor of the LBO, and caused the Company to purportedly rely on financial projections and a solvency opinion that Goodan knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Upon information and belief, Goodan lives in Washington.

37.     Defendant William Stinehart Jr. ("Stinehart") was a director of Tribune at the time of the LBO and until his resignation on or about June 4, 2007.  Stinehart served on the Tribune Board as a representative of the Chandler Trusts, of which he is a trustee.  As a director, Stinehart discussed and advocated in favor of the LBO, and caused the Company to purportedly rely on financial projections and a solvency opinion that Stinehart knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Upon information and belief, Stinehart lives in California.

38.     Defendants Chandler, Goodan and Stinehart are sometimes collectively referred to as the "Chandler Trust Representatives."  Defendants FitzSimons, Hernandez, Holden, Morrison, Osborn, Reyes, Taft, White, Chandler, Goodan, and Stinehart are sometimes collectively referred to as the "Director Defendants."

39.     The Director Defendants each had a significant monetary incentive to approve and facilitate the LBO.  The Director Defendants, individually or through trusts, retirement plans, or related entities, received at least the following material amounts by selling their Tribune shares in connection with the LBO, for a total of more than $28.1 million:

| Director Defendants | |
|---|---|
| **Defendant Name** | **Amount Received by Selling or Redeeming Shares in the LBO** |
| FitzSimons | $21,215,999 |
| Hernandez | $462,701 |
| Holden | $371,950 |
| Morrison | $524,528 |
| Osborn | $484,058 |
| Reyes | $586,441 |
| Taft | $3,431,892 |
| White | $295,732 |
| Chandler | $380,358 |
| Goodan | $257,550 |
| Stinehart | $137,394 |
| **Total** | **$28,148,603** |

40.     Defendant FitzSimons also received more than $28 million in additional special monetary incentives that were triggered by the LBO.  The Foundations, on whose behalf FitzSimons sat on the Tribune Board, received more than $1 billion by selling or redeeming their Tribune shares in connection with the LBO.  The Chandler Trusts, whose interests were represented on the Tribune Board by defendants Chandler, Goodan, and Stinehart, received more than $1.5 billion by selling their Tribune shares in connection with the LBO.

**B.     The Officer Defendants**

41.     The defendants listed in the following paragraphs 42-47, together with FitzSimons, are collectively referred to as the "Officer Defendants."  The Officer Defendants were keenly involved in the Company's review, acceptance, and facilitation of the LBO; created the fraudulent projections on which the LBO was premised; and worked closely with the Company's solvency advisor—defendant VRC—to manipulate the solvency opinions they issued and ensure that VRC would opine, falsely, that the Company was solvent at each step of the LBO.

42.     Defendant Chandler Bigelow ("Bigelow") was Tribune's Treasurer at the time of the LBO, and is currently Tribune's Chief Financial Officer.  Bigelow was also an officer of one or more of the Subsidiary Guarantors (defined below) at the time of the LBO, and executed the Subsidiary Guarantees (defined below) on behalf of all of the Subsidiary Guarantors.  Upon information and belief, Bigelow lives in Illinois.  The Debtors listed Bigelow as the holder of one or more unsecured claims on Schedule G of the Debtors' Schedules.

43.     Defendant Donald C. Grenesko ("Grenesko") was Tribune's Senior Vice President of Finance and Administration at the time of the LBO.  Upon information and belief, Grenesko lives in Illinois.  Grenesko filed two proofs of claim in the Debtors' Chapter 11 cases.

44.     Defendant Mark W. Hianik ("Hianik") was Tribune's Assistant General Counsel and Assistant Secretary at the time of the LBO.  Hianik was also a director and officer of one or more of the Subsidiary Guarantors at that time.  Upon information and belief, Hianik lives in Illinois.  Hianik filed two proofs of claim in the Debtors' Chapter 11 cases.

45.     Defendant Daniel G. Kazan ("Kazan") was Tribune's Vice President of Development at the time of the LBO, and currently is Tribune's Senior Vice President, Investments.  Upon information and belief, Kazan lives in Illinois.  Kazan filed one proof of claim in the Debtors' Chapter 11 cases.

46.     Defendant Crane H. Kenney ("Kenney") was Tribune's Senior Vice President, General Counsel and Secretary at the time of the LBO.  Kenney was also a director and officer of one or more of the Subsidiary Guarantors at that time.  Upon information and belief, Kenney lives in Illinois.  Kenney filed one proof of claim in the Debtors' Chapter 11 cases.

47.     Defendant Harry Amsden ("Amsden") was the Vice President of Finance of Tribune Publishing Company, a subsidiary of Tribune, and an officer of Tribune National

Marketing Company, another subsidiary of Tribune, at the time of the LBO. Notwithstanding that Amsden was an officer of these Tribune subsidiaries, he was integral in helping to facilitate the LBO on Tribune's behalf. Thus, Amsden owed fiduciary duties not only to Tribune Publishing Company and Tribune National Marketing Company, but also directly to Tribune. Upon information and belief, Amsden lives in Illinois. Amsden filed one proof of claim in the Debtors' Chapter 11 cases.

48.     Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "D&O Defendants." All claims of the D&O Defendants reflected on the Debtors' Schedules or any proofs of claim filed by, or on behalf of, any of the D&O Defendants are collectively referred to herein as the "D&O Creditor Claims."

49.     Each of the Officer Defendants had a substantial monetary incentive to approve the LBO. First, the Officer Defendants, individually or through trusts, retirement plans, or related entities, knew that they would collectively receive more than $36 million by selling or redeeming their Tribune shares in connection with the LBO; second, the Officer Defendants knew they would collectively receive more than $42 million in additional special monetary incentives if the LBO was consummated. The breakdown of the amounts received by the Officer Defendants in connection with the LBO was as follows:

| Officer Defendants | | |
| --- | --- | --- |
| **Defendant Name** | **Amount Received by Selling or Redeeming Shares in the LBO** | **Special Monetary Incentives Triggered by the LBO** |
| Amsden | $0 | $867,324 |
| Bigelow | ███████ | $1,335,620 |
| FitzSimons | $21,215,999 | $28,729,798 |
| Grenesko | $10,668,400 | $6,733,557 |
| Hianik | ███████ | $809,019 |
| Kazan | ███████ | $1,253,027 |
| Kenney | $3,570,087 | $3,129,789 |
| **Total** | **$36,192,626** | **$42,858,134** |

**C.    Additional Officers Who Received Monetary Transfers Related To The LBO**

50.    Defendant Thomas D. Leach ("Leach") was Tribune's Senior Vice President of Development at the time of the LBO.  Upon information and belief, Leach lives in Illinois. Leach filed one proof of claim in the Debtors' Chapter 11 cases.

51.    Defendant R. Mark Mallory ("Mallory") was Tribune's Vice President and Controller at the time of the LBO.  Upon information and belief, Mallory lives in Illinois. Mallory filed two proofs of claim in the Debtors' Chapter 11 cases.

52.    Defendant Luis E. Lewin ("Lewin") was Tribune's Senior Vice President of Human Resources at the time of the LBO.  Upon information and belief, Lewin lives in Illinois.

53.    Defendants Leach, Mallory, and Lewin are sometimes collectively referred to as the "Additional Officer Recipients."  Each of the Additional Officer Recipients received proceeds by selling or redeeming their shares in the LBO, and special monetary incentives triggered by the LBO.

**D.    The Subsidiary D&O Defendants**

54.    The defendants listed in the following paragraphs 55-69, along with FitzSimons, Bigelow, Hianik, and Kenney are collectively referred to as the "Subsidiary D&O Defendants." In complete dereliction of their fiduciary duties, the Subsidiary D&O Defendants authorized

certain of the Tribune Subsidiaries (the "Subsidiary Guarantors") to enter into guarantees (the "Subsidiary Guarantees") that transferred all of their post-LBO value to the parties financing the LBO, but provided no value or benefit to the Subsidiary Guarantors. The Subsidiary D&O Defendants authorized the Subsidiary Guarantees without any consideration of whether they furthered the interests of the Subsidiary Guarantors or their creditors. As set forth in detail below, the Subsidiary D&O Defendants, individually or through trusts, retirement plans, or related entities, received a total of more than $50 million by selling or redeeming their Tribune shares in connection with the LBO, and more than $71 million in additional special monetary incentives premised upon consummation of the LBO.

55.     Defendant Stephen D. Carver ("Carver") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Carver lives in Connecticut. Carver filed one proof of claim in the Debtors' Chapter 11 cases.

56.     Defendant Thomas S. Finke ("Finke") was a director of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Finke lives in Illinois. Finke filed one proof of claim in the Debtors' Chapter 11 cases.

57.     Defendant Robert Gremillion ("Gremillion") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Gremillion lives in Illinois. Gremillion filed one proof of claim in the Debtors' Chapter 11 cases.

58.     Defendant David Dean Hiller ("Hiller") was the publisher of the Los Angeles Times and a member of the boards of directors of the McCormick Foundation and the Cantigny Foundation at the time of the LBO. Hiller is currently the President and CEO of the McCormick Foundation. Hiller was also a director and officer of one or more of the Subsidiary Guarantors at

the time of the LBO. Upon information and belief, Hiller lives in Illinois. Hiller filed one proof of claim in the Debtors' Chapter 11 cases.

59. Defendant Timothy P. Knight ("Knight") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Knight lives in New York. Knight filed seven proofs of claim in the Debtors' Chapter 11 cases.

60. Defendant Timothy J. Landon ("Landon") was a director of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Landon lives in Illinois. Landon filed one proof of claim in the Debtors' Chapter 11 cases.

61. Defendant Richard H. Malone ("Malone") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Malone lives in Illinois. Malone filed one proof of claim in the Debtors' Chapter 11 cases.

62. Defendant Durham J. Monsma ("Monsma") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Monsma lives in Connecticut. Monsma filed at least one proof of claim in the Debtors' Chapter 11 cases.

63. Defendant Irving L. Quimby ("Quimby") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Quimby lives in Maryland. Quimby filed one proof of claim in the Debtors' Chapter 11 cases.

64. Defendant John E. Reardon ("Reardon") was the President of Tribune Broadcasting Company, a subsidiary of Tribune, at the time of the LBO. Reardon was also a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO. Upon information and belief, Reardon lives in Illinois. Reardon filed one proof of claim in the Debtors' Chapter 11 cases.

65.     Defendant Scott C. Smith ("Smith") was the President of Tribune Publishing Company, a subsidiary of Tribune, at the time of the LBO.  Smith was also a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  At the time of the LBO, Smith was also a member of the boards of directors of the McCormick Foundation and the Cantigny Foundation, and still holds those positions.  Upon information and belief, Smith lives in Illinois.  Smith filed one proof of claim in the Debtors' Chapter 11 cases.

66.     Defendant John J. Vitanovec ("Vitanovec") was the Executive Vice President of Tribune Broadcasting Company, a subsidiary of Tribune at the time of the LBO.  Vitanovec was also a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Vitanovec lives in Illinois.  Vitanovec filed one proof of claim in the Debtors' Chapter 11 cases.

67.     Defendant Kathleen M. Waltz ("Waltz") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Waltz lives in Florida.  Waltz filed one proof of claim in the Debtors' Chapter 11 cases.

68.     Defendant David D. Williams ("Williams") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Williams lives in Illinois.  Williams filed one proof of claim in the Debtors' Chapter 11 cases.

69.     Defendant John D. Worthington, IV ("Worthington") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Worthington lives in Maryland.

70.     The Subsidiary Guarantors for which each Subsidiary D&O Defendant served as director and/or officer, and the relevant time period in which each Subsidiary D&O Defendant held that position, are listed in Exhibit B.  The Subsidiary D&O Defendants, by virtue of their

positions as directors and/or officers of one or more Subsidiary Guarantors, owed fiduciary duties to each Subsidiary Guarantor he or she served. All claims of the Subsidiary D&O Defendants reflected on the Debtors' Schedules or any proofs of claim filed by, or on behalf of, any of the Subsidiary D&O Defendants are collectively referred to herein as the "Subsidiary D&O Creditor Claims."

71. The Subsidiary D&O Defendants, individually or through trusts, retirement plans, or related entities, received at least the following amounts by selling their Tribune shares in connection with the LBO, as well as at least the following amounts in special monetary incentives that were triggered by the completion of the LBO, for a total of more than $122 million:

| Subsidiary D&O Defendants | | |
|---|---|---|
| Defendant Name | Amount Received by Selling or Redeeming Shares in the LBO | Special Monetary Incentives Triggered by the LBO |
| Bigelow | ■ | $1,335,620 |
| Carver | | $512,710 |
| Finke | $0 | $377,462 |
| FitzSimons | $21,215,999 | $28,729,798 |
| Gremillion | $0 | $1,735,639 |
| Hianik | ■ | $809,019 |
| Hiller | ■ | $8,768,972 |
| Kenney | $3,570,087 | $3,129,789 |
| Knight | $0 | $3,743,646 |
| Landon | $3,059,380 | $3,685,548 |
| Malone | ■ | $587,691 |
| Monsma | ■ | $0 |
| Quimby | ■ | $74,668 |
| Reardon | $3,975,910 | $4,191,059 |
| Smith | $10,012,065 | $5,277,369 |
| Vitanovec | ■ | $4,113,042 |
| Waltz | $0 | $2,092,178 |
| Williams | ■ | $1,933,946 |
| Worthington | | $42,693 |
| **Total** | **$50,972,675** | **$71,140,849** |

### E. The Controlling Shareholder Defendants

72. Defendants Chandler Trust No. 1, Chandler Trust No. 2, and the Chandler Sub-Trusts[2] (collectively, the "Chandler Trusts") are California trusts established for the benefit of the Chandler family. At the time of the LBO, the Chandler Trusts were among Tribune's largest shareholders. At that time, the Chandler Trust Representatives represented the Chandler Trusts' interests on the Tribune Board. The Chandler Trusts demanded that Tribune explore potential transactions and actively engaged with the Special Committee in reviewing and assessing various strategic alternatives presented to and considered by the Special Committee, and in the Special Committee's ultimate determination to recommend the LBO to the Tribune Board. The Chandler Trusts also negotiated with Zell to modify the LBO so that it would provide the Chandler Trusts with more money sooner, and agreed to enter into a voting agreement that helped to ensure that the LBO would be consummated. The Chandler Trusts sold over 48 million shares of Tribune stock in connection with the LBO, including 27,774,388 shares at Step One (as hereinafter defined) of the LBO, for which they received $944,329,192; and then the rest of their Tribune holdings in a block trade three days after Step One, for which they received $634,777,414.

73. Defendant McCormick Foundation is a tax-exempt charitable foundation located in Illinois. At the time of the LBO, the McCormick Foundation was among Tribune's largest shareholders. The investment and voting power of the McCormick Foundation is vested in a

---

[2] The Chandler Sub-Trusts are: Philip Chandler Residuary Trust No. 2, May C. Goodan Trust No. 2, Ruth C. Von Platen Trust No. 2, Dorothy B. Chandler Marital Trust No. 2, Dorothy B. Chandler Residuary Trust No. 2, HOC Trust No. 2 FBO Scott Haskins, HOC Trust No. 2 FBO John Haskins, HOC Trust No. 2 FBO Eliza Haskins, HOC GST Exempt Trust No. 2. FBO Scott Haskins, HOC GST Exempt Trust No. 2. FBO John Haskins, HOC GST Exempt Trust No. 2. FBO Eliza Haskins, Alberta W. Chandler Marital Trust No. 2, Earl E. Crowe Trust No. 2, Patricia Crowe Warren Residuary Trust No. 2, Helen Garland Trust No. 2 (For Gwendolyn Garland Babcock), Helen Garland Trust No. 2 (For William M. Garland III), Helen Garland Trust No. 2 (For Hillary Duque Garland), Garland Foundation Trust No. 2, and Marian Otis Chandler Trust No. 2. Upon information and belief, the trustees of the Chandler Sub-Trusts, as well as of Chandler Trust No. 1 and Chandler Trust No. 2, are Susan Babcock, Jeffrey Chandler, Camilla Chandler Frost, Roger Goodan, William Stinehart, Jr., Judy C. Webb, and Warren B. Williamson.

board of five directors, all of whom are current or former Tribune executives (as mandated by the McCormick Foundation's incorporation documents), and included defendants FitzSimons, Hiller, and Smith at the time of the LBO. The McCormick Foundation demanded that Tribune explore potential transactions and actively engaged with the Special Committee in reviewing and assessing various strategic alternatives presented to and considered by the Special Committee, and in connection with the Special Committee's ultimate determination to recommend the LBO to the Tribune Board. The McCormick Foundation also negotiated with Zell to modify the LBO so that it would provide the McCormick Foundation with more money sooner. Additionally, the McCormick Foundation was actively involved in Tribune's management through, among others, defendant FitzSimons, who was intimately involved in helping to facilitate the LBO. The McCormick Foundation sold or redeemed 28,023,788 shares of Tribune stock in connection with the LBO, from which it received approximately $952,808,792 in cash proceeds.

74.     Defendant Cantigny Foundation is a tax-exempt charitable foundation located in Illinois that held shares of Tribune at the time of the LBO. The investment and voting power of the Cantigny Foundation is vested in a board of five directors, all of whom are current or former Tribune executives (as mandated by the Foundations' incorporation documents), and included defendants FitzSimons, Hiller, and Smith at the time of the LBO. The Cantigny Foundation is an affiliate of the McCormick Foundation, and at the time of the LBO, the Foundations' collective holdings in Tribune stock made them, collectively, Tribune's second largest shareholder. The Cantigny Foundation demanded that Tribune explore potential transactions and actively engaged with the Special Committee in reviewing and assessing various strategic alternatives presented to and considered by the Special Committee, and in connection with the Special Committee's ultimate determination to recommend the LBO to the Tribune Board. The Cantigny Foundation

also negotiated with Zell to modify the LBO so that it would provide the Cantigny Foundation with more money sooner. Additionally, the Cantigny Foundation was actively involved in Tribune's management through, among others, defendant FitzSimons, who was intimately involved in helping to facilitate the LBO. The Cantigny Foundation sold or redeemed 3,259,000 shares of Tribune stock in connection with the LBO, from which it received approximately $110,806,000 in cash proceeds.

75.     The Chandler Trusts, the McCormick Foundation, and the Cantigny Foundation are collectively referred to as the "Controlling Shareholders." Together, the Controlling Shareholders held at least 33% of Tribune's stock immediately prior to the LBO.

### F.     The Zell Defendants

76.     Defendant Zell is a billionaire investor who is the controlling party of EGI-TRB, L.L.C. ("EGI-TRB")—the entity that entered into the Agreement and Plan of Merger (the "Merger Agreement") with Tribune on April 1, 2007, memorializing the materials terms of the LBO. Zell was elected to the Tribune Board on May 9, 2007, before consummation of the first step of the LBO, and became the Chairman of the Tribune Board and Tribune's President and Chief Executive Officer in December 2007 when the second step of the LBO was consummated. Zell personally and directly received at least $77,452 in cash proceeds in connection with the LBO. Upon information and belief, Zell lives in Illinois. Zell filed two proofs of claim in the Debtors' Chapter 11 cases.

77.     Defendant Equity Group Investments, L.L.C. ("EGI") is a private investment company located in Illinois. Zell holds a controlling interest in EGI and is its President and Chairman. During the period that is on or within the 90 days prior to December 8, 2008 (the "90-Day Preference Period"), the date on which the Debtors filed for protection under the Bankruptcy Code (the "Petition Date"), Tribune made payments of not less than $586,759 to EGI

to reimburse EGI for expenses it allegedly incurred in connection with the LBO (the "EGI Reimbursements"). EGI filed two proofs of claim in the Debtors' Chapter 11 cases.

78. Defendant EGI-TRB is a Delaware limited liability company located in Illinois. Founded for the sole purpose of consummating the LBO, EGI-TRB's business was, at all relevant times, to "engage in any activities which pertain to acquiring, owning, operating, managing, financing, selling and otherwise dealing with" Tribune and the Tribune LBO. In connection with step one of the LBO, EGI-TRB received a $200 million unsecured subordinated note that was exchangeable for Tribune stock at Tribune's option (the "Exchangeable Note"). As set forth herein, EGI-TRB's investment in exchange for the Exchangeable Note had the attributes of an equity investment and should be recharacterized as such.

79. In or about December 2007 and in connection with the LBO, Tribune transferred to EGI-TRB money or assets worth $206,418,859 (the "Exchangeable Note Transfer") to satisfy its purported debt obligation under the Exchangeable Note (the "Exchangeable Note Obligation"). This transaction was akin to a sale of stock, in that the amount paid or credited by Tribune to EGI-TRB was based upon the price that would have been paid to EGI-TRB had the Exchangeable Note been converted to stock and the stock redeemed by Tribune (although such conversion did not actually occur). Tribune also transferred money or assets worth approximately $2.5 million to EGI-TRB for its legal fees and other expenses in connection with the LBO (the "EGI-TRB Fee Transfers").

80. EGI-TRB sold or redeemed 1,470,588 shares of Tribune stock in connection with Step Two (as defined below) of the LBO, for which it received $50,000,000 (the "EGI-TRB Stock Sale," and, together with the EGI-TRB Fee Transfers, the Exchangeable Note Obligation, and the Exchangeable Note Transfer, the "EGI-TRB Transfers")). Upon information and belief,

none of the EGI-TRB Fee Transfers were cleared or transferred to EGI-TRB through a financial institution, financial participant, or securities clearing agency.

81.     On December 20, 2007, in connection with the LBO, EGI-TRB purchased from Tribune a $225 million subordinated promissory note due December 20, 2018 (the "Subordinated Note").  The amounts purportedly owed or paid in connection with the Exchangeable Note Transfer, the Subordinated Note purchase, the EGI-TRB Stock Sale, and a Tribune warrant purchased by Zell that is described below were netted against one another, resulting in a payment by EGI-TRB to the Company of approximately $56 million on December 20, 2007.  Pursuant to a subordination agreement dated as of December 20, 2007, entered into by EGI-TRB (the "Subordination Agreement"), the claims arising from the Subordinated Note, including principal and interest and all other obligations and liabilities of Tribune to EGI-TRB, are subordinate and junior to all obligations, indebtedness, and other liabilities of Tribune with certain inapplicable exceptions.  Following execution of the Subordination Agreement, EGI-TRB assigned minority interests in the Subordinated Note to the Tower Defendants (defined below).  EGI-TRB filed two proofs of claim in the Debtors' Chapter 11 cases (the "EGI-TRB Proofs of Claim").  All claims of EGI-TRB reflected on the Debtors' Schedules or the EGI-TRB Proofs of Claim are collectively referred to herein as the "EGI-TRB Claims."

82.     Defendant Sam Investment Trust is an irrevocable Illinois trust established for the benefit of Zell and his family.  Sam Investment Trust is the sole member and 100% owner of EGI-TRB.  EGI-TRB, as a limited liability company, is a pass-through entity that is disregarded as an entity separate from Sam Investment Trust for federal tax purposes.  Sam Investment Trust is an irrevocable grantor trust, and Zell is therefore treated as the owner of all of the property of Sam Investment Trust for federal income tax purposes.

83.     EGI-TRB has no board of directors or similar board of managers.  At all relevant times, Zell was the President and Chief Executive Officer of EGI-TRB, with responsibility for the general and active management of EGI-TRB.  At all relevant times, William C. Pate, a managing director of EGI, was the Vice-President of EGI-TRB.  On information and belief, EGI-TRB has no office of its own, and has no employees of its own other than Zell and employees of EGI.  EGI-TRB is and was at all relevant times completely dominated by Zell, directly, and indirectly through Sam Investment Trust and EGI and its employees, each of which Zell controls.  EGI-TRB is and was at all relevant times merely an instrument for Zell, the Sam Investment Trust, and EGI.  EGI-TRB lacks and at all relevant times lacked sufficient capital to meet any liabilities that might arise from the LBO.  EGI-TRB has no assets other than the EGI-TRB Claims, and is insolvent.

84.     Defendants Zell, EGI, EGI-TRB and Sam Investment Trust are collectively referred to as the "Zell Defendants."  All claims of the Zell Defendants (other than the EGI-TRB Claims) reflected on the Debtors' Schedules or any proofs of claim filed by, or on behalf of, any of the Zell Defendants (other than EGI-TRB) are collectively referred to herein as the "Zell Claims."

85.     Upon information and belief, defendants Tower CH, L.L.C., Tower DC, L.L.C., Tower DL, L.L.C., Tower EH, L.L.C., Tower Greenspun DGSPT, LLC, Tower Greenspun JGGSTP, LLC, Tower Greenspun SGFFT, LLC, Tower Greenspun, L.LC., Tower HZ, L.L.C., Tower JB, L.L.C., Tower JK, L.L.C., Tower JP, L.L.C., Tower JS, L.L.C., Tower KS, L.L.C., Tower LL, L.L.C., Tower LM, L.L.C., Tower LZ, L.L.C., Tower MH, L.L.C., Tower MS, L.L.C., Tower MZ, L.L.C., Tower NL, L.L.C., Tower PH, L.L.C., Tower PT, L.L.C., Tower SF, L.L.C., Tower TT, L.L.C., Tower VC, L.L.C., and Tower WP, L.L.C. (collectively, the "Tower

Defendants") are assignees of EGI-TRB's interests in the Subordinated Note. Upon information and belief, the Tower Defendants are affiliated or closely aligned with EGI and EGI-TRB. Each of the Tower Defendants filed at least one proof of claim in the Debtors' Chapter 11 cases (the "Tower Proofs of Claim"). All claims of the Tower Defendants reflected on the Debtors' Schedules or the Tower Proofs of Claim are collectively referred to herein as the "Tower Claims."

### G.    The Advisor Defendants

86.    The defendants listed in the following paragraphs 87-90 are collectively referred to as the "Advisor Defendants."

87.    Defendant GreatBanc Trust Company ("GreatBanc") is an Illinois corporation headquartered in Illinois. GreatBanc was engaged by Tribune as trustee of its employee stock ownership plan ("ESOP") trust in connection with the LBO. GreatBanc negotiated the terms of the ESOP's investment in the LBO, including the price to be paid by the ESOP for the shares of Tribune Common Stock to be purchased by the ESOP.

88.    Defendant Duff & Phelps, LLC ("Duff & Phelps") is a Delaware limited liability company headquartered in Illinois. Duff & Phelps was initially engaged by Tribune to provide a solvency opinion to Tribune in connection with either a spin-off of the Company's broadcasting operations and internal recapitalization, or the LBO. Tribune and the Special Committee then engaged Duff & Phelps to explore Tribune's adoption of an ESOP and the ESOP's potential participation in the proposed LBO. Shortly thereafter, GreatBanc engaged Duff & Phelps as its financial advisor in connection with the LBO.

89.    Defendant VRC is a financial advisory firm that provides fairness and solvency opinions in support of transactions. VRC is headquartered in Wisconsin. Tribune retained VRC to provide solvency opinions, and VRC provided solvency opinions, in connection with the

LBO.  VRC received payments from Tribune for certain fees and expenses in connection with the LBO (the "VRC Transfers"), in an amount to be determined at trial but no less than $1,500,000.

90.     Defendant Morgan Stanley & Co. LLC f/k/a Morgan Stanley & Co. Incorporated ("Morgan Stanley") was engaged by the Company to act as a financial advisor to the Special Committee of the Tribune Board in connection with the LBO.  In addition, Morgan Stanley acted as a financial advisor to the Company both in 2007 and 2008.

91.     Defendant Morgan Stanley Capital Services, Inc. ("MSCS") is an affiliate of Morgan Stanley that entered into an interest rate swap with The Times Mirror Company, a predecessor of the Company, in 1994.

92.     Non-party Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") acted as a financial advisor to Tribune in connection with the LBO and served as one of the lead arrangers for the credit facilities governing the LBO financing.  Merrill is named as a defendant in a separate action by the Litigation Trustee entitled *Kirschner v. Citigroup Global Markets, Inc. and Merrill, Lynch, Pierce, Fenner & Smith Incorporated*, No. 12 CV 6055 (RJS) (the "Advisor Action"), which was originally filed by the Committee in the Bankruptcy Court and was transferred to this Court by the JPML for coordinated and consolidated pretrial proceedings with this and other related actions.

93.     Non-party Citigroup Global Markets, Inc. ("Citigroup") acted as a financial advisor to Tribune in connection with the LBO and served as one of the lead arrangers for the credit facilities governing the LBO financing.  Citigroup is named as a defendant in the Advisor Action.

### H. The Shareholder Defendants

94. Tens of thousands of persons and entities received transfers in connection with the purchase, repurchase, or redemption of Tribune stock as a result of the LBO (the "Shareholder Transfers"). Upon information and belief, the defendants listed on Exhibit A, which is attached hereto and incorporated herein, received at least the Shareholder Transfers shown therein.[3] The Litigation Trust sues the parties listed on Exhibit A as individually named defendants. The Controlling Shareholders, the D&O Defendants, the Additional Officer Recipients, the Subsidiary D&O Defendants, Zell, and EGI-TRB also received Shareholder Transfers as set forth herein, and, together with the defendants listed on Exhibit A, are referred to herein as the "Shareholder Defendants." As set forth below, the Litigation Trust sues certain remaining, unnamed recipients of Shareholder Transfers as absent class members.

### I. The Class Representative Defendants

95. Upon information and belief, defendant Automobile Mechanics' Local 701 Pension Fund a/k/a Automobile Mechanics' Local No. 701 Union and Industry Pension Fund is an Illinois fund that received at least ███████ in cash proceeds in connection with the LBO.

96. Upon information and belief, defendant Frank W. Denius is an individual who resides in Texas who received at least $1,797,988 in cash proceeds in connection with the LBO.

97. Upon information and belief, defendant The DFA Investment Trust Company is a Delaware statutory trust that received in connection with its Tax-Managed U.S. Equity Series, Tax-Managed U.S. Marketwide Value Series, and U.S. Large Cap Value Series at least ███████ in cash proceeds in connection with the LBO.

---

[3] To comply with a protective order entered by the Bankruptcy Court as well as this Court's local rules, Plaintiff has redacted certain information from this Complaint and Exhibit A. Pursuant to paragraph 40 of Master Case Order No. 3 [ECF No. 1395], Plaintiff will file unredacted versions of the Complaint and Exhibit A under seal contemporaneously with the filing of this Fifth Amended Complaint. A list of the names of each defendant listed on Exhibit A is attached as Exhibit A-1, which will be publicly filed with no redactions.

98.     Upon information and belief, defendant GDK, Inc. is a Delaware corporation that received at least █████████ in cash proceeds in connection with the LBO.

99.     Upon information and belief, defendant Hussman Strategic Growth Fund a/k/a The Hussman Investment Trust, John P. Hussman, Trustee is a Maryland fund that received at least █████████ in cash proceeds in connection with the LBO.

100.    Upon information and belief, defendant Edwin R. Labuz IRA, Ameriprise Trust Company f/k/a H&R Block Financial Advisors, Custodian is a Florida IRA that received at least █████████ in cash proceeds in connection with the LBO.

101.    Upon information and belief, defendant Denise Meck is an individual who resides in Texas who received at least █████████ in cash proceeds in connection with the LBO.

102.    Upon information and belief, defendant Nationwide S&P 500 Index Fund, a series of Nationwide Mutual Funds, is a Pennsylvania fund that received at least █████████ in cash proceeds in connection with the LBO.

103.    Upon information and belief, defendant New York State Teachers Retirement System is a New York pension fund that received at least █████████ in cash proceeds in connection with the LBO.

104.    Upon information and belief, defendant Dorothy C. Patterson Irrevocable Trust #2 U/A/D 12-21-93, of which The Northern Trust Company is the successor trustee, is an Illinois trust that received at least █████████ in cash proceeds in connection with the LBO.

105.    Upon information and belief, defendant Blandina Rojek is an individual who resides in Vermont who received at least █████████ in cash proceeds in connection with the LBO.

106.     Upon information and belief, defendant VTrader Pro, LLC is a California limited liability corporation that received at least ███████ in cash proceeds in connection with the LBO.

107.     Defendants Automobile Mechanics' Local 701 Pension Fund a/k/a Automobile Mechanics' Local No. 701 Union and Industry Pension Fund, Frank W. Denius, The DFA Investment Trust Company, GDK, Inc., Hussman Strategic Growth Fund a/k/a The Hussman Investment Trust, John P. Hussman, Trustee, Edwin R. Labuz IRA, Ameriprise Trust Company f/k/a H&R Block Financial Advisors, Custodian, Denise Meck, Nationwide S&P 500 Index Fund, a series of Nationwide Mutual Funds, New York State Teachers Retirement System, Dorothy C. Patterson Irrevocable Trust #2 U/A/D 12-21-93, Blandina Rojek, and VTrader Pro, LLC are collectively referred to as the "Class Representative Defendants."

## CLASS ALLEGATIONS

108.     Pursuant to Rule 23(b)(1) & (b)(3) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7023 of the Federal Rules of Bankruptcy Procedure, the claims set forth in Count One of this Complaint are brought against the Class Representative Defendants, individually and as representatives of a defendant class of similarly situated persons and legal entities (the "Shareholder Class").

109.     The Shareholder Class is comprised of (i) all persons or legal entities that directly or indirectly received payments, including the initial recipients and subsequent transferees, made in exchange for the purchase and/or redemption by Tribune of at least 1,471 shares of Tribune common stock in connection with the LBO, and that in consequence were the beneficial or legal recipients of at least $50,000 in payments by Tribune, and (ii) the guardians, trustees, partners, administrators, custodians, fiduciaries, estates, executors, owners, representatives, beneficiaries, members, and managers of such persons or legal entities, to the extent they must be named as

defendants in order to pursue the claim set forth in Count One of this Complaint against such persons or legal entities. All persons and legal entities (other than the Class Representative Defendants) that are timely and effectively served with a summons and complaint in this action are excluded from the Shareholder Class as of the date of such service (the "Excluded Persons").

110. Tribune's total payments in connection with the LBO for the purchase or redemption of the approximately 243,121,164 outstanding shares of Tribune stock in connection with the LBO exceeded $8 billion. The Shareholder Transfers left the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due.

111. Upon information and belief, the Shareholder Class includes hundreds or thousands of recipients. Accordingly, the Shareholder Class is so numerous that joinder of all of its members is impracticable.

112. There are questions of law and fact common to the Shareholder Class that predominate over any issues that may involve individual members of the Shareholder Class, including without limitation:

    a.    Whether Tribune, by and through certain of its officers and directors, made the Shareholder Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors;

    b.    Whether Tribune received less than reasonably equivalent value in exchange for the Shareholder Transfers;

    c.    Whether Tribune was insolvent at the time of the Shareholder Transfers, or became insolvent as a result of the Shareholder Transfers;

    d.    Whether, at the time of the Shareholder Transfers, Tribune was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and

    e.    Whether, at the time of the Shareholder Transfers, Tribune intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

113.     The Class Representative Defendants will fairly and adequately protect the interests of the entire Shareholder Class.  Any possible defenses of the Class Representative Defendants are typical of those of the Shareholder Class.  Additionally, if the Litigation Trustee obtains a judgment in his favor on the claims to avoid and recover the Shareholder Transfers set forth in Count One herein, then the Class Representative Defendants alone will be liable for a minimum of $195,196,739.

114.     The prosecution of separate actions against the individual members of the Shareholder Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Shareholder Class that would establish incompatible standards of conduct, and/or (b) adjudications with respect to individual members of the Shareholder Class that, as a practical matter, could be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

115.     A defendant class action is superior to other available methods for fairly and efficiently adjudicating this controversy because, *inter alia*, it avoids a multiplicity of individual adjudications with respect to the many thousands of individual members of the Shareholder Class, thereby conserving the resources of the Debtors' estates and of the Court.

## FACTS

**I.      Tribune's Business And Its Operations**

116.     Prior to filing for bankruptcy protection in December 2008, Tribune was America's largest media and entertainment company, reaching more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings.  Headquartered in Chicago,

36

Illinois, Tribune's operations were conducted through two primary business segments: (i) publishing, and (ii) broadcasting and entertainment. Tribune's publishing segment owned major newspapers in many of the most significant markets in the United States, including the *Chicago Tribune*, the *Los Angeles Times*, the *Baltimore Sun*, the *South Florida Sun-Sentinel*, the *Orlando Sentinel*, and the *Hartford Courant*. Tribune's broadcasting and entertainment segment owned numerous radio and television stations in major markets.

117. As of the date that Tribune initiated its bankruptcy case, the publishing segment employed approximately 12,000 full-time equivalent employees, and the broadcasting and entertainment segment employed an additional 2,600 full-time equivalent employees.

## II. Overview Of The Tribune LBO

118. A leveraged buyout is a transaction in which the shares of a corporation—the "target"—are purchased with debt that is borrowed by the target corporation itself. The effect of a leveraged buyout is to encumber the assets of the target corporation with debt that benefits not that corporation, but rather its new owner and former shareholders, and to substitute a significant amount of debt in the place of equity in the corporation's capital structure. In this case, Tribune incurred nearly $11 billion in debt to finance its two-step leveraged buyout (the "LBO"), bringing its total debt to more than $13 billion. At least 25% of the payouts to shareholders in the LBO went to D&O Defendants, the Subsidiary D&O Defendants, the Controlling Shareholders, and the Zell Defendants. The LBO debt was used to line the pockets of Tribune's shareholders, directors, officers, and advisors, and left Tribune's creditors holding the proverbial bag.

119. The Tribune LBO was a unitary transaction implemented in two steps at the behest of the Company's Controlling Shareholders. As the diagram below illustrates, prior to the LBO, Tribune had approximately $5.6 billion in funded debt obligations (*i.e.* bank or bond debt,

37

or debt arising from similar financial instruments), and the Subsidiary Guarantors—where the majority of the Company's value resided—had none. At the first step of the transaction ("Step One"), which closed on June 4, 2007, Tribune borrowed approximately $7 billion. That new debt was guaranteed by the Subsidiary Guarantors, thereby ensuring that the LBO lenders would be paid before the Company's existing creditors in the event of a bankruptcy. Of that new debt, approximately $4.3 billion was used to purchase shares from Tribune's existing shareholders at $34 per share. At the second step of the transaction ("Step Two"), which closed on December 20, 2007, Tribune borrowed an additional approximately $3.7 billion, which was also guaranteed by the Subsidiary Guarantors. Tribune then paid out that $3.7 billion, plus $300 million from other sources, to purchase the remainder of its outstanding shares from its shareholders at the $34 per share price.

120. Over the course of the two steps, an additional approximately $2.8 billion of the LBO Debt was used to retire Tribune's existing bank debt (the "2006 Bank Debt"), which had to be paid in full upon consummation of a transaction like the LBO pursuant to the governing credit agreements. Approximately $284 million more was paid in fees to advisors and lenders financing the LBO, and approximately $150 million was paid as special monetary incentives to the Tribune insiders who helped facilitate and consummate the deal. Thus, the entirety of the LBO debt—and then some—was used to pay Tribune's shareholders, LBO advisors, LBO lenders, and management, and left Tribune saddled with nearly $2.8 billion of pre-LBO debt, plus $10.7 billion of new LBO debt (the "LBO Debt"). Tribune also received $306 million from Zell, which represents the full cost that Zell paid to purchase control of the Company, and which imposed on the Company additional purported debt obligations to EGI-TRB of $225 million.

This left Tribune with approximately $13.7 billion in total debt—more than double the Company's total debt prior to the LBO.



III. **Prior To The LBO, The Secular Decline In The Publishing Industry And Tribune's Deteriorating Performance Led The Controlling Shareholders To Begin Looking For An Exit Plan From The Company**

    A. **The Publishing Industry—And Tribune To A Greater Extent—Were In The Midst Of A Deep Secular Decline During The Period Leading Up To The LBO**

121.    As the foregoing diagram illustrates, a leveraged buyout places a significant amount of debt on the target corporation, but the proceeds of that debt are used for purposes other than the corporation's operations or growth. If a company's performance is not likely to enable it to service a substantial amount of new debt, then the company is a particularly poor candidate for a leveraged buyout, and will become a likely candidate for bankruptcy following the leveraged buyout.

122. This was certainly the case with Tribune. At the time that the LBO was planned and executed, the newspaper publishing business—which accounted for approximately 75% of Tribune's revenues—was in the midst of a severe secular decline. As shown in the graph below, by 2006, the newspaper publishing industry had experienced declines in circulation for almost two decades.

**U.S. Newspaper Daily Circulation Volume**
*1980 to 2006*



*Source: Newspaper Association of America; JP Morgan Tribune Company Credit Analysis, May 29, 2007.*

123. A secular shift was also occurring in the distribution of advertising dollars across alternative advertising media. The newspaper publishing industry was expected to have lost 9.8% of its share of the U.S. advertising market over the 10-year period from 1998 to 2008. Conversely, the Internet was expected to increase its market share by 9.7% over the same period. In addition, as shown in the graph below, the growth rate in quarterly newspaper advertising expenditures began to decrease from the fourth quarter of 2004, and turned negative in the second quarter of 2006. By the second quarter of 2007, the quarterly rate of decline was over 10% on a year over year basis.



**Growth Rates for Quarterly Newspaper Print Advertising Expenditure**
*Decline in Quarterly Newspaper Advertising Expenditures Began in 2004*

Source: Research Dept., Newspaper Association of America.

124.    These changes were structural, not cyclical, and represented a fundamental shift of advertising away from print media.  The long-term secular decline plaguing the newspaper publishing industry was a great concern to the industry, and was widely reported on and discussed in various high-profile traditional media outlets during the period leading up to the LBO.  Industry experts and analysts also agreed that the declines in circulation levels and advertising revenues were not likely to abate.  For example, on March 15, 2007, the *Morton-Groves Newspaper Newsletter*—a leading industry newsletter that had been in operation for over 20 years—noted that the "business environment faced by publishers and media companies today has changed forever.  Instead of an industry cycle with advertising recovering as the economy recovers, we have a secular shift."  Similarly, on March 23, 2007, Morgan Stanley observed that "February will likely go on record as one of the worst months for the newspaper industry in recent years," and stated that "it appears rather clear to us that new revenue streams are simply not enough to offset the secular shift of print to online."

125. To make matters worse, in the five years preceding the LBO, Tribune experienced significant declines in its circulation levels that were more severe than the overall industry. In an industry report dated March 2007, Deutsche Bank noted that the Company, as a national newspaper publisher, was experiencing greater circulation losses than local newspapers. The *Morgan Stanley Publishing Handbook* reported that daily circulation for the Company's seven largest newspapers in September 2006 decreased by 4.9% from September 2005, as compared to the industry average decrease of 4.0% for the same period. Similarly, March 2007 daily circulation of the Company's newspapers decreased by 4.1% from March 2006, as compared to the industry average decrease of 2.7% over the same period. Thus, Tribune's daily circulation fell at a rate that was 50% greater than the newspaper publishing industry as a whole in the 12 months prior to the Tribune Board's approval of the LBO. The Company's loss in classified advertising revenues—which represented over 28% of Tribune's publishing segment's total 2006 revenue—in the first quarter of 2007 was also greater than the industry average loss across all major categories. In short, the Company was performing so poorly that there could have been no reasonable expectation that it would be able to satisfy the additional $8 billion of debt that it incurred in the LBO. Consummation of the LBO in the face of the Company's sharply deteriorating performance and the publishing industry's secular decline resulted in what the *New York Times* referred to as "one of the most absurd deals ever."

B. **The Chandler Trusts Voice Serious Concerns About The Company's Future And Begin Agitating For Change**

126. In response to the declining state of the newspaper industry, beginning in late 2005, the Tribune Board undertook a strategic review of the broadcasting and entertainment sector of the Company's business and considered possible changes to the structure and ownership of its properties. The Company retained the services of Merrill on or about October

17, 2005, to assist in this evaluation, and approved in advance Merrill's participation in financial

transactions that might develop from the strategic review.  The Company later retained Citigroup

to assist in the evaluation as well, and provided Citigroup with the same advance approval to

participate in financial transactions resulting from the review.  Pursuant to their advisory

engagements with the Company, both Merrill and Citigroup stood to reap millions of dollars in

fees, which would increase if the Company entered into a transaction at their recommendation.

127.    In May 2006, the Board, with the advice of Merrill and Citigroup, decided to

engage in a leveraged recapitalization transaction (the "2006 Leveraged Recapitalization"), in

which it ultimately repurchased 55 million shares of its then-outstanding stock for a total of

nearly $1.8 billion through a public tender offer and a private transaction with the Foundations.

Following the 2006 Leveraged Recapitalization, the Chandler Trusts held approximately 20% of

the Company's stock, and became the Company's largest shareholders.  The Foundations held

approximately 13% of the Company's outstanding stock, and became the second-largest

shareholders.

128.    Faced with the Company's rapidly declining performance, the Chandler Trusts

began exerting their influence over Tribune.  ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████

        ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

129.    In a publicly filed letter to the Tribune Board dated June 13, 2006 and signed by

defendant Stinehart—himself a member of the Tribune Board—Stinehart, purportedly acting in

his capacity as Trustee for the Chandler Trusts, complained that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different." Stinehart reiterated his view that the Company's financial condition would continue to deteriorate over the foreseeable future:

> In addition to the failure of its primary strategy, the company is confronted with a fundamental erosion in both of its core businesses and the consequences of failing to invest aggressively in growing new businesses.

> Since 2003, Tribune's revenue and EBITDA have underperformed its peers, and, unfortunately, analyst estimates for the next two years indicate that they expect the same bleak picture.

> Not only has Tribune underperformed the industry averages, but the company has lagged business segment performance for *each* of the companies in the comparable list over the last two years. . . . This trend is only expected to continue for the next two years.

> Much as they have in the previous two years, management doggedly projects a turnaround, with steady revenue and operating cash flow growth over the next four years. This projected turnaround is hard to believe with no proposed change in strategy and little prospect for an upturn in the core businesses. Management has already revised estimates down since December 2005, suggesting the likely direction of future changes. With the current plan in place, we believe the risk of further deterioration in print and broadcast outweighs the projected growth in interactive, a segment that, while growing, still makes up less than 9% of revenues (including joint ventures).

130.    In his letter, Stinehart pointedly reminded the Tribune Board that, "the [Chandler] Trusts are the largest investor in the Company, and, more than any other shareholder, it is in their interest to see that either current value is maximized or a value enhancing strategic repositioning occurs." To that end, Stinehart demanded that the Tribune Board "promptly appoint a committee of independent directors to oversee a thorough review of the issues facing Tribune and to take prompt decisive action to enhance stockholder value."

131.    Notably, one of the actions urged by Stinehart in his letter was the exploration of a leveraged buyout. After observing that realistic projections suggested that the Company's per

share value could be as low as (or even lower than) $21 per share (compared to the inflated $34 per share payout that shareholders later received in the LBO), Stinehart stated that given the current market conditions of easy money, a leveraged buyout would enable shareholders to cash out of the Company at an elevated share price, and to escape the "huge downside risks" that the Company was facing. Thus, Stinehart stated to the rest of the Tribune Board:

> In addition, in light of inquiries received from very credible private equity firms, and the very liquid, low cost financing markets, it seems quite likely that a leveraged buyout could be accomplished at a price in excess of $35 per share. *This would provide shareholders cash value at or above the high end value implied in management's plans without any exposure to the huge downside risk of the as yet unaddressed fundamental strategic challenges of Tribune's business.* If a separation of broadcasting and newspapers cannot be accomplished by year end, the company should actively pursue inquiries from private equity firms. (Emphasis added.)

132. Stinehart concluded the letter by stating, "We are prepared to work directly and cooperatively with [a special] committee to further our common objective of maximizing value." Stinehart also threatened, however, "to begin actively purs[uing] possible changes in Tribune's management and other transactions to enhance value realized by all Tribune stockholders" if timely action was not taken by the Tribune Board.

133. An agenda of "talking points" prepared by the Chandler Trusts on or about July 17, 2006 for the next Tribune Board meeting underscores the Chandler Trusts' extreme dissatisfaction with Tribune's declining performance, noting that the "Chandler Trusts have seen almost 40% of the value of their Tribune holdings evaporate into thin air. We believe action must be taken to recover as much as possible of this loss . . . ."

134. The Chandler Trusts also planned to stress that the Company needed to act "in a short timeframe. As Tribune is not a growth company, time is not on our side. Consequently, we have a real sense of urgency about action."

135.     In subsequent sworn testimony, Defendant Stinehart explained his and the

Chandler Trusts' view of Tribune's financial prospects in the early 2007 time period, and their

efforts to effect a transaction that benefitted the Chandler Trusts' interests:

> We looked out and we saw a ski slope.  Management looked at the ski slope as
> though it [were] a bunny hill and you can traverse across by cost-cutting and catch
> the Internet chair lift and go to the top, but what the [Chandler] Trusts saw was a
> four-star black-diamond run headed straight downhill.  Cost-cutting gets you
> nowhere, and the chair lift's broken.  Essentially there were two different versions
> of where the world was going, and we wanted off the ski slope.  We originally
> wanted to get everybody off the ski slope, but we saw the world differently, and
> we had a special constituency that wanted off.

**C.     The Tribune Board[4] Acquiesces In The Chandler Trusts' Demands, And The
Controlling Shareholders Inject Themselves Into The Special Committee
Process**

136.     In response to the demands made by the Chandler Trusts, in September 2006, the

Tribune Board announced that it had established the Special Committee to oversee the

Company's exploration of alternatives.  Defendants Hernandez, Holden, Morrison, Osborn,

Reyes, Taft, and White, a majority of whom were deemed to be "'audit committee financial

experts' as defined in applicable securities laws," were named to the Special Committee.  Officer

Defendants FitzSimons, Grenesko, and/or Kenney attended all but one of the Special Committee

meetings.

137.     In or around October 2006, the Company retained Morgan Stanley to act as the

financial advisor to the Special Committee.  The Company agreed to, and did, pay Morgan

Stanley more than $10 million in fees and expenses (the "Morgan Stanley Advisor Fees") for

serving in that role.

---

[4] The term "Board," as used in paragraphs 136 through 151, means defendants FitzSimons, Hernandez,
Holden, Morrison, Osborn, Reyes, Taft, White, Chandler, Goodan and Stinehart.

138.    On October 2, 2006, defendant Stinehart again wrote to the Tribune Board, on behalf of the Chandler Trusts, to ensure that the Chandler Trusts would play a significant role in the Special Committee's deliberations.  Stinehart wrote:

> We appreciate Bill Osborn's [the Chairman of the Special Committee] call to [me] last week.  . . . We believe such collaboration is important to assure that the Chandler Trusts will be in a position to support the conclusions of the special committee.  This is especially important since several of the alternatives under consideration would likely require a vote of the stockholders and possibly other affirmative action by the [Chandler] Trusts.

Stinehart advised the Tribune Board that the Chandler Trust Representatives would agree not to participate in the Special Committee, provided that

> they are assured full and bona fide cooperation and regular communication between the special committee and its advisors and the Chandler Trusts and their advisors.  This must include, at a minimum, the opportunity to discuss with the special committee and its advisors important issues . . . in order that the views of the Chandler Trusts may be considered by the special committee as it proceeds.

139.    At the beginning of 2007, Controlling Shareholder pressure on the Tribune Board intensified when the Foundations—which collectively held approximately 13% of Tribune's outstanding common stock and were Tribune's second largest shareholder group—also began advocating for change that would serve their own interests.

140.    On or about January 4, 2007, the Foundations announced that they had retained Blackstone Group L.P. ("Blackstone") to advise them in connection with their investment in Tribune.  At the time, Blackstone was working on a separate multibillion-dollar deal with Zell, who would soon set his sights on acquiring control of Tribune.

141.    On or about January 10, 2007, the Foundations advised the Special Committee that it would be "difficult to do a transaction" without the support of the Controlling Shareholders, who collectively owned 33% of Tribune.  That same day, the advisors to the Foundations acknowledged in an internal email that it was time for the Controlling Shareholders

to begin exerting their control over the Special Committee, stating that the Special Committee needed to "know[] very specifically what the goals and objectives of 33 percent of the owners [are]. . . . The independence of the special committee of the Tribune Board has been important up till now. But it is time for everyone to declare their intentions."

142.     Shortly thereafter, the Foundations' advisors reiterated that "it is important to make the Foundations' interest and objectives known at the very least to the special committee of the board and Dennis [FitzSimons]. . . . [We] also feel, to the degree possible, that management should be aware of [the Foundations'] perspective and that they are in support of the position(s) we take."

143.     On January 22, 2007, counsel for the Chandler Trusts reached out to the Foundations to explore the possibility of pooling their combined holdings to exert even greater control over the Company and the "[d]irection . . . the Tribune should go." Conscious of the legal consequences of joining forces in this way, counsel for the Controlling Shareholders sought to paper the record by writing that they "should avoid reaching any agreement or understanding between us." In fact, however, the Chandler Trusts and the Foundations intended to do exactly the opposite—to reach an agreement and understanding to use their voting power and influence to control Tribune—but to do so in a way they hoped would insulate them from the responsibilities that arise from taking such an active role in the Company's future. Upon information and belief, the Chandler Trusts and the Foundations did reach such an agreement and understanding, and the Chandler Trusts and the Foundations in fact acted in concert at all relevant times.

144.     Minutes from Special Committee meetings in early 2007 reveal that the Controlling Shareholders injected themselves into the Special Committee process at every step of

the decision-making process. The minutes show that the Special Committee repeatedly sought the Controlling Shareholders' views on potential strategic alternatives and spent significant time reporting on and discussing conversations with and letters sent by the Controlling Shareholders, and that the Controlling Shareholders' advisors were engaged in direct discussions with Tribune's management.

## IV.     Zell Proposes The Highly-Leveraged LBO, And Structures It To Respond To The Controlling Shareholders' Concerns

145.     In late January 2007, Zell emerged as a potential bidder for Tribune. Upon information and belief, Zell reached out to the Controlling Shareholders prior to making a proposal to Tribune. On February 7, 2007, five days after Zell sent his initial proposal to the Tribune Board, the *Chicago Tribune* reported that he had spoken with the McCormick Foundation about his interest in structuring a proposal for Tribune. The article recognized that Zell would need the McCormick Foundation's support to make any deal work. The minutes of the February 12, 2007 Special Committee meeting reveal that Zell representatives also met with Chandler Trusts representatives concerning Zell's proposal, and that the Chandler Trusts sent a letter to the Special Committee respecting those meetings.

146.     On February 2, 2007, defendant EGI wrote to the Tribune Board to propose a transaction in which an EGI affiliate (ultimately, EGI-TRB) would acquire all of Tribune's outstanding common stock for $30 per share, pursuant to a merger in which Tribune would be the surviving corporation. Tribune would then elect to be treated as an S corporation for federal income tax purposes, with the result that Tribune would no longer be subject to federal income taxes, subject to certain limitations. A newly-formed ESOP, which would also be exempt from federal income taxes subject to certain exceptions, would thereafter acquire the majority of Tribune's outstanding common stock for approximately $800 million. EGI's proposal

contemplated that EGI-TRB would provide approximately $1 billion of equity financing, and arrange for debt financing in the aggregate amount of $10.7 billion. The proposal also contemplated that approximately $2.2 billion of the Company's existing indebtedness would remain outstanding, which would bring the Company's total debt from less than $5 billion to approximately $12.9 billion—9.9 times the Company's 2006 earnings before interest, taxes, depreciation, and amortization ("EBITDA")—and would make the Company one of the most highly leveraged in the publishing industry.

147.     On February 19, 2007, EGI submitted a revised LBO term sheet to Tribune (including defendants FitzSimons and Grenesko). The revised terms increased the consideration to be paid to shareholders to $33 per share, and, remarkably, reduced EGI-TRB's equity investment to only $225 million (later increased such that Zell invested just $306 million of the nearly $11 billion needed to consummate the LBO). EGI's new proposal contemplated that Tribune would incur a whopping $11.3 billion in additional debt—on top of the existing $2.2 billion of debt that would remain after the LBO—to finance the remaining cash payments to stockholders and the fees and expenses related to the transaction, and to refinance the Company's existing bank debt (the "2006 Bank Debt" defined above). The term sheet also provided that Tribune would enter into an Investor Rights Agreement that would grant EGI-TRB the right to designate two members to the Tribune Board, and provide Zell with other minority consent rights (including the right to serve as chairman of the Tribune Board).

148.     On or about February 24, 2007, the Special Committee directed Tribune's management and financial advisors to solicit the views of the Chandler Trusts and the Foundations with respect to Zell's proposal. Tribune's financial advisors sent materials related to

Zell's proposal to the Controlling Shareholders, and engaged in discussions with them respecting the proposal.

149.     The Foundations and the Chandler Trusts responded with separate letters expressing concerns regarding the delays and completion risk associated with Zell's proposal. The McCormick Foundation's concerns centered on the price that Zell was offering shareholders, the time that it would take to close the deal (which the Foundations estimated to be between 9 and 12 months given the need to obtain approval from the Federal Communications Commission (the "FCC"), and the risk that, given that delay, the deal would not actually close. The Chandler Trusts echoed these concerns, writing to the Special Committee that Zell's one-step proposal could allow "the value of Tribune stock to decline during the interim period" before the transaction closed. The Controlling Shareholders concluded their letters by stating that they were not willing to sign voting agreements supporting Zell's proposal.

150.     In response to the Controlling Shareholders' concerns, the Special Committee requested that any further proposal submitted by EGI include a recapitalization that would provide an upfront distribution to Tribune's stockholders. EGI responded by submitting a revised proposal on March 4, 2007, which contemplated that prior to a merger, Tribune would effect a first step tender offer at $33 per share in cash as a means of providing a portion of the cash consideration to Tribune's stockholders more quickly and with greater certainty.

151.     Over the course of the next few weeks, Tribune sought to increase the price to be paid to Tribune's stockholders in the LBO. During this time, the Special Committee and Tribune provided the Controlling Shareholders with regular updates respecting Zell's proposal, and Zell and EGI also negotiated directly with the Chandler Trusts and the Chandler Trust Representatives in order to reach agreement on terms for the LBO that would be acceptable to

the Chandler Trusts. Throughout this process, none of the Controlling Shareholders, or any of their representatives on the Tribune Board, raised any concerns to Tribune or the Tribune Board about what would happen to the Company once it incurred the mountainous debt necessary to provide the Controlling Shareholders and their Tribune Board representatives with their lucrative payouts.

## V. Wall Street Derides Zell's Proposal As The Company's Performance Continues To Deteriorate

### A. Rating Agencies And Analysts Raise Concerns About The Zell Proposal

152. While the Company and the Controlling Shareholders analyzed Zell's proposal, various analysts expressed concern that the Company could not survive under the burden of the debt it would place on the Company. For example, on March 16, 2007, Lehman Brothers ("Lehman") issued an equity research report stating: "In our opinion, this is way too high a portion of debt, especially given the secular pressures on the newspaper and TV station operations, with or without the ESOP tax benefits in our opinion (which are relatively small)." The report continued, "We think putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy somewhere down the road, especially if the economy slows, with or without the added tax savings from the ESOP financing."

153. Credit rating agencies expressed similar concerns. In a letter to defendant Bigelow dated March 29, 2007, Standard & Poor's ("S&P") stated that if the Zell leveraged buyout moved forward, "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."

154.     Similarly, notwithstanding Zell's efforts to "ma[k]e some contact at a senior level" at Moody's in order to obtain a favorable debt rating for the LBO, Moody's wrote to defendant Grenesko on March 29, 2007, that it was "concerned that the significant amount of leverage is occurring at a time of pressure on the company's advertising revenue and operating margins from online and cross media competition and cyclical fluctuations in the U.S. economy."

**B.     The Company's Performance Raises Even More Concerns Among Certain Of The Defendants**

155.     The Company continued its downward spiral during the early months of 2007.  In early March 2007, the advisors for the Special Committee and Tribune, Morgan Stanley and Citigroup, discussed the Company's declining performance—"down 5% in February, and 9% in January"—and whether Tribune was going "to modify their management plan for the second time in a month."  Citigroup noted that while Tribune was not going to revise its business plan, it "had less confidence in the plan at present," and "certain members of publishing management were concerned" that "if the current business trajectory continue[d]" the Company would run afoul of the covenants in its loan documents.

156.     The Company's declining financial performance also caused Tribune to temporarily second-guess its decision to continue pursuing the Zell proposal.  For example, on March 10, 2007, a Managing Director at Company advisor Merrill stated that "in light of recent operating performance no comfort in putting the kind of leverage necessary for Zell proposal to work and have board get comfortable with employees owning the equity."

157.     On March 11, 2007, an EGI employee sent an email to bankers at JPMorgan Chase Bank, N.A. ("JPMorgan") informing them that "as of late Friday night Tribune signaled to us that they had decided not to pursue either deal.  The reasons given are a bit skimpy and I am not sure if this will stick but for now we are in limbo."  When asked why Tribune had decided

not to pursue the LBO, the EGI employee responded that Tribune's Chief Executive Officer and Board Chairman, defendant FitzSimons, "spent three days with the [Company's] publishers and got cold feet on the leverage." Notably, the amount of leverage associated with the LBO did not decrease in any material way subsequent to March 11, 2007. To the contrary, the only things that changed between March 11, 2007 and the date the LBO was approved and undertaken were that the Company's financial condition worsened, while management negotiated lucrative financial incentives that would be paid to them in connection with the LBO, and the proposed consideration paid to shareholders *increased* from $33 per share to $34 per share.

**VI.** **The Parties Charged With Protecting The Company Are Lured By Financial Incentives To Support Zell's Proposal**

    **A.** **Zell Induces The Officer Defendants And Subsidiary D&O Defendants To Recommend And Facilitate The LBO**

158. Notwithstanding the concerns over the LBO raised by the Company and its advisors in mid-March, 2007, Zell was ultimately able to induce the Officer Defendants and Subsidiary D&O Defendants to support the LBO by enticing them with lucrative financial benefits that would be awarded only if the LBO was consummated. In February 2007, EGI sent a proposed management equity incentive plan to, among others, Grenesko and Kenney at Tribune, with a copy to Zell. The plan was then forwarded to FitzSimons and Bigelow. The plan would provide key members of Tribune's management with "phantom" shares with an economic value equal to a percentage of Tribune's outstanding capital stock. An internal list of "deal points" that a top EGI executive wrote on February 27, 2007 suggested that a 5% stock option plan for management could be used to induce management to represent that the Company could achieve $100 million in cash savings.

159. On March 16, 2007, Bigelow instructed Tribune's financial advisors to make several changes to the "Zell model," including to increase the change of control payments by $20

million for possible transitional compensation. On March 26, 2007, Kazan emailed Bigelow regarding the "management equity plan," and noted that Osborne "was supposed to talk to Zell today." The next day, Kazan advised Bigelow that management was pushing Zell to increase the value of the management equity plan from 5% of Tribune's stock to 10%. Ultimately, Zell and the Tribune Board agreed that upon consummation of the LBO, executives and employees of Tribune and/or its subsidiaries who played "a critical role in overseeing the completion of the transaction" would receive from the Company (a) $6.5 million (later reduced to approximately $5 million) in cash awards (the "Success Bonus Payments") and (b) phantom stock that allowed management to reap the economic benefits of stock ownership without actually owning stock (the "Phantom Equity Payments"), which was beneficial for tax purposes. The phantom stock was awarded in two tranches equal to 5% and 3% of Tribune's common stock. The 5% tranche vested over three years. Half of the 3% tranche vested upon consummation of Step Two, and the other half vested one year later. Officer Defendants Amsden, Bigelow, FitzSimons, Grenesko, Kazan, Kenney, Leach, and Mallory, and Subsidiary D&O Defendants Gremillion, Hiller, Knight, Landon, Reardon, Smith, Vitanovec, and Waltz all received Success Bonus Payments and/or Phantom Equity Payments.

160. The Phantom Equity Payments and Success Bonus Payments were not the only financial incentives pushing the Officer Defendants toward facilitating and recommending the LBO. Consummation of the LBO would (and did) activate the premature vesting of millions of dollars in restricted stock units and stock options through an incentive compensation plan. The LBO also triggered enormous "change of control" severance payments (the "Executive Transition Payments," and together with the Phantom Equity Payments and Success Bonus Payments, collectively, the "Insider Payments") for officers let go after the LBO that were equal

to three times the employee's highest annual salary during the past three years and six times the employee's target bonus for the current year. The Merger Agreement expressly provided that the LBO would constitute a "Change of Control" under all of Tribune's various employee benefit plans, and that the surviving company—not just pre-LBO Tribune—was obligated to pay the Executive Transition Payments (the "Executive Transition Obligation"). These Executive Transition Payments resulted in more than $10 million for FitzSimons, who knew by late March that he would be terminated following the LBO.

161. As set forth in paragraphs 49 and 71, all of the Officer Defendants—each of whom played a critical role in ensuring that the LBO was consummated—and several of the Subsidiary D&O Defendants, benefitted greatly from these special monetary incentives. The final terms of the LBO provided that the Officer Defendants and Subsidiary D&O Defendants would collectively receive nearly $80 million in special monetary incentives for closing the deal, in addition to the aggregate payments of more than $60 million that they would receive for selling or redeeming their Tribune shares in connection with the LBO.

162. Upon information and belief, Zell and EGI also communicated to certain of the D&O Defendants that they would be rewarded with a future role at Tribune if they helped facilitate the LBO. For example, upon information and belief, Zell and/or his subordinates at EGI signaled to Bigelow—who kept Zell apprised of the Special Committee process notwithstanding an instruction to keep the information confidential—that if the LBO closed, Bigelow would be promoted to Chief Financial Officer of Tribune. Zell made good on this promise in or around March 2008, three months after the second step of the LBO closed.

163. By structuring and/or agreeing to these special incentives, Zell enticed the Officer Defendants to recommend the LBO to the Special Committee, and those Officer Defendants then

in turn committed intentional fraud in order to facilitate the LBO's consummation. At a March 30, 2007 meeting with the Special Committee, defendant FitzSimons, who received more than $37 million in connection with the LBO, reported to the Special Committee "that it was management's recommendation that the Company proceed with Zell's proposal."

**B.**     **The Company's Financial Advisors Are Incentivized To Favor The LBO**

164.    The Company's financial advisors, Merrill and Citigroup, were also incentivized to favor the LBO over the other proposals being considered by the Company. Although Morgan Stanley was the Special Committee's financial advisor, the Company's advisors—Merrill and Citigroup—solicited bids from third parties that expressed an interest in pursuing a strategic transaction with the Company, advised the Company respecting the bids, and repeatedly met with the Special Committee.

165.    Both Merrill's and Citigroup's retention agreements expressly provided that the banks could participate as lenders in any strategic transaction in which the Company engaged. Providing such financing would enable the banks to reap tens of millions of dollars in financing fees, on top of the tens of millions of dollars they were already earning for their advisory services. As such, both Merrill and Citigroup were incentivized to encourage Tribune to consummate a substantial sale or recapitalization so that they could participate in those financing fees.

166.    At the same time that Merrill and Citigroup were advising the Company on Zell's proposal, they were already negotiating for themselves and their affiliates to provide financing for the LBO, which, in addition to financing fees, would entitle them to receive interest at premium rates that were far higher than those they were earning from the Company's 2006 Bank Debt, and security in the form of the Subsidiary Guarantees. Merrill and Citigroup were thus

inherently biased in favor of the LBO, which, if selected, would reward them with enormous financial benefits.

167.    During the months leading up to the approval of the LBO, representatives of both Merrill and Citigroup met with the Special Committee on a near-weekly basis. Both Merrill and Citigroup strongly advocated in favor of the LBO, notwithstanding that internal emails from both banks showed that they had significant misgivings about the transaction. Indeed, Michael Costa, a senior member of Merrill's investment banking team and a principal advisor to Tribune, explained that the Company's initial uncertainty surrounding the LBO reflected a lack of "comfort in putting the kind of leverage necessary for [the] Zell proposal to work" in light of the Company's deteriorating performance. Similarly, just a week before the Special Committee approved the LBO, Julie Persily, a senior member of Citigroup's leveraged finance team, wrote to Christina Mohr, who was Citigroup's principal advisor to Tribune, that she was "extremely uncomfortable with Zell." Persily said she was "very concerned" about the rising debt level associated with the LBO in light of the Company's declining EBITDA, which she characterized as "scary" from a (prospective) lender's perspective.

168.    Despite their professed concerns about the crippling amount of debt the LBO would require the Company to take on, when in March 2007 the Company briefly turned away from the Zell proposal in favor of a more modest recapitalization plan, Merrill's and Citigroup's concerns quickly turned to the fees they might forfeit as a result. In an email dated March 10, 2007, Citigroup's Mohr wrote to Persily and other colleagues at Citigroup, informing them that "[t]he company wants to go to the recap[italization] route and has told Zell that they are pencils down on his proposal." After considering the lower debt associated with the recapitalization

proposal, Persily wrote to Mohr, "Bummer.  Say g'bye to another 18mm of fees (gross)."  Mohr responded in kind:  "Tell me about it."

169.    The Company purportedly recognized its advisors' conflicts and sought to mitigate them through its retention of Morgan Stanley to advise the Special Committee.  But Morgan Stanley also suffered from conflicts of interest, as Morgan Stanley's engagement letter made $7.5 million of Morgan Stanley's fee contingent on the preparation of an opinion concerning, or the closing of, a financial transaction, recapitalization, or restructuring plan for Tribune.  The engagement letter also provided for a discretionary "additional" fee.  Morgan Stanley later aggressively sought such a discretionary fee, although the Company declined to pay it.  Furthermore, notwithstanding that Morgan Stanley was hired because it agreed in its engagement letter not to participate as a lender in the LBO—and thus be free of the conflicts attendant to potential lenders—it repeatedly and persistently pressed for a role as a lender.  Thus, even apart from its other conflicts of interest, by pursuing a lending position in the LBO Morgan Stanley also created the very conflict it was hired to avoid.  Like Merrill and Citigroup, Morgan Stanley stood to gain substantially more if the LBO proceeded than if another transaction was consummated.

## VII.    Incentivized To Favor The LBO, The Officer Defendants Create Fraudulent, Unrealistic Projections

170.    While certain of the Officer Defendants—including Bigelow, Grenesko, and Kazan—were negotiating with Zell over the amount of the special monetary incentives they would receive if the LBO was consummated, those same Officer Defendants prepared a revised set of long-term projections (the "February 2007 Projections").  This was the fourth set of long-term projections issued by the Company in less than a year.  The February 2007 Projections were prepared in the midst of an accelerating, long-term, secular decline in the publishing industry,

which industry accounted for approximately three-quarters of Tribune's revenues. Moreover, as noted, the Company's publishing assets were performing poorly at the time of the LBO even by the standards of the troubled publishing industry. The Officer Defendants were aware of these secular declines and of Wall Street consensus estimates predicting decreasing EBITDA over the projection period, but nevertheless prepared unrealistic and unfoundedly optimistic projections that they knew the Company would not be able to meet.

171. Incredibly, the February 2007 Projections predicted that the Company would materially outperform 2006 in the latter half of 2007, and that its performance would continue to improve in subsequent years. To give but one example, the projections assumed that the Company's small Interactive business, which accounted for just 4% of the Company's revenues in 2006, would somehow double its growth during the 2007-2011 projection period. Merrill and Citigroup commented that the "Tribune Management Projections [were] generally more aggressive than Wall Street research," were "[a]bove consensus for Revenues and EBITDA through 2008," and that "2008 [was] considerably higher than even [the] most aggressive Wall Street estimate."



**Tribune – Consolidated Actual and Projected EBITDA**
*Case Projections Are Inconsistent With March 07 Wall Street Estimates*

Note: Actual EBITDA adjusted to include stock based compensation; and Projected EBITDA adjusted to include stock-based compensation and cost savings for 2007 – 2011, and exclude Cubs and Southern Connecticut Newspapers, Inc. for 2008 – 2011.

Sources: Tribune Co. Proxy Statement, July 13, 2007; Reuters Mean Consensus Estimates (March 2007); Tribune ESOP Transaction Model; Tribune Rating Agency Presentation, March 2007.

172.     Emails among the Officer Defendants show that the Officer Defendants knew that the February 2007 Projections were premised on unrealistic assumptions—and that they had been prepared without input from the members of Tribune management who may have questioned those assumptions.  For example, the projections assumed that the Company would receive cash income from its joint ventures, notwithstanding that, historically, this was not the case, and that the Company did not and could not control those joint ventures because it held only a non-controlling interest in them.  Defendant Landon was the person in management familiar with the joint ventures, and knew that the joint ventures had not distributed all their profits as cash before, and that there was no reason to expect them to begin doing so. Nevertheless, Landon was not asked whether the February 2007 Projections' assumption about the joint ventures was justifiable, or even told about the assumption.  Rather, in an August 2007

email with the subject line "Joint Venture Cash Distributions," Peter Knapp, the Company's publishing group controller, wrote to Landon, "[W]e need to start having the cash generated at our joint ventures come back to us because that is what we are assuming in the model." Landon responded shortly thereafter, remarking that such an assumption was "unrealistic" and inconsistent with the Company's actual intention:

> Not sure our other partners will be supportive of this. Certainly management will not be. This is a really tricky conversation *and it would seem we have set very unrealistic expectations*. (Emphasis added).

173. Landon's response showed that, incredibly, the Officer Defendants did not vet the February 2007 Projections with the members of management who were actually knowledgeable about the assumptions on which the projections were based. Landon confirmed in his email that the Officer Defendants did not confer with him about their joint-venture cash-flow assumptions, stating that "the first time I was aware that we were expected to take cash distributions for [sic] the ventures [was] in the last month," and specifically remarking that the assumption was "pretty inconsistent with the conversations [the Company] was having" with one of its joint venture partners.

174. The Company also appears to have massaged its expense data. For example, in December 2006, defendant Kazan questioned the capital expenditure forecast that was ultimately incorporated into the February 2007 Projections. Kazan stated, "On the capex, we don't really have an explanation for the $35 million reduction (which, by the way, was spread over Pub, Broadcasting and Corporate), so I wouldn't highlight this—just begs someone to ask why and we don't really have an answer."

**VIII.** **The Company Struggles To Find A Firm Willing To Opine That The Company Would Be Solvent Following The LBO**

    **A.** **Duff & Phelps Declines To Provide Tribune With A Solvency Opinion For The LBO, Instead Providing The ESOP With A "Viability Opinion"**

175. A "solvency opinion" is a recognized and commonly used vehicle in leveraged transactions to provide assurances to lenders, the borrower (*i.e.*, the target company itself) and other participants that the company will not fail after and as a result of the transaction, and that the transaction will not effect a fraudulent conveyance. Typically rendered by a reputable, independent financial advisory firm, a proper solvency opinion is the result of a standardized, legally condoned methodology that is designed to test whether a company will be able to survive under the weight of the additional leverage it intends to incur. A proper solvency opinion is generally a prerequisite to any leveraged transaction on the scale of the Tribune LBO, and is the central safeguard against overloading the company with debt and putting existing creditors at risk.

176. On February 13, 2007, the Tribune Board engaged Duff & Phelps to provide, for a fee of $1.25 million, an opinion as to the solvency and capitalization of Tribune following either an internal recapitalization and spin-off of the Company's broadcasting unit or, in the alternative, the LBO. █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████

177. On February 26, 2007, Tribune engaged GreatBanc to serve as the trustee of the ESOP for the LBO transaction. Tribune agreed to pay GreatBanc $1 million as compensation for its role in evaluating the LBO on behalf of the ESOP, and made half of GreatBanc's total fee contingent upon the occurrence of a shareholder vote in favor of the merger. GreatBanc's engagement agreement with Tribune specifically provided that GreatBanc would engage Duff &

Phelps as its independent financial advisor. But, given that it was already acting as a financial advisor to Tribune under the terms of its February 13, 2007 engagement letter, Duff & Phelps was hardly independent.

178. Duff & Phelps agreed to perform for GreatBanc essentially the same solvency analysis that it was performing for Tribune in connection with evaluating the proposed LBO. In an engagement agreement with Tribune's Special Committee (which automatically transferred to GreatBanc), Duff & Phelps agreed to provide advice as to the "financial feasibility" of the LBO, and acknowledged that it also had been engaged by Tribune to provide an opinion as to the solvency and capitalization of Tribune after giving effect to a number of transactions, including the LBO. The February 26, 2007 agreement was superseded by a March 8, 2007 agreement between Duff & Phelps and GreatBanc directly. That agreement reiterated the dual capacity in which Duff & Phelps was functioning and provided that, if all parties intended that a solvency opinion was required in connection with the LBO, Duff & Phelps would render that opinion to GreatBanc and the Tribune Board would be given the right to rely on it. Tribune agreed to pay Duff & Phelps a fee of $1 million for the work it performed on behalf of GreatBanc.

179. Until just days before the approval of the LBO, Duff & Phelps simultaneously worked on a draft solvency analysis for Tribune and multiple analyses—including valuation and fairness analyses—for GreatBanc. A "solvency team" performed analyses for Tribune, while an "ESOP team" performed analyses for GreatBanc. ██████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

180. In the period between March 19, 2007 and March 28, 2007, Duff & Phelps concluded that it could not render a solvency opinion to the Tribune Board in connection with the

LBO because the transaction would render Tribune insolvent—unless Duff & Phelps took into account approximately $1 billion in future income tax savings that Tribune hoped to realize by converting to a Subchapter S corporation following the merger. An S corporation passes income directly to its shareholders, thus avoiding income taxation at the corporate level. Moreover, the portion of an S corporation's ownership that is held by an ESOP is not subject to income tax at the federal level (and usually not at the state level). Tribune intended to avoid the payment of these taxes—and retain in the Company the cash that ordinarily would have been used to pay them—by converting itself into an S corporation that was 100% owned by the ESOP following the LBO.

181.    Duff & Phelps ultimately concluded, however, that it could not consider future (and uncertain) tax savings under any of the applicable legal or valuation standards that it was required to use to assess Tribune's post-transaction solvency. Handwritten notes on a draft Duff & Phelps/GreatBanc engagement letter read: "Solvency Opinion—very specific definition under [Delaware] law. Could not sell co[mpany] to anyone and repay debt. Need S corp benefits. Assets will not exceed liabilities w/o looking at S corp benefits." Upon information and belief, Tribune knew that Duff & Phelps would not provide a standard "solvency opinion" for the LBO because Duff & Phelps could not take the S corporation tax benefits into account in issuing such an opinion.

182.    In a March 19, 2007 meeting, Duff & Phelps advised GreatBanc that "there [was] no case law to support considering tax savings of the ESOP in [determining] solvency" and, as a result, any "Solvency Opinion to the Board [could not] factor in ESOP tax benefits." This was tantamount to Duff & Phelps saying to GreatBanc that it had concluded that the proposed ESOP transaction would render Tribune insolvent.

183.     GreatBanc should have walked away from the transaction at this point.  But, with half of its fee hanging in the balance, GreatBanc forged ahead.  Duff & Phelps, for its part, continued to work to evaluate the fairness of the LBO to the ESOP and to analyze the post-transaction value of Tribune, taking the expected S corporation tax savings into account.

184.     Both GreatBanc and Duff & Phelps knew that their roles were central to the consummation of the LBO by the D&O Defendants.  On March 21, 2007, defendant Osborn invited Marilyn Marchetti, Senior Vice President of GreatBanc, and Elyse Bluth, Managing Director of Duff & Phelps, to participate in a Special Committee meeting and to bring the Special Committee up to speed on the work that GreatBanc and Duff & Phelps were doing to evaluate the LBO.  During the meeting, Marchetti noted the considerations that GreatBanc would take into account as the ESOP trustee, and Bluth reviewed the "background work that would go into generating a valuation report and a solvency opinion for the Zell/ESOP proposal."

185.     On or around March 28, 2007, Duff & Phelps prepared a preliminary solvency analysis of the LBO that plainly demonstrated that, using a low-end estimation of Tribune's post-transaction enterprise value, Tribune's liabilities would exceed its assets by over $300 million unless $900 million in anticipated tax savings from the S corporation/ESOP structure were taken into account.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

186.     In a March 29, 2007 meeting of GreatBanc's ESOP Committee, Duff & Phelps presented its preliminary report on the post-transaction value of Tribune.  Robert Bartell, head of the Duff & Phelps solvency team, cautioned the ESOP Committee that the anticipated benefits of the S corporation tax shield were critical to Duff & Phelps' analysis and that Duff & Phelps was

"able to issue its financing opinion because of the anticipated benefits of the S corporation tax shield. If those tax benefits [were] not considered, [Duff & Phelps] would be unable to render its opinion." With this crucial caveat, Duff & Phelps stated that, "in its opinion, on a post-transaction basis, *taking into account the S corporation tax shield*, the fair salable value of the Company's assets is greater than its liabilities" and that "*taking into account the S corporation tax shield*, the Company will be able to pay its debts as they come due" (emphasis added).

187.    On or around March 28, 2007, Duff & Phelps advised the Tribune Board that it could not provide a solvency opinion in connection with the LBO. Intending to move forward with the LBO and knowing that Duff & Phelps could not provide the solvency opinion that was a precondition to the consummation of the transaction, the Tribune Board terminated Duff & Phelps' engagement. Upon information and belief, GreatBanc knew that the Tribune Board terminated Duff & Phelps' engagement because Duff & Phelps could not provide the solvency opinion that it needed.

188.    On March 31, 2007, GreatBanc revised the terms of Duff & Phelps' engagement to require that Duff & Phelps deliver, for a fee of $750,000, an opinion as to "the financial viability of [Tribune], as a going concern, and on a going-forward basis" following the close of the LBO. Duff & Phelps agreed to evaluate (i) whether the fair market value of Tribune's assets would exceed the value of its liabilities on a post-transaction basis; and (ii) whether Tribune, as a going concern and on a going-forward basis, would be able to pay its debts as they became due. Significantly, Duff & Phelps defined "fair market value" to include anticipated tax savings—even though it had never before defined fair market value in such fashion.

189.    Duff & Phelps rendered its so-called "viability opinion" on April 1, 2007, along with an opinion as to the fairness of the LBO to the ESOP. Duff & Phelps supported the viability

and fairness opinions with an "ESOP Analysis" which, among other things, purported to calculate the post-transaction enterprise value of Tribune. The viability opinion was the equivalent of a solvency opinion with one, important exception: it took into account the tax savings which Duff & Phelps had determined could not properly be considered under applicable legal standards. For that reason, the viability opinion expressly disclaimed that it was a solvency opinion and further disclaimed:

> The Determinations are not intended to be, and do not conform to, (a) determinations of insolvency as promulgated by § 101(29)(A) of the U.S. Bankruptcy Code or (b) determinations of fraudulent transfers under the Uniform Fraudulent Transfer Act and other state laws dealing with fraudulent conveyance and the Determinations do not include the standard analyses and determinations typically included in a standard Duff & Phelps solvency opinion.

Given this disclaimer, GreatBanc knew that it could not rely on Duff & Phelps' viability opinion for an assessment of Tribune's post-transaction solvency.

190. GreatBanc knew that it could not rely on Duff & Phelps' fairness opinion, viability opinion, or the ESOP Analysis on which those opinions were based for at least three other reasons. First, although Duff & Phelps acknowledged that its viability opinion was based upon the assumption that the Company would be able to realize the anticipated S corporation tax savings, it also acknowledged that it had done nothing to evaluate or determine the likelihood that Tribune would be able to realize any portion of the tax savings, and that it was making no assurances in that regard. Significantly, GreatBanc itself had raised concerns about whether Tribune would be able to elect S corporation status for 2008 and recognize the attendant tax savings for that year. Duff & Phelps dismissed those concerns, despite the fact that the accuracy of its analysis would literally rise or fall on the accuracy of its assumptions concerning the anticipated tax savings.

191.	Second, even assuming Tribune's ability to recognize in full the anticipated tax savings—which, by the time of the April 1, 2007 ESOP Analysis, Duff & Phelps had revised upward to $1 billion over 10 years—Duff & Phelps calculated the post-transaction equity value of Tribune to be within a range of negative $322 million at the low end to positive $1.278 billion at the high end.  Given the data to which they had access, the projections of industry analysts and the downward growth trends observed both at Tribune and comparable companies in the industry, both GreatBanc and Duff & Phelps knew, or were reckless or grossly negligent in not knowing, that the "low end" estimate of Tribune's post-transaction worth was substantially more realistic than the "high end" estimate.

192.	Third, even Duff & Phelps' negative $322 million "low end" estimate of Tribune's post-transaction value was overstated because it was based on a number of assumptions that both GreatBanc and Duff & Phelps knew, or were reckless or grossly negligent in not knowing were, inaccurate.  For example, although it was aware that Tribune's total operating cash flow was in decline, and Duff & Phelps projected flat or declining free cash flow in Tribune's broadcasting/entertainment and publishing businesses over the next 10 years, Duff & Phelps still assumed without any basis that Tribune would have a positive growth rate for those businesses' free cash flow for the years following the 10-year projection.  ███████████████████ ███████████████████████████████████████████████████████ █████████████████████████████

193.	GreatBanc should have abandoned the LBO based upon what Duff & Phelps' analysis revealed about the post-transaction value of Tribune.  Instead, on April 1, 2007, GreatBanc's ESOP Committee approved the LBO.  That day, Marchetti of GreatBanc and Bluth of Duff & Phelps participated in a telephonic meeting of the Tribune Board.  Marchetti reported

that (i) GreatBanc had received an opinion from Duff & Phelps that the terms of the proposed transaction were fair and reasonable from a financial point of view, (ii) the proposed transaction had been approved by GreatBanc's ESOP transaction review committee, and (iii) GreatBanc was prepared to proceed with document execution. By that time, GreatBanc and Duff & Phelps were keenly aware of the fiduciary duties that the D&O Defendants owed to Tribune and its creditors.

194.   Later on April 1, 2007, Tribune, GreatBanc (as trustee for the ESOP), and the Zell entity EGI-TRB entered into the Merger Agreement. Tribune and GreatBanc (on behalf of the ESOP) also entered into the ESOP Purchase Agreement, pursuant to which Tribune sold 8,928,571 shares of Tribune Common Stock to the ESOP at a price of $28 per share.

195.   On August 14, 2007, during a brief meeting of GreatBanc's ESOP Committee, Marchetti reported word from Tribune's senior management that the Company's second quarter financial performance was lower than expected, but that the proposed transaction was not at risk. At the close of the meeting, with little discussion and despite Tribune's disappointing second-quarter performance, the ESOP Committee unanimously approved voting the ESOP's shares in favor of the merger, and GreatBanc voted those shares accordingly on August 21, 2007.

196.   Nor did GreatBanc exercise its right to halt Step Two of the LBO in advance of the December 20, 2007 closing date. The Merger Agreement gave GreatBanc the power to terminate in the event that a "Company Material Adverse Effect" occurred before closing. The material change in the financial condition of Tribune—which was operating in a highly leveraged state that left almost no margin for error—constituted a Material Adverse Effect under the terms of the Merger Agreement. Yet GreatBanc took no steps to stop the transaction that the D&O Defendants and Controlling Shareholders were so intent on bringing to a close.

**B. Tribune Retains VRC To Issue A Solvency Opinion After Houlihan Lokey Voices Concerns Over The LBO**

197.    As noted, Duff & Phelps advised the Tribune Board that it could not provide a solvency opinion in connection with the LBO on or about March 28, 2007.  Finding a solvency opinion firm to provide the requisite opinion turned out to be no easy task.  Tribune first approached Houlihan Lokey ("Houlihan"), a prominent solvency opinion firm, which informed Tribune on March 29, 2007 that it would not bid for the engagement.  In soliciting Houlihan's involvement, Tribune's management did not tell Houlihan that Duff & Phelps had considered the transaction and concluded that it would render the Company insolvent.  But even without knowing that Duff & Phelps had concluded that the Company would be insolvent following the LBO, Houlihan independently reached the same conclusion, stating that it would be "tough" to find Tribune solvent based on the preliminary information with which it was provided.  In December 2007, Houlihan commented that the "Com[pa]ny was insolvent in [M]ay and [is] more so now."

198.    Based on communications from Duff & Phelps and Houlihan, the Officer Defendants, including Bigelow and Grenesko, knew that they could not obtain an industry-standard solvency opinion in connection with the LBO.  They therefore scrambled to find another firm that was willing to provide a *non*-standard opinion that the Company could use to close the deal.  On March 30, 2007, Bigelow emailed a lesser known solvency opinion firm—defendant VRC.  Bigelow told VRC that he "would very much like to speak with someone about solvency opinion work," and requested that VRC respond to him that very day.  Later that same day, Bigelow provided preliminary information to VRC.

199.    VRC's initial reaction was that the proposed transaction was "[h]ighly [u]nusual (because of S-Corp ESOP tax benefits) and highly leveraged," and that the Company consisted

of "good, stable but deteriorating businesses." One VRC executive wrote: "This may be just acceptable risk levels, but we will need to be compensated. My fee estimate would be $600-700k. . . ." Another VRC executive responded: "I would say at least $750[K] and maybe significantly more depending on levels and if they need bringdowns, etc." The reply revealed VRC's misgivings notwithstanding the potential for a high fee: "I'd like to discuss HLHZ [Houlihan] not wanting to bid. Raises the risk by itself."

200.    In order to compensate for its misgivings about this risky assignment, VRC charged Tribune $1.5 million, the highest fee it had ever charged for a solvency opinion.

201.    On April 11, 2007, Tribune formally engaged VRC to provide the Tribune Board with solvency opinions at Step One and Step Two. VRC's engagement letter, which was negotiated and edited by certain of the Officer Defendants, including Bigelow and Hianik, and signed by Bigelow, required a modification of the legal and industry standard definition of "fair value," which is determined based on the assumption that the company at issue is being purchased by a "hypothetical buyer." Instead, as set forth below, the definition contained in the engagement letter permitted VRC to assume, for purposes of its balance sheet solvency opinion, that the party purchasing Tribune was an S corporation wholly owned by an ESOP:

> **Fair Value** – The amount at which the aggregate or total assets of the subject entity (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act, *and, for purposes of the Step Two Opinion, both having structures similar to the structure contemplated in the Transactions by the subject entity (an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment), or another similar structure resulting in equivalent favorable federal income tax treatment.* (Emphasis added.)

This manipulation of the standard definition of "fair value" enabled VRC to calculate fair market value in the very same manner Duff & Phelps had concluded was contrary to legal and industry standards. Bryan Browning, a VRC Senior Vice President who was involved in the LBO

solvency analysis and who had worked on 400 to 500 solvency opinions, later testified that he had never before worked on a solvency opinion that modified the definition of fair value in that fashion. The decision to manipulate the definition of fair value in this manner completely eviscerated the protections that should have been afforded to the Company and its creditors by the solvency opinion requirements set forth in the LBO transaction documents.

202.     Although the engagement letter stated that VRC could assume and rely upon the reasonableness of the Company's financial forecasts and projections, and the correctness of the Company's determination of favorable federal income tax treatment to be received as part of the LBO, the engagement letter expressly provided as follows:

> VRC will, however, advise, after discussion with management with respect thereto, and based on its inquiries and its experience in reviewing such liabilities, (i) whether anything has come to VRC's attention in the course of its engagement which has led it to believe that any such financial forecasts and projections are unreasonable or that any such information or data is inaccurate in any material respect, or (ii) whether VRC has reason to believe that it was unreasonable for VRC to utilize and rely upon such financial forecasts, projections, information and data, or that there has been any material adverse change with respect to the Company.

## IX.     Lured By The Financial Incentives Associated With The LBO, The Controlling Shareholders And Tribune Directors Facilitate And Approve The Transaction

### A.     Zell Induces The Controlling Shareholders And Chandler Trust Representatives To Support The LBO By Proposing A Higher Purchase Price For Shareholders

203.     On March 30, 2007, the Special Committee directed defendant Osborn, who worked through Company management, including defendants FitzSimons and Kenney, to improve and finalize the Zell proposal. Over the course of the next 24 hours, Tribune, the ESOP, EGI, and the Chandler Trusts negotiated the agreements respecting Zell's proposal. In the course of these negotiations, EGI-TRB agreed to increase the price to be paid to Tribune's stockholders to $34 per share. EGI-TRB further agreed that its initial $250 million investment in Tribune

would be based on a $34 per share price, and that its total investment would increase to $315 million in connection with the merger—as opposed to the $1 billion equity investment Zell had originally proposed. That total consisted of the $225 million Subordinated Note and $90 million for a warrant, against which the Company credited $6 million in interest that EGI-TRB purportedly earned on the $200 million note it received in connection with Step One, and $2.5 million in fees incurred by Zell and/or EGI-TRB in connection with the transaction, such that the total amount of money that Zell ultimately invested in Tribune was just $306 million.

204.    As part of these negotiations, the Chandler Trusts agreed to enter into a voting agreement with the Company whereby they agreed to vote their shares in favor of the LBO, and against any alternative transaction, in exchange for certain registration rights. The Chandler Trusts further committed that they would not transfer their shares without also obtaining from any recipient a similar commitment to vote the transferred shares in favor of the LBO, and against any alternative transaction.

205.    As the parties involved in the LBO widely acknowledged, the voting agreement with the Chandler Trusts virtually guaranteed shareholder approval for the LBO. After the Chandler Trusts' and other Tribune shares were tendered during Step One, the Foundations and Zell controlled close to 50% of the remaining outstanding shares. Accordingly, only a tiny percentage of holders of the remaining shares needed to vote in favor of the merger in order for shareholder approval to be secured.

206.    The Chandler Trusts' decision to support the LBO stood in stark contrast to prior positions they, and their representatives on the Tribune Board, had taken with respect to other proposed transactions. For example, in May 2006, defendants Stinehart, Goodan, and Chandler, acting in their capacities as the Chandler Trusts' representatives on the Tribune Board,

"expressed concern regarding adding the . . . leverage" associated with the 2006 Leveraged

Recapitalization, "given the uncertainties of the Company's operating performance," and refused

to vote in favor of the transaction. Notably, the 2006 Leveraged Recapitalization brought the

Company's total debt from $3.7 billion to $5.8 billion. By contrast, one year later, the LBO

raised the Company's debt from less than $5 billion to *nearly $14 billion*, at a time when the

Company was—predictably—performing significantly worse than it had been when the 2006

Leveraged Recapitalization was being considered.

207.     The only possible explanation for the Chandler Trusts' and Chandler Trust

Representatives' change of heart is that the Chandler Trusts no longer cared about the Company's

viability, because the LBO enabled them to make a swift exit from the Company at a price that

far exceeded their estimate of Tribune's actual per-share value, and placed the entire risk of the

Company's failure on the Company, its employees, and its remaining stakeholders (primarily, the

Tribune creditors who would remain following the LBO). To use Stinehart's analogy, by

entering into the Voting Agreement and helping to facilitate the LBO, the Chandler Trusts, and

defendants Stinehart, Goodan, and Chandler, were ensuring that their "special constituency"

would be airlifted "off the ski slope," while the Company's existing creditors were buried by an

avalanche of LBO Debt.

208.     Given the Chandler Trusts' and Chandler Trust Representatives' dismal view of

Tribune's prospects, there is no way that they could have believed that Tribune could survive

with more than $13 billion of debt on its balance sheet. By negotiating the LBO with Zell,

advocating in favor of the LBO once it had been modified to satisfy their demands, and agreeing

to vote their Tribune shares in favor of the LBO, the Chandler Trusts breached their fiduciary

duties as controlling shareholders, and aided and abetted the breaches of fiduciary duties

committed by the D&O Defendants and Subsidiary D&O Defendants. The Chandler Trust Representatives also breached their fiduciary duties as members of the Tribune Board.

209. The Foundations similarly breached their fiduciary duties to creditors, and aided and abetted the D&O Defendants' and Subsidiary D&O Defendants' breaches. The Foundations' attitude toward the LBO was similar to that of the Chandler Trusts and Chandler Trust Representatives. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ Once the Foundations had an opportunity to exit the Company altogether at a premium price, however, their prior concerns about leverage vanished, and they agreed to saddle the Company with a debt to EBITDA ratio of significantly greater than seven times. Indeed, the Foundations took an active role in ensuring that the LBO would be consummated.

210. On Saturday, March 31, 2007, Joseph Hays, the spokesperson for the McCormick Foundation, sent an email to the McCormick Foundation's financial advisors at Blackstone that "[t]hose that I spoke with today say management was on the phone all day 'finishing the deal,' and that it looks to them like the Zell deal will be announced tomorrow, Sunday." Hays sent a separate email to a senior advisor at Blackstone the next day, writing, "God understands, but may not forgive us for what are bout to do to good Olde TRB." Like any reasonable person with knowledge of the publishing industry and the Company's financial condition, Hays knew that approval of the LBO meant an end to Tribune as a going concern.

**B.** **The Special Committee And Tribune Board Breach Their Fiduciary Duties By Approving The LBO**

211. On April 1, 2007, the Special Committee unanimously recommended that the Tribune Board approve the "Zell/ESOP transaction to acquire Tribune for $34 per share." The

Director Defendants (other than Taft who was absent and Stinehart, Goodan, and Chandler, who abstained from voting) then voted to agree to Zell's proposal, and caused Tribune to enter into the Merger Agreement contemplating that the LBO would proceed in a two-step transaction. In the first step, Tribune would incur approximately $7.015 billion in debt to retire its existing bank facility, and purchase approximately 50% of the Company's outstanding shares (126,000,000 shares) in a tender offer for $34 per share. In the second step, Tribune would incur approximately $3.7 billion in additional debt to purchase its remaining outstanding shares for $34 per share in a go-private merger following certain regulatory and shareholder approvals.

212. The LBO enabled the members of the Special Committee to reap aggregate payments of more than $6 million, and enabled the other members of the Tribune Board to collectively pocket tens of millions of dollars more from stock sales and special incentives, all at Tribune's expense. The members of the Special Committee and the Tribune Board, in respectively recommending and approving the LBO, breached the fiduciary duties of care, good faith, and loyalty that they owed to the Company and to its creditors.

213. Minutes from the Special Committee and Tribune Board meetings show that the Special Committee and Tribune Board completely disregarded the interests of the Company and its existing creditors, and focused exclusively on providing shareholders with the highest price for their shares that could be achieved. Neither the Special Committee nor the Board considered whether incurring an additional $8 billion of debt to fund such a high price constituted a breach of fiduciary duty to the Company and its creditors, given the Company's deteriorating financial condition and dismal future outlook.

214. To the contrary, the proxy statement accompanying the Company's tender offer at Step One stated that the Special Committee considered the trends contributing to the secular

decline in newspaper publishing, such as the "weakened demand" for newspaper advertising and the "declines and potential declines in newspaper circulation," as factors that weighed *in favor* of recommending the LBO and of shareholders tendering their shares. In short, the Special Committee recommended to shareholders that they should get out while the getting was good. The Special Committee, and the Board in accepting its recommendation, wholeheartedly endorsed the Controlling Shareholders' exit plan, without considering the effect these negative trends would have on the Company and its residual risk-takers—the pre-LBO creditors—following the LBO.

215. The Special Committee and Tribune Board should have abandoned the LBO when Duff & Phelps concluded that it could not provide a solvency opinion, or when Houlihan refused to even bid on the solvency opinion engagement. Instead, the Special Committee and Tribune Board went shopping for a customized solvency opinion and, for the right price, found a willing provider in VRC. The Special Committee and Tribune Board also should have considered the universally negative reaction to the LBO among news outlets, industry analysts, and rating agencies. Yet minutes of the Special Committee and Tribune Board meetings between the time that the LBO was proposed by Zell and the time that the Company approved the transaction reflect no discussion of these criticisms.

216. Moreover, the Director Defendants failed to acknowledge that the negative trends facing the publishing industry and the Company rendered the February 2007 Projections—which projected that the Company's performance would begin improving steadily in the latter half of February—patently unreasonable. This was a particularly egregious failure. Because a leveraged buyout places such a high amount of leverage on the target, it is essential that the base case projections on which the leveraged buyout is premised be reasonable and reliable. Had the

Director Defendants paid even minimal attention to the challenges facing the newspaper publishing industry at the time of the LBO, they could not have continued to rely on the February 2007 Projections.

217.    It is also crucially important that a leveraged buyout be tested using reasonable downside projections, so that the target can ensure that it will be able to service its increased debt and continue operating as a viable company even in the face of a significant downturn. Nevertheless, neither the Special Committee nor the Tribune Board requested that management or the Company's advisors perform the quality of downside testing of the Company's projections that the Tribune Board had previously insisted on in connection with the 2006 Leveraged Recapitalization, which involved far less leverage than the LBO, and was consummated during a period of comparatively better financial performance for the Company and the industry as a whole.

218.    In connection with its consideration of the 2006 Leveraged Recapitalization, the Tribune Board considered whether the Company could sustain an additional $2 billion in debt. The members of the Tribune Board at the time insisted on testing the 2006 transaction assuming the onset of a recession similar to that of 2001.  Specifically, the Tribune Board examined a scenario in which revenues declined by 15%, and then recovered by 5% annually over the next three years.

219.    ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

220. There can be no question that the Director Defendants knew better than to rely on management's obviously flawed projections in approving the LBO. According to Tribune Board minutes dated February 13, 2007, Special Committee members Holden, Osborn, Reyes, and Taft were all deemed "audit committee financial experts" within the meaning of applicable securities laws. According to the SEC, an Audit Committee Financial Expert must have, among other things, an understanding of generally accepted accounting rules and financial statements; the ability to apply such principles in connection with accounting for estimates; and experience with financial statements that present a breadth and level of complexity of accounting issues that can reasonably be expected to be raised by the company's financial statements.

221. Other Special Committee members were equally sophisticated. For example, White held a Stanford MBA, worked as a management consultant at McKinsey, and became Chairman and CEO of Abbott Laboratories; Morrison received an MBA from Wharton, and served as CEO of the 3M Company, Kraft Foods, and Quaker Oats, and as Vice Chairman of the Coca Cola Company; and Hernandez is or has been the President and Chief Executive Officer of Inter-Con Security Systems, Chairman of the board of Nordstrom, Inc., and a director on the boards of McDonald's Corp., Chevron Corp., and Wells Fargo & Co.

222. In short, the absurdity of the proposed LBO should have been even more obvious to the highly sophisticated, financially literate members of the Tribune Board and Special Committee than it was to the rest of the world.

223. Significantly, prior to the submission of Zell's proposal, the Special Committee spent substantial time reviewing the Company's projections and its ability to handle increased leverage (albeit, materially less leverage than the LBO Debt) in connection with its consideration of various strategic alternatives in which shareholders would continue to maintain an ownership interest in the Company. ██████████████████████████████████████

██████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

Once the Special Committee shifted its attention to the Zell proposal contemplating that shareholders would cash out of the Company completely, however, discussion by the Special Committee or the Tribune Board respecting the reliability of the Company's projections or the Company's ability to handle additional leverage ceased completely. At that point, in derogation of their obligations to the Company and the parties that would continue to hold an interest in its performance following the LBO, the Special Committee and Tribune Board focused exclusively on the value that would be provided to shareholders by the LBO.

224. Although the Chandler Trust Representatives abstained from voting on the LBO, they were still Tribune fiduciaries at this time. Thus, they had an obligation to voice their views,

as they had in the past, that the February 2007 Projections prepared by the Officer Defendants could not be believed, that the negative trends facing the Company, and the Company's deterioration, could only be expected to continue, and that the leverage being incurred in the LBO was egregious, and posed enormous risks to the Company's survival. Given these views, the Chandler Trust Representatives knew that the Company could not withstand the burden of the LBO Debt. They could not discharge their fiduciary duties simply by sitting out of the vote, and did not discharge these duties.

## X.    The Company Begins Implementing The Disastrous LBO Amid A Growing Chorus Of Criticism Of The Transaction

### A.    Tribune Announces The LBO And Begins Taking The Steps Necessary To Consummate The Transaction

225.    On April 1, 2007, Tribune entered into Step One and Step Two financing commitment letters that obligated JPMorgan, Merrill, Citigroup and Bank of America, N.A. ("Bank of America"), and affiliated entities of each of them (collectively, the "Lead Banks"), to provide up to $12.2 billion in financing in order to consummate the LBO.

226.    On April 2, 2007, Tribune publicly announced that it had agreed to Zell's proposal. Tribune's press release stated in relevant part:

> With the completion of its strategic review process, Tribune Company today announced a transaction which will result in the company going private and Tribune shareholders receiving $34 per share. Sam Zell is supporting the transaction with a $315 million investment. Shareholders will receive their consideration in a two-stage transaction.

> Upon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan (ESOP) holding all of Tribune's then-outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40 percent of Tribune's common stock. Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.

The first stage of the transaction was a cash tender offer for approximately 126 million shares at $34 per share. The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell . . . .

The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share. Zell will make an additional investment of $65 million in connection with the merger, bringing his investment in Tribune to $315 million.

227.    An Investor Rights Agreement executed in connection with the LBO granted Zell the power to veto major transactions, even though his investment in the Company was nominally structured as "debt" and a warrant rather than equity. Under the terms of the Investor Rights Agreement, transactions with a value of more than $250 million, among others, would require the approval of the Tribune Board, which would include two directors of Zell's choice. Such transactions, along with any changes to the Company's by-laws, would require approval of a majority of the Tribune Board's independent directors as well as that of one of Zell's appointees. On May 9, 2007, Zell was appointed a member of the Tribune Board. Consistent with the reality of Zell's position as the new controlling equity holder, the parties involved in the LBO routinely referred to Zell's "loans" to the Company as equity investments.

228.    On April 23, 2007 EGI-TRB made its initial $250 million investment in the Company in exchange for (a) 1,470,588 shares of Tribune's common stock at a price of $34 per share and (b) a $200 million unsecured subordinated exchangeable promissory note of Tribune (the Exchangeable Note), which required Tribune to make a payment to EGI-TRB at Step Two in the same amount that EGI-TRB would have received if it had held stock that was cashed out at $34 per share as a part of the completion of the LBO.

**B.      In Connection With The LBO, Tribune Enters Into Loan Agreements That Are Designed To Hinder, Delay, And Defraud Its Existing Creditors**

229.    On May 17, 2007, Tribune entered into a Senior Loan Agreement that obligated the Lead Banks to loan Tribune $8 billion in senior debt to be used at Step One, and $2 billion in

incremental funds to be used at Step Two. On December 20, 2007, Tribune entered into a Bridge Credit Agreement that obligated the Lead Banks to loan Tribune an additional $1.6 billion in subordinated senior debt in connection with Step Two. In all, these obligations totaled $11.2 billion.

230.     The Lead Banks knew that the LBO posed a high risk that the Company would have to file for bankruptcy. For example, on March 28, 2007, a senior JPMorgan employee wrote in an internal email that he was concerned about the structure of the LBO because the Lead Banks would not be entitled to "post [bankruptcy] petition interest."

231.     Thus, in order to protect themselves in the event of a bankruptcy, the Lead Banks were willing to arrange and finance the LBO only if they could effectively subordinate Tribune's existing debt (the "Non-LBO Debt") to the LBO Debt, so that, if the Company filed for bankruptcy, the lenders that extended the LBO Debt to the Company, or their successors (collectively, the "LBO Lenders"), would be paid before any of the Company's other creditors. The Special Committee and Tribune Board agreed to this aspect of the LBO financing without any discussion or consideration whatsoever.

232.     Under the Company's existing credit agreements and the indentures governing its bond debt (the "Bond Debt"), the Company's bondholders had a right to share equally in any payments made to the Company's bank lenders in the event of a bankruptcy. The Lead Banks sought to obtain priority of payment over the Bond Debt, by insisting that the Subsidiary Guarantors, which held the majority of the Company's value, guarantee all of the LBO Debt, including the amounts used to refinance the 2006 Bank Debt. Because the Subsidiary Guarantors had not guaranteed the Bond Debt, these Subsidiary Guarantees ensured that the LBO Lenders would be paid in full before the bondholders could receive any payments derived

from the value at the Subsidiary Guarantors.  As a result, by causing the Subsidiary Guarantors to enter into the Subsidiary Guarantees, the Company effectively transferred the value of the Company's equity interest in the Subsidiary Guarantors to the LBO Lenders.

233.    The Subsidiary Guarantors did not receive anything in exchange for the Subsidiary Guarantees, as all of the funds made available by virtue of the LBO Debt went first to Tribune, and then to its shareholders or advisors, existing bank lenders, or the Lead Banks.

234.    The Lead Banks also took other steps that were intended to make it more difficult for the Company's non-LBO lenders to share equally with the LBO Lenders in any bankruptcy recoveries.  Those steps included the creation of two new Company subsidiaries, Tribune Broadcasting Holdco, LLC ("Holdco") and Tribune Finance, LLC ("Finance").  Holdco became the holding company for the Company's broadcasting subsidiaries through the Company's transfer to Holdco of the stock of the previous broadcasting holding company, Tribune Broadcasting Company.  Finance became a creditor of the Company's principal publishing subsidiaries through a complex circle of transactions, accomplished through a series of book entries, that obligated the publishing subsidiaries to Finance through substantial intercompany obligations, even though Finance had not provided any value to the publishing subsidiaries.

235.    Holdco and Finance effectively controlled all the value of the other Subsidiary Guarantors, through Holdco's ownership of the broadcasting subsidiaries, and Finance's "loans" to the publishing subsidiaries.  Holdco and Finance were Subsidiary Guarantors, and the Company pledged its stock in Holdco and Finance to further secure the LBO Debt (the "Pledge").

236.    The Company and the Lead Banks agreed to the creation of Holdco and Finance and the complex related transactions to hinder, delay, and impede the ability of non-LBO lenders

85

to challenge the Subsidiary Guarantees in the event of a bankruptcy. Specifically, the Company and Lead Banks believed that because Holdco and Finance had no pre-existing creditors, a plaintiff would be unable to challenge their Subsidiary Guarantees as fraudulent.

237. In late May 2007, a JPMorgan analyst who was working on the LBO explained in colorful terms how the Subsidiary Guarantees ensured that JPMorgan and the other LBO Lenders would be paid in full in a Tribune bankruptcy, notwithstanding that the Company's value was less than the total debt it would have following consummation of the LBO:

> There was a WSJ article today that talked about how TRB . . . has no room for mistake no more. The article also talked about how there is a wide speculation that the company might have put so much debt that all of its assets aren't gonna cover the debt, in case of (knock knock) you-know what. Well that is actually basically what we (JK and me and rest of the group) are saying too, but we're doing this 'cause [Tribune's assets are] enough to cover our bank debt. So, lesson learned from this deal: our (here, I mean JPM's) business strategy for TRB, but probably not only limited to TRB, is "hit and run"—"we'll s_ck the sponsor's a$$ as long as we can s_ck $$$ out of the (dying or dead?) client's pocket, and we don't really care as long as our a$$ is well-covered. Fxxk 2nd/private guys— they'll be swallowed by big a$$ banks like us, anyways".

## C. The LBO Was A Single Unitary Transaction With Two Steps

238. The Tribune Board approved both Step One and Step Two on April 1, 2007. Consistent with this unitary approval, the market accurately viewed Step One and Step Two as part of a single, unitary transaction, designed to allow Tribune to become a privately held company that could reap the tax benefits afforded to an S corporation owned by an ESOP. Thus, the LBO made economic sense for its participants only if Step Two closed, which was necessary in order for the anticipated tax savings resulting from the ESOP structure to be realized. EGI-TRB acknowledged the central importance of the S corporation/ESOP structure to both it and the LBO at the outset of its bidding process, stating that "the tax structure is the only thing that made [the LBO] financially attractive for us."

239.     Consistent with EGI's views, an internal Bank of America "Deal Screen Memorandum" dated March 5, 2007 listed the tax benefits and potential reduction in capital gains taxes from future asset sales resulting from the Company's S corporation/ESOP structure, none of which would occur until the close of Step Two, as the first items in the "Transaction Rationale" for the LBO.  Similarly, in a letter dated March 29, 2007, Moody's called the S corporation election "a critical component of the company's plan," noting that "[t]he tax-free status and the effective elimination of the significant amount of deferred tax liabilities . . . is a critical mitigating factor to the minimal amount of equity and is thus a key assumption factored into" Moody's rating.

240.     As discussed above, the only reason that the transaction was consummated in two steps was because the Controlling Shareholders would not agree to vote in favor of or support the LBO unless it provided an upfront payment to shareholders that was not delayed by the time it would take to obtain the FCC approval necessary to complete the transaction.  Had there been a way to structure the transaction so that only one step was necessary, it would have been so structured.  Thus, neither of the two steps was intended to occur on its own, and each was designed to be dependent on the other.  For example:

a.      the Company's press release announcing the deal prior to the close of Step One referred to the LBO as a "two-stage transaction," and explained that, "[u]pon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan (ESOP) holding all of Tribune's then-outstanding common stock";

b.      the Tribune Board approved both Steps One and Two at the same time;

c.      the commitment letters providing for the Step One and Step Two financing (the "Step One Commitment Letter" and "Step Two Commitment Letter," respectively) were executed at the same time, and obligated the lenders to provide the requisite financing to permit Step Two to occur;

d.      the loan agreement entered into at Step One provided for the secured financing for both Step One and Step Two;

e. a single Merger Agreement executed at Step One required the Company to exercise reasonable best efforts to effect both Step One and Step Two of the LBO;

f. the Step One and Step Two Commitment Letters cross-referenced each other, and the Step One Commitment Letter made the execution and delivery of the Merger Agreement without waiver, amendment, or modification a condition precedent to the Company's initial borrowings at Step One;

g. the Step One Commitment Letter and Step Two Commitment Letter explicitly conditioned the borrowing under these facilities on the continued existence of the financing commitments (for both Step One and Step Two) set out in the Merger Agreement; and

h. the fairness opinions on shareholder consideration issued by Merrill and Morgan Stanley, on which the Tribune Board relied in approving the LBO in April 2007, evaluated and referred to the Merger Agreement as the governing document, and considered the share acquisitions at Step One and Step Two together.

241. The documents maintained by and communications among the Lead Banks also show that the LBO was a unitary transaction with two steps. For example, all of the Lead Banks analyzed the LBO, which they referred to as a "two-step transaction," as one transaction, and sought internal approval to participate in both steps in advance of Step One. Moreover, a senior member of the Merrill team commented that the rating agencies would "immediately rate Tribune for the entirety of the buyout transaction when the purchase agreement is signed," noting that JPMorgan, Citigroup, and Merrill "would commit to both steps in order to ensure financing for the whole transaction."

242. Additionally, at the time of Step One, Step Two was, at minimum, highly likely to occur. As noted, and as widely acknowledged by the parties involved, shareholder approval for the LBO was effectively secured from its inception, as the voting agreement with the Chandler Trusts virtually guaranteed it. As Tribune management consistently acknowledged, obtaining shareholder approval was never a significant hurdle.

243. The parties also believed that FCC approval, another condition of consummation of the deal, would be obtained because the LBO entailed no new combination of assets, and

therefore the merger merely involved the renewal of existing cross-ownership waivers.  As recognized by rating agencies and news analysts, FCC approval in these circumstances was expected.

> **D.** **Rating Agencies, Wall Street Analysts, News Publications, And Investors React Negatively To The LBO**

244.    On April 2, 2007, two of the three major credit rating agencies, Fitch and S&P, downgraded Tribune's debt in response to the approval of the LBO.  S&P stated:

> [B]ased on our analysis of the proposed capital structure, we have determined that if shareholders approve the transaction as outlined, we would lower the corporate credit rating to 'B', with a stable outlook.

> The expected 'B' rating would reflect the company's highly leveraged capital structure, weakened credit measures, and reduced cash flow-generating capability as a result of its LBO and associated heavy interest burden.  The rating would also underscore Tribune's exposure to the very challenging revenue climates and competitive market conditions affecting its newspaper and broadcasting operations, and its aggressive financial policy.

245.    On April 19, 2007, S&P downgraded Tribune's credit rating on its unsecured notes to CCC+ indicating a high default risk.  S&P reported that "given the amount of priority debt ahead of these notes, we will assign them a recovery rating of '5' upon the close of the proposed bank transaction, indicating the expectation for negligible (0% -25%) recovery of principal in the event of a payment default."  On April 23, 2007, Moody's also downgraded Tribune, citing the significantly increased leverage that the Company would incur as a result of the LBO.

246.    Similarly, citing the increased debt Tribune planned to take on by virtue of the LBO, Fitch expressed its belief that the deal would be "detrimental to bondholders," and maintained a negative outlook on the Company.  On May 3, 2007, Fitch announced that Tribune's ratings would remain on "rating watch negative."  Fitch stated that the downgrading reflected the "significant debt burden the announced transaction places on the company's balance

sheet while its revenue and cash flow have been declining," especially in light of "meaningful secular headwinds that could lead to more cash flow volatility in the future." Fitch believed that "these factors could impair the company's ability to service its debt, particularly if coupled with a cyclical downturn."

247.    Wall Street analysts' responses were consistent with the rating agency downgrades and concerns over the transaction. For example, on April 2, 2007 Barclays Capital stated:

> We think it is possible that TRB is leveraged higher than the total asset value of the company (after taxes), which makes recovery valuations difficult if the economy and/or advertising market slows.

248.    On April 3, 2007, an analyst from Gabelli & Co. stated, "I certainly hope no one else is thinking of doing what Tribune has done. It's a mess." Similarly, a Goldman Sachs analyst reported that same day that "with estimated annual interest expense of over $1bn/yr and estimated EBITDA of $1.3bn, the transaction leaves little room for error, particularly in this challenging newspaper operating environment." The analyst pointed out that the high leverage from the deal left Tribune in a "precarious financial position."

249.    Also on April 3, Bloomberg News quoted an industry analyst who stated that, for the LBO to succeed, Tribune either had to significantly cut costs or experience "significant growth." The analyst remarked that "[t]here just isn't a scenario that shows how this industry or this company is going to get significantly better." The article essentially predicted—correctly— that, absent a miracle, Tribune could not survive the LBO.

250.    A Lehman analyst reported on April 26, 2007 that the "[p]roposed deal leaves TRB with debt-to-2007E-EBITDA of 11.5x . . . which we believe is far too high for secularly declining businesses . . . . Debt payments should overwhelm EBITDA, by our calculations."

251.    Financial analysts and rating agencies were not alone in recognizing the devastating consequences of the proposed LBO. As soon as the LBO was announced, a growing

chorus of news outlets also began reporting on the substantial risk of the proposed transaction, openly questioning the proposal's soundness, and highlighted the crushing debtload that the LBO would create. For example, on April 2, 2007, the *Baltimore Sun*—one of Tribune's own newspapers—questioned the wisdom of the proposed LBO: "The deal, which would return Tribune to private ownership, would make the company one of the most heavily indebted enterprises in the media industry at a time of falling readership and declining advertising revenues." The report commented further that Tribune's rivals were "dumbfounded" by the deal.

252. On April 3, 2007, the *New York Times* reported that the proposed sale came with some "big risks," observing that the LBO "would saddle the company with $13 billion in debt even as advertising sales and circulation decline." An article appearing in the *Times* three days later characterized the proposed LBO as "one of the most absurd deals ever."

253. In an April 4, 2007 article entitled "How Will Tribune Pay Its Debts?" the *Wall Street Journal* stated:

> The big question hanging over Tribune's $8.2 billion buyout deal unveiled Monday is this: How do they plan to do that [repay its debt], given that the newspaper industry faces uncertain prospects? Financed almost entirely by debt, the buyout will leave the newspaper and TV concern staggering under more than $12 billion in debt when existing borrowings are included. That is about 10 times Tribune's annual cash flow, a ratio several times higher than typically carried by most media businesses.

254. On April 16, 2007, *Businessweek* also raised serious concerns as to the highly leveraged nature of the proposed LBO:

> How leveraged? The just-announced deal orchestrated by investor Sam Zell leaves the company with more than $13 billion in debt. To put that in its proper perspective, Tribune's cash flow in '06—earnings before interest, taxes, depreciation, and amortization, or EBITDA—was $1.3 billion. Thus its debt exceeds last year's EBITDA by about ten times. This is an angina-inducing multiple even for veteran media players accustomed to playing with debt, some of whom get nervous above six. And Tribune's cash flow comes in large part from big-city Old Media properties, which are not noted for their stability right now. (Tribune's revenues declined by more than 5% in February.)

255. By contrast, an extensive search of contemporaneous accounts reveals no articles or analyst reports suggesting that the LBO made sense or was a positive move for the Company. The D&O Defendants must have been—and certainly should have been—aware of the universally negative reaction to the LBO.

256. The market's negative perception of the LBO hindered the Lead Banks' ability to syndicate the LBO Debt. When asked if the problems were "[s]omething about this deal or the mkt," a Merrill banker responded: "[The issue is] [t]his deal—market is busy, but fine. Misjudged level that investors would require here. Working people through the structure has been a challenge, but major pushback has been on newspaper business."

257. Similarly, on May 11, 2007, a JPMorgan Banker reported internally:

Since we launched two weeks ago, the deal has struggled in the market. Investor concerns include total leverage (8.9x EBITDA), low equity check from Sam [Zell], continuing deterioration of newspaper industry fundamentals, price and overhang from expected Second step of the transaction which will occur later this year.

## XI.  The Company Engages In Intentional Fraud In Order To Close Step One

### A.  The D&O Defendants, Controlling Shareholders, Zell, And Advisor Defendants Purport To Rely On The Outdated, Unreasonably Optimistic February 2007 Projections In Order To Obtain A Step One Solvency Opinion

258. Incentivized to ensure that the LBO was consummated so that they could obtain the lucrative payments associated with selling their shares in the LBO and the special monetary incentives offered by Zell, the D&O Defendants, the Controlling Shareholders, Zell, and the Advisor Defendants purported to rely on the unrealistic February 2007 Projections even as each month's below-projection performance showed conclusively that they could not be achieved.

259. As should have been reasonably expected, the Company's actual operating cash flows through May 2007, right before Step One closed, materially failed to meet even the

relatively modest projections for early 2007 set forth in the February 2007 Projections, and definitively showed that the projections were unreasonable. As of May 2007, operating cash flow for six newspapers accounting for more than 91% of the Company's publishing business was 24% off of 2006 results, and 14% off of the February 2007 projections. Similarly, the Company's publishing segment as a whole was 21.5% off of its 2006 results, and 12% off of the February 2007 Projections.

260. To make up the ground the publishing segment lost through May and achieve the February 2007 Projections for the full calendar year, the publishing segment's weekly operating cash flow for June through December 2007 would have to have been 38% higher than it was from January through May. This meant that the Company would have had to exceed the 2006 actual results by 7.2% for the remainder of the year—an impossible proposition since the publishing segment's results were already trailing 2006 by 21.5%.



**Tribune – Publishing Segment 2006 Operating Cash Flow**
*February 2007 Projections and 2007 Actual Compared to 2006 Actual*

Legend:
- February 2007 Projections variance from 2006 Actual
- February 2007 Projections variance from 2006 Actual plus 5/07 YTD Deficit
- 2007 Actual variance from 2006 Actual
- 2007 Actual variance From 2006 Actual

261.    No reasonable person could have expected this to occur given the state of the publishing industry at that time and the Company's historical performance.  Indeed, as noted in June 2006 by Stinehart, "over the past two years, Tribune . . . significantly underperformed industry averages *and there [wa]s scant evidence to suggest the next two years w[ould] be any different*" (emphasis added).

262.    The Officer Defendants were aware of the Company's dismal performance, as they received weekly "flash reports" showing that the February 2007 Projections were unrealistic almost immediately after they were disseminated.  Up-to-date financial information was regularly provided to the Director Defendants.  For example, in preparation for the Tribune Board's May 9, 2007 meeting, FitzSimons sent to the Tribune Board the Company's first-quarter results, which showed total operating profits down 22% from 2007, with the observation that "the newspaper industry's going through a very difficult first half."  Such up-to-date financial

information was also likely known by, and was certainly available to, the Controlling Shareholders, Tribune advisors, and Zell.  Additionally, on May 20, 2007, in defending against shareholder litigation relating to the LBO, Tribune proffered the declaration of an expert witness who stated that absent the LBO, the Company's per share value could be "well below $32," particularly in light of the Company's weak financial performance since Zell's proposal was made.

263.    Nevertheless, contrary to what the Company subsequently acknowledged as proper corporate practice of updating its financial projections based upon "the most recent information available" as soon as such information became available, the Officer Defendants decided not to publicly update Tribune's February 2007 Projections until *after* Step One closed, and *after* VRC relied on those projections to render its Step One solvency opinion.  Similarly, the Director Defendants, Controlling Shareholders, Tribune advisors, and Zell continued to cite the February 2007 Projections as a justification for the deal, even though they knew, or were reckless or grossly negligent in not knowing, that these projections could not be achieved.  Emails among the Officer Defendants, EGI, and Tribune's advisors show, however, that notwithstanding the Officer Defendants' failure to update the February 2007 Projections prior to the close of Step One, the Officer Defendants knew that they should have done so.  On March 20, 2007, an EGI executive disclosed to the EGI team that defendant "Chandler [Bigelow] indicated on [March] 9th that management needed to sit down and refine their projections for 2007."  On March 21, 2007, Tribune circulated a document showing actual results for January and February compared to February 2007 Projections.  Kazan stated to Bigelow that they needed to discuss the results with defendant Grenesko before including them in a rating agency presentation or showing them

to EGI, as "[t]his is tricky b/c we've told Nils [Larsen of EGI] that we aren't [sic] changing our plan based on the results from the first two periods."

264.    Emails among defendant Amsden and EGI-TRB representative Mark Sotir ("Sotir") also show that the Officer Defendants did downwardly revise the February 2007 Projections *internally* weeks prior to the Step One close, but decided not to distribute the revised numbers outside of the Company or to the Tribune Board.  The emails reference "new 'projections' which are a new look at the full year numbers," but state that Amsden was reluctant to disclose the new projections to EGI because of "potential legal concerns."

265.    Emails among the Officer Defendants also show that the Officer Defendants engaged in subsequent discussions respecting whether the revised projections should be disclosed.  For example, Knapp wrote the following email to defendant Bigelow and others on April 30, 2007:

> Brian [Litman] and Chandler [Bigelow]:  You guys need to help get with Don [Grenesko] and Crane [Kenney] to figure out whether or not we are doing an updated projection next week knowing that if we do, we may end up with some consistency issues to the recent document disclosures.  Harry [Amsden] is insisting that we HAVE to and I told him I thought the 6th floor was thinking we weren't and he should get to Don [Liebentritt] and figure it out.

266.    Consistent with the contemporaneous emails showing that the Company knew that the February 2007 Projections were unrealistic both at the time they were created and at the close of Step One, the Company was unable to proffer a single witness during the pendency of its bankruptcy proceeding who could attest to the honesty or reasonableness of any aspect of the February 2007 Projections.

267.    On June 8, 2007, only four days after Step One closed, Sotir asked other EGI-TRB representatives if they could meet with the "Trib finance team" on June 12, 2007.  Sotir wrote, "[T]hey may show us their revised forecast, but are still discussing with lawyers what

level of detail they can discuss." Presumably, that "revised forecast" was not prepared during the four days between the Step One close and June 8, 2007.

268.    The decision to continue to purport to rely on the outdated, unreliable February 2007 Projections at the close of Step One was a crucial failing by the Company's fiduciaries. Because the February 2007 Projections were both unrealistically optimistic and significantly higher than the Company's actual performance, the downside cases used to test the LBO—(i) "Downside Case A," which reflected a 2% decline in publishing revenue per year and flat operating cash flow for the broadcasting segment, and (ii) "Downside Case B," which reflected a 3% decline in publishing revenue per year and a 1% per year decline in the operating cash flow for broadcasting—were, at best, base cases rather than downside cases. Indeed, the Company acknowledged in May 2007 that its performance for the first quarter of 2007 was "significantly below" the February 2007 Projections and "closest to its 'Downside Case B,'" and that its performance for April 2007 was substantially worse. Defendant Bigelow had acknowledged in writing in March 2007 that if the Company consummated the LBO and performed in accordance with even "Downside Case A," then the Company would have "no equity value," and thus be insolvent. Remarkably, the Company's even worse "Downside Case B" performance did not cause Bigelow, or any of the other Company fiduciaries, to suggest that the Company should abandon or restructure the LBO.

269.    As noted, both the Special Committee and Tribune Board had access to up-to-date financial information showing Tribune's dismal performance. The members of the Special Committee and Tribune Board thus knew—or were reckless or grossly negligent in not knowing—that VRC's opinion was premised on flawed projections and a flawed and inadequate downside case. As such, even if VRC otherwise applied appropriate valuation methodology—

which it did not—the Special Committee's and Tribune Board's purported reliance on VRC or management was wholly unwarranted and in bad faith.

**B.   The Officer Defendants Instruct VRC To Deviate From Industry Practice In Issuing Its Solvency Opinions**

270.   Faced with the reality that the traditional methodology used to prepare a solvency opinion would show that the LBO would render the Company balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due, and lured by the lucrative financial benefits that consummation of the LBO would bestow upon them, the Officer Defendants, including Bigelow and Hianik, prevailed upon VRC to use a series of improper methodologies to prepare its Step One solvency opinion.

271.   First, the Officer Defendants instructed VRC to ignore the debt that the Company planned to incur at Step Two when issuing the Step One solvency opinion.  As outlined above, the LBO was conceived of and promoted, first to Tribune and then to the public, as a single, unitary transaction with fully committed financing.  Thus, the legal and economic reality of the LBO required that all of the debt incurred in the transaction be considered in the Step One solvency analysis.  Indeed, the draft solvency opinions originally submitted to the Officer Defendants by VRC were prepared precisely in this manner.  In an effort to hide the disastrous effect that the LBO would have on the Company and ensure that they received the payments associated with consummation of the transaction, however, the Officer Defendants and VRC agreed to consider only the Step One debt, thus artificially reducing the Company's liabilities for purposes of the solvency analysis.

272.   Second, as noted above, the Officer Defendants and VRC agreed that in performing its solvency analyses, VRC would depart from the standard definition of "fair value" that it had used in every other solvency opinion it had ever prepared.  Specifically, rather than

assuming that Tribune would be purchased by a hypothetical willing buyer, VRC agreed to opine on Tribune's solvency assuming that the buyer would be structured to receive the same favorable tax treatment as the ESOP utilized for the LBO—that is, that the buyer would be another ESOP. As Duff & Phelps had previously recognized ████████████████████████, there was no precedent and no justification for making this alteration in the definition of fair value, other than to artificially pump up value for solvency purposes.

273.     Nevertheless, on June 4, 2007, defendants Grenesko and Bigelow delivered certificates to the Lead Banks certifying that the Company was solvent as of that date.

## XII.     VRC Improperly Renders The Step One Solvency Opinion

274.     VRC uncritically and erroneously accepted the Officer Defendants' improper directions to depart from the standard definition of "fair value" and to ignore the Step Two debt when issuing its Step One solvency opinion.  It also relied upon Tribune's unrealistic February 2007 Projections without a hint of skepticism, notwithstanding that VRC knew, from reviewing Tribune's interim financial statements through at least the period ended March 31, 2007, that the Company's performance was already off plan by the time the LBO was approved.  Indeed, there was virtually no instance throughout the course of its Tribune engagement in which VRC did not simply adopt management's instructions, projections, and assumptions at face value, even though VRC's own engagement letter contemplated that it would review any financial data provided by management critically.

275.     VRC itself realized that the aggregate amount of debt at both steps of the transaction should be considered in its Step One solvency analysis.  Draft VRC solvency opinions related to the Step One solvency analysis assumed consolidation of the aggregate debt related to both steps of the LBO.

276. That changed, however, when Tribune revised VRC's draft solvency opinion and instructed VRC to consider only the Step One debt. VRC expressed reservations about Tribune's gerrymandered approach. As Mose "Chad" Rucker, a VRC Managing Director, noted in an email dated April 22, 2007, "One major issue is the deletion of step 2. All of projections and analysis assume consum[m]ation of step 2." Nevertheless, VRC complied with Tribune's instruction so as not to jeopardize the high engagement fee it had bargained for in connection with a transaction that VRC viewed as risky.

277. In addition to improperly disregarding Step Two debt and improperly manipulating the definition of fair value, VRC committed several other significant errors in connection with its Step One solvency analysis. For example, VRC changed how it weighted the discounted cash flow ("DCF") valuation methodology in its overall analysis. The DCF valuation approach yielded a value for Tribune that was significantly lower than that obtained through other valuation methods. Several drafts of VRC's Step One solvency analysis weighted the DCF method more heavily than the other valuation methodologies. At the same time, VRC initially gave relatively little weight to the "comparable transactions" method, which yielded a much higher valuation figure. However, in its final solvency analysis, VRC reduced the weight given to the low DCF valuation and increased the weight given to the high comparable transactions value, thereby increasing Tribune's overall valuation figure. This shift in VRC's methodological weighting further tipped the balance in favor of finding Tribune solvent at Step One.

278. Other significant errors contained in VRC's Step One solvency analysis included the following:

a. VRC's DCF model failed to deduct the costs of the planned Tribune Interactive business acquisition and the costs of internal development investments in determining cash flow, resulting in a substantial overstatement in operating asset value.

b.      VRC used discount rates in its DCF analysis that were too low (resulting in an overstatement of value) given the uncertainty associated with Tribune's ability to achieve expected long-term growth rates in the publishing segment, particularly given the significant growth contemplated in the Interactive business.

c.      The exit multiples in VRC's DCF analysis assumed long-term growth rates that were unreasonable in light of the general secular decline in the publishing business and in Tribune's profitability, and that exceeded even the growth rates contemplated by Tribune management in the February 2007 Projections.

d.      VRC failed to apply any minority or marketability discounts in connection with its determination of the value of Tribune's equity investments, despite the fact that Tribune held less than a 50% ownership interest in most of those investments and most of the investments were in non-public, closely held businesses.

e.      VRC relied on comparable company and transaction valuation approaches informed by companies materially different than Tribune or its investments.

279.    On May 24, 2007, VRC delivered to Tribune its Step One solvency opinion, which concluded that the Company would be solvent immediately after and giving effect to the consummation of the Step One transactions.

## XIII. The Company's Fiduciaries Ignore The Company's Performance And The Cacophony Of Voices Warning Against The LBO And Permit The Transaction To Proceed

### A.      The Special Committee And The Tribune Board[5] Breach Their Fiduciary Duties In Connection With Step One

280.    The Tribune Board met only twice between the time that the LBO was approved and the time that Step One closed, and the Special Committee met only once during that period. The Director Defendants were all financially sophisticated, and information demonstrating the folly of the February 2007 Projections was provided to them.  The Tribune Board received regular reports of the Company's performance and thus had the information necessary to determine that the February 2007 Projections were not realistic.  Nevertheless, neither the Tribune Board nor the Special Committee minutes reflect any meaningful analysis of the

---

[5] The term "Board," as used in paragraph 280 means defendants FitzSimons, Hernandez, Holden, Morrison, Osborn, Reyes, Taft, White, Chandler, Goodan, Stinehart, and Zell.

February 2007 Projections on which the VRC Step One Solvency Opinion was based, nor

consideration of whether the Company's actual performance, which was significantly below that

forecast in the February 2007 Projections, rendered the VRC Step One Solvency Opinion

unreliable or the LBO inadvisable. Additionally, although the Director Defendants knew, or

were reckless or grossly negligent in not knowing, of all of the flaws in the VRC analysis,

including VRC's extraordinary change to the definition of fair value, none of the Director

Defendants questioned why VRC had made the modification or whether or how it would affect

VRC's conclusions. Rather, enticed by the financial incentives and the ability to escape the

Company's downward spiral at a premium price, both the Special Committee and the Tribune

Board charged head-long into a transaction that reaped tens of millions of dollars for their

members, but left the Company insolvent, inadequately capitalized, and unable to pay its debts as

they came due. In so doing, the Special Committee and the Tribune Board breached the

fiduciary duties of care, good faith, and loyalty that they owed to the Company.

281.    Moreover, neither Stinehart, Goodan, nor Chandler, who knew that the optimistic

outlook embodied in the February 2007 Projections was, in Stinehart's words, "hard to believe,"

voiced any concern respecting the LBO. Satisfied that the interests of their "special

constituency" were protected, the Chandler Trust Representatives remained silent.

**B.      The Subsidiary D&O Defendants Approve The Subsidiary Guarantees
          Through A Grossly Deficient And Conflicted Process**

282.    On June 4, 2007, the Subsidiary D&O Defendants also abdicated their fiduciary

duties by authorizing the Subsidiary Guarantors to guarantee the LBO Debt used to consummate

Step One and part of Step Two of the LBO.[6] These Subsidiary Guarantees were essential to the

---

[6] The following Subsidiary Guarantors were not signatories to the guarantees executed on June 4, 2007, but
executed joinders to those guarantees on December 20, 2007:  Eagle Publishing Investments, LLC; Eagle New
Media Investments, LLC; Newport Media, Inc. (now known as Tribune MD, Inc.); Star Community Publishing

LBO.  The LBO Lenders would not lend the LBO Debt unless they obtained guarantees from the Subsidiary Guarantors to guarantee the LBO Debt used to consummate the LBO.  Thus, without the guarantees, Tribune could not obtain the LBO Debt, and without the LBO Debt, Tribune could not consummate the LBO.

283.    The Subsidiary Guarantors received none of the proceeds of the LBO Debt that the Subsidiary Guarantees unconditionally obligated them to repay.  Instead, more than $8 billion of the proceeds were immediately used to consummate the LBO, such as buying Tribune's shares, paying inducements to Tribune's directors and officers, and paying tens of millions of dollars in fees to its lenders and advisors.  Thus, while the Subsidiary Guarantees imposed a joint and several multibillion-dollar debt on each Subsidiary Guarantor, they did not provide the Subsidiary Guarantors, either individually or collectively, with any direct or indirect benefit or value in return.

284.    The Subsidiary D&O Defendants did not conduct any due diligence or independent investigation in connection with the Subsidiary Guarantees prior to approving them. The Subsidiary D&O Defendants did not hold a single board meeting to consider the execution of the Subsidiary Guarantees, nor did the Subsidiary D&O Defendants hire an advisor to do so. Instead, at Tribune's request, the Subsidiary D&O Defendants approved the guarantees by signing unanimous written consents.

285.    In approving the Subsidiary Guarantees, the Subsidiary D&O Defendants did not consider the interests of the Subsidiary Guarantors or their creditors.  The Subsidiary D&O Defendants did not consider whether the Subsidiary Guarantors received adequate consideration in return for executing the Subsidiary Guarantees, or whether executing the Subsidiary

---

Group, LLC; Stemweb, Inc.; ForSaleByOwner.com; Homeowners Realty, Inc.; and Internet Foreclosure Service, Inc.

Guarantees was in the best interest of the Subsidiary Guarantors or their creditors. For example, defendant Landon, who served as a director of multiple Subsidiary Guarantors, acknowledged that he viewed that role as "perfunctory" and not a matter of particular focus. According to him, "my fiduciary responsibility was to Tribune, so I was watching their money."

286. In approving the Subsidiary Guarantees, the Subsidiary D&O Defendants labored under clear conflicts of interest. As noted, nearly all of the Subsidiary D&O Defendants stood to gain substantial monetary special incentives that would be awarded if—but only if—the LBO was consummated. The Subsidiary D&O Defendants also stood to receive millions of dollars by selling or redeeming their Tribune stock in connection with the LBO, but again, only if the LBO was consummated. The Subsidiary D&O Defendants were aware that the LBO could be consummated only if the Subsidiary D&O Defendants approved the Subsidiary Guarantees. The unanimous written consents the Subsidiary D&O Defendants signed approving the guarantees expressly stated that the Subsidiary Guarantees were a "condition precedent to the Lenders making advances" on the obligations incurred in connection with the LBO.

### C.     Step One Of The LBO Closes

287. On June 4, 2007, the Company consummated Step One of the LBO, and Tribune repurchased and retired 126 million shares of common stock at a purchase price of $34 per share using proceeds from the Senior Loan Agreement. Presented with an opportunity to cash out of a rapidly deteriorating company at a premium price, Tribune's shareholders tendered 92% of Tribune's stock, rendering the tender offer significantly oversubscribed. Tribune used the remainder of the Step One proceeds to refinance the 2006 Bank Debt and commercial paper and to pay transaction fees. The new debt carried significantly higher interest rates than the 2006 Bank Debt, causing material harm to Tribune.

288.     Consummation of Step One rendered the Company balance sheet insolvent,

unable to pay its debts as they came due, and inadequately capitalized.

## XIV.  The Publishing Industry And Tribune Continue To Decline Between The Close Of Step One And Step Two

### A.     The Secular Decline In The Publishing Industry Worsens

289.     The newspaper publishing industry continued its secular decline through the

remainder of 2007.  In a research report issued in July 2007, Fitch highlighted the negative

impact of secular and structural changes on the newspaper industry:

> Fitch believes newspapers will continue to face intense secular issues on the revenue side.  Fitch expects national advertising and automotive classifieds to continue to be significantly pressured.  Fitch believes these changes are structural, not cyclical, and does not believe the advertising lost in these categories will return to newspapers in any meaningful way in future periods.  Help wanted and real estate classifieds sustained growth and profits at many newspaper companies in 2005 and the first half of 2006, but both categories have slowed significantly in recent periods.  Fitch expects this trend to continue for the rest of 2007, driven by both cyclical and secular issues.

290.     Fitch also reiterated its negative outlook for the newspaper industry, stating:

> With no meaningful catalysts for the remainder of 2007 or 2008 to reverse the operational pressure and secular uncertainty facing the newspaper industry, Fitch expects the event risk environment to remain heightened for bondholders.

291.     Similarly, on September 6, 2007, S&P noted the continuing secular shift in the

distribution of advertising dollars from traditional media to new media, and affirmed its negative

outlook for the newspaper publishing industry:

> Advertising and circulation revenues, the bread and butter of newspaper publishers, continue to grow leaner as the industry deals with a number of serious problems and challenges.  Among publishers' hurdles are an ever-increasing array of new advertising media, which are cutting into newspapers' share of the ad pie. . . .  Newspaper publishers' share of the advertising market is shrinking in the United States, and we expect that trend to continue for the foreseeable future. . . .

> The trend in declining newspaper ad share extends back more than five decades . . . .  We do not expect the downtrend to end within the foreseeable future, if at all . . . .  Standard & Poor's forecasts little improvement for newspaper

advertising in 2008.  For newspaper advertising as a whole, we anticipate a rise in ad spending of less than 1.0%.

**B.**     **Tribune Significantly Underperforms The February 2007 Projections And Is Further Downgraded**

292.     In its Form 8-K filed on July 25, 2007, Tribune reported second quarter 2007 consolidated revenues for the Company of $1.3 billion, down 7% from the prior year.  Thus, 2007 second quarter performance was 5.9% off the February 2007 Projections on which the Tribune Board's approval of the transaction was based.  Given that the February 2007 Projections had been created only four months earlier, this was an enormous miss that should have been alarming.  While the February 2007 Projections forecast that Tribune was going to beat its 2006 performance, operating profit for publishing in the second quarter of 2007 was more than 50% below publishing's operating profit during the same period in 2006.

293.     In July 2007, Fitch noted that the Company continued to face "meaningful secular headwinds," as well as challenges including declining circulation trends for newspapers, pressures on newspaper advertising revenue streams, significant substitution risk, and competition threat from online rivals:

> Fitch believes [Tribune's] newspapers and broadcast affiliates (particularly in large markets where there is more competition for advertising dollars) face meaningful secular headwinds that could lead to more cash flow volatility in the future.  With fixed-charge coverage estimated to be below 1.3 times (x), there is very little room to endure a cyclical downturn.  In addition, the rating continues to reflect declining circulation trends for newspapers, pressures on newspaper advertising revenue streams, significant substitution risk and competitive threat from online rivals (particularly in high-margin classified categories), volatile newsprint prices, the threat of emerging technologies on the economics of the pure-play broadcasting business and the volatility of cash flow due to cyclical and political fluctuations.
>
> Importantly, publishing sector operating profits of $102 million were well below our $145 million figure and less than half of the $209 million reported in Q2/06.  This is a clear cause for concern.

294.     On August 14, 2007, Lehman cut its earnings estimate for Tribune and stated that "Tribune is significantly overlevered currently and should not be adding more debt to its capital structure given the ongoing secular decline in the fundamentals across Tribune's newspapers and TV stations."  Lehman concluded that final consummation of the LBO would leave the Company unable "to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year."

295.     On August 20, 2007, S&P issued a research update, lowering Tribune's corporate credit rating to B+ from BB-, and citing "deterioration in expected operating performance and cash flow generation compared to previous expectations."

296.     On November 27, 2007, the Company announced results for October 2007. Consolidated revenues had declined 9.3% in that period in relation to the comparable period in the prior year.  As a result, Moody's downgraded Tribune's Corporate Family Rating to B1 from Ba3.  The downgrade reflected Moody's

> estimate that projected advertising revenue, EBITDA and cash flow generation will be lower than previously anticipated in 2008 and 2009 as a result of the ongoing challenges associated with a difficult revenue environment facing the newspaper industry.

## XV.     The LBO Lenders Begin To Question The Company's Solvency

297.     The LBO Lenders also recognized that in light of Tribune's financial performance, the LBO rendered the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due.

298.     On July 26, 2007, various JPMorgan bankers centrally involved in the LBO reported to JPMorgan Vice Chairman James B. Lee, Jr. ("Lee") that JPMorgan was "totally underwater on this underwrite [and] the deal is now underequitized and underpriced."

299.     Additionally, in a memo marked "Highly Confidential, Internal Distribution

Only," JPMorgan wrote:

> JPMorgan deal team's DCF and sum of the parts analysis based on revised July
> projection indicate that the current valuation of Tribune is approximately $[10] to
> $[13] billion, potentially failing the solvency tests (*i.e.*, debt amount exceeds
> value of Borrower).

300.     Similarly, a Merrill banker informed EGI-TRB on August 20, 2007, that it was

"highly unlikely that [the Company's solvency firm] can get there." A Bank of America banker

echoed this sentiment on September 10, 2007, stating "I think the solvency opinion

might be difficult, in my opinion."

301.     Moreover, solvency analyses prepared by each of JPMorgan, Merrill and

Citigroup in the days leading up to the Step Two close concluded that the Company was

insolvent under various scenarios. Specifically:

a.     Citigroup "didn't believe the Company's projections were achievable" and
"created [its] own set." Solvency analyses using these projections and Citigroup
valuation parameters (rather than VRC's) showed that the Company was insolvent
by more than $1.4 billion.

b.     Merrill's solvency analyses showed that the Company was insolvent by more than
$1.5 billion in the "low" cases, and by at least $287 million in the "mid" cases.

c.     Solvency analyses prepared by JPMorgan on December 13 and December 18,
2007 show that Tribune was insolvent in certain "low" and "stress" cases.

302.     In light of these analyses, the LBO Lenders did not want to go forward with Step

Two, but believed they were contractually obligated to do so. In an email regarding a July 3,

2007 call with the Company, a Citigroup banker stated, "I expect a real problem. Let's hope that

it is so bad that they trip the 9x covenant that they have to meet to close Step 2." The Citigroup

banker reiterated this sentiment on July 20, 2007, stating:

I'm told there are only 3 ways that the deal won't close:

-they miss the 9x gteed debt covenant

-they don't get a solvency opinion
-whatever the FCC determines causes a MAC [material adverse change] in the broadcasting business.

I'm hoping for one of the first two.

303.     The Officer Defendants were aware that the LBO Lenders harbored these concerns.  On November 8, 2007, the Lead Banks sent management a list of more than a dozen questions regarding VRC's solvency analysis, and then sent a second list of follow-up questions on December 12, 2007.  Based on these questions, the Officer Defendants understood that the LBO Lenders—who now believed that the Company's value might be insufficient even to repay the LBO Lenders (which were first in line as a result of the Subsidiary Guarantees)—were seriously considering backing out of the deal.  In an effort to coerce the LBO Lenders into consummating Step Two, the Officer Defendants hired the law firm of Quinn Emanuel as litigation counsel, and threatened the LBO Lenders with litigation if they failed to close Step Two.

304.     In the days preceding the Step Two close, the LBO Lenders weighed their belief that the Company was insolvent against their concern that the Company would sue them if they did not fund Step Two. Notes from a December 14, 2007 meeting taken by a Bank of America banker reflect the deliberations among the LBO Lenders, and the predominant belief among them that the liability they would face if they refused to fund would be greater than any loss they would incur for funding Step Two when the Company inevitably failed:

JPM - Not 100% final but leaning
Going ahead and funding
Risk greater if do not fund

MRL - Not 100% but leaning to not fund
- Reasonable that not a solvent company
- Not planning on being lone wolf

Citi - Numerous and not significant to not fund

109

- More risk if end up in bk
- Focus on understanding risk of not funding
- Not yet landed
. . . if in good faith—good defense

305.    Not surprisingly, JPMorgan, Citigroup, and Bank of America each referred the

LBO Debt to their distressed groups prior to the Step Two close.  And JPMorgan downgraded its

Tribune credit (following a series of prior downgrades) the day after Step Two closed.

## XVI.    The Company Engages In Intentional Fraud In Order To Close Step Two

### A.    The Officer Defendants Create Unreliable, Overly Optimistic Projections In Order To Obtain A Solvency Opinion At Step Two

306.    Tribune's financial projections were finally updated by the Officer Defendants

and presented, in part, to the Tribune Board in October 2007 (the "October 2007 Projections").

As shown in the graph below, although the October 2007 Projections lowered the Company's

expected financial performance for calendar year 2007 relative to the February 2007 Projections,

the October 2007 Projections predicted that the Company's future growth rate would outperform

that predicted in the February 2007 Projections, notwithstanding that the outlook for the

publishing industry and Tribune had only declined since the February 2007 Projections were

prepared.



**Tribune – Consolidated Actual and Projected EBITDA**
*October 2007 Projections*

*Note: Actual EBITDA adjusted to include stock based compensation; Actual 2007 EBITDA adjusted to exclude one-time special items; and Projected EBITDA adjusted to include stock-based compensation and cost savings for 2007 – 2011, and exclude Cubs and Southern Connecticut Newspapers, Inc. for 2008 – 2011.*

*Sources: Tribune SEC Filings; Tribune ESOP Transaction Model; Tribune Brown Books, 2007; and Tribune Co. Proxy Statement, July 13, 2007.*

307.    For the years 2007–2010, the February 2007 Projections included an annual growth rate of 3.9%, whereas the October 2007 Projections included an annual growth of 5.1%, a 30% increase.  Similarly, the annual growth rate for the years 2010–2012 reflected in the February 2007 Projections was zero, compared with a 2.5% annual growth rate for the same period in the October 2007 Projections.  There was no basis whatsoever to support the increase in projected growth rates, which served to partially offset the revenue reductions in the earlier years of the projection period.

308.    The October 2007 Projections also erroneously assumed that the consolidated growth rate of 2.4% from 2011 to 2012—a year in which advertising revenues were forecast to spike due to the 2012 presidential election—would be replicated each and every year from 2013 through 2017.  In other words, the October 2007 Projections improperly assumed that each of the

five years following the 2012 presidential election year would also enjoy the benefit of a growth bump occasioned by an election year. This fraudulent assumption resulted in a projected growth rate for the last five years of the ten-year projection period that was five times greater than the growth rate projected by management just eight months earlier. This growth rate assumption was a conscious effort by certain of the Officer Defendants to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business. This intentionally fraudulent adjustment alone provided $613 million of additional "value" to support a conclusion of solvency by VRC.

309. The October 2007 Projections were also dependent upon speculative growth assumptions in the Company's Interactive business. At the time, the Company's Interactive business was a small Internet-based division that had grown over ten years to approximately 4% of the Company's total operating revenues in 2006, and had performed at more than 4% below expectations in 2007. Without any factual basis, the Officer Defendants increased the compound annual growth rate for the Interactive business from 16.3% in the February 2007 Projections to 22.0% in the October 2007 Projections. The October 2007 Projections forecasted that revenues from the Interactive business would more than triple by 2012, and account for more than 13% of the Company's total operating revenues and 31% of projected EBITDA in 2012.

310. As they had done with the February 2007 Projections, the Officer Defendants concealed the October 2007 Projections from the members of Tribune management who would have known that they were premised on fraudulent assumptions. For example, defendant Landon, who was the head of the Company's Interactive division at the time of the LBO, did not see the projections for the Interactive division that were set forth in the October 2007 Projections until after the Company had filed for bankruptcy. When asked about those projections, Landon

stated that he "would have expected the October forecast [for Interactive] to be flat or lower" than the February 2007 Projections, and expressed surprise when he was told that the October 2007 Projections predicted greater growth than the February 2007 Projections. When he finally saw the October 2007 Projections, Landon stated that he was "disappointed in the[] numbers," and didn't "believe in the logic behind th[em]."

311. In addition to the overly aggressive assumptions respecting Interactive revenue projections, the October 2007 Projections assumed significant increases in the cash distributions from the Company's equity investments, with a compound annual growth rate of 22.0% between 2007 and 2012. The premise of this increase was mainly focused on three investments; CareerBuilder, Classified Ventures, and Food Network.

312. The Officer Defendants assumed that the cash received from these investments would equal the Company's share of accounting profits (*i.e.*, equity income from investments). This assumption, however, was inconsistent with past practice. Moreover, because the Company held non-controlling interests in these joint ventures, it had no ability to control the timing or amount of profits actually distributed as cash to the Company. Including this assumed cash flow in the October 2007 Projections was yet another attempt by certain of the Officer Defendants to fraudulently bolster the Company's value so that VRC would be able to issue a Step Two solvency opinion and the LBO would close. As with the February 2007 Projections, Tribune was unable to proffer a witness during its bankruptcy proceeding who could attest to the honesty or reasonableness of any aspect of the October 2007 Projections.

**B.** **The Officer Defendants Reap The Benefits Of Altering The Definition Of Fair Value, And Instruct VRC To Artificially Lower The Amount Of Company Debt When Assessing Balance Sheet Solvency**

313. As noted above, in order to increase the likelihood that VRC would be able to opine that the Company would be solvent following the LBO, the Officer Defendants agreed

with VRC that VRC's solvency analysis could alter the standard definition of fair value so that the projected tax savings arising from the S corporation/ESOP structure could be included in the balance sheet solvency test. When combined with VRC's other deviations from standard valuation methodology at Step Two, inclusion of the projected S corporation/ESOP tax benefits enabled VRC to erroneously opine that the Company would be balance sheet solvent at Step Two.

314.    Additionally, in another attempt to artificially increase the Company's value for purposes of VRC's solvency analysis, the Officer Defendants prevailed upon VRC to understate the amount Tribune owed on its subordinated notes (the "PHONES Notes") by ascribing to them a liability of only $663 million, rather than the $1.256 billion face amount of the notes (less the $340 million value of Time Warner shares that could be netted against the liability upon redemption), and providing a representation letter signed by defendant Grenesko and, upon information and belief, drafted by defendants Grenesko, Hianik, and Bigelow, that this was a reasonable estimation of the liability arising from the PHONES Notes. The lower number was derived from the Company's financial statements, which calculated the PHONES Notes using a mix of book and fair values pursuant to Financial Accounting Standard No. 133. There can be no dispute, however, that the Company was required to pay the face amount of the PHONES Notes (less the value of the Time Warner shares) in a liquidation or upon maturity of the PHONES Notes, or that applicable law and standard valuation practice requires debt to be calculated at face value for purposes of performing a balance sheet solvency test. Indeed, VRC valued the PHONES Notes at face value in its Step One solvency opinion, and in all of the drafts of the Step Two solvency opinion that it prepared prior to the Officer Defendants' directed change. Additionally, both JPMorgan and Merrill used the face value of the PHONES Notes (minus the

value of the Time Warner shares) in the solvency analyses that they prepared prior to Step Two, as did Blackstone, the financial advisor to the McCormick Foundation. Furthermore, the Company itself considered the PHONES Notes at face value in the rating agency presentations it prepared in March and October 2007.

C. **Certain Officer Defendants Misrepresent To VRC That An Outside Financial Advisor Agreed That Tribune Would Be Able To Refinance Its Debt**

315. Notwithstanding that it relied on the patently unreasonable October 2007 Projections and employed multiple methodological flaws urged by the Officer Defendants or of its own making, VRC still concluded that the Company would face significant cash shortfalls in 2014 and 2015 unless it could refinance its debt that was set to mature in those years. VRC was deeply "concerned about [this] refinancing risk." VRC's opinion letter committee also concluded that VRC would not be able to issue a solvency opinion unless Tribune represented that Tribune could refinance that debt. Thus, on or about December 1, 2007, VRC's Rucker placed a telephone call to defendant Bigelow, and advised that any representation from Tribune as to the reasonableness of assuming that Tribune would have the ability to refinance its debt should indicate that an outside financial advisor to Tribune agreed with any such assumption. When Morgan Stanley refused to provide the representation, certain of the Officer Defendants decided to mislead VRC into believing that Morgan Stanley had actually done so.

316. On or about December 2, 2007, certain of the Officer Defendants, including Bigelow, Grenesko, and Kenney, placed a telephone call to VRC's Browning. During that conversation, Bigelow and/or Grenesko stated that Morgan Stanley had agreed that Tribune could refinance its debt in 2014 even in a "downside" scenario. Upon information and belief, however, Morgan Stanley had never represented that it agreed with management's refinancing assumptions. To the contrary, Morgan Stanley's Managing Director Thomas Whayne told

Bigelow explicitly on December 2, 2007 that Morgan Stanley was *unable* to make a representation as to Tribune's ability to refinance its debt.

317. Nonetheless, a Tribune representation letter to VRC dated December 20, 2007 that was signed by Grenesko and, upon information and belief, drafted by Grenesko, Bigelow, and Hianik, stated in part: "Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for VRC to assume that Tribune . . . would be able to refinance." VRC's Step Two solvency opinion relied on that representation letter, expressly citing management's purported discussions with Morgan Stanley regarding the Company's ability to refinance its debt when it came due. VRC never sought or received confirmation of Morgan Stanley's view from, or otherwise discussed the Tribune representation letter with, Morgan Stanley itself.

318. On December 20, 2007, defendants Grenesko and Bigelow delivered certificates to the Lead Banks certifying that the Company was solvent as of that date.

## XVII. VRC Ignores Its Own Internal Analysis And Adopts Management's Inflated October 2007 Projections In Issuing Its Step Two Solvency Opinion

319. Faced with the daunting task of delivering a solvency opinion in connection with Step Two of the LBO, VRC continued to rely on Tribune management's increasingly unreasonable assumptions and projections—even when VRC's own internal work product demonstrated that those projections were unreliable—and resorted to even more dubious methods of analysis.

320. As alleged above, Tribune management's October 2007 Projections unreasonably assumed that the 2.4% revenue growth rate forecast for the 2012 presidential election year would be duplicated in each of the following five years. Tribune provided VRC with a specific,

separate representation letter, signed by Grenesko and dated December 20, 2007, which purported to justify this methodology. VRC's solvency analysis incorporated management's "election year" assumption by extending the time period over which VRC calculated the discounted present value of projected cash flows from five years (as in VRC's Step One solvency analysis) to ten years, which added approximately $613 million to Tribune's DCF value at Step Two as computed by VRC.

321. VRC's wholesale adoption of management's inflated October 2007 Projections was patently unreasonable, and flew in the face of VRC's own internal critique of management's numbers and assumptions. Specifically, VRC performed an internal assessment of the reasonableness of Tribune management's revenue and expense growth rate assumptions informing the October 2007 Projections. This assessment was memorialized in several internal VRC memoranda dated October 29, 2007. VRC analysts adjusted Tribune management's revenue and expense growth rate projections and incorporated the revised figures into a separate DCF valuation. This internal VRC valuation contrasted sharply with the DCF valuation derived from Tribune's October 2007 Projections. Indeed, at their estimated midpoints, VRC's valuation was approximately $1.24 billion lower than the valuation derived from Tribune's projections.

322. Among the several downward adjustments that resulted in a reduced enterprise valuation by VRC, one of the most significant involved Tribune's projections regarding its Interactive business. The differences between Tribune management's and VRC's forecasts of projected annual revenues for the Interactive unit were substantial—amounting to more than $190 million for 2012 alone. In arriving at its downward adjustment, VRC considered a number of negative factors affecting the Interactive business, including increased competition in the

interactive sector, analysts' estimated growth for the interactive business generally, and the specific decline in Interactive growth experienced by Tribune in 2007.

323.    Yet, despite the fact that the internal VRC analysis demonstrated that it was inappropriate simply to accept the assumptions and conclusions fed to VRC by Tribune management, in the end VRC inexplicably ignored all of the conclusions it reached in its own analysis and proceeded to use the inflated October 2007 Projections without change in its Step Two solvency opinion. In that opinion, VRC falsely stated that, in connection with its review of the Company's forecasts, "nothing has come to VRC's attention to lead VRC to believe that it was unreasonable for VRC to utilize and rely upon such financial forecasts, projections, information and data." In an email from Amsden to various other Officer Defendants, Amsden remarked upon the apparent credulousness of VRC, noting that "[t]he bankers have asked much more detailed financial questions than VRC did."

324.    In addition to its unreasonable adoption of the October 2007 Projections, VRC's Step Two solvency analysis carried over many of the same flaws and skewed assumptions that infected its Step One solvency analysis, including VRC's novel and unjustified definition of "fair value," the improper equal weighting that VRC assigned to its different valuation methodologies, VRC's failure to apply any minority or marketability discounts in connection with its determination of the value of Tribune's equity investments, and VRC's reliance on comparable company and transaction valuation approaches that used companies materially different from Tribune or its investments.

325.    VRC's Step Two analysis included the following additional significant flaws:

a.    VRC accepted the Officer Defendants' direction to use a value nearly 50% lower than the face amount of the PHONES Notes for purposes of calculating the liability arising from those obligations.

118

b.　　VRC used discount rates in its DCF analysis that did not properly reflect the risk of achieving forecasted future cash flows, particularly regarding assumptions for growth in Tribune's Interactive business.

c.　　VRC ignored market-based information that was (or should have been) readily available to VRC that contradicted VRC's Step Two opinion that Tribune was solvent as of December 20, 2007.

## XVIII. Tribune's Fiduciaries Fail, Once Again, To Protect The Company

### A.　　The Tribune Board[7] And Special Committee Breach Their Fiduciary Duties In Connection With VRC's Step Two Solvency Opinion

326.　　As noted above, the Tribune Board (excluding Zell, and with Taft absent and the Chandler Trust Representatives abstaining), voted to approve the LBO, including Step Two, on April 1, 2007.  On December 18, 2007, The Tribune Board (including Zell and Taft) met again in connection with Step Two.  The Special Committee purportedly gathered separately for a meeting that lasted, at most, fifteen minutes, and, according to draft minutes that were never finalized, resolved to recommend to the Tribune Board that it rely on the VRC Step Two solvency opinion and direct management to take all steps necessary to consummate Step Two. The Tribune Board did not hold an additional vote as to whether the Company should proceed with Step Two.

327.　　As with the Step One solvency opinion, neither the Tribune Board nor the Special Committee board minutes reflect any meaningful analysis of the projections on which the VRC Step Two solvency opinion was based, or discussion of the faulty assumptions employed by VRC.  Given the Company's worsening financial performance, the declining state of the publishing industry, and the worsening state of the economy, no reasonable person could have believed that incurring an additional $4 billion of debt would not plunge the Company further into insolvency.  Enabling the Company to consummate Step Two of the LBO did, however,

---

[7] The term "Board," as used in paragraphs 326 through 342, means defendants FitzSimons, Hernandez, Holden, Morrison, Osborn, Reyes, Taft, White, and Zell.

ensure that the Director Defendants, Officer Defendants, and Foundations would be able to sell their remaining shares in Tribune at a price that was well above the shares' actual value, despite the inevitable consequences of placing the mountainous LBO Debt on the Company. This was the ESOP "escape" plan that Stinehart laid out in July 2006. By failing to act to prevent such consequences, the Director Defendants breached the fiduciary duties of loyalty, good faith, and due care that they owed to the Company.

328.     Indeed, in taking the actions described above with respect to the LBO, the D&O Defendants and Zell abandoned Tribune's interests. The D&O Defendants and Zell knowingly and intentionally acted in the sole pursuit of their personal individual interests (including receiving tens of millions of dollars in cash proceeds, bonus payments, and other monetary special incentives from the LBO, or in Zell's case, acquiring control of one of America's most prominent companies for a minimal equity investment), or in the interests of the Controlling Shareholders and/or Zell Defendants. They did not act in order to achieve any benefit or accomplish any legitimate corporate purpose for Tribune or its subsidiaries, in either the short term or long term. To the contrary, they engaged in actions that did not confer any benefit upon or serve any corporate purpose for Tribune and that could never have conferred any such benefit or served any such purpose. The actions they took were entirely adverse to Tribune's interests.

329.     The Subsidiary D&O Defendants, by unanimous written consents dated as of December 20, 2007, subsequently authorized additional Subsidiary Guarantees that were necessary for Step Two to close without holding even a single meeting to consider the execution of the guarantees or the effect they would have on the Subsidiary Guarantors. In approving the Subsidiary Guarantees, the Subsidiary D&O Defendants did not consider the interests of the Subsidiary Guarantors or their creditors, including whether the Subsidiary Guarantors received

adequate consideration in return for executing the Subsidiary Guarantees or whether executing

the Subsidiary Guarantees was in the best interest of the Subsidiary Guarantors or their creditors.

In addition, in approving the Subsidiary Guarantees, the Subsidiary D&O Defendants faced a

clear conflict of interest, in light of the significant monetary special incentives that the

Subsidiary D&O Defendants stood to receive if—but only if—the LBO closed, as well as the

millions of dollars the Subsidiary D&O Defendants stood to receive by selling or redeeming their

Tribune stock in Step Two of the LBO.  In approving the Subsidiary Guarantees, the Subsidiary

D&O Defendants breached the fiduciary duties of loyalty, good faith, and due care that they

owed to the Subsidiary Guarantors.

**B.**     **Morgan Stanley Fails To Inform Tribune Of Its Concerns
        That Tribune Would Be Insolvent If Step Two Closed**

330.     ███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

331.     Morgan Stanley understood from the beginning that this work concerning Step

Two included evaluating issues concerning Tribune's solvency.  A September 20, 2007 email

between senior Morgan Stanley representatives noted that:  "The scope of the work will be:  i)

reviewing the 5/9/07 solvency opinion rendered by Valuation Research Corp, ii) replicating their

analysis, and iii) making sure that VRC (based on their initial analysis) would still today render

an opinion that Tribune remains a solvent entity." ████████████████████████

332.     Consistent with its understanding of the scope of its work, Morgan Stanley

prepared a number of valuations of the Company.  Those valuations showed that the Company

would be insolvent after giving effect to Step Two under certain reasonable assumptions.

333.     For example, an October 9, 2007 exchange between Morgan Stanley analysts

indicated that one analyst had calculated "a negative equity value" for Tribune following Step

Two.  When the other analyst commented that that "[s]eems low," the first analyst replied: "its

tribune .. their [sic] putting a 10.0x leverage multiple on a co. that bearly [sic] trades 9x!"  She

further wrote, "I was explaining why the ev [presumably "equity value"] would be negative .. but

as a secret .. you should know this deal is happening because zell is soo f-n rich..  he's putting in

$65MM to get 40% of a multi-billion dollar co."

334.

335.



336.     Taubman and Whayne, two of Morgan Stanley's most senior representatives, were present in Chicago at a meeting of the Company's Board of Directors on October 17, 2007, but, upon information and belief, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

337.     Morgan Stanley was well aware that its involvement extended to all aspects of the financing discussions concerning the LBO. ████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

338.     Morgan Stanley representatives also participated in several other meetings of the Tribune Board between October 17 and December 18, 2007, when Taubman and Whayne attended a meeting of the Special Committee of the Board in Chicago.  For example, Whayne, Ashok Nayyar, and Charles Stewart of Morgan Stanley participated in a November 5, 2007 Tribune Board meeting.  Taubman and Whayne also participated in a November 21, 2007 Tribune Board meeting.  And Whayne participated in a December 4, 2007 Tribune Board meeting at which VRC representatives Browning, Bill Hughes, and Rucker made a

"comprehensive presentation" to the Board "regarding VRC's solvency analysis and the solvency opinion required to close the merger," including "the various tests used by VRC in its solvency analysis, comparable transactions, case comparisons and the assumptions VRC relied upon in reaching its solvency determination."

339.    Morgan Stanley did not disclose to the Tribune Board or to the Special Committee at any of these meetings, or otherwise, the results of its internal financial analyses indicating that the Company would have a negative equity value, and thus be insolvent, following Step Two on various assumptions.

340.    Morgan Stanley's failure to disclose its analyses showing that the Company could be insolvent upon completion of the LBO advanced its own interest in obtaining an additional, sizeable discretionary fee from the Company if the LBO closed.  By May 2007, Morgan Stanley had already been paid the Morgan Stanley Advisor Fees for work relating to the LBO.  It was owed no further payments for work it performed on the LBO after that date, yet its engagement letter did provide for a possible discretionary fee.  The only way Morgan Stanley would ever receive additional discretionary compensation for its work on the LBO was if the LBO closed.  Morgan Stanley's negative solvency analyses had the potential to jeopardize the completion of the LBO, and Morgan Stanley's subsequent fee.  Morgan Stanley thus had an incentive not to, and did not, disclose those negative solvency analyses or other analyses or assessments of the Company's solvency to the Company.

341.    On December 11, 2007, Bigelow forwarded to Whayne an email containing certain follow-up questions from the lead banks financing the LBO.  Those questions included the following:

> VRC indicates that it is relying, in part, on a representation from Tribune which
> states that based upon recent discussions with Morgan Stanley, the Company

would be able to refinance debt in its downside forecasts without the need for additional assets sales. Did VRC meet with someone from Morgan Stanley and does VRC know whether Morgan Stanley understands that Tribune is relying upon its view?

342. Morgan Stanley thus had notice as of at least December 11, 2007 that in giving its solvency opinion VRC was relying on a supposed Morgan Stanley representation that the Company would be able to refinance the LBO Debt. But Morgan Stanley did not tell the Tribune Board or the Special Committee prior to the closing of Step Two that Morgan Stanley had made no such representation, or that management's or VRC's reliance on such a representation concerning refinancing was misplaced, even though it had ample opportunity to do so when Taubman and Whayne participated in meetings of the Tribune Board and the Special Committee in Chicago on December 18, 2007. Instead, Morgan Stanley remained silent on this issue with the Tribune Board and the Special Committee.

343. Morgan Stanley had the same incentive not to upset an important basis for VRC's Step Two solvency opinion as it did with respect to its internal financial analyses: disclosure could jeopardize the LBO and thus Morgan Stanley's ability to obtain a discretionary fee from the Company.

344. In December 2007, Morgan Stanley in fact aggressively sought a discretionary fee from the Company above and beyond the Morgan Stanley Advisor Fees, arguing that its efforts had "significantly enhanc[ed]" the "certainty" that the LBO would close, but the Company ultimately declined Morgan Stanley's request.

## C. Zell Uses His Influence To Ensure That The LBO Is Consummated

345. From the inception of the LBO, Zell sought to capitalize on his banking relationships and reputation as a successful billionaire investor in order to coerce others into helping to consummate the deal, with varying degrees of success. For example, on March 29,

2007, after Houlihan notified the Company that it would not be bidding for the solvency work based on its determination that it would be difficult to find that the Company would be solvent following the LBO, Zell called a Houlihan managing director and demanded an explanation as to why Houlihan was "holding up his deal." Houlihan proved to be one of the few parties (if not the only party) involved in the LBO that Zell was unable to bend to his will.

346.     The LBO Lenders were more malleable. In an email dated February 6, 2007, Julie Persily, a managing director at Citigroup, wrote to a colleague that "Merrill is on board with this silly ESOP structure," noting that "ML is Sam's bank. They'll do anything for him. (They would not do this for KKR.)" A few months later another Citigroup banker remarked on Zell's control over the LBO Lenders, writing "Zell is dictating everything according to Chandler [Bigelow]."

347.     Additionally, on March 28, 2007, four days before the LBO Lenders committed to fund Steps One and Two, Jeffrey Sell, the former head of the Special Credits Group at JPMorgan, wrote to his supervisor that he had "told the team I'm not comfortable approving the new structure [of the LBO] for the reasons cited but would understand if Sen[i]or Man[a]gem[e]nt wanted to do this to further the Zell relationship." Similarly, on March 30, 2007, JPMorgan Vice Chairman Lee—a lifelong friend and business associate of Zell's—asked Jamie Dimon, Chairman, President, and Chief Executive Officer of JPMorgan, to personally intervene in efforts to help Zell "finance the bump" in his offer from $33.50 to $34.00 per share. Lee also urged the JPMorgan financing team to "be as helpful as we can" in extending additional financing to Zell, despite the team's warnings that doing so could result in a ratings downgrade. On or about March 30, 2007, EGI advised Bigelow that it had "made some progress with our friendly bankers" in connection with Zell's efforts to obtain a favorable financing package for the LBO.

348.    Additionally, in September 2007, JPMorgan Managing Director Peter Cohen sent Lee an email regarding meetings set to take place at JPMorgan regarding the troubled LBO, in order to give Lee a chance to "weigh in, if necessary, on behalf of Sam so that short term decisions don't have negative impact on the broader relationship with Sam and Trib." Cohen wrote further, "I am sure you are in the middle of a ton of this stuff but it strikes me that Sam is different."

349.    Zell also capitalized on his influence over JPMorgan in the days leading up to the LBO, when the Lead Banks were weighing the pros and cons of backing out of the LBO. In a December 18, 2007 email, Lee wrote of Zell and his claim of solvency: "I know this guy. . . . . I am 100% confident if he gives his word to me, it will be done. I have banked him for over 25 years and his word is gold." On December 19, 2007, Lee reported that he "just had a long call with sam. He could not have been any clearer and more confident that the company is solvent, no financial issues in year 1 . . . and his reputation being totally on the line. . . . . It was the kind of call we needed to proceed given our concerns. . . . . I told him we were totally banking on him to make this work, and he said 'I don't make commitments I can't keep." In an email later the same day to JPMorgan's CEO, Lee reiterated his support for the LBO based on Zell's personal "commitment" to Lee, and his spin on the deal, rather than on financial fundamentals: "Jamie I spoke to sam this am to get his confirmation that the company was solvent and he was going to make good on his commitment to me to make this deal work . . . . It was an excellent call—he said all the right things."

350.    Others involved in the LBO also recognized Zell's ability to make the deal happen notwithstanding that it would render the Company insolvent. As one Morgan Stanley banker

viewed it after concluding that the Company would have "negative equity value" following the LBO: "[T]his deal is happening because zell is soo f-n rich."

351. As defendant FitzSimons stated in a December 19, 2007 press release, the transaction could not have happened had it not been for Zell.

## XIX. The LBO Closes And Tribune Collapses Under Its Massive Debt Burden

352. On August 21, 2007 Tribune's remaining shareholders voted on the merger. Although the substantial risks to the Company arising out of the LBO were obvious, 97% percent of voting shareholders voted in favor of the merger.

353. On December 20, 2007, the Company completed Step Two of the LBO and repurchased the remaining 119 million shares of common stock outstanding at a purchase price of $34 per share.

354. In order to fund the repurchase, Tribune took on another approximately $3.7 billion of debt, bringing its total funded debt to approximately $13.7 billion. As part of Step Two, Tribune repaid EGI-TRB's initial $200 million unsecured subordinated Exchangeable Note in the amount that EGI-TRB would have received if it had held stock that was cashed out at $34 per share, and paid EGI-TRB $50 million for the 1,470,588 shares of common stock it had purchased prior to the completion of Step One. EGI-TRB also purchased from the Company a $225 million subordinated note and a $90 million warrant to purchase approximately 40% of the fully diluted equity of the Company at a later date. The warrant was for a term of 15 years and specified a maximum purchase price of $13.80 per share. In these transactions, EGI-TRB received credit for interest deemed to have accrued on the Exchangeable Note, and EGI and EGI-TRB also received credit for expenses they and/or Zell incurred in connection with the LBO (the EGI-TRB Fee Transfers and the EGI Reimbursements), rendering Zell's total equity investment in Tribune a mere $306 million.

355.     As a result of the LBO, the Company became a private company, wholly owned by the ESOP.

356.     Zell subsequently became Chairman of the Tribune Board and Tribune's President and Chief Executive Officer.  For Zell, the transaction clearly was an option play.  For a total investment of $306 million, Zell received control of a media conglomerate with $5 billion in revenue, and a warrant to purchase 40% of the Company at a maximum price per share of only $13.80.  Fees and expenses paid to various lenders and advisors at the closing of both Step One and Step Two amounted to approximately $284 million.

357.     The Company rapidly deteriorated under its massive debt burden after the LBO closed in December 2007.  ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████

358.     In early 2008, just weeks after the close of Step Two, the Company implemented a 5% workforce reduction in its publishing segment.  In announcing this reduction in a memo dated February 13, 2008, Zell discussed "the reality of [the Company's] significant debt levels," and "significant declines in advertising volume at our newspapers . . . putting downward pressure on our cash flow."  On July 14, 2008, the Associated Press reported that the *Los Angeles Times* planned to cut 250 positions, explaining "[l]ast December, Tribune bought out its public shareholders in an $8.2 billion deal orchestrated by real estate mogul Sam Zell.  Now, he and Tribune are struggling to service that debt."

359.    On or about March 5, 2008, *less than three months after Step Two closed*, Tribune hired bankruptcy lawyers from the law firm of Sidley Austin LLP to advise the Company on ways to escape the detrimental ramifications of the LBO Debt, including a potential bankruptcy filing.  On December 8, 2008, less than a year after Step Two closed, Tribune and nearly all of the Subsidiary Guarantors filed voluntary petitions for relief under the Bankruptcy Code.[8]  In an affidavit filed in connection with the bankruptcy filing, defendant Bigelow stated that for the quarterly period ended September 28, 2008, Tribune had approximately $7.6 billion in assets—$6.9 billion less than the midpoint of the asset value set forth in VRC's Step Two solvency opinion—and $13.9 billion of total liabilities—a number that, unlike the VRC Step Two solvency opinion, properly included the PHONES debt at face value.  Bigelow stated further that "the newspaper industry generally is in the midst of an unprecedented decline which has only been exacerbated by the current recession," and noted the constraints placed on the Company by virtue of the mountainous debt it had incurred in connection with the LBO.  Bigelow specified that "[i]n December, 2008 alone, the Debtors face debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009."  Bigelow stated that these "substantial debt service requirements," among other things, required the Debtors to seek bankruptcy protection.

360.    The Debtors remained in bankruptcy for more than four years.  On August 10, 2012, Tribune's then President and Chief Executive Officer stated in a sworn affidavit that as of that date, the Company had incurred approximately $400 million in fees and expenses in connection with the bankruptcy proceeding.  During the pendency of the bankruptcy proceeding, neither

---

[8] The Subsidiary Guarantors that filed bankruptcy petitions are indicated on Exhibit B.

Tribune nor the LBO Lenders presented any evidence that the Company was solvent at Step Two.

## XX.    Morgan Stanley's Insider Trading

361.    On December 19, 1994, MSCS, an affiliate of Morgan Stanley, and The Times Mirror Company, a predecessor to the Company, entered into an interest rate swap in respect of a $100 million notional amount of debt (the "Swap").  An interest rate swap is an agreement between two parties to exchange one stream of interest payments for another, over a set period of time.  Swap agreements generally are used either to hedge a company's interest rate risk or to speculate on future interest rates.  The Swap was memorialized in an ISDA Master Agreement, dated as of August 5, 1994, and a Confirmation to such agreement, dated December 19, 1994 (collectively, the "Swap Agreement").

362.    The Swap Agreement obligated MSCS to make certain payments to Tribune calculated using a fixed rate of interest in return for payments by Tribune to MSCS calculated using a floating rate of interest.  If Tribune declared bankruptcy, that was an "Event of Default" under the Swap Agreement that permitted MSCS to select an "Early Termination Date."  On the Early Termination Date, the Swap Agreement provided for a calculation of the amount due from MSCS to the Company in respect of the future fixed rate payments MSCS was obligated to make to the Company under the Swap Agreement.  In certain circumstances, MSCS was permitted to reduce its final payment to the Company by amounts that the Company owed MSCS or its affiliates.

363.    Morgan Stanley and MSCS embarked on a scheme to wrongfully exploit these provisions of the Swap Agreement.  Armed with the inside knowledge—which Morgan Stanley acquired through its work with the Company and its Board and Special Committee—that there was a substantial risk that the Company would file for bankruptcy, Morgan Stanley and MSCS

sought to make substantial financial gains by purchasing the Company's publicly traded debt at a discount to its face value. MSCS could then seek to set off the full face value of Tribune public debt—which it had acquired at a deep discount—against the amount it owed Tribune in the event of a bankruptcy.

364. On April 11 and 15, 2008 Morgan Stanley purchased a total of $18,865,000 face value of Tribune 7.5% Debentures for $7,840,000—less than 42% of face value. On April 21, 2008, Morgan Stanley transferred these debentures to MSCS. ███████████████

████████████████████████████████████████████████████

█████████████████████████████████████████ At the time of these purchases and transfers in 2008, Morgan Stanley was in possession of material non-public information relating to the likelihood that the Company would have to file for bankruptcy, information that Morgan Stanley obtained in its capacity as the Company's and Special Committee's financial advisor in 2007. Morgan Stanley also advised the Company on a transaction in mid-2008.

365. On or about November 10, 2008, the Company engaged Morgan Stanley to provide financial advisory services relating to a possible bankruptcy filing by the Company. Upon information and belief, the Company provided Morgan Stanley, in its capacity as professional financial advisor, with confidential financial information relating to the Company and its consideration of a bankruptcy filing in the near term.

366. On November 20, 2008, Morgan Stanley purchased an additional $5,000,000 in face amount of Tribune 7.5% Debentures for $601,041—roughly 12% of face value. Morgan Stanley transferred these debentures to MSCS on the same day.

367. On November 26, 2008, Morgan Stanley purchased an additional $5,000,000 in face amount of Tribune 7.5% Debentures for $644,795—less than 13% of face value. On approximately March 20, 2009—after the commencement of Tribune's Chapter 11 case— Morgan Stanley transferred these debentures to MSCS. In total, Morgan Stanley transferred to its affiliate MSCS an aggregate of $38,365,000 in face value of Tribune 7.5% Debentures.

368. At the times it purchased Tribune 7.5% Debentures on November 20 and 26, 2008, Morgan Stanley was in possession of material non-public information concerning the Company's active planning for a bankruptcy filing in the very near term, information that Morgan Stanley obtained in its capacity as financial advisor to the Company.

369. Because Morgan Stanley had material non-public information from Tribune on this issue, it could and did decide to buy the Debentures with confidence that it or its affiliate would profit as a result.

370. At the December 1, 2008 meeting of the Tribune Board, the Tribune Board terminated Morgan Stanley's engagement as financial advisor to Tribune.

371. On or about December 2, 2008—less than one week before Tribune's bankruptcy filing—Tribune paid Morgan Stanley the amount of $46,020.47, by wire transfer, in respect of certain expenses Morgan Stanley purportedly incurred in connection with its engagement as financial advisor to Tribune (the "Morgan Stanley Reimbursement").

372. Tribune's bankruptcy filing on December 8, 2008, was an Event of Default under the Swap Agreement, and MSCS designated December 9, 2008 as the Early Termination Date for the interest rate swap under the Swap Agreement.

373. By letter dated December 18, 2008, MSCS informed Tribune that it had set off $38,365,000 in principal amount of Tribune 7.5% Debentures (this amount includes $9,500,000

in principal amount of debentures that Morgan Stanley acquired before it was a financial advisor

to the Company), plus accrued interest and expenses, against the $50,433,470 MSCS had

determined, as the non-defaulting party under the Swap Agreement, was owing by MSCS to

Tribune.

374.    By letter dated March 20, 2009, MSCS advised that the correct amount owing to

Tribune under the Swap Agreement was $51,945,000 (the "Termination Amount"), and that the

prior figure was the result of a calculation error.  MSCS again informed Tribune that it had set

off $38,365,000 in principal amount of Tribune 7.5% Debentures (plus accrued interest and

expenses) against the Termination Amount.  By reason of its improper purchase and transfer of

Tribune 7.5% Debentures while in possession of material non-public information from the

Company, Morgan Stanley deprived the Company of $38,365,000 (plus accrued interest and

expenses) in payments that it would otherwise have received under the Swap Agreement, and

thereby damaged the Company in that amount.

375.    MSCS has filed a proof of claim in Tribune's Chapter 11 case in the principal

amount of $38,365,000 (the "MSCS Claim").  Among other claims, the MSCS Claim asserts a

protective claim of not less than $41,074,528 in the event that MSCS's setoff is successfully

challenged.

### GROUNDS FOR RELIEF

### COUNT ONE
**Avoidance And Recovery Of The Shareholder Transfers (Of At Least $8 Billion) As Actual
Fraudulent Transfers Under Sections 548(a)(1)(A) And 550(a) Of The Bankruptcy Code
Against The Shareholder Defendants And The Shareholder Class**

376.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing

paragraphs as though fully set forth herein.

377. The Shareholder Transfers are all of the transfers made in connection with the purchase, repurchase, or redemption of Tribune stock as a result of the LBO, as identified in Paragraph 94.

378. The Shareholder Transfers were made within two years of the Petition Date.

379. Tribune, by and through certain of its officers, directors, shareholders, and agents, made the Shareholder Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts that:

a.  The D&O Defendants stood to receive millions of dollars through the sale of their Tribune shares and the receipt of special monetary incentives if the LBO was consummated;

b.  The Officer Defendants recommended that the Tribune Board approve the LBO notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that the LBO would render the Company insolvent, inadequately capitalized, and/or unable to pay its debts as they came due;

c.  Certain of the Officer Defendants prepared, instructed, and/or induced VRC to rely on the patently unreasonable February 2007 Projections and October 2007 Projections, notwithstanding that these Officer Defendants knew, or were reckless or grossly negligent in not knowing, that the projections were not prepared by, and were actively concealed from, the members of Tribune management with direct knowledge of facts that rendered them unreasonable, and that these Officer Defendants knew, or were reckless or grossly negligent in not knowing, that Tribune would have to vastly outperform its own 2006 performance and its 2007 performance to date in order to meet the February 2007 Projections and October 2007 Projections, that the February 2007 Projections and October 2007 Projections conflicted with Tribune's internal projections, and that Tribune could not achieve the February 2007 Projections and October 2007 Projections;

d.  The D&O Defendants relied upon, and allowed VRC to rely upon, an inadequate downside analysis of the Company's projections which assumed a materially more optimistic downside case than the Tribune Board had insisted on in connection with the Company's 2006 Leveraged Recapitalization, even though the publishing industry and the Company's own financial performance had deteriorated since 2006 and despite the fact that the leverage associated with the LBO was more than double what the Company incurred in its 2006 Leveraged Recapitalization;

e.  Certain of the Officer Defendants colluded with VRC to ensure that in preparing its solvency opinions, which were crucial to the consummation of the LBO, VRC

would deviate from legal and recognized industry standards for preparing a solvency analysis, because these Officer Defendants knew that a solvency analysis prepared in accordance with proper legal and industry standards would show that the LBO would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due, and would have prevented the consummation of the LBO;

f.      Certain of the Officer Defendants knowingly misrepresented to VRC that an outside financial advisor had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt;

g.      The D&O Defendants and Subsidiary D&O Defendants effectively transferred virtually all of the Company's value to Tribune's shareholders and/or the LBO Lenders and away from its existing creditors, by causing the Subsidiary Guarantors to enter into the Subsidiary Guarantees;

h.      The D&O Defendants sought to ensure that the LBO Lenders would be paid in advance of Tribune's and its subsidiaries' existing creditors, by creating Holdco and Finance and authorizing the complex transactions resulting in intercompany obligations from the Company's publishing subsidiaries to Finance;

i.      The D&O Defendants, motivated by the fact that they would personally receive outsized, non-standard monetary rewards if the LBO was consummated, advocated and/or voted in favor of the LBO, notwithstanding that (a) they had previously refused to vote in favor of and/or endorse other proposed transactions on the ground that those transactions placed too much debt on the Company, (b) the LBO placed significantly more debt on the Company than those proposed transactions, and (c) at the time of the LBO, the Company was performing substantially worse than it had been when they refused to vote in favor of and/or endorse the other proposed transactions;

j.      At every stage of the LBO, the Director Defendants relied on the advice of outside advisors that the Director Defendants knew, or were reckless or grossly negligent in not knowing, was proffered by parties with a financial interest in the consummation of the LBO, and was not credible;

k.      At every stage of the LBO, the Director Defendants failed to adequately analyze the impact that the LBO would have on the Company and those parties who would continue to be creditors and/or constituents of the Company, and voted in favor of and/or advocated for the LBO, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that the LBO would render the Company insolvent, unable to pay its debts as they came due, and/or inadequately capitalized.

380.     In addition, the following traditional badges of fraud also indicate that Tribune

made the LBO Transfers (and incurred or reaffirmed the obligations to make the Insider

Payments) with the actual intent to hinder, delay, and defraud Tribune's creditors:

a.      The recipients of the Shareholder Transfers, the EGI-TRB Transfers, the EGI Reimbursements, the VRC Transfers, the Insider Payments, and the Morgan Stanley Advisor Fees (collectively, the "LBO Transfers") included Tribune's Controlling Shareholders, directors, officers, and other fiduciaries who effectuated the LBO; or, in the case of the VRC Transfers and Morgan Stanley Advisor Fees, fiduciaries of Tribune with a financial interest in the consummation of the LBO;

b.      The individuals and entities who controlled Tribune obtained and maintained control of Tribune's transferred funds by receiving the LBO Transfers;

c.      Tribune received less than reasonably equivalent value in exchange for each of the LBO Transfers;

d.      The LBO Transfers left Tribune with fewer assets than liabilities and transferred all or substantially all of the value of Tribune to Tribune's shareholders and/or the LBO Lenders, and away from the pre-LBO creditors of Tribune and its subsidiaries;

e.      The LBO Transfers were not undertaken in the regular course of Tribune's business;

f.      The LBO Transfers occurred at the same time as, or were made with the proceeds of, the LBO Loans; and

g.      Management engaged in deceptive conduct in connection with the LBO and the LBO Transfers by, among other things, concealing the February 2007 Projections and October 2007 Projections from members of management who had knowledge of facts that rendered them unreasonable; concealing from VRC and from the Board that the February 2007 Projections and October 2007 Projections were inaccurate, unjustified, based on unreasonable assumptions, and inconsistent with the Company's performance; and misrepresenting to VRC that Morgan Stanley had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt.

381.     Accordingly, each of the Shareholder Transfers was a transfer in fraud of the

rights of the creditors of Tribune and its subsidiaries, and the Shareholder Transfers should be

avoided and recovered pursuant to Sections 548(a)(1)(A) and 550(a) of the Bankruptcy Code.

## COUNT TWO
### Violations Of Delaware General Corporation Law Sections 160 And/Or 173
### Against The Director Defendants And Zell

382.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

383.    Section 160(a)(1) of the Delaware General Corporation Law (the "DGCL") provides, in relevant part, that "no corporation shall . . . [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation."

384.    Section 173 of the DGCL provides that "[n]o corporation shall pay dividends except in accordance with this chapter."

385.    Pursuant to Section 174 of the DGCL, the directors of a corporation are jointly and severally liable for "willful or negligent violation of § 160 or § 173."

386.    Tribune provided cash and/or property to its shareholders as a result of the LBO. The payments made by Tribune in connection with the LBO were, in substance, unlawful dividends and/or stock purchases in violation of Sections 160 and/or 173 of the DGCL. The Director Defendants and Zell are jointly and severally liable for the amount of such dividends and/or stock purchases due to their willful or negligent approval and/or facilitation of the transfer of the payments, while Tribune lacked a sufficient surplus or net profits or was otherwise insolvent, in violation of the DGCL, including without limitation Sections 160, 173, and 174.

387.    Tribune has been substantially damaged as a direct and proximate result of the Director Defendants' and Zell's violations of DGCL Sections 160, 173, and 174.

388.    Accordingly, Plaintiff is entitled to judgment against the Director Defendants and Zell in an amount to be determined at trial.

## COUNT THREE
## Breach Of Fiduciary Duty
## Against The Director Defendants

389.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

390.    As directors of Tribune, the Director Defendants owed Tribune fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the Director Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

391.    As a director of Tribune, each Director Defendant was obligated by his or her duty of care to use that amount of care which an ordinarily careful and prudent person would use in similar circumstances, and to consider all material information reasonably available.

392.    As a director of Tribune, each Director Defendant was obligated by his or her duty of loyalty to place Tribune's interests above any interest possessed by the Director Defendant that was not shared by the corporation generally.

393.    As a director of Tribune, each Director Defendant was obligated by his or her duty of good faith not to intentionally fail to act in the face of a known duty to act.

394.    All of the Director Defendants owned shares in Tribune prior to and after approval of the LBO, and received material cash proceeds, in many instances millions of dollars, from the sale of their stock in connection with the LBO.  These financial benefits were not available to many Company stakeholders who were to remain stakeholders following the LBO. Due to these direct financial incentives, the Director Defendants were interested in, and/or lacked independence with respect to, the LBO.

395.     The Director Defendants, acting both individually and collectively, failed to

exercise the necessary care, and breached their respective duties of good faith, care, and loyalty,

by, among other things:

a.     Acting in their own interests by approving the LBO and LBO Transfers, and permitting Steps One and Two to close even though they knew, or were reckless or grossly negligent in not knowing, that it would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

b.     Succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO, which benefitted the Controlling Shareholders but was detrimental to the Company the Director Defendants were obligated to serve;

c.     Transferring virtually all of the Company's value to Tribune's shareholders and/or the LBO Lenders, by causing the Subsidiary Guarantors to enter into the Subsidiary Guarantees;

d.     Seeking to ensure that the LBO Lenders would be paid in advance of Tribune's and its subsidiaries' existing creditors, by creating Holdco and Finance and authorizing the complex transactions resulting in intercompany obligations from the Company's publishing subsidiaries to Finance;

e.     Relying on the advice of outside advisors that the Director Defendants knew, or were reckless or grossly negligent in not knowing, was proffered by parties with a financial interest in the consummation of the LBO and was not credible;

f.     Relying on the patently unreasonable February 2007 Projections and October 2007 Projections, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that those projections were proffered to the Tribune Board by officers with a financial interest in the consummation of the LBO, and that they knew, or were reckless or grossly negligent in not knowing, that Tribune would have to vastly outperform its own 2006 performance, and its 2007 performance to date, in order to meet those projections, and that Tribune could not achieve those projections;

g.     Relying on an inadequate downside analysis of the Company's projections which assumed a materially more optimistic downside case than the Tribune Board had insisted on in connection with the Company's 2006 Leveraged Recapitalization, even though the publishing industry and the Company's own financial performance had deteriorated since 2006 and despite the fact that the leverage associated with the LBO was more than double what the Company incurred in its 2006 Leveraged Recapitalization;

h. Relying on VRC's solvency opinions, which were crucial to the consummation of the LBO, and which they knew, or were reckless or grossly negligent in not knowing, deviated from legal and recognized industry standards for preparing a solvency analysis, and where they also knew, or were reckless or grossly negligent in not knowing, that a solvency analysis prepared in accordance with proper legal and industry standards would show that the LBO would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due and would have prevented the consummation of the LBO;

i. Failing, at every stage of the LBO, to adequately analyze the impact that the LBO would have on the Company and those parties who would continue to be creditors and/or constituents of the Company, voting in favor of and/or advocating for the LBO, and ultimately allowing the LBO to close, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that it would render the Company insolvent, unable to pay its debts as they came due, and/or inadequately capitalized;

j. Failing, at every stage of the LBO, to consider all material facts reasonably available and completely and willfully or recklessly ignoring the duties they owed to Tribune and to all of Tribune's stakeholders, including creditors;

k. Engaging in self-dealing by causing Tribune to borrow money and otherwise act to its own detriment in order to obtain a personal gain and/or a gain to other entities whose interests they represented; and

l. Furthering the LBO for a purpose other than a genuine effort to advance the welfare of Tribune.

396. The Director Defendants are not entitled to the protection of the business judgment rule for the breach of their fiduciary duties, as the Director Defendants failed to act in good faith and instead breached their duties of loyalty by acting in their own interests or in the interests of entities other than Tribune.

397. By reason of the foregoing actions, the Director Defendants, acting both individually and collectively, engaged in self-dealing, did not act in good faith, and breached their respective fiduciary duties.

398. Tribune has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

399.     Accordingly, Plaintiff is entitled to judgment against the Director Defendants jointly and severally, in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any amounts paid to the Director Defendants in connection with the LBO.

## COUNT FOUR
### Breach Of Fiduciary Duty
### Against The Officer Defendants

400.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

401.     As officers of Tribune, the Officer Defendants owed Tribune fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the Officer Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

402.     As an officer of Tribune, each Officer Defendant was obligated by his duty of care to use that amount of care which an ordinarily careful and prudent person would use in similar circumstances, and to consider all material information reasonably available.

403.     As an officer of Tribune, each Officer Defendant was obligated by his duty of loyalty to place Tribune's interests above any interest possessed by the Officer Defendant that was not shared by the corporation generally.

404.     As an officer of Tribune, each Officer Defendant was obligated by his duty of good faith not to intentionally fail to act in the face of a known duty to act.

405.     Nearly all of the Officer Defendants owned shares in Tribune prior to and after approval of the LBO, and received material cash proceeds, in many instances millions of dollars, from the sale of their stock in connection with the LBO.  In addition, the Officer Defendants collectively received millions of dollars in special incentives for completing the LBO.  These

financial benefits were not available to many Company stakeholders who were to remain stakeholders following the LBO. Due to these direct financial benefits, the Officer Defendants were interested in, and/or lacked independence with respect to, the LBO.

406. The Officer Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty, by, among other things:

a. Acting in their own interests by recommending the LBO to the Tribune Board, facilitating the closing of Steps One and Two, and ultimately allowing the LBO to close, even though they knew, or were reckless or grossly negligent in not knowing, that it would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

b. Succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO, which favored interests other than those of the Company they were obligated to serve;

c. Preparing, instructing, and inducing VRC to rely on the patently unreasonable February 2007 Projections and October 2007 Projections, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that the projections were not prepared by, and were actively concealed from, the members of Tribune management with direct knowledge of facts that rendered them unreasonable, and that they knew, or were reckless or grossly negligent in not knowing, that Tribune would have to vastly outperform its own 2006 performance and its 2007 performance to date in order to meet the February 2007 Projections and October 2007 Projections; that the February 2007 Projections and October 2007 Projections conflicted with Tribune's internal projections; and that Tribune could not achieve the February 2007 Projections and October 2007 Projections;

d. Preparing, and inducing VRC to rely on, an inadequate downside analysis of the Company's projections which assumed a materially more optimistic downside case than the Tribune Board had insisted on in connection with the Company's 2006 Leveraged Recapitalization, even though the publishing industry and the Company's own financial performance had deteriorated since 2006 and despite the fact that the leverage associated with the LBO was more than double what the Company incurred in its 2006 Leveraged Recapitalization;

e. Relying on VRC's solvency opinions, which were crucial to the consummation of the LBO, that they knew, or were reckless or grossly negligent in not knowing, deviated from industry standards, and where they also knew, or were reckless or grossly negligent in not knowing, that a solvency analysis prepared in accordance with industry standards would show that the LBO would render the Company

insolvent, inadequately capitalized, and unable to pay its debts as they came due, and would have prevented the consummation of the LBO;

f.     In the case of certain of the Officer Defendants, colluding with VRC to ensure that VRC would deviate from industry standards in preparing its solvency opinions, which were crucial to the consummation of the LBO, because these Officer Defendants knew that a solvency analysis prepared under those standards would show that the LBO would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due, and would have prevented the consummation of the LBO;

g.     In the case of certain of the Officer Defendants, knowingly misrepresenting to VRC that an outside financial advisor had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt;

h.     Engaging in self-dealing by causing Tribune to borrow money and otherwise act to its own detriment in order to obtain a personal gain and/or a gain to other entities whose interests they represented; and

i.      Furthering the LBO for a purpose other than a genuine effort to advance the welfare of Tribune.

407.    The Officer Defendants are not entitled to the protection of the business judgment rule for the breach of their fiduciary duties, as the Officer Defendants failed to act in good faith and instead acted in their own interests or in the interests of entities other than Tribune.

408.    By reason of the foregoing actions, the Officer Defendants, acting both individually and collectively, engaged in self-dealing, did not act in good faith, and breached their respective fiduciary duties.

409.    Tribune has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the Officer Defendants.

410.    Accordingly, Plaintiff is entitled to judgment against the Officer Defendants jointly and severally in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any amounts paid to the Officer Defendants in connection with the LBO.

## COUNT FIVE
## Breach Of Fiduciary Duty
## Against Zell

411.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing

paragraphs as though fully set forth herein.

412.     As a director of Tribune, Zell owed Tribune fiduciary duties of good faith, care,

and loyalty.  As Tribune was rendered insolvent by the LBO, Zell owed fiduciary duties to all of

Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay

them in full.

413.     As a director of Tribune, Zell was obligated by his duty of care to use that amount

of care which an ordinarily careful and prudent person would use in similar circumstances, and

to consider all material information reasonably available.

414.     As a director of Tribune, Zell was obligated by his duty of loyalty to place

Tribune's interests above any interest was not shared by the corporation generally.

415.     As a director of Tribune, Zell was obligated by his duty of good faith not to

intentionally fail to act in the face of a known duty to act.

416.     Zell controlled EGI-TRB, which entered into the Agreement and Plan of Merger

with Tribune on April 1, 2007.  As a result, Zell was interested in, or lacked independence with

respect to, the LBO.

417.     Zell proposed, negotiated, and facilitated the LBO.  Zell acted in his own

interests, and/or in the interests of entities other than Tribune, in facilitating the consummation of

the LBO even though he knew, or was reckless or grossly negligent in not knowing, that it would

result in harm to Tribune.  At a minimum, Zell was willfully blind to the foreseeable disastrous

consequences of the LBO, and acted with gross negligence and/or recklessness in advocating for

and facilitating consummation of a transaction that would, in short order, result in disaster for the Company.

418. Zell, acting both individually and collectively with the D&O Defendants, failed to exercise the necessary care, and breached his duties of good faith, care, and loyalty, by, among other things:

a. Advocating for and facilitating consummation of Step Two of the imprudent and highly leveraged LBO that rendered Tribune insolvent, and allowing Step One of the LBO to close, while knowingly, recklessly, grossly negligently, and/or willfully blindly disregarding the foreseeable disastrous consequences of the LBO;

b. Engaging in self-dealing by advocating for and facilitating consummation of the LBO even though it favored interests (including his own) other than those of the Company that he was obligated to serve; and

c. Furthering the LBO for a purpose other than a genuine effort to advance the welfare of Tribune.

419. Zell is not entitled to the protection of the business judgment rule for the breach of his fiduciary duties, as Zell failed to act in good faith and instead acted in his own interest or in the interests of entities other than Tribune. Indeed, in taking the actions described above with respect to the LBO, Zell abandoned Tribune's interests. Zell knowingly and intentionally acted in the sole pursuit of his personal individual interest. He did not act in order to achieve any benefit, or accomplish any legitimate corporate purpose, for Tribune, in either the short term or long term. To the contrary, he engaged in actions that did not confer any benefit upon or serve any corporate purpose for Tribune and that could never have conferred any such benefit or served any such purpose. The actions he took were entirely adverse to Tribune's interests. Notwithstanding the positions of trust that Zell occupied and the fiduciary duties he owed to Tribune, he acted in service of interests wholly separate and distinct from those of the Company he was obligated to serve.

420.     By reason of the foregoing actions, Zell, acting both individually and collectively with the D&O Defendants, engaged in self-dealing, did not act in good faith, and breached his fiduciary duties.

421.     Tribune has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Zell.

422.     Accordingly, Plaintiff is entitled to judgment against Zell jointly and severally in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any payments to Zell or from which Zell benefited that were made in connection with the LBO.

**COUNT SIX**
**Aiding And Abetting Breaches Of Fiduciary Duty By The D&O Defendants**
**And By The Controlling Shareholder Defendants**
**Against The Zell Defendants**

423.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

424.     The Director Defendants, as directors of Tribune, the Officer Defendants, as officers of Tribune, and the Controlling Shareholders, as controlling shareholders of Tribune, owed Tribune fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the Director Defendants, the Officer Defendants, and the Controlling Shareholders owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

425.     As alleged above, the Director Defendants, the Officer Defendants, and the Controlling Shareholders, acting both individually and collectively, breached their respective duties of good faith, care and loyalty.

426.    The Zell Defendants knew that the Director Defendants, the Officer Defendants, and the Controlling Shareholders had the fiduciary duties alleged herein.

427.    The Zell Defendants knew that nearly all of the Director Defendants, the Officer Defendants, and the Controlling Shareholders owned shares in Tribune prior to and after approval of the LBO, and would receive material cash proceeds, in many instances millions of dollars, from the sale of their stock in connection with the LBO.  The Zell Defendants knew that these cash proceeds were not available to many Company stakeholders who were to remain stakeholders following the LBO.  The Zell Defendants knew that, due to these direct financial benefits, each of the Director Defendants, the Officer Defendants, and the Controlling Shareholders was interested in, and/or lacked independence with respect to, the LBO.

428.    The Zell Defendants proposed, as part of the LBO, substantial financial incentives for the Officer Defendants to consummate the transaction, and otherwise knew that each of the Officer Defendants stood to receive additional substantial financial incentives upon completion of the LBO, and that these financial incentives were not available to many Company stakeholders who were to remain stakeholders following the LBO.  The Zell Defendants knew that, due to these direct financial benefits, the Officer Defendants were interested in, and/or lacked independence with respect to, the LBO.

429.    The Zell Defendants knew that the Chandler Trust Representatives had a fiduciary duty to represent the interests of Tribune to the exclusion of other interests, and that they separately had duties to the Chandler Trusts that were different from and inconsistent with their duties to Tribune.  The Zell Defendants also knew that the Chandler Trust Representatives had an interest in obtaining the highest purchase price possible for Tribune's shares as quickly as

possible, irrespective of the amount of leverage involved, and that that interest was inconsistent with the Company's interest in remaining viable following the LBO.

430.    The Zell Defendants knowingly exploited these conflicts of interest and participated in the breaches of fiduciary duty of the Director Defendants, the Officer Defendants, and the Controlling Shareholders by (i) proposing terms for the LBO that were tailored to induce support from each of the Director Defendants, the Officer Defendants, and the Controlling Shareholders, based on their own interests (and, in the case of the Chandler Trust Representatives and FitzSimons, the interests of the Chandler Trusts and the Foundations), and (ii) negotiating and agreeing to terms for the LBO that redounded to the benefit of the Director Defendants, the Officer Defendants, and the Controlling Shareholders at the expense of Tribune and its other stakeholders, by, among other things:

a.    Proposing an initial, inflated share price for the LBO, and then increasing that price, knowing that a higher share price would be more attractive to the Director Defendants, the Officer Defendants, and the Controlling Shareholders individually as shareholders, but would burden Tribune with more debt than was sustainable and was therefore detrimental to the interests of Tribune and its other stakeholders;

b.    Proposing and agreeing to substantial financial incentives for the Officer Defendants that were material to those individuals and which would benefit those defendants individually rather than benefiting Tribune; and

c.    Modifying the terms of the LBO from a one-step to a two-step transaction to accommodate the individual interests of the Controlling Shareholders, and consequently of the Chandler Trust Representatives and FitzSimons, and defeat their opposition to the LBO, rather than to accommodate any interest of Tribune.

431.    The Zell Defendants also sought to capitalize on Zell's reputation by coercing the Lead Banks, and attempting to coerce Houlihan, into participating in a transaction that would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due.

432. The Zell Defendants thereby aided and abetted the breaches of fiduciary duties of each of the Director Defendants, the Officer Defendants, and the Controlling Shareholders, and were active and knowing participants in those breaches of fiduciary duties.

433. Tribune has been substantially damaged as a direct and proximate result of the actions of the Zell Defendants in aiding and abetting the breaches of fiduciary duties set forth fully herein.

434. Accordingly, Plaintiff is entitled to judgment against the Zell Defendants in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any amounts paid to the Zell Defendants or from which Zell benefited that were made in connection with the LBO.

## COUNT SEVEN
### Avoidance And Recovery Of The EGI-TRB Transfers (Of At Least $258,918,859) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code
### Against EGI-TRB

435. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

436. The EGI-TRB Transfers include the EGI-TRB Stock Sale, the Exchangeable Note Obligation, the Exchangeable Note Transfer (which, as set forth herein and in Count Thirty Two, was actually a transfer made on account of equity and not antecedent debt), and the EGI-TRB Fee Transfers, as defined in Paragraphs 79 and 80, which EGI-TRB received in connection with the LBO.

437. The EGI-TRB Transfers were made within two years of the Petition Date.

438. Tribune, by and through certain of its officers, directors, shareholders, and agents, made the EGI-TRB Transfers with the actual intent to hinder, delay, and defraud Tribune's

creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs 379 and 380, which are incorporated herein by reference.

439.     Tribune received less than reasonably equivalent value for the EGI-TRB Transfers, and Tribune (i) at the time of the EGI-TRB Transfers was insolvent or became insolvent as a result of the EGI-TRB Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

440.     Accordingly, the EGI-TRB Transfers were transfers in actual and constructive fraud of the rights of the creditors of Tribune and its subsidiaries, and the EGI-TRB Transfers should be avoided and recovered pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Bankruptcy Code.

## COUNT EIGHT
### Alter Ego Liability
### Against EGI, Sam Investment Trust, And Zell

441.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

442.     Sam Investment Trust, an irrevocable Illinois trust established for the benefit of Zell and his family, is the sole member and 100% owner of EGI-TRB.

443.     For tax purposes, EGI-TRB is disregarded as an entity separate from Sam Investment Trust, and Zell is in turn treated as the owner of all of the property of Sam Investment Trust.

444.     EGI-TRB has no board of directors or similar board of managers.

445.     Zell was at all relevant times the President and Chief Executive Officer of EGI-TRB and was responsible for its general and active management of EGI-TRB.

446.     William C. Pate, who was at all relevant times a managing director of EGI, which Zell controls, was at all relevant times the Vice-President of EGI-TRB.

447.     On information and belief, EGI-TRB has, and at all relevant times had, no office of its own, and no employees of its own other than Zell and employees of EGI.

448.     EGI-TRB is and was at all relevant times completely dominated by Zell, directly, and indirectly through Sam Investment Trust and EGI and its employees, each of which Zell controls.

449.     EGI-TRB is and was at all relevant times merely an instrument for the operations of Zell, the Sam Investment Trust, and EGI, and was further used as an instrument of fraud in an effort to insulate Zell, the Sam Investment Trust, and EGI from liability relating to or arising from the LBO.

450.     Zell held himself out as the principal engaged in the LBO, and held Sam Investment Trust, EGI, and EGI-TRB out as instruments for his own operations and for the operations of one another.  Tribune and its directors, officers, Controlling Shareholders, and agents understood that EGI-TRB was merely an instrument of Zell's operations and of the operations of Sam Investment Trust and EGI, using Zell's name to refer collectively to Zell, Sam Investment Trust, EGI, and EGI-TRB.

451.     EGI-TRB lacks and at all relevant times lacked sufficient capital to meet any liabilities that might arise from the LBO.

452.     EGI-TRB has no assets other than the EGI-TRB Claims, and is insolvent.

453.     At all relevant times, EGI-TRB was the alter ago of Zell, was the alter ego of Sam Investment Trust, and was the alter ego of EGI such that EGI-TRB's corporate form should be set aside for purposes of this action and Zell, Sam Investment Trust, and EGI are and should be

held liable for any and all liabilities of EGI-TRB in this action, including liability arising from the Shareholder Transfers, the EGI-TRB Transfers, the Exchangeable Note Transfer, and the EGI-TRB Fee Transfers, jointly and severally with one another and with EGI-TRB.

**COUNT NINE**
**Preference Against Zell And EGI-TRB To Recover The Exchangeable Note Transfer (Of At Least $206,418,859) And The EGI-TRB Fee Transfers (Of At Least $2.5 Million)**

454.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

455.    EGI-TRB is an alter ego of Zell, who was an insider of Tribune at the time of the Exchangeable Note Transfer and EGI-TRB Fee Transfers.

456.    The Exchangeable Note Transfer and EGI-TRB Fee Transfers were made within one year of the Petition Date.  Certain of the EGI-TRB Fee Transfers were made within 90 days of the Petition Date.

457.    The Exchangeable Note Transfer and certain of the EGI-TRB Fee Transfers were made for the benefit of Zell and/or EGI-TRB at a time while Tribune was insolvent.  These EGI-TRB Fee Transfers were made on account of antecedent debt, and, in the event that the Exchangeable Note Transfer is not recharacterized or the Exchangeable Note Obligation is not avoided, the Exchangeable Note Transfer was also made on account of antecedent debt.

458.    The Exchangeable Note Transfer and EGI-TRB Fee Transfers enabled Zell and/or EGI-TRB to receive more than they would have received if (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Exchangeable Note Transfer and EGI-TRB Fee Transfers had not been made; and (iii) Zell and/or EGI-TRB received payment of its debts under the provisions of the Bankruptcy Code.

459.    Accordingly, the Exchangeable Note Transfer and EGI-TRB Fee Transfers should be avoided and recovered pursuant to Sections 547(b) and 550(a) of the Bankruptcy Code.

**COUNT TEN**
**Preference Against EGI To Recover The EGI Reimbursements (Of At Least $586,759)**

460.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

461.     The EGI Reimbursements are the payments made by Tribune to EGI to reimburse EGI for expenses in connection with the LBO, as identified in Paragraph 77.

462.     The EGI Reimbursements were made to EGI within one year of the Petition Date.

463.     The EGI Reimbursements were made for the benefit of EGI, for or on account of antecedent debt and made while Tribune was insolvent.

464.     The EGI Reimbursements enabled EGI to receive more than it would have received if (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the EGI Reimbursements had not been made; and (iii) EGI received payment of its debts under the provisions of the Bankruptcy Code.

465.     Accordingly, the EGI Reimbursements should be avoided and recovered pursuant to Sections 547(b) and 550(a) of the Bankruptcy Code.

**COUNT ELEVEN**
**Avoidance And Recovery Of The EGI Reimbursements (Of At Least $586,759) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against EGI**

466.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

467.     The EGI Reimbursements were made within two years of the Petition Date.

468.     Tribune, by and through certain of its officers, directors, shareholders, and agents, made the EGI Reimbursements with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs 379 and 380, which are incorporated herein by reference.

154

469.     Tribune received less than reasonably equivalent value for the EGI Reimbursements, and Tribune, at the time of the EGI Reimbursements, (i) was insolvent or became insolvent as a result of the EGI Reimbursements; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

470.     Accordingly, the EGI Reimbursements were transfers in fraud of the rights of the creditors of Tribune and its subsidiaries, and the EGI Reimbursements should be avoided and recovered pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Bankruptcy Code.

## COUNT TWELVE
### Breach Of Fiduciary Duty Against The Subsidiary D&O Defendants

471.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

472.     As directors and/or officers of the Subsidiary Guarantors, each Subsidiary D&O Defendant owed the Subsidiary Guarantor(s) that he or she served fiduciary duties of good faith, care, and loyalty.  As the Subsidiary Guarantors were rendered insolvent by the LBO, the Subsidiary D&O Defendants owed fiduciary duties to all of the Subsidiary Guarantors and their stakeholders, including the Subsidiary Guarantors' creditors, who were harmed due to the Subsidiary Guarantors' inability to pay them in full.

473.     As a director and/or officer of the Subsidiary Guarantors, each Subsidiary D&O Defendant was obligated by his or her duty of care to use that amount of care which an ordinarily careful and prudent person would use in similar circumstances, and to consider all material information reasonably available.

155

474.     As a director and/or officer of the Subsidiary Guarantors, each Subsidiary D&O Defendant was obligated by his or her duty of loyalty to place the interests of the Subsidiary Guarantors above any interest possessed by the Subsidiary D&O Defendant and not shared by the corporation generally.

475.     As a director and/or officer of the Subsidiary Guarantors, each Subsidiary D&O Defendant was obligated by his or her duty of good faith not to intentionally fail to act in the face of a known duty to act.

476.     Nearly all of the Subsidiary D&O Defendants owned shares in Tribune prior to and after approval of the LBO, and received material cash proceeds, in many instances, hundreds of thousands or millions of dollars, from the sale of their stock in connection with the LBO.  In addition, the Subsidiary D&O Defendants collectively received millions of dollars in special incentives for completing the LBO.  None of these financial incentives were available to Company stakeholders who were to remain stakeholders following the LBO.  Due to these direct financial benefits, the Subsidiary D&O Defendants were interested in, and/or lacked independence with respect to, the LBO and the approval of the Subsidiary Guarantees on behalf of the Subsidiary Guarantors.

477.     The Subsidiary D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty, by, among other things:

    a.    Acting in their own interests by approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors, facilitating the closing of Steps One and Two, and ultimately allowing the LBO to close, even though they knew, or were reckless or grossly negligent in not knowing, that their conduct would render the Subsidiary Guarantors insolvent, inadequately capitalized, and unable to pay their debts as they came due;

    b.    Approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors without conducting any due diligence or independent investigation whatsoever,

and failing to engage in any deliberative process or to exercise any business judgment as to whether the Subsidiary Guarantees were in the best interest of the Subsidiary Guarantors or their creditors, even though the Subsidiary Guarantees rendered the Subsidiary Guarantors insolvent and provided no value to the Subsidiary Guarantors;

c.      Succumbing to financial incentives and catering to external influences in approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors, and thereby facilitating the LBO, which favored interests other than those of the Subsidiary Guarantors they were obligated to serve;

d.      Engaging in self-dealing by approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors, and thereby facilitating the LBO which harmed the Subsidiary Guarantors, in order to obtain a personal gain; and

e.      Approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors, and thereby facilitating the LBO, for a purpose other than a genuine effort to advance the welfare of the Subsidiary Guarantors.

478.    The Subsidiary D&O Defendants are not entitled to the protection of the business judgment rule for the breach of their fiduciary duties, as the Subsidiary D&O Defendants failed to act in good faith and instead acted in their own interests or in the interests of entities other than the Subsidiary Guarantors.  In addition, by failing to perform any due diligence or independent investigation, to engage in any deliberative process, or to exercise any business judgment prior to approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors, the Subsidiary D&O Defendants intentionally failed to act in the face of a known duty to act.

479.    By reason of the foregoing actions, the Subsidiary D&O Defendants, acting both individually and collectively, engaged in self-dealing, did not act in good faith, and breached their respective fiduciary duties.

480.    The Subsidiary Guarantors have been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the Subsidiary D&O Defendants.

481.    Accordingly, Plaintiff is entitled to judgment against the Subsidiary D&O Defendants in an amount to be determined at trial, including but not limited to the amount of the

harm incurred by the Subsidiary Guarantors as a result of the LBO and the approval of the Subsidiary Guarantees, and disgorgement of any amounts paid to the Subsidiary D&O Defendants in connection with the LBO.

## COUNT THIRTEEN
### Aiding And Abetting Breach Of
### Fiduciary Duty Against The Subsidiary D&O Defendants And Amsden

482.　Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

483.　As directors and officers of Tribune, the D&O Defendants owed Tribune and its stockholders fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

484.　The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty as set forth fully herein.

485.　The Subsidiary D&O Defendants and Amsden knew that the D&O Defendants had the fiduciary duties alleged herein.  Indeed, four of the Subsidiary D&O Defendants— FitzSimons, Bigelow, Kenney, and Hianik—are also D&O Defendants.

486.　The Subsidiary D&O Defendants colluded in or aided and abetted the breaches of fiduciary duties of the D&O Defendants, and were active and knowing participants in those breaches of fiduciary duties by, among other things, approving the Subsidiary Guarantees and the Pledge guaranteeing the obligations incurred in connection with the LBO, and failing to conduct any independent investigation, to engage in any deliberative process, or to exercise any business judgment on behalf of the Subsidiary Guarantors in connection with the approval of the Subsidiary Guarantees.

487.     Amsden colluded in or aided and abetted the breaches of fiduciary duties of the D&O Defendants, and was an active and knowing participant in those breaches of fiduciary duties by, among other things, assisting in the preparation of the February 2007 Projections, and the Company's decision to continue to purport to rely on those projections notwithstanding that the Company's performance rendered them demonstrably unreliable, assisting in the preparation of the overly optimistic and unrealistic October 2007 Projections, and assisting in the D&O Defendants' efforts to construct and utilize the fraudulent VRC solvency opinions to ensure that the LBO closed.

488.     Tribune has been substantially damaged as a direct and proximate result of the actions of the Subsidiary D&O Defendants and Amsden in aiding and abetting the breaches of fiduciary duties set forth fully herein.

489.     Accordingly, Plaintiff is entitled to judgment against the Subsidiary D&O Defendants and Amsden, jointly and severally, in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any amounts paid to the Subsidiary D&O Defendants and Amsden in connection with the LBO.

**COUNT FOURTEEN**
**Breach Of Fiduciary Duty Against The Chandler Trusts And The Foundations**

490.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

491.     The Chandler Trusts and the Foundations each functioned as a controlling shareholder, and acted in concert as a controlling shareholder, with respect to the LBO and effectively had the capacity to block or preclude the transaction if they deemed it was not in their own interests.  The Chandler Trusts collectively owned 20% of Tribune's stock in advance of

Step One and, by virtue of these substantial stock holdings, made clear to the Tribune Board that the Company had to comply with their demands and advance their objectives. Indeed, the Chandler Trusts threatened the Board with certain adverse consequences if the Board failed to comport with their demands. In addition, the Chandler Trusts had representatives on Tribune's Board. In response to the Chandler Trusts' demands, Tribune formed the Special Committee, actively pursued strategic transactions, modified the LBO structure proposed by Zell, and ultimately entered into the LBO. The Chandler Trusts also entered into a voting agreement with Tribune and EGI that virtually ensured that the LBO would be approved. Thus, for all practical purposes, the Chandler Trusts were controlling shareholders with respect to the transaction.

492.    The Foundations collectively owned 13% of Tribune's stock at Step One, and 10% at Step Two. By virtue of their substantial stock holdings, the Foundations made clear to the Tribune Board that it had to comply with their demands and advance their objectives. Indeed, the Foundations threatened the Tribune Board with certain adverse consequences if the Tribune Board failed to comport with their demands, and in response to those demands, Tribune formed the Special Committee, actively pursued strategic transactions, modified the LBO structure proposed by Zell, and ultimately entered into the LBO. In addition, the Foundations each had representatives on Tribune's Board, and through FitzSimons' roles at both the Foundations and Tribune, the Foundations had senior managerial presence at Tribune. The Foundations exercised their control over the company by, among other things, directly participating in the Special Committee's review of potential transactions and by causing Tribune to transform the LBO structure and ultimately enter into the LBO. Thus, for all practical purposes, the Foundations were controlling shareholders with respect to the transaction.

493.     As controlling shareholders of Tribune, the Chandler Trusts and the Foundations owed Tribune fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the Chandler Trusts and the Foundations owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

494.     As fiduciaries, the Chandler Trusts and the Foundations were obligated by their duty of care to use that amount of care which an ordinarily careful and prudent person would use in similar circumstances, and to consider all material information reasonably available.

495.     As fiduciaries, the Chandler Trusts and the Foundations were obligated by their duty of loyalty to place Tribune's interests above any interest not shared by the corporation generally.

496.     As fiduciaries, the Chandler Trusts and the Foundations were obligated by their duty of good faith not to intentionally fail to act in the face of a known duty to act.

497.     The Chandler Trusts and the Foundations, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty, by, among other things, (i) intentionally steering the D&O Defendants toward a corporate strategy aimed at enhancing the interests of the Chandler Trusts and of the Foundations at the expense of Tribune and its other stakeholders, (ii) interposing themselves in the Tribune Board's decision-making process and exerting undue influence over the D&O Defendants, and (iii) ensuring the consummation of a transaction that the Chandler Trusts and the Foundations knew, or were reckless or grossly negligent in not knowing, would render Tribune insolvent, inadequately capitalized, and unable to pay its debts as they came due.

498. As controlling shareholders of Tribune, the Chandler Trusts and the Foundations were not entitled to consider only their own interests in assessing the propriety of the LBO. Rather, in deciding whether to participate in the LBO and thereby help ensure its effectuation, the Chandler Trusts and the Foundations were obligated to consider the interests of Tribune and all its stakeholders. By exclusively focusing on, pressing, and pursuing their own interests, and by their other aforementioned acts and omissions, the Chandler Trusts and the Foundations breached their fiduciary obligations.

499. The Chandler Trusts and the Foundations are not entitled to the protection of the business judgment rule for the breach of their duties. The Chandler Trusts and the Foundations failed to act in good faith and instead acted solely in their own interests. Indeed, the Chandler Trusts and the Foundations abandoned Tribune's interests, and took actions that were entirely adverse to Tribune's interests, both short term and long term.

500. By and through the LBO, the Chandler Trusts and the Foundations received substantial proceeds for their Tribune stock that were funded by debt that rendered the Company insolvent, inadequately capitalized, and unable to pay their debts as they came due.

501. Tribune has been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by the Chandler Trusts and the Foundations.

502. Accordingly, Plaintiff is entitled to judgment against the Chandler Trusts and the Foundations jointly and severally in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any amounts paid to the Chandler Trusts and the Foundations in connection with the LBO.

## COUNT FIFTEEN
### Aiding And Abetting Breach Of Fiduciary Duty
### Against The Chandler Trust Representatives And The Controlling Shareholders

503.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

504.     As directors and officers of Tribune, the D&O Defendants owed Tribune duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors who were harmed due to Tribune's inability to pay them in full.

505.     The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty as set forth fully herein.

506.     The Chandler Trust Representatives and the Controlling Shareholders knew that the D&O Defendants had the fiduciary duties alleged herein.  To the extent that the Controlling Shareholders are determined not to be controlling shareholders with respect to the LBO, the Controlling Shareholders are nonetheless liable for aiding and abetting the D&O Defendants' fiduciary breaches as set forth herein.

507.     The Chandler Trust Representatives and the Controlling Shareholders colluded in or aided and abetted the D&O Defendants' breaches of fiduciary duties, and were active and knowing participants in those breaches of fiduciary duties by, among other things, (i) intentionally steering the D&O Defendants toward a corporate strategy aimed at enhancing the interests of the Controlling Shareholders at the expense of Tribune and its other stakeholders, (ii) interposing themselves in the Tribune Board's decision-making process and exerting undue influence over the D&O Defendants in connection with the LBO by, among other things, threatening the Board if it failed to pursue their desired course of action, and (iii) ensuring the

consummation of a transaction that the Chandler Trust Representatives and Controlling Shareholders knew was not in the interests of the Company.

508.    By and through the LBO, the Chandler Trust Representatives and the Controlling Shareholders received substantial proceeds for their Tribune stock that were funded by debt that rendered the Company insolvent.

509.    Tribune has been substantially damaged as a direct and proximate result of the actions of the Chandler Trust Representatives and the Controlling Shareholders in aiding and abetting the breaches of fiduciary duties set forth fully herein.

510.    Accordingly, Plaintiff is entitled to judgment against the Chandler Trust Representatives and the Controlling Shareholders jointly and severally, in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any amounts paid to the Chandler Trust Representatives and the Controlling Shareholders in connection with the LBO.

## COUNT SIXTEEN
### Aiding And Abetting Breach Of Fiduciary Duty Against VRC

511.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

512.    As officers and directors of Tribune, the D&O Defendants owed Tribune and its stockholders fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

513.    The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty as set forth fully herein.

514. VRC knew that the D&O Defendants had the fiduciary duties alleged herein.

515. VRC colluded in or aided and abetted the D&O Defendants' breaches of fiduciary duties, and was an active and knowing participant in those breaches of fiduciary duties, by, among other things:

a.  Agreeing to be engaged to provide solvency opinions, which were crucial to the consummation of the LBO, in the face of known and substantial risks that Tribune would be rendered insolvent as a result of the LBO and despite the prior refusal by Houlihan to accept the engagement;

b.  Colluding with certain of the Officer Defendants to manipulate the definition of fair value in VRC's solvency opinion, deviating from the legal and recognized industry standard definition of that term, where VRC and those Officer Defendants knew that a solvency analysis prepared in accordance with industry standards would show that the LBO would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due, and would have prevented the consummation of the LBO;

c.  Colluding with certain of the Officer Defendants to ignore the Step Two debt when issuing its Step One solvency opinion;

d.  Participating in meetings of the Tribune Board that were designed to push the LBO forward;

e.  Relying upon Tribune's February 2007 Projections for its Step One solvency opinion notwithstanding that those projections were patently unreasonable and that Tribune's actual financial performance had already deviated downward from plan by the time VRC issued its Step One opinion;

f.  Altering how it weighted its various valuation methodologies in order to facilitate findings of solvency at both Step One and Step Two;

g.  Relying upon Tribune's inflated October 2007 Projections for its Step Two solvency opinion notwithstanding that those projections were patently unreasonable;

h.  Ignoring its own internal analysis of Tribune management's assumptions and projections at Step Two, which demonstrated that Tribune's October 2007 Projections were inflated and unreliable;

i.  Failing to use reasonable professional judgment in reaching its solvency determinations;

j.  Failing to use appropriate valuation and financial practices in its solvency determinations;

k.    Ignoring or failing to give effect to information known by or made known or available to VRC that should have been considered under reasonable valuation and financial practices; and

l.    Being induced to provide solvency opinions that could not be justified in light of applicable professional standards.

516.    Tribune has been substantially damaged as a direct and proximate result of VRC's aiding and abetting the breaches of fiduciary duties set forth fully herein.  The D&O Defendants could not have consummated the LBO without the solvency opinions provided by VRC.

517.    Accordingly, Plaintiff is entitled to judgment against VRC in an amount to be determined at trial.

## COUNT SEVENTEEN
### Professional Malpractice Against VRC

518.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

519.    VRC was retained by Tribune to serve as one of Tribune's professional financial advisors in connection with the LBO and to, among other things, provide a series of solvency opinions with respect thereto.

520.    As Tribune's professional financial advisor, VRC had a duty to use the same degree of knowledge, skill, and ability as would an ordinarily careful professional in similar circumstances.

521.    VRC deviated from the standard of care expected of a professional financial advisor or solvency opinion provider under these circumstances, and acted in bad faith, engaged in willful misconduct, and/or was grossly negligent, by, among other things, taking the actions, or failing to act, as set forth in paragraph 515, which is incorporated herein by reference.

522.    Tribune has been substantially damaged as a direct and proximate result of VRC's professional malpractice, as set forth fully herein.  The D&O Defendants could not have consummated the LBO without the solvency opinions provided by VRC.

523.    Accordingly, Plaintiff is entitled to judgment against VRC in an amount to be determined at trial.

**COUNT EIGHTEEN**
**Avoidance And Recovery Of The VRC Transfers (Of At Least $1.5 Million) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against VRC**

524.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

525.    The VRC Transfers are the payments from Tribune to VRC for certain fees and expenses in connection with the LBO identified in Paragraph 89.

526.    The VRC Transfers were made within two years of the Petition Date.

527.    Tribune, by and through certain of its officers, directors, shareholders, and agents, made the VRC Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs 379 and 380, which are incorporated herein by reference.

528.    Tribune received less than reasonably equivalent value for the VRC Transfers, and Tribune (i) at the time of the VRC Transfers was insolvent or became insolvent as a result of the VRC Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

529.     Accordingly, the VRC Transfers were transfers in actual and constructive fraud of the rights of the creditors of Tribune and its subsidiaries, and the VRC Transfers should be avoided and recovered pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Bankruptcy Code.

## COUNT NINETEEN
### Aiding And Abetting Breach Of Fiduciary Duty
### Against GreatBanc And Duff & Phelps

530.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

531.     As officers and directors of Tribune, the D&O Defendants owed Tribune fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent as a result of the LBO, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

532.     The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty as set forth fully herein.

533.     GreatBanc and Duff & Phelps knew that the D&O Defendants had the fiduciary duties alleged herein.

534.     GreatBanc and Duff & Phelps knew that the D&O Defendants could not consummate the LBO without their participation.

535.     GreatBanc colluded in or aided and abetted the D&O Defendants' breaches of fiduciary duties, and was an active and knowing participant in those breaches of fiduciary duties by, among other things:

    a.     Participating in meetings of the Tribune Board that were designed to push the LBO forward;

b.	Executing the Merger Agreement and ESOP Purchase Agreement with knowledge that, under all applicable legal standards, the LBO would render Tribune insolvent;

c.	Purporting to rely on Duff & Phelps' fairness opinion, viability opinion, and supporting ESOP Analysis to justify its decision to approve the LBO, with knowledge that those opinions (i) did not conform to accepted legal standards for solvency analysis; (ii) used improper valuation techniques; and (iii) were based on information and assumptions that GreatBanc knew to be inaccurate;

d.	Voting all of the ESOP's shares in favor of the merger despite its knowledge that, to the extent Tribune was not already insolvent or operating in the zone of insolvency, the merger would render the Company insolvent;

e.	Failing to halt the merger in advance of closing despite its knowledge that, to the extent Tribune was not already insolvent or operating in the zone of insolvency, the closing of the merger would render Tribune insolvent;

f.	Failing to ensure that the LBO complied with applicable legal requirements; and

g.	Being induced to proceed with the LBO in the face of the aforementioned breaches.

536.	Duff & Phelps colluded in or aided and abetted the D&O Defendants' breaches of fiduciary duties, and was an active and knowing participant in those breaches of fiduciary duties by, among other things:

a.	Participating in meetings of the Tribune Board that were designed to push the LBO forward;

b.	Issuing an opinion to GreatBanc that the terms and conditions of the LBO were fair and reasonable to the ESOP from a financial point of view despite its knowledge that, under all applicable legal standards, the LBO would render Tribune insolvent;

c.	Issuing an opinion to GreatBanc as to the post-transaction viability of Tribune despite its knowledge that, under all applicable legal standards, the LBO would render Tribune insolvent;

d.	Rendering the fairness opinion, viability opinion, and supporting ESOP Analysis to GreatBanc with the intent that GreatBanc would purport to rely on those opinions and with knowledge that those opinions (i) did not conform to accepted legal standards for solvency analysis; (ii) used improper valuation techniques; and (iii) were based on information and assumptions that Duff & Phelps knew to be inaccurate; and

e. Being induced to proceed with the issuance of its opinions so that GreatBanc could approve and move forward with the LBO in the face of the aforementioned breaches.

537. Tribune has been substantially damaged as a direct and proximate result of GreatBanc's and Duff & Phelps' aiding and abetting the breaches of fiduciary duties set forth fully herein. The D&O Defendants could not have consummated the LBO without the approval and participation of GreatBanc on behalf of the ESOP. Moreover, GreatBanc's approval of the LBO was contingent upon its receipt of a fairness opinion, viability opinion, and supporting ESOP Analysis from Duff & Phelps.

538. Accordingly, Plaintiff is entitled to judgment against GreatBanc and Duff & Phelps in an amount to be determined at trial.

### COUNT TWENTY
**Avoidance And Recovery Of The Morgan Stanley Advisor Fees (At Least $10 Million) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against Morgan Stanley**

539. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

540. The Morgan Stanley Advisor Fees are the payments from Tribune to Morgan Stanley for certain fees and expenses identified in Paragraph 137.

541. By October 2006, the Company engaged Morgan Stanley to advise the Special Committee to the Tribune Board in connection with a potential financial transaction.

542. Pursuant to the Company's engagement of Morgan Stanley, Tribune transferred or caused to be transferred the Morgan Stanley Advisor Fees to Morgan Stanley.

543. The Morgan Stanley Advisor Fees were paid within two years of the Petition Date.

544.     Tribune, by and through certain of its officers, directors, shareholders, and agents, transferred the Morgan Stanley Advisor Fees with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs 379 and 380, which are incorporated herein by reference.

545.     Tribune received less than reasonably equivalent value for the Morgan Stanley Advisor Fees, and Tribune, at the time of the payment of the Morgan Stanley Advisor Fees, was (i) insolvent or became insolvent as a result of the Morgan Stanley Advisor Fees; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

546.     Accordingly, payment of the Morgan Stanley Advisor Fees was a transfer in fraud of the rights of the creditors of Tribune and its subsidiaries, and the payment of the Morgan Stanley Advisor Fees should be avoided and recovered pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Bankruptcy Code.

**COUNT TWENTY ONE**
**Aiding And Abetting Breach Of Fiduciary Duty**
**Against Morgan Stanley**

547.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

548.     As officers and directors of Tribune, the D&O Defendants owed Tribune fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent by the LBO, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

549.     The D&O Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty as set forth fully herein.

550.     The Company's management, including Bigelow and Grenesko, acting both individually and collectively, further failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty as set forth fully herein.

551.     Morgan Stanley knew that the Company's officers and directors had the fiduciary duties alleged herein.

552.     Morgan Stanley, as a professional financial adviser to the Company and Special Committee, had an obligation to advise them of facts relevant to the scope of its engagement, including facts bearing on the likelihood that the LBO would render the Company insolvent. Morgan Stanley colluded in or aided and abetted the breaches of fiduciary duties by the D&O Defendants, and was an active and knowing participant in those breaches of fiduciary duties by, among other things:

a.     Advising the Special Committee on the LBO when it stood to gain substantially more if the LBO proceeded than if no transaction were consummated;

b.     Recommending and supporting the LBO in its role as a professional financial advisor to the Company when it knew that the LBO would or was highly likely to render Tribune insolvent; and

c.     Failing to disclose to the Tribune Board or Special Committee (i) that the LBO would or was highly likely to render the Company insolvent; (ii) Morgan Stanley's internal valuations of the Company showing that Tribune would be insolvent after Step Two under certain reasonable assumptions; and (iii) that Morgan Stanley was unable to make a representation as to Tribune's ability to refinance the LBO Debt and that the representations by Bigelow and/or Grenesko to VRC that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO Debt were incorrect.

553.    Morgan Stanley's actions were grossly negligent.  In recommending and supporting the LBO, Morgan Stanley failed to exercise even slight care and acted in such a way as to show complete disregard for the rights and safety of others.

554.    The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's aiding and abetting the breaches of fiduciary duties set forth herein.

555.    Accordingly, Plaintiff is entitled to recover damages from Morgan Stanley in an amount to be determined at trial.

## COUNT TWENTY TWO
### Professional Malpractice Against Morgan Stanley

556.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

557.    Morgan Stanley agreed to provide professional financial advice to the Special Committee in connection with the LBO, including whether to pursue a transaction, and what form of transaction to pursue, and to the Company in connection with Step Two, including advice on negotiations with the LBO Lenders and advice concerning VRC's solvency opinions, and continued to provide advice to the Special Committee in connection with Step Two.

558.    In providing professional financial advice to the Company and the Special Committee, Morgan Stanley had a duty to use the same degree of knowledge, skill, and ability as would an ordinarily prudent professional in similar circumstances.

559.    Morgan Stanley deviated from the standard of care expected of a professional financial advisor under these circumstances, and, in fact, failed to exercise even slight care in rendering financial advice to the Company.  Morgan Stanley was grossly negligent by, among other things, taking the actions, or failing to act, as set forth in paragraph 552, which incorporated herein by reference.

560. The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's professional malpractice set forth fully herein.

561. Accordingly, Plaintiff is entitled to judgment against Morgan Stanley for damages in an amount to be determined at trial.

## COUNT TWENTY THREE
### Preference Against Morgan Stanley To Recover
### The Morgan Stanley Reimbursement (Of At Least $46,020)

562. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

563. The Morgan Stanley Reimbursement is the payment from Tribune to Morgan Stanley for certain expenses purportedly incurred by Morgan Stanley identified in Paragraph 371.

564. The Morgan Stanley Reimbursement was made to Morgan Stanley within 90 days of the Petition Date.

565. The Morgan Stanley Reimbursement was made for the benefit of Morgan Stanley, for or on account of antecedent debt and made while Tribune was insolvent.

566. The Morgan Stanley Reimbursement enabled Morgan Stanley to receive more than it would have received if (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Morgan Stanley Reimbursement had not been made; and (iii) Morgan Stanley received payment of its debts under the provisions of the Bankruptcy Code.

567. Accordingly, the Morgan Stanley Reimbursement should be avoided and recovered pursuant to Sections 547(b) and 550(a) of the Bankruptcy Code.

## COUNT TWENTY FOUR
## Fraud/Insider Trading Against Morgan Stanley

568.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

569.     Morgan Stanley was engaged by the Company to advise the Special Committee and the Company as a financial advisor.  In that capacity, Morgan Stanley knew it would receive, and did receive, highly confidential financial information concerning the Company, including internal financial projections and information concerning bankruptcy planning.

570.     In its role as financial advisor to the Company and Special Committee, Morgan Stanley occupied a special position of trust and confidence in relation to the Company and in the conduct of the Company's business.  Accordingly, by virtue of its position, Morgan Stanley had a duty to maintain the confidentiality of non-public information the Company provided to it solely for corporate purposes, and a duty not to use such information for its own financial benefit.

571.     Morgan Stanley used that confidential financial information to prepare analyses of the solvency of the Company and concluded that under certain assumptions, the LBO would render the Company insolvent.

572.     Tribune had a reasonable expectation that Morgan Stanley would maintain the confidentiality of such non-public information.  Tribune provided Morgan Stanley with such information in reliance on Morgan Stanley's not misusing the Company's non-public information to the Company's detriment or for Morgan Stanley's benefit.

573.     Morgan Stanley breached its duty to the Company and engaged in fraud, as detailed above, by inducing the Company to provide Morgan Stanley, as an inside advisor to the Company, with material non-public information, then knowingly or recklessly using such information concerning the likelihood that Tribune would file for bankruptcy in deciding to

purchase Tribune 7.5% Debentures in April and November 2008 and in transferring those debentures and previously purchased debentures to MSCS. When it made these purchases and transfers, Morgan Stanley knew that, in the event of a Company bankruptcy, it would attempt to set off the face amount of the debentures against MSCS's obligations under the Swap Agreement and stood to make enormous profits as a result—more than seven times its investment with respect to the debentures purchased in November.

574. Morgan Stanley's fraud, breach of duty, and insider trading injured the Company because it caused the Company to receive substantially less in a final payment under the Swap Agreement from Morgan Stanley.

575. Accordingly, Plaintiff is entitled to recover damages from Morgan Stanley in an amount to be determined at trial.

## COUNT TWENTY FIVE
### Breach Of Fiduciary Duty Against Morgan Stanley

576. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

577. As described above, Morgan Stanley was engaged by the Company in 2006 as a financial advisor to advise the Special Committee with respect to various issues relating to the LBO and other potential restructuring transactions, including issues concerning the solvency of the Company assuming completion of the LBO. In late 2007, Morgan Stanley also agreed to advise the Company with respect to various issues relating to the LBO. In its role as financial advisor to the Company and Special Committee from 2006 to 2007, and as financial advisor to the Company in 2008, Morgan Stanley occupied a special position of trust and confidence in relation to the Company and in the conduct of the Company's business and thereby owed fiduciary obligations to the Company and the Special Committee, including the duty of loyalty.

578.     Morgan Stanley breached its duty of loyalty to the Company and Special Committee by taking the actions, or failing to act, as set forth in paragraphs 552, which is incorporated herein by reference.

579.     The Company provided Morgan Stanley, in its capacity as financial advisor, with highly confidential financial information concerning the Company, including internal financial projections and information concerning bankruptcy planning.

580.     As part of its duty of loyalty, Morgan Stanley had an express or implied duty not to misuse non-public information the Company provided to it in its role as financial advisor for its own financial benefit and to the Company's detriment.

581.     Morgan Stanley also breached its fiduciary duty of loyalty by engaging in insider trading.

582.     Morgan Stanley used confidential information concerning the likelihood that Tribune would file for bankruptcy in deciding to purchase Tribune 7.5% Debentures in April and November 2008 for its own financial benefit and to the Company's detriment.  When it made these purchases, Morgan Stanley knew that it would transfer the debentures to MSCS so that it could, in the event of a Company bankruptcy, set off the face amount of the debentures against MSCS's obligations under the Swap Agreement and make enormous profits as a result—more than seven times its investment with respect to the debentures purchased in November.  Because Morgan Stanley had confidential information from Tribune on the Company's financial predicament, Morgan Stanley could and did decide to buy the Debentures when it did with confidence that it would profit as a result.

583.     The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's breaches of fiduciary duties set forth herein.

584.     Accordingly, Plaintiff is entitled to recover damages from Morgan Stanley in an amount to be determined at trial.

## COUNT TWENTY SIX
### Aiding And Abetting Breach Of Fiduciary Duty Against MSCS

585.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

586.     MSCS colluded in or aided and abetted the breach of fiduciary duties by Morgan Stanley, and was an active and knowing participant in those breaches of fiduciary duties by, among other things, (a) receiving an assignment or transfer of Tribune 7.5% Debentures purchased by Morgan Stanley for the purpose of utilizing them to offset amounts owing to the Company under the Swap Agreement in the event of a Company bankruptcy, and (b) offsetting such amounts after the Company commenced its bankruptcy case.

587.     The Company has been substantially damaged as a direct and proximate result of MSCS's aiding and abetting the breaches of fiduciary duties set forth herein.

588.     Accordingly, Plaintiff is entitled to judgment against MSCS for damages in an amount to be determined at trial.

## COUNT TWENTY SEVEN
### Breach Of Contract, Including Breach Of Covenant
### Of Good Faith And Fair Dealing, Against MSCS

589.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

590.     The Swap Agreement, entered into between MSCS and The Times Mirror Company, a predecessor to the Company, is a binding and enforceable agreement.

591.     The Company and its predecessors performed their obligations under the Swap Agreement.

592.     MSCS breached the Swap Agreement by acquiring in bad faith the Tribune 7.5% Debentures from Morgan Stanley for the sole purpose of setting them off against the amount that MSCS would owe to the Company under the Swap Agreement.  This action by MSCS was done in bad faith and constitutes a breach of the duty of good faith and fair dealing inherent in every contract, including the Swap Agreement.  MSCS's subsequent assertion of a right of setoff constitutes an additional breach of the covenant of good faith and fair dealing.

593.     The Company has been substantially damaged as a result of these breaches.

594.     Accordingly, Plaintiff is entitled to recover damages from MSCS in an amount to be determined at trial.

**COUNT TWENTY EIGHT**
**Willful Violation Of The Automatic Stay Against MSCS**

595.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

596.     With full knowledge of Tribune's Chapter 11 case, MSCS willfully violated the automatic stay under Section 362(a)(7) of the Bankruptcy Code by offsetting the amount of the Tribune 7.5% Debentures purchased by Morgan Stanley and thereafter transferred to MSCS against amounts owed by MSCS to the Company under the Swap Agreement.

597.     MSCS's violation of the automatic stay caused Tribune to incur actual damages, including costs and attorneys' fees.

598.     Accordingly, Plaintiff is entitled to judgment against MSCS for damages in an amount to be determined at trial, plus costs and attorneys' fees.

## COUNT TWENTY NINE
## Equitable Subordination And Disallowance Of The MSCS Claim And Denial Of Setoff Against MSCS

599.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

600.     MSCS acted inequitably in aiding and abetting Morgan Stanley in its breach of fiduciary duties and by willfully violating the automatic stay to effect a setoff of amounts owed under the Swap Agreement.  The Company's stakeholders, including creditors, were injured as a result.

601.     MSCS is affiliated with Morgan Stanley, which is an insider of the Company as a result of its engagement as a financial advisor to Tribune and the Special Committee and by its possession of material non-public information about the Company's financial predicament.

602.     The purchase of Tribune 7.5% Debentures by Morgan Stanley and the transfer of those Debentures by Morgan Stanley to MSCS was a coordinated scheme by two affiliates that sought to allow an affiliated non-insider to prosper as a result of an insider's acts.  Accordingly, equity dictates that MSCS be treated as an insider as well.

603.     Equitable subordination and disallowance of the MSCS Claim is consistent with the provisions and purposes of the Bankruptcy Code.

604.     Accordingly, the MSCS Claim should be equitably subordinated and/or disallowed, and MSCS's setoff denied.

## COUNT THIRTY
## Turnover To Recover Under The Swap Agreement (Of At Least $59.6 Million) Against MSCS

605.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

606.     MSCS owes a matured and payable debt to the Company of at least $59.6 million under the Swap Agreement that is property of the estate and not susceptible to setoff.

607.     Accordingly, MSCS should pay that debt without further delay.

## COUNT THIRTY ONE
### Unjust Enrichment Against The D&O Defendants, Subsidiary D&O Defendants, Controlling Shareholders, Zell Defendants, Tower Defendants, VRC, GreatBanc, Duff & Phelps, And Morgan Stanley

608.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

609.     By virtue of their own wrongful acts and omissions, and through the wrongful receipt of payments and distributions from Tribune at a time when Tribune was insolvent or became insolvent as a result of the LBO, the D&O Defendants, the Subsidiary D&O Defendants, Controlling Shareholders, Zell Defendants, Tower Defendants, VRC, GreatBanc, Duff & Phelps, and Morgan Stanley have unjustly retained cash, credit, and other things of value that belong to Tribune, their retention of which violates fundamental principles of justice, equity, and good conscience.

610.     The Subsidiary D&O Defendants, Controlling Shareholders, Zell Defendants, Tower Defendants, VRC, GreatBanc, Duff & Phelps, and Morgan Stanley are therefore liable to Tribune for unjust enrichment.

611.     Plaintiff seeks restitution from these defendants and an order of this Court disgorging all payments, transfers, credit, profits, fees, benefits, incentives, and other things of value obtained by the defendants as a result of their wrongful conduct and breaches of fiduciary duties.

612. By virtue of the foregoing, these defendants are liable to reimburse Tribune by the amount of the payments, profits, fees, benefits, incentives, and other compensation they received in connection with the LBO.

**COUNT THIRTY TWO**
**Recharacterization Of The Exchangeable Note As Equity**
**Pursuant To 11 U.S.C. § 105**

613. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

614. EGI-TRB contributed $200 million to Tribune in exchange for the Exchangeable Note. EGI-TRB was not a true creditor nor was the Exchangeable Note a true debt instrument. As reflected in Tribune's April 2, 2007 press release and Tribune's internal documents, this money was an "invest[ment]" by Zell in Tribune, which was intended to be used to pay shareholders who tendered their shares at Step One of the LBO. This money was in fact used to pay shareholders who tendered their shares at Step One of the LBO and to cover fees associated with Step One.

615. EGI-TRB was a holder of both the Exchangeable Note and 1,470,588 shares of Tribune stock.

616. The Exchangeable Note was unsecured and subordinated to the right of payment to all "Senior Obligations," which term was defined therein as "all obligations, indebtedness and other liabilities of [Tribune] other [than] any such obligations, indebtedness or liabilities that by its express terms ranks pari passu or junior to [Tribune's] obligations under this Note, in each case, whether incurred on or prior to the date hereof or hereafter incurred." The Exchangeable Note was thus subordinate to all of the debt incurred by Tribune in connection with the LBO.

617. The Exchangeable Note had no fixed date of maturity and did not provide a fixed schedule of payments of principal.

618.     The Exchangeable Note provided for interest to be paid at an annual rate of 4.81% per annum, but interest payments were to be made, on a quarterly basis, if and only if Tribune's senior indebtedness was retired.  The Exchangeable Note therefore did not provide for the regular payment of interest because payment of interest was conditioned on the repayment of senior obligations, which was not expected to occur and did not occur during the term of the Exchangeable Note.

619.     Tribune had the option to exchange any portion of the outstanding principal amount owed on the Exchangeable Note for shares of Tribune stock at any time.  If Step Two of the LBO failed to close, the outstanding principal amount owed on the Exchangeable Note would be automatically exchanged for shares of Tribune stock without any further action by Tribune or EGI-TRB.  Repayment of the principal and accrued interest was only required upon, and was therefore dependent upon, the success of the LBO.

620.     The amount paid or credited by Tribune to EGI-TRB in exchange for the Exchangeable Note was based upon the price that would have been paid to EGI-TRB had the Exchangeable Note been converted to stock and the stock redeemed by Tribune.

621.     The Exchangeable Note was a *sui generis* instrument tailored to Zell's and EGI-TRB's participation in the LBO, and under the circumstances a reasonable outside creditor would not have made a loan to the Company on similar terms.

622.     The proceeds that the Company received in return for the Exchangeable Note were used to finance and pay fees for the LBO, rather than to finance the Company's ordinary business.

623.     No sinking fund was established in connection with the Exchangeable Note.

624.     Based on the real nature of the Exchangeable Note, the Exchangeable Note should be recharacterized as equity pursuant to Section 105 of the Bankruptcy Code.

### COUNT THIRTY THREE
### Equitable Subordination And Disallowance Of The D&O Creditor
### Claims, Subsidiary Creditor Claims, Zell Claims,
### EGI-TRB Claims, And Tower Claims

625.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

626.     The D&O Defendants, the Subsidiary D&O Defendants, Zell, EGI-TRB, and the Tower Defendants were insiders as defined by Section 101(31) of the Bankruptcy Code at the time of the transaction.

627.     None of the D&O Defendants, Subsidiary D&O Defendants, Zell Defendants, EGI-TRB, or Tower Defendants have paid the amount, or turned over any property, for which any such defendant is liable.

628.     The D&O Defendants, Subsidiary D&O Defendants, and Zell Defendants engaged in a pattern of misconduct designed to enrich themselves at the expense of Tribune, the Subsidiary Guarantors, and their stakeholders, including creditors, by, among other things:

   a.     Approving the LBO, and permitting Steps One and Two to close even though they knew, or were reckless or grossly negligent in not knowing, that the LBO would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

   b.     Failing, at every stage of the LBO, to adequately analyze the impact that the LBO would have on the Company and those parties who would continue to be creditors and/or constituents of the Company, and voting in favor of and/or advocating for the LBO, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that it would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

   c.     Advocating for and facilitating consummation of Step Two of the imprudent and highly leveraged LBO that rendered Tribune insolvent, and knowingly, recklessly, grossly negligently, and/or willfully blindly disregarding the foreseeable disastrous consequences of the LBO; and

d.   Succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO, which benefited the Controlling Shareholders, the D&O Defendants, the Subsidiary D&O Defendants, and Zell Defendants, but was detrimental to the Company and those parties who would continue to be creditors and/or constituents of the Company.

629.   The misconduct of the D&O Defendants, Subsidiary D&O Defendants, and Zell Defendants described herein was inequitable, and resulted in injury to Tribune's and the Subsidiary Guarantors' stakeholders, including creditors.

630.   EGI-TRB and the Tower Defendants knew, or were reckless or grossly negligent in not knowing, of the inequitable misconduct of the D&O Defendants, Subsidiary D&O Defendants, and Zell Defendants described herein, and that such misconduct would result in injury to Tribune's and the Subsidiary Guarantors' stakeholders, including creditors.

631.   Any claims arising from the Subordinated Note, including principal and interest, and all other obligations and liabilities of Tribune to EGI-TRB or the Tower Defendants, are contractually subordinate and junior to all obligations, indebtedness and other liabilities of Tribune with certain inapplicable exceptions.  To the extent that any such claims are not already fully contractually subordinated, however, they should be equitably subordinated to all other claims, and/or disallowed.

632.   Because EGI-TRB assigned minority interests in the Subordinated Note to the Tower Defendants, EGI-TRB thereby assigned the Tower Claims to the Tower Defendants.  If the Tower Claims had not been assigned to the Tower Defendants—and instead had been asserted by, on behalf of, or for the benefit of EGI-TRB—each Tower Creditor Claim would have been subject to equitable subordination and disallowance pursuant to Sections 510(c) and 502(d), respectively, of the Bankruptcy Code.  Thus, each Tower Creditor Claim should be equitably subordinated and/or disallowed to the same extent that it would have been had EGI-TRB not assigned the Tower Claims and, instead, continued to hold such claims.

633.    Equitable subordination and disallowance of the D&O Creditor Claims,

Subsidiary Creditor Claims, Zell Claims, EGI-TRB Claims, and Tower Claims is consistent with

the provisions and purposes of the Bankruptcy Code.

634.    Accordingly, the D&O Creditor Claims, Subsidiary Creditor Claims, Zell Claims,

EGI-TRB Claims, and Tower Claims should be equitably subordinated and/or disallowed.

**COUNT THIRTY FOUR**
**Avoidance And Recovery Of The Insider Payments (Of At Least $81 Million) As**
**Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B)**
**And 550(a) Of The Bankruptcy Code Against The Defendants**
**Listed Herein And In Exhibit C**

635.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing

paragraphs as though fully set forth herein.

636.    The D&O Defendants, the Subsidiary D&O Defendants, and the Additional

Officer Recipients were insiders as defined by Section 101(31) of the Bankruptcy Code at the

time of the transaction.

637.    The Insider Payments are the Executive Transition Payments, Phantom Equity

Payments, and Success Bonus Payments that the defendants listed herein and on Exhibit C

received in connection with the LBO.

638.     Within two years before the Petition Date, Tribune:  (i) incurred or reaffirmed the

obligations to make the Insider Payments listed on Exhibit C; and (ii) made the Insider Payments

summarized below and detailed in Exhibit C.

| Recipient | Total Insider Payments Received |
|---|---|
| Amsden | $150,000 |
| Bigelow | $709,825 |
| FitzSimons | $18,850,800 |
| Gremillion | $250,000 |
| Grenesko | $9,591,707 |
| Hianik | $175,000 |
| Hiller | $8,708,843 |
| Kazan | $626,226 |
| Kenney | $600,000 |
| Knight | $5,553,513 |
| Landon | $5,261,105 |
| Leach | $6,102,303 |
| Lewin | $3,359,821 |
| Mallory | $1,053,500 |
| Malone | $1,200,000 |
| Reardon | $7,672,605 |
| Smith | $9,214,806 |
| Vitanovec | $4,950,166 |
| Waltz | $2,153,467 |
| **Total** | **$86,183,687** |

639.     Tribune, by and through certain of its officers, directors, shareholders, and agents,

incurred or reaffirmed the obligations to make the Insider Payments and made the Insider

Payments with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is

demonstrated by, among other things, the facts set forth in Paragraphs 379 and 380, which are

incorporated herein by reference.

640.     Tribune received less than reasonably equivalent value for incurring or

reaffirming the obligations to make the Insider Payments and making the Insider Payments, and

Tribune, at the time of the Insider Payments, (i) was insolvent or became insolvent as a result of

incurring or reaffirming the obligations to make the Insider Payments and making the Insider Payments; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

641. Accordingly, the obligations to make the Insider Payments, as well as the Insider Payments themselves, were transfers in fraud of the rights of the creditors of Tribune and its subsidiaries, and the obligations to make the Insider Payments, and the Insider Payments themselves, should be avoided and recovered pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Bankruptcy Code.

## COUNT THIRTY FIVE
**Preference Against The D&O Defendants, The Subsidiary D&O Defendants, And The Additional Officer Recipients To Recover The Insider Payments (Of At Least $81 Million)**

642. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

643. The D&O Defendants, the Subsidiary D&O Defendants, and the Additional Officer Recipients were insiders as defined by Section 101(31) of the Bankruptcy Code at the time of the transaction.

644. Tribune made the Insider Payments listed on Exhibit C to the D&O Defendants, Subsidiary D&O Defendants, and the Additional Officer Recipients within one year of the Petition Date.

645. On or within one year before the Petition Date, Tribune continued to operate its business affairs, including by transferring property either by checks, cashier checks, wire transfers, direct deposit, or otherwise to certain entities.

646.     At the time the Insider Payments were made, to the extent any of the D&O Defendants, Subsidiary D&O Defendants, or the Additional Officer Recipients gave reasonably equivalent value to Tribune in exchange for his or her Insider Payment, in full or in part, the D&O Defendants, the Subsidiary D&O Defendants, and the Additional Officer Recipients each had a right to payment on account of a compensation obligation owed to each such defendant by Tribune in the amounts listed on Exhibit C.  Therefore, the Insider Payments were for, or on account of, antecedent debts owed before the Insider Payments were made.  The Insider Payments were made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because the Insider Payments either reduced or fully satisfied a debt then owed to the D&O Defendants, the Subsidiary D&O Defendants, and the Additional Officer Recipients, and were made while Tribune was insolvent.

647.     As a result of the Insider Payments, the D&O Defendants, the Subsidiary D&O Defendants, and the Additional Officer Recipients each received more than he or she would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Insider Payments had not been made; and (iii) each of the D&O Defendants, the Subsidiary D&O Defendants, and the Additional Officer Recipients received payment of his or her debts under the provisions of the Bankruptcy Code.

648.     Accordingly, the Insider Payments should be avoided and recovered pursuant to Sections 547 and 550 of the Bankruptcy Code.

### COUNT THIRTY SIX
**Avoidance Of The Indemnification Obligations As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against The D&O Defendants, The Subsidiary D&O Defendants, And The Additional Officer Recipients**

649.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

650.     The Merger Agreement expressly provided that the surviving company—not just pre-LBO Tribune—was obligated to indemnify Tribune's directors and officers against any costs or expenses, judgments, fines, losses, claims, damages, liabilities, and amounts paid in settlement in connection with any actual or threatened claim, action, suit, proceeding, or investigation, whether civil, criminal, administrative, or investigative, arising out of, relating to, or in connection with any action or omission occurring or alleged to have occurred in connection with the LBO (the "Indemnification Obligations").

651.     Tribune and its successors received less than reasonably equivalent value in exchange for incurring the Indemnification Obligations, and Tribune, at the time the Indemnification Obligations were incurred, (i) was insolvent or became insolvent as a result of incurring the Indemnification Obligations; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

652.     Tribune, by and through certain of its officers, directors, shareholders, and agents, incurred the Indemnification Obligations with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs 379 and 380, which are incorporated herein by reference.

653.     Accordingly, the Indemnification Obligations were incurred in actual and constructive fraud of the rights of the creditors of Tribune and its subsidiaries, and the Indemnification Obligations should be avoided pursuant to Sections 548(a)(1)(A) and 548(a)(1)(B) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

654.     The Litigation Trustee reserves the right, to the extent permitted under the Bankruptcy Code, the Federal Rules of Civil or Bankruptcy Procedure, or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtors and their estates against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

(a)     certifying the Shareholder Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     awarding Plaintiff damages in an amount to be determined at trial;

(c)     declaring each of the Shareholder Transfers to be a transfer or incurrence of an obligation in actual fraud of the rights of the creditors of Tribune and its subsidiaries and/or a transfer that preferred certain creditors to the detriment of others;

(d)     declaring each of the VRC Transfers, EGI-TRB Transfers, EGI Reimbursements, Morgan Stanley Advisor Fees, Morgan Stanley Reimbursement, Indemnification Obligations, and Insider Payments to be a transfer or incurrence of an obligation in actual and/or constructive fraud of the rights of the creditors of Tribune and its subsidiaries and/or a transfer that preferred certain creditors to the detriment of others;

(e)     avoiding and/or granting recovery of all amounts paid and/or obligations incurred in connection with the Shareholder Transfers, VRC Transfers, EGI-TRB Transfers, EGI Reimbursements, Morgan Stanley Advisor Fees, Morgan Stanley Reimbursement, Indemnification Obligations, and Insider Payments pursuant to Bankruptcy Code Sections 547 and/or 548 and/or 550;

(f)     imposing a constructive trust on assets of the defendants in the amount of all proceeds received by each such defendant in connection with the LBO;

(g)     recharacterizing the Exchangeable Note as equity;

(h)     equitably subordinating and disallowing the MSCS Claim, the D&O Creditor Claims, Subsidiary Creditor Claims, Zell Claims, EGI-TRB Claims, and Tower Claims;

(i)     denying the MSCS setoff and ordering the payment of MSCS's Swap Agreement debt;

(j)     awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(k)     awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(l)     awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: August 1, 2013
       New York, New York

Lawrence S. Robbins
Michael L. Waldman
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
(202) 775-4500
lrobbins@robbinsrussell.com
mwaldman@robbinsrussell.com

*Counsel for the Tribune Litigation Trust with respect to claims against all defendants except Bank of America and any of its affiliates in their*

192

*individual and custodial capacities, The Bank of New York Mellon Corporation and any of its affiliates in their individual and custodial capacities, Duff & Phelps, LLC, Fidelity Management Trust Co. and any of its affiliates in their individual and custodial capacities, GreatBanc Trust Company, David Dean Hiller, Intel Corporation, Liberty Mutual Insurance Co., Merrill Lynch & Co., Inc. and any of its affiliates in their individual and custodial capacities, Morgan Stanley & Co. LLC and any of its affiliates in their individual and custodial capacities, Morgan Stanley Capital Services, Inc. and any of its affiliates in their individual and custodial capacities, Perry Partners L.P., TD Bank, NA, UBS AG and any of its affiliates in their individual and custodial capacities, UBS SA and any of its affiliates in their individual and custodial capacities, and Valuation Research Corporation*

Robert J. Lack
Hal Neier
Amy C. Brown
Jeffrey R. Wang
FRIEDMAN KAPLAN SEILER
& ADELMAN LLP
7 Times Square
New York, NY 10036-6516
(212) 833-1100
rlack@fklaw.com
hneier@fklaw.com
abrown@fklaw.com
jwang@fklaw.com

*Counsel for the Tribune Litigation Trust with respect to claims against GreatBanc Trust Company, Duff & Phelps, LLC, Valuation Research Corporation, Morgan Stanley & Co. LLC, Morgan Stanley Capital Services, Inc., and those defendants with respect to which "FKSA" is identified as "LT Counsel" in Exhibit A*

David M. Zensky
Mitchell Hurley
Deborah J. Newman
AKIN GUMP STRAUSS HAUER & FELD
LLP
One Bryant Park
New York, NY 10036
(212) 872-1000
dzensky@akingump.com
mhurley@akingrump.com
djnewman@akingump.com

*Counsel for the Tribune Litigation Trust with
respect to claims against Dennis J. FitzSimons,
Enrique Hernandez Jr., Betsy D. Holden, Robert
S. Morrison, William A. Osborn, J. Christopher
Reyes, Dudley S. Taft, Jeffrey Chandler, Roger
Goodan, William Stinehart Jr., Chandler
Bigelow, Donald C. Grenesko, Mark W. Hianik,
Daniel G. Kazan, Crane H. Kenney, Thomas D.
Leach, Luis E. Lewin, R. Mark Mallory, Harry
Amsden, Stephen D. Carver, Thomas S. Finke,
Robert Gremillion, David Dean Hiller, Timothy
P. Knight, Timothy J. Landon, Richard H.
Malone, Durham J. Monsma, Irving L. Quimby,
John E. Reardon, Scott C. Smith, John J.
Vitanovec, Kathleen M. Waltz, David D.
Williams, John D. Worthington IV, Samuel Zell,
Equity Group Investments, L.L.C., EGI-TRB,
L.L.C., Sam Investment Trust, Tower CH, L.L.C.,
Tower DC, L.L.C., Tower DL, L.L.C., Tower EH,
L.L.C., Tower Greenspun DGSPT, LLC, Tower
Greenspun JGGSTP, LLC, Tower Greenspun
SGFFT, LLC, Tower Greenspun, L.L.C., Tower
HZ, L.L.C., Tower JB, L.L.C., Tower JK, L.L.C.,
Tower JP, L.L.C., Tower JS, L.L.C., Tower KS,
L.L.C., Tower LL, L.L.C., Tower LM, L.L.C.,
Tower LZ, L.L.C., Tower MH, L.L.C., Tower MS,
L.L.C., Tower MZ, L.L.C., Tower NL, L.L.C.,
Tower PH, L.L.C., Tower PT, L.L.C., Tower SF,
L.L.C., Tower TT, L.L.C., Tower VC, L.L.C.,*

*Tower WP, L.L.C., Chandler Trust No. 1,
Chandler Trust No. 2,  Philip Chandler
Residuary Trust No. 2, May C. Goodan Trust
No. 2, Ruth C. Von Platen Trust No. 2, Dorothy
B. Chandler Marital Trust No. 2, Dorothy B.
Chandler Residuary Trust No. 2, HOC Trust
No. 2 FBO Scott Haskins, HOC Trust No. 2 FBO
John Haskins, HOC Trust No. 2 FBO Eliza
Haskins, HOC GST Exempt Trust No. 2. FBO
Scott Haskins, HOC GST Exempt Trust No. 2.
FBO John Haskins, HOC GST Exempt Trust No.
2. FBO Eliza Haskins, Alberta W. Chandler
Marital Trust No. 2, Earl E. Crowe Trust No. 2,
Patricia Crowe Warren Residuary Trust No. 2,
Helen Garland Trust No. 2 (For Gwendolyn
Garland Babcock), Helen Garland Trust No. 2
(For William M. Garland III), Helen Garland
Trust No. 2 (For Hillary Duque Garland),
Garland Foundation Trust No. 2, Marian Otis
Chandler Trust No. 2, Robert R. McCormick
Foundation, Cantigny Foundation, Automobile
Mechanics' Local 701 Pension Fund a/k/a
Automobile Mechanics' Local No. 701 Union
and Industry Pension Fund, Frank W. Denius,
The DFA Investment Trust Company, GDK Inc.,
Hussman Strategic Growth Fund a/k/a The
Hussman Investment Trust, John P. Hussman,
Trustee, Edwin R Labuz IRA, Ameriprise Trust
Company f/k/a H&R Block Financial Advisors,
Custodian, Denise Meck, Nationwide S&P 500
Index Fund, a Series of Nationwide Mutual
Funds, New York State Teachers Retirement
System, Dorothy C. Patterson Irrevocable Trust
#2 U/A/D 12-21-93, The Northern Trust
Company, as Successor Trustee, Blandina Rojek,
VTrader Pro, LLC, and those defendants with
respect to which "Akin" is identified as "LT
Counsel" in Exhibit A*

David S. Rosner
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
Paul J. Burgo
KASOWITZ BENSON TORRES &
FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
drosner@kasowitz.com
skorpus@kasowitz.com
cmontenegro@kasowitz.com
mstein@kasowitz.com
pburgo@kasowitz.com

*Counsel for the Tribune Litigation Trust with respect to claims against those defendants with respect to which "Kasowitz" is identified as "LT Counsel" in Exhibit A*

**EXHIBIT A TO THE FIFTH AMENDED COMPLAINT**

**REDACTED**

# EXHIBIT A-1

1173132 ONTARIO INC

1199SEIU GREATER NY PENSION FUND LCV

1199SEIU HEALTH CARE EMPLOYEES PENSION FUND

1199SEIU HEALTHCARE EMPLOYEES PENSION FUND MCV

1199SEIU HOME CARE EMPLOYEES PENSION FUND

1980 CHARITABLE LEAD TRUST, BANK OF AMERICA, N.A., TRUSTEE

1993 GF PARTNERSHIP #4 G-BAR

1994 GREGG CHILDRENS TRUST U/A 04/29/94, WILL R GREGG IV, ALLEN DANDRIDGE GREGG, TRUSTEES

1998 CLARKE FAMILY TRUST UA DTD 2/12/98, RANDALL W CLARKE, TINA LIN CLARKE, TRUSTEES

1ST SOURCE BANK

2005 EDWARD K NEWMAN REVOCABLE TRUST U/A/D 04-14-2005, EDWARD K NEWMAN, TRUSTEE

21ST CENTURY EQUITY FUND

3GT INVESTMENT PARTNERSHIP

3M EMPLOYEES WELFARE BENEFITS ASSOCIATION TRUST I, CURRENT TRUSTEE

A & P ASSOCIATES SB ADVISOR

A E OSBORNE ASSOCIATES

A ERICKSON SHUSTER AND VIRGINIA G SHUSTER

A GOOD NEIGHBOR FOUNDATION

A J CAPONE TRUST B U/W FBO CELIA, CURRENT TRUSTEE

A R TRUST U/A DTD 09/15/ FBO AGNES STELLA NELTNER, ANGES S NELTNER, ANTHONY W NELTNER, MARY RIESENBECK, TRUSTEES

A RICHARD HERSUM 1995 TRUST U/A 10/3/95, LOUISE HERSUM, A RICHARD HERSUM, TRUSTEES

A.G. EDWARDS & SONS, LLC

A.G. EDWARDS TRUST COMPANY, FSB

AAA FRIENDS IN ADOPTION FOUNDATION TRUST, GEORGE H. LONG, DAWN SMITH-PLINER, TRUSTEES

AAR CORPORATION TRUST F/B/O IRA EICHNER, THE NORTHERN TRUST COMPANY, TRUSTEE

ABBEY EQUITY FUND ICVC SUB, THE ROYAL BANK OF SCOTLAND PLC, AS HOLDER OF ACCOUNTS

ABBEY NATIONAL SECURITIES, INC.

ABBOTT LABORATORIES CONSOLIDATED PENSION TRUST, PAM HOLLIS, MANAGER, RETIREMENT FUNDS, TRUSTEE

ABBY R ROSENBERG, DAVID S ROSENBERG, CUSTODIAN UNDER THE IL UNIF TRSF TO MINORS ACT

ABC ARBITRAGE SA

ABDUL W MOTEN AND MICHELLE L MOTEN

ABIGAIL WALLACH

ABINGTON ORTHOPAEDIC SPEC PC RET PL DTD 5/1/80 GABELLI PORTFOLIO, JEFFRY F RUBIN, TRUSTEE

ABN AMRO ASIA FINANCIAL SERVICES, LTD.

ABN AMRO CLEARING CHICAGO LLC

ABN AMRO EQUITIES (UK), LTD.

ABN AMRO MULTI-MANAGER FUNDS

ABSOLUTE VALUE FUND LP

ABU DHABI INVESTMENT AUTHORITY ACCOUNT 1935

ACCT 38 EQUITY ADVISORY

ACM GROUP TRUST- S&P 500, CURRENT TRUSTEE

ACS UNCLAIMED PROPERTY CLEARINGHOUSE

ACT, INC. LARGE-CAP VALUE FUND

ADA H MCIVER

ADAGE CAPITAL ADVISORS, L.L.C. NATIONAL CORPORATE RESEARCH, LTD

ADAGE CAPITAL PARTNERS LP

ADALY OPPORTUNITY FUND, L.P. F/B/O ADALY OPPORTUNITY FUND

ADAM W. POTTER, USAA FEDERAL SAVINGS BANK C/F

ADELAIDE WALDENMAIER AND KATHRYN DYBOS

ADIA INVESTMENT SERIES

ADOLPH J & JEANNE M CAPURRO REV TRUST UAD 5/18/00, ADOLPH J & JEANNE M CAPURRO, TRUSTEES

ADRIENNE A BRIMICOMBE TRUST, BANK OF AMERICA, N.A., TRUSTEE

ADVANCED SERIES TRUST - AST QMA US EQUITY ALPHA PORTFOLIO F/K/A AST ALLIANCEBERNSTEIN MANAGED INDEX 500 PORTFOLIO

ADVANCED SERIES TRUST - AST T. ROWE PRICE ASSET ALLOCATION PORTFOLIO

ADVISORS INNER CIRCLE FUND - LSV VALUE EQUITY FUND

AETNA LIFE INSURANCE COMPANY

AETOS CAPITAL, LLC, CURACAO INTERNATIONAL TRUST CO., TRUSTEE

AFFILIATED PRIVATE INVESTORS U.S. CORE VALUE FUND, L.L.C.

AFPC DIV PTRS LP1-GAMCO A PARTNERSHIP, PAMELA JASINSKI BY PTSHP AGMT

AGILE NEXUS MULTI STRATEGY FUND SPV 1, LLC

AHL PEGASUS LTD.

AIG U.S. LARGE CAP FUND - OFFSHORE CLASS U AIMCO

AIMEE M LANG, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

ALAN D. EGELSEER

ALAN DEVANEY AND JILL DEVANEY

ALAN E. FOWLER AND MARIA K. FOWLER

ALAN GARNER AND ALICE GARNER

ALAN GERRY

ALAN J. TAPPER M.D.

ALAN J. TAPPER M.D. CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

ALAN L GARNER BGC INSURANCE TRUST PLG

ALAN L. GARNER SEP/IRA, BANK OF AMERICA, N.A., CUSTODIAN

ALAN M GOLD REVOCABLE TRUST UA 9/20/83, ALAN M GOLD, TRUSTEE

ALAN R RHEN IRA R/O U/A DTD 8/13/98, FCC, CUSTODIAN

ALAP UK WP NORWICH UNION INVESTMENT TRUST, CURRENT TRUSTEE

ALASKA LARGE-CAP TRUST

ALASKA PERMANENT FUND CORPORATION

ALBERT & JULIA SMITH CHARITABLE REMAINDER UNITRUST II, JULIA ANNE SMITH RAWSON AND WILLIAM COLLINS SMITH, TRUSTEES

ALBERT EINSTEIN HEALTHCARE - ALBERT EINSTEIN MEDICAL CENTER

ALBERT EINSTEIN MEDICAL CENTER EMPLOYEES RETIREMENT TRUST, CURRENT TRUSTEE

ALBERT J. GAYSON CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

ALBERT M DREYFUSS TRUST U/A DTD 08/14/91, ALBERT M DREYFUSS, TRUSTEE

ALBERT TAFFONI

ALBERTA FINANCE

ALBERTA W. CHANDLER MARITAL TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

ALBERTO CRIBIORE

ALBERTO KNIE

ALECTA PENSIONSFORSAKRING OMSESIDIGT

ALEX DAMIAN BLUM, UGMA MD, LEONOR BLUM, CUSTODIAN

ALEXANDER AGNEW

ALEXANDER ANGERMAN AND JUDITH ANGERMAN IRRVOC TRUST U/A 3/5/91, ALEXANDER ANGERMAN AND JUDITH ANGERMAN, TRUSTEES

ALEXANDER D SOLON AND PAULA SOLON

ALEXANDER DAWSON FOUNDATION

ALEXANDER J WEISS IRREVOCABLE TRUST U/A 10/12/06, JUDITH N H WEISS, TRUSTEE

ALEXANDER SOLON IRRA, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CUSTODIAN

ALEXANDRA GLOBAL MASTER FUND LTD

ALEXANDRA RAPHAEL

ALFA-TECH, LLC

ALFRED I. DUPONT TESTAMENTARY TRUST, KARA RILEY, TRUSTEE

ALFRED V TJARKS, ALFRED V TJARKS RETIREMENT PLAN DTD 02/18/85, ALFRED V TJARKS JR, TRUSTEE

ALFRED W. MERKEL, MARLOWE G. MERKEL TRUST UA 11 SEP 85, MARLOWE G. MERKEL, TRUSTEE

ALFRED WEINSTEIN

ALI SAR AND MURIEL SAR

ALICE C. GARNER

ALICE GARNER MONEY PPP

ALICE M. GRABAU

ALISON FORD DUNCAN, ACTING TRUSTEE AND BENEFICIARY OF THE ALFRED C. GLASSELL JR. CHILDREN'S TRUST FOR ALISON FORD DUNCAN

Note: The naming of a person as a "trustee" of a trust, which is based on the Litigation Trust's current information and belief, includes all other, additional, and/or successor trustees of the trust. Similarly, the words "current trustee" include "current trustees" when there is more than one trustee.

ALIZA LEAH ROZMAN TRUST, U/A DTD 10/08/82, MARJORIE ROZMAN, NANETTE ROSENBERG, TRUSTEES

ALLAMERICA INDEX MACM 12 (MUTUAL OF AMER LIFE INS CO)

ALLAN H WILLARD TRUST U/A DTD 9/7/93, CURRENT TRUSTEE

ALLAN R. KORETZ REVOCABLE TRUST UAD 05/10/1978, ALLAN R. KORETZ, PRESIDENT, TRUSTEE

ALLEGRO ASSOCIATES

ALLEN C. TANNER JR.

ALLEN DANDRIDGE GREGG

ALLEN PUTTERMAN MD SC MONEY PURCHASE PENSION PLAN

ALLIANCE CAPITAL GROUP TRUST, TIM MCCARTHY, TRUSTEE

ALLIANCE CAPITAL MANAGEMENT LLC

ALLIANCEBERNSTEIN L.P. F/K/A ALLIANCE CAPITAL MANAGEMENT CO F/K/A ALLIANCE CAPITAL MANAGEMENT LP

ALLIANCEBERNSTEIN TRUST, ALLIANCEBERNSTEIN VALUE FUND, CURRENT TRUSTEE

ALLIANZ INVEST KAG

ALLIED WORKERS LOCAL 48, PHILIP RAINWATER, TRUSTEE

ALOYSIUS J & EUGENE F FRANZ FOUNDATION FOR THE CONGREGATION OF THE MISSION

ALPHA A. WETENKAMP

ALPHADYNE INTERNATIONAL MASTER FUND LTD

ALPHEUS L. ELLIS 1989 TRUST, CAROL E. MARTIN, TRUSTEE

ALPHEUS L. ELLIS 1993 GRANDCHILDREN'S TRUST FBO CHRISTINE GAGNON, THE NORTHERN TRUST COMPANY AND CAROL E. MARTIN, CO-TRUSTEES

ALPHEUS L. ELLIS 1993 GRANDCHILDREN'S TRUST FBO HELEN JO CAHALIN, THE NORTHERN TRUST COMPANY AND CAROL E. MARTIN, CO-TRUSTEES

ALPHEUS L. ELLIS 1993 GRANDCHILDREN'S TRUST FBO LYNN ANN SHARP, THE NORTHERN TRUST COMPANY AND CAROL E. MARTIN, CO-TRUSTEES

ALPHEUS L. ELLIS 1993 GREAT GRANDCHILDREN'S TRUST, THE NORTHERN TRUST COMPANY, CAROL E. MARTIN, DON HALL, CO-TRUSTEES

ALPHEUS L. ELLIS 1993 TRUST FBO CAROL MARTIN, THE NORTHERN TRUST COMPANY, CAROL E. MARTIN, DON HALL, CO-TRUSTEES

ALPINE ASSOCIATES II, L.P.

ALPINE ASSOCIATES OFFSHORE FUND II LTD.

ALPINE ASSOCIATES OFFSHORE FUND LTD.

ALPINE ASSOCIATES, A LIMITED PARTNERSHIP

ALPINE INSTITUTIONAL LP

ALPINE PARTNERS, L.P.

ALPINE PLUS L.P.

ALTERNATIVE FD LLC (CATALYST)

ALTMA FUND SICAV PLC IN RESPECT OF THE AMIENS SUB-FUND

ALVIN A VINEGAR TRUST SV-15, ALVIN VINEGAR, TRUSTEE

ALVIN BAUM JR 1966 TRUST, ALVIN H BAUM, TRUSTEE

ALVIN R GROSS

ALYCE TUTTLE FULLER TRUST U/A DTD 10/03/2003, ALYCE TUTTLE FULLER, TRUSTEE

ALYN L COOPERMAN REVOCABLE TRUST DATED 8/25/1994, A MAITLAND & M COOPERMAN, TRUSTEES

ALZ S&P 500 INDEX FUND

AM INTERNATIONAL EMAC 63 LTD/VOL ARB

AM MASTER FUND III, LP

AMALGAMATED BANK

AMALGAMATED BANK OF CHICAGO

AMALGAMATED TRANSIT UNION LOCAL

AMELIA ROSE HOWELLS

AMELITA NEIBURGER

AMELITA NEIBURGER TRUST 5C-183, AMELITA M NEIBURGER, TRUSTEE

AMEREN MANAGEMENT HEALTH TRUST, CURRENT TRUSTEE

AMEREN SERVICES COMPANY, AMEREN SVCS NUCLEAR DECOMMISSIONING TRUST, CURRENT TRUSTEE

AMERICAN BAPTIST HOME MISSION SOCIETY LCV

AMERICAN CENTURY INVESTMENT MANAGEMENT INC S&P 500 EQUITY INDEX FUND

AMERICAN ENTERPRISE INVESTMENT SERVICES INC

AMERICAN GENERAL LIFE INSURANCE COMPANY OF DELAWARE A/K/A AIG LIFE INSURANCE COMPANY

AMERICAN NATIONAL BANK

AMERIPRISE TRUST CO.

AMETEK INC EMPLOYEES MASTER RETIREMENT TRUST, CURRENT TRUSTEE

AMICI ASSOCIATES LP

AMICI FUND INTERNATIONAL, LTD.

AMICI QUALIFIED ASSOCIATES LP

AMIDA PARTNERS MASTER FUND LTD

AMPERE CAPITAL MANAGEMENT LP

AMY BURNS COUNTISS TRUST UA 09/18/99, H. D. BURNS, TRUSTEE

AMY W FONG LIVING TRUST U/A DTD 06/14/1988, ARNOLD D FONG AND AMY W FONG, TRUSTEES

ANA ROTHANA ROTH TRUST, CURRENT TRUSTEE

ANADARKO PETROLEUM CORP.

ANADARKO PETROLEUM CORPORATION MASTER TRUST, APC ADMINISTRATIVE AND INVESTMENT COMMITTEE, TRUSTEE

ANANTH S BHOGARAJU AND PURNIMA U BHOGARAJU, JTWROS

ANCILLA SYSTEMS INC. LCV

ANDE ELLEN WINKLER

ANDERSEN CORPORATION EMPLOYEES

ANDERSEN CORPORATION, US BANK N.A., TRUSTEE

ANDERSEN DEFINED BENEFIT, US BANK N.A., TRUSTEE

ANDRA-AP-FONDEN (AP2)

ANDREA REIMANN-CIARDELLI TRUST U/A DTD 04/28/2006, CURRENT TRUSTEE

ANDREW ABSLER AND LAUREN F ABSLER

ANDREW ALLEN CHARITABLE FOUNDATION SEL ADV, NORTHERN TRUST, TRUSTEE

ANDREW BATER

ANDREW BOEHM AND RITA A BOEHM

ANDREW G CASSEN AND ENID CASSEN

ANDREW J IAN GARY WENDY J MACKEN FAMILY TRUST U/A 3/16/1999, ANDREW J IAN GARY WENDY J MACKEN, TRUSTEES

ANDREW J WALLACE TRUST U/A DTD 07/31/1996, ANDREW J WALLACE, JAMES WENDELL WALLACE, TRUSTEES

ANDREW J. MCKENNA TRUST, CURRENT TRUSTEE

ANDREW T SZYMULANSKI

ANDREW W SHELDEN VOLUNTARY TRUST U/A 8/22/99, WILLIAM W SHELDEN JR, TRUSTEE

ANDY HOK FAN SZE REV TRUST U/A 5/30/96, ANDY HOK FAN SZE, TRUSTEE

ANGELO D. GIANCARLO

ANIMA SOCIETA DI GESTIONE DEL RISPARMIO PER AZIONI S.P.A. A/K/A ANIMA SGR S.P.A.

ANN B. MURPHY REV TRUST U/A DTD 4/13/04, ANN B. MURPHY, TRUSTEE

ANN C. GRAFF TRUST, ANN C. GRAFF, TRUSTEE

ANN F. PARKS TRUST, WILLIAM M. PARKS, TRUSTEE

ANNA B. SILVER

ANNA H DEMING

ANNA H GREER IRA, AMERIPRISE TRUST COMPANY, CUSTODIAN

ANNA L MAST

ANNA W. MURRAY

ANNABELLE M FREDERICKSON #XXXXXXX0010, MELLON, CUSTODIAN

ANNE AARON MERLE EPSTEIN UA 11/09/05, ROSENWALD EPSTEIN, ANNE AARON MERLE EPSTEIN, TRUSTEES

ANNE CUSACK DERK IRA NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

ANNE E. MCKENNY, TRUSTEE MANAGED

ANNE ELIZABETH MCKENNY 2007, ANNE E MCKENNY, TRUSTEE

ANNE F NEVILLE FAMILY TRUST U/A DTD 07/14/1999, ANNE F NEVILLE, TRUSTEE

ANNE IRENE ANDERSON

ANNE LESLIE FENSTERMAKER

ANNE MCCUTCHEON LEWIS TRUST U/A DTD 10/26/1987, ANNE MCCUTCHEON LEWIS, MARY SHAW MCCUTHEON, J MCCUTCHEON III, OLIVER MCCUTCHEON LEWIS, MATTHEW V. LEWIS, TRUSTEES

ANNE MCKENNY TRUST, CLARA WHITNEY, TRUSTEE

ANNE PARRY REV LIV TRUST U/A DATED 11/13/97, ANNE PARRY, TRUSTEE

ANNE RR HUSK & EF PORTER III S HOWELLS TRUST 12/30/85, MARTHA S MOLLOY, J CS MULLEN, TRUSTEES

ANNE S HOWELLS CHAR TRUST DTD DEC 18 1989, JANE C. MULLEN, RICHARD R. HUSK, TRUSTEES

ANNE S SCHEIERMANN

ANNE W. CHARPIE TRUST, ANNIE W. CHARPIE, TRUSTEE

ANNE WERTHEIM WERNER TRUST U/W DTD 10/10/95, THOMAS L. LANGMAN, PHILIP H. LILIENTHAL, TRUSTEES

ANNE-MARIE S GREENBERG

ANNETTE O GLOVER HAROLD R GLOVER TRUST UA 02/08/99, ANNETTE O. GLOVER, HAROLD R. GLOVER, TRUSTEES

ANTHONY C BERARDI UTA IRA CONTRIBUTORY DTD 06/24/97, CHARLES SCHWAB & CO INC, TRUSTEE

ANTHONY C SCOLARO AND CELESTE P SCOLARO

ANTHONY G BRYAN, ANTHONY G BRYAN R1F1973 5, CUSTODIAN

ANTHONY M STEPUSZEK

ANTHONY MARRO AND JACQUELINE MARRO

ANTHONY TABASCO III

ANTHONY Y. LIN

ANTHONY YUKSEEN YAU

ANTOINETTE B BRUMBAUGH TRUST, ANTOINETTE B BRUMBAUGH, TRUSTEE

AON CORPORATION

AP1 MSCI WORLD INDEX PLUS (BARCLAYS GLOBAL INVESTORS NA)

APG (DINA) SUCESOR TR/TIMES, TROY GASS, TRUSTEE

APG A/K/A ALL PENSIONS GROUP STRUCTURED RESEARCH A/K/A APG ASSET MANAGEMENT US, INC. F/K/A ABP INVESTMENTS US, INC.

APPLEBY INVESTMENTS LP

AQR ABSOLUTE RETURN MASTER ACCOUNT, L.P.

AQR CAPITAL MANAGEMENT LLC

AQR GLOBAL STOCK SELECTION HV MASTER ACCOUNT LTD.

AQR GLOBAL STOCK SELECTION MASTER ACCT LP

AQR R. C. EQUITY AUSTRALIA FUND

AQUA AMERICA-GABELLI ASSET MANAGEMENT

ARBAWAY INVESTMENTS LP

ARC REVOCABLE TRUST, ROBERT SNYDER, TRUSTEE

ARCHDIOCESAN PENSION PLAN OF THE ARCHDIOCESE OF NEW YORK

ARCHDIOCESE OF CINCINNATI

ARCHDIOCESE OF LOS ANGELES LAY EMPLOYEES PENSION PLAN

ARCHDIOCESE OF NEW YORK MASTER TRUST, CURRENT TRUSTEE

ARCHDIOCESE OF PHILADELPHIA

ARCHIE/GONSALVES FAMILY TRUST U/A 12/4/01, ARCELLIOUS ARCHIE, LEONIDIA GONSALVES, TRUSTEES

ARCHITAS MULTI-MANAGER LIMITED

ARGYLL RESEARCH LLC

ARI DANIEL BLUM, UGMA MD, LEONOR BLUM, CUSTODIAN

ARIE & IDA CROWN MEMORIAL

ARIEL ENTERPRISES INC. PROFIT SHARING PLAN AND TRUST U/A 10/30/1990, CURRENT TRUSTEE

ARIZONA STATE RETIREMENT SYSTEM

ARLENE D SCHULTZ TRUST U/A/D 10/18/03, ARLENE D. SCHULTZ, TRUSTEE

ARMEN J ADAJIAN TRUST U/A 9/15/80, ARMEN J ADAJIAN, TRUSTEE

ARMEN MELKUMYAN

ARMENIAN GEN. BENEVOLENT UNION

ARMSTRONG WORLD INDUSTRIES

ARMSTRONG WORLD INDUSTRIES, INC. RETIREMENT MASTER TRUST, CURRENT TRUSTEE

ARNOLD A DELUCA

ARNOLD BUCKMAN TRUST U/A DTD 12/24/96, ARNOLD BUCKMAN, TRUSTEE

ARNOLD MANHEIMER

ARNOLD R WEBER & EDNA F WEBER

ARNOLD R WEBER AND EDNA F WEBER

ARS & CO

ARTHUR E GOLDBERG

ARTHUR E LEE

ARTHUR E LEE AND NANCY L LEE

ARTHUR E. MCKENNY, TRUSTEE MANAGED

ARTHUR FARBER IRA ROLLOVER ACCOUNT ADP CLEARING, CUSTODIAN

ARTHUR G BESS III IRA R/O, RAYMOND JAMES & ASSOCIATES, INC., CSDN, TRUSTEE

ARTHUR HOYER ROLLOVER IRA, SCOTTRADE INC, CUSTODIAN

ARTHUR JUEDES

ARTHUR M KOBLISH TRUST U/A 11/30/92, ARTHUR M KOBLISH, JEFFREY ARTHUR KOBLISH, TRUSTEES

ARTHUR R MARTIN, WELLS FARGO BANK C/F

ARTHUR R. HOYER AND THELMA L. LEMTS

ARTHUR SHAWN CASEY

ARTHUR Y CHU

ARTICLE VI TRUST 11/W/0 FRANCES BRADLEY LUMMIS, WILLIAM R LUMMIS SR, TRUSTEE

ARTIS AGGRESSIVE GROWTH MASTER FUND LP

ARTIS AGGRESSIVE GROWTH, L.P.

ARTIS PARTNERS (INSTITUTIONAL), L.P.

ARTIS PARTNERS 2X (INSTITUTIONAL), L.P.

ARTIS PARTNERS 2X LTD

ARTIS PARTNERS 2X, L.P.

ARTIS PARTNERS LTD

ARTIS PARTNERS, L.P.

ARTURO QUINONES

ASBESTOS WORKERS LOCAL 32 PENSION FUND

ASBESTOS WORKERS LOCAL 6 PENSION FUND

ASBESTOS WORKERS PHILADELPHIA PENSION LCV

ASBURY THEOLOGICAL SEMINARY

ASCENSION HEALTH

ASSET MANAGEMENT INVESTORS LLC

ASSETMARK ENHANCED FUNDAMENTAL INDEX - LARGE COMPANY VALUE FUND

ASSISI FOUNDATION OF MEMPHIS, INC.

ASSOCIATED BANK, NATIONAL ASSOCIATION F/K/A ASSOCIATED BANK GREEN BAY

ASTRID K BIRKE REVOCABLE TRUST DATED 04/28/98, ASTRID K BIRKE, TRUSTEE

AT&T INC.

ATHOLIE K ROSETT

ATLANTIC SALMON FEDERATION CANADA ENDOWMENT FUND INV

AUDREY M SOUTHARD

AUSTIN PRESBYTERIAN THEOLOGICAL

AUSTIN TRUST COMPANY

AUSTRALIAN COMPANY NUMBER 003 113 960 LTD

AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA

AUTOMOBILE MECHANICS' LOCAL 701 PENSION FUND A/K/A AUTOMOBILE MECHANICS' LOCAL NO. 701 UNION AND INDUSTRY PENSION FUND

AUTOMOTIVE INDUSTRIES PENSION TRUST FUND, ASSOCIATED THIRD PARTY ADMIN, CURRENT TRUSTEE

AUTOMOTIVE MACHINISTS PENSION TRUST FUND

AVALON TRUST COMPANY

AVERY DENNISON CORPORATION MASTER RETIREMENT TRUST A/K/A AVERY DENNISON MASTER RETIREMENT TRUST, CURRENT TRUSTEE

AVIV NEVO

AVONDALE PARTNERS LLC

AXA EQUITABLE LIFE INSURANCE COMPANY

AXA INSURANCE

AXA PACIFIC INSURANCE COMPANY

AXA PREMIER VIP TRUST

AXA PREMIER VIP TRUST - MULTIMANAGER LARGE CAP CORE EQUITY PORTFOLIO, CURRENT TRUSTEE

AXA PREMIER VIP TRUST - MULTIMANAGER LARGE CAP VALUE PORTFOLIO

AXELSON FAM. LIMITED PARTNERSHIP, STEPHEN AXELSON AND LINDA AXELSON

AYDA R ARSLAN

B & B LUMBER CO PFT SHRING PL, JEFFREY H BOOHER, GARY R BOOHER, TRUSTEES

B H GERALD ROGERS MD LTD EMPLOYEE PENSION TRUST U/A 07/01/84, B H GERALD ROGERS, TRUSTEE

B PRIVATE BANK SINGAPORE BRANCH

BABCOCK & WILCOX ASBESTOS PERSONAL INJURY TRUST, JOHN BROPHY, TRUSTEE

BABSON

BACAP EQUITY FUND XX1 BANK OF AMERICA

BAE SYSTEMS LAND & ARMAMENTS INC. F/K/A UNITED DEFENSE LP

BAKERY, CONFECTIONERY, TOBACCO WORKERS & GRAIN MILLERS INTERNATIONAL PENSION FUND

BALDWIN ENTERPRISES, INC

BALENTINE US MID CAP EQUITY FUND SELECT

BALL STATE UNIVERSITY

BANCO PORTUGES DE INVESTIMENTO, BANCO PORTUGUE DO ATLANTICO

BANK JULIUS BAER & CO. AG

BANK OF AMERICA (F/K/A MERRILL LYNCH IQ)

BANK OF AMERICA (GLASS LEWIS CO.)

BANK OF AMERICA (STRUCTURED RESEARCH)

BANK OF AMERICA PENSION-T. ROWE PRICE, BANK OF AMERICA, N.A. AS DIRECTED TRUSTEE

BANK OF AMERICA, NATIONAL ASSOCIATION

BANK OF AMERICA, NATIONAL ASSOCIATION (GWIM TRUST OPERATIONS)

BANK OF AMERICA, NATIONAL ASSOCIATION, AS SUCCESSOR-IN-INTEREST TO BOATMENS

BANK OF AMERICA, NATIONAL ASSOCIATION, AS SUCCESSOR-IN-INTEREST TO LASALLE BANK N.A.

BANK OF AMERICA, NATIONAL ASSOCIATION, AS SUCCESSOR-IN-INTEREST TO U.S. TRUST COMPANY, N.A.

BANK OF HAWAII

BANK OF MONTREAL HOLDING, INC. AS SUCCESSOR TO BMO NESBITT BURNS TRADING CORP. SA

BANK OF NEW YORK MELLON CORP RET PLANS MASTER TRUST, CURRENT TRUSTEE

BANK OF NY BKR 901

BAPTIST FOUNDATION OF TEXAS

BARBARA ALTER

BARBARA ANNE WARD LIVING TRUST U/A DTD 11/20/2007, BARBARA ANNE WARD, TRUSTEE

BARBARA BELL

BARBARA BONOFF GETTINGER

BARBARA C. SHANE

BARBARA CADY SCHMID

BARBARA CLEMENTS HELLER REVOCABLE TRUST DTD 3/22/01, CURRENT TRUSTEE

BARBARA D. MCGRAW

BARBARA F SALAS & GEORGE M SALAS JT TEN

BARBARA H ALTER 2002 DECLARATION OF TRUST DTD 12/12/2002, BARBARA H ALTER, TRUSTEE

BARBARA HOROWITZ TRUST U/A/D 04/05/91, BARBARA J HOROWITZ, TRUSTEE

BARBARA J. KNEELAND

BARBARA K WALSH TRUST U/A 10/11/04, BARBARA K WALSH, TRUSTEE

BARBARA K. WARNER

BARBARA M OSBORNE INTERIM TST DTD 2/7/02, JONATHAN OSBORNE & ELIZABETH O SIEGEL, TRUSTEES

BARBARA M OSBORNE TRUST U/I/T DTD 2/7/05, JONATHAN OSBORNE, ELIZABETH SIEGEL, TRUSTEES

BARBARA M. CALVERT

BARBARA M. J. WOOD LIVING TRUST U/A/D 9/17/81, THE NORTHERN TRUST COMPANY, TRUSTEE

BARBARA M. OSBORNE TRUST U/I/T DTD 2/7/05, JONATHAN OSBORNE, ACTING TRUSTEE

BARBARA MARTELL

BARBRA ATSAVES PABST IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

BARCLAYS BANK PLC - BARCLAYS CAPITAL GROUP

BARCLAYS CAPITAL INC.

BARCLAYS CAPITAL PRIME BROKER

BARCLAYS CAPITAL SECURITIES LIMITED

BARCLAYS CAPITAL SECURITIES LIMITED AS SUCCESSOR TO BZW SECURITIES LIMITED

BARCLAYS GLOBAL INVESTORS

BARCLAYS GLOBAL INVESTORS LTD (A/C XXXXXX6408)

BARCLAYS GLOBAL INVESTORS LTD (A/C XXXXXXNE8W)

BARCLAYS GLOBAL INVESTORS LTD (A/C XXXXXXPE01)

BARLOW TRUST FBO M A BARLOW JR., L. THOMAS SLIGER, AUSTIN TRUST COMPANY, TRUSTEES

BARNET PARTNERS LTD

BARRETT C MCGREGOR

BARRINGTON INVESTORS L.P. 0102 GSAM: TAX ADV LH (S&P500)

BARRY D MCCORMICK TRADITIONAL IRA ROLLOVER, JPMORGAN CHASE BANK, CUSTODIAN

BARRY DAVID KUPFERBERG & LORI BANNER KUPFERBERG

BARRY L. FELDPAUSCH AND JEANNE R. FELDPAUSCH

BARRY SHEIN REVOCABLE TRUST, BARRY S SHEIN, TRUSTEE

BARRY T WERBLOW AND BARI WERBLOW

BARRY WOLSTAN

BASF CORPORATION PENSION MASTER TRUST

BASF PENSIONSKASSE WAG

BASHAR A MUBASHIR

BASHAR A MUBASHIR IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

BASIM S. NIMRI AND CATHY MARIE NIMRI

BATTELLE MEMORIAL INSTITUTE

BATTELLE MEMORIAL INSTITUTE PN - NASA TECHNICAL REPORTS SERVER

BAXTER INTERNATIONAL INC.

BAYCARE HEALTH SYSTEM, INC.

BAYLOR HEALTH CARE SYSTEM

BCBSM FOUNDATION BLUE CROSS BLUE SHIELD OF MICHIGAN (BERNSTEIN VALUE)

BEACON TRUST COMPANY

BEAR STEARNS ASSET MANAGEMENT, INC.

BEAR STEARNS EQUITY STRATEGIES RT LLC

BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND

BECHTEL CORPORATION TRUST AND THRIFT PLAN

BEDFORD OAK PARTNERS LP

BELL ATLANTIC MASTER TRUST, CURRENT TRUSTEE

BELLIN HOSPITAL

BELLIN HOSPITAL PENSION TRUST, U.S. BANK N.A., TRUSTEE

BELLSOUTH CORP. NON-REPRESENTABLE HEALTH CARE TRUST, CURRENT TRUSTEE

BELLSOUTH CORPORATION

BELLSOUTH GROUP LIFE TRUST S&P, CURRENT TRUSTEE

BELLSOUTH HEALTHCARE S&P 500

BELLSOUTH/ALLIANCE

BENJAMIN FAMILY LIMITED PARTNERSHIP

BENJAMIN FRANK OLIVA

BENJAMIN J. VERDUSCO TRUST, U/A DTD 12/13/1989, CATHERINE A VERDUSCO, TRUSTEE

BENJAMIN JOSEPH DALY GIFT TRUST, AUDREY YOUNG, TRUSTEE

BENTLEY F KAPLAN

BERNADETTE FINGLETON

BERNARD AND BARBRO OSHER 2006 CHARITABLE REMAINDER UNITRUST #2, BERNARD OSHER AND BARBRO OSHER, TRUSTEES

BERNARD AND RENA SHAPIRO, INTERVIVOS TRUST A/C #1 DTD 10/15/87, BERNARD SHAPIRO AND RENA SHAPIRO, TRUSTEES

BERNARD CHAPMAN TRUST U/A, BERNARD CHAPMAN, TRUSTEE

BERNARD E & EDITH B WATERMAN CHARITABLE FOUNDATION

BERNARD E WATERMAN AND EDITH B WATERMAN

BERNARD J SILGARDO AND KAREN A SILGARDO

BERNARD OSHER 2006 CHARITABLE REMAINDER UNTRUST #2, BERNARD OSHER, TRUSTEE

BERNARD OSHER TRUST, BERNARD OSHER, TRUSTEE

BERNARD RABINOWITZ TRUST U/A/D 09-11-2006, BERNARD RABINOWITZ, TRUSTEE

BERNARD W. LINCICOME

BERNARD WEINGER GST TRUST, LAURENCE S. SPECTOR, TRUSTEE

BERNER CHARITABLE SCHOLARSHIP FOUNDATION

BERNICE K WATTMAN TRUST, U/A DTD 11/01/2002, CURRENT TRUSTEE

BERNIE H. SMITH & JOYCE M. SMITH

BESSEMER TRUST COMPANY

BESSIE E MURRAY

BETH L ZWEIG C/F LAURA H ZWEIG H/IN/UTMA

BETH L. CHAPIN

BETHESDA MASTER TRUST, CURRENT TRUSTEE

BETSY D. HOLDEN

BETSY N. ANDERSON

BETTE WENDT JORE

BETTIE SUE FLYNN

BETTY ANDRES TRUST U/A/D 04-21-1988, BETTY R. ANDRES AND RICHARD W. ANDRES, TRUSTEES

BETTY BEAIRD LIVING TRUST U/A DTD 4/10/87, BETTY BEAIRD, TRUSTEE

BETTY ELLEN BERLAMINO

BETTY H. ROELAND MARITAL TRUST, THE ROELAND FAMILY TRUST UA 8/19/86, BETTY H ROELAND, TRUSTEE

BETTY J. STEPHENS SURVIVORS TRUST, BETTY J. STEPHENS, TRUSTEE

BETTY K. ZLATCHIN IRA, DELAWARE CHARTER GUARANTEE & TRUST, CUSTODIAN

BETTY RICH SELF-DECLARATION OF TRUST DTD 7-1-71, BETTY RICH, TRUSTEE

BETURN

BGI CDN US EQUITY INDEX - NON TAX FUND

BGICL NONPENSION US EQ

BHF-BANK AKTIENGESELLSCHAFT

BIG HEN GROUP I LLC, A PARTNERSHIP

BIG SKY, LLC

BILL C. OGLE AND JANIE L. OGLE

BILL HORTON AND MARY HORTON AND/OR CURRENT TRUSTEE(S)

BILLIE J BOUZEK TRUST U/A 1/28/00, FRANK J BOUZEK, TRUSTEE

BINHUA MAO ROTH IRA, ETRADE, CUSTODIAN

BLACK BOX CORPORATION

BLACK DIAMOND ARBITRAGE OFFSHORE LTD. CARLSON CAPITAL L.P.

BLACK DIAMOND OFFSHORE LTD. CARLSON CAPITAL L.P.

BLACK RIVER GLOBAL EQUITY FUND LTD. F/K/A BLACK RIVER GLOBAL EQUITY ARBITRAGE FUND LTD.

BLACKBURN TRUST, MARSHA BLACKBURN, TRUSTEE

BLACKPORT CAPITAL FUND LTD

BLACKROCK ADVISORS (UK) LTD. F/K/A BARCLAYS GLOBAL INVESTORS LTD. [A/C XXXXXX6498]

BLACKROCK ADVISORS (UK) LTD. F/K/A BARCLAYS GLOBAL INVESTORS. LTD. A/C XXXXXX5416

BLACKROCK ADVISORS (UK) LTD. F/K/A BARCLAYS GLOBAL INVESTORS. LTD. A/C XXXXXX7995

BLACKROCK ADVISORS (UK) LTD. F/K/A BARCLAYS GLOBAL INVESTORS. LTD. [A/C BANK OF NY ACCXX046748]

BLACKROCK DEBT STRATEGIES FUND, INC. A/K/A DSU

BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A.

BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A. (U.S. EQUITY MARKET SUDAN FREE EQUITY INDEX FUND)

BLACKROCK NORTH AMERICAN EQUITY TRACKER FUND TRUST ACCOUNTS, BANK OF NEW YORK EUROPE LTD, RBS, TRUSTEE

BLACKROCK S&P 500 INDEX V.I. FUND (INS-VAR SER)

BLACKROCK S-P 500 INDEX SERIES MASTER BLACKROCK, INC. (MERRILL LYNCH)

BLAINE B ROMINGER CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

BLANDINA ROJEK

BLANDINA ROJEK CHAR LD. TRUST, FRIEDMAN & HUEY ASSOCIATES, TRUSTEE

BLEND SURVIVOR'S TRUST DTD 12/2/99, ROBERT R BLEND AND THOMAS R BLEND, TRUSTEES

BLK GLOBAL EQUITY I

BLOCK COMMUNICATIONS, INC. RETIREMENT TRUST, CURRENT TRUSTEE

BLUE CHIP FUND, A SERIES OF FIRST INVESTORS EQUITY FUNDS

BLUE CHIP FUND, A SERIES OF FIRST INVESTORS LIFE SERIES FUNDS

BLUE CROSS & BLUE SHIELD OF KANSAS

BLUE CROSS AND BLUE SHIELD OF FLORIDA INC

BLUE CROSS AND BLUE SHIELD OF GEORGIA, INC. A/K/A WELLPOINT, INC. BLUE CROSS BLUE SHIELD OF GEORGIA

BLUE CROSS BLUE SHIELD OF MICHIGAN BCBSM FOUNDATION BERNSTEIN VALUE

BLUE CROSS BLUE SHIELD OF TENNESSEE

BLUE CROSS OF CALIFORNIA

BLUE HILLS BANK F/K/A HYDE PARK SAVINGS BANK

BLYTH TRUST, R.B. CARPENTER, SUCCESSOR TRUSTEE

BLYTHE T BELENKY

BMO HARRIS BANK N.A., AS SUCCESSOR BY MERGER TO M&I MARSHALL AND ILSLEY BANK

BMO NESBITT BURNS INC./CDS

BMR 2 LLC

BNA EMPLOYEES RETIREMENT PLAN

BNA EMPLOYEES RETIREMENT TRUST, CURRENT TRUSTEE

BNP PARIBAS ARBITRAGE, SNCR

BNP PARIBAS F/K/A NEFF ALTERNATIVE MANAGEMENTS - TMS/ITS SETT A/C FOR COOPER

BNP PARIBAS PRIME BROKERAGE, INC.

BNP PARIBAS PRIVATE BANK, SA HONG KONG BRANCH (POOL 3 30% WITHHOLD DIVIDEND)

BNP PARIBAS SECURITIES CORP.

BNP PARIBAS SECURITIES CORP. (EQUITY DERIVATIVES SEFUSD)

BNP PARIBAS SECURITIES CORP. (PARIS TRADING)

BNP PARIBAS SECURITIES SERVICES

BNY MELLON INVESTMENT SERVICING (US) INC. F/K/A PFPC, INC.

BNY MELLON, NATIONAL ASSOCIATION AS SUCCESSOR-IN-TRUST TO MELLON TRUST OF NEW ENGLAND, N.A.

BNYTD AC MLC GLOBAL EQUITY DFA BNYTD A/C MLC

BNYTD EQUATOR INV FD ICVC NAMERICA LARGE MID CAP EQTY-FD-T ROWE PRICE

BO QUAN

BOA PENSION PLAN FOR LEGACY COMPANIES

BOA PENSION-BACAP LARGECAP INDEX, BANK OF AMERICA, TRUSTEE

BOA PENSION-CMG LARGECAP INDEX

BOARD OF ADMINISTRATION OF THE WATER AND POWER EMPLOYEES' RETIREMENT PLAN A/K/A WATER AND POWER EMPLOYEES' RET DISAB & DEATH BENEFIT INS PLAN, T. ROWE PRICE ASSOCIATES, INC., CUSTODIAN

BOARD OF EDUCATION NEW YORK CITY RETIREMENT SYSTEMS, CHANCELLOR

BOART LONGYEAR COMPANY EMPLOYEES' PENSION PLAN AND TRUST, US BANK, TRUSTEE

BOB FUSHIMI AND CLOVIA L. FUSHIMI

BODMAS CAPITAL PARTNERS LP

BOEING CO.

BOEING COMPANY EMPLOYEE RETIREMENT - CHANNING CAPITAL MGT LLC A/C

BOKF, NATIONAL ASSOCIATION F/K/A BANK OF OKLAHOMA NA

BONNIE GONZALEZ, AS BENEFICIARY OF THE ESTATE OF ALFRED C. GLASSELL JR.

BORROWED-NY, STOCK

BOSTON PARTNERS ASSET MANAGEMENT

BOSTON TRUST & INVESTMENT MANAGEMENT COMPANY

BP PENSION SERVICES. LTD

BRADLEY A LONG TRADITIONAL IRA

BRADLEY FAMILY TRUST, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

BRAGA REVOCABLE TRUST UA 31-JUL-95, FRANK M. BRAGA JR, MARILYN M. L. BRAGA, TRUSTEES

BRANDES INVESTMENT FUNDS PLC BRANDES US EQUITIES FUND

BRANDES INVESTMENT PARTNERS & CO

BRANDES INVESTMENT PARTNERS, L.P.

BRANDES U.S. EQUITY FUND

BRANDON DEAN DALY GIFT TRUST, AUDREY G YOUNG, TRUSTEE

BRAXTON N ROBINSON

BRENT EASTBURG HY/SCT

BRENT V WOODS IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

BRESLER FAMILY INVESTORS LLC

BRIAN F. LITMAN

BRIAN GORMLEY

BRIAN HULL

BRIAN J MCMANUS, SR IRA, FCC, CUSTODIAN

BRIAN JOSEPH MEEK C/F ADAM JOHN MEEK UGMA/IL

BRIAN MCGOVERN

BRIAN SHERIDAN HALL

BRIAN W SMITH

BRICKLAYERS & ALLIED CRAFTWORKERS LOCAL 5 PENSION FUND

BRICKLAYERS & TROWEL TRADES INTL PENSION FUND MCV

BRIDGER COAL COMPANY RECLAMATION TRUST LCV, CURRENT TRUSTEE

BRIDGESTONE FIRESTONE

BRISTOL COUNTY RETIREMENT SYSTEM LCV

BRISTOL-MYERS SQUIBB COMPANY MASTER RETIREMENT TRUST, BOB RAMNARINE, TRUSTEE

BROADRIDGE BUSINESS PROCESS OUTSOURCING, LLC F/K/A RIDGE CLEARING & OUTSOURCING SOLUTIONS

BROOKLINE AVENUE PARTNERS, LP

BROPHY PROPERTIES INC

BROWN & JAMES PC PFT SHR PLAN DTD 91/03

BROWN BROTHERS HARRIMAN & CO

BROWN INVESTMENT ADVISORY & TRUST CO.

BRUCE G MURPHY AND LOU ANN MURPHY JT WROS

BRUCE KIRKPATRICK

BRUCE REZNICK

BRUCE STROHM REV TRUST U/A 05/12/93 FBO BRUCE STROHM, BRUCE CARLTON STROHM, TRUSTEE

BRUCE W. AHLMANN AND BETTY J. AHLMANN

BRUMBACK FAMILY LLC CHARLES T. BRUMBACK

BRUMBAUGH A B IRRV TRUST, PIERCE ATWOOD, TRUSTEE

BRUNO HOFMANN GABELLI US PORTFOLIO

BRYCE PATRICK ANDREWS

BSCS CAPITAL GROWTH LIMITED PARTNERSHIP

BUFFALO FINE ARTS ACADEMY FUND D

BUILDING TRADES UNITED PENSION TRUST FUND, CURRENT TRUSTEE

BURROUGHS WELLCOME FUND

BURT JM TEST, CURRENT TRUSTEE

BURTON J RAIN IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

BYRD TRADING LLC

BYRON PALMER TRUST U/A DTD 02/15/2002, BYRON H PALMER, TRUSTEE

C & F LANE FAMILY LP

C HUGH STEPHENS TRUST U/A DTD 11/08/2002, C HUGH STEPHENS, TRUSTEE

C M LLOYD MAR GST TAX EXEMPT TRUST U/D, CURRENT TRUSTEE

C PHILLIPS TR-IMA, CURRENT TRUSTEE

C. HEALY & C. HEALY LIV. TRUST U/A DTD 08/03/1987, C HEALY, TRUSTEE

CACEIS BANK

CACEIS BANK LUXEMBOURG (CLIENT ACCOUNT)

CAISSE DE DEPOT ET PLACEMENT DU QUEBEC

CALDWELL FOUNDATION

CALIFORNIA IRONWORKERS FIELD PENSION TRUST, BOARD OF TRUSTEES

CALIFORNIA MASTER TRUST, CURRENT TRUSTEE

CALIFORNIA PHYSICIANS' SERVICE D/B/A BLUE SHIELD OF CALIFORNIA

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM (CALIFORNIA PUBLIC EMPLOYEES' FUND)

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM (CALPERS) SW5J A/C DOMESTIC ENHANCED INDEX ST

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM (DEFERRED COMPENSATION FUND/TRUST)

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM (DYNAMIC COMPLETION FUND)

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM (JUDGES' RETIREMENT SYSTEM II TRUST, CALIFORNIA EMPLOYEES' RETIREE BENEFIT TRUST, LEGISLATORS RETIREMENT SYSTEM TRUST, LONG-TERM CARE FUND TRUST)

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM (POOLED S+P 500 INDEX FUND)

CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM

CALVERT LESTER

CALVERT VARIABLE PRODUCTS, INC. F/K/A SUMMIT MUTUAL FUNDS, INC.

CAMBRIDGE APPLETON TRUST N.A.

CAMDEN

CAMDEN ASSET MANAGEMENT LP AND BARNET PARTNERS LTD

CAMILLA CHANDLER FAMILY FOUNDATION

CANADA PENSION PLAN INVESTMENT BOARD

CANADIAN IMPERIAL HOLDINGS INC.

CANE GLOBAL MASTER FUND LP

CANTIGNY FOUNDATION

CANTOR FITZGERALD & CO.

CANYON BALANCED MASTER FUND, LTD F/K/A CANYON BALANCED EQUITY MASTER FUND, LTD.

CANYON VALUE REALIZATION FUND LP HIGH YIELD PORTFOLIO

CANYON VALUE REALIZATION FUND, L.P.

CANYON VALUE REALIZATION MAC 18 LTD FORTIS PRIME FUND SOL.

CAPITAL ONE BANK (USA), NATIONAL ASSOCIATION - MARSHALL & ILSLEY TRUST CO.

CAPITALIA AZIONARIO USA PV, CREDIT AGRICOLE, SA (AMUNDI GROUP F/K/A SYSTEIA CAPITAL MANAGEMENT)

CAPURRO INVESTMENTS A LIMITED PARTNERSHIP

CAPURRO PROP SERIES LLC - SERIES G

CARA LEIGH GILLESPIE-WILSON

CARDINAL CAPITAL MANAGEMENT

CARE USA NORTHERN TRUST, ELENITA FERNANDEZ, TRUSTEE

CARL B. FIELD III AND MARY JEAN CHASE FIELD

CARL E HIRSCH

CARL F. THORNE AND ROSELLA M. THORNE

CARL H SPAHR

CARL S IACOPELLI AND SUSAN IACOPELLI

CARL V CLARK IRA FIDELITY MANAGEMENT TRUST CO CUST

CARL WEINER TESTAMENTARY TRUST U/A/D 3/7/86, HELEN BERMAN, FRANCES GOLDSTEIN, TRUSTEES

CARL ZLATCHIN PROFIT SHARING PLAN, DELAWARE CHARTER GUARANTEE & TRUST, CUSTODIAN

CARLA M LAZZARESCHI FRP PS, FIDELITY MANAGEMENT TRUST CO, TRUSTEE

CARLOS MADRIGAL JR AND ELSA MADRIGAL

CARLY E ROSENBERG, DAVID S ROSENBERG, CUSTODIAN UNDER THE IL UNIF TRSF TO MINORS ACT

CARLYLE BLUE WAVE - CITIGROUP - PRIME BROKER F/A/O A/C #XXX-XXX90-1-4

CARLYLE MULTI-STRATEGY MASTER FUND LTD WILMINGTON TRUST CORPORATION COMPANY

CARLYLE PAFF HEDRICK TRUST U/A/D 02/06/06, CARLYLE PAFF HEDRICK, TRUSTEE

CARMINE MACCHIAROLI LIVING TRUST U/A 07/01/88, MARIE MACCHIAROLI, CARMINE MACCHIAROLI, TRUSTEES

CAROL E JANSSON TRUST U/A DTD 06/17/1998, CAROL E JANSSON, TRUSTEE

CAROL E MILAN

CAROL E NEWMAN REVOCABLE TRUST UA 02-10-2006, CAROL E. NEWMAN, TRUSTEE

CAROL F DAVIES

CAROL FORACE

CAROL LAU PHD PSP PART QRP, CAROL LAU, TRUSTEE

CAROL M ENGLISH REV TRUST UD AGY, CAROL ENGLISH, TRUSTEE

CAROL S ROWE ROLLOVER ACCOUNT, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

CAROL SKRENTNY ROLLOVER IRA, TD AMERITRADE INC, CUSTODIAN

CAROL VIRGINIA JAMES

CAROLE LEVY REVOCABLE TRUST U/A/D 05-05-1986, CAROLE LEVY, TRUSTEE

CAROLINAS HEALTHCARE SYSTEM

CAROLINE D BRADLEY TRUST DATED 11/30/51 FBO SARAH DOLL BARDER, THE NORTHERN TRUST COMPANY, TRUSTEE

CAROLYN S FISHER FAMILY TRUST 11/16/90 U-A, CAROLYN S. FISHER, TRUSTEE

CAROMONT HEALTH INC. LSV MANAGED ACCOUNT-DBAB

CAROMONT/GASTON HEALTHCARE CORPORATE LCV

CAROMONT/GASTON HEALTHCARE PENSION LCV

CARPENTERS ANNUITY TRUST FUND FOR NORTHERN CALIFORNIA, CURRENT TRUSTEE

CARPENTERS PENSION TRUST FOR NORTHERN CALIFORNIA, BOARD OF TRUSTEES

CARR TOTAL RETURN FUND LIMITED PARTNERSHIP, ALPHA WINDWARD LLC

CARRINGTON M. LLOYD, JR. PLD

CARROLL PITTMAN, LOU E PITTMAN TRUST UA 04/30/02 PITTMAN TRUST, CURRENT TRUSTEE

CARYL PUCCI RETTALIATA DESIGNATED BENE PLAN

CASEY AND ASSOCIATES, LLP

CASSANDRA TRADING GROUP LLC

CATERPILLAR INC GRP INS A/C XX-X6669 (ALLIANZ GLOBAL INVESTORS CAPITAL LLC F/K/A OPPENHEIMER CAPITAL)

CATERPILLAR INC.

CATERPILLAR INC. GROUP INSURANCE PLAN MASTER TRUST, LOCI COLAW, TRUSTEE

CATERPILLAR INC. MASTER RETIREMENT TRUST, CURRENT TRUSTEE

CATERPILLAR INC. VEBA LCV

CATERPILLAR INVESTMENT TRUST A/K/A CATERPILLAR, INC. 401(K) PLAN

CATERPILLAR PORTABLE ALPHA

CATHERINE A. CAMPBELL TRUST UAD 9/21/1995, ROBERT D. CAMPBELL, TRUSTEE

CATHERINE VERDUSCO & FRANCESCA J VERDUSCO TRUST UA 12/13/89, CATHERINE J VERDUSCO, TRUSTEE

CATHLEEN L ROONEY

CATHOLIC MEDICAL CENTER

CATHOLIC MEDICAL CENTER BOARD DESIGNATED FUNDS MCV

CATHOLIC MEDICAL CENTER ERISA MCV

CATHOLIC UNITED INVESTMENT TRUST, CURRENT TRUSTEE

CAXTON INTERNATIONAL LIMITED CAXTON ASSOCIATES, LP F/K/A CAXTON ASSOCIATES, LLC

CAYUGA MEDICAL CENTER AT ITHACA

CBS MASTER TRUST, CURRENT TRUSTEE

CD INVESTMENT PARTNERS LTD

CDC FINANCIAL PRODUCTS INC.

CDP - NORTHERN TRUST CO

CDS CLEARING AND DEPOSITORY SERVICES, INC.

CECIL C. SMITH IRA, PERSHING LLC, CUSTODIAN

CECIL C. SMITH IRA, PTC, CUSTODIAN

CECILE M CROWE 1989 TRUST C U/A DTD 12/27/1989 FBO D CROWE, G CROWE, S CROWE, TRUSTEES

CEDAR GROVE CEMETERY ASSOCIATION PERPETUAL CARE INVESTMENT FUND

CEDE & CO. A/K/A THE DEPOSITORY TRUST COMPANY A/K/A THE DEPOSITORY TRUST & CLEARING CORPORATION

CEMEX INC. MASTER TRUST, CURRENT TRUSTEE

CENTRAL PENSION FUND

CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND

CENTRASTATE MEDICAL CENTER

CENTURION LONG-TERM STRATEGIES OVERSEAS, LTD.

CERVURITE

CERVURITE FAMILY LLC

CEY LIVING TRUST 5/14/87, RONALD C CEY & FRANCES L CEY TRUSTEES

CHALFANT H FOR NANCY-MARITAL TRUST NO 1, CURRENT TRUSTEE

CHANDLER BIGELOW AND ELIZABETH BIGELOW

CHANDLER TRUST NO. 1, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

CHANDLER TRUST NO. 2 AND CHANDLER SUB-TRUSTS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

CHANNING CAPITAL MGT LLC A/C XXXX5479

CHARI FAMILY TRUST UAD 1/18/01, ANATOL CHARI, TRUSTEE

CHARITABLE GIFT FUND MONEY MARKET POOL #4

CHARLENE FROST TRUST, GERTRUDE K CHISHOLM, TRUSTEE

CHARLES & ELIZABETH CLARKE TRUST U/A DTD 01/03/1994, CHARLES C CLARKE, ELIZABETH M CLARKE, TRUSTEES

CHARLES & NELL NOBIS TRUST U/A DTD 04/05/1995, CHARLES NOBIS, NELL NOBIS, TRUSTEES

CHARLES A. GARCIA TRUST UNDER AGREEMENT DATED SEPTEMBER 29, 1992, MICHAEL F. GARCIA, TRUSTEE

CHARLES C WELLS

6

CHARLES E EDWARDS FAMILY TRUST, U/A DTD 04/11/1990 (SUB ACCT MLI), CHARLES E EDWARDS, TRUSTEE

CHARLES E. COLE

CHARLES E. HUGEL

CHARLES E. WINDSOR

CHARLES FRIEDMAN

CHARLES GOTTFRIED TRUST U/A DTD 03/03/1969, DOLLSEY G RAPPAPORT, TRUSTEE

CHARLES J BOYLE JR AND DALE NANCY BOYLE

CHARLES J SALEMI LIV TRUST U/A DTD 08/02/2002, CHARLES J. SALEMI, TRUSTEE

CHARLES L. EDWARDS IRA R/O, GUARANTEE & TRUST CO., TRUSTEE

CHARLES M. DAVIS MARITAL TRUST 2 UNDER AGREEMENT DATED 11-27-1984 AS AMENDED, MARGARET E. DAVIS, TRUSTEE

CHARLES R . BAUGH, JR. AND BARBARA BAUGH

CHARLES R BAUGH

CHARLES R DILL AND MARILYN C DILL JT WROS

CHARLES ROTHERS TRUST UA 5/11/89, JANICE E ROTHERS, BARBARA A RADER, CHARLES T ROTHERS, TRUSTEES

CHARLES S. PAIGE AND DIANNA L. PAIGE

CHARLES S. SMITH

CHARLES SCHWAB & CO, INC.

CHARLES SCHWAB INVESTMENT MANAGEMENT, INC.

CHARLES STODDARD IRR TRUST UA, CHARLES C STODDARD, TRUSTEE

CHARLES STOTTLEMYER TRUST UA DTD 04/15/82, CHARLES E. STOTTLEMYER, TRUSTEE

CHARLES T BRUMBACK JR AND KIMBERLY C BRUMBACK

CHARLES T MARTIN

CHARLES T. AND MARY HOWE BRUMBACK DESCENDANTS TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

CHARLES T. RUPPMAN 1994 TRUST DATED 3-18-94, CHARLES T. RUPPMAN, TRUSTEE

CHARLES VANOLE AND BETTY VANOLE

CHARLES W HAMMOND TRUST, JAMES P HAMMOND, TRUSTEE

CHARLES WEINBERG

CHARLEY CHUNYU LU & BIYING ZHANG

CHARLOTTE BRODER REVOCABLE LIVING TRUST, CURRENT TRUSTEE

CHARLOTTE CASTLE NEAL TRUST U/A DTD 10/31/2000, CHARLOTTE CASTLE NEAL, TRUSTEE

CHARLOTTE M. HUGGINS REV TRUST, CHARLOTTE M. HUGGINS AND JACK D. HUGGINS, TRUSTEES

CHARLOTTE PIPE & FOUNDRY PENSION LARGE CAP EQUITIES

CHART & CO

CHARTER PARTNERS LP

CHARTER TRUST COMPANY

CHASE FAMILY TRUST #2 U/A DTD 02/21/1997, MARJORIE ANN CHASE, W H CHASE, TRUSTEES

CHAU LAM

CHEATHAM MARITAL TRUST DTD 1-23-88, ALYCE R CHEATHAM, TRUSTEE

CHEETAH + CO (T. ROWE PRICE ASSOCIATES INC.)

CHEMTURA CORPORATION MASTER RETIREMENT TRUST, ANN BUDZYNSKI, TRUSTEE

CHERCHEZ LA LOI LLC

CHERRY JACKSON SVEEN

CHERRY SUE JACKSON

CHERYL ANN GOKE TRUST UA 12-16-1996, CHERYL ANN GOKE, TRUSTEE

CHERYL R FOX

CHESTER S CAIN IRA, AMERIPRISE TRUST COMPANY F/K/A H&R BLOCK FINANCIAL ADVISORS, CUSTODIAN

CHEUK W YUNG

CHICAGO COMMUNITY FOUNDATION THE CELLMER/NEAL FAMILY FOUNDATION

CHICAGO MERCANTILE EXCHANGE

CHICAGO TRIBUNE FOUNDATION

CHINESE NATIONAL COUNCIL FOR SOCIAL SECURITY FUND

CHRIS CARPENTER

CHRIS LINDBLAD REVOCABLE TRUST U/A/D 04-20-2000, CHRIS LINDBLAD, TRUSTEE

CHRIS P STEPUSZEK

CHRISTI DASHER IRA, FCC, CUSTODIAN

CHRISTIAN COMMUNITY FND DBA FUND # 9659

CHRISTIAN SCHOOL PENSION AND TRUST FUND

CHRISTIAN SCHOOLS INTERNATIONAL

CHRISTIANA CARE HEALTH SERVICES RETIREMENT PLAN, WILMINGTON TRUST COMPANY, M&T BANK, TRUSTEES

CHRISTIANA CARE HEALTH SERVICES, INC., WILMINGTON TRUST COMPANY, M&T BANK AS AGENTS (CHRISTIANA CARE HEALTH SERVICES INVESTMENT FUND)

CHRISTIANA L O'CONNOR TRUST, BANK OF AMERICA, N.A., TRUSTEE

CHRISTIE ROBERTS

CHRISTINA MONSON

CHRISTINE E. SMITH CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

CHRISTINE FITZSIMONS 2004 TRUST U/A DTD 08/26/2004, MATTHEW B FITZSIMONS, TRUSTEE

CHRISTOPHER E. GATES

CHRISTOPHER F. BADER AND MICHELE M. BADER

CHRISTOPHER J APPLEBY TRUST U/A DTD 12/13/1989, JEFFREY J APPLEBY, TRUSTEE

CHRISTOPHER K CARPENTER

CHRISTOPHER POPE

CHRISTOPHER REILLY

CHRISTUS HEALTH

CHRISTUS HEALTH CASH BALANCE PLAN - CHRISTUS HEALTH OPERATING FUND LCV

CHRYSLER GROUP LLC F/K/A DAIMLERCHRYSLER CORPORATION

CHURCH PENSION FUND

CIBC GLOBAL EQUITY FUND

CIBC POOLED U.S EQUITY S&P 500 INDEX FUND

CIBC TRUST CORPORATION IMPERIAL U.S. EQUITY POOL

CIBC U.S. BROAD MARKET INDEX FUND

CIBC WORLD MARKETS CORP.

CIBC WORLD MARKETS, INC./CDS

CIC

CICONIA CO LLC, A PARTNERSHIP

CIGNA CORPORATION

CIM XVI LLC

CINDY L SCHREUDER IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

CIRI GILLESPIE

CITADEL DERIVATIVES GROUP LLC

CITADEL EQUITY FUND LTD

CITADEL LIMITED PARTNERSHIP

CITI CANYON LTD CIBC BANK & TRUST COMPANY (CAYMAN) LTD, CANYON CAPITAL ADVISORS LLC

CITI GOLDENTREE LTD

CITIBANK NA EQUITY DERIVATIVES

CITIBANK, NATIONAL ASSOCIATION, IN ITS INDIVIDUAL AND CUSTODIAL CAPACITIES

CITICORP SECURITIES SERVICES INC.

CITIGROUP (SBI SWAPS)

CITIGROUP DERIVATIVES MARKETS INC.

CITIGROUP DERIVATIVES MARKETS INC. (QCM JOINT ACCOUNT)

CITIGROUP GLOBAL MARKETS INC.

CITIGROUP GLOBAL MARKETS LTD

CITIGROUP PENSION PLAN TRUST, THE BANK OF NEW YORK MELLON, TRUSTEE

CITITRUST (SWITZERLAND) LTD.

CITY NATIONAL BANK

CITY OF ATLANTA POLICE OFFICERS' PENSION FUND

CITY OF ATLANTA, GENERAL EMPLOYEES PENSION FUND

CITY OF BOYNTON BEACH

CITY OF CINCINNATI

CITY OF DAYTONA BEACH POLICE AND FIRE PENSION

CITY OF GAINESVILLE POLICE OFFICERS' AND FIREFIGHTERS RETIREMENT FUND

CITY OF JACKSONVILLE POLICE & FIRE PENSION BOARD OF TRUSTEES TRUST

CITY OF LOS ANGELES EMPLOYEES' RETIREMENT SYSTEM

CITY OF MEMPHIS

CITY OF PHILADELPHIA PUBLIC EM

CITY OF RICHMOND

CITY OF RICHMOND - RSRS

CITY OF ST. LOUIS ERS LCV

CITY OF STAMFORD CLASSIFIED EMP. RET. FUND

CIVILIAN EMPLOYEES' RETIREMENT SYSTEM OF THE POLICE DEPARTMENT OF KANSAS CITY, MISSOURI

CLARA BUSCH ORTHWEIN IRREVOCABLE TRUST, BANK OF AMERICA, N.A., TRUSTEE

CLARE ATTWELL GLASSELL, INDIVIDUALLY AND AS THE BENEFICIARY OF THE CLARE ATTWELL GLASSELL CONTINUING MARITAL TRUST, ALFRED C. GLASSELL III, ACTING TRUSTEE

CLARENCE G PETERSEN

CLARESA F. M. ARMSTRONG

CLARETIAN MISSIONARIES WESTERN PROVINCE INC

CLAUDIA BARCLAY

CLAUDIA BROWN

CLAUDIA F GASPARINI

CLAUDIA F GASPARINI IRA

CLAYTON COUNTY EMPLOYEES RETIREMENT SYSTEM

CLAYTON COUNTY GEORGIA

CLEAR COVE CAPITAL LP

CLEARVIEW CORRESPONDENT SERVICES

CLEARWATER INVESTMENT TRUST (CLEARWATER GROWTH FUND), CURRENT TRUSTEE

CLERICAL MEDICAL INVESTMENT GROUP LIMITED

CLERICAL MEDICAL MANAGED FUNDS LIMITED

CLINTON CHAN, GABELLI ASSET MANAGEMENT CO.

CLOSE, PROGRAM GUARANTEED

CLW TRUST FBO ARTHUR MCKENNY, BANK OF AMERICA, N.A., TRUSTEE

CLWYD PENSION FUND

CMA CAPITAL PARTNERS FUND GU IG MARKETS, CMA CAPITAL PARTNERS LTD.

CMCJL LLC

CNH MASTER ACCOUNT L.P. CNH PARTNERS, LLC

CO TUW ISABELLE COCHRAN FBO INA, BANK OF AMERICA, N.A., TRUSTEE

CO VALUE EQUITY ARIEL/PACE/PACE SMALL MEDIUM

COASTVIEW EQUITY PARTNERS LP

COBALT TRADING LLC

COBLENTZ PATCH DUFFY BASS PSP FBO WILLIAM K COBLENTZ, FIDELITY MANAGEMENT TRUST CO, TRUSTEE

CO-EXEC EST OF RONALD WILLIAMS, CURRENT TRUSTEE

COFFEY BERTHA FBO B COFFEY HOYT-TR

COGENT INVESTMENT STRATEGIES MASTER FUND, SPC-CLASS D

COHEN FRAN REV LIV TRUST, MILTON L COHEN, TRUSTEE

COLBY BARTON COOK UCAUTMA, KEITH K COOK, CUSTODIAN

COLIN T KERR TRUST U/A DTD 09/02/1977, JULIE M. KERR, TRUSTEE

COLIN THOMAS KERR

COLLECTIVE INVESTMENT TRUST FOR EMPLOYEE BENEFIT PLANS, CURRENT TRUSTEE

COLLECTIVE TRUST OF THE BANK OF NEW YORK, THE BANK OF NEW YORK MELLON, TRUSTEE

COLLEGE OF THE OZARKS

COLLEGE RETIREMENT EQUITIES FUND - EQUITY INDEX ACCOUNT

COLLEGE RETIREMENT EQUITIES FUND - GLOBAL EQUITIES ACCOUNT

COLLEGE RETIREMENT EQUITIES FUND - SOCIAL CHOICE ACCOUNT

COLLEGE RETIREMENT EQUITIES FUND - STOCK ACCOUNT

COLLEGES OF APPLIED ARTS AND TECHNOLOGY PENSION PLAN

COLLER HOLDINGS, LLC

COLORADO BUSINESS BANK

COLORADO PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION

COLUMBIA LARGE CORE QUANTITATIVE FUND F/K/A COLUMBIA LC INDX

COLUMBIA LARGE CORE QUANTITATIVE FUND F/K/A RVS VP LARGE CAP EQUITY FUND – MAIN

COLUMBIA ORTHOPAEDIC GROUP PSP FBO R D CARTER

COLUMBIA UNIVERSITY

COMERICA 500 INDEX FUND - EB

COMERICA 500 LARGECAP INDEX - 584 (184)

COMERICA BANK & TRUST, N.A., IN ITS CORPORATE CAPACITY AND AS SPONSOR OF ITS COLLECTIVE INVESTMENT FUNDS

COMERICA LARGECAP INDEX - 584 (184)

COMERICA LARGECAP INDEX - EB

COMERICA LARGECAP VALUE INDEX - EB

COMERICA TOTAL US EQUITY INDEX FD. 584

COMMERCE BANK, N.A.

COMMERZ MARKETS LLC A/K/A COMMERZBANK CAPITAL MARKETS

COMMERZBANK AG F/K/A DRESDNER BANK AG

COMMONWEALTH OF PA TOBACCO SETTLEMENT INVESTMENT BOARD

COMMONWEALTH OF PA TREASURY DEPARTMENT FUNDS

COMMONWEALTH OF PENNSYLVANIA PUBLIC SCHOOL EMPLOYEES' RETIREMENT SYSTEM

COMMONWEALTH OF PENNSYLVANIA TUITION ACCOUNT PROGRAM FUND

COMMUNITY FOUNDATION OF SARASOTA COUNTY CORPORATE ENDOWMENT FDN

COMMUNITY FOUNDATION OF SARASOTA COUNTY, INC

COMMUNITY FOUNDATION OF SARASOTA COUNTY TRUST ENDOWMENT FUND, THE NORTHERN TRUST COMPANY, TRUSTEE

COMMUNITY FOUNDATION OF WESTERN NORTH CAROLINA

COMMUNITY INSURANCE COMPANY

COMMUNITY OF CHRIST CHURCH LCV

COMMUNITY OF CHRIST PENSION LCV

COMP PLNING CORP PSP & TR, ALAN J HUNKEN, TRUSTEE

COMPUTERSHARE TRUST CO., N.A.

CONAIR CORPORATION

CONNECTICUT GENERAL LIFE INSURANCE COMPANY

CONNECTICUT HEALTH FOUNDATION, INC.

CONNELL FAMILY PARTNERSHIP TRUST, CURRENT TRUSTEE

CONRAD C FINK AND SUE C FINK

CONS DISC SELECT SECTOR SPDR

CONSEILLER MANAGED FUND LTD.

CONSEJO EPISCOPAL LATINO

CONSERVATIVE BALANCED PORTFOLIO, A SERIES OF PRUDENTIAL SERIES FUND, INC.

CONSOLIDATED EDISON COMPANY OF NEW YORK

CONSTANCE TOLBERT YESO

CONSTANCE W SCHNUCK REV TRUST U/A DTD 12-15-93, CONSTANCE W SCHNUCK, TRUSTEE

CONSUMERS ENERGY COMPANY

CONSUMERS FINANCIAL SERVICES OF UNION COUNTY

CONVERTIBLES STRATEGIC HOLD EQ CONVERTIBLES MIDDLE OFFICE

CONWAY 1992 TRUST U/A DATED 01/16/1992, CHRISTOPHER J. CONWAY, ANN W. CONWAY, TRUSTEES

COOK COUNTY OFFICERS AND EMPLOYEES

COOK COUNTY PENSION FUND

COOK COUNTY RET BOARD

COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A. A/K/A RABOBANK

COPPER NUGGET, INC.

COPPOLA FAMILY TRUST U/A DTD 11/27/2001, LOUIS COPPOLA, BETTY COPPOLA, TRUSTEES

CORINNE CHANDLER WERDEL TST NO. 1 GST NON-EXEMPT QUA, TOM WERDEL, TRUSTEE

CORNELIA V. TOBEY

CORPORATION SERVICE COMPANY

CORRIE NORRIS WHITE

CORTESE/MOGAVERO JOINT VENTURE

COSMOPOLITAN INVESTMENT FUND

COUGAR TRADING LLC

COUNTRY CLUB BANK

COUNTY EMPLOYEES' AND OFFICERS' ANNUITY AND BENEFIT FUND OF COOK COUNTY

COUNTY OF LOS ANGELES A/K/A COUNTY OF LOS ANGELES SAVINGS

COUTTS US EQUITY INDEX PROGRAMME

COWEN CAPITAL LLC F/K/A LABRANCHE STRUCTURED PRODUCTS LLC

COX FAMILY EDUCATIONAL TRUST U/A DTD 08/02/2004, ROSEMARY T COX, TRUSTEE

CRAIG A FOR ALBERT JR ET AL

CRAIG BRIMICOMBE

CRAIG G FOR K KNIGHT

CRAIG P WILLIAMSON REV TRUST U/A DTD 05/16/2006, CRAIG P WILLIAMSON, TRUSTEE

CRAIG P. EMMONS TRUST U/A FBO CRAIG P EMMONS, BANK OF AMERICA, N.A., TRUSTEE

CRAIG W DOUGHERTY

CRANE CO MASTER TRUST, CURRENT TRUSTEE

CRANE H KENNEY 401(K) SAVINGS PLAN

CRANE H. KENNEY

CRANE H. KENNEY AND KELLY KENNEY

CRAWFORD COMPANY LLC

CREDIT AGRICOLE CORP. & INVESTMENT BANK - CREDIT AGRICOLE SECURITIES (USA) INC.

CREDIT SUISSE (LUXEMBOURG) SA

CREDIT SUISSE CAPITAL LLC

CREDIT SUISSE FIRST BOSTON

CREDIT SUISSE FIRST BOSTON (CSFB PROP TRADING US A/C)

CREDIT SUISSE FIRST BOSTON EUROPE LTD

CREDIT SUISSE INTERNATIONAL (DEALER)

CREDIT SUISSE SECURITIES (EUROPE) LTD

CREDIT SUISSE SECURITIES (USA) LLC

CREDIT SUISSE SECURITIES (USA) LLC F/K/A CREDIT SUISSSE FIRST BOSTON LLC

CROW REALTY INVESTORS, LP

CROWELL WEEDON & CO.

CS ZURICH

CSAA IIB AUTOBANK RETIREMENT PLAN

CSS, LLC

CSX CORPORATION MASTER TRUST PENSION, RICK PATSY, TRUSTEE

CTC FUND MANAGEMENT, L.L.C.

CTC HOLDINGS, L.P. D/B/A CHICAGO TRADING COMPANY

CTC MASTER FUND LTD

CTHF CONNECTICUT HEALTH FOUNDATION

CTS CORPORATION MASTER RETIREMENT TRUST, DONNA BELUSAR, TRUSTEE

CUSTOMER FRIENDLY CREATIONS

CUTLER GROUP, LP

CYMI EQUITY LP.

CYNTHIA BAKER

CYNTHIA BLOOMGARDEN U/A DTD 12/27/2002, CYNTHIA BLOOMGARDEN, TRUSTEE

8

2855453.1

| | | |
|---|---|---|
| D & J TENENBAUM REVOCABLE TRUST U/A 8/14/06, DAVID M TENENBAUM, JANN G TENENBAUM, TRUSTEES | DARELL F KUENZLER, EDWARD D JONES & CO, CUSTODIAN | DAVID T.K. LU |
| D. JEFFREY SWINSON | DARELL F. KUENZLER IRA, EDWARD D. JONES & CO., CUSTODIAN | DAY FAMILY LLLP |
| D.A. DAVIDSON & CO. | DARRIN MARITAL TRUST, KEVIN O'DONNELL, TRUSTEE | DBI FONDS HPT USV |
| D.C. RETIREMENT BOARD D.C. RETIREMENT FUNDS | DARYL V DICHEK | DBSO SECURITIES LTD. |
| D.C. RETIREMENT FD/ALLIANCE | DAVENPORT & CO. LLC | DBX RISK ARBITRAGE 7 FUND |
| D.E. SHAW & CO. LP | DAVID & LOIS LIEBERMAN TRUST SL-237, CUSTODIAN, DAVID A. & LOIS A. LIEBERMAN, TRUSTEES | DE GROOT FAMILY TRUST, BANK OF AMERICA, N.A., TRUSTEE |
| D.E. SHAW OCULUS PORTFOLIOS LLC | | DE PAUL UNIVERSITY |
| D.E. SHAW VALENCE PORTFOLIOS LLC | DAVID & TEDDI BAGGINS TRUST 7E-124, CUSTODIAN, TEDDI E. BAGGINS, TRUSTEE | DE WERD TRUST U/A DTD 05/04/1998, J DE WERD, M DE WERD, TRUSTEES |
| D.E. SHAW VALENCE PORTFOLIOS LLC - BROAD CORE | DAVID A DICHEK | DEAN L. DAVENPORT |
| DAILY NEWS TRIBUNE INC | DAVID A. NOYES & COMPANY | DEAN P GILLESPIE UND CT UNIF TFRS TO MIN ACT, DEAN P GILLESPIE, LEE U GILLESPIE C/F |
| DAIMLERCHRYSLER CORP. | DAVID B LEICHENGER | |
| DAIMLERCHRYSLER CORP. VEBA LCV | DAVID B NELSON INVESTMENT TRUST U/A 4/24/09, DAVID B NELSON, TRUSTEE | DEANN K RILEY AND DAVID L RILEY JT TEN |
| DALLAS POLICE AND FIRE PENSION SYSTEM, CURRENT TRUSTEES | | DEBORAH FEDYNAK |
| | DAVID C DE SIEYES | DEBORAH L BRICE |
| DALTON TRUST AGREEMENT, U/A DTD 10/03/2007, DEREK M. DALTON, KAREN E. DALTON, TRUSTEES | DAVID C. TWICHELL | DEBORAH P GREEN |
| | DAVID D GRUMHAUS 1990 TRUST U/A DTD 03/26/1990, DAVID D GRUMHAUS, TRUSTEE | DEBRA A. GASTLER |
| DAN MURPHY FOUNDATION | | DEBRA A. MARTHEY |
| DANA CORPORATION PENSION PLANS TRUST, COREY LUCAS, TRUSTEE | DAVID D GRUMHAUS III TRUST UAD 12/23/95, LISA G. HAAS, TRUSTEE | DEBRA ANN AURAND IRA ROLLOVER DTD 06/23/1999, CHARLES SCHWAB & CO INC, CUSTODIAN |
| DANIEL A MCCAUGHNA IRA, FCC, CUSTODIAN | DAVID D. BROWN AND CYNTHIA M. BROWN | |
| DANIEL A SMITH | DAVID D. WILLIAMS AND SANDRA L. WILLIAMS JTWROS | DEBRA CONTARINO AND THERESA KASLER JT TEN |
| DANIEL B. OLDHAM | | |
| DANIEL COHEN AND BARRIE COHEN F/K/A BARRIE A. KASS | DAVID DEAN HILLER | DEBRA J HOLMES |
| | DAVID E NEISSER IRREVOCABLE TRUST DATED 8-14-83, JUDITH E NEISSER, TRUSTEE | DECLARATION OF BELL FAMILY TRUST, GLEN W. BELL JR., MARTHA A BELL AND KATHLEEN B FLYNN, TRUSTEES |
| DANIEL E. GELLER TRUST U/A/D 07/19/2006, DANIEL E GELLER, TRUSTEE | | |
| | DAVID ERTEL AND BETH ERTEL | DEEPAK AGARWAL |
| DANIEL G PREZEMBEL | DAVID F ANTHONY SEP IRA, NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN | DEEPHAVEN EVENT TRADING LTD. |
| DANIEL G VOLKMANN III REV TRUST 3/7/03, DANIEL G VOLKMANN III, TRUSTEE | | DEEPHAVEN GROWTH OPPORTUNITIES TRADING, LTD. |
| DANIEL H RENBERG IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN | DAVID FRANK & MARESSA C FRANK TRUST HC 31 TRUST UA 12/13/89, DAVID D. FRANK, TRUSTEE | DEERE & COMPANY LARGE CAP VALUE |
| | | DEERE & COMPANY WELFARE BENEFIT TRUST #1, CURRENT TRUSTEE |
| DANIEL H. BAYLY | DAVID FRANK & WAYNE C FRANK TRUST UA 12/13/89 HC 31, DAVID D FRANK, TRUSTEE | |
| DANIEL H. RENBERG | | DEKALB COUNTY |
| DANIEL J FABIAN | DAVID GREENSPAHN | DEL MAR ASSET MANAGEMENT, LP |
| DANIEL J FABIAN CUSTODIAN FPO IRA | DAVID GREENSPAHN TOD HERBERT GREENSPAHN | DEL MAR MASTER FUND |
| DANIEL J HILLARY | | DEL MAR MASTER FUND, LTD. |
| DANIEL J SHEA | DAVID H COFRIN TRUST, US BANK, TRUSTEE | DELAPLANTE FAMILY TRUST U/A DTD 07/27/96, ALBERT M DELAPLANTE, HORTENSE MARY DELAPLANTE, TRUSTEES |
| DANIEL J ZWEIG AND BETH L ZWEIG | DAVID H JACOBY | |
| DANIEL J. COLLINS | DAVID HOCHBERG | |
| DANIEL J. GREENBLATT IRR LIV TRUST U/A DTD 12/11/2003, LYNNE M GREENBLATT, TRUSTEE | DAVID J EDWARDS | DELD FAMILY FOUNDATION TRUST UAD 9/30/02, DOROTHY L. DRUMMEY, PAUL BOURDEAU, TRUSTEES |
| | DAVID J TROCCOLI AND JANICE E TROCCOLI JT TEN | |
| DANIEL JOSEPH AND SUSAN JOSEPH | | DENISE MECK |
| DANIEL K ROLLO ROLLOVER IRA, NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN | DAVID JEFF AND CARMELA SHAW | DENISE PALMER REVOCABLE TRUST U/A/D 10-28-1991, DENISE E PALMER, TRUSTEE |
| | DAVID L. NELSON REVOCABLE TRUST U-A 02/11/91, DAVID L. NELSON, TRUSTEE | |
| DANIEL KAZAN | | DENNIS E THOMAS AND JOAN E THOMAS |
| DANIEL OPAT TRUST U/A DTD 08/31/2006, DANIEL OPAT, TRACY OPAT, TRUSTEES | DAVID LEIGHTON TAYLOR REV TRUST U/A/D 09-09-2004, DAVID L. TAYLOR, TRUSTEE | DENNIS EUGENE DE HAAS |
| | | DENNIS J BRITT |
| DANIEL OSORIO | DAVID M BRUNS | DENNIS J BRITT ROLLOVER IRA, SCOTTRADE INC, CUSTODIAN |
| DANIEL R ZUCKERMAN | DAVID M JACOBS REVC LVG TRUST U/A DTD 05/08/90, DAVID M. JACOBS, TRUSTEE | |
| DANIEL R. REESE | | DENNIS J FITZSIMONS |
| DANIEL S JURSA IRA ROLLOVER, PERSHING LLC, CUSTODIAN | DAVID MAZZULLO | DENNIS J FITZSIMONS 401(K) SAVINGS PLAN |
| | DAVID N KORNFELD PSRP PS, FIDELITY MANAGEMENT TRUST CO, TRUSTEE | DENNIS J FITZSIMONS TRUST U/A DTD 03/29/2001, DENNIS J FITZSIMONS, TRUSTEE |
| DANIEL S JURSA IRA ROLLOVER, PTC, CUSTODIAN | | |
| | DAVID OVERTON | DENNIS J. DREBSKY |
| DANIEL S. GREGORY | DAVID P. MILLER | DENNIS J. LAYNE ROLLOVER IRA, ROBERT W BAIRD & CO INC, CUSTODIAN |
| DANIEL WHITNEY YOUNG GIFT TRUST, LISA F GRUMHAUS, TRUSTEE | DAVID R KATZ IRA, AMERIPRISE TRUST COMPANY, CUSTODIAN | |
| | | DENNIS S. BUNDER |
| DANSKE BANK | DAVID S MORRISON | DENNIS W HETLER, MSSB, CUSTODIAN |
| DARBY J DOUGLAS FOR JAMES REM TR, CURRENT TRUSTEE | DAVID S ROSENBERG AND CYNTHIA ROSENBERG | DEPAUL UNIVERSITY |
| | | DEPFA BANK PLC, HYPO REAL ESTATE BANK INTERNATIONAL |
| | DAVID SIU | |

9

DERRICK E MCGAVIC IRA NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

DESERET TRUST CO.

DESJARDINS AMERICAN EQUITY VALUE

DET ED QUALIFIED NUCLEAR DECOMMISSIONING TRUST, CURRENT TRUSTEE

DETROIT FREE PRESS NEWSPAPER GUILD LCV

DETROIT MEDICAL CENTER CONSOLIDATED PENSION PLAN AND MASTER RETIREMENT TRUST, CURRENT TRUSTEE

DETROIT MEDICAL CENTER INSURANCE

DETROIT POLICEMAN AND FIREMAN RETIREMENT SYSTEM

DEUTSCHE ASSET MANAGEMENT (SCUDDER)

DEUTSCHE BANK AG AMSTERDAM

DEUTSCHE BANK AG LONDON

DEUTSCHE BANK AG LONDON RIPLEY INDEX

DEUTSCHE BANK AG LONDON RIPLEY SPX LNG-AUTO

DEUTSCHE BANK AG LONDON RIPLEY SPX SHT-AUTO

DEUTSCHE BANK AG LONDON SEF SWAP HEDGE ACCOUNT

DEUTSCHE BANK AG MAP TRADING ACCOUNT

DEUTSCHE BANK AG MAPS PROVIDENT ADVISORS LLC

DEUTSCHE BANK AG WESTCHESTER CAPITAL MANAGEMENT INC.

DEUTSCHE BANK AG, FILIALE AMSTERDAM

DEUTSCHE BANK AG, LONDON, GED

DEUTSCHE BANK SECURITIES INC.

DEUTSCHE BANK SECURITIES INC. - DB AG EQUITY SWAPS OFFSHORE CONSOLIDATED ACCOUNT I

DEUTSCHE BANK USA (DEUTSCHE BANK AG, FRANKFURT)

DEUTSCHE LUFTHANSA AG

DEUTSCHE SHELL PENSIONEN TREUHAND E.V. (DSPT)

DEVIN J MURPHY

DEVIN J MURPHY IRA FIDELITY MANAGEMENT TRUST CO CUST

DEXIA BANK

DF MEDIA

DFA INVESTMENT DIMENSIONS GROUP INC. -- U.S. CORE EQUITY 1 PORTFOLIO

DFA INVESTMENT DIMENSIONS GROUP INC. -- U.S. CORE EQUITY 2 PORTFOLIO

DFA INVESTMENT DIMENSIONS GROUP INC. -- U.S. VECTOR EQUITY PORTFOLIO

DFA INVESTMENT DIMENSIONS GROUP INC. -- VA U.S. LARGE VALUE PORTFOLIO

DFA U.S. CORE EQUITY FUND OF DIMENSIONAL FUNDS

DFA US VECTOR EQUITY FUND OF DIMENSIONAL FUNDS

DFE ASSET MANAGEMENT, LLC DF ENTERPRISES

DGAM HERITAGE ABSOLUTE RETURN MASTER FUND

DIAMOND CONSOLIDATED L.P.

DIAMONDBACK CAPITAL MANAGEMENT, LLC

DIAMONDBACK MASTER FUND LTD.

DIANA L. BONVEGNA CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

DIANA NEWELL TOD AND STEVEN R NEWELL

DIANE BUCHANAN WILSEY

DIANE D MURPHY

DIANE FILIPPI

DIANE SCLAFANI

DICHEK FAMILY TRUST U/A 12/11/74, SHIRLEY DICHEK, TRUSTEE

DIGEL FAMILY INVESTMENT CO. LLC

DIGNITY HEALTH F/K/A CATHOLIC HEALTHCARE WEST

DIGNITY HEALTH F/K/A CATHOLIC HEALTHCARE WEST FUNDED DEPRECIATION

DIGNITY HEALTH F/K/A CATHOLIC HEALTHCARE WEST RETIREMENT TRUST, CURRENT TRUSTEE

DIGNITY HEALTH F/K/A CATHOLIC HEALTHCARE WEST SELF INSURANCE

DIGNITY HEALTH F/K/A CATHOLIC HEALTHCARE WEST WORKERS COMPENSATION

DII INDUSTRIES LLC ASBESTOS PI TRUST, MARCELLENE MALOUF, TRUSTEE

DILLON SMITH

DINA ALBRIGHT TR-TIMES MIRROR, TROY GASS, TRUSTEE

DIOCESE OF BUFFALO LAY PENSION LCV

DIOCESE OF TRENTON-PENSION FUND

DIRECT EDGE ECN A-F

DIRECT EDGE ECN LLC

DIRECTORS GUILD OF AMERICA - PRODUCER PENSION PLAN BASIC BENEFIT PLAN A/K/A DIRECTOR'S GUILD OF AMERICA PRODUCER PENSION TRUST, CURRENT TRUSTEE

DIREXION FUNDS TRUST (EVOLUTION ALL CAP EQUITY FUND)

DIREXION FUNDS TRUST (EVOLUTION LARGE CAP FUND)

DIREXION INSURANCE TRUST, CURRENT TRUSTEE

DISTRICT #9 IAMAW PENSION TRUST FD, PAULA WORLITZ, TRUSTEE

DISTRICT 1199J NEW JERSEY HEALTH CARE EMPLOYERS PENSION PLAN A/K/A DISTRICT 1199J NEW JERSEY HEALTH CARE EMPLOYERS PENSION FUND

DIVERSIFIED INV ADV E-HZN

DL PARTNERS LP HARVARD BUSINESS SERVICES, INC.

DLD FAMILY LLLP

DLD PARTNERS

DMC INSURANCE CO. LTD. MASTER CUSTODY AGREEMENT

DOHENY EYE INSTITUTE

DOLLSEY SEYMOUR RAPPORT UAD 5/6/88 FBO DANI Y ROZMAN, MARJORIE ROZMAN, NANETTE ROSENBERG, TRUSTEES

DOLORES C. MIERKIEWICZ

DOLORES H. RUSS TRUST, DOLORES H. RUSS, TRUSTEE

DOMINION NUCLEAR CONNECTICUT, QUAL NDT INVESTMENT POOL

DOMINION RESOURCES, INC. DEFINED BENEFIT MASTER TRUST, CURRENT TRUSTEE

DON & IRENE BARON FAMILY TRUST 7B-251, IRENE BARON, TRUSTEE

DON E CARTER

DON H. FELLABAUM, JR.

DON P HAYN JR

DON WIDRIG TRUST, MICHAEL RICHARD WIDRIG, GREGORY D WIDRIG, TRUSTEES, FIDELITY MANAGEMENT TRUST CO CUSTODIAN - ROTH BDA TRUSTEE

DONALD A AGRELLA AND ELEANOR T AGRELLA TRUST U/A/D 10-15-88, DONALD A AGRELLA, ELEANOR T AGRELLA, TRUSTEES

DONALD B. PRELL CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

DONALD C GRENESKO 401(K) SAVINGS PLAN

DONALD C. KRASKA

DONALD CARL AND SHARRON LOUISE CRAMER

DONALD CASPER TRUST U/A DTD 01/27/97, DONALD CASPER, TRUSTEE

DONALD E GOSS

DONALD GRENESKO

DONALD GRENESKO AND MARCIA GRENESKO

DONALD H NIEDERER

DONALD H RUMSFELD

DONALD HORWITZ

DONALD J. WIIKEN CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

DONALD L MILLER TRUST U/A DTD 05/20/1982, DONALD L MILLER, TRUSTEE

DONALD L. ROSS TRUST, DONALD LEE ROSS, NANCY ANN ROSS, TRUSTEES

DONALD M HINMAN JR

DONALD N BOYCE

DONALD R HARRIS LIVING TRUST UA DTD 8/25/2000, DONALD R HARRIS, TRUSTEE

DONALD ROONEY AND SARA ROONEY

DONALD SALMANSON TRUST, CURRENT TRUSTEE

DONALD W. READETT

DONN M. DAVIS 9398 IRA

DONN R ROBERTS AND PATRICIA ROBERTS

DONNA BARROWS

DOREEN M KLIME REVOCABLE LIVING TRUST U/A DTD 6/13/2006, L KLIMA, D KLIMA, TRUSTEES

DORIS DUKE CHARITABLE FOUNDATION

DORIS E. LILLY IRA, FCC, CUSTODIAN

DORIS KEATS FRANK REVOCABLE TRUST UA 03/07/00, DORIS KEATS FRANK, TRUSTEE

DOROTHY B CHANDLER MARITAL TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

DOROTHY B CHANDLER RESIDUARY TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

DOROTHY C. PATTERSON IRREVOCABLE TRUST #2 U/A/D 12-21-93, THE NORTHERN TRUST COMPANY, AS SUCCESSOR TRUSTEE

DOROTHY CAHN TRUST UAD 07/03/1981, KENNETH CAHN, TRUSTEE

DOROTHY D SMITH TRUST U/A DTD 10/15/1980, DOROTHY M WALKER, TRUSTEE

DOROTHY D. PARK

DOROTHY DUNKLIN MARTING

DOROTHY E. HINZE

DOROTHY L. DRUMMEY 2005 GRANTOR RETAINED ANNUITY TRUST U/A DTD 12/09/2005, DOROTHY L. DRUMMEY, TRUSTEE

DOROTHY LEE INGEBRETSEN SEPARATE PROPERTY TRUST, CURRENT TRUSTEE

DOROTHY P O'DONNELL REVOCABLE TRUST U/A DTD 04/25/1983, J OLDENDORF, TRUSTEE

DOROTHY PATTERSON GUARDIANSHIP, THE NORTHERN TRUST COMPANY, TRUSTEE

DOROTHY QUAAL REV TRUST UA 09/02/1993, DOROTHY QUAAL, BMO HARRIS BANK N.A., TRUSTEES

DOROTHY R MOOG FAMILY TRUST, US BANK, TRUSTEE

DOROTHY ROCKE TRUST U/A DTD 06/06/88, DOROTHY ROCKE, TRUSTEE

DOROTHY ROUSE-BOTTOM

DOROTHY RUSSELL SHATTUCK

DOROTHY UPJOHN DALTON GRANDCHILDREN'S TRUST

DOUBLE BLACK DIAMOND OFFSHORE LTD. F/K/A DOUBLE BLACK DIAMOND OFFSHORE LDC, CARLSON CAPITAL L.P.

DOUGLAS A. WARD

DOUGLAS B STEWART

DOUGLAS H DITTRICK

DOUGLAS H DITTRICK AND BARBARA S DITTRICK

DOUGLAS H MCCORKINDALE

DOUGLAS J LUITEN DMD PC PSP U/A DTD 01/01/1996, DOUGLAS J LUITEN DMD, TRUSTEE

DOUGLAS L SMATHERS TRUST U/A DTD 04/12/2004, DOUGLAS L SMATHERS, TRUSTEE

DOUGLAS LEE MEYER AND STACEY MEYER

DOUGLAS M. & JUDITH A. LIGHT REV. TRUST, D. LIGHT & J. LIGHT, TRUSTEES

DOUGLAS PAGE IRA

DOUGLAS R MURRAY ADVISORY AGENCY

DOUGLAS WILLIAM AND VICTORIA M. KING

DOW JONES LG/MIDCAP SL SERIES COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

DOYLE D. MCMANUS

DR. CLARESA F ARMSTRONG TRUST U/A DTD 4/21/1983, CLARESA F. ARMSTRONG, TRUSTEE

DR. DAVID L. HOEXTER IRA R/O, DELAWARE CHARTER GUARANTEE & TRUST COMPANY, TRUSTEE

DRAPER AND KRAMER, INC. A/K/A DK/EQUITY, LLC

DRAWBRIDGE GLOBAL MACRO MASTER FUND LTD - K

DREMAN CONTRARIAN VALUE TRUST SERIES 3, CURRENT TRUSTEE

DRESSER-RAND COMPANY

DREYFUS INDEX FUNDS, INC. (DREYFUS S&P 500 INDEX FUND)

DREYFUS STOCK INDEX FUND, INC.

DRS. BRUCE AND LEE FOUNDATION

DUDLEY S. TAFT

DUKE ENERGY CORPORATION MASTER DECOMMISSIONING TRUST

DUKE POWER COMPANY NON-QUALIFIED EQUITY NUCLEAR DECOMMISSIONING TRUST, DUKE ENERGY CORPORATION, TRUSTEE

DUNCAN T WEAVER JR AND KAREN M SORRELL

DUNN INVESTMENT COMPANY PMP GROWTH

DUQUESNE UNIVERSITY OF THE HOLY SPIRIT

DURHAM J MONSMA AND ROBBIE E MONSMA

DWP BANK

DWS EQUITY 500 INDEX PORTFOLIO, DWS INSTITUTIONAL FUNDS, DWS INVESTMENT TRUST, DWS INVESTMENTS VIT FUNDS, DWS VARIABLE SERIES II

DWS EQUITY 500 INDEX VIP (DWS INVESTMENTS ACCOUNT BOS05-0702)

DYE CHILDREN PARTNERSHIP SPECIAL TV JWD MANAGEMENT

DYNAMIC DOMESTIC FUND LP

E DONALD HEYMANN

E H OPPENHEIMER TRUST, EDWARD H OPPENHEIMER, TRUSTEE

E L SANFORD TRUST CHILDREN/ADA, BANK OF AMERICA, N.A., TRUSTEE

E L SANFORD TRUST CHILDREN/MASON, BANK OF AMERICA, N.A., TRUSTEE

E L SANFORD TRUST CHILDREN/WILLIAM, BANK OF AMERICA, N.A., TRUSTEE

E L SANFORD TRUST FAM FBO ADA, BANK OF AMERICA, N.A., TRUSTEE

E L SANFORD TRUST FAM FBO MASON, BANK OF AMERICA, N.A., TRUSTEE

E L SANFORD TRUST FAM FBO WILLIAM, BANK OF AMERICA, N.A., TRUSTEE

E L WIEGAND FOUNDATION

E W MASKE TRUST U/W FOR RUTH M BENNETT, CURRENT TRUSTEE

E*TRADE CLEARING LLC

E*TRADE S & P 500 INDEX FUND

E. DOMINICK AND A. ANDREWS, JR. TRUST AGREEMENT DATED 10/02/90 F/B/O ELIZABETH M. DOMINICK, E. DOMINICK, A. ANDREWS, JR., TRUSTEES

E. GALLAGHER

E.ON ENERGIE US VALUE (EBWFOND

EAC PARTNERS MASTER FUND LTD.

EAGLE TRADING COMPANY

EARL E CROWE TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

EARL W HUNTLEY FBO MELINDA, BANK OF AMERICA, N.A., TRUSTEE

EARL W HUNTLEY FBO PAMELA, BANK OF AMERICA, N.A., TRUSTEE

EAST LIVERPOOL RADIOLOGY ASSOC PROFIT SHARING PLAN & TRUST, PAUL W LIM, TRUSTEE

EASTERN BANK

EATON VANCE CAPITAL GROWTH PORTFOLIO

EATON VANCE MULTI CAP GROWTH PORTFOLIO

EATON VANCE TAX MANAGED GLOBAL BUY-WRITE OPPORTUNITIES FUND, ALAN R. DYNNER, TRUSTEE

EATON VANCE TAX MANAGED GROWTH PORTFOLIO

EATON VANCE TAX MANAGED MULTI-CAP GROWTH PORTFOLIO

ECF 1201 INDEX FUND LTD PARTNERSHIP

ECHOTRADE LLC

ED BUCHSBAUM

EDGAR COUNTY BANK AND TRUST COMPANY

EDGAR D GIFFORD TRUST, EDGAR D GIFFORD, TRUSTEE

EDGAR O. JANNOTTA

EDGAR O. JANNOTTA JR. REVOCABLE TRUST DATED 07/8/1993, EDGAR O. JANNOTTA, JR., TRUSTEE

EDITH A. EHRLICH

EDITH C BRIZENDINE

EDITH D. COFRIN TRUST, US BANK, TRUSTEE

EDMOND D. HAIGLER, JR

EDMUND F MURPHY JR REV TRUST U/A 6/21/99, EDMUND F MURPHY JR, MARY P MURPHY, TRUSTEES

EDMUND M. GOODHUE

EDSON W. MURRAY

EDUCATIONAL TESTING SERVICE RETIREE MEDICAL BENEFITS PLAN

EDWARD A. COX, JR. REVOCABLE TRUST DTD 5/21/2004, EDWARD A. COX, JR., TRUSTEE

EDWARD B BYRD TRUST UA 08/02/93, EDWARD B. BYRD, TRUSTEE

EDWARD D. JONES & CO., L.P.

EDWARD E NEISSER MARITAL TRUST, SHERWIN A ZUCKERMAN, TRUSTEE

EDWARD GALLAGHER

EDWARD H MATTHEI TRUST U/A DTD 09/18/90, EDWARD H MATTHEI, TRUSTEE

EDWARD HOWELLS

EDWARD J CAMPBELL TRUST U/A DTD 05/17/1994, EDWARD J CAMPBELL, TRUSTEE

EDWARD J DELLIN

EDWARD J SIDNEY TRUST UA 07/22/76, EDWARD J SIDNEY, TRUSTEE

EDWARD J. HEYWOOD

EDWARD K NEWMAN REVOCABLE TRUST U/A/D 04-14-2005, EDWARD K NEWMAN, TRUSTEE

EDWARD S WOOLNER JR

EDWARD STERLING WHITE

EDWARD T MCGOWAN

EDWIN J HAYES JR

EDWIN J HAYES JR TRUST, U/A DTD 05/26/2006, EDWIN J HAYES, TRUSTEE

EDWIN R LABUZ IRA, AMERIPRISE TRUST COMPANY F/K/A H&R BLOCK FINANCIAL ADVISORS, CUSTODIAN

EFG BANK EUROPEAN FINL GROUP

EFH RETIREMENT PLAN MASTER TRUST, CURRENT TRUSTEE

EHAB KHALIL KHALIFA

EHSAN BOKHOUR

EIGHTH DISTRICT ELECTRICAL PENSION FUND

EILEEN B VAUGHAN AND ROBERT JOSEPH VAUGHAN, JT TEN

EILEEN S. BUCKLEY

ELAINE A MC INTOSH TRUST, JAMES DOHERTY, LINDA BILEK, CAROL ELLIOTT, TRUSTEES

ELAINE B WOOD REV TRUST U/A DTD 10/24/06, ELAINE B WOOD, TRUSTEE

ELAINE CHEAH-RICHERT

ELAINE T BOVAIRD TRUST U/A DTD 02/18/1993, ELAINE T BOVAIRD, TRUSTEE

ELAINE W GETZ TRUST UA FEB 5 1986, ELAINE W GETZ, TRUSTEE

ELAINE W PETTIJOHN TRUST U/A 12/20/89, CURRENT TRUSTEE

ELDEN GUTWEIN

ELEANOR A. KENYON

ELEANOR JACKSON STERN TRUST DATED 01/06/1971, THE NORTHERN TRUST COMPANY, RUSSELL T. STERN JR., PATRICIA STERN ROSS, TRUSTEES

ELEANOR LINDEN THURSTON TRUST DTD 02-19-2001, ELEANOR LINDEN THURSTON, TRUSTEE

ELEANOR T AGRELLA TRUST, DONALD A AGRELLA, TRUSTEE

ELECTROLUX HOME PRODUCTS, INC. MASTER TRUST, CURRENT TRUSTEE

ELINOR P. BAKER TUW FBO CHARITIES, THE BANK OF NEW YORK, TRUSTEE

ELISABETH B LARDNER TRUST U/A DTD 12/14/1988, ELISABETH B. LARDNER, TRUSTEE

ELIZABETH A NEAL DECLARATION OF TRUST 9/30/1999, ELIZABETH A NEAL, TRUSTEE

ELIZABETH ANN PALEY

ELIZABETH COLE

ELIZABETH DE CUEVAS

ELIZABETH G CHAMBERLAIN TRUST U/A DTD 04/25/1979, GORDON CHAMBERLAIN, PARK CHAMBERLAIN, TRUSTEES

ELIZABETH H VANMERKENSTEIJN

ELIZABETH H. WOLFF

ELIZABETH J. HAND

ELIZABETH L. LEVIN 2006 SZ-2 YEAR GRANTOR RETAINED ANNUITY TRUST UAD 07/31/06, ELIZABETH L. LEVIN, TRUSTEE

ELIZABETH L'ENGLE TRUST UNDER THE WILL OF PHILIP F. L'ENGLE, SUNTRUST BANK, TRUSTEE

ELIZABETH SCHELLENGER T/U/D, ELIZABETH SCHELLENGER, TRUSTEE

ELKHORN LLC

ELLA L. MORRIS TRUST, 1ST SOURCE BANK, AS TRUSTEE

ELLEN DANAHER TULLY

ELLEN J SUTTON

ELLEN J TWADDELL

ELLEN JACKSON

ELLEN JOHNSON TWADDELL

ELLEN WARREN

ELLIOTT CAPITAL MANAGEMENT

ELLIOTT JAY & BARBARA E WAGNER FAMILY TRUST DTD 10/2/91, ELLIOTT JAY WAGNER, TRUSTEE

ELLIS HENICAN

ELMER H. WAVERING FAMILY TRUST DATED 06/24/1977 AS AMENDED, THE NORTHERN TRUST COMPANY AND LYNNE SHOTWELL, AS CO-TRUSTEES

ELMO C. BROOKS

EMANUEL E. GEDULD 2005 FAMILY TRUST, CURRENT TRUSTEE

EMANUEL GRUSS

EMBARQ CORPORATION MASTER RETIREMENT TRUST, ADAM HANKS, TRUSTEE

EMIL D KRATOCHVIL

EMILE LEGROS TRUST B FOR THE BENEFIT OF DEBORAH NEWCOMER, US BANK, AS TRUSTEE

EMILE LEGROS TRUST B FOR THE BENEFIT OF EMILE A. LEGROS, JR., US BANK, AS TRUSTEE

EMILE LEGROS TRUST B FOR THE BENEFIT OF JUDITH MURRAY, US BANK, AS TRUSTEE

EMILY A JEFFERSON TR/STOCK ACCOUNT U/A 6/1/84, EMILY A JEFFERSON, TRUSTEE

EMILY E ORTHWEIN IRREV TRUST DTD 8/19/91, ELLEN W ORTHWEIN, TRUSTEE

EMILY EVANS EMBREY, BENEFICIARY OF THE ALFRED C. GLASSELL JR. CHILDREN'S TRUST FOR EMILY EVANS EMBREY

EMILY G. PLUMB CHARITABLE TRUST DTD 1/8/80 AS AMENDED, NORTHERN TRUST COMPANY, TRUSTEE

EMILY T SHAW TRUST U/DECL, CURRENT TRUSTEE

EMMA LYN SCHWARTZ TRUST UA 07/10/98, JAMES D. SCHWARTZ, TRUSTEE

EMMA M PARKERSON TRUST U/W, BANK OF AMERICA, N.A., TRUSTEE

EMMAS LP, A PARTNERSHIP

EMPIRE STATE CARPENTERS

EMPIRE STATE CARPENTERS PENSION FUND

EMPIRE STATE CARPENTERS WELFARE FUND

EMPLOYEE RETIREMENT INCOME PLAN TRUST OF MINNESOTA MINING & MANUFACTURING CO., CURRENT TRUSTEE

EMPLOYEE RETIREMENT SYSTEM OF GEORGIA

EMPLOYEES' RETIREMENT FUND OF THE CITY OF DALLAS

EMPLOYEES RETIREMENT SYSTEM OF TEXAS

EMPLOYERS' FIRE INSURANCE COMPANY

EMPLOYERS INSURANCE COMPANY OF NEVADA

EMPLOYERS MUTUAL CASUALTY COMPANY

ENERGIZER HOLDINGS INC. RETIREMENT PLAN TRUST, JOHN DRABIK, TRUSTEE

ENERGY INDUSTRIES SUPERANNUATION SCHEME

ENHANCED RAFI US LARGE, L.P. A/K/A RESEARCH AFFILIATES FUNDAMENTAL INDEX LP

ENRIQUE HERNANDEZ JR

ENSIGN PEAK ADVISORS INC

ENVESTNET, INC. F/K/A ENVESTNET ASSET MANAGEMENT GROUP, INC.

ENZO S RICCIARDELLI

EPF- NOMURA - GLOBAL EQUITY FUND

EPHRAIM G HIRSCH

EPPIST LLC A/K/A EPIST INVESTMENT PARTNERSHIP

EPSILON DISTRESSED STRATEGIES MASTER FUND, LP

EQ ADVISORS TRUST (EQ/EQUITY 500 INDEX PORTFOLIO)

EQ ADVISORS TRUST (EQ/GAMCO MERGERS AND ACQUISITIONS PORTFOLIO)

EQ ADVISORS TRUST (EQ/LARGE CAP CORE PLUS)

EQ ADVISORS TRUST (EQ/MID CAP VALUE PLUS PORTFOLIO)

EQUAL WEIGHT S&P 500 MH TR, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

EQUIFAX INC MASTER TRUST, CURRENT TRUSTEE

EQUIFAX US RETIREMENT PLAN

EQUISERVE EXCHANGE AGENT OVERAGE ACCT

EQUITABLE SEPARATE ACCOUNT #20

EQUITEC SPECIALISTS LLC

EQUITECH/DBAG LDN/DB GLB MSTRS

EQUITRUST SERIES FUND, INC.

EQUITRUST VARIABLE INSURANCE SERIES FUND

EQUITY FUND B LENDABLE

EQUITY INDEX A

EQUITY INDEX FUND

EQUITY INDEX FUND B

EQUITY INDEX FUND B LENDABLE

EQUITY INDEX FUND A, A SERIES OF AMERICAN CENTURY CAPITAL PORTFOLIOS, INC.

EQUITY INDEX PLUS FUND A

EQUITY INDEX PLUS FUND B

EQUITY INDEX TRUST, CURRENT TRUSTEE

EQUITY INVESTMENT CORPORATION

EQUITY INVSTMENT CORP

EQUITY LEAGUE PENSION TRUST FUND, CURRENT TRUSTEE

EQUITY MODELS - EFP

EQUITY VALUE FUND

ERIC B. TOWNSEND

ERIC COFFELT

ERIC D. WERTHMAN

ERIC I CHANG

ERIC MORRIS AND SHANNON MORRIS

ERIC ROWLEY KEOGH ACCOUNT HARRY GUY SNYDER WM BLAIR & CO DEFERRED PFT SHG PLAN

ERIK LEBSACK

ERIK WHITE MASKE TRUST U/D 2/20/67, DEBRA MASKE, CURRENT TRUSTEE

ERIKA RE MAGGIPINTO UCAUTMA UNTIL AGE 21, ERIKA MAGGIPINTO, R MAGGIPINTO, CUSTODIANS

ERMAGARD KUENZLI REV TR, ERMAGARD E KUENZLI, TRUSTEE

ERMINE P PEAVY FAMILY LP

ERNEST K. KOEHLER IRA

ERNEST R MOFFATT IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

ERNEST W MICHEL

ERVIN L HEYDE JR SEP IRA, FCC, CUSTODIAN

ERWIN SHAKIN DELTA TRUST U/A 10/5/00, STANLEY WEISS, TRUSTEE

ESTALEEN O ROGERS

ESTATE OF ADRIANNE BAKER REILLY, WILLIAM R LYNCH, EXECUTOR

ESTATE OF ALFRED C. GLASSELL JR., ALFRED C. GLASSELL, III, INDEPENDENT EXECUTOR

ESTATE OF BARBARA HAMMOND

ESTATE OF BEVERLY A. PERRY, LISA A. SCHUSTER, EXECUTOR

ESTATE OF CHARLES PRATT TWICHEL UW HT CLEMENT FOR SP BC QTIP TRUST, CHASE TWICHEL, AS REPRESENTATIVE

ESTATE OF DONALD BARON, IRENE BARON, EXECUTRIX

ESTATE OF GENE C MCCAFFERY

ESTATE OF JANICE FAY JOHNSON OCHS, RODNEY D. OCHS, MICHAEL HULL, ADMINISTRATORS

ESTATE OF KAREN BABCOCK, PHILIP S. BABCOCK, EXECUTOR

ESTATE OF KURT ADLER, CLIFFORD ADLER, HOWARD ADLER, EXECUTORS

ESTATE OF LEAVITT J POPE, MARTHA P POPE, EXECUTRIX

ESTATE OF NANCY G. LEZETTE, THOMAS LEZETTE, EXECUTOR

ESTATE OF ROBERT C GILKISON, JOAN L GILKISON, EXECUTOR

ESTATE OF ROBERT D. NELSON, CHARLES JASA, PERSONAL REPRESENTATIVE

ESTATE OF ROSE ROCHELL, NANCY ROCHELL GILMORE, EXECUTOR

ESTATE OF WARD L. QUAAL, BMO HARRIS BANK, N.A., EXECUTOR

ESTATE OF WAYNE F. MCNULTY, MARY KATHLEEN MCNULTY, EXECUTRIX

ESTATE OF WILLIAM ANTONIS, 1ST SOURCE BANK, PERSONAL REPRESENTATIVE

ESTATE OF WILLLIAM F WARCHOL

ESTATES OF WAYNE F. MCNULTY AND IRENE M. MCNULTY, MARY KATHLEEN MCNULTY, EXECUTRIX

ESTERLE COBOURN

ESTHER WONG IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

ESURANCE INSURANCE COMPANY

ETF SPY EQ FINANCE PROD CTRL

EUGENE E DECHTER JIED TRUST UA 02/02/92 , BRADLEY DECHTER, TRUSTEE

EUGENE KAPALOSKI

EUGENE P. HIGGINS AND MARGARET S. HIGGINS

EUGENE TAYLOR AND ROSE MARIE TAYLOR

EUGENE TOMCZAK TRUST U/W U/A DTD 06/11/1998, CAROLE A TOMCZAK, TRUSTEE

EUGENE V THAW REV TRUST U/A DTD 4/25/00, CURRENT TRUSTEE

EULAV ASSET MANAGEMENT TRUST, THE VALUE LINE INCOME FUND, CURRENT TRUSTEE

EUR YIELD ENHANCEMENT - FORWARD CONV OPT & COMM STK

EUREKA OPTIONS LLC

EUROCLEAR BANK

EUROCLEAR BANK SA/NV

EVAN NORRIS AND ANNETTE CHAN-NORRIS

EVANGELICAL BOARD OF PENSIONS

EVANGELICAL LUTHERAN CHURCH IN AMERICA BOARD OF PENSIONS

EVELYN A FREED TRUST U/A/D 03/26/90 BRANDES - ALL CAP VALUE, EVELYN A, FREED, TRUSTEE

EVELYN COOPER AURANDT TRUST U/A 10-12-71, CURRENT TRUSTEE

EVELYN KOUCHOUKOS AND DEBORAH M NOLAN

EVERENCE FINANCIAL

EVEREST REINSURANCE (BERMUDA) LTD. EVEREST RE GROUP LTD.

EVERETT SMITH JR. TRUST U/A DTD 10/15/1998, E. SMITH, TRUSTEE

EVERGREEN ASSET MANAGEMENT CORP.

EVERGREEN EQUITY INDEX FUND

EVERGREEN INVESTMENT SERVICES FUND ADMINISTRATION, EVERGREEN ASSET MANAGEMENT CORP.

EVERGREEN INVESTMENT, EVERGREEN ASSET MANAGEMENT CORP.

EVERYTHING MEDICAL, INC. A/K/A EVERYTHING MEDICAL SERVICES, INC.

EVOL CAPITAL MANAGEMENT LLC PORTFOLIO MARGIN ACCOUNT

EVOLUTION ALL-CAP EQUITY FUND - DIREXION FUNDS

EVOLUTION LARGE CAP FUND - DIREXION FUNDS

EVOLUTION VP ALL-CAP EQUITY FUND, A SERIES OF DIREXION INSURANCE TRUST

EWT, LLC

EXCAVATORS UNION LOCAL 731 PEN

EXCEL REALTY FUND, LP

EXELON CORPORATION NUCLEAR DECOMMISSION TRUST - NON TAX QUALIFIED, CINDY CATLIN, DIRECTOR INVESTMENT OPERATIONS AND RISK MANAGEMENT, TRUSTEE

EXELON CORPORATION NUCLEAR DECOMMISSION TRUST - TAX QUALIFIED, CINDY CATLIN, TRUSTEE

EXEMPT/BYPASS SUB TRUST OF THE MICHAEL & MARION SHLAUDEMAN TRUST U/A/D 10-01-1995, MARION B SHLAUDEMAN, TRUSTEE

EXXONMOBIL INVESTMENT MANAGEMENT, INC. (EXXONMOBIL INVESTMENT FUND)

F AUDRYE WOLLER

F GENE GOSELIN IRA, FCC, CUSTODIAN

F GENE GOSELIN REVOCABLE LIVING TRUST U/A DTD 12/31/1992, F GENE GOSELIN, TRUSTEE

F HARLAN BATRUS

F&C MANAGED PENSION FUNDS LIMITED A/K/A MANAGED PENSION FUNDS LIMITED (MFS FUNDS (UK))

FAIRWAY FUND LIMITED F/K/A MAN MAC 1 LTD

FAIRWEATHER FAMILY L.P. A/K/A FAIRWEATHER LTD PTRSHP

FAITH B. MEEM TRUST, NANCY F. MEEM, FIDUCIARY TRUST CO., TRUSTEES

FAMANDSFORENINGEN TRP US LARGE CAP AKTIER

FARMERS & MERCHANTS TRUST CO

FARMERS GROUP, INC. A/K/A FARMERS INSURANCE GROUP

FASKEN LTD

FASKEN LTD (CHANNING I)

FASKEN, LTD. B A/K/A FASKEN (CHANNING II)

FAULKNER FAMILY TRUST UA DTD 8/29/1989, MARILYN M MATHESON, TRUSTEE

FBF PENSION-CMG S&P 500 INDEX, BANK OF AMERICA

FEDERAL NATIONAL MORTGAGE ASSOCIATION (FANNIE MAE)

FEDERAL RESERVE EMPLOYEE BENEFITS SYSTEM

FEDERAL RESERVE SYSTEM EMPLOYEE RETIREMENT FUND

FEDERATED CAPITAL APPRECIATION FUND II F/K/A FEDERATED CLOVER VALUE FUND II

FEDERATED CAPITAL INCOME FUND

FEDERATED CAPITAL INCOME FUND, INC.

FEDERATED CLOVER VALUE FUND F/K/A FEDERATED AMERICAN LEADERS FUND

FEDERATED EQUITY INCOME FUND

FEDERATED EQUITY INCOME FUND, INC.

FEDERATED INV COUNSELING, INC (A/C: XFEIF)

FEDERATED INV COUNSELING, INC (FAO: FMSAF)

FEDERATED INVESTORS INC.

FEDERATED MANAGED VOLATILITY FUND II F/K/A FEDERATED CAPITAL INCOME FUND II

FEDERATED MANAGED VOLATILITY FUND II F/K/A FEDERATED CAPITAL INCOME FUND II F/K/A FEDERATED EQUITY INCOME FUND II

FEDERATED MAX-CAP INDEX FUND

FEDERATED MTD STOCK TRUST, CURRENT TRUSTEE

FEDERATED MUNI AND STOCK ADVANTAGE FUND

FEDERATED STOCK AND CALIFORNIA MUNI FUND

FEHIR LIMITED PARTNERSHIP

FELICITY E APPLEBY TRUST U/A DTD 12/13/1989, JEFFREY J APPLEBY, TRUSTEE

FELIX LENG ENG & SERENE WEE WEE LEENO

FELIX SHEU

FELIX WEN GUANG TONG TOD

FEO THOMAS P. O'KEEFE SALLY B. O'KEEFE EXEC

FERRIS TRADING FUND LLC

FETHEROLF FAMILY TRUST, DONALD M FETHEROLF, MARILYN N FETHEROLF, TRUSTEES

FICKLING FAMILY FOUNDATION INC

FIDELITY ADVISOR LEVERAGED COMPANY STOCK FUND, A SERIES OF FIDELITY ADVISOR SERIES I

FIDELITY COMMONWEALTH TRUST, ABIGAIL P. JOHNSON, TRUSTEE

FIDELITY CONCORD STREET TRUST

FIDELITY CONCORD STREET TRUST (SPARTAN U.S. EQUITY INDEX FUND), CURRENT TRUSTEE

FIDELITY LEVERAGED COMPANY STOCK FUND, A SERIES OF FIDELITY SECURITIES FUND

FIDELITY MOHAWK INSURANCE CO

FIDELITY US EQUITY INDEX COMMINGLED POOL FIDELITY

FIDEURAM BANK LUXEMBOURG S.A.

FIDUCIARY SMALL AND MID-CAP STOCK FUND LLC

FIDUCIARY SSB

FIDUCIARY TRUST COMPANY

FIDUCIARY TRUST COMPANY INTERNATIONAL

FIDUCIE DESJARDINS INC.

FIERSTEIN COMPANY

FIFTH THIRD ASSET MANAGEMENT

FIFTH THIRD ASSET MANAGEMENT MUTUAL FUND - FIFTH THIRD EQUITY INDEX FUND

FIFTH THIRD BANK

FIFTH THIRD BANK, TRUSTEE

FIFTH THIRD FUNDS

FINANCIAL MANAGEMENT CONCEPTS

FIREMAN'S FUND INSURANCE COMPANY

FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS

FIRST AMERICAN INVESTMENT FUNDS, INC. - EQUITY INDEX FUND

FIRST BANK & TRUST

FIRST BUSEY TRUST INVESTMENT CO.

FIRST CAPITAL ALLIANCE LP

FIRST CITIZENS BANK & TRUST COMPANY

FIRST CLEARING, LLC

FIRST EAGLE CONTRARIAN VALUE MASTER FUND, LTD.

FIRST FINANCIAL BANK

FIRST FOUNDATION ADVISORS FA MASTER ACCOUNT

FIRST INTERSTATE BANK OF COMMERCE

FIRST MERCHANTS TRUST COMPANY, A DIVISION OF FIRST MERCHANTS BANK, N.A.

FIRST MIDWEST BANCORP

FIRST NATIONAL BANK & TRUST CO.

FIRST NATIONAL BANK OF LAGRANGE A/K/A MADCO

FIRST NEW YORK SECURITIES, LLC

FIRST REPUBLIC BANK

FIRST SOUTHWEST CO.

FIRST TRUST EXCHANGE-TRADED FUND

FIRST TRUST VALUE LINE EQUITY ALLOCATION INDEX FUND

FIRST-CITIZENS BANK & TRUST COMPANY

FIRSTENERGY CORP NON-QUALIFYING NUCLEAR DECOMMISSIONING TRUSTS, CURRENT TRUSTEE

FIS OPERATIONS

FISHER FAMILY LARGE CAP GROWTH LLC

FLEET MARITIME INC.

FLEXIBLE (US EQUITY) MANAGERS: PORTFOLIO 1 LLC

FLICK FAMILY REVOCABLE TRUST, JOHN E. FLICK & LOIS L. FLICK, TRUSTEES

FLORENCE S BRADSHAW

FLORIDA POWER CORP NON-QUAL PROGRESS ENERGY SERVICE CO

FLORIDA PREPAID COLLEGE PLAN - FLORIDA PREPAID COLLEGE BOARD

FLOYD C SANGER JR TRUST U/A 3/11/86, FLOYD C SANGER JR, TRUSTEE

FLUSHING FINANCIAL CORP.

FLYNN CORPORATION

FM GLOBAL

FM GLOBAL PENSION

FMC CORP DEFINED BENEFIT RETIREMENT TRUST, CURRENT TRUSTEE

FMC TECHNOLOGIES INC. DEFINED BENEFIT RETIREMENT TRUST, KURT NIEMETZ, TRUSTEE

FMC TECHNOLOGIES, INC.

FNY MANAGED ACCOUNTS LLP, A WHOLLY OWNED SUBSIDARY OF FNY FIRST NEW YORK SECURITIES, LLC

FOLIOFN INVESTMENTS, INC. F/K/A FOLIO INVESTMENTS, INC.

FORD MOTOR COMPANY DEFINED BENEFIT MASTER TRUST, MARK KOPP, TRUSTEE

FORD MOTOR COMPANY OF CANADA - WAM DOMESTIC

FORD MOTOR COMPANY OF CANADA, LIMITED MASTER TRUST FUND, FORD MOTOR COMPANY PENSION ASSET MANAGEMENT, TRUSTEE

FORDHAM UNIVERSITY

FOREST MULTI-STRATEGY MASTER FUND SPC FOR ITS MULTI-STRATEGY SEGREGATED PORTFOLIO

FORESTAL FUNDING MASTER TRUST, WILMINGTON TRUST CO., ERIC SIEKE, TRUSTEES

FORMANEK INVESTMENT TRUST, PAIGE EAVENSON, TRUSTEE

FORT PITT CAPITAL GROUP, INC.

FOSTER G HEMBRY JR

FOUNDATION FOR ANESTHESIA EDUCATION AND RESEARCH

FOUNDATION FOR FLORIDA'S COMMUNITY COLLEGES INC.

FRANCES C JONES REV TRUST U/A/D 08-10-1999, FRANCES C JONES, TRUSTEE

FRANCES I EDWARDS DECLARATION OF TRUST U/A/D 06/16/81, FRANCES I. EDWARDS, TRUSTEE

FRANCES L VAN TREESE

FRANCES LOEB TRUST U/W, JEROME A MANNING, JOHN A LEVIN, TRUSTEES

FRANCES P. GORMLEY

FRANCES R PICONE LIV TRUST UA DTD 01/18/00, FRANCES R PICONE, TRUSTEE

FRANCESA J. VERDUSCO TRUST U/A DTD 12/13/1989, CATHERINE A VERDUSCO, TRUSTEE

FRANCESCO LAPIETRA AND ANN MARIE LAPIETRA

FRANCIS G DUGGAN AND JEANETTE M DUGGAN

FRANCIS L. COOLIDGE

FRANCIS NESSINGER AND JEAN K NESSINGER

FRANCIS NESSINGER IRA CONTRIBUTORY TRUST DTD 10/14/86, CHARLES SCHWAB & CO INC, TRUSTEE

FRANCISCO PERDOMO & CAROLINE OLIVEIRA

FRANCISCO PERDOMO-FERRER RET PL, FRANCISCO J PERDOMO-FERRER, TRUSTEE

FRANCOISE ISABELLE MICHEL TRUST U/A DTD 10/26/1994, JOHN M STICKNEY, TRUSTEE

FRANK A JONES TRUST U/A DTD 05/05/1995 FBO M JONES, FRANK A JONES, TRUSTEE

FRANK CALLEA

FRANK D. SIMMONS

FRANK DELLAQUILA AND ROSEMARY DELLAQUILA

FRANK H POE TRUST U/A/D 11/27/91, WENDY POE, TRUSTEE

FRANK J MANGANO GST NON-TAX EXEMPT TRUST U/A 6/22/94, MARGARET MANGANO, MIKE HOOVER, TRUSTEES

FRANK J. BARTUSEK JR.

FRANK MALONEY AND KATHLEEN MALONEY

FRANK N MAGID AND MARILYN A MAGID JT TEN

FRANK P ROCCAFORTE

FRANK R. BALL, JR. TRUST DATED 4/27/94, FRANK R. BALL, JR., TRUSTEE

FRANK RUSSELL INVESTMENT MANAGEMENT

FRANK RUSSELL TRUST COMPANY

FRANK S LADNER REV TRUST U/A DTD 03/03/1993, FRANK S LADNER, TRUSTEE

FRANK S TIERNAN

FRANK W CONSIDINE

FRANK W DENIUS

FRED J EYCHANER

FRED LINDQUIST AND MYRTLE H. LINDQUIST

FRED O POLTEVENT JR

FRED P. PETTIJOHN IRRV TRUST MARK PETTIJOHN, GEORGETTE PETTIJOHN, PERSONAL REPRESENTATIVE, TRUSTEE

FRED PHILLIP PETTIJOHN (DECEASED) (AS BENEFICIARY OF ELAINE W. PETTIJOHN IRREVOCABLE TRUST), GEORGETTE PETTIJOHN, PERSONAL REPRESENTATIVE, TRUSTEE

FRED T KAJIWARA

FREDERICK B GETZE

FREDERICK E NIELSEN

FREDERICK E NIELSEN AND PETER A NIELSEN

FREDERICK GOLDSTEIN

FREDERICK S SHARE TRUST U/A DTD 11/04/88, FREDERICK S SHARE, TRUSTEE

FREDERICKA PAFF & CARLYLE PAFF HEDRICK

FREDRIC LEVENSON AND DOROTHY A LEVENSON

FREDRICK L KATZ IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

FREE CHURCH MINISTER AND MISSIONARIES RETIREMENT PLAN A

FRICK C FBO F D FRICK I I-TRUST NO 3

FRIDSTEIN INVESTMENT PARTNERSHIP

FRIEDMAN BILLINGS RAMSEY

FRIEDMAN LIVING TRUST U/A 08/04/99, ROBERT D FRIEDMAN, TRUSTEE

FROEDTERT & COMMUNITY HEALTH, INC.

FROEDTERT & COMMUNITY HEALTH, INC. LONG TERM MASTER TRUST, CURRENT TRUSTEE

FROST BANK

FT1112 STRATEGIC DIVIDEND PORTFOLIO SERIES 2 FIRST TRUST PORTFOLIO LP

FULL HOUSE VENTURES, LTD.

FULL VALUE PARTNERS LP

FULTON INVESTMENT TRUST, TERRY POWER, TRUSTEE

FUND AMERICAN REINSURANCE COMPANY, LTD.

FUTURE FUND BOARD OF GUARDIANS

G - CLOSE

G M JOHNSON CUST

G P H DEVASGUNAWARDHANE IRA, FCC, CUSTODIAN

GABELLI & COMPANY INC. (GABELLI AVG PRICE 2)

GABELLI 787 FUND INC. - GABELLI ENTERPRISE MERGERS AND ACQUISITIONS FUND F/K/A THE 787 FUND INC - AXA ENTERPRISE MERGERS AND ACQUISITIONS FUND

GABELLI ASSET MANAGEMENT CO.

GABELLI ASSET MANAGEMENT CO. (A/C X0560)

GABELLI ASSOCIATES

GABELLI ASSOCIATES FUND

GABELLI ASSOCIATES LIMITED

GABELLI COMPANY

GABELLI DIVIDEND & INCOME TRUST, CURRENT TRUSTEE

GABELLI FOUNDATION INC

GABELLI FUNDS, LLC

GABELLI MULTIMEDIA PARTNERS, L.P.

GABELLI PERFORMANCE PARTNERSHIP

GABELLI SECURITIES, INC., GAMCO INVESTORS, INC.

GABELLI VALUE FUND, INC.

GAIL A. UEBOVICH LIVING TRUST, GREGORY L UEBOVICH, TRUSTEE

GAIL C SCHLANG

GAINESVILLE POLICE AND FIRE

GALL DECLARATION OF TRUST U/A DTD 05/05/1981, CLAIRE T GALL, TRUSTEE

GAMCO ASSET MANAGEMENT INC.

GAMCO INVESTORS INC

GAMMA PHI BETA FOUNDATION, INC.

GARLAND FOUNDATION TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

GARY A WOLENS

GARY ALLEN SPENCER IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

GARY D BLACK

GARY E. PEKALA

GARY N SMITH ROLLOVER ACCOUNT POMONA COLLEGE, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

GARY R. NORTON

GARY S BRIARS AND LAURA A BRIARS

GARY S. GROSSINGER

GASPARE LOCASCIO AND DOLORES LOCASCIO, JTWROS

GASTON CAPERTON

GAYLE G MCLEAN REV LIVING TRUST U/A 3/1/94, GAYLE G MCLEAN, TRUSTEE

GAYLIN E FRYE JR

GAYON EMILY CHUN IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

G-BAR LIMITED PARTNERSHIP

GBL ALPHA EDGE COMMON TRUST FD, STATE ST BANK & TRUST CO, TRUSTEE

GCW CAPITAL LLC

GDK INC

GE MUTUAL FUNDS

GEI STOCK INDEX FUND - GE MUTUAL FUNDS

GELERT R. RAMAGE JR. AND NANCY D. RAMAGE JTRS

GENERAL BOARD OF THE GLOBAL MINISTRIES OF THE UNITED METHODIST CHURCH COLLINS HEALTH BENEFIT TRUST A/K/A GBGM COLLINS HEALTH BENEFIT TRUST LCV, CURRENT TRUSTEE

GENERAL BOARD OF THE GLOBAL MINISTRIES OF THE UNITED METHODIST CHURCH COLLINS PENSION PLAN A/K/A GBGM COLLINS PENSION PLAN LCV

GENERAL BOARD OF THE GLOBAL MINISTRIES OF THE UNITED METHODIST CHURCH ENDOWMENT FUND A/K/A GBGM ENDOWMENT FUND LCV

GENERAL BOARD OF THE GLOBAL MINISTRIES OF THE UNITED METHODIST CHURCH GENERAL FUND A/K/A GBGM GENERAL FUND LCV

GENERAL BOARD OF THE GLOBAL MINISTRIES OF THE UNITED METHODIST CHURCH'S COLLINS PENSION PLAN

GENERAL BUILDING LABORERS' LOCAL 66 LCV

GENERAL CIGAR RETIREMENT TRUST, JOSEPH C AIRD, TRUSTEE

GENERAL DYNAMICS CORPORATION VEBA TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

GENERAL DYNAMICS LAND SYSTEMS RETIREE BENEFITS TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

GENERAL ELECTRIC COMPANY

GENERAL ELECTRIC MT

GENERAL ELECTRIC PENSION TRUST, CURRENT TRUSTEE

GENERAL MOTORS HOURLY-RATE EMPLOYEE PENSION TRUST (GMHREP TRUST), STATE STREET BANK AND TRUST COMPANY, TRUSTEE

GEOFFREY B FITZGERALD SR AND CAROL A FITZGERALD

GEOFFREY C LLOYD REC TRUST L-176, GEOFFREY C. LLOYD, TRUSTEE

GEOFFREY DAWSON

GEORGE A.P. WALLACE 1999 REV TR, CURRENT TRUSTEE

GEORGE B. KAISER

GEORGE BLOSSOM III TRUST K3-3219IA2, GEORGE W BLOSSOM III, TRUSTEE

GEORGE BUCKMAN TRUST U/A/D 08/26/88, GEORGE BUCKMAN, TRUSTEE

GEORGE D VEON TRUST U/A DTD 10/03/01, GEORGE D VEON, TRUSTEE

GEORGE DRAPEAU, III

GEORGE E ANDERSON REV LIV TRUST U/A, GEORGE E ANDERSON, TRUSTEE

GEORGE E. KEELER

GEORGE EASTMAN HOUSE INC ENDOWMENT FUND

GEORGE HENRY KALBERER

GEORGE JOHNSON

GEORGE LICHTENSTEIN

GEORGE LONGLAND JR IRA, FCC, CUSTODIAN

GEORGE M. MOSS

GEORGE MICHAEL ECKERT, ESQ.

GEORGE MUNROE ENDICOTT TRUST FBO ELIZABETH E. RANDS, WILLIAM C RANDS III, TRUSTEE

GEORGE S NOWIK TRUST UA 02/06/01, GEORGE S. NOWIK, TRUSTEE

GEORGE W B ROBERTS TRUST FBO CHILDREN

GEORGE W BLOSSOM III

GEORGE W THOMS TRUST B, BANK OF AMERICA, N.A., TRUSTEE

GEORGE WALLACE

GEORGE WILLIAM BUCK SEP-IRA DTD 4/8/93, CHARLES SCHWAB & CO INC, CUSTODIAN

GEORGEANN S. BLAHA T/U/D, GEORGEANN S. BLAHA A/K/A GEORGEANN SCHELLENGER, TRUSTEE

GEORGETOWN PREPATORY SCHL INC

GEORGIA DEPARTMENT OF REVENUE

GEORGIA M. JOHNSON

GEORGIA MUNICIPAL EMPLOYEE BENEFIT SYSTEM PENSION PLAN GEORGIA MUNICIPAL ASSOCIATION

GERALD BENJAMIN

GERALD E. GRIEVE

GERALD J MCCARTHY IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

GERALD KRZYWDZINSKI AND DORIS A KRZYWDZINSKI JT TEN

GERALD W THIEL TRUST U/A DTD 10/20/1999, GERALD W THIEL, TRUSTEE

GERALD W. AGEMA

GERALD W. AGEMA AND MARCIA L. AGEMA

GERALD W. AGEMA REVOCABLE TRUST, GERALD W AGEMA, TRUSTEE

GERALDO RIVERA

GERALDO RIVERA R/O IRA, STERNE AGEE & LEACH INC, CUSTODIAN

GERDA SCHILD

GGCP, INC. F/K/A GABELLI FUNDS, INC. (GABELLI ABC FUND)

GGCP, INC. F/K/A GABELLI FUNDS, INC. (GABELLI FUNDS INC)

GGCP, INC. F/K/A GABELLI FUNDS, INC. (GABELLI)

GGCP, INC. F/K/A GABELLI FUNDS, INC. (THE GABELLI ASSET FUND)

GGCP, INC. F/K/A GABELLI FUNDS, INC. (THE GABELLI EQUITY INC FD)

GGCP, INC. F/K/A GABELLI FUNDS, INC. A/K/A GABELLI GLOBAL MULTIMEDIA TRUST INC.

GIBSON FAMILY TRUST, FRANKLIN L GIBSON & KAREN C GIBSON, TRUSTEE

GIDWITZ ART VENTURES

GIDWITZ FAMILY LIMITED PARTNERSHIP

GILA RIVER INDIAN COMMUNITY

GILBERT LANOFF TRUST UA DTD 9/9/1988, GILBERT LANOFF, TRUSTEE

GINA MAZZAFERRI AND THOMAS PERRY

GINKGO INVESTMENTS LLC, A PARTNERSHIP

GJD PARTNERS L.P.

GLADYS G. COFRIN TRUST, US BANK, TRUSTEE

GLADYS SMITH HAYES TESTAMENTARY TRUST 12/3/1987, W L JACK EDWARDS, TRUSTEE

GLADYS SMITH HAYES TESTAMENTARY TRUST U/A DTD 12-03-1987, PATSY HAYES EDWARDS, GLADYS SMITH HAYES, TRUSTEES

GLASSELL, ALFRED C. III, INDIVIDUALLY AND AS ACTING TRUSTEE AND BENEFICIARY OF ALFRED C. GLASSELL, JR. CHILDREN'S TRUST FOR ALFRED C. GLASSELL, III

GLASSMAN GRANDCHILDREN IRR TRUST UAD 07/21/1999, CURRENT TRUSTEE

GLEN W BELL, MARTHA BELL, BELL FAMILY TRUST, GLEN W BELL, KATHLEEN BELL, MARTHA BELL, TRUSTEES

GLENN A KILLOREN TRUST UAD 12/27/85, GLENN A KILLOREN, TRUSTEE

GLENN FAMILY TRUST U/A DTD 04-03-96, WILLIAM R GLENN, CAROLE L GLENN, TRUSTEE

GLENVIEW STATE BANK

GLOBAL EQUITY ENHANCED INDEX FUND

GLOBAL SEC. CP/CDS GLOBAL SECURITIES CORP.

GLORIA TRUDMAN TRUST, GLORIA TRUDMAN, TRUSTEE

GLORYA KAUFMAN SURVIVOR'S TRUST, JUDY MARSHALL, TRUSTEE

GM PROMARK LARGE CAP BLEND FUND

GMP (BROBBZ) RE GREENWICH CAP

GOLDENHAWK PARTNERS LP

GOLDENTREE MASTER FUND II, LTD.

GOLDENTREE MASTER FUND LTD.

GOLDENTREE MULTISTRATEGY LTD

GOLDENTREE MULTISTRATEGY OFFSHORE FUND

GOLDMAN SACHS 1997 EXCHANGE 6823 PLACE FUND L.P.

GOLDMAN SACHS 1997 EXCHANGE PLACE FUND, L.P.

GOLDMAN SACHS 1999 EXCHANGE PLACE FUND, L.P.

GOLDMAN SACHS 2005 EXCHANGE PLACE FUND, L.P.

GOLDMAN SACHS EXECUTION & CLEARING, L.P.

GOLDMAN SACHS EXECUTION & CLEARING, L.P. F/K/A SPEAR LEEDS AND KELLOGG

GOLDMAN SACHS INTERNATIONAL

GOLDMAN SACHS VARIABLE INSURANCE TRUST, CURRENT TRUSTEE

GOLDMAN, SACHS & CO., IN ITS INDIVIDUAL AND CUSTODIAL CAPACITIES

GOLDSHER INVESTMENT CO INC

GOOD STEWARD TRADING COMPANY SPC

GOODMAN TRUSTS TIC 8G-380, CUSTODIAN, ERNEST GOODMAN, TRUSTEE

GOODRICH CORP, AS PLAN ADMINISTRATOR FOR THE GOODRICH CORPORATION MASTER TRUST FOR QUALIFIED EMPLOYEE BENEFIT PLANS, CURRENT TRUSTEE

2855453.1

GOODRICH CORPORATION EMPLOYEES' SAVINGS PLAN

GORDON T FORD TRUST U/A/D 04/24/72, ROBERT L HERITIER, RICHARD R MULLANEY, RANDOLPH C PASCHKE, TRUSTEES

GOVERNING COUNCIL OF THE UNIVERSITY OF TORONTO

GOVERNMENT OF SINGAPORE INVESTMENT CORPORATION PTE. LTD.

GOVERNMENT PENSION INVESTMENT FUND, JAPAN

GPC LIX LLC

GPC LVIII LLC

GPC LX LLC

GPU, INC

GRACE I. SPIER

GRACE M MITCHELL

GRAFF VALVE & FITTINGS CO. EMPLOYEES PROFIT SHARING PLAN 2 UAD 6/30/85, PHILIP GRAFF, MICHAEL GRAFF, TRUSTEES

GRAHAM CAPITAL PARTNERSHIP I, LP

GRAHAM EQUITY BASKETS TRADING LTD.

GRAHAM EVENT DRIVEN LTD. A/K/A GRAHAM CAPITAL MANAGEMENT, LIMITED PARTNERSHIP

GRAHAM FAMILY GROWTH PARTNERSHIP LCV

GRAMMEL JOINT LIVING TRUST U/A DTD 5/24/00, JOHN E GRAMMEL, MARY C. GRAMMEL, TRUSTEES

GRANTHAM, MAYO, VAN OTTERLOO & CO. LLC

GRAPHIC ARTS JOINT PENSION TRUST, JOHN PRICE, TRUSTEE

GREATBANC TRUST COMPANY

GREAT-WEST S&P 500 INDEX FUND F/K/A MAXIM S&P 500® INDEX PORTFOLIO

GREAT-WEST STOCK INDEX FUND F/K/A MAXIM STOCK INDEX PORTFOLIO F/K/A MAXIM SERIES FUND, INC.

GREEN CENTURY USA GREEN CENTURY CAPITAL MANAGEMENT

GREEN FOREST INVESTMENTS LIMITED

GREEN FOREST TRUST, HSBC GUYERZELLER TRUST COMPANY AG, TRUSTEE

GREGORY D WIDRIG

GREGORY D WIDRIG IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

GREGORY J CAPUTO AND ELLEN P CAPUTO

GREGORY J MARCIANO

GREGORY L MOLOZNIK

GREGORY L. MOLOZNIK AND JULIE M. MOLOZNIK

GREGORY REYETMAN

GREGORY REYFTMANN

GREGORY S SIMKO

GREGORY S SIMKO IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

GREGORY SMITH

GREGORY W. WARMUTH

GRIFFITH PATRICK MADIGAN UTMA WI, GRIFFITH E. MADIGAN, CUSTODIAN

GRYPHON HIDDEN VALUES VIII L.P.

GRYPHON HIDDEN VALUES VIII LTD

GS 1999 EXCHANGE PLACE 6823 FUND LP

GS 2005 EXCHANGE PLACE FUND

GS 2005 EXCHANGE PLACE FUND 6823 LP (FEEDER 2005)

GS FINANCIAL MARKETS

GS INVESTMENT STRATEGIES LLC (LIBERTY HARBOR MASTER FUND I, LP)

GSA CAPITAL INTERNATIONAL MASTER FUND LIMITED

GUARDIAN

GUARDIAN VC 500 INDEX FUND

GUARDIANS OF NEW ZEALAND SUPERANNUATION GV

GUGGENHEIM (GOLDEN TREE ASSET MANAGEMENT, LP)

GUGGENHEIM PORTFOLIO COMPANY XXXI LLC

GUGGENHEIN PORTFOLIO LIX, LLC

GUIDEMARK LARGE CAP VALUE FUND F/K/A ASSETMARK LARGE CAP VALUE FUND

GUIDESTONE FUNDS (EQUITY INDEX FUND)

GUIZHI LIANG & YONGHUI YANG

GULCO CORPORATION

GULLEY FAMILY TRUST U/A 7/27/00, PATSY J GULLEY, TRUSTEE

GURDON H. METZ

GUS G HARTOONIAN IRA, A G EDWARDS & SONS C/F

GUY W RUSSELL AND AIJA A RUSSELL

GWENDOLYN G. BABCOCK

GWINNETT COUNTY BOARD OF EDUCATION RETIREMENT SYSTEM

H G BARKHAUSEN TRUST 12/20/34, CURRENT TRUSTEE

H H HOWARD TRUST FOR L H SELBY, BANK OF AMERICA, N.A., TRUSTEE

H JUNE WIDRIG IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

H. ROBERT HOLMES IRA, FCC, CUSTODIAN

H.M. PAYSON & CO.

HACH SCIENTIFIC FOUNDATION

HAIDEE W FLINDERS

HAIG KEROPIAN & ROSANNE KEROPIAN REVOCABLE TRUST UA 07/09/97, HAIG KEROPIAN, ROSANNE KEROPIAN, TRUSTEES

HALCYON DIVERSIFIED FUND L.P. F/K/A/ HALCYON SPECIAL SITUATIONS, L.P.

HALCYON DIVERSIFIED FUND LP

HALCYON FUND LP

HALCYON MASTER FUND LP F/K/A HALCYON OFFSHORE ENHANCED MASTER FUND LP

HALCYON OFFSHORE FUND LTD.

HALIFAX INTERNATIONAL INVESTMENT NORTH AMERICAN FUND, THE ROYAL BANK OF SCOTLAND AS DEPOSITARY

HALLIBURTON CO.

HALL-PERRINE FOUNDATION

HALPS 51/BSH, LLC A/K/A BSH, LLC

HAMMOND FAMILY TRUST U/A/D 02-11-1988, PAUL THEODORE HAMMOND, KAREN HAMMOND, TRUSTEES

HAMPTON UNIVERSITY ENDOWMENT

HANNA JONAS MILLER

HANNAH GOLLIN

HANNAH SMITH TRUST, ALISON S ANDREWS, TRUSTEE

HANOVER CORPORATION

HARBOR CAPITAL ADVISORS LCV

HARBOR CAPITAL GROUP TRUST

HARBOR MID CAP VALUE FUND

HAREWOOD ASSET MANAGEMENT (US) INC. F/K/A COOPER NEFF ADVISORS, INC.

HARMONY INVESTMENT MANAGEMENT LLC

HAROLD E MICKENS

HAROLD E MICKENS ROLLOVER IRA, SCOTTRADE INC, CUSTODIAN

HAROLD K.L. CASTLE FOUNDATION

HAROLD R. LIFVENDAHL TRUST U/A/D 9/7/1988, THE NORTHERN TRUST COMPANY AND HAROLD R LIFVENDAHL, AS CO-TRUSTEES

HARRIET H GLASSPIEGEL DL TRUST U/A DTD 6/21/89, HARRY H GLASSPIEGEL, TRUSTEE

HARRIET ROBINSON 1999 TRUST U/A DTD 06/11/1999, HARRIET ROBINSON, TRUSTEE

HARRIET ROBINSON TRUST, MR. AND MRS. MARVIN ROBINSON, TRUSTEES

HARRINGTON BISCHOF TRUST DTD 9/15/97, HARRINGTON BISCHOF, TRUSTEE

HARRIS CORPORATION MASTER TRUST A/K/A HARRIS CORP. RETIREMENT TRUST, CURRENT TRUSTEE

HARRISON R. AND CLARE HORAN

HARSCO PENSION & PROFIT SHARING FUND LCV

HART FAMILY TRUST DTD 04/23/92, WILLIAM HART, ERICA HART, TRUSTEES

HARTFORD INDEX HLS FUND

HARTFORD LIFE INSURANCE COMPANY (SEPARATE ACCOUNT B)

HARVARD MANAGEMENT CO.

HARVEST AA CAPITAL LP

HARVEST CAPITAL LP

HARVEST FOUNDATION

HARVEY B. PLOTNICK DECLARATION OF TRUST 6321 UA MAR 16 88, HARVEY B. PLOTNICK, TRUSTEE

HARVEY BOOKMAN

HARVEY CANTER IRA CONTRIBUTORY, CHARLES SCHWAB & CO INC, CUSTODIAN

HARVEY MUDD COLLEGE

HARVEY R. HELLER

HATABAH LTD.

HAVENS PARTNERS ENHANCED FUND, L.P.

HAVENS PARTNERS, L.P.

HAWAII DENTAL SERVICE

HAYWOOD SECURITIES, INC.

HAZEL C HOUGH

HC CAPITAL TRUST (F/K/A THE HIRTLE CALLAGHAN TRUST) - THE VALUE EQUITY PORTFOLIO, ROBERT ZION, TRUSTEE

HCA, INC. MASTER RETIREMENT TRUST, CURRENT TRUSTEE

HCK ENTERPRISES INC PSP UAD 9/15/93, HENRY KUNKEL, HENRY JOHN KUNKEL, TRUSTEES

HE & FANG 2005 REV LIVING TRUST, ZHENGXU HE, YING FANG, TRUSTEES

HEADWATERS HOLDINGS LLC

HEALTH RESOURCE GRP INC 401K PSP, DRS BRUNNER/BURTON, TRUSTEES

HEALTHCARE GEORGIA INC

HEARST EQUITY APPRECIATION PLAN

HEDGEHOG CAPITAL LLC

HEDONIC CAPITAL LLC

HELEN BROWN, JEAN SAMOS & GAIL SAMOS JOHNSON

HELEN BUTTENWIESER TRUST 7/28/38, LAWRENCE B. BUTTENWIESER, TRUSTEE

HELEN D HOKE LIVING TRUST UA 06-16-1994, HELEN D HOKE, TRUSTEE

HELEN GARLAND TRUST NO. 2 (FOR GWENDOLYN GARLAND BABCOCK), SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HELEN GARLAND TRUST NO. 2 (FOR HILLARY DUQUE GARLAND), SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HELEN GARLAND TRUST NO. 2 (FOR WILLIAM M. GARLAND III), SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HELEN GROSSMAN TRUST U/A/D 09/08/99, LAURIE H. WEAVER, TRUSTEE

HELEN HOUGH FEINBERG

HELEN K DOHM IRA, FCC, CUSTODIAN

HELENA RUOTSALAINEN

HENRY & MARY JO RAY

HENRY ALIG SPURGEON

HENRY C BORSKI AND SHARYN L BORSKI

HENRY CARSON JACKSON IRREVOCABLE MANAGEMENT TRUST UA 12-17-96, TRUST B, H. CARSON JACKSON JR, CHERRY SUE JACKSON, TRUSTEES

HENRY CARSON JACKSON TRUST U/W IRREVOCABLE MANAGEMENT TRUST UA 12-17-96, TRUST A-2, CHERRY SUE JACKSON, TRUSTEE

HENRY DAVIS HAGUE IRA FIDELITY MANAGEMENT TRUST CO CUST

HENRY FRANCIS DUPONT WINTERTHUR MUSEUM, INC.

HENRY G BARKHAUSEN TRUST 12/14/36, BMO HARRIS BANK, N.A., TRUSTEE

HENRY H CAREY IMA

HENRY H KINDLINGER IRR TR, WILLIAM HAUER, MERRILL LYNCH TRUST COMPANY, TRUSTEES

HENRY I PRIEN FAMILY TRUST, BETTY ANN PRIEN, NUBAR TASHJIAN, TRUSTEES

HENRY L ADAMIC JR

HENRY M CHANCE TRUST DTD 6/26/36 FBO H CHANCE II, STEVEN K. CHANCE AND PETER E. CHANCE, TRUSTEES

HENRY M HARPER JR TRUST UA 12/22/93, CURRENT TRUSTEE

HENRY P ALBRECHT REVOCABLE TRUST U/A 1/21/74, CURRENT TRUSTEE

HERBERT ANTHONY CLARK, JR

HERBERT G. LAU PROFIT SHARING QRP PARTICIPATION, DELAWARE CHARTER GUARANTEE & TRUST, TRUSTEE

HERBERT L WASHINGTON

HERBERT SCHEIDEL LIVING TRUST U/A 2/16/05 FBO HERBERT SCHEIDEL, LEGACY TRUST COMPANY, TRUSTEE

HERBERT VANCE TRUST UAD 8/9/71, HERBERT VANCE, DOROTHY J. VANCE, TRUSTEES

HERMAN R FRIEDBERG REVOCABLE TRUST, JAMES A. FRIEDBERG, THOMAS F. FRIEDBERG, TRUSTEES

HERMAN VOLPE TRUST 01/24/92, HERMAN VOLPE, TRUSTEE

HF BARBARA J MCKENNY ADVISORY, BARBARA J MCKENNY

HFF I LLC

HFR ED SELECT PERFORMANCE MASTER TRUST ENHANCED

HFR RVA WHITEBOX MASTER TRUST F/K/A HVR RVA COMBINED MASTER TRUST, CURRENT TRUSTEE

HHS PARTNERSHIP

HIGHMARK INC

HILDA FLYNN

HIMAN BROWN TRUST UA 11/20/02 HIMAN BROWN REVOCABLE TRUST, CURRENT TRUSTEE

HNB MACRO 100

HOC GST EXEMPT TRUST NO. 2. FBO ELIZA HASKINS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HOC GST EXEMPT TRUST NO. 2. FBO JOHN HASKINS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HOC GST EXEMPT TRUST NO. 2. FBO SCOTT HASKINS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HOC TRUST NO. 2 FBO ELIZA HASKINS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HOC TRUST NO. 2 FBO JOHN HASKINS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HOC TRUST NO. 2 FBO SCOTT HASKINS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

HOESLEY FAMILY LIMITED PARTNERSHIP

HOLMES FAMILY TRUST UA DTD 04/24/87, ROBERT HOLMES, TRUSTEE

HOMELAND INSURANCE COMPANY OF NEW YORK

HON HARRY F BYRD REV TRUST U/A DTD 01/25/82, HARRY F BYRD JR, THOMAS T BYRD, TRUSTEES

HONEYWELL - INCOME AND APPRECIATION HOLDINGS

HONEYWELL INTERNATIONAL INC. MASTER RETIREMENT TRUST, CURRENT TRUSTEE

HONG KONG MONETARY AUTHORITY

HONG KONG SPECIAL ADMINISTRATIVE REGION GOVERNMENT - EXCHANGE FUND

HORACE W. HOWELLS

HORIZON GOLDEN PARTNERS L P

HORIZON PARTNERS

HORIZON TRUST & INVESTMENT MANAGEMENT

HORWITZ CHARITABLE FUND

HOUGH FAMILY FOUNDATION INC

HOUSTON ENDOWMENT, INC.

HOWARD BERKOWITZ

HOWARD F. AHMANSON JR. REVOCABLE TRUST, HOWARD F. AHMANSON, JR., THE NORTHERN TRUST COMPANY, TRUSTEES

HOWARD J. TRIENENS, HOWARD J. TRIENENS TRUST DATED 9-18-91, HOWARD J. TRIENENS, TRUSTEE

HOWARD JAY KIRSCHBAUM

HOWARD L WEINSTEIN TRUST, CURRENT TRUSTEE

HOWARD L. WEINSTEIN

HOWARD M ROSS AND JACQUELYN ROSS

HOWARD R & HARRIETTE E REUTER EXEMPTION TRUST UA 01/06/95, HARRIETTE E REUTER, TRUSTEE

HOWARD RESNICK IRA, FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

HOWARD SHULKES RESIDUARY CREDIT TRUST U/A DTD 09/20/1991, MYRA SHULKES, TRUSTEE

HOWE BARNES HOEFER & ARNETT, INC. EMPLOYEES' PROFIT SHARING PLAN, WILMINGTON TRUST RETIREMENT AND INSTITUTIONAL SERVICES COMPANY, TRUSTEES

HOWE BARNES INVESTMENT,INC. EMPLOYEES' PROFIT SHARING PLAN SECURITY TRUST COMPANY N.A.

HOWELLS FAMILY GST, GURDON H. METZ, TRUSTEE

HOWELLS FAMILY GST, WILLIAM DEAN HOWELLS, TRUSTEE

HSBC BANK PLC

HSBC GLOBAL ASSET MANAGEMENT F/K/A HSBC BANK PLC GLOBAL INVESTOR SERVICES

HSBC SECURITIES (USA) INC.

HSBC SECURITIES CANADA

HSUEH-MEI PU

HUDSON BAY FUND LP

HUDSON BAY MASTER FUND LTD

HUFFMAN FAMILY FOUNDATION

HUGH F FAGAN

HUGH LAWSON BROWN & ERLINE P. BROWN HUNTINGTON

HUNTINGTON MACRO 100 FUND

HUNTINGTON NATIONAL BANK

HUNTINGTON R /CHARLES HUNTINGTON

HUNTINGTON R B/ANNA H DEMING

HURRICANE FUND I - IMA

HUSSMAN STRATEGIC GROWTH FUND A/K/A THE HUSSMAN INVESTMENT TRUST, JOHN P. HUSSMAN, TRUSTEE

HYDE PARK SAVINGS BANK/H.P. SECURITY CORP.

HYMAN F BLUM

HYMF LTD DE SHAW OCULUS PORT LLC - US, BSCL AS AGENT

IA UMKC COMMINGLED FD-LARGE CAP

IBEW LOCAL 103 TRUST FUND A/K/A INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 103 PENSION FUND LCV

IBEW LOCAL 57

IBEW/NECA LOCAL 124 PENSION - ALLIANCE - IBEW LOCAL UNION 124 PENSION TRUST, CURRENT TRUSTEE

IBEW-NECA EQUITY INDEX FUND

IBM 401(K) PLUS PLAN TRUST, CURRENT TRUSTEE

IBM CANADA LIMITED

IBM PERSONAL PENSION PLAN TRUST, CURRENT TRUSTEE

IBM RETIREMENT FUNDS

IBM TAX DEFERRED SAVINGS PLAN

ICAP CORPORATES LLC

ICCREA BANCA SPA - EUROPE (RB9999)

ICE BEAR INCORPORATED

IDAHO TRUST BANK

IGLESIA METODISTA DEL PERU - GENERAL BOARD OF GLOBAL MINISTRIES, UMC

ILLINOIS MUNICIPAL RETIREMENT FUND

ILLINOIS STATE BOARD OF INVESTMENT

ILLINOIS STUDENT ASSISTANCE COMMISSION

IMPERIUM INSURANCE COMPANY F/K/A DELOS INSURANCE COMPANY

INARCASSA U.S. STRUCTURED EQUITY

INDEX 500 FUND, A SERIES OF PENN SERIES FUND, INC.

INDIAN POINT QUALIFIED NDT INVESTMENT POOL C-O MELLON GSS

INDIANA TEACHERS' RETIREMENT FUND A/K/A INDIANA STATE TEACHERS' RETIREMENT FUND

ING BELGIUM, SA

ING CAPITAL LLC

ING CORPORATE LEADERS 100 FUND F/K/A INDEXPLUS LARGE CAP FUND F/K/A ING INDEX PLUS LARGECAP EQUITY

ING INDEX PLUS LARGECAP EQUITY FUND IV

ING INVESTMENT TRUST CO. ENHANCED CORE EQUITY COMMON TRUST FUND

ING INVESTMENT TRUST COMPANY

ING INVESTORS TRUST (ING US STOCK INDEX PORTFOLIO)

ING T. ROWE PRICE EQUITY INCOME PORTFOLIO, A SERIES OF ING INVESTORS TRUST

ING U.S. STOCK INDEX PORTFOLIO F/K/A ING STOCK INDEX PORTFOLIO (ING INVESTORS TRUST)

ING VALUE CHOICE FUND F/K/A ING LARGECAP VALUE FUND (ING INVESTORS TRUST)

INJA LEW CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

INKA MBH A/K/A INTERNATIONALE KAPITAANAGEGESELLSCHAFT MBH A/K/A HSBC INKA

INNOVEST- SIEMENS EQUITY NORT

INSTITUTIONAL BENCHMARKS SERIES (MASTER FEEDER) LIMITED I/R/O GLAZER MERGER ABRITRAGE SER AMUNDI INVESTMENT SOLUTIONS AMERICAS LLC (F/K/A CASAM ADVISORS LLC/LYRA CAPITAL LLC)

INSTITUTIONAL BENCHMARKS SERIES MASTER FEEDER LIMITED - IZAR SERIES OLYMPIA CAPITAL INTERNATIONAL INC

INSTITUTIONAL BENCHMARKS SERIES MASTER FEEDER LIMITED MATAR SERIES OLYMPIA CAPITAL INTERNATIONAL INC

INSTITUTIONAL BENCHMARKS SERIES MASTER FUND, LTD.

INSTITUTIONAL MANAGED US EQUITY

INSURANCE TRUST U/A 4/25/67 FBO SHELDON COOPER, SHELDON COOPER, TRUSTEE

INTEL CORPORATION

INTELLIGENCE RESEARCH GROUP CORP. TRUST DATED 12/11/75, FRANK MANCINI, TRUSTEE

INTERACTIVE BROKERS GROUP

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 25 MASTER TRUST PLANS

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 357 PENSION TRUST FUND, ZENITH ADMINISTRATORS, INC, TRUSTEE

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION PLAN MV

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS PENSION BENEFIT FUND

INTERNATIONAL BUSINESS MACHINES CORPORATION

INTERNATIONAL MONETARY FUND RETIRED STAFF BENEFITS INVESTMENT ACCOUNT

INTERNATIONAL MONETARY FUND STAFF RETIREMENT PLAN

INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND A/K/A INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES UNION & INDUSTRY PENSION FUND A/K/A INTERNATIONAL UNION PAINTERS & ALLIED TRADES INDUSTRY PENSION FUND

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 825 PENSION FUND

INTERNATIONAL VALUE FUND OF DIMENSIONAL FUNDS

INTERSIL EQUITY INC FUND, T. ROWE PRICE TRUST CO, TRUSTEE

INTL PROGRAM TRADES PROGRAMS AVERAGE PRICE #1

INVENIO PARTNERS LP

INVESCO ASSET MANAGEMENT (JAPAN) LTD.

INVESCO EQUALLY-WEIGHTED S&P 500 FUND F/K/A MORGAN STANLEY EQUALLY-WEIGHTED S&P 500 FUND

INVESCO S&P 500 INDEX FUND

INVESCO S&P 500 INDEX FUND F/K/A MS S&P 500 INDEX FUND

INVESCO V.I. S&P 500

INVESCO V.I. SELECT DIMENSIONS EQUALLY-WEIGHTED S&P 500 FUND

INVOC, WILMINGTON TRUST COMPANY, CUSTODIAN

IOLAIRE INVESTORS LIMITED PARTNERSHIP

IPAC ASSET MANAGEMENT

IRA WILLIS BAKER, JR

IRENE M F SEWELL AND TIMOTHY A SEWELL

IRENE M. FREUTEL REV TRUST U/A DTD 04/28/2001, IRENE M. FREUTEL, TRUSTEE

IRENE PAGE

IRIS A . MILLER REVOCABLE TRUST U/A/D 12/31/1989, IRIS A MILLER, TRUSTEE

IRIS B. MAHONEY REV TRUST U/A/D 04/10/98, PAUL M. MAHONEY, TRUSTEE

IRIS ELSTON 5/30/95 TRUST, CURRENT TRUSTEE

IRON WORKERS LOCAL 16 PEN FD LSV

IRONWORKERS-LABORERS PENSION PLAN OF CUMBERLAND MD UAD 8/1/1965, CURRENT TRUSTEE

IRVING & VARDA RABIN 1992 REVOCABLE TRUST, IRVING RABIN, VARDA RABIN, TRUSTEES

IRVING S. GILMORE FOUNDATION LCV

IRWIN GROSSINGER TRUST DTD 9/1/65, CAROLINE GROSSINGER, SHARON GROSSINGER, TRUSTEES

IRWIN WALLSHEIN IRA, FIDELITY MANAGEMENT TRUST CO CUST

ISABEL B. YOUNG BALANCED ADVISORY

ISABELLA LAUDE AND WALTER LAUDE

ISABELLA M LAUDE TRUST U/A 8/24/10, ISABELLA LAUDE PHD TRUSTEE

ISHARES DOW JONES U.S. CONSUMER SERVICES SECTOR INDEX FUND

ISHARES DOW JONES U.S. TOTAL MARKET INDEX FUND

ISHARES MORNINGSTAR MID VALUE INDEX FUND

ISHARES MSCI KLD 400 SOCIAL INDEX FUND

ISHARES NYSE COMPOSITE INDEX FUND

ISHARES RUSSELL 1000 INDEX FUND

ISHARES RUSSELL 1000 VALUE INDEX FUND

ISHARES RUSSELL 3000 INDEX FUND

ISHARES RUSSELL 3000 VALUE INDEX FUND

ISHARES RUSSELL MIDCAP INDEX FUND

ISHARES RUSSELL MIDCAP VALUE INDEX FUND

ISHARES S&P 500 INDEX FUND

ISHARES S&P 500 VALUE INDEX FUND

ISHARES S&P GLOBAL CONSUMER DISCRETIONARY SECTOR INDEX FUND

ITG INC. F/K/A INVESTMENT TECHNOLOGY GROUP, INC.

ITT CORPORATION

IUOE LOCAL 138 LCV

IUOE LOCAL 14-14B PENSION FUND

J BOURNE TR-IMA, CURRENT TRUSTEE

J CHRISTOPHER REYES

J D DECKER TRUST 12/14/67 SD KING ET, BANK OF AMERICA, N.A., TRUSTEE

J MCWETHY I/T SHRD

J SANFORD TRUST CHILDREN/ADA, BANK OF AMERICA, N.A., TRUSTEE

J SANFORD TRUST CHILDREN/MASON, BANK OF AMERICA, N.A., TRUSTEE

J SANFORD TRUST CHILDREN/WILLIAM, BANK OF AMERICA, N.A., TRUSTEE

J&M MARSHALL TRUST AND M.B. MARSHALL TRUST, MAXINE MARSHALL, TRUSTEE

J&M TRUST UA DATED 07/23/1992, ROBERT N. MOHR, SUCCESSOR TRUSTEE

J. ALEX ORB ACCT B

J.J.B. HILLIARD, W.L. LYONS LLC

J.M. SMUCKER COMPANY LCV

J.P. MORGAN CLEARING CORP.

J.P. MORGAN SECURITIES LLC F/K/A BEAR STEARNS & CO. INC.

J.P. MORGAN SECURITIES LLC F/K/A J.P. MORGAN SECURITIES INC. A/K/A JP MORGAN SECURITIES

J.P. MORGAN SECURITIES LTD.

J.P. MORGAN SECURITIES, LLC F/K/A J.P. MORGAN SECURITIES INC.

J.P. MORGAN WHITEFRIARS INC.

J.P. MORGAN WHITEFRIARS INC. (A/C MARGIN)

J.P. MORGAN WHITEFRIARS INC. (WHFR-MGN PT)

JACK D. MCMANUS AND JOHN R. MCMANUS

JACK E. MEADOWS

JACK L RASMUSSEN LIVING TRUST UA 01 12 83, JACK L RASMUSSEN, TRUSTEE

JACK M ROSENBERG, A G EDWARDS & SONS C/F SEP-IRA

JACK R. MCDONALD CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

JACK S LITZ DDS LTD PENSION AND PROFIT SHARING TRUST DTD 2/1/79

JACK V SECORD IRA, FCC, CUSTODIAN (PILOT PLUS)

JACK WITKOWSKY MARITAL TRUST, IRIS S WITKOWSKY, JACK WITKOWSKY, TRUSTEES

JACKSON CAPITAL, L.P. A/K/A JACKSON CAPITAL PTRS,LP-MAIN-PL

JACKSON FAMILY TRUST UA DTD 9/30/1994, VICKI LYNN AARON, TRUSTEE

JACKSONVILLE PLUMBERS AND PIPEFITTERS PENSION FUND

JACQUELINE ADLER WALKER

JACQUELINE E AUTRY, AUTRY COMMUNITY PROPERTY TRUST, U/A DTD 03/15/1985, JACQUELINE E AUTRY, TRUSTEE

JACQUELINE S PHELAN TRUST U/A DTD 12/12/83 FBO J PHELAN, TERYL PHELAN, TRUSTEE

JACQUELINE S. ARONSON

JACQUELYN ROSS ROTH IRA, NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

JACQUES HOCHGLAUBE MD PC EMPLOYEE PROFIT SHARING PLAN U/A DTD 8/15/75, JACQUES HOCHGLAUBE, TRUSTEE

JACUZZI BRANDS, INC. D/B/A REXNORD-ZURN HOLDINGS, INC.

JADE KEY ENTERPRISES, LTD.

JAMES 2 18 FOUNDATION

JAMES A CRUMLEY

JAMES A MAC GEORGE II

JAMES A SCHEROCMAN IRA, FCC, CUSTODIAN

JAMES B KAISER TRUST U/A/D 12/16/75 AMENDED 2/4/86, JAMES B KAISER, TRUSTEE

JAMES B KERR III AND JULIE M KERR JT TEN

JAMES B KERR III TRUST U/W AGNES R KERR DTD 7/2/1977, JAMES B KERR III, TRUSTEE

JAMES B SLOAN IRA R/O, JAMES SLOAN, CUSTODIAN

JAMES C WARREN

JAMES C. DONAHUE AND SUZAN ALTAN

JAMES C. DOWDLE REVOCABLE INSURANCE TRUST U/A/D 4/15/1983, JAMES C DOWDLE, TRUSTEE

JAMES CHAN

JAMES D ARONSON 401 K PL U/A DTD 01/01/2003 FBO JAMES ARONSON, JAMES ARONSON, TRUSTEE

JAMES DIETZ

JAMES E BOLIN

JAMES E CUSHING JR AND THERESE M CUSHING

JAMES E MURRAY AND CHERYL L MURRAY

JAMES E PEARSON

JAMES E. HANNIGAN AND SUSAN M. HANNIGAN

JAMES EDWARD GLYNN

JAMES F KERR JR. AND NANCY E KERR JT WROS

JAMES F POLK TRUST U/A DTD 12/13/1989, JEFFREY J. APPLEBY, TRUSTEE

JAMES F PRUYN

JAMES F. HOGE JR.

JAMES FRANKLIN HOLDERMAN

JAMES G REILLY FAMILY TRUST U/A DTD 08/05/97, MICHAEL J REILLY, TRUSTEE

JAMES G UP DE GRAFF TRUST U/A 01/15/04, JAMES G UP DE GRAFF, TRUSTEE

JAMES GLYNN IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

JAMES H. BEATTY

JAMES H. KIMBERLY AND ELIZABETH O. KIMBERLY

JAMES K GOODLAD IRA, MERRILL LYNCH, PIERCE, FENNER & SMITH, CUSTODIAN FPO

JAMES KING AND JUDIE KING

JAMES L FAUST REVOCABLE TRUST U/A/ DATED 11/11/1993, JAMES L FAUST, TRUSTEE

JAMES L SILVERSTEIN FAMILY TRUST U/A DTD 02/14/1996, JAMES L SILVERSTEIN, TRUSTEE

JAMES L. LOCKWOOD

JAMES L. SIEPMAN, JR

JAMES M CHMEL

JAMES M KEVRA AND LINDA JOHNSON KEVRA

JAMES M KEVRA IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

JAMES M ROBERTS IRRA, MERRILL LYNCH, PIERCE, FENNER & SMITH, CUSTODIAN FPO

JAMES M SHARP

JAMES M. LACHEY

JAMES M. READ

JAMES MARSHALL BURT, BURT JM TEST, CURRENT TRUSTEE

JAMES MATEJA

JAMES O. ASHER

JAMES P HOGE REVOCABLE TRUST U/A DTD 12/19/1984, JAMES PATRICK HOGE, TRUSTEE

JAMES P ROCHE AND MARGARET E DURKIN TEN/COM

JAMES P. MOSKUN REVOCABLE TRUST (MOSKTR) JAMES P. MOSKUN, TRUSTEE

JAMES R STANGE

JAMES R. CALDWELL & YVONNE R. CALDWELL

JAMES ROTHERMEL AND MARY ROTHERMEL

JAMES S. MCDONNELL CHARITABLE TRUST A

JAMES S. MCDONNELL CHARITABLE TRUST B

JAMES T SMITH TRUST U/A DTD 10/09/1995, CURRENT TRUSTEE

JAMES THOMAS WIRTH AND EILEEN MARIE WIRTH JT TEN

JAMES V. DIETZ AND KATHRYN DIETZ

JAMES W KIRK TRUST, BANK OF AMERICA, N.A., TRUSTEE

JAMES W. DUFORD REVOCABLE TRUST U/A DTD 03/01/94, JAMES W. DUFORD, TRUSTEE

JAMES W. YING

JAMES ZERWEKH

JAMIEL ANDREW AKHTAR

JAMSHID KHALDAR AND MORAD KHALDAR JT TEN

JAN C PHILIPSBORN TRUST U/A DTD 02/12/1992, JAN C PHILIPSBORN, TRUSTEE

JANE B WHITE TRUST UA OCT 17 02, JANE B WHITE, TRUSTEE

JANE BEHREL TRUST UA 01/13/98, JANE BEHREL, TRUSTEE

JANE D. MEADOWS

JANE G. SCAM BIER TRUST UNDER AGREEMENT DATED 6/9/82, JOHN G SCAMBLER, TRUSTEE

JANE HEALY

JANE K LEE IRA, FCC, CUSTODIAN

JANE M BROWER TRUST U/A/D 11-09-1994, JANE M. BROWER, TRUSTEE

JANE MCGIVERN LEVINE

JANE ROSENTHAL HORVITZ

JANE S HOLZKAMP TRUST DATED 12/18/1998, JANE S HOLZKAMP, TRUSTEE

JANE STREET CAPITAL, LLC

JANET B BERMAN TRUST U/A DTD 04/18/1979, JANET B BERMAN, TRUSTEE

JANET L AND HENRY C BUCKINGHAM RESIDUARY TRUST DTD 10/28/99, JANET L BUCKINGHAM, HENRY C BUCKINGHAM, TRUSTEES

JANET SCHEMMEL MARITAL TRUST U/A/D 08-28-1996, JOANN L SCHAUER, TRUSTEE

JANET U EMBURY CHLN TRUST GRACE FD, BMO HARRIS BANK, N.A., TRUSTEE

JANET U EMBURY CHLN TRUST J LEY FD, BMO HARRIS BANK, N.A., TRUSTEE

JANET U EMBURY CHLN TRUST JANET FD, BMO HARRIS BANK, N.A., TRUSTEE

JANICE B YOUNG

JANICE DAVIS JOBSON

JANICE F. WINBURN

JANICE JACOBS AND ALAN H. JACOBS

JANICE M. MCGURN TRUST U/A DTD 09/22/1987, SUMMERS MCGURN, TRUSTEE

JANICE R. GRUBMAN IRA ROLLOVER, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

JANICE V HOWE TRUST U/A DTD 11-20-95, JANICE V HOWE, TRUSTEE

JANNA L GADDEN

JANNEY MONTGOMERY SCOTT INC.

JANUS

JANUS CAPITAL GROUP

JANUS CAPITAL MANAGEMENT

JAPAN POST INSURANCE CO., LTD.

JAPAN POST INSURANCE CO., LTD. DTK XXXXX-8301/POSSU2, SUMITOMO MITSUI TRUST BANK, LIMITED, TRUSTEE

JAPAN TRUSTEE SERVICES BANK

JASON A. JANIK

JASON BERNZWEIG AND MARYLYN BERNZWEIG

JASON H CAMASSAR AND CAROLYN I CAMASSAR

JAVAD RASSOULI

JAY GOLDMAN MASTER LP

JAY S. MEYSTEL TRUST DTD 5/20/82, CURRENT TRUSTEE

JEAN CURRY GLASSELL, ACTING TRUSTEE AND BENEFICIARY OF THE ALFRED C. GLASSELL JR. CHILDREN'S TRUST FOR JEAN CURRY GLASSELL

JEAN D & ALAN P JONES JR TRUST U/A DTD 12/15/2005, ALAN P JONES JR, JEAN D JONES, TRUSTEES

JEAN SHAULIS BLACK, JEAN S. BLACK TRUST, JEAN SHAULIS BLACK, TRUSTEE

JEAN T. ORB TRUST UNDER AGREEMENT DATED 1-17-90, RUSSELL T STERN JR, TRUSTEE

JEANETTE D DAY FAMILY TRUST U/A DTD 10/04/1994, JEANETTE DAY, TRUSTEE

JEANNE E FITZSIMONS 2004 TRUST U/A DTD 08/26/2004, MATTHEW B FITZSIMONS, TRUSTEE

JEANNE NAPOLITANO TRUST, CURRENT TRUSTEE

JEANNETTE C. LUCAS

JEFFERIES & COMPANY (EQUITY DERIVATIVES)

JEFFERIES & COMPANY, INC.

JEFFERIES & COMPANY, INC. (STOCK LOAN OMNIBUS ACCOUNT VS LOANET SUBSIDIARY LEDGER)

JEFFERIES & COMPANY, INC. PROPRIETARY TRADING ACCOUNT B-SIEVERS

JEFFERSON R SOLENDER

JEFFERY N WALLACE IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

JEFFREY A SHELDEN VOL TRUST U/A 8/22/99, WILLIAM W SHELDEN JR, TRUSTEE

JEFFREY C NEAL

JEFFREY CHANDLER

JEFFREY MARTIN FEDYNAK UGMA/MD, DEBORAH FEDYNAK C/F

JEFFREY RISLEY

JEFFREY SCHATZ AND KIMBERLY SCHATZ

JEFFREY W BABCOCK

JENIFER B. BOOTH F/K/A JENIFER B. MCINTOSH

JENNIE KING SCAIFE

JENNIFER A DIAMOND REVOCABLE TRUST UAD 7-17-00, JENNIFER A DIAMOND, TRUSTEE

JENNIFER G HINES

JENNIFER GRUMHAUS DALY

JENNISON MID-CAP IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

JERIS J BOYCE

JEROLD JAY WICHTEL

JEROME & MARIA MARKOWITZ

JEROME AND ILENE COLE FOUNDATION SC-287

JEROME BLANK, JEROME BLANK DECLARATION OF TRUST U/A DTD 9/19/96, JEROME BLANK, TRUSTEE

JEROME G. LEE

JEROME HEINE TOD SUSAN PORTELLI

JEROME KAHN JR REVOCABLE TRUST DTD 10-16-87, JEROME KAHN, TRUSTEE

JEROME M WELLS IRA, FCC, CUSTODIAN

JEROME P. MARTIN AND MELANIE M. MARTIN

JERRY J. WOLFE AND TIFFANY WOLFE TANKERSLEY

JERRY LOWER IRA R/O, AMERIPRISE TRUST CO, CUSTODIAN

JESSE LLOYD GUMA IRREV TRUST U/A DTD 7-5-96, GREG GUMA, TRUSTEE

JESSE WERTHMAN

JESSIE BALL DUPONT FUND, THE NORTHERN TRUST COMPANY, MARY HUNTLEY, EDDIE JONES JR., LEROY DAVIS, THOMAS JEAVONS, MARY PHILLIPS, CO-TRUSTEES

JESSNICK PARTNERS, L.P.

JEWISH COMMUNITY FEDERATION OF SAN FRANCISCO

JEWISH HEALTHCARE FOUNDATION OF PITTSBURGH

JG GLOBAL GROWTH FUND LTD

JHT 500 INDEX TRUST

JHT 500 INDEX TRUST B

JHT EQUITY INCOME TRUST

JHT MID VALUE TRUST

JHT SPECTRUM INCOME TRUST

JHT TOTAL STOCK MARKET INDEX TRUST

JIA XU

JIANSHI MAO

JILL CUNNIFF AND TIM CUNNIFF JT WROS

JILL KAPLIN A/K/A JILL KAPLIN HERZ

JIM BARKSDALE

JIM HICKS & CO. EMPLOYEE PROFIT-SHARING PLAN, JIM HICKS, TRUSTEE

JIM WELSH

JIMMY A HANCOCK IRA A/C XXXX0794

JIMMY C PETTYJOHN JR IRREV INSURANCE TRUST DTD 02/12/2002, CURRENT TRUSTEE

JING YE AND HONG LU

JING YI WANG

JINVEST TRUST U/A DTD 1-9-93, JACK E CHAPPELL, TRUSTEE

JNL/MELLON CAPITAL MANAGEMENT S&P 500 INDEX FUND

JOAN E CLARK

JOAN ELLIS VAN LOAN

JOAN F WADE REVOCABLE TRUST U/A DTD 12/26/1996, JOAN F WADE, TRUSTEE

JOAN J. JONES

JOANNA STURM

JOANNE DESHEROW SANGER LIV TRUST U/A DTD 03/29/2004, JOANNE DESHEROW SANGER, TRUSTEE

JOANNE SCHILLER IRA, FCC, PLAN CUSTODIAN

JODY E GUNTER IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

JOE FRANK

JOE YOUSSRY KELADA SEP IRA, E*TRADE SECURITIES LLC, CUSTODIAN

JOEL F ZEMANS REV TRUST 1Z -51 PLDG, CUSTODIAN, JOEL ZEMANS, TRUSTEE

JOEL JAY TATOR IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

JOEL S MARKS REV LIV TRUST ESOP ROLLOVER U/A/D 03-30-2006, JOEL MARKS, TRUSTEE

JOHN & BETTY ALTMAN FAMILY TRUST UAD 05/16/86, JOHN M ALTMAN, BETTY ANN ALTMAN, TRUSTEES

JOHN & JOAN HUMPHREY FAMILY TRUST, CURRENT TRUSTEE

JOHN & VIRGINIA LANFRANKI TRUST U/A DTD 04/29/1989, VIRGINIA LANFRANKI, TRUSTEE

JOHN A CANNING JR REV TRUST U/A 3/15/94, JOHN A CANNING JR, TRUSTEE

JOHN A DITTMAR

JOHN A DORE AND NANCY L DORE

JOHN A MAHER AND BETTY A MAHER

JOHN A MAHER IRA ROLLOVER ACCOUNT, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

JOHN A ORB JR TRUST U/A/D 11/02/04, JOHN A ORB, TRUSTEE

JOHN A. HARRAH CHARIT REMAIN TRUST UAD 09/06/95 - GABELLI, JOHN A. HARRAH, DAVID COX, TRUSTEES

JOHN A. MCWETHY IRREVOCABLE TRUST U/A/D MAY 10, 1978, GREENLEAF TRUST, TRUSTEE

JOHN A. TOMEI

JOHN AND JANN REARDON TRUST U/A DTD 11/03/1999, JOHN E REARDON, JANN M REARDON, TRUSTEES

JOHN B LLOYD JR REV TR, JOHN B LLOYD JR, TRUSTEE

JOHN B. DIAMOND DECLARATION OF TRUST DATED APRIL 15,2010, JOHN B. DIAMOND, TRUSTEE

JOHN B. LLOYD, JR.

JOHN BIRD LLOYD '68 IRREVOCABLE TRUST, CURRENT TRUSTEE

JOHN C KARNUTH

JOHN CHELONI AND JEAN CHELONI JT TEN

JOHN D. & CATHERINE T. MACARTHUR FOUNDATION

JOHN D. LANE REVOCABLE TRUST, CURRENT TRUSTEE

JOHN DEERE PENSION TRUST, CURRENT TRUSTEE

JOHN DONLEY AND MICHELE DONLEY JT WROS

JOHN E MARTIN REVOCABLE TRUST, CURRENT TRUSTEE

JOHN E MAYASICH TRUST U/A DTD 04/23/2007, JOHN E. MAYASICH, TRUSTEE

JOHN E MCGOWAN

JOHN E MURRAY JR. AND BESSIE E MURRAY JT WROS

JOHN E REARDON

JOHN E REARDON 401(K) SAVINGS PLAN

JOHN F DONAHUE JR IRA, MERRILL LYNCH, PIERCE, FENNER & SMITH, CUSTODIAN FPO

JOHN F. BARNARD TRUST U/A/D 04/04/03, JANICE ANDERSON, JOHN F. BARNARD, TRUSTEES

JOHN F. LLEWELLYN LIVING TRUST, JOHN F. LLEWELLYN, TRUSTEE

JOHN F. MANGAN, JR.

JOHN F. PATINELLA

JOHN F. POELKING AND LAURIE H. POELKING

JOHN FOX SULLIVAN AND BEVERLY K SULLIVAN JT TEN

JOHN G DARGAN

JOHN G KOLOGI

JOHN G LINDSAY TRUST U/A DTD 10/04/2007, JOHN G LINDSAY, ANNE P LINDSAY, TRUSTEES

JOHN G. KOLOGI FIRST DATA INCENTIVE SVGS PLAN, STATE STREET BANK & TRUST COMPANY, TRUSTEE

JOHN H SEYMOUR & BARBARA M SEYMOUR TRUST UA 22-MAR-93, JOHN H SEYMOUR, BARBARA M SEYMOUR, TRUSTEES

JOHN H. PANTON AND MARY PANTON

JOHN H. RHODES

JOHN HANCOCK FINANCIAL (MANULIFE FINANCIAL)

JOHN HANCOCK FUNDS II EQUITY-INCOME FUND

JOHN HANCOCK FUNDS II INDEX 500 FUND

JOHN HANCOCK FUNDS II SPECTRUM INCOME FUND

JOHN HANCOCK FUNDS II SPI REF EQUITY INCOME TRPA 4627

JOHN HANCOCK VARIABLE INSURANCE TRUST F/K/A JOHN HANCOCK TRUST (NEW INCOME TRUST)

JOHN HOWELLS

JOHN J GROGAN IRA AMERIPRISE TRUST CO ACF

JOHN J JIGANTI

JOHN J MCDERMOTT

JOHN J MCDERMOTT AND MARY R MCDERMOTT

JOHN J MICHALEC IRA, AMERIPRISE TRUST COMPANY, CUSTODIAN

JOHN J VITANOVEC TRUST U/A DTD 12/27/1996, JOHN J VITANOVEC, KATHLEEN GEARY, TRUSTEES

JOHN J WAGNER AND ROSEMARY WAGNER JT WROS

JOHN JOSEPH CAHILL

JOHN KARNUTH AND MARLENE KARNUTH

2855453.1

JOHN L MILNER REV TRUST UAD 08/15/2003, JOHN L MILNER, TRUSTEE

JOHN LABAK, HOW BARNES HOEFER & ARNETT EMPLOYEE PROFIT SHARING PLAN, AST TRUST COMPANY NA, TRUSTEE

JOHN LANFRANKI & VIRGINIA LANFRANKI TRUST UA 4/29/80, VIRGINIA LANFRANKI, TRUSTEE

JOHN M BUCKWALTER

JOHN M PAPADOPULOS JR UTMA IL, SUSAN TIPPET PAPADOPULOS, CUST

JOHN M SCHLOERB TRUST DTD JUL 26 00, JOHN M. SCHLOERB, TRUSTEE

JOHN M. LAVINE

JOHN MASON SANFORD

JOHN MICHAEL KELLEHER

JOHN MULLOOLY

JOHN N. ROBSON TRUST B DATED 9/11/1970, TOM FALCEY, THE NORTHERN TRUST COMPANY, AND/OR FAIR OAKS LLC, TRUSTEES

JOHN NESBIT REES AND SARAH HENNE REES CHARITABLE FOUNDATION U/W, RICHARD W ROEDER & BARBARA L SMITH, TRUSTEES

JOHN P FENDLEY TRUST U/A DTD 11/27/1995, PATRICIA J FENDLEY, TRUSTEE

JOHN P MCMEEL

JOHN PRITZKER AND LISA PRITZKER

JOHN R BLACK

JOHN R FLANAGAN CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

JOHN R JAGO

JOHN R STAIB

JOHN R. LOFTUS IRA, STIFEL NICOLAUS, CUSTODIAN

JOHN R. POLATSCHEK

JOHN RANDOLPH FOUNDATION SUPPORT FUND, INC.

JOHN S. BABCOCK TRUST, CURRENT TRUSTEE

JOHN S. HOWELL

JOHN SPEARS

JOHN STEPHENS MARITAL DEDUCTION TRUST, BETTY J. STEPHENS, TRUSTEE

JOHN STEWART PROPERTY TRUST U/A DTD 12/06/2000, JOHN W STEWART II, TRUSTEE

JOHN T O'LOUGHLIN

JOHN T SAPIENZA ESQ

JOHN T. MCCUTCHEON III TRUST U/A DTD 10/26/1987, JOHN T. MCCUTCHEON IV, JOHN T. MCCUTCHEON III, LINDSAY MCCUTCHEON, TRUSTEES

JOHN T. MCCUTCHEON JR., JOHN T. MCCUTCHEON JR. TRUST U/A DTD 10/26/87, ANNE MCCUTCHEON LEWIS, TRUSTEE

JOHN THALHEIMER TRUST U/A 7/23/85 AS AMENDED 11/16/98, PNC BANK, CUSTODIAN FOR THE TRUSTEE

JOHN THALHEIMER TRUST UNDER WILL OF LEAN THALHEIMER FBO EMILY THALHEIMER REINER U/A DTD 11/16/98, PNC BANK, CUSTODIAN FOR THE TRUSTEE

JOHN V FARWELL IV DEC OF TR, AMEND & RESTATEMENT U/A 1/15/98, JOHN V FARWELL IV, TRUSTEE

JOHN W PEAVY & LINDA A PEAVY, JOHN W PEAVY & LINDA A PEAVY JOINT TRUST, CURRENT TRUSTEE

JOHN W TYRONE AND CHERYL C TYRONE

JOHN W. MADIGAN TRUST, JOHN W. MADIGAN, TRUSTEE

JOHN W. STEWART

JOHN W. STEWART 1966 TRUST FBO CYNTHIA L. PHELPS, JAMES C. WALDO, TRUSTEE

JOHN W. STEWART 1966 TRUST FBO NINA P. GORNY, JAMES C. WALDO, TRUSTEE

JOHN W. STEWART 1966 TRUST FBO PATRICIA S. HAYES, JAMES C. WALDO, TRUSTEE

JOHNSON GROWTH LLC

JON M AUMAN

JON M. VAN DYKE

JON OSCHER

JON R. LIND IRA ROLLOVER, NORTHERN TRUST COMPANY, CUSTODIAN

JONATHAN A . KNEE

JONATHAN BRACHFELD

JONATHAN C. HAMILL REVOCABLE TRUST, JONATHAN CORWITH HAMILL, TRUSTEE

JONATHAN E. ZAKARY

JONATHAN KOVLER

JONATHAN R. EVANS IRA, JONATHAN R. EVANS OR JPMCC CUST

JONESTRADING INSTITUTIONAL SERVICES LLC

JOSEF HUY TRUST, JOSEF HUY, TRUSTEE

JOSEPH A GAGLIARDO TRUST U/A DTD 7/12/1984, LORRAINE GAGLIARDO, TRUSTEE

JOSEPH A PALECZNY

JOSEPH A. YOUNG AND SANDRA L. YOUNG

JOSEPH F KUN AND KAREN L KUN

JOSEPH FLORENCE BLACHARSKI TRUST UA DTD 04/09/80, B FLORENCE BLACHARSKI, TRUSTEE

JOSEPH G TRAYNOR AND ELAINE S TRAYNOR JT WROS

JOSEPH H TWICHELL TRUST U/D 8/7/98 SELF ESTATE OF ANGELA E LOH, CURRENT TRUSTEE

JOSEPH KOLLIN & BELLA KOLLIN

JOSEPH L MOLDER TRUST, BANK OF AMERICA, N.A., TRUSTEE

JOSEPH L ROSENMILLER LIFETIME TRUST, JOSEPH L ROSENMILLER, TRUSTEE

JOSEPH LEONARD

JOSEPH M FEE AND ELIZABETH FEE REVOCABLE LIVING TRUST, JOSEPH M FEE, TRUSTEE

JOSEPH O'CONNOR

JOSEPH P & JEANNE M SULLIVAN CHAR REM UNITRUST U/A 12/6/91, JEANNE M SULLIVAN, TRUSTEE

JOSEPH P BALDWIN

JOSEPH POPE

JOSEPH R MEDLEY

JOSEPH R MEDLEY IRA, MESIROW FINANCIAL, INC, CUSTODIAN

JOSEPH T SOBECK AND JEANNE SOBECK JT TEN

JOSHUA F. LOMBARD

JOSHUA G. WOOL

JOSHUA S KANTER, WINDY CITY INC PFT SHG PL, JOEL S KANTER, TRUSTEE

JOSHUA TREE CAPITAL MANAGEMENT LP

JOY LEICHENGER TRUST U/A DTD 08/02/1978, CURRENT TRUSTEE

JP MORGAN MOSAIC FUND, LLC

JP MORGAN SERVICES

JPMORGAN 401(K) SAVINGS PLAN

JPMORGAN CHASE & CO. INC.

JPMORGAN CHASE BANK, N.A

JPMORGAN CHASE BANK, N.A. F/K/A CUSTODIAL TRUST CO.

JPMORGAN CHASE FUNDING INC. F/K/A JP MORGAN VENTURES CORP QRDT

JPMORGAN EQUITY INDEX FUND

JPMORGAN SERVICES, INC.

JPMORGAN TRUST II

JUDD S ALEXANDER FOUNDATION INC

JUDITH E NEISSER

JUDITH E NEISSER IRA

JUDITH E. BLAZER LIVING TRUST U/A/D 10/21/96, JUDITH E. BLAZER, TRUSTEE

JUDITH JUDS AND RICHARD C. JUDS JR

JUDITH L GENESEN TRUST U/A DTD 06/05/1995, JUDITH L GENESEN, TRUSTEE

JUDITH M HUPE TRUST U/A/D 12/22/93, JUDITH M HUPE, TRUSTEE

JUDITH N H WEISS

JUDITH R MINOR TRUST UA 07/11/88, EDWARD MINOR, TRUSTEE

JUDITH SARNAT TRUST SS-512, CUSTODIAN, JUDITH SARNAT, TRUSTEE

JULIA F. MENARD MARITAL TRUST, WILLIAM L MENARD, TRUSTEE

JULIA K. ROSENWALD

JULIA NEITZERT TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

JULIA P WALSKI

JULIA WESTLAND REV TRUST U/A DTD 10/28/1996, JULIA WESTLAND, TRUSTEE

JULIE A. TRIONA TRUST U/A DTD 04/17/1998, JULIE A. TRIONA, TRUSTEE

JULIO ARRIAGA

JUNIUS F. ALLEN IRREVOCABLE TRUST DATED 03/27/1978, THE NORTHERN TRUST COMPANY, TRUSTEE

JUPITER CAPITAL PARTNERS LLC

JUPITER MEDICAL CENTER FOUNDATION PERMANENT ENDOWMENT GENERAL FUND

JUSTIN LONG

JYG LIMITED PARTNERSHIP #2 G-BAR

K P TWICHELL TRUST U/D, D C TWICHELL, TRUSTEE

KAAREN I. HOFFMAN SEPARATE PPTY TRUST DATED 11/30/98, KAAREN I. HOFFMAN, TRUSTEE

KAISER FOUNDATION HEALTH PLAN

KAISER FOUNDATION HOSPITALS

KAISER PERMANENTE RABBI TRUST, CURRENT TRUSTEE

KALO HOLDINGS LP #2

KAMAN CORP. MASTER TRUST A/K/A KAMAN EMPLOYEES' PENSION PLAN

KANGAROO INVESTMENTS, LCC - CANAL STREET

KANSAS CITY POLICE EMPLOYEES' RETIREMENT SYSTEMS

KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM

KANYE LIM IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

KAREN L LOCKWOOD REV TRUST U/A/D 07/30/1998, KAREN L LOCKWOOD, TRUSTEE

KAREN RAPKIN

KARL PUTNAM

KARLIN HOLDINGS LP/EQ INVEST CORP

KARMA I RODHOLM IRA

KARPEN TRUST #1, J MARTIN KARPEN, TRUSTEE

KAS BANK, NV

KASZTON FAMILY TRUST UAD 10/23/1997, WILLIAM & PATRICIA KASZTON, TRUSTEES

KATHARINE F ANDERSON TRUST

KATHARINE N LLOYD TESTAMENTARY TRUST, CURRENT TRUSTEE

KATHERINE GILLESPIE SPEARMAN

KATHERINE KILLEBREW

KATHERINE MARSHALL WHITE

KATHERINE PRATT TWICHELL TRUST U/I DATED JULY 27, 1964 FOR THE ISSUE OF HARMONY T. CLEMENT, UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEE

KATHERINE T GOLDBERG AND STEVEN Y GOLDBERG

KATHLEEN GEARY TRUST U/A DTD 12/27/1996, KATHLEEN GEARY, JOHN J. VITANOVEC, TRUSTEES

KATHLEEN GUCK AND EBEN PUTNAM SMITH

KATHRYN A DIETZ LIV TRUST U/A DTD 4/29/04, KATHRYN DIETZ, JAMES DIETZ, TRUSTEES

KATHRYN H. LALLOU - TR

KATHRYN M BARGER REV. TRUST DTD 8-18-99, KATHRYN M BARGER, DONALD W MURRAY, TRUSTEES

KATHRYN TURNER

KATHY REX AND THOMAS W HUNDLEY

KAY MIKULA

KBC GLOBAL INVESTMENT FUNDS

KBC SECURITIES

KBS PARTNERSHIP

KEARNS CHARITABLE REMAINDER ANNUITY TRUST U/A DATED 7/24/03, THE NORTHERN TRUST COMPANY, TRUSTEE

KEITH Y. KWOH

KELLOGG BROWN & ROOT LLC AS SUCCESSOR TO THE RIGHTS AND INTERESTS OF KELLOGG BROWN & ROOT, INC.

KELLOGG CAPITAL MARKETS, LLC

KELLY B MINICHIELLO

KEN CASCARELLA AND LISA CASCARELLA

KENNETH BRACHFELD

KENNETH CAHN

KENNETH E LACY AND PATRICIA H LACY JT WROS

KENNETH E PAGE 2001 TRUST UA DTD 11/20/01, KENNETH E. PAGE, TRUSTEE

KENNETH E PERRY

KENNETH E. NICHOLS

KENNETH F MILLER, WELLS FARGO BANK C/F

KENNETH F PUGLISI

KENNETH J DEPAOLA

KENNETH J KUBACKI, G OGDEN NUTTING, RMN CAPITAL LP, A PARTNERSHIP

KENNETH J. DOUGLAS AND VICKI F. DOUGLAS

KENNETH J. VYDRA TRUST NO. 101 U/A/D 03-10-2006, KENNETH J. VYDRA, TRUSTEE

KENNETH L FEIGL AND RUTH FEIGL

KENNETH M WEIL

KENNETH MARCO

KENNETH MITCHELL

KENNETH PUGLISI

KENNETH R LOISELLE TRUST U/A DTD 10/30/2001, KENNETH ROBERT LOISELLE, TRUSTEE

KENNETH R. M. THOMPSON, CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

KENNETH R. POSNER AND ARLENE L. POSNER

KENNETH W LINT FAMILY TRUST UA 12/19/89, ELEANOR G. LINT, TRUSTEE

KENNETH WEISS

KENTUCKY RETIREMENT SYSTEMS

KEVIN D O'BRIEN TRUST DTD 8-18-03, KEVIN D. O'BRIEN, SARAH A. O'BRIEN, TRUSTEES

KEVIN DANSART AND PAULA DANSART

KEVIN E DOMBKOWSKI ALCATEL-LUCENT SAVINGS PLAN FBO, FIDELITY MANAGEMENT TRUST CO, TRUSTEE

KEVIN J KING

KEVIN L RINGEL AND KATHLEEN M RINGEL JT TEN

KEVIN M. MOORE AND KIMBERLY A. MOORE JT WROS

KEVIN O'SULLIVAN AND CAROLE O'SULLIVAN

KEVIN STONE IRA R/O, DELAWARE CHARTER GUARANTEE & TRUST, CUSTODIAN

KEYBANK NATIONAL ASSOCIATION

KIDVIEW PARTNERS LP

KIENER LP

KING BRUWAERT HOUSE

KIRK F. FLYNN & VIRGINIA O. FLYNN LIVING TRUST, CURRENT TRUSTEE

KIRKPATRICK FARMING RANCHING

KIRSTEN GIBBS AND JOHN GIBBS

KKP HOLDINGS LG CAP TESE

KNIGHT CAPITAL MKTS LLC

KOSHIYAMA TRUST UA 02-AUG-87 1987, TERUKO S KOSHIYAMA, TRUSTEE

KOTHE ENTERPRISES LLLP

KPC US EQUITY LLC

KRAFT GROUP

KRISHNA PAHUJA CHAND TRUST U/A 1/28/96 FBO KRISHNA PAHUJA, KRISHNA PAHUJA, TRUSTEE

KRISTIN D GRAHN UTMA CA, BARBARA J. GRAHN, CUST

KRISTIN LYNN HERTZ

KRISTIN MONROE GRUNHAUS GIFT TRUST, KRISTIN W BRENNAN, TRUSTEE

KRYSTYNA JURZYKOWSKI

KUANG C YEH IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

KURT J HERBINGER AND CHRISTINE M HERBINGER

L MANILOW TRUST U/A DTD 2/08/2002, LEWIS MANILOW, TRUSTEE

L. RICHARD WOLFF

L. WIENER REVOCABLE TRUST U/A/D 07/22/82, WILLIAM A. WIENER, LOUISA M. WIENER, TRUSTEES

L-3 COMMUNICATIONS CORPORATION LCV

L-3 COMMUNICATIONS CORPORATION MASTER TRUST

LABORERS' DISTRICT COUNCIL & CONTRACTORS' PENSION FUND OF OHIO

LABORERS DISTRICT COUNCIL AND CONTRACTORS PENSION FUND OF OHIO

LABORERS NATIONAL PENSION FUND

LAKE CHARLES AMER PRESS TAX ADVANTAGED THRIFT TRUST, CURRENT TRUSTEE

LAKONISHOK CORP

LAMOTTA FAMILY TRUST U/A/D 01/01/93, MATTHEW MARYLES, TRUSTEE

LANCASHIRE INSURANCE COMPANY, LTD

LANCE HILLSTROM AND DAWN HILLSTROM

LANCE THOMAS MCCLUSKEY IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

LANGDON STREET CAPITAL LP - MARCH PARTNERS LLC

LANSFORSAKRINGAR

LARGE CAP FUND, A SERIES OF SEI INSTITUTIONAL INVESTMENTS TRUST

LARGE CAP INDEX FUND, A SERIES OF SEI INSTITUTIONAL INVESTMENTS TRUST

LARGE CAP VALUE FUND, A SERIES OF SEI INSTITUTIONAL MANAGED TRUST

LARGE CAP VALUE INDEX TRUST OF QA COLLECTIVE TRUST SERIES

LARGE CAP VALUE SUBTRUST OF THE DFA GROUP TRUST, DIMENSIONAL FUND ADVISORS, TRUSTEE

LARRY & DIXIE HART LIFETIME TRUST, THE PEOPLES BANK, TRUSTEE

LARRY BRAINARD AND MARILYN BRAINARD

LARRY J. LIGHT

LARRY JAY FOX

LARRY L BLOOM AND MARY J BLOOM TRUST(S) 11-21-95, LARRY L BLOOM AND MARY J BLOOM, TRUSTEES

LARRY TOWNSEND CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

LARRY TOWNSEND, CITIBANK TAX SHELTER A/C/F LARRY TOWNSEND IRR

LAS EQUITY PARTNERS LP

LASZLO N TAUBER FAMILY FOUNDATION I

LATIGO MASTER FUND LTD

LAURA E MOLASKEY LIVING TRUST UA 07/28/89, LAURA E. MOLASKEY, TRUSTEE

LAURA LABATON

LAURALEE K. BELL 1993 TRUST, LAURALEE K. BELL, TRUSTEE

LAURALYN D. MATOS

LAURENCE A WEISS AND JUDITH N H WEISS

LAVERGNE MARCUCCI TRUST U/A DTD MAY 28 1988, DENNIS R. MARCUCCI & NICOLAS G. MARCUCCI, TRUSTEES

LAVONNE MULLET IRA, AMERIPRISE TRUST COMPANY, CUSTODIAN

LAW COMPANIES GROUP, INC. PENS

LAWRENCE A BUSSE TRUST U/A DTD 10/22/1991, LAWRENCE A BUSSE, TRUSTEE

LAWRENCE BARNER AND JOAN BARNER JT WROS

LAWRENCE E ARONSON TRUST U/A/D 9/8/95 (PILOT PLUS), LAWRENCE E. ARONSON, TRUSTEE

LAWRENCE F KLIMA IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

LAWRENCE H BURKS

LAWRENCE J BLUM TRUST U/A 1/30/06, LAWRENCE J BLUM, TRUSTEE

LAWRENCE M COHEN TRUST LAWRENCE M COHEN TRADING ACCT, CURRENT TRUSTEE

LAWRENCE M PUCCI DESIGNATED BENE PLAN

LAWRENCE MARWILL, MSSB, CUSTODIAN

LAWRENCE S COMEGYS AND JOCELYN WATTS COMEGYS

LAWRENCE S. SMITH

LAY EMPLOYEES OF THE ARCHDIOCESE OF CINCINNATI DEFINED BENEFIT PLAN, US BANK, TRUSTEE

LAY EMPLOYEES RETIREMENT PLAN OF ARCHDIOCESE OF PHILADELPHIA

LDI LIMITED

LEANDRO P RIZZUTO

LEANNE MCRILL

LEE ANN VARASCONI LIVING TRUST U/A DTD 02/09/2004, LEE ANN VARASONI, TRUSTEE

LEE CARLISLE GREGORY

LEE U GILLESPIE REV TRUST U/A - DEC'D 05/20/10, BANK OF AMERICA, N.A., TRUSTEE

LEGACY FUND

LEGACY TRUST COMPANY, N.A., ACTING TRUSTEE OF THE ALFRED C. GLASSELL JR. CHILDREN'S TRUST FOR EMILY EVANS EMBREY

LEGAL & GENERAL US INDEX TRUST, THE ROYAL BANK OF SCOTLAND, TRUSTEE

LEGENT CLEARING LLC

LEGG MASON BATTERYMARCH FINANCIAL MANAGEMENT S&P 500 INDEX FUND, A SERIES OF THE LEGG MASON PARTNERS EQUITY TRUST, A MARYLAND STATUTORY TRUST A/K/A LEGG MASON PARTNERS

LEGG MASON PARTNERS LMP VAR EQUITY INDEX PORTFOLIO

LEI JIN

LEIGH C CHAO

LENOX HILL HOSPITAL

LEONA Z ROSENBERG IRREV CHARITABLE TRUST UAD 12/4/1998, LEONA Z ROSENBERG, LAWRENCE A ROBINS, TRUSTEES

LEONARD & PHYLLIS SEIDL LIVING TRUST U/A DTD 03/15/06, LEONARD L SEIDL, PHYLLIS J SEIDL, TRUSTEES

LEONARD ALLEN AND JANE ELLEN ALLEN

LEONARD HILL, HILL REVOCABLE LIVING TRUST DTD 12/24/91, LEONARD HILL, TRUSTEE

LEONARD J BETLEY

LEONARD R SOGLIO DESIGNATED BENE PLAN

LEONARD ROSS AND LANA ROSS

LEONARD SARNAT TRUST #71825 SS-253, CUSTODIAN, LEONARD A. SARNAT, TRUSTEE

LEONARD WILLIAM ALLEN IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

LEONHARD LIVING TRUST U/A DTD 11/30/2009, RICHARD W. LEONHARD, MARION S. LEONHARD, TRUSTEES

LEROY K MCCUNE TRUST U/A DTD 05/28/1998, LEROY K MCCUNE, KAREN MCCUNE FLEMING, TRUSTEES

LESLIE HILGER III

LESTER & FRANCES JOHNSON FOUNDATION

LESTER R THURSTON JR REVOCABLE TRUST U/A 10/05/06, CURRENT TRUSTEE

LETICIA F GARCIA TRUST UNDER AGREEMENT DATED SEPTEMBER 29, 1992, LETICIA F GARCIA, TRUSTEE

LEWIS S MENHINICK TRUST U/A DTD 02/05/1980, DIANE BOHLMAN, BARBARA D. MENHINICK, TRUSTEES

LEWIS TAMAN

LEWY FAMILY TRUST 4L-210, MARIEL B LEWY, THOMAS J LEWY, TRUSTEES

LFT PARTNERSHIP

LIBERTY FINANCIAL SERVICES CO

LIBERTY HARBOR MASTER FUND I, LP

LIBERTY MUTUAL INSURANCE CO.

LIECHTENSTEINISCHE LANDESBANK AG

LIGHTHOUSE FINANCIAL GROUP LLC

LIGHTNING TRADING LLC

LILA J. BOUWENS TRUST U/A DTD 6/23/93, JOEL G. & LILA J. BOUWENS, TRUSTEES

LILI-CHARLOTTE SARNOFF TRUST U/A DTD 02/04/2005, LILI-CHARLOTTE SARNOFF, TRUSTEE

LIMA YMCA, INC. TRUSTEES ENDOWMENT FUND

LINDA B KELLER

LINDA E BEAN

LINDA E PEARCE

LINDA F JOHNSON TRUST U/A 3/24/05, LINDA F JOHNSON, GEORGE R JOHNSON. TRUSTEES

LINDA LIPINSKI CORLISS IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

LINDA R. COHEN F/K/A LINDA ROBIN CAHN

LINDA SHAW CARPENTER

LINDA VERBLOW AND CLIVE VERBLOW TEN BY ENT

LINDY CRAWFORD IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

LINNET F MYERS IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

LISA A. HUGHES

LISA G. HAAS

LISA M FEATHERER IRA R/O, DELAWARE CHARTER GUARANTEE & TRUST COMPANY, CUSTODIAN

LISA M. FEATHERER TRUST U/A/D JUNE 12, 1992, LISA M. FEATHERER, TRUSTEE

LISA PERRY AND BEVERLY PERRY

LISL GERSHON

LISPENARD STREET CREDIT MASTER FUND

LIVING TRUST OF LAUREL L SCHNITZER UA JUL 16 2003, LAUREL L SCHNITZER, TRUSTEE

LIVING TRUST OF LAUREL L SCHNITZER, LAUREL L SCHNITZER, TRUSTEE

LJR LIMITED PARTNERSHIP

LLOYD A CONNERS IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

LLOYD FERGUSON CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

LLOYD RICHARD MUSETTI SR

LLOYD TRIBUNE NOMINEE TRUST, CURRENT TRUSTEE

LLOYD VAN ANTWERPEN

LLOYD VAN ANTWERPEN REVOCABLE TRUST, MARSHALL & ILSLEY TRUST COMPANY, TRUSTEE

LLOYD WENDT

LMA SPC FOR AND ON BEHALF OF MAP I SEGREGATED PORTFOLIO

LOCAL 104 SUPPLEMENTAL PENSION

LOCAL 1102 AMALGAMATED PENSION FUND

LOCAL 134 S&P 500 INDEX FUND

LOCAL GOVERNMENT SUPER ANNUATION SCHEME

LOCAL UNION #124 IBEW PENSION

LOCALS 302 & 612 OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS-EMPLOYERS CONSTRUCTION INDUSTRY RETIREMENT TRUST, CURRENT TRUSTEE

LOCKHEED MARTIN CORP.

LOCKHEED MARTIN CORPORATION MASTER RETIREMENT TRUST, LMIM CO, TRUSTEE

LOCKWOOD BROTHERS INC.

LODESTONE SOUTH L.P. - LODESTONE SOUTH PARTNERSHIP LP FAMILY LIMITED PARTNERSHIP

LOEB ARBITRAGE B FUND LP

LOEB ARBITRAGE FUND INVESTMENT A/C UNDER SEC 1236 & 475 OF I R C

LOEB ARBITRAGE MANAGEMENT LP

LOEB OFFSHORE B FUND LTD

LOEB PARTNERS (LOEB OFFSHORE FUND LTD)

LOEB PARTNERS CORPORATION

LOIS D KALIEBE TRUST U/A DTD 03/05/1993, LOIS D KALIEBE, TRUSTEE

LOIS MOSS BARNWELL

LOISANNE R FLAHERTY TRUST U/A DTD 09/23/2004, LOISANNE R. FLAHERTY, TRUSTEE

LOLA LLOYD HORWITZ

LOLITA WAGNER LIVING TRUST U/A/D 10/07/88, LOLITA K. WAGNER, TRUSTEE

LOMBARD ODIER DARIER HENTSCH & CIE

LOMBARDI & CO., INC.

LONDON EQUITY FINANCING OPERATIONS

LONE TREE PARTNERS, LLC

LONERGAN TRUST, JAMES A LONERGAN, TRUSTEE

LONGVIEW MANAGEMENT GROUP LLC

LOOMIS SAYLES CREDIT ALPHA MASTER FUND

LOOMIS SAYLES MULTI STRATEGY MASTER ALPHA LTD

LORETTA C. FINLAY TRUST U/A DTD 02/04/1994, LORETTA C. FINLAY, TRUSTEE

LORI ANN TALARICO

LORING WOLCOTT AND COOLIDGE FIDUCIARY

LORRAINE AYDINIAN

LORRAINE BUCCINO REVOCABLE TRUST U/A 3/6/90, LORRAINE M BUCCINO, TRUSTEE

LORRAINE J GAGLIARDO TRUST U/A DTD 7/21/1984, ANDREW GAGLIARDO, TRUSTEE

LORRAINE L WARD

LOS ANGELES FIRE AND POLICE PENSION PLAN

LOUIS CARBONE IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

LOUIS G GILBERT AND RENEE GILBERT

LOUIS ROE TRUST U/A DTD 09/08/87, ALAN KOOPERMAN, TRUSTEE

LOUISE BROUGH CLAPP TRUST, LOUISE BROUGH CLAPP, TRUSTEE

LOUISE W. GRAVES TRUST U/W/O PHILLIP L. EDWARDS, CURRENT TRUSTEE

LOUISIANA SCHOOL EMPLOYEES' RETIREMENT SYSTEM

LOUISIANA STATE EMPLOYEES' RETIREMENT SYSTEM

LOW JOINT LIVING TRUSTS U/A DTD 02/08/1996, ZOLA L LOW, JOSEPH T LOW, TRUSTEES

LOWE INTERESTS, L.P.

LOWELL ASSOCIATES LTD PTNSHP

LOWELL W. PAXSON CHARITABLE REMAINDER UNITRUST NUMBER FOUR DATED 2/28/1992, THE NORTHERN TRUST COMPANY, TRUSTEE

LP MA1 LTD - LATIGO PARTNERS, L.P.

LPL FINANCIAL LLC

LSV ASSET MANAGEMENT

LSV ASSET MANAGEMENT - DIVIDEND PERFORMERS IVS/3407/JOHN HANCOCK FUNDS

LSV ENHANCED INDEX CORE EQUITY TRUST, CURRENT TRUSTEE

LSV U.S. LARGE CAP LONG/SHORT FUND L.P.

LUCE FAMILY TRUST U/A DTD 09-01-1999, RANDALL C LUCE, TRUSTEE

LUCENT TECHNOLOGIES INC. MASTER PENSION TRUST, ALCATEL-LUCENT USA INC., TRUSTEE

LUCILE MCVEY DUNN TRUST U/A DTD 12/19/1991, LUCILE M DUNN, TRUSTEE

LUCILLE ANN SODANO IRA, AMERIPRISE TRUST CO ACF

LUCY A O'CONNOR TRUST, BANK OF AMERICA, N.A., TRUSTEE

LUIS E LEWIN

LUIS E LEWIN 401(K) SAVINGS PLAN

LUIS EDUARDO LEWIN TRUST U/A DTD 05/14/1997, LUIS LEWIN, SYLVIA LEWIN, TRUSTEES

LUMINA FOUNDATION FOR EDUCATION INC.

LVIP SSGA S&P 500 INDEX FUND

LYLE ROSENZWEIG

LYNN ANN WESTON

LYNN R. WOLFSON TRUST, THE NORTHERN TRUST COMPANY, LYNN R. WOLFSON AND/OR MARK SCOTT, TRUSTEES

LYNNE W SHOTWELL TRUST U/A DATED 5/16/84, LYNNE W SHOTWELL, TRUSTEE

LYONDELL PETROCHEMICAL CORPORATION DEFINED BENEFIT A/K/A LYONDELL CHEMICAL CO. DEFINED BENEFIT PLAN LCV

LYRA INSTITUTIONAL BAKRAM

LYXOR ALPHADYNE SPC F/K/A LYXOR STARWAY SPC F/K/A SGAM AI STARWAY SPC

LYXOR/BLACK DIAMOND ARBITRAGE FUND LIMITED

LYXOR/CANYON VALUE REALIZATION FUND LIMITED

M & J INVESTMENT GROUP L.P.

M A BARLOW TRUST FBO ALICE B JONES, L. THOMAS SLIGER, AUSTIN TRUST COMPANY, TRUSTEES

M A BARLOW TRUST FBO GLORIA BOWMAN, L. THOMAS SLIGER, AUSTIN TRUST COMPANY, TRUSTEES

M A BARLOW TRUST FBO J B DIEMAN, L. THOMAS SLIGER, AUSTIN TRUST COMPANY, TRUSTEES

M A BARLOW TRUST FBO KATHLEEN BARLOW, L. THOMAS SLIGER, AUSTIN TRUST COMPANY, TRUSTEES

M A BARLOW TRUST FBO NANCY BARLOW, L. THOMAS SLIGER, AUSTIN TRUST COMPANY, TRUSTEES

M A BARLOW TRUST UA G J BARLOW, L. THOMAS SLIGER, AUSTIN TRUST COMPANY, TRUSTEES

M CHRISTINE JURZYKOWSKI REV TRUST FBO M CHRISTINE JURZYKOWSKI, MILENA CHRISTINE JURZYKOWSKI, CLAUDE D PEPIN, MARK FINSER, TRUSTEES

M K PASCHALL TRUST-IMA, DANIEL BULL, TRUSTEE

M PETER MILLER III TRUST U/A 7/15/83, M PETER MILLER III, TRUSTEE

M&T BANK F/K/A MANUFACTURERS & TRADERS TRUST CO.

M. CHRISTINE JURZYKOWSKI 2005 REVOCABLE TRUST, CURRENT TRUSTEE

M. DIAMOND FAMILY LP

M.C. TERRELL

MACARTHUR FOUNDATION SCV

MACATAWA BANK

MACONDA BROWN O'CONNOR MANAGEMENT TRUST, MACONDA B. O'CONNOR, NADINE TERPSTRA, TRUSTEES

MACQUARIE INVESTMENT MANAGEMENT LIMITED

MACVAL PENSION TRUST OF MCV RET PLAN, A GARCIA-SOLA, A ESCUDERO-VIERA, TRUSTEES

MADDOCK INDUSTRIES PENSION PLAN, ANDREW & MATTHEW MADDOCK, TRUSTEE

MADELINE I NOVECK

MADGE A L MACNEIL

MADGE A L MACNEIL 1988 FAMILY TRUST, JOHN BIRD LLOYD JR, TRUSTEE

MADGE A L MACNEIL TRUST, MADGE A L MACNEIL, TRUSTEE

MADISON (HITE 2) BUTTERFIELD FUND SERVICES FUND SPC OBO MADISON L/S SEG

MADISON PROPRIETARY TRADING GROUP, LLC

MADISON SQUARE INVESTORS LARGE-CAP ENHANCED INDEX COLLECTIVE FUND F/K/A NYLIM LARGE-CAP ENHANCED INDEX COLLECTIVE FUND

MADISON SQUARE INVESTORS LARGE-CAP ENHANCED INDEX FUND LP F/K/A NYLIM-QS LARGE CAP ENHANCED FUND LP

MADISON SQUARE INVESTORS U.S. LARGE-CAP CORE 130/30 COLLECTIVE FUND F/K/A NYLIM US LARGE-CAP CORE 130/30 COLLECTIVE FUND

MADISON SQUARE INVESTORS U.S. LARGE-CAP CORE 130/30 FUND LP F/K/A NYLIM US LARGE-CAP CORE 130/30 FUND LP

MADISON STREET FUND QP FUND LP

MADISON STREET FUND, L.P.

MAGGIE T CHAU

MAGNIFICENT SEVEN 5s, LTD

MAHAFFEY MARITAL II TRUST, MARK T MAHAFFEY, TRUSTEE

MAHESH R BAJAJ MD AND FRANCESCA M BAJAJ MC

MAHMOUD SEBGHATI IRA, STIFEL NICOLAUS, CUSTODIAN

MAIN STREET AMERICA ASSURANCE CO.

MAIN STREET SMALL CAP PORTFOLIO

MAINSTAY COMMON STOCK FUND F/K/A MCM EQUITY INVESTMENT FUND F/K/A MCMORGAN EQUITY INVESTMENT FUND

MAINSTAY FUNDS TRUST, AS ISSUER OF A SERIES KNOWN AS MAINSTAY S&P 500 INDEX FUND

MAINSTAY FUNDS TRUST, AS ISSUER OF A SERIES KNOWN AS MAINSTAY U.S. EQUITY OPPORTUNITIES FUND F/K/A MAINSTAY 130/30 CORE FUND

MAINSTAY VP FUNDS TRUST, AS ISSUER OF A SERIES KNOWN AS VP COMMON STOCK PORTFOLIO A/K/A MAINSTAY VP COMMON STOCK FUND

MAINSTAY VP FUNDS TRUST, AS ISSUER OF A SERIES KNOWN AS VP MID CAP CORE PORTFOLIO A/K/A MAINSTAY VP MIDCAP CORE

MAINSTAY VP FUNDS TRUST, AS ISSUER OF A SERIES KNOWN AS VP S&P 500 INDEX PORTFOLIO A/K/A MAINSTAY VP S&P 500 INDEX FUND

MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION

MAJOR LEAGUE BASEBALL PLAYERS BENEFIT PLAN

MALIN GIDDINGS

MALLET GLOBAL ENHANCED LTD.

MALLORY & EVANS INC.

MAM SECURITIES LLC

MANAGED PORTFOLIO OF THE EQUITRUST VARIABLE INSURANCE SERIES FUND

MANDARIN INC

MANUFACTURERS & TRADERS TRUST 14 0272881, CURRENT TRUSTEE

MANULIFE (INTERNATIONAL) LIMITED (BERMUDA)

MANULIFE ASSET MANAGEMENT LIMITED F/K/A ELLIOTT & PAGE LIMITED

MANULIFE FINANCIAL CORP (ML INVST EX FDS CORP.-MIX US LARGE CAP VALUE CLASS)

MANULIFE REINSURANCE (BERMUDA) LIMITED

MANULIFE U.S. EQUITY (ALLIANCE BERNSTEIN US EQUITY)

MANULIFE U.S. VALUE EQUITY FUND

MANVILLE PERSONAL INJURY SETTLEMENT TRUST, MANAGING TRUSTEE

MAPLE PARTNERS AMERICA INC

MARC D HOFFRICHTER IRA, FCC, CUSTODIAN

MARCELLA A DELUCA IRA C/O RBC CAPITAL MARKETS CORP CUST

MARCELLA A LORAINE

MARCIA FINCH CANNELL

MARCIA TINGLEY

MARCUS A ALLEN AND MARY L ALLEN

MARCUS C BUENABENTA UTMA CA, JULES GILBERT BUENABENTA, TRUSTEE

MAREN STURM NELSON

MARGARET A. PALUCH FAMILY TRUST U/A DATED 12/17/1976, JOHN D. MARSHALL, TRUSTEE

MARGARET DURKIN AND JIM ROCHE

MARGARET E CARROLL TRUST U/A DTD 06/07/2000, MARGARET E CARROLL, TRUSTEE

MARGARET G ARNONE

MARGARET K. CRANE TRUST, MARGARET K. CRANE, TRUSTEE

MARGARET L SINDELAR

MARGARET MCKENZIE, MARGARET MCKENZIE LIVING TRUST U/A DTD 02/23/1994 AS AMENDED AND RESTATED, RICHARD S. ARNOLD, SAN PASQUAL FIDUCIARY TRUST CO., TRUSTEES

MARGARET P GILLEO REVOCABLE LIVING TRUST U/A DTD SEPT 24 1990, MARGARET P GILLEO, TRUSTEE

MARGARET P GUNDLACH REV TRUST DTD 3/27/1996, MARGARET P GUNDLACH, TRUSTEE

MARGARET R CONIGLIO TRUST U/A DTD 08/22/1989, BEVERLY MACKINTOSH, TRUSTEE

MARGARET S RITCH

MARGARET VERDIRAME

MARGERET T. M. JONES, CHARLES PRATT & COMPANY LLC, CUSTODIAN

MARGUERITE PAYNE TRUST U/A/D 6/7/61 FBO VIRGINIA K. TOWNLEY, THE NORTHERN TRUST COMPANY, TRUSTEE

MARIAN C FALK FOR ALEXANDRA, BANK OF AMERICA, N.A., TRUSTEE

MARIAN OTIS CHANDLER TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

MARIAN P. JAMES TR/IMA, CURRENT TRUSTEE

MARIAN WETTERLING

MARIANNE R. ATTERBURY TRAD IRA

MARIE CASPER TRUST U/A DTD 01/27/97, MARIE CASPER, TRUSTEE

MARIE EDWARDS FAMILY TRUST U/A DTD 07/13/1994, TILDEN H EDWARDS JR, MARK A OBERHOFER, TRUSTEES

MARILYN R MILLER IRA NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

MARILYN R ZIRN REVOCABLE TRUST, MARILYN R ZIRN, TRUSTEE

MARILYN R. DIAMOND TRUST DATED 11-11-88, MARILYN R. DIAMOND, TERRY DIAMOND, TRUSTEES

MARILYN R. GIRSH MARITAL TRUST DATED 5/26/1998, THE NORTHERN TRUST COMPANY, TRUSTEE

MARILYN RAPKIN

MARILYN Y MAGID

MARINE CARPENTERS PENSION FUND

MARINO FAMILY TRUST U/A DTD 09/21/1997, P MARINO & G MARINO, TRUSTEES

MARIO CAMPANARO IRA DTD 02-09-01, MERRILL LYNCH, CUSTODIAN

MARIO J. GABELLI

MARION BARTUSH IRREVOCABLE TRUST UAD, ADDISON BARTUSH, TRUSTEE

MARISSA RUDMAN

MARJORIE B DAVID CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

MARJORIE B. PELINO

MARJORIE F BRAISTED TRUST U/A DTD 07/15/1992, MARJORIE F. BRAISTED, TRUSTEE

MARJORIE ROZMAN TRUST UAD 8/7/85 FBO AVI J ROZMAN, NANETTE ROSENBERG, MARJORIE ROZMAN, TRUSTEES

MARJORIE W ULLMANN TRUST U/A DTD 05/28/1987, DONALD M ULLMANN, TRUSTEE

MARK A BAUN JR IRR TRUST U/A DTD 2/28/2005, CAPRICE WW BAUN, CONSUELO W PIERREP, CHARLES L WILSON III, TRUSTEES

MARK A GRABO TRUST U/A DTD 11/11/1998, ALBERT BONDS, TRUSTEE

MARK A HUGHES AND DANICA F HUGHES

MARK A. JONES AND DIANE D. JONES

MARK ALLEN ITKIN TRUST 3/16/2001, MARK A. ITKIN, TRUSTEE

MARK C BOE TRUST U/A DTD 07/20/2000, MARK C BOE, TRUSTEE

MARK C LANDRY

MARK DOMAS

MARK EDWARD ROTHERMEL

MARK H. KURTICH

MARK HIANIK

MARK I. SEIDEN

MARK M REILLY AND JEANNE M REILLY

MARK METZNER

MARK PETTIJOHN AND GEORGETTE PETTIJOHN

MARK R. PATTIS REVOCABLE TRUST UAD 07/30/04, MARK R. PATTIS, TRUSTEE

MARK S. & DONNA C. LIES

MARK STRANAHAN

MARK W MADIGAN C/F EDWARD P MADIGAN UTMA IL

MARK W MADIGAN C/F WILLIAM W MADIGAN UTMA/IL UNTIL AGE 21

MARK W. MADIGAN AND STEPHANIE A. MADIGAN

MARKET STREET SECURITIES

MARLA KRAUSE IRA, NM WEALTH MANAGEMENT CO., CUSTODIAN

MARLENE F SLADE ROLLOVER IRA, NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

MARLIS J DAWSON IRA, FCC, CUSTODIAN

MARNI HORWITZ TRUST DATED JANUARY 22, 1998, LOLA LLOYD HORWITZ, THE NORTHERN TRUST COMPANY, TRUSTEES

MARSCO INVESTMENT CORP.

MARSHALL R LAVIN

MARSHFIELD CLINIC MASTER TRUST, CURRENT TRUSTEE

MARTHA CASSELMAN TRUST, MARTHA CASSELMAN, TRUSTEE

MARTHA GROSS LIVING TRUST FBO MARTHA GROSS U/A/D 04/14/1996, JENNIFER GROSS & BERNARD SCHINDER, TRUSTEES

MARTHA M ARVEY TRUST U/A DTD 11/13/1992 ACCOUNT A, MARTHA M ARVEY, TRUSTEE

MARTHA POPE

MARTHA T WENDT REV LIV TRUST U/A/D 03-30-1992 FBO MARTHA T WENDT, MARTHA T WENDT, TRUSTEE

MARTHA VUKOV

MARTIN BARRY ROSENZWEIG AND SANDRA ARLENE ROSENZWEIG

MARTIN COMPANY-PROXY DEPT A/C SCOTT M NISWONGER #2

MARVIN A REYNOLDS TRUST B U/A DTD 05/16/1988, MARIE O REYNOLDS, SUSAN M REYNOLDS, TRUSTEES

MARVIN C RICKLEFS AND MARGARET M RICKLEFS

MARVIN C SCHNEIDER TRUST DTD 6-5-97, MARVIN C. SCHNEIDER, TRUSTEE

MARVIN HOFFENBERG BETTY HOFFENBERG TRUST UA 09/01/78, MARVIN HOFFENBERG, BETTY S HOFFENBERG, TRUSTEES

MARVIN L GOODMAN & MELINDA K GOODMAN REVOCABLE TRUST UTA DTD 1/15/92, CURRENT TRUSTEE

MARVIN ROBINSON TRUST, MR. AND MRS. MARVIN ROBINSON, TRUSTEES

MARY A RYAN

MARY ANN LANE

MARY B. SCHWAB CHARITABLE REMAINDER TRUST, MARY B. SCHWAB, TRUSTEE

MARY BEALES SURV TR, MARY K BEALES, KIRK BEALES, ROSS BEALES, TRUSTEES

MARY BETH RICHMOND AND JEFFREY S RICHMOND JT WROS

MARY BRYSKIER MARITAL DED TRUST U/A/D 07-02-1999, MICHAEL BRYSKIER, TRUSTEE

MARY C PARKER ROLLOVER IRA, DCG&T, TRUSTEE

MARY CONIGLIO TRUST U/A DTD 08/22/89, BEVERLY MACKINTOSH, TRUSTEE

MARY CONIGLIO TRUST U/A DTD 8/22/1989 GSTT TE TRUST, BEVERLY MACKINTOSH, TRUSTEE

MARY E DAY

MARY ELLEN BEACH ELA TRUST U/A DTD 04/24/1997, MARY ELLEN BEACH ELA, TRUSTEE

MARY F BROWN

MARY F ROBERTS TRUST FBO GRANDCHILDREN

MARY GREEN

MARY H COOPER

MARY J. COLEMAN

MARY JANE F MOELLER TRUST U/A DTD 08/07/2006, MARY JANE F MOELLER, TRUSTEE

MARY JO OSTERMAN TRUST U/A/D 04/04/91, MARY JO OSTERMAN, TRUSTEE

MARY K LAWLER TRUST U/A DTD 06/18/1996, MARY K LAWLER, TRUSTEE

MARY KATHRYN ROBBINS

MARY L ELSON

MARY L MCKENNY TRUST, MARY L MCKENNY, TRUSTEE

MARY L. TUNNEY JUNIOR TRUST, CURRENT TRUSTEE

MARY LEE YUEN TRUST U/A DTD 05/09/2000, MARY LEE YUEN, DENNIS JOE YUEN, TRUSTEE

MARY LOU RICOTTA

MARY MAVERICK LLOYD TRUST U/A 5/23/89 FBO MARY MAVERICK LLOYD, MARY LLOYD, W B LLOYD III, TRUSTEES

MARY MCCUNE EDWARDS CHARITABLE LEAD ANNUITY TRUST, JOANNE WELSH, TRUSTEE ADVISOR

MARY MIHELIC IRRA, MERRILL LYNCH, PIERCE, FENNER & SMITH, CUSTODIAN FPO

MARY NEVILLE HANKEY

MARY O. NAFTZGER

MARY OWEN ROSENTHAL TRUST U/A DTD OCTOBER 19, 1999, MARY O ROSENTHAL, GARNETT COHEN, TRUSTEES

MARY R. FENSTERMAKER

MARY ROSS IRREV TRUST U/A 09/13/99, HOWARD M ROSS, TRUSTEE

MARY ROWENA FENSTERMAKER

MARY SHAW MCCUTCHEON TRUST, U/A DTD 10/26/1987, J MCCUTCHEON III, ANNE MCCUTCHEON LEWIS, MARY SHAW MCCUTCHEON, TRUSTEES

MARY SUE GATZERT TRUST DATED 9-29-95, CURRENT TRUSTEE

MARY SUTLIFFE LOUCKS TRUST PORTFOLIO 835, MARY SUTLIFFE LOUCKS, TRUSTEE

MARYLAND STATE RETIREMENT AGENCY

MARYLAND STATE RETIREMENT AND PENSION SYSTEM

MARYLAND VOTED RUSSELL 3000 COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

MASONIC EDUCATION & CHARITY TRUST, CURRENT TRUSTEE

MASONIC FAMILY HEALTH FOUNDATION

MASS MUTUAL-SEPARATES

MASSACHUSETTS MUTUAL

MASSMUTUAL PREMIER BALANCED FUND

MASSMUTUAL PREMIER DISCIPLINED VALUE FUND F/K/A MASSMUTUAL PREMIER ENHANCED INDEX VALUE FUND

MASSMUTUAL PREMIER ENHANCED INDEX CORE EQUITY FUND

MASSMUTUAL PREMIER SMALL/MID CAP OPPORTUNITIES FUND F/K/A MASSMUTUAL PREMIER SMALL COMPANY OPPORTUNITIES FUND

MASSMUTUAL PREMIER MAIN STREET SMALL CAP FUND

MASSMUTUAL SELECT DIVERSIFIED VALUE FUND

MASSMUTUAL SELECT INDEXED EQUITY FUND

MASTER EQUITIES I LTD (CFEV) TMS/ITS SETT A/C FOR HITE CRAGMUIR CHAMBERS

MASTER EQUITIES I LTD (GAP) TMS/ITS SETT A/C FOR HITE CRAGMUIR CHAMBERS

MASTER TRUST BANK OF JAPAN, LTD

MASTER TRUST BETWEEN PFIZER INC. AND THE NORTHERN TRUST COMPANY (AS SUCCESSOR TO WYETH MASTER TRUST), THE NORTHERN TRUST COMPANY, TRUSTEE

MATT J. WOLLMAN REVOCABLE TRUST, MATT J WOLLMAN, TRUSTEE

MATTHEW B FITZSIMONS 2004 TRUST U/A DTD 08/26/2004, CHRISTINE M FITZSIMONS, TRUSTEE

MATTHEW BENDER IV

MATTHEW BENDER IV FAMILY LIMITED PARTNERSHIP

MATTHEW GERARD HARTMANN AND LISA MARIE HARTMANN JTWROS

MATTHEW HALBOWER

MATTHEW J. BOTICA AND CHRISTINE C. BOTICA

MATTHEW POPE

MAUD P. BARTON REV TRUST 0396 DTD 11/13/89, MAUD P. BARTON, RANDOLPH P. BARTON, TRUSTEES

MAUREEN S. WOODALL, AS SUCCESSOR TO DONALD W. WOODALL IRA R/O

MAX L. GARDNER IRA, TD AMERITRADE CLEARING, CUSTODIAN

MAX S BELL AND JEAN F BELL

MAXIM T. ROWE PRICE EQUITY/INCOME PORTFOLIO

MAXINE R PHILIPSBORN TRUST U/A 2/2/07, FIFTH THIRD BANK, SUCCESSOR TRUSTEE

MAY C. GOODAN TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

MAYBACH FAMILY, LLC, WILMINGTON TRUST COMPANY, CUSTODIAN

MAZUR, HOWARD E

MB FINANCIAL BANK, INC.

M-BAR DRM, US BANK, TRUSTEE

MBNA PENSION - T.ROWE PRICE

MC INVESTMENT PARTNERS LLC

MCAFEE & TAFT PROFIT-SHARING PLAN, CURRENT TRUSTEE

MCGILL UNIVERSITY PENSIONER FUND A/K/A MCGILL UNIVERSITY PENSION PLAN

MCMORGAN BALANCED EQUITY MAINSTAY FUNDS

MEADOWBROOK EQUITY FUND UA DEC 01 86 DECLARATION OF BELL FAMILY TR, GLEN W BELL, MARTHA BELL, KATHLEEN B FLYNN, TRUSTEES

MEA-MESSA-MEA FINANCIAL SERVICES

MEGAN R. BOSAU AND ROBERT D. BOSAU DESIGNATED BENE PLAN/TOD

MEGHAN M FLANNERY

MEL L SHULTZ & BETH JANE SHULTZ TRUST DTD 9/5/79, MEL L SHULTZ & BETH J SHULTZ, TRUSTEES

MEL L SHULTZ AND BETH JANE SHULTZ

MELBA THOMASSON-DEAUTRIELL AND WILLIAM P. DEAUTRIELL

MELISSA MONSON

MELLON BANK SECURITIES LENDING

MELLON CAPITAL MANAGEMENT

MELLON TRANSITION MANAGEMENT

MELVIN GOODMAN

MELVIN W SANDMEYER TRUST DTD 3/31/97, M SANDMEYER & C SANDMEYER, TRUSTEES

MEMORIAL HERMANN HEALTH CARE SYSTEM PENSION TRUST, CURRENT TRUSTEE

MER ROUGE PROPERTIES, LLC, SERIES A, W JONES, A WILLIAMS, TRUSTEES

MERCER FUNDS F/K/A MGI FUNDS (MGI US SMALL/MID CAP VALUE EQUITY FUND)

MERCER GLOBAL INVESTMENTS

MERRILL L PUGH REV LIV TRUST U/A DTD 09/16/2003, MERRILL LESTER PUGH, TRUSTEE

MERRILL LYNCH FINANCIAL MARKET EQUITY FINANCING GROUP

MERRILL LYNCH FINANCIAL MARKET EQUITY FINANCING GROUP - SINGLE STOCK

MERRILL LYNCH PROFESSIONAL CLEARING CORP. (BROKER DEALER REG T)

MERRILL LYNCH PROFESSIONAL CLEARING CORP. (CUSTOMER SHORT (REG T 1563-3))

MERRILL LYNCH PROFESSIONAL CLEARING CORP. (PAX DIV)

MERRILL LYNCH PROFESSIONAL CLEARING CORP. (REORG MANDATORY PROCESSING A/C)

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED AS SUCCESSOR TO BZW SECURITIES LIMITED

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED F/K/A 1IA SPX1, A DIVISION OF BANC OF AMERICA SECURITIES LLC

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED F/K/A BANC OF AMERICA SECURITIES LLC

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED F/K/A BANC OF AMERICA SECURITIES LLC (SPX PRINCIPAL STRATEGY U.S. SHARES PROGRAMS)

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, IN ITS INDIVIDUAL AND CUSTODIAL CAPACITIES

MESIROW FINANCIAL, INC.

METCALF X LIMITED

METHODIST HEALTH SYSTEMS

METHODIST HEALTHCARE (CHANNING CAPITAL MANAGEMENT)

METHODIST HEALTHCARE (LSV ASSET MANAGEMENT)

METLIFE INVESTMENT FUNDS INC

METLIFE STOCK INDEX PORTFOLIO

METRO WATER DIST OF SOUTHERN CA TR

METRO WATER DIST OF SO CA SAV PLAN FBO JAMES J GINGRICH

METROPOLITAN LIFE (METLIFE STOCK INDEX II)

METROPOLITAN LIFE INSURANCE CO

METROPOLITAN TORONTO PENSION PLAN

METROPOLITAN TRANSIT AUTHORITY

METZNER FAMILY FOUNDATION

MEYERHOFF FAMILY TRUSTS CHARITABLE ENTITIES, CURRENT TRUSTEE

MF INDEX FUND LLC

MH PENSION PLAN - ALLIANCEBERNSTEIN - MEMORIAL HERMANN HEALTH CARE SYSTEM

MIAMI CORPORATION

MIAMI OIL PRODUCERS INC

MICHAEL & ROSALIND KEISER CHARITABLE TRUST U/A DTD 12/30/90, MICHAEL & ROSALIND KEISER, TRUSTEES

MICHAEL A HIRSLEY IRA

MICHAEL A SILVER

MICHAEL BAKWIN

MICHAEL BOURGON

MICHAEL BRYSKIER AND MARY BRYSKIER JT WROS

MICHAEL C DONAHUE AND MARTHA D DONAHUE

MICHAEL C. LABONIA AND DEBRA D. LABONIA

MICHAEL E. BEE TRUST UAD 10/20/2003, MICHAEL E. BEE, TRUSTEE

MICHAEL E. WEINER

MICHAEL EIGNER AND LINDA EIGNER

MICHAEL G. MURPHY AND MARY THERESE MURPHY

MICHAEL GLAZER AND LAUREN GLAZER

MICHAEL H. GRAFF

MICHAEL HALLCH

MICHAEL J DOLAN AND DOROTHY F DOLAN JT TEN

MICHAEL J KRAUSE IRA, AMERIPRISE TRUST COMPANY, CUSTODIAN

MICHAEL J PALUMBO REVOCABLE LI TRUST U/A DTD 11/29/1999, CURRENT TRUSTEE

MICHAEL J. & MARY K. POULOS REVOCABLE MANAGEMENT TRUST, MICHAEL AND MARY K. POULOS, TRUSTEES

MICHAEL J. LICCAR & COMPANY LLC

MICHAEL J. O'NEILL

MICHAEL K REILLY TRUST U/A DTD 09/25/1995, MICHAEL K. REILLY, TRUSTEE

MICHAEL KEISER (SPECIAL ACCOUNT)

MICHAEL LOEB

MICHAEL MROCZKOWSKI

MICHAEL MUSKAL IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

MICHAEL P CHMURA FRP PS A/C MICHAEL P CHMURA ACCTG CORP, FIDELITY MANAGEMENT TRUST CO, TRUSTEE

MICHAEL P WHELAN AND MARY ELLEN WHELAN

MICHAEL PLONSKI AND NEDRA PLONSKI

MICHAEL R QUINLAN TRUST U/A DTD 09/04/1979, MICHAEL R. QUINLAN, TRUSTEE

MICHAEL R. LUFRANO

MICHAEL RICHARD WIDRIG AND JACQUELINE A WIDRIG

MICHAEL ROSENBERG TRUST U/A DTD 02/23/1981, NANETTE ROSENBERG, MARJORIE ROZMAN, TRUSTEES

MICHAEL S MEADOWS

MICHAEL S ROSENBLUM

MICHAEL SOBEL PAPER

MICHAEL SUPERA

MICHAEL TARNOFF

MICHAEL TIERNEY AND PATRICIA TIERNEY

MICHIGAN CATHOLIC CONFERENCE SOCIALLY RESPONSIBLE INVESTMENT POOL

MICHIGAN DEPARTMENT OF TREASURY

MICHIGAN EDUCATION ASSOCIATION

MICHIGAN JUDGES' RETIREMENT SYSTEM

MICHIGAN PUBLIC SCHOOL EMPLOYEES' RETIREMENT SYSTEM

MICHIGAN STATE POLICE RETIREMENT SYSTEM

MICRO TRADING CAPITAL FUND

MICROSOFT CORPORATION

MID CAP VALUE SUDAN FREE

MID-ATLANTIC REGIONAL COUNCIL OF CARPENTERS PENSION PLAN

MIDLAND GUARDIAN COMPANY, US BANK, TRUSTEE

MIKE & MELISSA PARNELL REV TRUST UA DTD 08/27/90, MIKE PARNELL, MELISSA PARNELL, TRUSTEES

MIKE EUGENE ABERNETHY

MILAN E CHILLA

MILAN E CHILLA CUSTODIAN FPO IRA

MILES ADRIAN COLLET MURRAY

MILES D WHITE

MILES D WHITE 1994 TRUST U/A DTD 08/24/1994, MILES D WHITE, TRUSTEE

MILIKEN STOCK FUND (7R) T ROWE PRICE TRUST CO

MILL SHARES HOLDINGS (BERMUDA) LTD.

MILLENCO LLC

MILLENCO LP (OMNI STAT ARB)

MILLENNIUM FUNDING ASSOCIATES LLC

MILLER FAMILY TRUST UAD 3/24/87, MARGARET U MILLER, TRUSTEE

MILTON GOLDWASSER

MILTON HIRSCH AND ILENE HIRSCH TEN BY ENT

MILTON J ROSENBERG TRUST U/A DTD 12/10/1992, MILTON J ROSENBERG, TRUSTEE

MILTON PARTNERS LLC

MINE SCRIBANTE CRUT-SANIBEL CAPITVA

MINI TRUST U/A EDWARD H LINDSAY, BANK OF AMERICA, N.A., TRUSTEE

MINISTRY OF FINANCE OF THE REPUBLIC OF KAZAKHSTAN

MINNESOTA LIFE INSURANCE COMPANY - SEPARATE ACCOUNT A

MINNESOTA LIFE INSURANCE COMPANY - SEPARATE ACCOUNT L

MINNESOTA POWER MASTER TRUST SMID, CURRENT TRUSTEE

MINNESOTA STATE BOARD OF INVESTMENT

MINNETTE R. ECKHOUSE TRUST #502 U/W/O DTD 2/1/74, JAMES H. ECKHOUSE AND JILL E. BERUBE, TRUSTEES

MIP S&P 500 INDEX

MIRA LEE TOMEI LORAN

MIRIAM A. PAWEL

MIRIAM SUSAN ZACH

MISSISSIPPI PUBLIC EMPLOYEES' RETIREMENT SYSTEM

MISSOURI LOCAL GOVERNMENT EMPLOYEES RETIREMENT SYSTEM

MITCHELL WOLFSON SR. TRUST U/W F/B/O GRANDCHILDREN, SYLVAN MYERS, TRUSTEE

MITCHELL WOLFSON, SR FOUNDATION

MITSUBISHI UFJ ASSET MANAGEMENT #XX8364 (THROUGH MASTER TRUST BANK OF JAPAN) C/O BANK OF TOKYO-MITSUBISHI UFJ TRUST COMPANY

MIZUHO TRUST & BANKING CO. (USA)

MIZUHO TRUST & BANKING CO., LTD.

ML EQUITY INDEX TRUST, MERRILL LYNCH TRUST COMPANY, TRUSTEE

ML INDEX 500 V.I. FUND

ML LARGE CAPITALIZATION IN MERRILL LYNCH TRUST COMPANY

ML STERN & CO. LLC

MLC INVESTMENTS L.L.C.

MLC INVESTMENTS LTD DIMENSIONAL FUND ADVISORS

MM TRUST (BVI) F/K/A MORGAN & MORGAN TRUST CO. FOR INTERLANDS SA/SICPA HOLDINGS SA

MMA PRAXIS VALUE INDEX FUND

MML BLEND FUND

MML ENHANCED INDEX CORE EQUITY FUND

MML EQUITY INCOME FUND

MML EQUITY INDEX FUND

MML SMALL CAP EQUITY FUND

MNS, LTD.

MOC CHANDLER TRUST NO. 1 UTA DTD 6/16/35, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

MOGAVERO/FELTY JOINT VENTURE - TMS

MONICA K. HINMAN

MONTAGUE HACKETT

MONTANA BOARD OF INVESTMENTS

MONTEAGLE VALUE FUNDS

MONTPELIER REINSURANCE HOLDINGS, LTD.

MONTPELIER REINSURANCE LTD - MINTFLOWER PL

MONUMENTAL LIFE INSURANCE COMPANY - TEAMSTERS SEPARATE ACCOUNT L-23

MONUMENTAL LIFE INSURANCE COMPANY F/K/A PEOPLES BENEFIT LIFE INSURANCE

MORGAN KEEGAN & CO.

MORGAN STANLEY

MORGAN STANLEY & CO. INTERNATIONAL PLC F/K/A MORGAN STANLEY & CO. INTERNATIONAL LIMITED

MORGAN STANLEY & CO. INTERNATIONAL PLC F/K/A MORGAN STANLEY & CO. INTERNATIONAL LIMITED (BNY GCM)

MORGAN STANLEY & CO. LLC 0201 STOCK OPTIONS

MORGAN STANLEY & CO. LLC MSCS VA SWAP HEDGE

MORGAN STANLEY & CO., LLC F/K/A MORGAN STANLEY & CO. INCORPORATED

MORGAN STANLEY ASSET - NY13

MORGAN STANLEY SMITH BARNEY LLC

MORGAN STANLEY TOTAL MARKET INDEX FUND A/K/A MS TOTAL MARKET INDEX FUND

MORRIS R EDDY III

MORTON FIEDLER & SHERMA FIEDLER TRUST U/A DTD 10/14/94, MORTON FIEDLER, SHERMA FIEDLER, TRUSTEES

MORTON GOLDFINE AND ADRIENNE M. GOLDFINE

MOUNT ARARAT CEMETARY INC

MOUNT VERNON HOSPITAL EMPLOYEES RETIREMENT PLAN, AMERICAN STOCK TRANSFER & TRUST COMPANY, TRUSTEE

MP&L MASTER TRUST, US BANK, TRUSTEE

MPAMG SECURITY PROCESSING OMNIBUS

MPF NORTH AMERICA EQUITY INDEX SUB FUND

MS SELECT-VALUE ADDED MARKET

MTA NON-UNION PENSION PLAN & T

MTB EQUITY INDEX FUND

MULTI-STRATEGY, GREENOCK MASTER FUND LTD, GREENOCK MULTI-STRATEGY FUND LP

MUNDER INDEX 500 FUND

MUNI POLICE EMP RET SYS

MUNICIPAL EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO

MUNICIPAL FIRE AND POLICE RETIREMENT SYSTEM OF IOWA

MUNICIPALITY OF ANCHORAGE TRUST, CURRENT TRUSTEE

MURIEL HYMAN

MURIEL LEWIS

MURIEL S HARRIS

MURIEL W LEWIS TRUST, RONNA ISAACS STOLMAN, TRUSTEE

MURIEL Z PFAELZER-SP91 TRUST U/A DTD 02/03/1993, MURIEL Z PFAELZER, TRUSTEE

MUSEUM OF FINE ARTS, HOUSTON, AS BENEFICIARY OF THE ESTATE OF ALFRED C. GLASSELL JR.

MUSEUM OF FINE ARTS, ST. PETERSBURG

MUSHIN TRADING LLC #2

MUTUAL OF AMERICA INVESTMENT CORPORATION

MYLIN M. SIVATON

MYRNA RAMIREZ AND MONSERRATE RAMIREZ JTWROS

MYRON L. HENDRIX

NANCY A COOK

NANCY B HEINZ FAMILY TRUST, ARTHUR P. HEINZ, TRUSTEE

NANCY B. HEINZ

NANCY CROSSMAN

NANCY D. RAMAGE

NANCY FAY JOHNSON

NANCY H FEE TRUST U/A DTD 05/15/1998, NANCY H FEE, TRUSTEE

NANCY M WEBER

NANCY M. ROBERTS REVOCABLE TRUST, NANCY M. ROBERTS, TRUSTEE

NANCY R SPIEGEL REV TRUST UAD 10/14/89, MICHAEL COTTLE, CHRIS MARDER, TRUSTEES

NANCY SUE FRIDSTEIN

NANCY TROHAN DOLLAR

NANCY W. NEWKIRK

NANETTE ROSENBERG

NANNO & IRENE MAARSINGH SURVIV TRUST U/A DTD 09/24/1984, IRENE MAARSINGH & J LUCHTMAN, TRUSTEES

NATALIE MCCORMICK MILLER IRREVOCABLE PRESENT INTEREST TRUST, DATED DECEMBER 27, 1983, CHARLES R. PLAYER JR., RICHARD DUFFIELD, TIMOTHY N. GARDNER, TRUSTEES

NATALIE MCCORMICK MILLER LIVING TRUST U/W 12/27/83 FBO NATALIE MCCORMICK MILLER, RICHARD DUFFIELD, TRUSTEE

NATHAN B SANDLER CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

NATHAN H. PERLMAN TRUST B DTD 12-17-68, MIRIAM NOVICK, ARLINE DOBLIN, TRUSTEES

NATIONAL ASBESTOS WORKERS PENSION FUND

NATIONAL AUTOMATIC SPRINKLER INDUSTRY PENSION FUND

NATIONAL BANK OF KAZAKHSTAN

NATIONAL CONSTRUCTION ASSOCIATION PENSION FUND

NATIONAL ELECTRICAL BENEFIT FUND TRUST, DILLARD R. BORDEN, JR. AND SALVATORE J. CHILIA, TRUSTEES

NATIONAL GEOGRAPHIC SOCIETY (DEFERRED CAPITAL FUND)

NATIONAL GRANGE MUTUAL

NATIONAL PENSIONS RESERVE FUND COMMISSION

NATIONAL PREARRANGED SERVICES INC.

NATIONAL RAILROAD RETIREMENT INVESTMENT TRUST, CURRENT TRUSTEE

NATIONAL ROOFING INDUSTRY PENSION FUND

NATIONWIDE S&P 500 INDEX FUND, A SERIES OF NATIONWIDE MUTUAL FUNDS

NATIXIS FINANCIAL PRODUCTS LLC F/K/A NATIXIS FINANCIAL PRODUCTS INC

NATIXIS SECURITIES AMERICAS LLC F/K/A NATIXIS BLEICHROEDER LLC

NAUMBURG FAMILY LLC A PARTNERSHIP

NBC SECURITIES, INC.

NBCN INC

NC DEPARTMENT OF STATE TREASURER

NEAL CREIGHTON AND JOAN H CREIGHTON

NECA IBEW PENSION

NECA IBEW PENSION LSV US EQ NECA

NECA-IBEW LOCAL UNION NO. 35 P

NECA-IBEW PENSION TRUST FUND, CURRENT TRUSTEE

NECKAR HOLDINGS LLC

NEIL HARKINS

NEIL J. ROWE & CAROL S. ROWE

NEISSER INVESTMENT LP

NETCH FAMILY TRUST U/A DTD 11/28/97, CHARLES WILLIAM NETCH, MARY ELIZABETH NETCH, TRUSTEES

NEUBERGER BERMAN INC.

NEVADA PUBLIC EMPLOYEES RETIREMENT SYSTEM

NEW AMERICANS LLC

NEW CASTLE COUNTY DELAWARE (NEW CASTLE COUNTY EMPLOYEES)

NEW CENTURY PARTNERS, L.P.

NEW DAY DEVELOPMENT LLC

NEW EAGLE HOLDINGS LLC

NEW ENGLAND HEALTH CARE EMPLOYEES PENSION FUND

NEW JERSEY HEALTH FOUNDATION

NEW JERSEY PHYSICIANS LLC

NEW JERSEY TRANSIT - MTA ALLOCATION

NEW JERSEY TRANSIT CORPORATION

NEW LIFE INTERNATIONAL TRUST, US BANK, TRUSTEE

NEW MEXICO EDUCATIONAL RETIREMENT BOARD

NEW MEXICO STATE INVESTMENT COUNCIL

NEW SCHOOL FOR SOCIAL RESEARCH (NEUBERGER BERMAN LLC)

NEW YORK CITY DEFERRED COMPENSATION PLAN

NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS PENSION FUND

NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS WELFARE FUND

NEW YORK CITY EMPLOYEES RETIREMENT SYSTEM

NEW YORK CITY FIRE OFFICER VARIABLE SUPPLEMENT RETIREMENT SYSTEM - NYC RETIREMENT SYSTEM

NEW YORK CITY FIRE PENSION FUND

NEW YORK CITY FIRE RETIREMENT SYSTEM

NEW YORK CITY FIREFIGHTERS' VARIABLE SUPPLEMENTS FUND

NEW YORK CITY POLICE OFFICERS' VARIABLE SUPPLEMENTS FUND

NEW YORK CITY POLICE PENSION FUND

NEW YORK CITY POLICE RETIREMENT SYSTEM

NEW YORK CITY POLICE SUPERIOR OFFICERS' VARIABLE SUPPLEMENTS FUND

NEW YORK CITY TEACHERS RETIREMENT FUND

NEW YORK LIFE INSURANCE COMPANY

NEW YORK LIFE INVESTMENT MANAGEMENT LLC

NEW YORK STATE COMMON RETIREMENT FUND

NEW YORK STATE INSURANCE FUND

NEW YORK STATE OFFICE OF STATE COMPTROLLER

NEW YORK STATE TEACHERS RETIREMENT SYSTEM

NEWBROOK CAPITAL ADVISORS

NEWEDGE USA, LLC

NGM INSURANCE COMPANY

NICHOLAS F. YOUNG TRUST A SEPT 26 92, DAVID D. GRUMHAUS JR, TRUSTEE

NICHOLAS GEORGE TRUST, NATHAN M GROSSMAN, HELEN RUESCH, TRUSTEES

NICHOLAS H. WERTHMAN

NICHOLAS HALLACK

NICHOLAS J SOLLI

NICHOLAS P. GOSCHI TRUST B U/A DTD 08/21/1996 FBO BARBARA V. GOSCHI, PETER E. GOSCHI, TRUSTEE

NICHOLAS STARR

NICHOLAS T. PREPOUSES

NICHOLAS VAN HOOGSTRATEN IRA, AMERIPRISE TRUST COMPANY F/K/A H&R BLOCK FINANCIAL ADVISORS, CUSTODIAN

NICK D KLADIS

NIELSEN SUPERANNUATION PTY LTD

NINTH STREET PARTNERS LTD.

NISSWA MASTER FUND LTD

NJ TRANSIT AMALGAMATED TRANSIT UNION

NOEL CAROLINE MCKISSICK TRUST UNDER AGREEMENT DTD 3/3/98, NOEL CAROLINE MCKISSICK, TRUSTEE

NOMURA INTERNATIONAL TRUST CO.

NOMURA RAFI INTERNATIONAL EQUITY FUND

NOMURA SECURITIES INTERNATIONAL, INC.

NOMURA TRUST AND BANKING CO LTD

NONDIMA CHICAGO COMM FDN-FITZSIMONS

NORA E. MORGENSTERN

NORAH K LLOYD TRUST, BANK OF AMERICA, N.A., TRUSTEE

NORBERT ROCH

NORDEA BANK AB A/K/A NORDEA BANK SWEDEN AB (PUBL)

NORGES BANK INVESTMENT MANAGEMENT

NORINCHUKIN BANK US EQUITY INDEX FUND

NORMA B. WEBB

NORMA JEAN AUTRY

NORMA R PANE

NORMA R. PHELPS TRUST U/A AGENCY, NORMA R. PHELPS, TRUSTEE

NORMAN ROCHELL FAMILY TRUST U/A/D 10/21/97, CHARLES R BRAUN, NANCY GILMORE, TRUSTEES

NORMAN W. MITCHELL

NORMAN X RAIDL REV TRUST U/A/D 05/15/00, NORMAN X RAIDL, TRUSTEE

NORMANDY HILL MASTER FUND LP

NORTEL NETWORKS RETIREMENT INCOME PLAN TRUST, PENSION BENEFIT GUARANTY CORPORATION, TRUSTEE

NORTH CAROLINA S&P 500 - NORTH CAROLINA DEPARTMENT OF TREASURY

NORTH CENTRAL STATES REGIONAL

NORTH DAKOTA STATE INVESTMENT BOARD

NORTH DAKOTA STATE INVESTMENT BOARD INS. TRUST, CURRENT TRUSTEE

NORTH DAKOTA STATE INVESTMENT BOARD PENSION TRUST, CURRENT TRUSTEE

NORTH SHORE BANK OF COMMERCE

NORTHEAST MEDICAL CENTER INVES

NORTHERN ASSURANCE CO. OF AMERICA

NORTHERN FUNDS - ENHANCED LARGE CAP FUND

NORTHERN FUNDS - LARGE CAP VALUE FUND A/K/A NORTHERN LARGE CAP VALUE FUND

NORTHERN FUNDS - MULTI-MANAGER MID CAP FUND

NORTHERN FUNDS - STOCK INDEX FUND A/K/A NORTHERN STOCK INDEX FUND

NORTHERN ILLINOIS BENEFIT FUNDS

NORTHERN INSTITUTIONAL FUND EQUITY INDEX PORTFOLIO

NORTHERN TRUST

NORTHERN TRUST COMPANY

NORTHERN TRUST CORPORATION

NORTHERN TRUST INVESTMENTS

NORTHERN TRUST INVESTMENTS N.A. (LARGE CAP VALUE)

NORTHERN TRUST INVESTMENTS N.A. (MULTI DISCIPLINE EQUITY)

NORTHERN TRUST QUANTITATIVE FUND PUBLIC LIMITED COMPANY

NORTHERN TRUST VALUE

NORTHERN TRUST VALUE INVESTORS, A DIVISION OF NORTHERN TRUST INVESTMENTS, INC. F/K/A NORTHERN TRUST INVESTMENTS, N.A.

NORTHSHORE UNIVERSITY HEALTHSYSTEM PENSION PLAN

NORTHSHORE UNIVERSITY HEALTHSYSTEM SECOND CENTURY FUND

NORTHWESTERN MUTUAL SERIES FUND INC.

NORTHWESTERN MUTUAL SERIES FUND INC. (INDEX 500 PORTFOLIO)

NORTHWESTERN MUTUAL SERIES FUND INC. (SMALL CAP VALUE PORTFOLIO)

NORTHWESTERN MUTUAL SERIES FUND, INC. (EQUITY INCOME PORTFOLIO)

NORTHWOOD CEMETERY COMPANY

NRG SOUTH TEXAS LP AMENDED AND RESTATED DECOMMISSIONING MASTER TRUST NO. 2 FOR THE SOUTH TEXAS PROJECT, NRG ENERGY, CURRENT TRUSTEE

NSP-MINNESOTA PRAIRIE I RETAIL QUALIFIED TRUST, CURRENT TRUSTEE

NSP-MINNESOTA RETAIL PRAIRIE II QUALIFIED TRUST, CURRENT TRUSTEE

NSP-MONTICELLO MINNESOTA RETAIL QUALIFIED TRUST, CURRENT TRUSTEE

NT COLLECTIVE RUSSELL 1000 VALUE INDEX FUND - LENDING

NT COLLECTIVE S&P 500 INDEX FUND LENDING

NT COLLECTIVE S&P 500 INDEX FUND NON LENDING

NT COLLECTIVE US MARKETCAP EQUITY INDEX FUND - LENDING

NTCC ADVISORS FUNDS FOR EMPLOYEE BENEFIT TRUST, THE NORTHERN TRUST COMPANY OF CONNECTICUT, TRUSTEE

NTCC CHANNING MID CAP VALUE AFEBT

NTCC CHANNING MID CAP VALUE SUDAN FREE FUND AFEBT

NTGI-QM COLLECTIVE DAILY QUANT INDEX PAN S&P 500 EQUITY FUND - LENDING

NTGI-QM COLLECTIVE DAILY S&P 500 CITIGROUP/VALUE EQUITY INDEX FUND - LENDING

NTGI-QM COLLECTIVE DAILY S&P 500 SPECIAL PURPOSE EQUITY INDEX FUND - LENDING

NTGI-QM COLLECTIVE DAILY US MARKET CAP EQUITY SPECIAL PURPOSE INDEX FUND - LENDING

NTGI-QM COMMON DAILY LABOR SELECT RUSSELL 3000 EQUITY INDEX FUND - LENDING

NTGI-QM COMMON DAILY RUSSELL 1000 VALUE EQUITY INDEX FUND - LENDING

NTGI-QM COMMON DAILY S&P 500 EQUITY INDEX FUND - LENDING

NTGI-QM COMMON DAILY S&P 500 EQUITY INDEX FUND - NON LENDING

NTGI-QM COMMON DAILY US MARKETCAP EQUITY INDEX FUND - LENDING

NTGI-QM COMMON MONTHLY QUANT INDEX PLUS S&P 500 EQUITY FUND - NON LENDING

NTGI-QM LABOR SELECT COLLECTIVE DAILY RUSSELL 3000 EQUITY INDEX FUND - LENDING

NUANCE COMMUNICATIONS, INC. F/K/A DICTAPHONE CORPORATION

NUCLEAR ELECTRIC INSURANCE LIMITED

NUVEEN EQUITY INDEX FUND

NUVEEN EQUITY INDEX FUND F/K/A FIRST AMERICAN EQUITY INDEX, INC.

NUVEEN EQUITY INDEX FUND F/K/A FIRSTAR EQUITY INDEX FUND

NUVEEN INVESTMENT SOLUTIONS, INC. F/K/A RICHARDS AND TIERNEY

NVIT S&P 500 INDEX FUND

NW INDIANA CARPENTERS PENSION FUND LCV

O DALE SMITH FBO SINCLAIR SMITH SIRAGUSA UAD 6/20/70, CHARLES A. WOLFIN AND A. C. SMITH, TRUSTEES

O.C. SMITH & P.L. PIERCE JOINT REV LIVING TRUST DTD 7/18/2005, PATRICIA L. PIERCE, TRUSTEE

OAKBROOK (GLASS LEWIS CO)

O'CONNOR GLOBAL MULTI-STRATEGY ALPHA MASTER LIMITED

ODDO & CIE AS SUCCESSOR TO BANQUE D'ORSAY

OFI INSTITUTIONAL LARGE CAP CORE INDEX FUND, LLC

OFIPI MAIN STREET SELECT STRATEGY

OGDEN CAP ASSOCIATES, LLC

OGLE B & J TNTS-COM VALUE-CUST

OHANA LP

OHIO BUREAU OF WORKERS' COMPENSATION

OHIO CARPENTERS INDEX

OHIO CARPENTERS' PENSION PLAN A/K/A OHIO CARPENTERS' PENSION FUND

OHIO MEATPACKERS, MEATCUTTERS, AND BUTCHER WORKMEN PENSION FUND (UFCW LOCAL 911)

OHIO NATIONAL FUND, INC. BLUE CHIP FUND (STRATEGIC VALUE PORTFOLIO)

OHIO NATIONAL FUND, INC. S&P 500 INDEX

OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM

OHLSON ENTERPRISES

OKABENA US CORE EQUITY FUND, LLC

OLGA L BUENZ MARITAL TRUST 2 U/A DTD 10/1/2003, JOHN B BUENZ, TRUSTEE

OLIFANT FUND LTD.

OLIN CORPORATION PENSION PLANS MASTER RETIREMENT TRUST, CURRENT TRUSTEE

OLIVIA JEAN WILLIAMS, INDIVIDUALLY AND AS BENEFICIARY OF OLIVIA JEAN WILLIAMS IRA ROLLOVER AND OLIVIA JEAN WILLIAMS IRA ROLLOVER DTD 12/19/97

OMA OPA LLC

OMAR F. JOHNSON, JR.

OMERS ADMINISTRATION CORP

OMERS/AACP INVESTORS II, LP

OMIMEX INVESTMENTS, LLC

OMNI, MATCHED BOOK CORPORATES

OMNI, QVT MAN ACCT

OMS SUBSID 2 LTD.

ONEBEACON AMERICA INSURANCE CO.

ONEBEACON INSURANCE

ONEBEACON INSURANCE COMPANY

ONEBEACON INSURANCE PENSION PLAN A/K/A ONEBEACON PENSION PLAN

ONEBEACON INSURANCE SAVINGS PLAN

ONEBEACON INSURANCE SAVINGS PLAN - EQUITY 401K

ONEBEACON INSURANCE SAVINGS PLAN - FULLY MANAGED

ONKAR SINGH NARULA IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

ONTARIO PENSION BOARD

OPAL INVESTMENT LIMITED

OPERATING ENGINEERS LOCAL 428 DB (PENSION) LCV

OPPENHEIMER & CO., INC.

OPPENHEIMER MAIN STREET SELECT FUND F/K/A OPPENHEIMER MAIN STREET OPPORTUNITY FUND

OPPENHEIMER MAIN STREET SMALL- & MID-CAP FUND F/K/A OPPENHEIMER MAIN STREET SMALL CAP FUND

OPPENHEIMER VARIABLE ACCOUNT FUNDS D/B/A OPPENHEIMER MAIN STREET SMALL- & MID-CAP FUND/VA, F/K/A OPPENHEIMER MAIN STREET SMALL CAP FUND/VA

OPPENHEIMERFUNDS

OPPENHEIMERFUNDS, INC

OPPORTUNITY PARTNERS LP

OPTION OPPORTUNITIES COMPANY

OPTIONSXPRESS, INC.

OPUS TRADING FUND LLC

OPUS TRADING FUND LLC - BBX

ORDER OF FELICIAN SISTERS CS NT OF ST FRANCIS

OREGON SHEET METAL WORKERS MASTER RETIREMENT TRUST, CURRENT TRUSTEE

ORPHEUS TRUST, ROBERT LEBERMAN, TRUSTEE

OSBORNE INTERIM TRUST DTD 2/7/02, CURRENT TRUSTEE

OTTO J KOCH TRUST U/A DTD NOV 18 1992, OTTO J KOCH, TRUSTEE

OVERLOOK CAPITAL LLC

P & K BISSINGER REV TRUST, PAUL A. BISSINGER, JR., KATHLEEN B. BISSINGER, TRUSTEES

P KENT THRUSH MD KEOGH TR, PETER KENT THRUSH, TRUSTEE

P L SANKEY

PACIFIC SELECT FUND - EQUITY INDEX PORTFOLIO

PACIFICORP (OTHER TRUSTS), FRANK BURKHARTSMEYER, TRUSTEE

PACKAGE DEVELOPMENT CORP.

PACTIV CORPORATION

PALISADES PARTNERS LP

PALMER HOME FOR CHILDREN SCHOLARSHIP ENDOWMENT ACCOUNT

PALOMA SECURITIES LLC

PAMELA KAY PEAVY BRANDT TRUST UAD 12/30/1983, JOHN PEAVY III, TRUSTEE

PAMELA S. LINDBERG, AS BENEFICIARY OF THE ESTATE OF ALFRED C. GLASSELL JR.

PANDION II CHARITABLE REMAINDER UNITRUST U/A DTD 12/22/2005, PETER R. BRINCKERHOFF, TRUSTEE

PANDORA SELECT PARTNERS, LP

PANOS ENTERPRISES INC ETAL PSP & RET PL U/A DTD 12/31/1973, STEVE PANOS, TRUSTEE

PAPER PRODUCTS, MISCELLANEOUS CHAUFFEURS, WAREHOUSEMEN, HELPERS, MESSENGERS, PRODUCTION AND OFFICE WORKERS LOCAL 27 PENSION FUND

PARK AVE INVESTMENT SERVICES PLG

PARK NATIONAL CORPORATION

PARKER S GATES IR TRUST, BANK OF AMERICA, N.A., TRUSTEE

PAROCHIAL EMPLOYEES RETIREMENT SYSTERM LOUISIANA

PARTNERS GROUP ALTERNATIVE STRATEGIES PCC LTD

PARTNERS GROUP ALTERNATIVE STRATEGIES PCC LTD – BLACK VEGA CELL

PARTNERS GROUP ALTERNATIVE STRATEGIES PCC LTD – GREY DELTA CELL

PARTNERS GROUP ALTERNATIVE STRATEGIES PCC LTD – YELLOW VEGA CELL

PAT S PHELPS 1935 TRUST FBO RS PHELPS, CURRENT TRUSTEE

PATIENCE HUMPHREY

PATRICIA CALLAHAN THRAPP IRA, FIDELITY MANAGEMENT TRUST CO CUST

PATRICIA CROWE WARREN RESIDUARY TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

PATRICIA FULTON EEK REV TRUST U/A DTD 09/25/1987, NATHANIEL SISSON EEK, TRUSTEE

PATRICIA I WALSH

PATRICIA J SHAND

PATRICIA J SMITH, MSSB, CUSTODIAN

PATRICIA L. STEWART F/K/A PATRICIA STEWART HAYES

PATRICIA S. PHELPS 1935 TRUST FBO CYNTHIA L. PHELPS, JAMES C. WALDO, TRUSTEE

PATRICIA S. PHELPS 1935 TRUST FBO NINA P. GORNY, JAMES C. WALDO, TRUSTEE

PATRICIA S. PHELPS 1935 TRUST FBO STEWART PHELPS, JAMES C. WALDO, TRUSTEE

PATRICIA SORM, MS&CO, CUSTODIAN

PATRICIA W BERNHARDT

PATRICK G RYAN

PATRICK H. DOHERTY III

PATRICK J SLOYAN IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

PATRICK J. MCGLINN IRA, PATRICK J. MCGLINN, RBC DAIN RAUSCHER, CUSTODIANS

PATRICK L OCONNOR R/O IRA, FCC, CUSTODIAN

PATRICK M. SCHLEDER AND CHRISTINE S SCHLEDER

PATRICK MOONEY TRAD IRA, WFBNA, CUSTODIAN

PATRICK S MAGUIRE TRUSTMARK SERVICES CO PLAN FBO, FIDELITY MANAGEMENT TRUST CO, TRUSTEE

PATRICK T. HACKETT AND JANIENNE HACKETT

PATTON ALBERTSON

PAUL C ROMANAZZI JR.

PAUL C. KONRAD AND KIRSTEN KONRAD

PAUL D BORMAN

PAUL F. GISSEL ATLANTIC TRUST ACCOUNT, CURRENT TRUSTEE

PAUL G EITNER

PAUL H DEAN MARITAL TRUST A, SHIRLEY H DEAN & STACY DEAN YOCHUM, TRUSTEES

PAUL H DEAN RESIDUARY TRUST B U/A DTD 12/07/89, SHIRLEY H DEAN AND STACY DEAN YOCHUM, TRUSTEES

PAUL HARVEY AURANDT TRUST UA 11/13/90 M-B, CURRENT TRUSTEE

PAUL I COHEN

PAUL J. KENKEL

PAUL KUAI YU LEONG

PAUL M MEISTER 2005 REVOCABLE TRUST U/A 10/20/05, PAUL M MEISTER, TRUSTEE

PAUL M. MAHONEY, PAUL P. MAHONEY TRUST DTD 12/28/1978, PAUL M. MAHONEY, TRUSTEE

PAUL PAI AND HELENA PAI JT TEN

PAUL R GERKEN

PAUL SCHINDLER IRRA, MERRILL LYNCH, PIERCE, FENNER & SMITH, CUSTODIAN FPO

PAUL W MORRIS IRA, FCC, CUSTODIAN

PAUL W. DILLON GRANDCHILDREN'S TRUST DATED 12/6/41 FBO PAUL D. GODDARD, THE NORTHERN TRUST COMPANY, TRUSTEE

PAULA L. CURRIE IRA R/O, AMERIPRISE TRUST COMPANY ACF

PAULA MILLER TRIENENS TRUST DATED 9-18-91, HOWARD J. TRIENENS AND THE NORTHERN TRUST COMPANY, TRUSTEES

PAULA STANDLEY

PAULEY LIVING TRUST U/A DTD 09/23/1988, STEPHEN AND MARYLYN PAULEY, TRUSTEES

PAVERS & ROAD BUILDERS PENSION FUND

PCRG A/C FOR XXXX2645

PCRG A/C FOR XXXX2646

PCRG FUND I, LLC

PEAK 6 PERFORMANCE MGMNT LLC

PEAK6 INVESTMENTS A/C 8PK PEAK6 ADVISORS

PEAK6 PERFORMANCE MANAGEMENT LLC

PEAPACK GLADSTONE BANK

PEARL F SCHALLER TRUST U/W, HARRY D. SCHALLER, TRUSTEE

PEARL LAWRENCE REVOCABLE TRUST UA MAR 30, 1990, PEARL LAWRENCE, TRUSTEE

PECARO FAMILY TRUST DTD 04-12-02, DANIEL D PECARO AND OFELIA R PECARO, TRUSTEES

PENINSULA MOTOR CARS INC

PENNSYLVANIA GENERAL INSURANCE CO.

PENNSYLVANIA MUNICIPAL RETIREMENT SYSTEM

PENNSYLVANIA PUBLIC SCHOOL EMPLOYEES RETIREMENT SYSTEM

PENSIOENFONDS HORECA & CATERING

PENSION COMMINGLE FUND, SUMITOMO MITSUI TRUST BANK, LIMITED, TRUSTEE

PENSION FUND ASSOCIATION FOR LOCAL GOVERNMENT OFFICIALS

PENSION FUND OF THE CHRISTIAN CHURCH (DISCIPLES OF CHRIST)

PENSION FUND OF THE INTL UNION OF OPERATING ENGRS LCL 14-14B

PENSION RESERVES INVESTMENT TRUST FUND, PENSION RESERVES INVESTMENT MANAGEMENT BOARD, TRUSTEE

PENSION TRUST FUND LOCAL UNION #27, CURRENT TRUSTEE

PENSIONSKASSE SYNGENTA

PENTWATER CREDIT PARTNERS FUND LTD

PENTWATER GROWTH FUND LTD

PEOPLE'S BENEFIT LIFE TEAMSTERS ACCOUNT

PEOPLES BENEFIT LIFE TEAMSTERS DVP ACCOUNT

PEOPLES SECURITIES INC

PEPPERDINE UNIVERSITY

PEQUOT CREDIT OPPORTUNITIES FUND LP

PEQUOT DIVERSIFIED MASTER FUND, LTD.

PERCEVAL INVESTMENT PARTNERS P, L.P.

PERMAL TB VALUE LTD.

PERRY COUNTY DENTAL GROUP INC FBO LAWRENCE NASH PEN TRUST U/A DTD 10-01-2006, R.G. HAGY, TRUSTEE

PERRY LOUISE LANE AND RICHARD EUGENE LANE

PERRY PARTNERS L.P.

PERSHING LLC

PERSHING SECURITIES LTD

PETER A BARBER

PETER A NIELSEN

PETER A YOUNG

PETER ARNELL AND SARA ARNELL

PETER C LARDNER

PETER C LARDNER TRUST DATED 08/06/91, PETER C LARDNER, TRUSTEE

PETER C SCRIVNER & ELLEN M SCRIVNER

PETER DEAN GRUMHAUS GIFT TRUST, KRISTIN W BRENNAN, TRUSTEE

PETER F HOWE TRUST U/A DTD 11-20-95, PETER F HOWE, TRUSTEE

PETER G. LAGEN

PETER J FERNALD TRUST U/A 1/13/92, PETER J FERNALD, TRUSTEE

PETER JADROSICH IRA NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

PETER KNAPP AND JENNIFER KNAPP

PETER KOCH

PETER R MARINO IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

PETER RIZZO AND KIMBERLY RIZZO

PETER W. KING

PG&E POSTRETIREMENT MEDICAL PLAN TRUST, THE BANK OF NEW YORK MELLON, TRUSTEE

PG&E QUAL CPUC NDT PARTNERSHIP

PHILIP B CHASE REVOCABLE TRUST, U/A/D 07/28/94, CHASE L LEAVITT, TRUSTEE

PHILIP B DOHERTY TRUST U/A DTD 04/28/2000, PHILIP B. DOHERTY, TRUSTEE

PHILIP B LLOYD CAMBRIDGE SAVINGS BANK

PHILIP CHANDLER RESIDUARY TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

PHILIP H SLESUR AND DAVID P SLESUR JT TEN

PHILIP HALPIN

PHILIP HULSIZER AND MARY HULSIZER

PHILIP S STYLIANOS

PHILIP V MANN

PHILIPS ELECTRONICS N.A. CORP MASTER RETIREMENT TRUST, CURRENT TRUSTEE

PHILLIP W GREER IRA, FIDELITY MANAGEMENT TRUST CO CUST

PHOEBE P BENDER

PHYLLIS G ROTH

PHYLLIS M ANDERSON IRA, AMERIPRISE TRUST COMPANY, CUSTODIAN

PHYLLIS W FAGIN TRUST U/A DTD 6/2/95, DEBRA F MASCHINO, TRUSTEE

PHYSICAL, INDEX ARB EXCH FOR IDA KIERAN KILKENNY BRYAN CROSS

PICTET & CIE

PICTET & CIE (EUROPE) S.A. LUXEMBOURG

PIM EQUITY AVERAGE PRICE ACCT

PINES EDGE VALUE INVESTORS LP

30

PINNACLE HEALTH SYSTEM BOARD DESIGNATED LCV

PINNACLE HEALTH SYSTEM PENSION PLAN

PIPEFITTERS LOCAL 274 ANNUITY

PIPEFITTERS LOCAL 274 PENSION FUND

PITNEY BOWES, INC.

PITT COUNTY MEMORIAL HOSPITAL

PITTMAN TRUST, RIDGE PITTMAN, TRUSTEE

PJM CHARITABLE FOUNDATION INC

PL PIERCE SURVIVING SPS'S TRUST DTD 09-17-2005, PL PIERCE, TRUSTEE

PLAN B TRUSTEES LIMITED

PLATINUM GROVE CONTINGENT CAPITAL MASTER FUND LTD.

PLEASANT T. ROWLAND REVOCABLE TRUST, RHONA VOGEL, TRUSTEE

PLEIADES INVESTMENT PARTNERS - G, L.P.

PLEIADES TRUST, ROBERT LEBERMAN, TRUSTEE

PLM FOUNDATION TRUST, PHILIP L. MILSTEIN & CHERYL G. MILSTEIN, TRUSTEES

PLUMBERS & PIPEFITTERS LOCAL 123 PENSION LCV

PLUMBERS & PIPEFITTERS NATIONAL PENSION FUND

PLUMBERS AND PIPEFITTERS LOCAL 501 F/K/A PLUMBERS AND PIPEFITTERS LOCAL 507

PLUMBERS LOCAL 101 PEN PLAN

PLUMBERS LOCAL UNION NO. 519 PENSION FUND

PME GLOBAL VALUE

PNC BANK NATIONAL ASSOCIATION

PNC BANK, NATIONAL ASSOCIATION F/K/A BANK OF LANCASTER COUNTY NA

POLICEMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO

POLLY H. HOWELLS

POLLY H. WERTHMAN IRREVOCABLE TRUST UA, BANK OF AMERICA, N.A. AND PIERCE ATWOOD LLP, TRUSTEES

POND VIEW CREDIT (MASTER) LP - TRADI

POOL WIOF U.S. VALUE EQUITY

PORTER ORLIN LLC F/K/A PORTER, FELLEMAN, INC.

PORTFOLIO STRATEGIES INCORPORATED

POSEN FAMILY LIMITED PARTNERSHIP

POSER INVEST INC RET TRUST UAD 09/29/1995, WALTER L POSER, TRUSTEE

POWER AUTHORITY OF THE STATE OF NEW YORK

POWERSHARES BUYBACK ACHIEVERS PORTFOLIO, A SERIES OF POWERSHARES EXCHANGE TRADED FUND TRUST

POWERSHARES FTSE RAFI CONSUMER SERVICES SECTOR PORTFOLIO

POWERSHARES FTSE RAFI US 1000 PORTFOLIO, A SERIES OF POWERSHARES EXCHANGE TRADED FUND TRUST

PRADEEP MEHRA & BHAVIKA MEHRA

PRAMOD J. SHAH

PRESSMAN'S PUBLISHERS PENSION FUND

PRIAC FUNDS

PRIDEAUX-BRUNE TRUST UA 07 17 87, ROWLAND & GENEVIEVE PRIDEAUX-BRUNE, TRUSTEES

PRIME ANN L DECD TRUST U/W RES TR, CURRENT TRUSTEE

PRIMEVEST FINANCIAL SERVICES, INC.

PRINCETON THEOLOGICAL SEMINARY

PRINCIPAL FUNDS INC-LARGECAP BLEND FUND II

PRINCIPAL VARIABLE CONTRACTS FUNDS INC.-LARGE CAP BLEND ACCOUNT II

PRISCILLA G POWELL LVG TRUST U/A DTD 4/25/97, PRISCILLA G POWELL, TRUSTEE

PRISM PARTNERS I, L.P.

PRISM PARTNERS II OFFSHORE FUND

PRISM PARTNERS III LEVERAGED LP

PRISM PARTNERS IV LEVERAGED OFFSHORE FUND

PRISM PARTNERS OFFSHORE FUND

PRO SHARES ULTRA S&P 500

PRODUCER-WRITERS GUILD OF AMERICA PENSION TRUST/PENSION PLAN, MICHAEL KOLLER, TRUSTEE

PROGRESS COMMON TRUST, BEVERLY PASLEY-HARRISON, TRUSTEE

PROGRESS ENERGY INC.

PROGRESS ENERGY SERVICE CO

PROGRESS ENERGY, INC. MASTER DECOMMISSIONING TRUST - BRUNSWICK UNIT NO. 1 QUALIFIED FUND - EQUITY, PROGRESS ENERGY SERVICE COMPANY, TRUSTEE

PROGRESS ENERGY, INC. MASTER DECOMMISSIONING TRUST - BRUNSWICK UNIT NO. 2 QUALIFIED FUND - EQUITY, PROGRESS ENERGY SERVICE COMPANY, TRUSTEE

PROGRESS ENERGY, INC. MASTER DECOMMISSIONING TRUST - HARRIS UNIT NO. 1 QUALIFIED FUND - EQUITY, PROGRESS ENERGY SERVICE COMPANY, TRUSTEE

PROGRESS ENERGY, INC. MASTER DECOMMISSIONING TRUST - ROBINSON UNIT NO. 2 QUALIFIED FUND - EQUITY, PROGRESS ENERGY SERVICE COMPANY, TRUSTEE

PROGRESSIVE CASUALTY INSURANCE - PROGRESSIVE-HALCYON INS CO

PROSPECTOR PARTNERS LLC

PROSPECTOR SUMMIT FUND, L.P.

PROXY GOVERNANCE, INC. - JMR&MCG/DE8

PRUDENTIAL INVESTMENT MANAGEMENT, INC.

PRUDENTIAL INVESTMENT PORTFOLIOS 3 (PRUDENTIAL STATEGIC VALUE FUND)

PRUDENTIAL INVESTMENT PORTFOLIOS 8 - PRUDENTIAL STOCK INDEX FUND F/K/A DRYDEN INDEX SERIES FUND

PRUDENTIAL INVESTMENT PORTFOLIOS 8 (PRUDENTIAL STOCK INDEX FUND)

PRUDENTIAL INVESTMENTS LLC

PRUDENTIAL PENSIONS LIMITED

PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY

PRUDENTIAL RETIREMENT SA LV5 LCV

PSP FOREIGN EQUITY FUND

PTR FOUNDATION

PUBLIC EMPLOYEE RETIREMENT SYSTEM OF IDAHO

PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO

PUBLIC EMPLOYEES RETIREMENT SYSTEM OF NEVADA

PUBLIC SCHOOL TEACH PEN RE

PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO

PUBLIC SECTOR PENSION INVESTMENT BOARD

PUTNAM LOVELL NBF SECURITIES INC

PUTNAM S&P 500 FUND

PUTNAM S&P 500 INDEX FUND, PUTNAM FIDUCIARY TRUST COMPANY, TRUSTEE

PVA-3233/RHUMBLINE ADVISORS

Q4 PARTNERS LP

QC CO.

QCM ABSOLUTE RETURN FUND

QUANTITATIVE MASTER SERIES LLC F/K/A QUANTITATIVE MASTER SERIES TRUST (MASTER S&P 500 INDEX SERIES), CURRENT TRUSTEE

QUENTIN KUENZLI ADMIN TR, ERMAGARD E. KUENZLI, TRUSTEE

QUIET LIGHT SECURITIES, LLC

QUINN MARTIN DOLAN

QUIXOTE CAPITAL MANAGEMENT LLC

QUIXOTE CAPITAL PARTNERS LP

QUIXOTE FOUNDATION

QVT FUND LP

QVT FUND LP AND QUINTESSENCE FUND L.P.

QWEST DEFINED BENEFIT/DEFINED CONTRIBUTION MASTER TRUST, CURRENT TRUSTEE

QY7 JOINT ACCOUNT (G-BAR LIMITED PARTNERSHIP)

R AND E VANDER MEER 95 REV TRUST, R VANDER MEER, TRUSTEE

R CHARLES RASHID II

R DANIEL SOULES

R F FOUNDATION

R JAMES MACALEER

R K MELLON CTF #3

R OSBORNE UAD 10/10/2006, RICHARD C OSBORNE, TRUSTEE

R. DEAN JOLLAY, JR

R. J. BROOKS COMMUNITY PROPERTY TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

R. KENT ERICKSON

R. MARK MALLORY 401(K) SAVINGS PLAN

R. MARK MALLORY, R. MARK MALLORY TRUST U/A DTD 12/30/1999, R. MARK MALLORY, TRUSTEE

RABO CAPITAL SERVICES, INC.

RADHARANI GUPTA

RADIOLOGY CONSULTANTS PC 401K

RAE F PATTERSON SELF TRUST, RAE F PATTERSON, TRUSTEE

RAFAEL ORDONEZ REVOCABLE LIVING TRUST DTD. JUNE 9, 2009, RAFAEL A. ORDONEZ, TRUSTEE

RAFI GLOBAL EQUITY FUND

RALPH D. LOWENSTEIN JR

RALPH GOETTING JR

RALPH H GIBSON AND MARY E JUNCK

RALPH LOUCKS TRUST, RALPH B LOUCKS, TRUSTEE

RALPH W GOETTING JR 2000 TRUST, RALPH W GOETTING JR, TRUSTEE

RALPH W GOETTING JR ROLLOVER IRA, TD AMERITRADE INC, CUSTODIAN

RAMACHANDRA N KURUP IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

RAMIRO BARRERA III

RAMIUS SECURITIES, LLC

RAMONA G HOWARD LIV TRUST U/A 1/18/96, RAMONA G HOWARD, TRUSTEE

RAMONA R DIAZ AND BONITA DIAZ

RANDALL GLENN PIANT AND JULIE ANN PIANT

RANDALL M TOIG MD TR, RANDALL M TOIG MD, TRUSTEE

RANJIT MATHODA

RANSON WEBSTER AND NORMA WEBSTER

RAPPAPORT FAMILY TRUST U/A DTD 06/04/1992, NANETTE ROSENBERG, MARJORIE ROZMAN, TRUSTEES

RAY A. ANDERSON IRA, FCC, CUSTODIAN

RAYMOND & ANNA SCHROER TRUST U/A DTD 09/28/2006, ANNA B SCHROER, SUSAN F FREDERICK, TRUSTEES

RAYMOND A ECKHART AND MARGARET E ECKHART JT TEN

RAYMOND A. UZANAS CGM ROTH CONVERSION IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

RAYMOND DELESCAILLE

RAYMOND E JANCZAK IRA NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

RAYMOND F FALK

RAYMOND GENE NOVELLY

RAYMOND GENE NOVELLY SEPP IRA FIDELITY MANAGEMENT TRUST CO CUST

RAYMOND J ALLEN LIVING TRUST U/A DTD 06/06/88, RAYMOND J ALLEN, TRUSTEE

RAYMOND J MCCUTCHEON

RAYMOND J MCCUTCHEON AND AUDREY E MCCUTCHEON

RAYMOND J STANCY IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

RAYMOND JAMES & ASSOCIATES INC

RAYMOND JOHN FRANK REVOCABLE TRUST UA 03/07/00, RAYMOND JOHN FRANK, TRUSTEE

RAYMOND M LUTHY TRUST, ELAINE A LUTHY, TRUSTEE

RAYMOND R COFFEY TRAD IRA JPMORGAN CHASE BANK CUST

RAYMOND SALVATORE IRA ROLLOVER ACCOUNT, PERSHING LLC, CUSTODIAN

RAYTHEON MASTER PENSION TRUST (LARGE CAP/LONG/SHORT/MARKET NEUTRAL), CURRENT TRUSTEE

RB&W/GAMCO

RBC CAPITAL MARKETS, LLC F/K/A FERRIS BAKER WATTS, INC.

RBC CAPITAL MARKETS, LLC F/K/A RBC CAPITAL MARKETS CORPORATION

RBC DEXIA INVESTOR SERVICES BANK S.A.

RBC DISB/MIGROS AST US.

RBC DOMINION SECURITIES, INC.

RBC O'SHAUGHNESSY CANADIAN EQUITY FUND

RBC O'SHAUGHNESSY U.S. VALUE FUND

RBS CITIZENS N.A.

RBS DEP SKANDIA SF US EQ FD QMA

RBS SECURITIES INC.

RCCI MANAGEMENT, LLC

RE GINNA NUCLEAR POWER PLANT LLC MASTER DECOMMISSIONING TRUST, CONSTELLATION ENERGY NUCLEAR GROUP, CURRENT TRUSTEE

READER'S DIGEST ASSOCIATION INC. RETIREMENT PLAN

REBECCA B SANDA

REBECCA VANDER VEEN

RED DIAMOND PASS US EQ LTD-INV ADV

RED GIANTS PRODUCTIONS INC

REDACTED AT REQUEST OF OFFICE OF TEXAS ATTORNEY GENERAL

REDBOURN PARTNERS LTD

REDWOOD MASTER FUND LTD

REED ELSEVIER US RETIREMENT PLAN

REFORM PENSION BOARD LCV

REGENCE BLUE CROSS/BLUE SHIELD OF OREGON

REGENCE BLUESHIELD

REGENTS OF THE UNIVERSITY OF MICHIGAN

REGENTS OF UNIVERSITY OF CALIFORNIA

REGIONS BANK

REGIONS MORGAN KEEGAN SELECT MID CAP VALUE FUND

REHABILITATION HOSPITAL OF THE PACIFIC DEF BEN PENS PL

REICHHOLD, INC. (REICHHOLD CHEMICALS INC.)

RELATIVE VALUE LTD - HIGHBRIDGE EVENT DRIVEN

RELIANCE TRUST CO.

REMPEL BROTHERS

RENAISSANCE FUND ADVISORS

RENATE J. TUCKER REVOCABLE LIVING TRUST, RENATE J. TUCKER, TRUSTEE

RENEE E CASTELLUZZO TRUST U/A DTD 01/14/2000, RENEE E CASTELLUZZO, TRUSTEE

RENEE H MILLER LIVING TRUST U/A DTD 12/13/97, RENEE H MILLER, TRUSTEE

RENEE H. MILLER LIVING TRUST, RENEE H MILLER, TRUSTEE

REPUBLIC BANK AND TRUST CO.

RESIDUARY TRUST B-2 UNDER THE 1986 SANDRETTI LIVING TRUST, RONALD A. SANDRETTI, TRUSTEE

RETIREMENT PROGRAM PLAN FOR EMPLOYEES OF CERTAIN EMPLOYERS AT THE U.S. DEPARMENT OF ENERGY FACILITIES AT OAK RIDGE, TENN.

RETIREMENT SYSTEM OF ALABAMA

REUBEN E CALOW LIVING TRUST UA 11/03/98, BARBARA A CALOW, REUBEN E CALOW, TRUSTEES

REV SHELDON COOPER INS TRUST U/A 4/25/67, SHELDON COOPER, MARY H. COOPER, TRUSTEES

REX L STURM IRA, RBC CAPITAL MARKETS, CUSTODIAN

REX L STURM TRUST DTD 7/15/99, REX L STURM, TRUSTEE

REX LOGAN STURM, JR

REX R MULL AND NANCY B MULL

REXNORD-ZURN HOLDINGS INC. MASTER TRUST

RGM FOR GA MATTESON III 12/30/70 BANK OF AMERICA, N.A., TRUSTEE

RHETA R. SMITH

RHETT BUTLER, AGENT

RHS FAMILY PARTNERSHIP LTD

RHUMBLINE S.A. FREE S&P INDEX

RIC DIVERSIFIED EQUITY

RICHARD & DESPINA HAIGLER LIVING TRUST UA 11/04/91, RICHARD HAIGLER AND DESPINA HAIGLER, TRUSTEES

RICHARD & DIANE KUCERA TRUST U/A/D 03-23-2007, RICHARD A. KUCERA, DIANE A KUCERA, TRUSTEES

RICHARD & GAYLE LANDUYT TRUST U/A DTD 11/16/1991, G LANDUYT & R LANDUYT, TRUSTEES

RICHARD A GREENWOOD IRA SEPP, THE NORTHERN TRUST COMPANY, CUSTODIAN

RICHARD A PITINO

RICHARD A. ASNT-PAYNE

RICHARD A. FORSYTHE REVOCABLE TRUST UA DATED JANUARY 22, 1985, RICHARD A. FORSYTHE, TRUSTEE

RICHARD ASKIN AND CAROL ASKIN, ASKIN FAMILY TRUST U/A DTD 09/27/1990, RICHARD ASKIN, CAROL ASKIN, TRUSTEES

RICHARD B. COHEN REVOCABLE TRUST, RICHARD B. COHEN, TRUSTEE

RICHARD BURRELL MADDOX IRA, TD AMERITRADE CLEARING, CUSTODIAN

RICHARD C. FREEDMAN AND LYNDA M. FREEDMAN

RICHARD COOLEY AND BERNADETTE COOLEY

RICHARD D DUDLEY

RICHARD DARDEN

RICHARD DEAN LEWIS AND CAROLYN LEE LEWIS

RICHARD ENGBERG AND DOROTHY ENGBERG

RICHARD ERNST AND LORRAINE ERNST

RICHARD G BROWN

RICHARD GERING

RICHARD H COPP REV LIV TRUST U/A DTD 03/25/92, RICHARD H COPP, TRUSTEE

RICHARD H SCHWAMB

RICHARD H. RICCIARDI & CHER DELLIN RICCIARDI

RICHARD HAIGLER

RICHARD J HOFFMAN

RICHARD J ORTHWEIN REV TRUST DTD 3/13/01, C/O RICHARD J ORTHWEIN OR CURRENT TRUSTEE

RICHARD J WOODY IRA, RAYMOND JAMES & ASSOCIATES, INC., CUSTODIAN

RICHARD J WOSTICK

RICHARD J. MOONEY IRA, FCC, CUSTODIAN

RICHARD JAMES BAMISH

RICHARD JOHN DEFOE

RICHARD KALLENBERGER AND NANCY KALLENBERGER JT WROS

RICHARD L GOLDSTEIN

RICHARD L. PHILLIPS

RICHARD M ADER

RICHARD M VANDER MEER

RICHARD M VANDER MEER AND ELLEN J VANDER MEER

RICHARD M. BASOCO AND CARYL W. BASOCO JT WROS

RICHARD MAK AND HOA AI TU

RICHARD MORABITO CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

RICHARD MOY IRA, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CUSTODIAN

RICHARD O KEARNS REVOCABLE TRUST, RICHARD O. KEARNS AND THE NORTHERN TRUST COMPANY, TRUSTEES

RICHARD P. SIMMONS

RICHARD PANIAGUA

RICHARD R. SCHMALTZ

RICHARD ROTT

RICHARD RYAN, TRUSTEE OF RESERVATIONS

RICHARD S. CATALANO

RICHARD T. GARRETT CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

RICHARD T. YU IRA, PERSHING LLC, CUSTODIAN

RICHARD T. YU, AMERITRADE INC, CUSTODIAN

RICHARD TRIEST LVG TRUST U/A DTD 2-29-96, RICHARD R TRIEST, TRUSTEE

RICHARD W WATTS IRA, FIRST CLEARING LLC, CUSTODIAN

RICHARD W. MCINTOSH AND JENIFER B. BOOTH F/K/A JENIFER B. MCINTOSH

RICHARD Y CHAO INTERESTS LTD

RICHMAN GREER PA 401K PROFIT SHARING PLAN

RICHMOND CAPITAL MASTER FD LTD

RICHMOND ENHANCED CAPITAL LP

RICK L COLYER

RIEF RMP LLC

RIEF TRADING LLC

RIP INVESTMENTS, LP

RISK FACIL 99: CLOSE/RISK - U.S. SHARES PROGRAMS

RIVERSOURCE ABSOLUTE RETURN FUND LLC

RIVERSOURCE ABSOLUTE RETURN FUND LP

RIVERSOURCE ENHANCED ABSOLUTE RETURN

RIVERSOURCE EQUITY INDEX BASE FUND

RIVERSOURCE LARGE CAP SERIES, INC. (COLUMBIA LARGE CAP INDEX FUND A/K/A RIVERSOURCE DISCIPLINED EQUITY FUND)

RIVERSOURCE LARGE CAP SERIES, INC. (COLUMBIA LARGE CORE QUANTITATIVE FUND F/K/A RIVERSOURCE LARGE CAP EQUITY FUND)

RIVERSOURCE STRATEGIC ALLOCATION SERIES, INC. (COLUMBIA STRATEGIC ALLOCATION FUND F/K/A RIVERSOURCE STRATEGIC INCOME ALLOCATION FUND)

RIVERSOURCE VP – DYNAMIC EQUITY FUND

RIVERSOURCE VP S&P 500 INDEX FUND

RMH INDEX FUND LLC

ROBECO INSTITUTIONAL ASSET MANAGEMENT BV

ROBERT & EVELYN DEBES FAMILY TRUST UA 9/30/85, ROBERT CARL DEBES, EVELYN MAURIC DEBES, TRUSTEES

ROBERT & HANNAH CROOKS REV TRUST U/A 2/16/06, ROBERT W CROOKS, HANNAH C CROOKS, TRUSTEES

ROBERT & MILDRED HARRIS TRUST 7H-249, CLAUDIA HARRIS BROWN, TRUSTEE

ROBERT A GERNAND AND DIANA L GERNAND

ROBERT A HABERMANN REVOCABLE TRUST U/A DTD 4/20/99, ROBERT A HABERMANN, TRUSTEE

ROBERT A LANGE

ROBERT A STRUTZEL DECLR TRUST U/A 9/28/04, ROBERT A STRUTZEL, TRUSTEE

ROBERT A STRUTZEL IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

ROBERT A. FOX & ESTHER G. FOX

ROBERT A. SIMINS AND JAMIE A. SIMINS

ROBERT B DOLD AND EILEEN C NORRIS

ROBERT B GREENE JR TRUST U/A 11/06/86, ROBERT B GREENE JR, TRUSTEE

ROBERT C & NANCY LOBDELL FAMILY TRUST UA 08/20/96, NANCY LOBDELL, TRUSTEE

ROBERT C VICKERS AND MARY T VICKERS

ROBERT C. & LAURENA P. HUBER

ROBERT C. NEWMAN AND JUDITH S. NEWMAN

ROBERT C. PALMER IRA R/O, DELAWARE CHARTER GUARANTEE & TRUST, CUSTODIAN

ROBERT CHASE

ROBERT D H HARVEY

ROBERT D SPARR

ROBERT D. BOSAU DESIGNATED BENE PLAN/TOD

ROBERT DISHON FAMILY TRUST, 1ST SOURCE BANK, TRUSTEE

ROBERT E LA BLANC & ELIZABETH ANNE LA BLANC FOUNDATION

ROBERT E MATTHEWS AND DIANNE S MATTHEWS

ROBERT E. LA BLANC

ROBERT EDWARD BELLACK

ROBERT EVANS

ROBERT EVANS AND NANCY FEIGENBAUM

ROBERT EVANS IRA

ROBERT F FUSON IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

ROBERT F. SHANNON

ROBERT F. WALSH AND GLORIA E. WALSH

ROBERT FARRINGTON ROLLOVER ACCOUNT, PERSHING LLC, CUSTODIAN

ROBERT G SCHLOERB TRUST DATED MAY 01 91, ROBERT G SCHLOERB, TRUSTEE

ROBERT G WITT IRA FIDELITY MANAGEMENT TRUST CO CUST

ROBERT G. SPECK

ROBERT H CARRIER IRA ROLLOVER, TD AMERITRADE CLEARING, CUSTODIAN

ROBERT H FARRINGTON MARITAL TRUST UAD 09/05/05, ROBERT H FARRINGTON AND ROBERT F FARRINGTON, TRUSTEES

ROBERT H HARPER

ROBERT H HUFFMAN III IRA, FIDELITY MANAGEMENT TRUST CO CUST

ROBERT H HUFFMAN III REV TRUST U/A 3/12/90, ROBERT H HUFFMAN III, TRUSTEE

ROBERT H TACKETT IRA, FCC, CUSTODIAN

ROBERT J BROOKES TRUST U/A 3/10/87 FBO ROBERT J BROOKES AND VALENTINE M BROOKES, ROBERT J BROOKES, TRUSTEE

ROBERT J GUNTERBERG

ROBERT J KERR

ROBERT J VARECHA

ROBERT J WHITE TRUST U/A/D 06/16/99, ROBERT JOSEPH WHITE, TRUSTEE

ROBERT J. KUHN DECL OF TRUST DTD 4-6-92, THOMAS J. KUHN, TRUSTEE

ROBERT J. LEONARD AND JANE E. LEONARD

ROBERT J. PASSANEAU

ROBERT JOSEPH WHITE TRUST U/A/D 06/16/99, ROBERT J WHITE, TRUSTEE

ROBERT K KRAFT

ROBERT K. URBAIN AND JEANETTE C. URBAIN

ROBERT KUHN

ROBERT L MANUEL AND FRANCES E MANUEL

ROBERT L. DRUMMEY AND DORIANN C. DRUMMEY ATBE

ROBERT L. FROELICH

ROBERT L. NEWTON CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

ROBERT L. OAKUM AND SUSANN OAKUM

ROBERT M BERGER

ROBERT M WORSFOLD IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

ROBERT M. KAHN CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

ROBERT M. STEINER, ROTHSCHILD INVESTMENT CORP. EMPLOYEE PROFIT SH PLAN DESIGNATED INV ACCT FBO

ROBERT M. TREBOUX

ROBERT MOSBERG

ROBERT O'BRIEN, EXECUTOR U/W CHARLOTTE O'BRIEN

ROBERT PARRILLO TRUST, U/A DTD 12/27/1990, ROBERT PARRILLO, TRUSTEE

ROBERT R BLEND, BLEND DECEDENT'S TRUST, UAD 12/2/99, ROBERT R BLEND, THOMAS R BLEND, TRUSTEES

ROBERT R CULL TRUST U/A 1/14/98, ROBERT R CULL, TRUSTEE

ROBERT R. MCCORMICK FOUNDATION

ROBERT RAMSEY

ROBERT ROSENBERG TRUST U/A DTD 11/02/1977, NANETTE ROSENBERG, MARJORIE ROZMAN, TRUSTEES

ROBERT S EVANS

ROBERT S LA MANTIA

ROBERT S MORRISON, ROBERT S MORRISON 2000 TRUST U/A/D 11/30/2000, ROBERT S MORRISON, TRUSTEE

ROBERT S SPLITHOFF TRUST U/A/D 05-27-1992, ROBERT S. SPLITHOFF, TRUSTEE

ROBERT S. GLEASON, SR.

ROBERT V FATTIBENE AND MILDRED W FATTIBENE

ROBERT VANDEWATER CR SHEL TRUST U/W/O R VANDEWATER, ELIZABETH P VANDEWATER, NOEL DECORDOVA JR, TRUSTEES

ROBERT W & MARGARET A EDER REV LIVING TRUST UA DTD 05/02/03, MARY MADDEN, TRUSTEE

ROBERT W BAIRD CO. INC.

ROBERT W HASKINS LIVING TR

ROBERT W YOUNG

ROBERT WESLEY THORNBURGH FIDUCIARY MGT. ASSOC. LLC 401K, KATHRYN VORISEK, TRUSTEE

ROBERT/LOIS ERBURU LIV TRUST U/A 03/19/96, ROBERT F ERBURU, LOIS STONE ERBURU, TRUSTEES

ROBERTSON FIVE, INC.

ROBIN LLOYD

ROBIN WOOD ORTHOPEDIC SPECIALISTS BENEFIT TRUST, CURRENT TRUSTEE

ROBSON INTERESTS, LTD.

ROBYN L. MOTLEY

ROCCA LIMITED LIABILITY CO

ROCK SOLID INVESTMENTS LLC

ROCKWOOD INVESTMENT PARTNERS LP

RODMAN W. MOORHEAD, III

RODOLFO V GIL

ROGER BARE

ROGER D ELLIOTT

ROGER GOODAN AND KRISTINE JONES GOODAN, A WASHINGTON MARITAL COMMUNITY

ROGER H JOHNSON

ROGER WILLIAMS UNV ED GROWTH EQ

ROGERS F WORTHINGTON

ROMANO BROTHERS & CO.

ROMANS 85 LLC

RONALD CANN TRUST UAD 11-22-04, RONALD E. CANN, TRUSTEE

RONALD G HEIBER IRA, FCC, CUSTODIAN

RONALD H. GALOWICH

RONALD H. GALOWICH IRA R/O, DELAWARE CHARTER GUARANTEE & TRUST, CUSTODIAN

RONALD J BOEHM

RONALD L BORNHUETTER

RONALD RETTAGLIATA AND BARBARA RETTAGLIATA

RONALD SHINDLER

RONDA PURDY

RONDRA MATTHEWS AND KEITH MATTHEWS

RONIN CAPITAL LLC

ROSALIE BECKENBAUGH

ROSANNE LEGANO IRA AMERIPRISE TRUST CO ACF

ROSE HANCOCK AND JIMMY HANCOCK ATBE

ROSE M HOWELLS

ROSE MARIE BOYD

ROSE T. BOSAU DESIGNATED BENE PLAN/TOD

ROSEMARY E SKAPLEY IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

ROSEMARY T. COX REVOCABLE TRUST DTD 5/21/2004, ROSEMARY T. COX, TRUSTEE

ROSEMARY V. GILLESPIE

ROSENBAUM LIV TRUST U/A DTD 5/7/98, MAX ROSENBAUM, MITZI ROSENBAUM, TRUSTEES

ROSENBERG REVOCABLE TRUST, LOUISE ROSENBERG, TRUSTEE

ROSLYN FURTH TRUST U/A DTD 11/16/2004, NANCY YACYSHYN SUCC, TRUSTEE

ROSS & JUNE REEVES JT LIV TRUST U/A 11/30/09, ROSS N REEVES III, JUNE D REEVES, TRUSTEES

ROSS DAVID CAHN

ROVENSKY TRUST U/D FBO AJLR 62GSX, CURRENT TRUSTEE

ROY J. CARVER CHARITABLE TRUST, CURRENT TRUSTEE

ROY V NOLTING AND CAROL M NOLTING

ROYAL TRUST CORPORATION OF CANADA

ROYCE W NATION AND NELL NATION

RS S&P 500 INDEX VIP SERIES

RUANWIL LLC

RUBEN J. CORNEJO CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

RUSSELL 1000 ALPHA TILTS B -- RLBCORE

RUSSELL 1000 ALPHA TILTS FUND BL

RUSSELL 1000 INDEX FUND

RUSSELL 1000 VALUE COMMON TRUST FUND

RUSSELL 1000 VALUE FUND

RUSSELL 1000 VALUE FUND B

RUSSELL 1000 VALUE INDEX NL QP COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

RUSSELL 1000 VALUE SL COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

RUSSELL 2500 INDEX FUND

RUSSELL 3000

RUSSELL 3000 INDEX FUND

RUSSELL 3000 INDEX FUND COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

RUSSELL 3000 INDEX NON-LENDING COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

RUSSELL 3000 SCREENED INDEX NON-LENDING COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

RUSSELL E ATHA JR DONOR TRUST U/A DTD 09/10/1999, RUSSELL E ATHA, CAROLEE ATHA, TRUSTEES

RUSSELL EQUITY I FUND

RUSSELL F STEPHENS JR TRUST U/A DTD 02/10/1992, RUSSELL F STEPHENS JR, TRUSTEE

RUSSELL INVESTMENT COMPANY

RUSSELL INVESTMENT COMPANY DIVERSIFIED EQUITY FUND

RUSSELL INVESTMENT COMPANY PLC

RUSSELL INVESTMENT GROUP

RUSSELL P KELLEY JR TRUST, RUSSELL P KELLEY JR, TRUSTEE

RUSSELL RUSTICI

RUSSELL T. STERN TRUST B, THE NORTHERN TRUST COMPANY, RUSSELL T. STERN JR., PATRICIA STERN ROSS, TRUSTEES

RUSSELL US CORE EQUITY FUND

RUTH A. BOHANNON CGM IRA ROLLOVER, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

RUTH B ZARITSKY

RUTH B. BARKER IRREVOCABLE TRUST DATED 1/11/78 CREATED UNDER THE EMILY B. BALDWIN TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

RUTH C. VON PLATEN TRUST NO. 2, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES

RUTH EISEN

RUTH EISEN TRUST 7E-121, RUTH EISEN, TRUSTEE

RUTH F TALAMO TRUST DTD 01/24/06, RUTH TALAMO, S CHARLES TALAMO, TRUSTEES

RUTH M TANKERSLY REV TRUST AMD 6/16/2000 U/A 10/6/92, RUTH M TANKERSLEY, TRUSTEE

RUTH MCCORMICK TANKERSLEY REVOCABLE TRUST DATED OCTOBER 6, 1992, RUTH MCCORMICK TANKERSLEY, TRUSTEE

RUTH STEIF SUPPORT TRUST FOR WILLIAM U/A DTD 01/02/1980, WILLIAM STEIF, TRUSTEE

RUTH STEIN DISCRETIONARY TRUST FOR JOAN S FREEHLING UAD 1/2/80, CURRENT TRUSTEE

RUTH TANKERSLEY TRUST U/A DTD 12/03/1990, MCKIM N BARNES, TRUSTEE

RUTH WOTTGE

RUTHELLYN MUSIL 401(K) SAVINGS PLAN

RUTHELLYN MUSIL, RUTHELLYN MUSIL TRUST U/A DTD 07/27/2001, RUTHELLYN MUSIL, TRUSTEE

RWB FUNDS - INVESTMENT TRUST

RYAN SKLENICKA JT REV TRUST U/A DTD, RICHARD M. RYAN & CAROL J. SKLENICKA, TRUSTEES

RYDEX DYNAMIC TRUST, S&P 500 2X STRATEGY FUND

RYDEX ETF TRUST, RYDEX S&P 500 PURE VALUE ETF

RYDEX ETF TRUST, RYDEX S&P EQUAL WEIGHT CONSUMER DISCRETIONARY ETF

RYDEX ETF TRUST, RYDEX S&P EQUAL WEIGHT ETF

RYDEX SERIES FUNDS, ABSOLUTE RETURNS STRATEGIES FUND

RYDEX SERIES FUNDS, LARGE CAP VALUE FUND

RYDEX SERIES FUNDS, MULTI-HEDGE STRATEGIES FUND

RYDEX SERIES FUNDS, S&P 500 PURE VALUE FUND

RYDEX VARIABLE TRUST, ABSOLUTE STRATEGIES RETURN FUND

RYDEX VARIABLE TRUST, LARGE CAP VALUE FUND

RYDEX VARIABLE TRUST, MULTI-HEDGE STRATEGIES FUND

RYDEX VARIABLE TRUST, S&P 500 PURE VALUE FUND

S & P 500 EQUITY INDEX WEIGHTED FUND LP A/K/A S & P 500 INDEX EQUAL WEIGHT - ADVISORY RESEARCH INC

S CHARLES BAER JR TRUST U/A DTD JULY 1 1992, S CHARLES BAER JR, TRUSTEE

S KEATING AND CAROL RHOADS TRUST U/A DTD 11/07/1994, S KEATING RHOADS AND CAROL RHOADS, TRUSTEES

S&P 500 EQUAL WEIGHT COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

S&P 500 EQUITY INDEX WEIGHTED FUND LP

S&P 500 FLAGSHIP COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

S&P 500 INDEX COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

S&P 500 INDEX E.W.F., LP

S&P 500 INDEX FUND - UBS GLOBAL ASSET MANAGEMENT (AMERICAS) INC.

S&P 500 INDEX FUND, A SERIES OF SEI INSTITUTIONAL MANAGED TRUST

S&P 500 SCREENED SL COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

S&P 500 STOCK MASTER PORTFOLIO

S&P 500 TOBACCO FREE COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

S&P CONSERVATIVE INDEX COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

S.E.I.U. LOCAL #25 PENSION FUND

S.E.I.U. LOCAL #25 PENSION TRUST, JIM MCARDLE, TRUSTEE

SA FUNDS-INVESTMENT TRUST (S.A. U.S. MARKET FUND)

SA FUNDS-INVESTMENT TRUST (S.A. U.S. VALUE FUND)

SACRAMENTO COUNTY EMPLOYEES RETIREMENT SYSTEM

SACRED HEART UNIVERSITY

SAHARA INVESTMENTS, LLC

SAINT LOUIS UNIVERSITY

SALEH H. AL HUMAIDAN

SALISBURY BANK &TRUST CO.

SALLY B O'KEEFE

SALLY B O'KEEFE 1999 RESTATED TRUST U/A/D 5/12/1999, SALLY B O'KEEFE, TRUSTEE

SALLY H CONTANT TRUST U/A DTD 10/13/1983, SALLY H CONTANT, TRUSTEE

SALLY M DIXON IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

SALLY S SHELDEN TRUST U/A 12/21/99, SALLY S SHELDEN, TRUSTEE

SALOMON J DAYAN TRUST U/A DTD 11/08/78, SALOMON J DAYAN, TRUSTEE

SAM J AZZARELLO TRUST U/W, FRANK MAGGIO, TRUSTEE

SAMBASIVAN NARAYANAN

SAMCO CAPITAL MKTS

SAMPENSION INVEST

SAMPLE H FOR D HILL

SAMPLE P L FOR REBECCA

SAMUEL CLEMENT REV 10/05 CP & CO, CURRENT TRUSTEE

SAMUEL H FRANKEL TRUST U/A/D 01/28/80, SAMUEL H FRANKEL, TRUSTEE

SAMUEL J MEYER GST EXEP TRUST M423 U/A 11/10/85 AMD 9/20/91, PATRICIA M LIVINGSTON, JOSEPH B GLOSSBERG, TRUSTEES

SAMUEL P RECKFORD

SAMUEL S MOORE TRUST U/A DTD 10/11/1988, SAMUEL MOORE, TRUSTEE

SAMUEL T. PESUSICH TRUST U/A DTD 11/19/1990, SAMUEL T. PESUSICH, ZANDRA L. HALSTEAD, TRUSTEES

SAMUEL ZELL

SAN FRANCISCO EMPLOYEES' RETIREMENT SYSTEM A/K/A SAN FRANCISCO CITY & COUNTY EMPLOYEES' RETIREMENT SYSTEM

SAN FRANCISCO LADIES' PROTECTION AND RELIEF SOCIETY D/B/A THE HERITAGE

SANDELMAN PARTNERS MULTI-STRATEGY MASTER FUND

SANDERS MORRIS HARRIS, INC. A/K/A SMH CAPITAL INC

SANFORD BERNSTEIN COMPANY, INC.

SANFORD C BERNSTEIN FUND INC - ALLIANCE BERNSTEIN INVESTOR SERVICES

SANFORD C BERNSTEIN FUND INC - ALLIANCE BERNSTEIN LP

SANFORD C. BERNSTEIN & CO., LLC

SANFORD C. BERNSTEIN FUND, INC.

SANIBEL CAPTIVA TRUST CO.

SANO INVESTMENTS LLC

SANTA BARBARA COUNTY EMPLOYEES RETIREMENT SYSTEM

SANTA CLARA UNIVERSITY

SANTA FE ART FOUNDATION

SANTA FE G VWAP (EQ722)

SARA A LIGHTBOURN

SARA J NEWMAN LIVING TRUST U/A/D 04/14/89, SARA J NEWMAN, TRUSTEE

SARA JOYCE TRUST U/A DTD 1/7/2005, M. JOYCE & S. JOYCE TRUSTEES

SARA L WEBER AND ROBERT P LANGAN

SARAH A O'BRIEN TRUST DTD 8-18-03, KEVIN D O'BRIEN AND SARAH A O'BRIEN, TRUSTEES

SARAH FRANCES COWLES STEWART TRUST FBO DOUGLAS BABCOCK, PHILIP BABCOCK, TRUSTEE

SARAH FRANCES COWLES STEWART TRUST FBO PHILIP BABCOCK, PHILIP BABCOCK, TRUSTEE

SARAH LEE BALDWIN

SARGEANT & LUANN JOYS LIVING TRUST U/A DTD 09/23/2001, SARGEANT E JOYS & LUANN G JOYS, TRUSTEES

SAUDI ARABIAN MONETARY AGENCY

SAVANNAH RIVER NUCLEAR SOLUTIONS LLC MASTER TRUST, CURRENT TRUSTEE

SBC MASTER PENSION TRUST, CURRENT TRUSTEE

SBL FUND SERIES H

SBL FUND, SERIES N

SBL FUND, SERIES O

SC BLACKROCK SMALL CAP INDEX FUND F/K/A SC OPPENHEIMER MAIN STREET CAP FUND

SC EDISON NUCLEAR FACILITIES QUALIFIED CPUC DECOM MASTER TRUST, CURRENT TRUSTEE

SCB CANADA TRUST DIVERSIFIED (SANFORD C. BERNSTEIN)

SCG BALA EQUITY OPTIONS (SUSQUEHANNA CAPITAL GROUP)

SCHAEFER-NEVADA INC

SCHEER ROWLETT & ASSOCIATES

SCHEIERMANN LIVING TRUST, U/A DTD 08/28/1997, ANNE SCHEIERMANN, TRUSTEE

SCHOOL BOARD OF MARTIN COU U/A DTD 02/03/1989, S WILCOX, L GAYLORD, TRUSTEE

SCHOOL EMPLOYEES RETIREMENT SYSTEM OF OHIO - LSV US LRG

SCHOOL EMPLOYEES RETIREMENT SYSTEM OF OHIO - SSGA PASSIVE

SCHULER TRUST UTD 01/18/88, CURRENT TRUSTEE

SCHULMAN FINANCIAL L P SS-908, CUSTODIAN

SCHULTZE APEX MASTER FUND LTD

SCHULTZE ASSET MANAGEMENT, LLC (A/C ARROW DISTRESSED FUND)

SCHULTZE MASTER FUND LTD

SCHURZ COMMUNICATIONS INC. DEFINED BENEFIT

SCHWAB 1000 INDEX FUND

SCHWAB CAPITAL TRUST

SCHWAB FUNDAMENTAL US LARGE COMPANY INDEX FUND A/K/A SCHWAB FUNDAMENTAL US LARGE COMPANY

SCHWAB MARKETTRACK GROWTH PORTFOLIO (2M28)

SCHWAB S&P 500 INDEX FUND (2M32)

SCHWAB S&P 500 INDEX FUND F/K/A SCHWAB INSTITUTIONAL SELECT S&P 500 FUND (2M37)

SCHWAB S&P 500 INDEX PORTFOLIO (2M46)

SCHWAB TOTAL STOCK MARKET INDEX FUND (2M40)

SCOTIA CAPITAL INC.

SCOTT C SMITH

SCOTT C SMITH 401(K) SAVINGS PLAN

SCOTT C SMITH TRUST U/A DTD 04/16/1983, SCOTT C SMITH, TRUSTEE

SCOTT GOODMAN AND NANCY GOODMAN

SCOTT KLARQUIST

SCOTT R COOK

SCOTTRADE, INC.

SCRIPPS FAMILY REV. TRUST U/A/D 02-16-2006/SB, BARRY H. AND GAIL D. SCRIPPS, TRUSTEES

SDA LARGECAP EQUITY INDEX CL A

SDG&E NUC FACILITIES NQ CPUC DECOM MASTER TRUST FOR SONGS, SEMPRA ENERGY, TRUSTEE

SDG&E QUALIFIED NUCLEAR DECOMMISSIONING TRUST PARTNERSHIP, SEMPRA ENERGY, TRUSTEE

SEASONS SERIES TRUST - FOCUS VALUE PORTFOLIO

SEASONS SERIES TRUST - LARGE CAP VALUE PORTFOLIO

SEASONS SERIES TRUST - MID CAP VALUE PORTFOLIO

SECURIAN FUNDS TRUST F/K/A ADVANTUS SERIES FUND, INC. (INDEX 500 PORTFOLIO)

SECURITIES LENDING OPS LOAN COLLATERAL ACCOUNT P&L 74878

SECURITY BENEFIT LIFE INSURANCE COMPANY

SECURITY BENEFIT/RYDEX

SECURITY BENEFIT/RYDEX SBL N MANAGED ASSET ALLOCATION SERIES

SEEING EYE FOUNDATION

SEI GLOBAL INVESTMENTS FUND - GLOBAL UNCONSTRAINED ALPHA FUND

SEI GLOBAL MASTER FUND PLC - US LARGE COMPANIES FUND

SEI INSTITUTIONAL INVESTMENTS TRUST LARGE CAP

SEI INSTITUTIONAL INVESTMENTS TRUST LCV

SEI INSTITUTIONAL MANAGED TRUST LARGE CAP

SEI INSTITUTIONAL MANAGED TRUST LCV

SEI INSTITUTIONAL MANAGED TRUST TAX MANAGED

SEI INSTITUTIONAL MANAGED TRUST TAX MANAGED LARGE CAP

SEI INSTITUTIONAL MANAGED TRUST TAX-MANAGED LARGE CAP FUND

SEI INVESTMENTS CANADA COMPANY (U.S. LARGE COMPANY EQUITY FUND)

SEI PRIVATE TRUST COMPANY

SEIU LOCAL 36 BOLR PENSION FUND

SEIU MASTER TRUST A/K/A SEIU MASTER PENSION TRUST

SELF-INSURANCE RESERVE FUND - MASTER TRUST INVESTMENT ACCOUNTS (CHRISTIANA CARE HEALTH SERVICES, INC.), WILMINGTON TRUST COMPANY, TRUSTEE (CHRISTIANA CARE UNRESTRICTED INVESTMENT FUND)

SEMPRA ENERGY PENSION MASTER TRUST, SEMPRA ENERGY, TRUSTEE

SENTINEL INVESTMENT PARTNERS LTD

SENTRY SELECT CAPITAL INC.

SESLIA SECURITIES

SETH A THAYER

SEYMOUR LIBRARY FOUNDATION INC

SG AMERICAS SECURITIES, LLC

SGAM AI EQUITY FUND - RENAISSANCE INSTITUTIONAL EQUITY

SGIF LARGE CAP VALUE FUND (R1V ENHANCED)

SHAPIRO LIVING TRUST UAD 06/12/1996, STEVE TALMUD, TRUSTEE

SHAREBUILDER SECURITIES CORP

SHARON B. CHRISTHILF A/K/A SHARON ANNE BRADFORD

SHARON B. ZELL, SHARON B. ZELL FAMILY TRUST #2 DTD 1/21/94 RESTATED 5/10/96, SHARON B. ZELL, TRUSTEE

SHARON L. BOULTINGHOUSE TRUST, SHARON H. BOULTINGHOUSE, TRUSTEE

SHARON ROSENHAUSE

SHARON SPEAR

SHEET METAL WORKERS LOCAL 104 SUPPLEMENTAL PENSION PLAN, KAUFMAN & GOBLE SECURITY TRUST COMPANY, CUSTODIAN

SHEET METAL WORKERS' LOCAL 73 PENSION FUND A/K/A SHEET METAL WORKERS' LOCAL 73 PENSION TRUST, CURRENT TRUSTEE

SHEET METAL WORKERS NATIONAL PENSION FUND

SHEET METAL WORKERS PENSION TRUST OF NORTH CALIFORNIA ATPA, CURRENT TRUSTEE

SHEILA L PELLEGRINI 1961 REV, BANK OF AMERICA, N.A., TRUSTEE

SHELDON GRAY

SHELDON GRAY (PHL)

SHELDON S. FISCHER

SHELL CONTRIBUTORY PENSION FUND ("SCPF")

SHELL OVERSEAS CONTRIBUTORY PENSIONS FUND ("SOCPF")

SHERRIE M ARGIRION REV TRUST U/A DTD NOV 13, 1996, SHERRIE M ARGIRION, TRUSTEE

SHERRY L LONDON IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

SHERRY P. BRODER IRA A/K/A SHERRY P. BRODER TRUST U/A DTD 1/1/94, SHERRY BRODER, TRUSTEE

SHERRY P. BRODER IRA, DELAWARE CHARTER GUARANTEE & TRUST, CUSTODIAN

SHERWIN A. ZUCKERMAN IRA, PERSHING LLC, CUSTODIAN

SHIRLEY C. BEAL GEGENHEIMER

SHIRLEY J SPERLING AND SUSAN J MARTIN

SHIRLEY MIKA IRA ROLLOVER IRA SPOUSAL ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

SHIRO HIGASHI LIVING TRUST UA 04/10/96, SHIRO HIGASHI, TRUSTEE

SHUNDE THEE WONG

SI TRUST SERVICING

SICAV STATE STREET BANQ, PARIS

SIDNEY J SILVER WBNA COLLATERAL ACCOUNT

SIGMUND HSIAO AND JY-HWA YING

SIG-SS CBOE JOINT ACCOUNT, SUSQUEHANNA INVESTMENT GROUP, CUSTODIAN

SIL 1 LTD

SILVER POINT CAPITAL FUND L.P.

SILVER POINT CAPITAL OFFSHORE FUND, LTD.

SIMIN N. ALLISON

SIMON WOTTGE

SIMPSON FAMILY TRUST U/A 02/24/97, JAMES R SIMPSON, SUSAN J SIMPSON, TRUSTEES

SINCLAIR ELEVATOR 401K PROFIT SHARING TRUST DTD 12-29-1980, ROGER BAKER, TRUSTEE

SINCLAIR SMITH SIRAGUSA FM TRUST DATED 4/17/75, CURRENT TRUSTEE

SIRAGUSA ENTERPRISES LP

SIRAGUSA FOUNDATION

SIRAGUSA HOLDINGS INC

SIRIUS INTERNATIONAL INSURANCE CORPORATION

SISTERS OF CHARITY OF LEAVENWORTH NOT-FOR-PROFIT MASTER CUSTODY AGREEMENT

SISTERS OF SAINT CASIMIR

SISTERS OF THE BLESSED VIRGIN

SISTERS SERVANTS OF IMMACULATE HEART OF MARY FUND

SIX SIS AG

SJ MEMORIAL HOSPITAL -NORTHERN TRUST

SJC CAPITAL LLC

SJL MOORE LTD

SJUNDE AP-FONDEN PREMIUM SAVINGS FD AP7/CUSTODY SERVICES

SKANDIA INVESTMENT MANAGEMENT LIMITED

SKANDINAVISKA ENSKILDA BANKEN AB

SKYLAWN ENDOWMENT CARE FUND UTA DATED 02/09/1969

SLOYAN LIVING TRUST U/A 03/03/00, PATRICK J SLOYAN, PHYLLIS H. SLOYAN, TRUSTEES

SMITH AND REILLY FAMILY FOUNDATION U/A 7/14/99, SCOTT C SMITH, MARTHA R SMITH, TRUSTEES

SMITH, MOORE & CO.

SMOKE RISE FOUNDATION, INC.

SOBRATO FAMILY HOLDINGS, LLC

SOCIETE EUROPEENE DE BANQUE LUXEMBOURG S.A.

SOCIETE GENERALE ASSET MANAGEMENT ALTERNATIVE INVESTMENTS

SOCIETE GENERALE ASSET MANAGEMENT CO. (THROUGH MASTER TRUST BANK OF JAPAN)

SOCIETE GENERALE SECURITIES SERVICES

SOCIETY FOR THE DANISH OLD PEOPLES HOME

SOCIETY OF PHOTO OPTICAL

SOHIER WILLIAM D FBO ELEANOR ETAL-TR, BNY MELLON NA, TRUSTEE

SOL DIAMOND TRUST DATED 12/4/72, TERRY AND MURIEL DIAMOND, TRUSTEES

SOLOTKIN INV LTD, A PARTNERSHIP

SONDRA FETNER

SOPHIA A BANAKIS TRUST UA 11/27/00, SOPHIA A BANAKIS, TRUSTEE

SOPHIE & MALCOLM MCCONNELL

SOUTH CAROLINA RETIREMENT SYSTEM

SOUTH DAKOTA RETIREMENT SYSTEM

SOUTH SHORE HOSPITAL CORPORATION

SOUTHERN CALIFORNIA EDISON COMPANY NUCLEAR FACILITIES QUALIFIED CPUC DECOMMISSIONING MASTER TRUST

SOUTHERN CALIFORNIA UNITED FOOD AND COMMERCIAL WORKERS UNION AND FOOD EMPLOYERS JOINT PENSION FUND

SOUTHERN CALIFORNIA UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND FOOD EMPLOYERS JOINT PENSION TRUST FUND, CURRENT TRUSTEE

SOUTHERN COMPANY SYSTEM MASTER RETIREMENT TRUST, CURRENT TRUSTEE

SOUTHERN ELECTRICAL RETIREMENT FUND DTD 8/22/1975, PAUL GASS & LANNY SMITH, TRUSTEES

SOUTHERN NEVADA CULINARY & BARTENDERS PENSION TRUST FUND BARTENDERS LOCAL # 165, CURRENT TRUSTEE

SOUTHWEST CARPENTERS PENSION TRUST MCV, CURRENT TRUSTEE

SOUTHWEST CARPENTERS PENSION TRUST RUSSELL 3000 (736), CURRENT TRUSTEE

SOUTHWEST SECURITIES, INC.

SOVEREIGN BANK

SOWOOD ALPHA FUND LP

SOWOOD ALPHA FUND, LTD.

SOWOOD CAPITAL MANAGEMENT

SPDR DOW JONES TOTAL MARKET ETF

SPDR S&P 500 ETF

SPDR S&P MIDCAP 400 ETF TRUST A/K/A SPDR MIDCAP 400 TRUST, THE BANK OF NEW YORK MELLON, TRUSTEE

SPECTRUM TRADING LLC - MICHAEL M. TARPY JBO

SPECTRUM TRADING LLC - ZACHARY SHOWALTER JBO

SPENCER W BEARD AND SHARRON R BEARD

SPIEGEL & SPIEGEL PA MPP U/A 1/1/91, SAM SPIEGEL, SIMONE SPIEGEL, TRUSTEES

SPINDLE LIMITED PARTNERSHIP

SPINNING WHEEL LP

SPRINT CORPORATION

SPRINT CORPORATION MASTER TRUST, CURRENT TRUSTEE

SR LATIGO MASTER MA LTD CITCO FUND SVS(CAYMAN ISLANDS) LTD

SR LOEB ARBITRAGE MASTER MA LTD

SS&C TECHNOLOGIES, INC. F/K/A COGENT MANAGEMENT INC.

SSB EXCHANGE FUND - CONFIDENTIAL CLIENT

SSB EXCHANGE FUND (STATE STREET GLOBAL ADVISORS)

SSB-TRUST CUSTODY

SSCSIL RIC II US VALUE - TACOMA (RUSSELL INVESTMENTS)

SSGA IAM SHARES FUND (STATE STREET GLOBAL ADVISORS)

SSGA JAPAN CO LTD (STATE STREET GLOBAL ADVISORS)

SSGA S&P 500 INDEX FUND

SSGA S&P 500 INDEX FUND CTF

SSGA WORLD FUNDS (STATE STREET GLOBAL ADVISORS)

SSIHM CHARITABLE TRUST U/A 6/3/88, S SATTLER, HELEN E INGLES, TRUSTEE

SSM HEALTH CARE

ST. BARNABAS HOSPITAL & BRAKER MEMORIAL HOME EMPLOYEES CUSTODY

ST. FRANCIS FRIENDS OF THE POOR, INC

ST. GREGORY COLLEGE PREPARATORY SCHOOL

ST. IGNATIUS COLLEGE PREP

ST. JOSEPH INVESTMENT FUND LCV

ST. PETERSBURG COLLEGE FOUNDATION INC

STACEY LYNN ARTANDI IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

STACIE ELIZABETH FORD, ACTING TRUSTEE AND BENEFICIARY OF THE ALFRED C. GLASSELL JR. CHILDREN'S TRUST FOR STACIE ELIZABETH FORD

STAFFORD INVESTMENT MANAGEMENT LLC

STANFORD STODDARD IRR TRUST UA, STANFORD C STODDARD, TRUSTEE

STANLEY CZERWIEN AND BRIDGET GAWENDA JT WROS

STANLEY FREEHLING

STANLEY G. HARRIS CHARITY TRUST 6/13/45, BMO HARRIS BANK, N.A., TRUSTEE

STANLEY G. HARRIS CYNTHIA TRUST 6/13/45, BMO HARRIS BANK, N.A., TRUSTEE

STANLEY G. HARRIS MAR TRUST 6/17/65, BMO HARRIS BANK, N.A., TRUSTEE

STANLEY G. HARRIS MARIAN TRUST 6/13/45, BMO HARRIS BANK, N.A., TRUSTEE

STANLEY G. HARRIS RUTH TRUST 6/13/45, BMO HARRIS BANK, N.A., TRUSTEE

STANLEY G. HARRIS TRUST 6/10/46, BMO HARRIS BANK, N.A., TRUSTEE

STANLEY J. GRADOWSKI, JR. TRUST DTD 3-26-97, STANLEY J. GRADOWSKI, JR., TRUSTEE

STANLEY K FRIEDMAN

STANLEY L WALSKI

STANLEY LANE AND MILLIE LANE TIC

STANTON R. COOK - STANTON R. COOK CHARITABLE REMAINDER TRUST, CURRENT TRUSTEE

STARK & ROTH INC AS SUCCESSOR TO DEEPHAVEN CAPITAL MANAGEMENT LLC

STARK GLOBAL OPPORTUNITIES MASTER FUND LTD

STARK MASTER FUND LTD

STATE FARM FIRE & CASUALTY INSURANCE COMPANY

STATE FARM INSURANCE COMPANIES EMPLOYEE RETIREMENT TRUST, CURRENT TRUSTEE

STATE FARM LARGE CAP INDX

STATE FARM LIFE INSURANCE COMPANY

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

STATE FARM VARIABLE PRODUCT TRUST (LARGE CAP EQUITY INDEX FUND), CURRENT TRUSTEE

STATE GENERAL RESERVE FUND OF THE MINISTRY OF FINANCE OF SULTAN OF OMAN

STATE OF ALASKA SBS

STATE OF ARIZONA

STATE OF CONNECTICUT

STATE OF MICHIGAN EMPLOYEES' RETIREMENT SYSTEM

STATE OF WYOMING

STATE STREET BANK - GBL ALPHA EDGE COMMON TRST FD & TRUST COMPANY

STATE STREET BANK & TRUST BKR 997

STATE STREET BANK & TRUST CO PORTFOLIO #2769

STATE STREET BANK & TRUST CO. AS SUCCESSOR TO INVESTORS BANK & TRUST COMPANY

STATE STREET BANK & TRUST CO., TRUSTEE OR CUSTODIAN FOR CLOSED FUNDS

STATE STREET BANK & TRUST CO., TRUSTEE OR CUSTODIAN FOR CONFIDENTIAL CLIENT 1

STATE STREET BANK & TRUST CO., TRUSTEE OR CUSTODIAN FOR CONFIDENTIAL CLIENT 2

STATE STREET BANK & TRUST COMPANY

STATE STREET BANK LUXEMBOURG, S.A.

STATE STREET EQUITY 500 INDEX PORTFOLIO (STATE STREET GLOBAL ADVISORS)

STATE STREET EQUITY 500 INDEX PORTFOLIO A/K/A STATE STREET AMR

STATE STREET GLOBAL

STATE STREET GLOBAL ADVISORS FUND

STATE STREET GLOBAL ADVISORS INDEX FUNDS SICAV

STATE STREET GLOBAL ADVISORS, INC.

STATE STREET GLOBAL ADVISORS, INC. - RUSSELL 1000 VALUE CTF

STATE STREET MANAGEMENT S.A.

STATE STREET TRUST AND BANKING CO. LTD.

STATE TEACHERS RETIREMENT SYSTEM OF OHIO A/K/A STRS OHIO RETIREMENT BOARD

STATE UNIVERSITIES RETIREMENT SYSTEM

STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND, CURRENT TRUSTEE

STAVROU PARTNERS LP

STEAMFITTERS LOCAL 420

STEFANO CARBONIN

STEINMETZ, ROBERT C

STELLARONE BANK

STEPHAN P ROTHERMEL

STEPHANIA G FUSICK

STEPHANIE B FLYNN TRUST U/A DTD 11/14/62, STEPHANIE B. FLYNN & WILLIAM J. BYRNES, TRUSTEES

STEPHANIE CAHN

STEPHANIE F. HANSEN

STEPHANIE MURRAY LIVING TRUST, STEPHANIE MURRAY, TRUSTEE

STEPHANIE S ABRUTYN, MS&CO, CUSTODIAN

STEPHANIE TANSOR REV DEED OF TRUST UA DTD 12/1/2008, STEPHANIE TANSOR, TRUSTEE

STEPHEN D CARVER

STEPHEN D CARVER IRA, NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

STEPHEN E QUAST IRA 12/31/1995, STEPHEN E. QUAST, TRUSTEE

STEPHEN HERBERT KAELBER

STEPHEN HERBERT KAELBER IRA ROLLOVER FIDELITY MANAGEMENT TRUST CO CUST

STEPHEN J DONNELLY & CONSTANCE R DONNELLY

STEPHEN J DONNELLY IRA NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

STEPHEN JAMES ROTHERMEL

STEPHEN L. O'CONNOR, STEPHEN L. O'CONNOR TRUST, BANK OF AMERICA, N.A., TRUSTEE

STEPHEN M WEST TRAD IRA, WFBNA, CUSTODIAN

STEPHEN M. CHAPLIN AND CAROL M. CHAPLIN

STEPHEN MANHEIMER

STEPHEN MAUZER IRA DTD 02/11/02, THE NORTHERN TRUST COMPANY, CUSTODIAN

STEPHEN P. HOLMES AND BONNIE HOLMES TIC

STEPHEN R MILLER IRA NATIONAL FINANCIAL SERVICES LLC/FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

STEPHENS INC.

STERLING FINANCIAL TRUST COMPANY

STERN INVESTMENTS, LLC

STERNE AGEE & LEACH, INC.

STEVE H. KAGAN IRA ROLLOVER ACCOUNT, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

STEVEN A TANANBAUM

STEVEN A. BALLMER

STEVEN BACKER IRA, MERRILL LYNCH, PIERCE, FENNER & SMITH, CUSTODIAN FPO

STEVEN BALLARD HUNTLEY IRA ROLLOVER, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

STEVEN BURGER

STEVEN C ROBERTS & EVA LOUISE FRAZER

STEVEN DAVID LEVITT AND JEANNETTE LEVITT

STEVEN G. BOOTH

STEVEN J LOTZ IRA CONTRIBUTORY, CHARLES SCHWAB & CO INC, CUSTODIAN

STEVEN M MILLER ALCATEL-LUCENT SAVINGS PLAN FBO, FIDELITY MANAGEMENT TRUST CO, TRUSTEE

STEVEN M MILLER AND SUSAN CAROL MILLER

STEVEN M. SHIPKA FAMILY TRUST U/A, STEVEN M SHIPKA, TRUSTEE

STEVEN RAPKIN

STEVEN SOSNICK

STEVEN U LEE AND JUNG E LEE

STEVEN W. MORRIS

STEVEN WINKLER AND ANDE-ELLEN WINKLER

STEWARD FUNDS, INC. (STEWARD MULTI-MANAGER EQUITY FUND)

STEWARD FUNDS, INC. (STEWARD MULTI-MGR E)

STICHTING BEDRIJFSPENSIOENFONDS METALEKTRO

STICHTING BEDRIJFSTAKPENSIOENFONDS BEROEPSVERVOER US LARGE CAP EQUITY

STICHTING PENSIOENFONDS ABP

STICHTING PENSIOENFONDS CAMPINA LCV

STICHTING PENSIOENFONDS HOOGOVENS

STICHTING PENSIOENFONDS IBM NEDERLAND A/K/A IBM NETHERLANDS MSCI US

STICHTING PENSIOENFONDS MEDISCHE SPECIALISTEN

STICHTING PENSIOENFONDS OCE

STICHTING PENSIOENFONDS STORK

STICHTING PENSIOENFONDS VAN DE ABN AMRO BANK N.V.

STICHTING PENSIOENFONDS VOOR HUISARTEN - DOCTORS PENSION FUND SERVICES

STICHTING PENSIOENFONDS ZORG EN WELZIJN

STICHTING SHELL PENSIOENFONDS

STICHTING SHELL PENSIOENFONDS LCV

STIFEL NICOLAUS & CO. INC.

STINEHART LIVING TRUST UA DTD 05/19/89, WILLIAM STINEHART, JR. AND PATRICIA K. STINEHART, CO-TRUSTEES

STIX ENTERPRISES, LLC

STOCK BORROW

STOCK INDEX FUND, A SERIES OF VALIC COMPANY I F/K/A AIG RETIREMENT COMPANY I

STOCK INDEX PORTFOLIO, A SERIES OF THE PRUDENTIAL SERIES FUND, INC.

STRATEGIC FUNDS, INC. - DREYFUS ACTIVE MIDCAP FUND

STRATEGIC OPPORTUNITIES MASTER FUND LP

STRATEGY MASTER FUND (TRADEWORX, INC.)

STRONGBOW FUND LTD

STUART E CORLISS ROTH IRA, FIDELITY MANAGEMENT TRUST CO, CUSTODIAN

STUART JAY AND NANCY HOPE BABENDIR

SUBSIDIZED SCHOOLS PF / SSGA

SUC CO TUA ORTHWEIN FND APPRECIA

SUC TUW RICHARD KLINE FB BARBARA KLINE, SUSAN KINSELLA, TRUSTEES

SUDHIR K. JAIN

SUMITOMO MITSUI TRUST BANK (U.S.A.) LIMITED F/K/A SUMITOMO TRUST & BANKING CO. (U.S.A.)

SUMITOMO MITSUI TRUST BANK, LIMITED

SUMITOMO MITSUI TRUST BANK, LIMITED F/K/A THE SUMITOMO TRUST & BANKING CO. LTD. STB PEN XXX-XXXXX-0018-P, SUMITOMO MITSUI TRUST BANK, LIMITED, TRUSTEE

SUMITOMO MITSUI TRUST BANK, LIMITED F/K/A THE SUMITOMO TRUST & BANKING CO. LTD. STB PEN XXX-XXXXX-0059-K, SUMITOMO MITSUI TRUST BANK, LIMITED, TRUSTEE

SUMITOMO MITSUI TRUST BANK, LIMITED F/K/A THE SUMITOMO TRUST & BANKING CO. LTD. STB-PEN XXX-XXXXX-0004-C, SUMITOMO MITSUI TRUST BANK, LIMITED, TRUSTEE

SUMITOMO MITSUI TRUST BANK, LIMITED F/K/A THE SUMITOMO TRUST & BANKING CO. LTD. STB-PUB XXX-XXXXX-0001, SUMITOMO MITSUI TRUST BANK, LIMITED, TRUSTEE

SUN CREATIVE INVESTMENTS LP

SUN LIFE OF CANADA (OPPENHEIMER FUNDS INC.)

SUNAMERICA ASSET MANAGEMENT CORP.

SUNAMERICA SERIES TRUST - EQUITY OPPORTUNITIES PORTFOLIO

SUNAMERICA SERIES, INC. - SUNAMERICA STRATEGIC VALUE PORTFOLIO F/K/A FOCUSED VALUE PORTFOLIO

SUNGARD - CENTRAL TRUST & INVESTMENT CO

SUNGARD - NORTH FORK BK & TR

SUNGARD BROKERAGE & SECURITIES SERVICES LCC F/K/A ASSENT LLC

SUNTRUST BANK

SUNTRUST RETIREMENT 500 INDEX FUND

SUPERANNUATION FUNDS MANAGEMENT CORPORATION OF SOUTH AUSTRALIA

SURVIVOR'S TRUST U/A DTD 04/19/1991, AUDREY C. SMALL, TRUSTEE

SURVIVOR'S TRUST, BETTY H ROELAND, TRUSTEE

SURVIVORS'S TRUST CR 9/30/01 UA CHARLES R & ELIZABETH F REDMOND TRUST DTD 05/20/87, ELIZABETH F REDMOND, TRUSTEE

SUSAN A. JOHNSON

SUSAN B MAHAR TRUST U/A DTD 01/05/2000, SUSAN B MAHAR, KAREN L MAHAR, TRUSTEES

SUSAN B. HEYMANN

SUSAN COONEY KUHN

SUSAN D. KING

SUSAN GAIL HARWOOD TRUST U/A DTD 8-22-94, SUSAN GAIL HARWOOD, TRUSTEE

SUSAN H SHANE TRUST U/A DTD 08/09/1991, SUSAN H SHANE, TRUSTEE

SUSAN J CELLMER

SUSAN K CUNNINGHAM

SUSAN K. LIPMAN

SUSAN L HOUGH HENRY PHD

SUSAN LYNN OSTERMAN

SUSAN M MITCHELL

SUSAN M RODGERS TRUST U/A DTD 01/08/1991, SUSAN M. RODGERS, TRUSTEE

SUSAN S WHITE

SUSAN S. STRECKER FAMILY TRUST 5/1/98, SUSAN S. STRECKER, TRUSTEE

SUSQUEHANNA CAPITAL GROUP

SUSQUEHANNA INVESTMENT GROUP

SUTTONBROOK CAPITAL PORTFOLIO LP

SUZANNE C HUTCHINS TRUST UAD 01/16/1974, SUZANNE C HUTCHINS, TRUSTEE

SUZANNE GROSSINGER GOULD

SUZANNE ROSENTSWIEG

SUZANNE ROSENTSWIEG REVOC TRUST U/A/D 10-18-2010, SUZANNE ROSENTSWIEG, TRUSTEE

SWISS AMERICAN SECURITIES INC.

SWISS NATIONAL BANK (BANQUE NATIONALE SUISSE)

SWISS RE FINANCIAL PRODUCTS CORP.

SWOPE ENTERPRISES INC

SYBIL JINX ROBINSON SEPARATE PROPERTY TRUST U/A DTD 07/03/07, SYBIL JINX ROBINSON, TRUSTEE

SYKEHJELPS-OG PENSJONSORDNING FOR LEGER (SOP)

SYMETRA FINANCIAL CORPORATION

SYMETRA LIFE INSURANCE CO.

SYNERGISTIC ASSETS A PARTNERSHIP

SYNERGY CAPITAL MANAGEMENT LLC

SYNOVUS TRUST COMPANY, N.A.

SYSTEMATIC MANAGED ACCOUNTS (BEAR STEARNS)

T BANK LCV QP

T BANK-LCV-PT

T ROWE PRICE ASSOCIATES A/K/A SPINNINGROD & CO

T ROWE PRICE INSTL COM TRUST FD EQY INDEX TRUST

T ROWE PRICE STRUCTURED RESEARCH TRUST, T ROWE PRICE TRUST COMPANY, TRUSTEE

T. MICHAEL OSTERMAN

T. ROWE PRICE

T. ROWE PRICE ASSOCIATES, INC.

T. ROWE PRICE BALANCED FUND - LARGE CAP CORE FUND, INC.

T. ROWE PRICE BALANCED FUND, INC.

T. ROWE PRICE CAPITAL OPPORTUNITY FUND, INC.

T. ROWE PRICE DIVIDEND GROWTH FUND, INC. A/K/A SHERBET + CO

T. ROWE PRICE EQUITY INCOME FUND A/K/A TASKFORCE & CO

T. ROWE PRICE EQUITY INCOME PORTFOLIO

T. ROWE PRICE EQUITY INCOME TRUST

T. ROWE PRICE EQUITY INDEX TRUST

T. ROWE PRICE EQUITY SERIES, INC. A/K/A FOULARD AND CO

T. ROWE PRICE INDEX TRUST, INC. (T. ROWE PRICE EQUITY INDEX 500 FUND)

T. ROWE PRICE INDEX TRUST, INC. (T. ROWE PRICE TOTAL EQUITY MARKET INDEX FUND)

T. ROWE PRICE INTERNATIONAL

T. ROWE PRICE MID-CAP VALUE FUND, INC.

T. STANTON ARMOUR TR. 2/10/66, BMO HARRIS BANK, N.A., TRUSTEE

T.H. MCNABB TRUST UNDER WILL OF T.H. MCNABB, BETTY M. RICH, TRUSTEE

TAFT BROADCASTING COMPANY

TALIESIN CAPITAL PARTNERS LP

TALLEYRAND OFFSHORE MASTER FD LTD

TALON OPPORTUNITY PTNRS LP

TAMAR SECURITIES INC

TANGLEY C LLOYD

TANGLEY LLOYD 1935 TRUST NO. 1, TANGLEY LLOYD, TRUSTEE

TAO HUANG AND XIAOMEI HUANG

TAX MANAGED OPPORTUNITY FUND LLC

TBK PARTNERS, LLC

TD AMERITRADE CLEARING, INC.

TD ASSET MANAGEMENT INC (TD EMERALD POOLED U.S. FUND)

TD ASSET MANAGEMENT INC (TD U.S. INDEX FUND)

TD BANK, NA

TD EMERALD HEDGED U.S. EQUITY POOLED FUND TRUST, CURRENT TRUSTEE

TD EMERALD U.S. MARKET INDEX FUND

TD OPTIONS LLC

TD SECURITIES S&P 500 INDEX

TD U.S. LARGE CAP VALUE FUND

TD WATERHOUSE CANADA INC.

TE CALEL PORTFOLIO, LTD

TEACHERS' RETIREMENT SYSTEM OF LOUISIANA

TEACHERS' RETIREMENT SYSTEM OF LOUISIANA (INTL. LG. VALUE)

TEACHERS' RETIREMENT SYSTEM OF TEXAS

TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK

TEACHERS RETIREMENT SYSTEM OF THE STATE OF ILLINOIS

TEAMSTERS JOINT COUNCIL NO 83 OF VIRGINIA PENSION FUND

TEAMSTERS LOCAL 639 EMPLOYERS PENSION TRUST FUND

TEKTRONIX 401 K PLAN TRUST, FRANK T. MCFADEN, TRUSTEE

TEKTRONIX CASH BALANCE PLAN TR, CURRENT TRUSTEE

TELFORD CORPORATION

TELLURIDE CAPITAL MASTER FUND

TENNESSEE CONSOLIDATED RETIREMENT SYSTEM

TENSOR OPPORTUNITY LIMITED

TERENCE B. BRITTON

TERENCE RHODEN

TERI LEICHENGER

TERRA NOVA FINANCIAL, LLC

TERRENCE R MCGOVERN AND BARBARA T MCGOVERN

TERRENCE TOOHEY

TERRENCE W REEDER IRA ROLLOVER, FIDELITY MANAGEMENT TRUST CO CUST

TERRILL F COX & LORRAINE M COX TRUST U/A DTD 3/31/98, TERRILL F COX, LORRAINE M COX, TRUSTEES

TERRY D. DIAMOND TRUST DTD 5/7/86, TERRY DIAMOND, TRUSTEE

TERRY DIAMOND IRA, THE NORTHERN TRUST COMPANY, CUSTODIAN

TEWKSBURY INVESTMENT FUND LIMITED

TEWKSBURY INVESTMENT FUND LTD.

TEXAS CHRISTIAN UNIVERSITY

TEXAS EDUCATION AGENCY

TEXAS GUARANTEED STUDENT LOAN CORP MPP & TRUST U/A/D 7/1/80, CAL ABBOTT, TRUSTEE

TEXAS METHODIST FOUNDATION

TEXAS PRESBYTERIAN FOUNDATION

TEXAS SCOTTISH RITE HOSPITAL FOR CRIPPLED CHILDREN

TEXAS UTILITIES QUAL NDT PARTNERSHIP

TEXTRON INC MASTER TRUST, ELLEN HAYES, TRUSTEE

THE 2000 PECKHAM FAMILY TRUST U/A/D 07-14-2000, GEORGE J. PECKHAM, IMOGENE S. PECKHAM, TRUSTEES

THE A W K LIMITED PARTNERSHIP DATED 1/5/95

THE ALICIA P. GUGGENHEIM TRUST, CURRENT TRUSTEE

THE ALLIANCEBERNSTEIN PORTFOLIOS (ALLIANCEBERNSTEIN TAX-MANAGED FUNDS)

THE ALTERNATIVE FUND

THE AMERICAN ELECTRIC POWER MASTER RETIREMENT TRUST

THE ANGERMAN TRUST U/A DTD 03/05/1991, ALEXANDER ANGERMAN, JUDITH ANGERMAN, TRUSTEES

THE AUTOMOTIVE MECHINISTS PENSION TRUST FUND

THE BANK OF NEW YORK MELLON CORPORATION

THE BANK OF NEW YORK MELLON DECOMMISSIONING COLLECTIVE TRUST INVESTMENT PLAN–DT BROAD MARKET STOCK INDEX FUND, THE BANK OF NEW YORK MELLON, TRUSTEE

THE BANK OF NEW YORK MELLON EMPLOYEE BENEFIT COLLECTIVE INVESTMENT FUND PLAN, THE BANK OF NEW YORK MELLON, TRUSTEE

THE BANK OF NEW YORK MELLON, IN ITS INDIVIDUAL AND CUSTODIAL CAPACITIES

THE BANK OF NOVA SCOTIA

THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY

THE BOEING COMPANY EMPLOYEES RETIREMENT PLANS MASTER TRUST, CURRENT TRUSTEE

THE BURROUGHS WELLCOME FUND LCV

THE CANADIAN MEDICAL PROTECTIVE ASSOCIATION

THE CANYON VALUE REALIZATION MASTER FUND, L.P. (AS ASSIGNEE OF THE CANYON VALUE REALIZATION FUND (CAYMAN) LTD.)

THE CARMELITE FATHERS INC

THE CATALYST STRATEGIC EVENT

THE CHURCH PENSION FUND, IN ITS INDIVIDUAL AND TRUSTEE CAPACITIES

THE COLLECTORS FUND LP

THE CONNABLE OFFICE, INC.

THE CONSOLIDATED EDISON RETIREMENT PLAN, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

THE DAN MURPHY FOUNDATION

THE DANISH HOME 8D-101, CUSTODIAN

THE DCLA FUNDS LLC

THE DFA GROUP TRUST

THE DFA INVESTMENT TRUST COMPANY -- TAX-MANAGED U.S. EQUITY SERIES

THE DFA INVESTMENT TRUST COMPANY -- TAX-MANAGED U.S. MARKETWIDE VALUE SERIES

THE DFA INVESTMENT TRUST COMPANY -- U.S. LARGE CAP VALUE SERIES

THE DIAMOND FAMILY FOUNDATION

THE DREYFUS CORPORATION

THE DREYFUS/LAUREL FUNDS INC. (DREYFUS BSC S&P 500 ST INDX FD)

THE EASTERN BAND OF CHEROKEE INDIANS MINORS & INCOMPETENCE FUND

THE EFFIE AND WOFFORD CAIN FOUNDATION

THE FBO DUNAWAY FAMILY TRUST U/A/D 07-05-1991, MICHAEL W DUNAWAY, TRUDY V DUNAWAY, TRUSTEES

THE FRANCISCAN MISSIONARY UNION

THE GABELLI EQUITY TRUST INC

THE GDL FUND F/K/A GABELLI GLOBAL DEAL FUND

THE GLASSELL FAMILY FOUNDATION INC., AS BENEFICIARY OF THE ESTATE OF ALFRED C. GLASSELL JR.

THE GLENMEDE TRUST COMPANY, N.A.

THE GLOVER TRUST DTD 01-19-90, CAROL T GLOVER, TRUSTEE

THE GOVERNOR AND COMPANY OF THE BANK OF IRELAND

THE GRACE TRUST, DUANE SHELTON TYDINGS, JOHN HEALEY, TRUSTEES

THE GUARDIANS OF NEW ZEALAND SUPERANNUATION AS MANAGER AND ADMINISTRATOR OF THE NEW ZEALAND SUPERANNUATION FUND

THE HARTFORD FINANCIAL SERVICES GROUP, INC. (COLI POOLED S & P 500)

THE HARTMARX RETIREMENT INCOME PLAN/TRUST, PENSION BENEFIT GUARANTEE CORPORATION, SUCCESSOR TRUSTEE

THE HELEN HAY WHITNEY FOUNDATION

THE HENSHEL FOUNDATION SPECIAL ACCOUNT

THE JACOB & CHARLOTTE LEHRMAN FOUNDATION

THE KAPLEN FOUNDATION

THE KROGER COMPANY MASTER RETIREMENT TRUST, CURRENT TRUSTEE

THE L/S MARKET NEUT FD, A SEP

THE LATTNER FAMILY FOUNDATION

THE LIGHTHOUSE FOR THE BLIND, INC. MASTER RETIREMENT TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

THE MAINSTAY FUNDS, AS ISSUER OF A SERIES KNOWN AS MAINSTAY COMMON STOCK FUND

THE MAINSTAY FUNDS, AS ISSUER OF A SERIES KNOWN AS MAINSTAY EQUITY INDEX FUND

THE MARITAL TRUST OF THE DE GOLDSMITH FAMILY TRUST, ERIC DE GOLDSMITH, MURIEL DE GOLDSMITH, TRUSTEES

THE MARYKNOLL SISTERS OF ST DOMINIC INC-MARYKNOLL NY

THE MCCONNELL FOUNDATION

THE MEDVIN FAMILY TRUST U/A/D 02/03/88, ALVIN G. MEDVIN, DEBORAH R. MEDVIN, TRUSTEES

THE MERGER FUND (WESTCHESTER CAPITAL MANAGEMENT)

THE MERGER FUND VL (WESTCHESTER CAPITAL MANAGEMENT)

THE MICHAEL ARGIRION REVOCABLE TRUST UNDER AGREEMENT DATED NOV 13, 1996, MICHAEL ARGIRION, TRUSTEE

THE MINNESOTA STATE BOARD OF INVESTMENT

THE NBLN LIMITED PARTNERSHIP

THE NEW CHURCH INVESTMENT FUND

THE NEW YORK PROVINCE OF THE SOCIETY OF JESUS

THE NORTHERN TRUST COMPANY OF CONNECTICUT AFGT MID CAP VALUE FUND

THE NORTHERN TRUST COMPANY OF CONNECTICUT EBT MCV

THE NORTHERN TRUST COMPANY PENSION TRUST, KIM SOPPI, TRUSTEE

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

THE OPPENHEIMER FAMILY FDN

THE PENNSYLVANIA STATE UNIVERSITY MASTER TRUST, PENNSYLVANIA STATE UNIVERSITY, TRUSTEE

THE PENSION BOARDS - UNITED CHURCH OF CHRIST, INC.

THE PEOPLES BANK

THE PETERS CORPORATION

THE PNC FINANCIAL SERVICES GROUP, INC. F/K/A NATIONAL CITY BANK

THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

THE PRIVATEBANK AND TRUST COMPANY

THE PROMOTION AND MUTUAL AID CORPORATION FOR PRIVATE SCHOOLS OF JAPAN, RESONA BANK, LIMITED, TRUSTEE

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

THE READER'S DIGEST ASSOCIATION, INC. RETIREMENT PLAN, THE NORTHERN TRUST COMPANY, TRUSTEE

THE RESNICK FAMILY LP

THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES

THE ROWAN FAMILY TRUST SURVIVORS SHARE U/A DTD 03/23/1993, MARILYN ROWAN, TRUSTEE

THE ROYAL BANK OF SCOTLAND N.V. F/K/A ABN AMRO BANK N.V.

THE ROYAL BANK OF SCOTLAND PLC (ROYAL BANK OF SCOTLAND FINANCIAL MARKETS)

THE RSZ TRUST U/A/D 06/02/99, RICHARD S ZIMAN, TRUSTEE

THE S.O.G. FUND - INTERNATIONAL

THE SALVATION ARMY - CENTRAL TERRITORY

THE SALVATION ARMY - SOUTHERN TERRITORY

THE SCHWAB TRUST A CHARITABLE U/A DTD 05/23/1995, MARY B SCHWAB, TRUSTEE

THE SEAWATER FOUNDATION

THE SEEING EYE, INC.

THE SERVANTS OF RELIEF FOR INCURABLE CANCER

THE SOCIETY OF JESUS OF NEW ENGLAND

THE SOLIDAGO FOUNDATION

THE SOUTHERN COMPANY SYSTEM MASTER RETIREMENT TRUST, CURRENT TRUSTEE

THE SPURGEON FAMILY LIMITED PARTNERSHIP

THE STATE BOARD OF ADMINISTRATION OF FLORIDA, AS INVESTMENT FIDUCIARY FOR: THE FLORIDA RETIREMENT SYSTEM TRUST FUND, THE LAWTON CHILES ENDOWMENT FUND, THE FLORIDA EDUCATION FUND, THE FLORIDA STATE UNIVERSITY RESEARCH FOUNDATION, AND THE DIVISION OF BLIND SERVICES

THE THEOSOPHICAL INVESTMENT TRUST, FLOYD KETTERING, TRUSTEE

THE TRUST OF MARY I BALDWIN RESTATED U/A/D 02/07/95, MARY ISAACS BALDWIN, TRUSTEE

THE TRUSTEES OF RESERVATIONS

THE UNIVERSITY OF MISSOURI RETIREMENT, DISABILITY AND DTH BENEFIT PLAN, CURATORS OF THE UNIVERSITY OF MISSOURI, TRUSTEE

THE UNIVERSITY OF TENNESSEE

THE VANGUARD GROUP, INC.

THE VANTAGEPOINT FUNDS (VANTAGEPOINT 500 STOCK INDEX FUND)

THE VANTAGEPOINT FUNDS (VANTAGEPOINT ASSET ALLOCATION FUND)

THE VANTAGEPOINT FUNDS (VANTAGEPOINT BROAD MARKET INDEX FUND)

THE VANTAGEPOINT FUNDS (VANTAGEPOINT EQUITY INCOME FUND)

THE VANTAGEPOINT FUNDS (VANTAGEPOINT GOLDMAN)

THE VANTAGEPOINT FUNDS (VANTAGEPOINT MELLON CAPITAL MANAGEMENT)

THE VANTAGEPOINT FUNDS (VANTAGEPOINT T. ROWE PRICE)

THE WALT DISNEY COMPANY

THE WALTERS ART GALLERY, INC. D/B/A THE WALTERS ART MUSEUM

THE WALTERS ART GALLERY, INC. D/B/A THE WALTERS ART MUSEUM A/K/A WALTERS ART GALL EES CON TRP, CURRENT TRUSTEE

THE WORKERS COMPENSATION BOARD - ALBERTA

THE ZOOLOGICAL SOCIETY OF THE PALM BEACHES, INC.

THEDACARE, INC. PENSION PLAN

THELMA B. AND THOMAS P. HART FOUNDATION

THELMA ORSHEK TESTAMENTARY TRUST, US BANK N.A., TRUSTEE

THEODORE D NOVAK IRA ROLLOVER, THE NORTHERN TRUST COMPANY, CUSTODIAN

THEODORE D NOVAK REVOC TRUST U/A 12/12/90, THEODORE D NOVAK, TRUSTEE

THEODORE ROTHSTEIN

THERESE M CUSHING AND JAMES E CUSHING JR

THIRD AVENUE SPECIAL SITUATIONS MASTER FUND LP

THIRD MILLENNIUM TRADING LLC

THOMAS B O'KEEFE

THOMAS B. SHERRILL, III

THOMAS C HUNT

THOMAS C. MCKENNY, TRUSTEE MANAGED

THOMAS CARTTER LUPTON TRUST U/W FBO JOHN T. FONTAINE & ISSUE, BRETT W ROUSCH, TRUSTEE

THOMAS D LEACH 401(K) SAVINGS PLAN

THOMAS D. UTZ & DARLENE M. UTZ

THOMAS DECEDENT'S TRUST U/D/T 6/12/1981, WILLIAM F. THOMAS, TRUSTEE

THOMAS E BAK IRA R/O, MESIROW FINANCIAL, INC, CUSTODIAN

THOMAS E MCGIVERN IRA R/O, FCC, CUSTODIAN

THOMAS E. EHLMANN AND KELLY LA CHANCE EHLMANN

THOMAS E. MITCHELL

THOMAS E. MITCHELL, III

THOMAS E. SCHAEFER IRA, AMERIPRISE TRUST COMPANY F/K/A H&R BLOCK FINANCIAL ADVISORS, CUSTODIAN

THOMAS E. SCHAEFER REV TRUST U/A/D 12/16/96, THOMAS E SCHAEFER, TRUSTEE

THOMAS G DUBIN REVOCABLE TRUST UA 10/19/99, THOMAS G. DUBIN, TRUSTEE

THOMAS G. AYERS TRUST, JOHN S. AYERS AND CATHERINE A. ALLEN, TRUSTEES

THOMAS J BURKE JR IRA, DELAWARE CHARTER GUARANTEE & TRUST, CUSTODIAN

THOMAS J PENCE

THOMAS J. MAJORANA CGM IRA, STATE STREET BANK AND TRUST COMPANY, CUSTODIAN

THOMAS J. OSTERMAN TRUST U/A/D 04/04/91, THOMAS J. OSTERMAN, TRUSTEE

THOMAS LEACH

THOMAS LEACH AND TRACY LEACH

THOMAS M. OWENS

THOMAS P O'KEEFE

THOMAS READ

THOMAS S ANDERSON

THOMAS SCHUBA AND JUDITH SCHUBA

THOMAS T BYRD TRUST UA 01/25/82 HARRY F BYRD JR REVOCABLE TRUST, HARRY F BYRD JR, TRUSTEE

THOMAS W BEILKE

THOMAS WHALEN REV. TRUST U/A/D 12/21/96, THOMAS J. WHALEN, TRUSTEE

THOMASYNE C. HUBERT TOD THOMAS G. HUBERT

THOMPSON E FLETCHER AND SUSAN A FLETCHER

THOMPSON TRUST UA 09 26 12, DEVERE BENDIXEN, SAM O'BRIEN, G THOMAS SULLIVAN, TRUSTEES

THORN DALE S&P 500 INDEX, LLC

THRIFT PLAN FOR THE EMPLOYEES OF THE FEDERAL RESERVE SYSTEM

THRIVENT FINANCIAL FOR LUTHERANS F/K/A LUTHERAN BROTHERHOOD

THRIVENT SERIES FUND, INC., THRIVENT BALANCED PORTFOLIO

THRIVENT SERIES FUND, INC., THRIVENT LARGE CAP INDEX PORTFOLIO

TIIA -SEPARATE ACCOUNT VA-1 STOCK INDEX ACCOUNT

TIAA-CREF FUNDS

TIAA-CREF FUNDS TIAA-CREF EQUITY INDEX FUND

TIAA-CREF FUNDS TIAA-CREF LARGE CAP VALUE INDEX FUND

TIAA-CREF FUNDS TIAA-CREF MID-CAP BLEND INDEX FUND

TIAA-CREF FUNDS TIAA-CREF MID-CAP VALUE INDEX FUND

TIAA-CREF FUNDS TIAA-CREF S&P 500 INDEX FUND

TIAA-CREF FUNDS TIAA-CREF SOCIAL CHOICE EQUITY FUND

TIAA-CREF INSTITUTIONAL MUTUAL FUNDS

TIAA-CREF LIFE FUNDS - SOCIAL CHOICE EQUITY FUND

TIAA-CREF LIFE FUNDS STOCK INDEX FUND

TIAN F RONG

TIDEN DESTINY MASTER FUND LIMITED

TIF LLC

TILLMAN FAMILY TRUST U/A 07/29/1980, INA TILLMAN, JONATHAN TILLMAN, EUGENE TILLMAN, TRUSTEES

TIMBER HILL LLC

TIME WARNER INC. MASTER PENSION TRUST, CURRENT TRUSTEE

TIMES MIRROR SAVINGS PLUS PLAN

TIMOTHY J LANDON 401(K) SAVINGS PLAN

TIMOTHY L O'ROURKE IRA, FIDELITY MANAGEMENT TRUST CO CUST

TIMOTHY LANDON

TIMOTHY LANDON AND ELIZABETH LANDON

TIMOTHY M DONAHUE AND JAYNE N DONAHUE

TIMOTHY R. KENNEDY

TIMOTHY R. KENNEDY AND SUSAN M. KENNEDY

TIMOTHY S. PECARO AND SUSAN S. PECARO

TINTINA INVESTMENT INC

TLCD LIST LP

TLCD LTD

TMI

TMVH EMPLOYEE RETIREMENT PL RPM003, AST CAPITAL TRUST CO, TRUSTEE

TOA REINSURANCE

TOMMIE L CORDERO TRUST UA 12/09/90, DOROTHY FLIBBERT, TRUSTEE

TOMPKINS FINANCIAL CORPORATION F/K/A TOMPKINS TRUSTCO, INC.

TORO TRADING LLC

TORONTO DOMINION BANK

TOURO INFIRMARY FOUNDATION

TOWER NORTH AMERICAN EQUITY FUND

TOWER TRUST COMPANY

TOWERVIEW LLC

TRACK DATA SECURITIES CORPORATION

TRADELINK HOLDINGS LLC A/K/A TRADELINK LLC

TRADESTATION SECURITIES, INC.

TRADEWORX ULTRA SELECT LP

TRAITS OMNI

TRANSAMERICA PARTNERS MID VALUE PORTFOLIO F/K/A TRANSAMERICA PARTNERS MID-CAP VALUE F/K/A DIVERSIFIED INVESTORS MID-CAP VALUE

TRANSAMERICA SERIES TRUST, AS ISSUER OF THE SERIES TRANSAMERICA BLACKROCK LARGE CAP VALUE VP F/K/A AEGON/TRANSAMERICA T. ROWE PRICE EQUITY INCOME VP

TRAUB TRADING LLC

TRE PENSION EFT ACCOUNT PENSION PAYMENT SYSTEM

TREASURER OF STATE OF OHIO - BUREAU OF WORKERS' COMPENSATION

TREASURER OF THE STATE OF N.C.

TREASURER OF THE STATE OF NC INDEX, FIRST CITIZENS BANK, TRUSTEE

TREDEGAR CORPORATION MASTER TRUST, CURRENT TRUSTEE

TREDJE AP-FONDEN

TREVOR GRAY AND EDNA GRAY JTWROS

TRIBUNE COMPANY 401(K) SAVINGS PLAN

TRIBUNE COMPANY MASTER RETIREMENT SAVINGS TRUST, CURRENT TRUSTEE

TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN

TRINITY DERIVATIVES GROUP LLC

TRINITY HEALTH CORPORATION

TRINITY HEALTH PENSION PLAN

TROON & CO A PARTNERSHIP

TROWEL TRADES S&P 500 INDEX FUND

TRUST & CUSTODY SERVICES BANK, LTD.

TRUST COMPANY OF ILLINOIS

TRUST COMPANY OF THE SOUTH - SANIBEL CAPTIVA TRUST CO.

TRUST COMPANY OF TOLEDO, N.A.

TRUST D FOR A PORTION OF THE ASSETS OF THE KODAK RET INC FD PLN, CURRENT TRUSTEE

TRUST FOR THE BENEFIT OF MARY ANNE VYDRA U/A/D 03-10-2006, MARY ANNE VYDRA, TRUSTEE

TRUST FUND NUMBER 2381011, STATE STREET TRUST AND BANKING CO. LTD., TRUSTEE

TRUST U/A DATED 12/13/76, CHARLES JOSEPH DE SIEYES, FIDUCIARY TRUST COMPANY INTERNATIONAL, UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEES

TRUST U/A DATED 12/13/76, DAVID C. DE SIEYES, FIDUCIARY TRUST COMPANY INTERNATIONAL, UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEES

TRUST U/A DATED 12/19/77, JOHN T. RISLEY, FIDUCIARY TRUST COMPANY INTERNATIONAL, UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEES

TRUST U/W THE GREENLEAF TRUST, PRIVATE TRUST CORP LTD, TRUSTEE

TRUSTEES OF BOSTON COLLEGE

TRUSTEES OF ST. PATRICK'S CATHEDRAL LCV

TRUSTEES OF WATCH HOUSE TRUST

TUDOR G VWAP

TWEEDY BROWNE VALUE FUND

TWEEDY, BROWNE FUND INC.

TWIN CITY PIPE TRADES PENSION FUND LCV

TWIN DISC INC. LCV

TWIN SECURITIES, INC.

TYGH CAPITAL MANAGEMENT, INC.

U OF A HEALTH SERVICES FOUNDATION

U.A. LOCAL 63/353 JOINT PENSION TRUST FUND, CURRENT TRUSTEE

U.E. DECOM MO

U.S. ALL CAP FUND, FAMILY LIMITED PARTNERSHIP

U.S. BANK NATIONAL ASSOCIATION

U.S. CONFERENCE OF CATHOLIC BISHOPS

U.S. EQUITY MARKET SUDAN FREE EQUITY INDEX FUND

U.S. LARGE COMPANY EQUITY FUND

U.S. LARGE COMPANY PORTFOLIO OF DIMENSIONAL INVESTMENT GROUP INC.

UA S & P 500 INDEX FDSEI GLOBAL INVESTMENTS

UBS (LUXEMBOURG) S A

UBS AG - UBS (CH) IF EQUITIES USA PASSIVE

UBS AG - UBS (CH) IF2 EQUITIES USA PASSIVE

UBS AG (SWISS PORTFOLIO XXXX3200)

UBS AG (SWISS PORTFOLIO XXXX4400)

UBS AG (SWISS PORTFOLIO XXXX5700)

UBS AG (SWISS PORTFOLIO XXXX6900)

UBS AG (SWISS PORTFOLIO XXXX7700)

UBS AG (SWISS PORTFOLIO XXXX8500)

UBS AG, STAMFORD BRANCH (AS CUSTODIAN FOR UBS AG LONDON)

UBS BANK AG, JERSEY BRANCH

UBS BANK AG, NEW YORK BRANCH

UBS ETF MARKET MAKING

UBS EVENT DRIVEN PRG

UBS FINANCIAL SERVICES, INC.

UBS GLOBAL ASSET MANAGEMENT UBS S&P 500 INDEX FUND

UBS GLOBAL EQUITY

UBS LIFE USA TRACKER FUND

UBS MULTI-MANAGER LARGE CAP VALUE

UBS SECURITIES LLC AS SUCCESSOR TO UBS SECURITIES INC

UHS/BERNSTEIN LARGE CAP, FIRST CITIZENS BANK, TRUSTEE

ULYSSES CHENG

UMB BANK, N.A.

UMC BENEFIT BOARD, INC

UMWA 1974 PENSION TRUST, CURRENT TRUSTEE A/K/A UMWA HEALTH AND RETIREMENT

UNICO ASSET MANAGEMENT

UNION BANK & TRUST COMPANY

UNION BANK, N.A. F/K/A UNION BANK OF CALIFORNIA

UNION ELECTRICAL INDUSTRY MASTER TRUST, TINA THOMAN, TRUSTEE

UNION INVEST LUXEMBOURG S.A.

UNIONTOWN HOSPITAL

UNISYS MASTER TRUST, BANK OF NEW YORK MELLON, TRUSTEE

UNITARIAN UNIVERSALIST ASSOCIATION

UNITE HERE NATIONAL RETIREMENT FUND

UNITED AIR LINES, INC. PILOTS' DIRECTED ACCOUNT PLAN

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA

UNITED ASSOCIATION S&P 500 INDEX FUND - ADVISORS INNER CIRCLE FUND

UNITED AUTO WORKERS LOCAL UNION NO. 259

UNITED BANK INC

UNITED BROTHERHOOD OF CARPENTERS

UNITED DEFENSE L.P. MASTER PENSION TRUST, CURRENT TRUSTEE

UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION - INDUSTRY PENSION FUND

UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION INDUSTRY PENSION FUND

UNITED FOOD & COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST PENSION FUND

UNITED STATES MSC COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

UNITED TEAMSTERS PENSION FUND "A" LCV

UNITED TECHNOLOGIES CORP. MASTER RETIREMENT TRUST, CURRENT TRUSTEE

UNIVERSITY OF ALASKA FOUNDATION

UNIVERSITY OF INDIANAPOLIS ENDOWMENT

UNIVERSITY OF MIAMI GROWTH POOL

UNIVERSITY OF MINNESOTA

UNIVERSITY OF MINNESOTA FOUNDATION

UNIVERSITY OF MISSOURI RET DSBLTY & DTH BEN PL, UNIVERSITY OF MISSOURI BOARD OF CURATORS, TRUSTEES

UNIVERSITY OF TORONTO MASTER TRUST, GOVERNING COUNCIL OF UNIVERSITY OF TORONTO, TRUSTEE

UNIVEST

US BANCORP INVESTMENTS, INC.

US BANCORP PENSION PLAN, U.S. BANK NATIONAL ASSOCIATION, TRUSTEE

US BANK - FIRST AMERICAN EQUITY INDEX

US BANK PENSION PLAN EQUITY INDEX

US EQUITY FUND, THE ROYAL BANK OF SCOTLAND PLC, AS HOLDER OF ACCOUNTS

US EQUITY MARKET FUND A

US EQUITY MARKET FUND B

US EQUITY PASSIVE 2 OF GLOBAL EQUITY INVESTMENT TRUST

US EQUITY VALUE POOL

US PHARMACOPEIAL CONVENTION, INC.

US VALUATION TILTED STRATEGY COMMON TRUST FUND, STATE STREET BANK AND TRUST COMPANY, TRUSTEE

USA FUND LIMITED PARTNERSHIP

USA FUND LLLP

USAA INVESTMENT COMPANY

USAA INVESTMENT MANAGEMENT COMPANY

USAA MUTUAL FUND INC. (USAA INCOME STOCK FUND)

USAA MUTUAL FUND, INC.

USAA MUTUAL FUNDS TRUST, CURRENT TRUSTEE

USHER CHARITABLE FOUNDATION

USUF, FLORENCE HENDRICK WRAY, EDWIN NEWTON WRAY, LOIS WRAY ROWE

UTAH RETIREMENT SYSTEMS

UTICA MUTUAL INSURANCE COMPANY

V DAVIS HUNT, SANDRA GRAY HUNT POA

V H ENERGY LLC

VALDEMAR DANIELSON MARITAL TRUST 32223, JEAN ANDERSON, TRUSTEE

VALUE FUND, A SERIES OF FIRST INVESTORS EQUITY FUNDS

VALUE FUND, A SERIES OF FIRST INVESTORS LIFE SERIES FUNDS

VALUE GROWTH PORTFOLIO OF THE EQUITRUST VARIABLE INSURANCE SERIES FUND

VALUE LINE INCOME & GROWTH FUND, INC. F/K/A VALUE LINE INCOME FUND

VANDERBILT PARTNERS, LLC.

VANGUARD FENWAY FUNDS (VANGUARD EQUITY INCOME FUND)

VANGUARD FIDUCIARY TRUST COMPANY (EMPLOYEE BENEFIT INDEX FUND)

VANGUARD FIDUCIARY TRUST COMPANY (RUSSELL 1000 INDEX TRUST)

VANGUARD FIDUCIARY TRUST COMPANY (RUSSELL 3000 INDEX TRUST)

VANGUARD FIDUCIARY TRUST COMPANY (VANGUARD COMPANY STOCK 21)

VANGUARD FIDUCIARY TRUST COMPANY (VANGUARD TOTAL STOCK MARKET INDEX FUND)

VANGUARD FIDUCIARY TRUST COMPANY, AS TRUSTEE OF ITS SPONSORED AND MANAGED COLLECTIVE INVESTMENT FUNDS

VANGUARD INDEX FUNDS (VANGUARD INDEX 500 FUND)

VANGUARD INDEX FUNDS (VANGUARD LARGE CAP INDEX FUND)

VANGUARD INDEX FUNDS (VANGUARD MID-CAP INDEX FUND)

VANGUARD INDEX FUNDS (VANGUARD MID-CAP VALUE INDEX FUND)

VANGUARD INDEX FUNDS (VANGUARD TOTAL STOCK MARKET INDEX FUND)

VANGUARD INDEX FUNDS (VANGUARD VALUE INDEX FUND)

2855453.1

VANGUARD INSTITUTIONAL INDEX FUNDS (VANGUARD INSTITUTIONAL INDEX FUND)

VANGUARD INSTITUTIONAL INDEX FUNDS (VANGUARD INSTITUTIONAL TOTAL STOCK MARKET INDEX FUND)

VANGUARD MALVERN FUNDS (VANGUARD ASSET ALLOCATION FUND)

VANGUARD QUANTITATIVE FUNDS (VANGUARD GROWTH & INCOME FUND)

VANGUARD QUANTITATIVE FUNDS (VANGUARD STRUCTURED LARGE-CAP EQUITY FUND)

VANGUARD SCOTTSDALE FUNDS (VANGUARD FIDUCIARY TRUST COMPANY, RUSSELL 1000 VALUE)

VANGUARD TAX-MANAGED FUNDS (VANGUARD TAX MANAGED GROWTH & INCOME FUND)

VANGUARD VALLEY FORGE FUNDS (VANGUARD BALANCED INDEX FUND)

VANGUARD VALUE INDEX FUND EQUITY INDEX

VANGUARD VARIABLE INSURANCE FUNDS (VANGUARD VVIF EQUITY FUND INDEX)

VANGUARD VARIABLE INSURANCE FUNDS (VANGUARD VVIIF MIDCAP INDEX FUND)

VANGUARD VARIABLE INSURANCE FUNDS (VVIF-EQUITY INCOME VGI)

VANGUARD WHITEHALL FUNDS (VANGUARD HIGH DIVIDEND YIELD INDEX FUND)

VANGUARD WINDSOR FUNDS (VANGUARD WINDSOR II FUND)

VANGUARD WORLD FUNDS (VANGUARD CONSUMER DISCRETIONARY FUND)

VANGUARD WORLD FUNDS (VANGUARD FTSE SOCIAL INDEX FUND)

VARIABLE ANNUITY LIFE INSURANCE CO.

VEBA PARTNERSHIP N LP

VEBA PARTNERSHIP X L.P.

VERIZON INVESTMENT MANAGEMENT CORP.

VERIZON MASTER SAVINGS TRUST, CURRENT TRUSTEE

VERMONT STATE EMPLOYEES RETIREMENT SYSTEM

VERN M STRICKLER

VERNA R. HARRAH, VERNA R. HARRAH TRUST SPECIAL ACCOUNT DTD 9/5/86, VERNA HARRAH, TRUSTEE

VERVOERFGR/LSV/US LCV

VESTER T HUGHES JR

VICIS CAPITAL MASTER FUND

VICKI S. BENJAMIN

VICTOR F. GANZI AND PATRICIA M. GANZI

VICTOR GROSSI TRUST UA DTD 05/08/98 FBO VICTOR GROSSI, VICTOR GROSSI, TRUSTEE

VICTORIA BADALI DEC OF LIVING FAMILY TRUST UAD 12/9/98, VINCENT A BADALI AND VINCENT A G BADALI, TRUSTEES

VICTORIA H. SCOTT TRUST DATED 12-01-2000, VICTORIA H. SCOTT, TRUSTEE

VIKRAM PARVATANENI

VILMA L CHANTILES AND NICHOLAS G CHANTILES

VINCENT ADONE IRA, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

VINCENT CAMUTO GABELLI VALUE

VINCENT J SCHODOLSKI

VINCENT T TURITTO

VIOLA R KOENIG TRUST U/A DTD 09/22/1999, VIOLA R. KOENIG, TRUSTEE

VIOLET PAYNE AND LESLIE PAYNE

VIOLET R MARGLY

VIP INDEX 500 FUND, A SERIES OF VARIABLE INSURANCE PRODUCTS FUND II

VIRGIL SMITH RAY

VIRGINIA B. SALL

VIRGINIA COLLEGE SAVINGS PLAN

VIRGINIA KEARNS REVOCABLE TRUST, VIRGINIA A. KEARNS AND THE NORTHERN TRUST COMPANY, TRUSTEES

VIRGINIA M CERULLI LIVING TRUST U/A DTD 05/03/2000, V CERULLI & C CERULLI, TRUSTEES

VIRGINIA PEERY IRR TRUST UA, VIRGINIA PEERY, TRUSTEE

VIRGINIA POPE

VIRGINIA RETIREMENT SYSTEM

VIRGINIA SONNENSCHEIN TRUST, VIRGINIA SONNENSCHEIN, TRUSTEE

VITO CREMONA

VIVIAN B. LARSSON TRUST, THE NORTHERN TRUST COMPANY, TRUSTEE

VIVIAN PAPPAS IRA ROLLOVER, THE NORTHERN TRUST COMPANY, CUSTODIAN

VMI INVESTMENT HOLDINGS LLC C/O VMI FOUNDATION

VTRADER PRO, LLC

W B BROWDER JR

W ELLIS GIDDENS LIVING TRUST UAD, WILLIAM WILLIS GIDDENS, TRUSTEE

W. JEROME FRAUTSCHI LIVING TRUST, RHONA VOGEL, TRUSTEE

W. MILTON JR. TRUST U/W FBO ANNA LIVINGSTONE, M&T BANK, TRUSTEE

W. WRIGLEY JR CHRISTMAS TRUST, WILLIAM WRIGLEY, JR., TRSUTEE

W.G. LASSITER, JR. AND ANEICE R. LASSITER

W.L. PUTNAM PRIZE FUND

W.P. LAUGHLIN, W.P. LAUGHLIN TRUST, MICHIGAN TRUST BANK, TRUSTEE

WABASH/HARVEST PARTNERS, L.P. F/K/A WABASH HARVEST PARTNERS LP

WALTER B. GLADSTONE

WALTER BAUM

WALTER C J PANG & CAROL L PANG

WALTER E LANG IRA, JPMCC CUST

WALTER K GRAHAM TRUST U/A DTD 10/16/2000, ANNE G TAYLOR, TRUSTEE

WALTER K GRAHAM TRUST U/A DTD 10/16/2000, WALTER E GRAHAM, TRUSTEE

WALTER L MEAGHER IRA ROLLOVER, TD AMERITRADE CLEARING, CUSTODIAN

WALTER LANG

WAMU PENSION PLAN MASTER TRUST, CURRENT TRUSTEE

WARD L QUAAL REVOCABLE TRUST UA 09/02/1993, BMO HARRIS BANK, N.A., TRUSTEE

WAREHOUSE EMPLOYEES LOCAL 570 PENSION LCV

WARREN B. WILLIAMSON

WARREN CEREGHINO

WARREN F BATEMAN REVOCABLE TRUST DATED 8/14/91, WARREN BATEMAN, TRUSTEE

WARREN F BATEMAN TRUST U/A DTD 08/16/1991, WARREN F BATEMAN, TRUSTEE

WARREN J EIDE

WARREN R & PATRICIA M PHELPS REVOCABLE TRUST 07/06/89 U-A, WARREN R PHELPS, PATRICIA M PHELPS, TRUSTEES

WARREN R PHELPS AND PATRICIA M PHELPS

WASHINGTON AREA CARPENTERS PENSION FUND

WASHINGTON MUTUAL, INC. CASH B

WATERMAN BROADCASTING CORP EMPLOYEE PROFIT SHARING PLAN U/A 01/01/1974

WATERMAN BROADCASTING CORPORATION

WATERMAN BROADCASTING INVESTMENT CORPORATION

WAVERING FAMILY CHARITABLE FOUNDATION DATED 07/24/1990, THE NORTHERN TRUST COMPANY, TRUSTEE

WAYNE AND GRACE WILLEMS MANAGEMENT TRUST, WAYNE AND GRACE WILLEMS, TRUSTEES

WAYNE BANK

WAYNE D. REID, II

WAYNE F DOMAZ IRA, FCC, CUSTODIAN

WAYNE HUMMER TRUST CO NA

WAYNE R. WEIGAND

WEALTH MANAGEMENT SERVICES

WEDBUSH SECURITIES INC. F/K/A WEDBUSH MORGAN SECURITIES, INC.

WEED LIV TRUST U/A DTD 08-01-90, ROBERT N WEED, MARJORIE L WEED, MARGO WEED, TRUSTEES

WEEGE FAMILY TRUST U/A 6/21/89, REINHOLD WEEGE AND SHELLEY WEEGE, TRUSTEES

WEINSTEIN FAMILY CHARITABLE FOUNDATION

WEINTRAUB CAPITAL MANAGEMENT

WEISS FAMILY FOUNDATION

WEISS MULTI-STRATEGY PARTNERS LLC

WELCH & FORBES LLC

WELLMARK HEALTH PLAN OF IOWA, INC.

WELLMARK, INC.

WELLPOINT, INC. F/K/A WELLPOINT HEALTH NETWORKS INC. D/B/A CALIFORNIACARE HEALTH PLANS

WELLS FARGO ADVANTAGE ASSET ALLOCATION FUND

WELLS FARGO ADVANTAGE DIVERSIFIED STOCK PORTFOLIO

WELLS FARGO ADVANTAGE INDEX PORTFOLIO

WELLS FARGO BANK, N.A.

WELLS FARGO BANK, N.A. F/K/A WACHOVIA BANK, N.A.

WELLS FARGO BANK, N.A. F/K/A WACHOVIA BANK, N.A. CMC-NORTHEAST

WELLS FARGO FUNDS TRUST (DISCIPLINED SMALL-MID VALUE)

WELLS FARGO FUNDS TRUST (EVERGREEN EQUITY INDEX FUND)

WELLS FARGO FUNDS TRUST (EVERGREEN MARKET INDEX FUND)

WELLS FARGO FUNDS TRUST (EVERGREEN MARKET INDEX FUND)

WELLS FARGO INVESTMENTS, LLC

WELLSPAN HEALTH MASTER TRUST, CURRENT TRUSTEE

WENDI POWER AND SCOTT POWER

WENDY & NATALIE TRUST UW WALTER BLUM, DAVID R COGGINS JR, TRUSTEE

WENDY L. KAISER

WENDY PYE ENTERPRISES LTD

WENDY S AYRES

WERNER H JEAN TRUST U/A DTD 07/22/1994, WERNER H JEAN, TRUSTEE

WESBANCO BANK, INC.

WESTHAB RETIREMENT PLAN, ROBERT L. MILLER, KENNETH BELFER, TRUSTEES

WESTWAYS LIVING TRUST, JOHN R. AND BARBARA Z. WILSON, TRUSTEES

WG TRADING COMPANY LP, ROBB EVANS & ASSOCIATES LLC, RECEIVER

WHEELS COMMON INVESTMENT FUND

WHI GROWTH FUND QP LP

WHITE MOUNTAINS INSURANCE GROUP, LTD

WHITE MOUNTAINS RE BERMUDA LTD

WHITE MOUNTAINS REINSURANCE COMPANY OF AMERICA

WHITE MOUNTAINS REINSURANCE COMPANY OF AMERICA F/K/A FOLKSAMERICA REINSURANCE COMPANY

WHITEBOX CONVERTIBLE ARBITRAGE PARTNERS, LP

WHITEBOX CREDIT ARBITRAGE PARTNERS, L.P.

WHITEBOX DIVERSIFIED CONVERTIBLE ARBITRAGE FUND, LP

WHITEBOX HIGH YIELD FUND, LP

WHITTIER TRUST COMPANY

WILFRED H NELTNER AMENDED RESTATED TRUST AGREEMENT U/A DTD 7/9/82, WILFRED NELTNER, TRUSTEE

WILL K. WEINSTEIN, WILL K. WEINSTEIN REVOCABLE TRUST U/A DTD 2-27-90, WILL K. WEINSTEIN, TRUSTEE

WILLIAM & JANE HAYS CHARITABLE REMAINDER UNITRUST, US BANK, TRUSTEE

WILLIAM A CAREY AND JANET S CAREY TRUST U/A 4/16/90, WILLIAM A CAREY, TRUSTEE

WILLIAM A GRIFFITHS IRA, RAYMOND JAMES & ASSOCIATES, INC., CUSTODIAN

WILLIAM A OSBORN, WILLIAM A OSBORN 2004 TRUST U/A 9/9/04, WILLIAM A OSBORN, TRUSTEE

WILLIAM A. JOBSON III

WILLIAM APFELBAUM

WILLIAM B AYRES IRA, FCC, CUSTODIAN

WILLIAM B DENHART NONQUALIFYING TRUST UNDER WILL OF WILLIAM B DENHART, US BANK, TRUSTEE

WILLIAM BLAIR & CO.

WILLIAM BROSS LLOYD JR. NEW YORK TRUST DATED JULY 18, 1968, THE NORTHERN TRUST COMPANY, TRUSTEE

WILLIAM BROSS LLOYD JR. VERMONT TRUST DATED JULY 18, 1968, THE NORTHERN TRUST COMPANY, TRUSTEE

WILLIAM C HATCH TRUST U/A/D 07/11/96, WILLIAM C HATCH, TRUSTEE

WILLIAM CALDWELL CLAY JR LUCAS FAMILY TRUST U/A DTD 05/01/1967, JEANNETTE C LUCAS, TRUSTEE

WILLIAM CAPLICE REVOCABLE TRUST U/A/D 3/10/1987, JEANNE CAPLICE, TRUSTEE

WILLIAM CARTER

WILLIAM CHOSLOVSKY

WILLIAM D ARVEY TRUST U/A DTD 11/13/1992, WILLIAM D ARVEY, TRUSTEE

WILLIAM D BOYETT AND THERLENE B BOYETT

WILLIAM D JERNIGAN AND JESSIE B JERNIGAN

WILLIAM D MAC DONALD & NANCY L MAC DONALD TRUST UA 7 21, NANCY L. MAC DONALD, TRUSTEE

WILLIAM D. & JESSIE B. JERNIGAN

WILLIAM DEAN HOWELLS AND CHRISTINA HOWELLS

WILLIAM DEAN HOWELLS TRUST, WILLIAM DEAN HOWELLS, BENITHA C. HOWELLS, TRUSTEES

WILLIAM E STEIGER AND BEVERLY STEIGER

WILLIAM E WOLF IRA

WILLIAM E. WITSBERGER

WILLIAM EFFRON KATZIN IRA ROLLOVER, CHARLES SCHWAB & CO INC, CUSTODIAN

WILLIAM F CULLERTON, MSSB, CUSTODIAN

WILLIAM F. WELCH

WILLIAM G MOLLER III IRA, FCC, CUSTODIAN

WILLIAM G. LYCAN REVOCABLE LIVING TRUST, WILUAM G. LYCAN, TRUSTEE

WILLIAM G. PARZYBOK JR.

WILLIAM G. RUPP

WILLIAM H JOHNSON TRUST #92 U/A/D 04/29/92, WILLIAM H JOHNSON, TRUSTEE

WILLIAM H. BROWNE

WILLIAM I BROCKMAN

WILLIAM J SMALL

WILLIAM J. BROWN

WILLIAM J. BYRNES TRUST U/A DTD 11/14/62, WILLIAM J. BYRNES, STEPHANIE B. FLYNN, TRUSTEES

WILLIAM J. HALPIN

WILLIAM J. REINKE

WILLIAM JAMES BELL 1993 TRUST U/A 8/23/93, WILLIAM J BELL, TRUSTEE

WILLIAM JAMES BELL TRUST, WILLIAM J BELL, TRUSTEE

WILLIAM K MCGEE JR

WILLIAM K. SCHAEFER

WILLIAM L & BEVERLY J BREYFOGLE TRUST OF 2010 U/A DTD AUG 25, 2010, WILLIAM L BREYFOGLE, BEVERLY J BREYFOGLE, TRUSTEES

WILLIAM L HARKE SR R/O IRA, FCC, CUSTODIAN

WILLIAM M DAVENPORT TRUST UNDER WILL OF THOMAS CARRTER LUPTON, BRETT W ROUSCH, TRUSTEE

WILLIAM M VANNEMAN TRUST AMENDED 6/1/2007 U/A 5/6/92, W M VANNEMAN, W VANNEMAN JR, TRUSTEES

WILLIAM M. BRACHFELD

WILLIAM MEYER IRRA, MERRILL LYNCH, PIERCE, FENNER & SMITH, CUSTODIAN FPO

WILLIAM MURPHY & BARBARA MURPHY

WILLIAM O HOWE IRA, VANGUARD FIDUCIARY TRUST CO, CUSTODIAN

WILLIAM P MUMMA AND KATHLEEN A MUMMA

WILLIAM P WEBER TRUST U/A/D 11-02-2007, WILLIAM P WEBER, TRUSTEE

WILLIAM P. HAMMOND TRUST U/A DTD 08/11/1992, WILLIAM P. HAMMOND, TRUSTEE

WILLIAM P. JORDAN AND DORIAN S. JORDAN

WILLIAM R HOUGH CHARITABLE REMAINDER TRUST U/A DTD 12/21/2001, JEFFREY P MCCLANATHAN, TRUSTEE

WILLIAM R. BARTON

WILLIAM R. HOUGH

WILLIAM R. LUMMIS, SR.

WILLIAM RAMSEY REVOC TRUST U/A DTD 12/27/2000, WILLIAM RAMSEY, TRUSTEE

WILLIAM RANDOLPH AND MARGARET MAY WALTON

WILLIAM S O'REILLY AND DANIEL JOSEPH O'REILLY MD, TRUSTEES

WILLIAM S O'REILLY TRUST U/A 6/23/04 FBO WILLIAM S O'REILLY, WILLIAM S O'REILLY, TRUSTEE

WILLIAM SANDERSON TWADDELL

WILLIAM SANDERSON TWADDELL IRREVOCABLE PRESENT INTEREST TRUST, DATED DECEMBER 27, 1983 (A/K/A WILLIAM H. TWADDELL REV LIVING TRUST U/A DTD 05/10/2004 AND WILLIAM S. TWADDELL UTMA DC), WILLIAM H TWADDELL, TRUSTEE

WILLIAM STEIF

WILLIAM STEINER LIVING TRUST U/A 3/16/02, WILLIAM STEINER, TRUSTEE

WILLIAM STEINER LIVING TRUST U/A 8/16/06, WILLIAM STEINER, TRUSTEE

WILLIAM V MONOPOLI AND MARY K MONOPOLI JT WROS

WILLIAM W. HOWELLS

WILLIE H. SHERROUSE

WILLIS & ELSIE SHENK FOUNDATION

WILLOW CREEK CAPITAL PARTNERS

WILLOW CREEK LONG BIASED FUND

WILLOW CREEK OFFSHORE FUND

WILLOWLAKE DEVELOPMENT CORPORATION

WILMA GOETCH AND JAMES GOETCH

WILMINGTON LARGE CAP STRATEGY FUND F/K/A WILMINGTON MULTI-MANAGER MID-CAP FUND

WILMINGTON MID CAP GROWTH FUND F/K/A MTB MID CAP STOCK FUND F/K/A M&T BANK VISION MID CAP STOCK FUND

WILMINGTON MID CAP MULTI MANAGER SERIES

WILMINGTON TRUST CO.

WILMINGTON TRUST CO. AS OWNER AND TRUSTEE OF FORRESTAL FUNDING MASTER TRUST

WILSHIRE MUTUAL FUNDS, INC. (WILSHIRE 5000 INDEX FUND)

WILSHIRE VARIABLE INSURANCE TRUST EQUITY FUND

WILSHIRE VARIABLE INSURANCE TRUST SOCIALLY RESPONSIBLE FUND

WILSON MEDICAL CENTER INC.

WINCHESTER EVENING STAR INC.

WINFIELD H JAMES TR/IMA, WINFIELD H JAMES, TRUSTEE

WINSTON B. & KATHRYN M. DITTO TRUST, KATHRYN M DITTO, TRUSTEE

WINTON EVOLUTION PORTFOLIO SPC FBO WINTON EVOLUTION SEGREGATED PORTFOLIO NO 1

WIRTZ CORPORATION

WISCONSIN CARPENTERS PENSION FUND

WISCONSIN REINSURANCE CORP

WM T BURNETT RET PL-HARG

WOLVERINE ARBITRAGE FUND A/K/A WOLVERINE CONVERTIBLE ARBITRAGE FUND

WOLVERINE TRADING LLC

WOMEN'S DIVISION OF THE UNITED METHODIST BOARD OF GLOBAL MINISTRIES

WOO B CHOI ROLLOVER IRA, TD AMERITRADE INC, CUSTODIAN

WOODMONT INVESTMENTS LTD

WOODS FUND OF CHICAGO

WOODS/MITCHELL FAMILY TRUST U/A DTD 01/25/1999, BRENT WOODS AND LAURIE MITCHELL, TRUSTEES

WOOJIN CHOI PRINCIPAL

WORLDWIDE TRANSACTIONS LIMITED

WPG ERICOTT MERGER ARBITRAGE OVERSEAS LP - MASTER FEEDER

WPML LIMITED PARTNERSHIP

WR MULTI STRATEGY MASTER FUND WR MARKET NEUTRAL MASTER FUND LTD

WSJ ENTERPRISES INC PRFT SHRNG UAD 10/10/75, WILLIAM S SAPP & DOLORES SAPP TRUSTEES

WSLLC-NICK SHERMAN

WYETH

WYETH MASTER RETIREMENT TRUST, CHRISTI FALLON, TRUSTEE

XIUZHEN KONDOR

YEOMANS FAMILY TRUST U/A 2/22/92, PATRICIA H YEOMANS, TRUSTEE

YIELD STRATEGIES FUND I LP

YNEZ VIOLE O'NEILL

YVONNE A MCCARTER TRAD R/O IRA JPMORGAN CHASE BK CUST

YVONNE SANDERS

ZEBRA MULTI-STRATEGY MASTER FUND LTD.

ZIEGELMAN PARTNERS LP

ZIEGLER FAMILY TRUST A, CURRENT TRUSTEE

ZOLTAN HORVATH AND LIDIA HORVATH

ZOOLOGICAL SOCIETY OF SAN DIEGO

ZUCK FAMILY TRUST, HOWARD ZUCK, BETTY B ZUCK, TRUSTEES

**Exhibit B**

| Subsidiary Guarantors | | Subsidiary D&O Defendants[1] | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bigelow | Carver | Finke | FitzSimons | Gremillion | Hlatik | Hiller | Kenney | Knight | Landon | Malone | Monsma | Quimby | Reardon | Smith | Vitanovec | Waltz | Williams | Worthington |
| 5800 Sunset Productions Inc. | O | | | | | | | D,O | | | | | | | | | | | |
| The Baltimore Sun Company | O | | | | D | | | D,O | | | | | | | D² | | | | |
| California Community News Corporation | O | | | | | | O | D,O | | | | | | | | | | | |
| Channel 39, Inc. | O | | | | O | O | | D,O | | | | | | | | D | | | |
| Channel 40, Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| Chicago National League Ball Club | O | | | | | O | | D,O | | | | | | | | | | | |
| Chicago Tribune Company | O | | | | | O | | D²,O | | | O | | | D,O | D,O | | | | |
| Chicagoland Publishing Company | O | | | | | O | | D,O | | | | | | | D | | | | |
| Chicagoland Television News, Inc. | O | | | | | O | | D,O | | | | | | D,O | D | | | | |
| Courant Specialty Products, Inc. | O | D,O | | | D | O | | D,O | | | | | | | | | | | |
| The Daily Press, Inc. | O | | | | | O | | D,O | | | | | | | D | | D | | |
| Distribution Systems of America, Inc. | O | | | | | O | | D,O | D,O | | | | | | D | | | | |
| Eagle New Media Investments, LLC³ | O | | | | | O | | O | | | | | | | | | | | |
| Eagle Publishing Investments, LLC⁴ | O | | | | | O | | O | | | | | | | | | | | |
| ForSaleByOwner.com Corp | O | | D,O | | | O | | O | | D | | | | | | | | | |
| Forum Publishing Group, Inc. | O | | | | D | O | | D,O | | | | | | | D | | | | |
| Gold Coast Publications, Inc. | O | | | | D | O | | D,O | | | | | | | D | | | | |
| The Hartford Courant Company | O | D,O | | | D | O | | D,O | | | | | | | | | | | |
| Homeowners Realty, Inc. | O | | D,O | | | O | | O | | D | | | | | | | | | |
| Homestead Publishing Company | O | | | | | O | | D²,O | | | | | D,O | | D² | | | | D,O |
| Hoy Publications, LLC⁵ | O | | | | | O | | O | | | | | | | | | | | |

| Subsidiary Guarantors | Bigelow | Carver | Finke | FitzSimons | Gremillion | Hianik | Hiller | Kenney | Knight | Landon | Malone | Monsma | Quimby | Reardon | Smith | Vitanovec | Waltz | Williams | Worthington |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Internet Foreclosure Service, Inc. | O | | D,O | | | O | | O | | D | | | | | | | | | |
| KIAH Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| KPLR, Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| KSWB Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| KTLA Inc. | O | | | | | O | | D,O | | | | | | D,O | | | | | |
| KWGN Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| Los Angeles Times Communications LLC | O | | | D | | D[2],O | D,O | O | | | | | | | D | | | | |
| The Morning Call, Inc. | O | | | | | O | | O | | | | | | | D | | D,O | | |
| New Mass Media, Inc. | O | D,O | | | D | O | | D,O | | | | | | | | | | | |
| Orlando Sentinel Communications Company | O | | | D | | O | | O | | | | | | | D | | D,O | | |
| Patuxent Publishing Company | O | | | | | O | | O | | | | | D,O | | | | | | D,O |
| Southern Connecticut Newspapers, Inc. | O | | | | | D[2],O | | D,O | D | | | D[6],O | | | | | | | |
| Star Community Publishing Group, LLC[7] | O | | | | | O | | O | O | | | | | | | | | | |
| Stemweb, Inc. | O | | D,O | | | O | | O | | D | | | | | | | | | |
| Sun-Sentinel Company | O | | | D | D | O | | O | | | | | | | D | | | | |
| TMLH2, Inc. | O | D,O | | | | O | | D,O | | | | | | | | | | | |
| TMLS1, Inc. | O | | | | | D[2] | | D | D | | | D[6] | | | | | | | |
| TMS Entertainment Guides, Inc. | O | | | | | O | | D,O | | | | | | | D | | | D,O | |
| Tower Distribution Company | O | | | | | O | | D,O | | | | | | D | | D | | | |
| Tribune Broadcast Holdings, Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| Tribune Broadcasting Company | O | | | | | O | | O | | | | | | D,O | | O | | | |
| Tribune Broadcasting Holdco, LLC[8] | O | | | | | O | | O | | | | | | | | | | | |
| Tribune California Properties, Inc. | O | | | | | O | | D,O | | | | | | D,O | | | | | |

## Subsidiary D&O Defendants[1]

| Subsidiary Guarantors | Bigelow | Carver | Finke | FitzSimons | Gremillion | Hianik | Hiller | Kenney | Knight | Landon | Malone | Monsma | Quimby | Reardon | Smith | Vitanovec | Waltz | Williams | Worthington |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune Direct Marketing, Inc. | O | | | | | O | | D,O | | | D[6] | | | | D[2] | | | | |
| Tribune Entertainment Company | O | | | | | O | | D,O | O | | | | | D | | D | | | |
| Tribune Finance, LLC[9] | O | | | | | O | | O | | | | | | | | | | | |
| Tribune Los Angeles, Inc. | O | | | | | O | O | D,O | | | | | | | | | | | |
| Tribune Manhattan Newspaper Holdings, Inc. | | | | | | O | | D,O | O | | | | | | | | | | |
| Tribune MD, Inc. | | | | D | | O | | D,O | O | | | | | | | | | | |
| Tribune Media Net, Inc. | O | | | | | O | | D,O | | | | | | | D | | | | |
| Tribune Media Services, Inc. | O | | | | | O | | D,O | | | | | | | D | | | D,O | |
| Tribune New York Newspaper Holdings, LLC | O | | | | | O | | D,O | D | | | | | | | | | | |
| Tribune Television Company | O | | | | | O | | D,O | | | | | | D,O | | D,O | | | |
| Tribune Television Holdings, Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| Tribune Television New Orleans, Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| Tribune Television Northwest, Inc. | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| Virginia Gazette Companies, LLC | O | | | | | O | | D,O | | | | | | | D[2] | | D | | |
| WDCW Broadcasting, Inc. | O | | | | | O | | O | | | | | | D,O | | D | | | |
| WGN Continental Broadcasting Company | O | | | | | O | | D,O | | | | | | D,O | | D | | | |
| WPIX, Inc. | O | | | | | O | | D,O | | | | | | D,O | | | | | |
| WTXX Inc. | O | | | | | O | | D,O | | | | | | D,O | | | | | |

---

[1] Legend: D = Director as of June 4, 2007 and December 20, 2007, unless otherwise noted; O = Officer from at least June 4, 2007 through at least December 20, 2007.

[2] This defendant was not a director as of June 4, 2007.

[3] Tribune is the sole manager of Eagle New Media Investments, LLC. Kenney authorized the Subsidiary Guarantees on behalf of Eagle New Media Investments, LLC.

[4] Tribune is the sole manager of Eagle Publishing Investments, LLC. Kenney authorized the Subsidiary Guarantees on behalf of Eagle Publishing Investments, LLC.

[5] Tribune is the sole member of Hoy Publications, LLC. Kenney authorized the Subsidiary Guarantees on behalf of Hoy Publications, LLC.

[6] This defendant was not a director as of December 20, 2007.

[7] Distribution Systems of America is the managing member, and Newport Media, Inc. (now known as Tribune MD, Inc.) is also a member, of Star Community Publishing Group, LLC. Knight authorized the Subsidiary Guarantees on behalf of Star Community Publishing Group, LLC.

[8] Tribune is the sole member of Tribune Broadcasting Holdco, LLC. Kenney authorized the Subsidiary Guarantees on behalf of Tribune Broadcasting Holdco, LLC.

[9] Tribune is the sole member of Tribune Finance, LLC. Kenney authorized the Subsidiary Guarantees on behalf of Tribune Finance, LLC.

**Exhibit C**
**List of Insider Payments**

| | Defendant | Date | Transferor | Form of Transfer/No. | Basis For Transfer* | Total |
|---|---|---|---|---|---|---|
| | Amsden, Harry A. | 12/27/07 | Tribune Company/Tribune Publishing Company | ACH/3902954 | Success Bonus | $150,000.00 |
| 1 | **Amsden, Harry A. Total** | | | | | **$150,000.00** |
| | Bigelow, Chandler | 12/27/07 | Tribune Company | ACH/3903517 | Excise Tax Gross Up | $309,825.00 |
| | Bigelow, Chandler | 12/27/07 | Tribune Company | ACH/3903517 | Success Bonus | $400,000.00 |
| 2 | **Bigelow, Chandler Total** | | | | | **$709,825.00** |
| | FitzSimons, Dennis J. | 12/27/07 | Tribune Company | ACH/3903505 | Excise Tax Gross Up | $5,276,633.00 |
| | FitzSimons, Dennis J. | 12/27/07 | Tribune Company | ACH/3903505 | Executive Transition | $10,657,500.00 |
| | FitzSimons, Dennis J. | 12/27/07 | Tribune Company | ACH/3903505 | Phantom Equity | $2,916,666.67 |
| 3 | **FitzSimons, Dennis J. Total** | | | | | **$18,850,799.67** |
| | Gremillion, Robert J. | 12/27/07 | Tribune Company/Tribune Publishing Company | ACH/3902951 | Success Bonus | $250,000.00 |
| 4 | **Gremillion, Robert J. Total** | | | | | **$250,000.00** |
| | Grenesko, Donald C. | 12/27/07 | Tribune Company | ACH/3903507 | Success Bonus | $400,000.00 |
| | Grenesko, Donald C. | 3/28/08 | Tribune Company | ACH/4021582 | Excise Tax Gross Up | $817,090.00 |
| | Grenesko, Donald C. | 3/28/08 | Tribune Company | ACH/4021582 | Phantom Equity | $2,083,333.33 |
| | Grenesko, Donald C. | 4/11/08 | Tribune Company | ACH/4039776 | Excise Tax Gross Up | $1,888,034.00 |
| | Grenesko, Donald C. | 4/11/08 | Tribune Company | ACH/4039776 | Executive Transition | $4,403,250.00 |
| 5 | **Grenesko, Donald C. Total** | | | | | **$9,591,707.33** |
| | Hianik, Mark W. | 12/27/07 | Tribune Company | ACH/3903542 | Success Bonus | $175,000.00 |
| 6 | **Hianik, Mark W. Total** | | | | | **$175,000.00** |
| | Hiller, David Dean | 7/25/08 | Tribune Company/LA Times Communications LLC (Tribune Los Angeles, Inc.) | Check/1117911 | Excise Tax Gross Up | $918,570.00 |
| | Hiller, David Dean | 7/25/08 | Tribune Company/LA Times Communications LLC (Tribune Los Angeles, Inc.) | Check/1117911 | Phantom Equity | $2,083,333.33 |
| | Hiller, David Dean | 8/8/08 | Tribune Company/LA Times Communications LLC (Tribune Los Angeles, Inc.) | Check/1120029 | Excise Tax Gross Up | $1,746,940.00 |
| | Hiller, David Dean | 8/8/08 | Tribune Company/LA Times Communications LLC (Tribune Los Angeles, Inc.) | Check/1120029 | Executive Transition | $3,960,000.00 |
| 7 | **Hiller, David Dean Total** | | | | | **$8,708,843.33** |
| | Kazan, Daniel G. | 12/27/07 | Tribune Company | ACH/3903502 | Excise Tax Gross Up | $276,226.00 |
| | Kazan, Daniel G. | 12/27/07 | Tribune Company | ACH/3903502 | Success Bonus | $350,000.00 |
| 8 | **Kazan, Daniel G. Total** | | | | | **$626,226.00** |
| | Kenney, Crane H. | 12/27/07 | Tribune Company | ACH/3903545 | Success Bonus | $600,000.00 |
| 9 | **Kenney, Crane H. Total** | | | | | **$600,000.00** |
| | Knight, Timothy P. | 12/27/07 | Tribune Company/Tribune Media Net, Inc. | ACH/3903099 | Success Bonus | $250,000.00 |
| | Knight, Timothy P. | 8/8/08 | Tribune Company | ACH/4200922 | Excise Tax Gross Up | $735,785.00 |
| | Knight, Timothy P. | 8/8/08 | Tribune Company | ACH/4200922 | Phantom Equity | $1,666,666.67 |
| | Knight, Timothy P. | 8/22/08 | Tribune Company | ACH/4219349 | Excise Tax Gross Up | $965,061.00 |
| | Knight, Timothy P. | 8/22/08 | Tribune Company | ACH/4219349 | Executive Transition | $1,936,000.00 |
| 10 | **Knight, Timothy P. Total** | | | | | **$5,553,512.67** |
| | Landon, Timothy J. | 12/27/07 | Tribune Company | ACH/3903250 | Success Bonus | $300,000.00 |
| | Landon, Timothy J. | 2/29/08 | Tribune Company | Check/1088625 | Excise Tax Gross Up | $644,747.00 |
| | Landon, Timothy J. | 2/29/08 | Tribune Company | Check/1088625 | Phantom Equity | $1,666,666.67 |
| | Landon, Timothy J. | 3/7/08 | Tribune Company | ACH/3992031 | Excise Tax Gross Up | $823,691.00 |
| | Landon, Timothy J. | 3/7/08 | Tribune Company | ACH/3992031 | Executive Transition | $1,826,000.00 |
| 11 | **Landon, Timothy J. Total** | | | | | **$5,261,104.67** |
| | Leach, Thomas D. | 12/27/07 | Tribune Company | ACH/3903503 | Success Bonus | $400,000.00 |
| | Leach, Thomas D. | 2/15/08 | Tribune Company | ACH/3964387 | Excise Tax Gross Up | $711,600.00 |
| | Leach, Thomas D. | 2/15/08 | Tribune Company | ACH/3964387 | Phantom Equity | $1,666,666.67 |
| | Leach, Thomas D. | 2/29/08 | Tribune Company | Manual Check/1008113 | Excise Tax Gross Up | $1,114,356.00 |
| | Leach, Thomas D. | 2/29/08 | Tribune Company | Manual Check/1008113 | Executive Transition | $2,209,680.00 |
| 12 | **Leach, Thomas D. Total** | | | | | **$6,102,302.67** |

**Exhibit C**
**List of Insider Payments**

| | Defendant | Date | Transferor | Form of Transfer/No. | Basis For Transfer* | Total |
|---|---|---|---|---|---|---|
| | Lewin, Luis E. | 12/27/07 | Tribune Company | ACH/3903525 | Success Bonus | $50,000.00 |
| | Lewin, Luis E. | 3/28/08 | Tribune Company | ACH/4021664 | Excise Tax Gross Up | $894,221.00 |
| | Lewin, Luis E. | 3/28/08 | Tribune Company | ACH/4021664 | Executive Transition | $2,415,600.00 |
| 13 | **Lewin, Luis E. Total** | | | | | **$3,359,821.00** |
| | Mallory, R. Mark | 12/27/07 | Tribune Company | ACH/3903510 | Success Bonus | $75,000.00 |
| | Mallory, R. Mark | 5/16/08 | Tribune Company | Check/1106176 | Executive Transition | $978,000.00 |
| | Mallory, R. Mark | 5/23/08 | Tribune Company | ACH/4094149 | Executive Transition | $500.00 |
| 14 | **Mallory, R. Mark Total** | | | | | **$1,053,500.00** |
| | Malone, Richard H. | 5/30/08 | Tribune Company | ACH/4100992 | Executive Transition | $1,200,000.00 |
| 15 | **Malone, Richard H. Total** | | | | | **$1,200,000.00** |
| | Reardon, John E. | 12/27/07 | Tribune Company/Tribune Broadcasting Company | ACH/3903307 | Success Bonus | $200,000.00 |
| | Reardon, John E. | 2/22/08 | Tribune Company/Tribune Broadcasting Company | Check/1087309 | Excise Tax Gross Up | $628,023.00 |
| | Reardon, John E. | 2/22/08 | Tribune Company/Tribune Broadcasting Company | Check/1087309 | Phantom Equity | $1,500,000.00 |
| | Reardon, John E. | 2/29/08 | Tribune Company/Tribune Broadcasting Company | Manual Check/1014043 | Excise Tax Gross Up | $1,636,582.00 |
| | Reardon, John E. | 2/29/08 | Tribune Company/Tribune Broadcasting Company | Manual Check/1014043 | Executive Transition | $3,708,000.00 |
| 16 | **Reardon, John E. Total** | | | | | **$7,672,605.00** |
| | Smith, Scott C. | 7/11/08 | Tribune Company/Tribune Publishing Company | Check/1115739 | Excise Tax Gross Up | $780,176.00 |
| | Smith, Scott C. | 7/11/08 | Tribune Company/Tribune Publishing Company | Check/1115739 | Phantom Equity | $2,083,333.33 |
| | Smith, Scott C. | 8/1/08 | Tribune Company/Tribune Publishing Company | ACH/4182344 | Excise Tax Gross Up | $1,731,357.00 |
| | Smith, Scott C. | 8/1/08 | Tribune Company/Tribune Publishing Company | ACH/4182344 | Executive Transition | $4,619,940.00 |
| 17 | **Smith, Scott C. Total** | | | | | **$9,214,806.33** |
| | Vitanovec, John J. | 12/27/07 | Tribune Company/Tribune Broadcasting Company | ACH/3903308 | Success Bonus | $300,000.00 |
| | Vitanovec, John J. | 9/12/08 | Tribune Company/Tribune Broadcasting Company | ACH/4241251 | Excise Tax Gross Up | $500,782.00 |
| | Vitanovec, John J. | 9/12/08 | Tribune Company/Tribune Broadcasting Company | ACH/4241251 | Phantom Equity | $1,250,000.00 |
| | Vitanovec, John J. | 9/26/08 | Tribune Company/Tribune Broadcasting Company | ACH/4259228 | Excise Tax Gross Up | $917,934.00 |
| | Vitanovec, John J. | 9/26/08 | Tribune Company/Tribune Broadcasting Company | ACH/4259228 | Executive Transition | $1,981,450.00 |
| 18 | **Vitanovec, John J. Total** | | | | | **$4,950,166.00** |
| | Waltz, Kathleen M. | 12/27/07 | Tribune Company/Orlando Sentinel Communications Company | ACH/3903188 | Success Bonus | $100,000.00 |
| | Waltz, Kathleen M. | 2/29/08 | Tribune Company/Orlando Sentinel Communications Company | Check/1088627 | Phantom Equity | $416,667.00 |
| | Waltz, Kathleen M. | 3/10/08 | Tribune Company/Orlando Sentinel Communications Company | Manual Check/1010891 | Executive Transition | $1,636,800.00 |
| 19 | **Waltz, Kathleen M. Total** | | | | | **$2,153,467.00** |

\* Amounts shown for Excise Tax Gross Up reflect only amounts that are attributable to Success Bonus, Executive Transition, and/or Phantom Equity claims (collectively, the "SEP Transfers"). Therefore, where a defendant received an Excise Tax Gross Up payment that included amounts attributable to both SEP Transfers and non-SEP Transfers, the amount of such payment shown herein has been reduced to exclude the non-SEP Transfer portion.