# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

Multidistrict Litigation No. 11-md-2296 (RJS)
Master Case File No. 12-mc-2296 (RJS)
No. 12-cv-2652 (RJS)

————————————

IN RE TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION

————————————

MARC S. KIRSCHNER, AS LITIGATION TRUSTEE FOR THE
TRIBUNE LITIGATION TRUST,

Plaintiff,

VERSUS

DENNIS J. FITZSIMONS *et al.*,

Defendants.

————————————

OPINION AND ORDER
January 6, 2017

————————————

RICHARD J. SULLIVAN, District Judge:

This multidistrict litigation ("MDL") relates to the 2007 leveraged buyout of the Tribune Company ("Tribune") and its subsequent bankruptcy in 2008. In the MDL, Tribune's litigation trustee, Marc Kirschner (the "Trustee"), seeks to claw back money that was distributed to various entities and individuals (the "Defendants") as a result of the leveraged buyout, including over $8 billion paid to Tribune's shareholders (the "Shareholder Defendants") in exchange for their shares in Tribune (the "Shareholder Transfers"). Now before the Court is the Shareholder Defendants' motion to dismiss the Trustee's actual fraudulent conveyance claim related to the Shareholder Transfers. For the reasons stated below, the Shareholder Defendants' motion is granted.

## I. BACKGROUND

### A. Facts

Prior to its bankruptcy in 2008, Tribune was "America's largest media and entertainment company," owning numerous radio and television stations and major newspapers, including the *Chicago Tribune*

and the *Los Angeles Times*.[1]  (*FitzSimons* Compl. ¶ 116.)  In June 2006, in light of Tribune's deteriorating financial condition, the Chandler Trusts, which owned 20% of Tribune's stock, urged Tribune's eleven-member board of directors (the "Board") to create a special committee to begin exploring possible strategic transactions, including a leveraged buyout ("LBO").  (*Id.* ¶¶ 127–35.)[2]  Tribune's Board included seven independent directors (the "Independent Directors") – Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft, and Miles D. White.  (*Id.* ¶¶ 28–34, 39.)  The Board was chaired by Dennis FitzSimons, who also served as Tribune's President and Chief Executive Officer ("CEO"), Chairman of the Robert R. McCormick Foundation (the "McCormick Foundation"), and board member of the Cantigny Foundation (together with the McCormick Foundation, the "Foundations"), which collectively owned approximately 13% of Tribune's outstanding stock.  (*Id.* ¶¶ 27, 127.)  Jeffrey Chandler, Roger Goodan, and William

Stinehart Jr., who were representatives from the Chandler Trusts, also served on the Board.  (the "Chandler Trusts Representatives").  (*Id.* ¶¶ 35–37, 39.)  In September 2006, the Board created a special committee comprising the seven Independent Directors (the "Special Committee") to consider the proposed transactions.  (*Id.* ¶¶ 9, 28–34, 136.)

On February 2, 2007, private-equity investor Sam Zell, in association with Equity Group Investments ("EGI"), a company in which he owned a controlling interest, proposed that EGI-TRB, an affiliate of EGI, buy all of Tribune's outstanding stock pursuant to a merger.  (*Id.* ¶¶ 7, 77, 145–46.)  Zell negotiated and updated this proposal based on conversations with the Board, the Special Committee, and other relevant stakeholders, including the Chandler Trusts and the Foundations, which together owned 33% of Tribune's stock.  (*Id.* ¶¶ 127, 149–51.)  Throughout these negotiations, Morgan Stanley advised the Special Committee, and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") and Citigroup Global Markets, Inc. ("Citigroup") advised the Board as a whole.  (*Id.* ¶¶ 14–15, 90, 92, 127, 137, 155–56, 167, 336–38.)

Eventually, Zell and EGI submitted a revised proposal whereby Tribune would enter into a two-step LBO transaction.  (*Id.* ¶¶ 119, 150, 211.)  In Step One, Tribune would borrow approximately $7 billion in debt and purchase approximately 50% of Tribune's outstanding shares for $34 per share in a tender offer ("Step One").  (*Id.* ¶ 211.)  In Step Two, Tribune would purchase Tribune's remaining shares and borrow an additional $3.7 billion in a go-private merger with the newly formed Tribune Employee Stock Ownership Plan ("ESOP"), and, as a result, Tribune would

---

[1] The following facts are taken from the Fifth Amended Complaint (Doc. No. 2701 ("*FitzSimons* Complaint" or "*FitzSimons* Compl.")), and are presumed to be true for the purposes of this motion, *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In ruling on the Shareholder Defendants' motion, the Court has also considered the Shareholder Defendants' memorandum of law (Doc. No. 5948 ("Motion 12" or "Mot. 12")), the Trustee's opposition (Doc. No. 6136 ("Opp'n")), the Shareholder Defendants' reply (Doc. No. 6202 ("Mot. 12 Reply")), and all exhibits and declarations attached therein.  In addition, unless otherwise noted, all docket numbers refer to case number 11-md-2296.

[2] As the Second Circuit has explained, "[i]n a typical LBO, a target company is acquired with a significant portion of the purchase price being paid through a loan secured by the target company's assets."  *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 105 n.1 (2d Cir. 2016).

become wholly owned by the ESOP ("Step Two"). (*Id.* ¶¶ 211, 355.)

On February 13, 2007, the Board engaged Duff & Phelps to provide a solvency opinion for each step of the transaction.[3] (*Id.* ¶ 176.) However, by March 28, 2007, Duff & Phelps advised the Board that it could not provide a solvency opinion based on the definitions prescribed in its engagement letter. Specifically, although Tribune expected $1 billion in future tax savings that would result from converting the company into a subchapter S-corporation after the merger, and would thus keep the company solvent, Duff & Phelps declined to factor the potential tax savings into its solvency opinion. (*Id.* ¶¶ 180–82, 187.)

After being apprised of Duff & Phelps's reservations, the Board terminated Duff & Phelps's engagement to issue a solvency opinion on March 28, 2007. (*Id.* ¶ 187.) However, on April 1, 2007, Duff & Phelps issued a "viability opinion" which concluded that "the fair market value of Tribune's assets would exceed the value of its liabilities on a post-transaction basis" and that Tribune "would be able to pay its debts as they became due." (*Id.* ¶¶ 188–89, 193.) The viability opinion "was the equivalent of a solvency opinion," except that it considered Tribune's expected tax savings. (*Id.* ¶ 189.)

On April 1, 2007, Merrill Lynch and Morgan Stanley each issued a fairness opinion to the Board and the Special Committee concerning the shareholder consideration provided in the LBO. (*Id.* ¶ 240(h).) That same day, the Special Committee unanimously recommended that the full Board approve Zell's revised proposal, and a majority of the Board voted to accept the proposal, including six of the Independent Directors and FitzSimons. (*Id.* ¶ 211.) One independent director, Taft, was absent at the time of the vote; the Chandler Trusts Representatives abstained; and no directors dissented. (*Id.*)

On April 11, 2007 – ten days after Duff & Phelps issued its viability opinion and the Board voted – Valuation Research Company ("Valuation Research") was retained to replace Duff & Phelps and render solvency opinions that would be presented to the Board prior to the consummation of each step of the transaction. (*Id.* ¶ 201.) Valuation Research's engagement letter provided that it would rely on a different definition of fair value that included the expected tax savings. (*Id.*) Relying in part on Tribune's February 2007 financial projections (the "February Projections"), which were prepared by Tribune officers Chandler Bigelow, Donald C. Grenesko, and Daniel G. Kazan and forecasted Tribune's long-term financial health from 2007 through 2011, Valuation Research issued its Step One solvency opinion on May 24, 2007, finding that Tribune would be solvent immediately after Step One was completed.[4] (*Id.* ¶¶ 274–79; *see also* 170–174, 258–73.) Step One was completed as planned on June 4, 2007. (*Id.* ¶ 287.)

---

[3] As the Trustee explains, a solvency opinion "is a recognized and commonly used vehicle in leveraged transactions to provide assurances to lenders, the borrower (i.e., [Tribune]), and other participants that the company will not fail after and as a result of the transaction, and that the transaction will not effect a fraudulent conveyance." (*FitzSimons* Compl. ¶ 175.)

[4] For the purposes of this opinion, Bigelow, Grenesko, and Kazan – together with Tribune's other officers, Dennis J. FitzSimons, Mark W. Hianik, Crane H. Kenney, and Harry Amsden – are referred to collectively as the "Officer Defendants." (*FitzSimons* Compl. ¶¶ 27, 41–47.)

On December 18, 2007, Valuation Research issued its Step Two solvency opinion – relying in part on Tribune management's revised October 2007 financial projections (the "October Projections"), which forecasted Tribune's growth through 2012. (*Id.* ¶¶ 319–25; *id.* ¶¶ 306–18.)  That same date, the Special Committee recommended that the Board rely on it and proceed with the LBO.  (*Id.* ¶ 326 & n.7.)  Step Two was then completed as planned on December 20, 2007, when Tribune repurchased the remaining 119 million shares of common stock at $34 per share.  (*Id.* ¶ 353.)

Soon after the LBO was completed, Tribune experienced financial difficulties.  Specifically, between 2007 and 2008, the Company did not meet the projected growth rate that management forecasted in the October Projections, and it began to experience declines in advertising revenue that made it difficult to service the new debt.  (*Id.* ¶¶ 357–58.)  As a result of this financial distress, Tribune filed for Chapter 11 bankruptcy in Delaware on December 8, 2008.  (*Id.* ¶ 359.)

## B.  Procedural History

In 2010, the Official Committee of Unsecured Creditors of Tribune (the "Unsecured Creditors") sought standing in the Bankruptcy Court to assert claims on behalf of Tribune's bankruptcy estate and creditors and subsequently began filing claims against Tribune's directors, officers, shareholders, and financial advisors to claw back funds transferred during the LBO.  (*See In re Tribune Co.*, No. 08-br-13141 (Bankr. D. Del.) ("Bankr. Doc."), Doc. Nos. 5668, 6150.)  In connection with these proceedings, the Unsecured Creditors undertook wide-ranging discovery from over 30 entities and persons involved in the LBO,

"obtained and reviewed nearly 4.5 million pages of documents" pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, and deposed "a number of" critical participants. (Bankr. Doc. 8173 at 13, 19.)  In addition, the Trustee had access to more than 30 deposition transcripts and 10 expert witness reports that were filed in connection with the confirmation hearing for Tribune's plan of reorganization.  (*Id.*)

On December 19, 2011, in light of the voluminous filings and pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation consolidated approximately seventy-four federal and state cases filed across the country involving more than 5,000 defendants in the Southern District of New York before Judge Holwell.  *See In re Tribune Co. Fraudulent Conveyance Litig.*, 831 F. Supp. 2d 1371 (J.P.M.L. 2011).  On February 9, 2012, the consolidated action was reassigned to Judge Pauley.  (Doc. No. 499.)  On July 23, 2012, the bankruptcy court confirmed a plan for Tribune's reorganization and transferred the Unsecured Creditors' claims to the Trustee.  (Bankr. Doc. No. 12074; *FitzSimons* Compl. ¶ 26.)  On March 27, 2013, the MDL and all related motions were transferred to my docket.  (Doc. No. 2419.)

On September 23, 2013, this Court granted Defendants' motion to dismiss the individual creditors' state-law fraudulent conveyance claims (the "Phase One Motions"), finding that § 362(a)(1) of the Bankruptcy Code deprives individual creditors of standing to challenge the same transactions that the Trustee is simultaneously seeking to avoid.  *See In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 313 (S.D.N.Y. 2013).  On September 30, 2013, the parties filed a joint notice of appeal (*see* Doc. No. 2730), and on March 29, 2016, the Second Circuit affirmed

this Court's decision with respect to the state law fraudulent conveyance claims, albeit on different grounds. *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016). On July 22, 2016, the Second Circuit denied rehearing en banc, and the Second Circuit's mandate was issued on August 1, 2016. (Doc. Nos. 6895, 6896, 6907.) On September 9, 2016, Plaintiffs filed a petition for a writ of certiorari with the United States Supreme Court, which is currently pending. (Doc. No. 6907.)[5]

Meanwhile, this Court issued an order establishing the timing and procedures for Defendants' motions to dismiss the remaining claims. (Doc. No. 5697 (the "Phase Two Motions").) Defendants subsequently filed twelve separate motions to dismiss, including the present motion to dismiss Count 1 of the *FitzSimons* Complaint filed by the Shareholder Defendants ("Motion 12").[6] The Court also imposed a stay of discovery pending resolution of these motions, and as a practical matter, pending resolution of the appeal of the Phase One motions.

---

[5] Though the petition had originally been distributed at the Supreme Court's December 2 and December 9, 2016 Conferences, the Supreme Court has subsequently postponed consideration of the petition. Docket, *Deutsche Bank Tr. Co. Ams. v. Robert R. McCormick Found.*, No. 16-317, *available at* https://www.supremecourt.gov/docket/docket.aspx.

[6] The Shareholder Defendants – totaling over 5,200 individuals – are identified in Exhibit A of the *FitzSimons* Complaint. (Doc. No. 2701, Ex. A.) They include any shareholder who received more than $50,000 from the LBO. (*FitzSimons* Compl. ¶ 6.) Since commencing this action, the Trustee has voluntarily dismissed at least 300 additional Shareholder Defendants.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc.*, 493 F.3d at 98; *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

In addition, to state a claim for actual fraudulent conveyance, a plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 9(b), *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005), which requires plaintiff to "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b). While "malice, intent, knowledge, and other conditions of a person's mind may be

alleged generally," *id.*, this "'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations,'" *In re M. Fabrikant & Sons, Inc.*, 480 B.R. 480, 484 (S.D.N.Y. 2012) (quoting *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). Accordingly, a complaint alleging an actual fraudulent conveyance must "allege facts that give rise to a strong inference of fraudulent intent." *Id.*; *accord In re Sharp*, 403 F.3d at 56. "An inference is strong if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015) (internal quotation marks omitted); *accord In re Lyondell Chem. Co.* ("*Lyondell III*"), 554 B.R. 635, 652 (S.D.N.Y. 2016), *reconsideration denied*, No. 16-cv-518 (DLC), 2016 WL 5818591 (S.D.N.Y. Oct. 5, 2016). "In determining whether this strength-of-inference requirement is met," the Court assesses "the complaint in its entirety and take[s] into account plausible opposing inferences." *Loreley*, 797 F.3d at 177 (internal quotation marks omitted). Although "the degree of particularity required" of a bankruptcy trustee may vary depending on whether "the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts," *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987), the particularity requirement still applies in cases where, as here, the bankruptcy trustee had access to "numerous documents" and "depositions of many witnesses" when crafting the Fifth Amended Complaint, *see In re Old CarCo LLC*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010).

## III.  Discussion

In Count 1 of the *FitzSimons* Complaint, the Trustee alleges that the Shareholder Transfers constituted actual fraudulent conveyances because Tribune authorized these payments with an actual intent to hinder, delay, or defraud Tribune's creditors in violation of §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code.  Section 548(a)(1)(A) allows a trustee to avoid any transfer of property of the debtor if the debtor made the transfer (1) in the two years preceding a bankruptcy filing and (2) "with an actual intent to hinder, delay, or defraud" the debtor's creditors.  Section 550(a) allows a trustee to recover the value of any property that was transferred in violation of § 548(a).[7]

Here, there is no dispute that the Shareholder Transfers occurred in the two years preceding Tribune's bankruptcy filing on December 8, 2008.  Accordingly, the sole issue for the present motion is whether the Trustee has alleged sufficient facts to support a strong inference that Tribune, as the transferor, acted with an actual intent to hinder, delay, or defraud its creditors.

---

[7] Because Count 1 concerns the application of the federal Bankruptcy Code, the Court will apply this Circuit's interpretation of the Bankruptcy Code.  *See Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (noting that when a case is transferred pursuant to 28 U.S.C. § 1407, the "transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit"); *In re Mirena IUD Prods. Liab. Litig.*, No. 13-cv-3383 (CS), 2015 WL 144214, at *2 n.1 (S.D.N.Y. Jan. 9, 2015) ("MDL transferee courts apply the law of the transferee court as to matters of federal law.").  Where appropriate, the Court also considers out-of-circuit decisions and decisions construing analogous, similarly worded actual fraudulent conveyance statutes.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 553 (Bankr. S.D.N.Y. 2016) (noting that New York's actual fraudulent transfer provision, N.Y. Debt. & Cred. Law § 276, is "substantially similar to section 548(a)(1)(A) of the Code"), *aff'd*, No. 16-cv-561 (JGK), 2016 WL 3554995 (S.D.N.Y. June 24, 2016).

A. Imputed Intent To Hinder, Delay, or Defraud

As an initial matter, the Court must decide whose intent should be imputed to *Tribune*. When considering whether a debtor had an actual intent to hinder, delay, or defraud its creditors, courts focus on the intent of the transferor, not the intent of the transferee. *See In re Bayou Grp., LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010); *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 444–45 (S.D.N.Y. 2001) (same). However, where the transferor in an alleged fraudulent conveyance is a corporation, as opposed to a real person, determining the transferor's actual intent becomes more difficult to discern. Because all corporations must act through agents, *see In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 715 (S.D.N.Y. 2006), courts assessing the intent of a corporation in a fraudulent conveyance claim will look to the intent of the corporate actors who effectuated the transaction on behalf of the corporation, *see In re Elrod Holdings Corp.*, 421 B.R. 700, 712 (Bankr. D. Del. 2010) (declining to impute insiders' intent where trustee failed to show "formal, legal control as well as functional control"); *Collier on Bankruptcy* ¶ 548.04[1][b][iv] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016) (noting that "if management of the debtor is . . . diverse, issues of control exist, with imputation barred unless the trustee can prove such control").

Here, the Court must determine Tribune's intent based on the intent of Tribune's agents who effectuated the LBO, and there are several groups of actors whose intent may be relevant. The Court will consider each in turn.

1. Shareholders

At the highest level of generality, the LBO was only consummated because Tribune's public shareholders either accepted the tender offer at Step One or voted in favor of the merger at Step Two. (*FitzSimons* Compl. ¶¶ 287, 352.) Critically, however, the Trustee acknowledges that "the intent of Tribune's public shareholders is irrelevant." (Opp'n 38–39.) Therefore, as the Trustee all but concedes, he has failed to sufficiently allege that Tribune's public shareholders possessed an actual intent to hinder, harm, or delay Tribune's creditors.

Defendants argue that the Trustee's failure to allege actual fraudulent intent by a majority of Tribune's shareholders, who had ultimate control over the decision to effectuate the LBO, precludes any finding that Tribune possessed the requisite intent under Section 548(a)(1)(A). (Mot. 12 at 27–28 (citing Delaware General Corporation Law ("DGCL") § 251(c)).) However, Defendants cite no cases for the proposition that approval of the transaction by innocent shareholders necessarily precludes an actual fraudulent conveyance claim. Regardless of the merits of this argument, the Court need not address it, since the Court finds that the Trustee has also failed to allege that any other relevant actors had actual intent sufficient to support a claim under Section 548(a)(1)(A).

2. Board of Directors

The Trustee *does* allege that members of Tribune's board of directors possessed fraudulent intent. (*FitzSimons* Compl. ¶¶ 27–40; Opp'n 26–34.) Indeed, pursuant to Delaware law, any decision to merge or engage in an LBO requires approval from the board of directors. *See* DGCL §§ 141(a), 160(a), 251(b); *In re Primedia, Inc. Shareholders Litig.*, 67 A.3d 455, 490–91 (Del. Ch. 2013). Here, however, the Board delegated its decision-making authority to

the Independent Directors, who constituted a seven-member majority of the Board and were convened as a special committee for the express purpose of assessing the desirability of the LBO and other alternatives. (*FitzSimons* Compl. ¶¶ 9, 28–34.) As a result, the Independent Directors were clearly in a position to control the outcome of the Board's vote on the LBO and did in fact supply the necessary votes to approve the LBO on April 1, 2007. (*Id.* ¶ 211.) Furthermore, even after this vote, the Trustee asserts that the Independent Directors retained the ability to terminate the transaction before the consummation of Steps One and Two. (*See* Opp'n 25–26.) Accordingly, to the extent that the Trustee has pleaded facts demonstrating that the Independent Directors possessed an actual intent to hinder, harm, or delay Tribune's creditors, that intent may be imputed to the corporation for purposes of the Trustee's fraudulent conveyance claim. [8]

### 3. Officer Defendants

The Trustee also alleges that the Officer Defendants possessed the requisite intent to hinder, delay, or defraud Tribune's creditors and urge that their fraudulent intent be imputed to the corporation. (Opp'n 19–26.) Based on the facts alleged in the Complaint, the Court declines to do so.

Although the Second Circuit has not yet articulated a test for determining when an officer's intent should be imputed to a corporation in an actual fraudulent conveyance suit, the Court finds the test applied by the First Circuit and recently elaborated upon by Judge Gerber in this district to be particularly appropriate. *In re Roco Corp.*, 701 F.2d 978, 984, 988 (1st Cir. 1983); *In re Lyondell Chem. Co.*, 503 B.R. 348, 388 (Bankr. S.D.N.Y. 2014) ("*Lyondell I*"), *abrogated in part on other grounds in In re Tribune*, 818 F.3d at 118.[9] Specifically, the Court agrees with these decisions that the intent of the debtor's officers may be imputed to the debtor if the officers were "in a position to control the disposition of [the transferor's] property," thereby effectuating the underlying offense. *In re Roco Corp.*, 701 F.2d at 984; *see also Lyondell I*, 503 B.R. at 388; *accord In re Lehman Bros. Holdings Inc.*, 541 B.R. at 576 ("[T]he Court's analysis regarding imputation must turn on *actual control* of [the debtor]." (emphasis added)); *In re L & D Interests, Inc.*, 350 B.R. 391, 400 (Bankr. S.D. Tex. 2006) (imputing intent of the persons "directly in control of disposition of the corporation's property" that was allegedly fraudulently transferred rather than corporation's "president, director, and sole shareholder"); *see also In re Adler*, 263 B.R. at 441–43, 447–48 (concluding that transferee's "actual fraudulent intent may be ascribed to" transferor corporation where transferee "dominated or controlled [transferor's] disposition" of its property); *In re Elrod Holdings Corp.*, 421 B.R. at 712 (same). In other words, an officer's wrongful intent may be imputed to the

---

[8] Although the composition of the Board changed several times following the April 1, 2007 vote, the Special Committee members remained a majority of the Board. Specifically, Zell was elected to the Tribune Board on May 9, 2007 prior to effectuation of Step One (*FitzSimons* Compl. ¶¶ 76, 280 & n.5), and the three Chandler Trust Representatives resigned from the Board on June 4, 2007 following Step One (*id.* at 35–38, 326–42 & n.7).

[9] Although former U.S. Bankruptcy Judge Gerber's thoughtful opinions in *Lyondell* were recently overturned on appeal by Judge Cote in *Lyondell III*, 554 B.R. at 635, that opinion is not binding on this Court. Indeed, the Court finds Judge Gerber's analysis to be highly compelling and, for the reasons set forth in this section, the Court continues to apply Judge Gerber's analysis as persuasive, though obviously not binding, authority.

corporation "by establishing that [the officer], by reason of the ability to control" members of the board, "caused the critical mass" to form "an actual intent to hinder, delay or defraud creditors." *In re Lyondell Chem. Co.* ("*Lyondell II*"), 541 B.R. 172, 177–78 (Bankr. S.D.N.Y. 2015), *rev'd and remanded*, 554 B.R. at 635. Like Judge Gerber, the Court finds that this test appropriately accounts for the distinct roles played by directors and officers under corporate law, while also factoring in the power certain officers and other actors may exercise over the corporation's decision to consummate a transaction. *Lyondell I*, 503 B.R. at 388.

As a necessary corollary to this holding, the Court rejects Defendants' argument that only the directors' intent is relevant to an assessment of the corporation's intent (*see* Mot. 12 Reply at 1), since it is too restrictive and "effectively disregards any influence on the Board that [officers] may have exercised," *see Lyondell I*, 503 B.R. at 386. Similarly, the Court rejects the Trustee's argument for the opposite rule, whereby an officer's intent is *always* attributable to the corporation in actual fraud cases. (*See* Opp'n 18–21.) As stated earlier, in large corporations with diverse management, where "issues of control exist . . . imputation [is] barred unless the trustee can prove" that an officer exercised "control" over the transaction. *Collier* ¶ 548.04[1][b][iv]. To the extent that the Trustee relies on out-of-circuit decisions that, on their face, appear to hold otherwise (Opp'n 20), the Court finds these decisions unpersuasive for the same reason Judge Gerber did, since none "addresse[d] any necessary distinctions between officers and directors in instances

where the distinctions matter." *Lyondell I*, 503 B.R. at 387.[10]

Where, as here, a party who does not own a majority of a corporation's shares is alleged to control that corporation, the plaintiff must show "such formidable voting and managerial power that [he], as a practical matter, [is] no differently situated than if [he] had majority voting control" of the corporation's shares. *In re Morton's Rest. Grp., Inc. Shareholders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (Strine, C.). Though applied in the context of Delaware fiduciary law, this test is equally appropriate in the fraudulent conveyance context, since it measures whether a party "could be deemed to have effective control of the board without actually owning a majority of stock." *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 307 (Del. 2015) (Strine, C.J.); *see also In re Elrod Holdings Corp.*, 421 B.R. at 712 (requiring trustee in actual fraudulent conveyance case to show

---

[10] *See also In re James River Coal Co.*, 360 B.R. 139, 161–62, 165 & n.19 (Bankr. E.D. Va. 2007) (imputing the intent of "[d]irectors [who] caused the Debtors to make transfers of their interests in property and/or to incur obligations with the actual intent to hinder, delay or defraud"); *In re Nat'l Audit Def. Network*, 367 B.R. 207, 221 (Bankr. D. Nev. 2007) (imputing intent of officers who "personally authorized or executed the transaction[s] (by signing the check; by authorizing the wire transfer), or authorized" the relevant transfers); *In re Blazo Corp.*, No. 93-6087, 1994 WL 92405, at *4 (Bankr. N.D. Ohio Feb. 25, 1994) (imputing the intent of the debtor's chairman of the board, president, and CEO who was using the debtor corporation to operate a Ponzi scheme); *In re Anchorage Marina, Inc.*, 93 B.R. 686, 691 (Bankr. D.N.D. 1988) (imputing to the debtor, Anchorage, the intent of directors who "together control[ed] the majority of the voting rights of Anchorage").

"formal, legal control as well as functional control").[11]

### a.  Voting Power

Here, the Trustee alleges that Tribune's CEO, FitzSimons, was affiliated with the Foundations, which owed 13% of Tribune's outstanding stock.  (FitzSimons Compl. ¶¶ 40, 127.)  But there are no other allegations that any of the Officer Defendants exercised meaningful voting power in Tribune (*id.* ¶ 49), and mere ownership of 13% of stock is far below the amount typically found to constitute "formidable voting" power under Delaware law.  *See In re Morton's*, 74 A.3d at 665 (noting that a decision finding that CEO who "only held 35% of the company's stock" had control was "perhaps" Delaware's "most aggressive finding that a minority blockholder" had control).  The Trustee also makes no allegation that any of the Officer Defendants had the "right to appoint any directors," the "right to veto any board action," or "the power to exact retribution by removing" or reducing the compensation of any of Tribune's directors "if they did not bend to [their] will in their consideration of the proposed merger." *Corwin*, 125 A.3d at 307 (finding that entity did not control corporation, notwithstanding

fact that entity managed its day-to-day operations, where entity owned less than 1% of corporation's stock, "had no right to appoint directors, and had no contractual right to veto any board action").  In short, the Trustee fails to plead sufficient allegations of control, since there is no basis for inferring that any of the Officer Defendants "possessed sufficient voting power to remove [the directors] from their positions if they rejected" the LBO.  *See In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 994 (Del. Ch. 2014), *aff'd sub nom.*, *Corwin*, 125 A.3d at 304.

### b.  Managerial Power

Even assuming the Trustee alleged sufficient voting power on the part of the Officer Defendants, there are also insufficient allegations of managerial power over the Board's decisionmaking such that any Officer Defendant's intent should be imputed to the corporation itself.  Significantly, the Trustee contends that the Officer Defendants effectively controlled the disposition of the Shareholder Transfers because Tribune CEO FitzSimons and Officer Defendants Grenesko and Kenney attended all but one of the Special Committee meetings.  (*Id.* ¶ 136; *see also* Opp'n 26.)  But these allegations – by themselves – do not support a plausible inference of managerial control.  Certainly, there is no allegation that the Officer Defendants inappropriately pressured the Independent Directors at those meetings or that the officers had a "dominating and intrusive style of management." *See In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 799 n.128 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011); *cf. N.J. Carpenters Pension Fund v. Infogroup, Inc.*, No. CIV.A. 5334 (VCN), 2011 WL 4825888, at *4, *11 (Del.

---

[11] Even assuming federal, as opposed to state, law governs the imputation analysis under § 548(a)(1)(A), *compare In re Roco Corp.*, 701 F.2d at 984 (applying federal law), *with Lyondell III*, 554 B.R. at 647 (applying Delaware law), the "first place" that the Court "must look to determine the powers of corporate directors is in the relevant State's corporation law," since "in this field congressional legislation is generally enacted against the background of existing state law;" and "Congress has never indicated that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute," *Burks v. Lasker*, 441 U.S. 471, 478 (1979). Accordingly, Delaware corporate governance law, even if not controlling, is highly relevant authority.

Ch. Sept. 30, 2011) (control adequately alleged where threats and erratic behavior of former CEO, company founder, and owner of 34% of common stock "negatively impacted" and "simply overwhelmed" the board).[12]

The Trustee also fails to allege familial or other professional ties between the Officer Defendants and the Independent Directors. *See Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (noting, in context of Delaware fiduciary law, that a director may be controlled "through close personal or familial relationship or through force of will"). Nor does the Trustee allege that the Independent Directors – who included the former CEOs of Abbott Laboratories and Kraft Foods and the former Chairman of the Board of Nordstrom, Inc. (*FitzSimons* Compl. ¶ 221) – were financially dependent on or otherwise beholden to the Officer Defendants. *See Emerald Partners v. Berlin*, No. CIV.A. 9700, 2003 WL 21003437, at *3, *39 (Del. Ch. Apr. 28, 2003) (plaintiffs failed to show that directors, who were "successful businessmen of independent means," were "financially dependent upon [controlling

shareholder] or otherwise subject to his control"), *aff'd*, 840 A.2d 641 (Del. 2003).

The Trustee next argues that the Officer Defendants controlled the disposition of the Shareholder Transfers by manipulating the information provided to the Special Committee. Specifically, the Trustee asserts that the Officer Defendants deceived – and thereby controlled – the Committee by: (i) creating inflated projections on which the LBO and solvency opinions were based (*FitzSimons* Compl. ¶¶ 41, 163, 170–73, 306–14, 319–21, 323, 379(c), 380(g); *see also* Opp'n 25–26), (ii) directing Valuation Research to use a non-standard definition of fair value in its solvency opinions (*id.* ¶¶ 19, 201, 270–72, 274; *see also* Opp'n 25–26), and (iii) misrepresenting to Valuation Research that Morgan Stanley had blessed various refinancing scenarios in order to ensure that Valuation Research would issue a Step Two solvency opinion (*id.* ¶¶ 315–17, 342; *see also* Opp'n 25–26).

Although in some contexts, courts have indeed found management to "control" an utterly passive board through deception, *see Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1279 (Del. 1989) (transaction was not product of board's independent business judgment where there had been "deception" by management and "the board's own lack of oversight in structuring and directing the auction afforded management the opportunity to indulge in the misconduct which occurred"), the Trustee has failed to plead such facts here. To the contrary, the allegations before the Court reveal that the Special Committee and other board members:   (i) reviewed management's projections on several occasions, including during meetings with Morgan Stanley, the Special Committee's independent financial advisor, (ii) considered Duff & Phelps's viability

---

[12] While the Trustee also asserts in his brief that "FitzSimons alone briefly halted" Tribune's consideration of the LBO, thus evincing control over the Board (Opp'n 26), the only relevant allegation to that effect is based on a vague and speculative statement made by an unnamed employee of EGI who had no affiliation with Tribune and admitted to being "a bit skimpy" on Tribune's internal deliberations (*FitzSimons* Compl. ¶ 157). This allegation is highly speculative and offers no facts as to whether and how FitzSimons even communicated his misgivings to the Board, much less how he dominated it. Therefore, this allegation fails to raise a plausible inference of control by FitzSimons and does not support the characterization in the Trustee's brief. *See Twombly*, 550 U.S. at 555 (conclusory and speculative allegations insufficient to withstand 12(b)(6) motions).

opinion before the board's April 1, 2007 vote, (iii) evaluated the LBO against two downside test cases, and (iv) reviewed Valuation Research's solvency opinions prior to consummation of Steps One and Two of the LBO, among other things. (*FitzSimons* Compl. ¶¶ 15, 188–89, 193, 214, 217–19, 223, 268, 279–80, 326, 336, 338, 552.)  In other words, contrary to other cases in which courts have found that management dominated a board of directors, the Trustee has alleged no facts to suggest that the Special Committee here was "supine" or "under the sway of an overweening CEO."  *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1002 (Del. Ch. 2005).

Indeed, even though the Trustee makes much of the Officer Defendants' request that Valuation Research use an allegedly non-standard definition of fair value, the Complaint acknowledges that Valuation Research made an independent determination that it was appropriate to include expected tax savings in its fair value calculations.  (*Id.* ¶¶ 199–201.)  In addition, the Special Committee enlisted its own financial advisor, Morgan Stanley, to separately assess Tribune's solvency.  (*Id.* ¶¶ 552; *see also* 15, 90, 155, 169, 336, 338.)  And as already discussed, the Independent Directors also considered Duff & Phelps's "viability opinion," which provided an independent basis for concluding that "the fair market value of Tribune's assets would exceed the value of its liabilities on a post-transaction basis" and thereby enable Tribune "to pay its debts as they became due."  (*Id.* ¶¶ 188–89, 193.)  Similarly, the Officer Defendants' alleged manipulations of the February Projections and October Projections are also insufficient to support an inference of domination or control over the Special Committee, since the Trustee overlooks the fact that these projections were also reviewed by the Committee's various financial advisers and were not merely rubber stamped by the Independent Directors.  Thus, this case is readily distinguishable from *In re Tronox*, the Trustee's leading authority, in which the corporation "assiduously avoided" performing an analysis of the transferor's legacy liabilities and the impact of the transaction on creditors.  503 B.R. 239, 291 (Bankr. S.D.N.Y. 2013).

It is true, as the Trustee underscores, that Judge Cote recently imputed the actual fraudulent intent of a CEO to a transferor corporation based in part on the fact that the CEO presented misleading projections to the board.  554 B.R. at 639; (*see also* Doc. Nos. 6980, 6911.)  But the Trustee glosses over the many ways in which the *Lyondell* trustee's allegations of control were more compelling than those alleged here.  For instance, in *Lyondell*, the board allegedly plunged headlong into an LBO at the urging of its CEO, notwithstanding the Board's failure to obtain a solvency opinion or obtain any meaningful analysis from an independent advisor concerning the transferor corporation's ability to repay its debts.  *See In re Lyondell Chem Co.*, No. 09-bk-10023 (REG), Doc. No. 753 ¶¶ 193, 201–02 (Bankr. S.D.N.Y. Apr. 18, 2014).  Here, by contrast, the allegations before the Court reveal that the Special Committee and other board members reviewed management's projections on several occasions, were advised by an independent financial adviser, and obtained both solvency and viability opinions from outside experts.  (*FitzSimons* Compl. ¶¶ 15, 214, 217–19, 223, 268, 279–80, 326, 336, 338, 552.)

Furthermore, in *Lyondell*, one of the outside directors who voted in favor of the LBO was a senior officer of an entity that

"stood to gain $326 million from the sale," and therefore had a strong motive to approve the LBO notwithstanding its potentially adverse impact on creditors. *See Lyondell III*, 554 B.R. at 642. Here, as discussed elsewhere, the Trustee has failed to allege any financial or other personal ties between any of the Independent Directors and the parties who stood to gain the most from the LBO – including the Officer Defendants, Foundations, Chandler Trusts, and Tribune's financial advisors (*FitzSimons* Compl. ¶¶ 158–63, 168–69, 203–04, 210, 258, 328–329) – that "could have affected the impartiality" of the Special Committee. *See Kahn*, 88 A.3d at 649. Although the seven Independent Directors did obtain consideration for their shares, the approximately $6 million that they collectively received, though perhaps significant in isolation, was an utterly miniscule fraction of the nearly $11 billion transferred. (*FitzSimons* Compl. ¶¶ 39, 212.) In fact, excluding the approximately $3.4 million obtained by Taft, the one Independent Director who was absent from the April 1 vote, the remaining six Independent Directors collectively received approximately $2.73 million for their shares. Accordingly, the Court finds the Trustee's attempts to analogize this case to *Lyondell* to be unavailing.[13]

At its heart, the Trustee's argument turns on the allegation that the Officer Defendants misled Valuation Research when they indicated in a December 2, 2007 telephone call and in a December 20, 2007 letter that Morgan Stanley had confirmed their refinancing assumption. The Trustee asserts that the misrepresentation was crucial in inducing Valuation Research to issue its solvency opinion. (*Id.* ¶¶ 315–17.) And while the Trustee at times suggests that the effectuation of Step Two was already a fait accompli following implementation of Step One (*FitzSimons* Compl. ¶¶ 238–43), he also argues that without Valuation Research's Step Two solvency opinion, the Board would not have permitted the LBO to proceed (*id.* ¶ 17; Opp'n 25–26).

What complicates the Trustee's imputation argument, however, is the roundabout means by which he alleges that the Officer Defendants dominated or controlled the Board's decisionmaking. Significantly, the Trustee does not suggest that the Officer Defendants misled the Board itself; rather, he claims that the Officer Defendants manipulated an outside expert on which the Board relied. Thus, the Trustee's theory depends on two successive levels of domination or influence: first, that the Officer Defendants dominated Valuation Research in the issuance of its solvency opinion by misleadingly citing

---

[13] To the extent that *Lyondell III* also concluded that it was unnecessary for the trustee to allege control by the CEO to impute his intent to the transferor corporation, the Court disagrees. Under Delaware law, a corporation "is liable for the actions of its agent that are within the scope of the agent's actual or apparent authority." *Creedon Controls, Inc. v. Banc One Bldg. Corp.*, 470 F. Supp. 2d 457, 460 (D. Del. 2007); *see also In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 887 n.40 (Del. Ch. 2009) ("Whether employees can be considered managerial employees so as to impute their actions to the corporation does not necessarily hinge on their level in the corporate hierarchy but depends on the degree of discretion the employee has in making

decisions that will ultimately determine corporate policy." (quoting 18B *Am. Jur.* 2d *Corporations* § 1444)). Other courts addressing this issue as a matter of federal law have reached the same conclusion. *See In re Roco Corp.*, 701 F.2d at 984 (insider's intent is imputed to the corporation if he has sufficient control to effectuate the acts alleged to have been fraudulent); *In re Elrod Holdings Corp.*, 421 B.R. at 712 (same). Thus, even assuming, as *Lyondell III* concluded, that Delaware law (as opposed to the Bankruptcy Code or federal common law) controls the imputation analysis, the relevant inquiry – and the outcome – would be the same.

"management's recent discussions with Morgan Stanley" regarding Tribune's ability to refinance (*id.* ¶ 317), and, second, that Valuation Research, through the solvency opinion, dominated the Board's decision to proceed with the LBO. But while the Trustee's theory hinges on Valuation Research's alleged misconduct – its failure to seek or confirm Morgan Stanley's view or otherwise discuss the Officers' letter with Morgan Stanley (*id.*) – the Trustee alleges no facts to suggest that Valuation Research *itself* had fraudulent intent. Nor does the Trustee allege that Valuation Research conspired with the Officer Defendants to "dominate" an otherwise passive and derelict group of Independent Directors through deception. In essence, the Trustee argues that the Officer Defendants' actual intent, combined with (i) Valuation Research's negligence in improperly relying on the Officer Defendants' characterization of Morgan Stanley's refinancing assumption, and (ii) the Independent Directors' negligence in accepting the Valuation Research solvency opinion, is enough to impute the Officer Defendants' fraudulent intent to Tribune.

The Court disagrees. Here, the facts alleged in the Complaint demonstrate that the Officer Defendants were plainly not "in a position to control" the Independent Directors through Valuation Research's projections. Rather, the Officer Defendants' alleged deceptions only influenced the Independent Directors because of Valuation Research's alleged failure to seek or confirm Morgan Stanley's view of the transaction and the Independent Directors' alleged failure to scrutinize the assumptions underlying the solvency opinion. The Trustee's expansive conception of the imputation doctrine, whereby a misrepresentation communicated through a third party might be found to "control" a board, sweeps the corporate landscape too broadly. The Trustee's freewheeling imputation theory is particularly problematic under the facts of this case, in which the Trustee seeks to unravel $8 billion in shareholder transfers. As the Second Circuit recognized in dismissing the state-law fraudulent conveyance claims in Phase One, "after-the-fact unwinding of securities transactions" has a "disruptive effect" on securities markets and "seriously undermine[s] . . . markets in which certainty, speed, finality, and stability are necessary to attract capital." *In re Tribune*, 818 F.3d at 119, 121. Thus, "[a] lack of protection against the unwinding of securities transactions would create substantial deterrents, limited only by the copious imaginations of able lawyers, to investing in the securities market." *Id.* at 121. For this reason, Congress limited a trustee's power to avoid transfers that are settlement payments in securities transactions or made in connection with a securities contract to cases of *actual*, as opposed to *constructive*, fraud on the debtor's part under Section 546(e) of the Bankruptcy Code.

The Court finds that the Trustee's multi-layered imputation theory – which is entirely contingent on the nonfeasance of both an unwitting intermediary, Valuation Research, and an arguably negligent but by no means supine board – would undermine Congress's policy of protecting securities markets by introducing substantial uncertainty to the law governing actual fraudulent conveyance claims. Given the ease with which one could allege that the misrepresentation of a material fact – originating from *any source* – manipulated the board's decisionmaking, it is important to confine the imputation doctrine to those actors who deliberately and directly exert control inside the boardroom. *See In re Elrod Holdings Corp.*, 421 B.R. at 712 (noting that cases imputing third party's

"intent to a transferee have typically involved sole shareholders of the transferor, with complete control of the transferor, transferring assets to themselves as transferee").[14]

\*       \*       \*

In sum, the Trustee has failed to sufficiently allege that any Officer Defendant possessed "such formidable voting and managerial power that [he], as a practical matter, [is] no differently situated than if [he] had majority voting control." *In re Morton's*, 74 A.3d at 665. Therefore, the Court finds the Trustee's attempt to impute the Officer Defendants' intent to the corporation is unjustified.

Accordingly, the Trustee's fraudulent conveyance claim in Count I rises and falls

on the intent of the Independent Directors, and whether the Trustee has alleged facts sufficient to support an inference of actual fraudulent intent on the part of the Independent Directors who approved the Shareholder Transfers.

B. Sufficiency of the Allegations of Intent

As noted above, Section 548(a)(1)(A) allows a trustee to avoid any transfer of property of the debtor if the debtor made the transfer (1) in the two years preceding a bankruptcy filing and (2) "with an actual intent to hinder, delay, or defraud" the debtor's creditors. Nevertheless, courts within this Circuit have employed different standards for finding actual fraudulent intent. In particular, some courts require a pleading to allege facts raising a strong inference that the debtor made a conveyance with the "purpose of placing a debtor's assets out of the reach of creditors," either through direct proof of fraudulent intent or the existence of "badges of fraud," which "focus the inquiry on the circumstances that suggest a conveyance was made with fraudulent intent." *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005); *In re Sharp Int'l Corp.*, 302 B.R. 760, 784 (E.D.N.Y. 2003), *aff'd*, 403 F.3d at 43; *see also In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 n.16 (S.D.N.Y. 2007) ("Knowledge to a substantial certainty constitutes intent in the eyes of the law." (citing Restatement (Second) of Torts § 8A (1963 & 1964)).) Other courts within this Circuit, while also employing a badges-of-fraud analysis, have invoked the more plaintiff-friendly test commonly used in securities-fraud suits, which permits plaintiffs to raise a strong inference of fraudulent intent either by a showing of "motive and opportunity to commit fraud" or facts "constitut[ing] strong circumstantial evidence of conscious misbehavior or

---

[14] The Trustee also argues, in passing, that the intent of the Chandler Trust Representatives who served on the Board should also be imputed to Tribune. (Opp'n 33–34.) The Trustee points to facts that the Chandler Trust Representatives and representatives of the Foundations, which collectively owned 33% of Tribune's stock immediately prior to the LBO, influenced the decision to create the Special Committee in September 2006 (*FitzSimons* Compl. ¶¶ 75, 129–136) and expressed their support for the LBO during negotiations (*id.* ¶¶ 138, 141, 144–45, 148–49, 151). But the Trustee fails to plead any facts that would permit a plausible inference that the Chandler Trust Representatives, who abstained from the vote to approve the LBO, controlled the Independent Directors' decision to vote in favor of the deal. *See In re W. Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192, at \*8 (Del. Ch. May 22, 2000) (holding that the mere fact that a company solicited the view of a 40% shareholder about an "extraordinary business transaction and ultimately agreed with the view expressed" was insufficient to "indicate a relationship of domination and control" by that shareholder). The Court also notes that, even though Zell joined the Board prior to the effectuation of Step One, the Trustee makes no argument for imputing Zell's intent to Tribune and all but concedes that Zell's intent is irrelevant with respect to this cause of action.

recklessness," *see, e.g., In re Refco*, No. 07-mdl-1902 (GEL), 2009 WL 7242548, at *8 (S.D.N.Y. Nov. 13, 2009) (internal quotation marks omitted), *report and recommendation adopted*, No. 07-mdl-1902 (JSR), 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010); *accord In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 222 & n.14 (Bankr. S.D.N.Y. 2011).

At first glance, there appears to be some tension between these standards, and the parties extensively dispute them in their briefs. (*Compare* Mot. 12 at 2–3, 6–8, *with* Opp'n 17–19); *see also In re Rudrakumaran*, 516 F. App'x 9, 13 n.1 (2d Cir. 2013) ("'Recklessness involves . . . a lesser degree of fault than intentional wrongdoing.'" (quoting *Black's Law Dictionary* (9th ed. 2009)). Even so, as the Second Circuit has underscored, recklessness still requires a "state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Candidly, if forced to choose between an intentional harm standard and a recklessness standard, the Court would be inclined to adopt the former, since it more closely tracks the language of the bankruptcy code, which imposes liability for "actual intent to hinder, delay, or defraud," 11 U.S.C. § 548(a)(1)(A), "as distinguished from intent presumed in law," Uniform Fraudulent Conveyance Act § 7; *see also In re Actrade*, 337 B.R. at 809 (noting that "intentional fraudulent conveyance claims should be relegated to their proper sphere, i.e., where there is a knowing intent on the part of the defendant to damage creditors"). Nevertheless, the Court need not wade into this alleged conflict between these authorities because, for the reasons set forth below, the Court finds that the Trustee's actual fraudulent conveyance claim against the Shareholder Defendants fails under either standard.[15]

Accordingly, the Court considers both (1) the "purposeful harm test," by which the Trustee must allege either direct proof of actual intent or the existence of "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent," *Sharp Int'l Corp.*, 403 F.3d at 56, and (2) the securities law test,

---

[15] The Court does, nonetheless, expressly decline to follow decisions relied on by the Trustee implying that a debtor acts with actual intent if it "should have seen" that its actions would harm creditors (Opp'n 18–19 (quoting *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013))), or that actual intent may be found where a defendant "could have foreseen the effect on creditors resulting from" its actions (Opp'n 18 (quoting *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986))). The Court concludes that these out-of-circuit opinions impermissibly equate the actual intent standard with a foreseeability or negligence standard, *see United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir. 2000) ("[T]he should-have-known alternative connotes a concept more akin to negligence than to knowledge."), and therefore ignore the statute's clear language limiting its scope to intentionally fraudulent conveyances, *see In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 575 n.6 (S.D.N.Y. 2015) (rejecting the test set forth in *Tabor* because a foreseeability-based standard, "'though appropriate where culpability is based on negligent conduct, is incompatible with the concept of actual fraud'" (quoting *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 936 (S.D.N.Y. 1995))); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) ("The existence of actual intent to defraud is never presumed, and intent to defraud cannot be found based merely on suspicion, conjecture, or doubtful inference." (internal quotation marks omitted)), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *see also Lyondell III*, 554 B.R. at 651 (distinguishing *Sentinel* and concluding that the decision "should not be read as replacing the traditional, more demanding standard for ascribing actual intent with a presumption that a person is aware of the natural consequences of her acts.").

which requires "facts demonstrating that [Tribune] had both the motive and the opportunity" to hinder, delay or defraud its creditors or "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," *In re Saba Enterps., Inc.*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009) (internal quotation marks omitted). Whether these are truly separate tests or merely different formulations of the same standard, the Court finds that the trustee has failed to allege actual fraudulent intent on the part of the Independent Directors sufficient to support the claim that the Shareholder Transfers were actual fraudulent conveyances.

1. Purposeful Harm and Badges of Fraud

Although the Trustee all but concedes that there is no "smoking gun" in which the Independent Directors admitted their intent to hinder, delay, or defraud Tribune's creditors by approving the LBO, the law is clear that because "[f]raudulent intent is rarely susceptible to direct proof," a plaintiff can establish a strong inference of fraudulent intent by relying on certain "badges of fraud." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983); *accord In re Sharp*, 403 F.3d at 56. In fact, as set forth earlier, the badges of fraud analysis is almost universally applied in fraudulent conveyance cases, including those that have held plaintiffs to the higher standard of showing a "purpose" of harming creditors. *In re Actrade*, 337 B.R. at 809; *In re Sharp*, 302 B.R. at 784. Thus, when determining whether a debtor acted with an *actual intent* to hinder, delay, or defraud its creditors, courts consider the following non-exhaustive list of badges of fraud:

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*In re Kaiser*, 722 F.2d at 1582–83 (finding sufficient badges of fraud when the defendant, while insolvent, bought two homes with his own money and transferred the homes to his wife for no consideration, while maintaining possession and use of the homes). The Second Circuit has also recognized that "[c]oncealment of facts and false pretenses by the transferor" may be a badge of fraud. *Id.* at 1582.

While the "presence or absence of one badge of fraud is not conclusive," *In re Geltzer*, 502 B.R. 760, 769 (Bankr. S.D.N.Y. 2013); *see also In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 10 n.13, "the presence of multiple indicia will increase the strength of the inference," *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 935. In other words, while "[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254–55 (1st Cir. 1991) (citation omitted). Even so, the "'flip side of these badges of fraud is that their absence . . . would constitute evidence that there was no intent to

defraud.'" *N.Y. Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, No. 07-cv-8008 (RJS), 2008 WL 2115225, at *4 (S.D.N.Y. May 16, 2008) (quoting *Lippe*, 249 F. Supp. 2d at 374–75)).

For the reasons set forth below, the Court finds that the "badges of fraud" identified by the Trustee are insufficient to raise a strong inference that the Independent Directors possessed an intent to hinder, delay, or defraud Tribune's creditors.

a. "Family, Friendship or Close Associate Relationship Between the Parties"

With respect to the second badge of fraud, the Trustee argues that Shareholder Transfers were made to insiders of Tribune, including the Independent Directors. (*FitzSimons* Compl. ¶ 380(a).) While the claim that an allegedly fraudulent transfer was made to an insider or "close associate" can support an inference of fraudulent intent, *In re Kaiser*, 722 F.2d at 1582, in this case the Trustee fails to acknowledge that the only proceeds that the Independent Directors received from the Shareholder Transfers were from selling their shares in Tribune. (*See FitzSimons* Compl. ¶¶ 39, 212.) As discussed earlier, any inference of scienter that could be drawn from the Independent Directors' receipt of a miniscule fraction of the Shareholder Transfers is weak at best.

In fact, the arms-length relationships at issue in this highly complex transaction "'were significantly different from the family relationships – a husband conveying property to his wife, for example, or a mother conveying property to her son – one typically sees in fraudulent conveyance cases.'" *In re Lehman Bros. Holdings Inc.*, 541 B.R. at 576 (quoting *Lippe*, 249 F. Supp. 2d at 382); *see also Kaiser*, 722 F.2d

at 1583 ("The transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud."). Moreover, the transactions at issue here "did not involve sham or dummy corporations or fictitious parties." *In re Lehman Bros. Holdings Inc.*, 541 B.R. at 576 (internal quotation marks omitted)); *see also NMFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 935 (fact that "[t]here was no close relationship among the parties to the LBO" and that "it was an arm's-length transaction by sophisticated businesspeople" weighed *against* finding of actual fraudulent intent). Accordingly, the Trustee fails to sufficiently allege the second badge of fraud.

b. "Retention of Possession, Benefit or Use of the Property in Question"

The Trustee next argues that the third badge of fraud under *Kaiser* is satisfied because Tribune's insiders retained "possession, benefit, or use" of the Shareholder Transfers following the LBO. (*FitzSimons* Compl. ¶ 380(b).) A plaintiff may certainly support an inference of fraudulent intent by alleging "retention of control of the property *by the transferor* after the conveyance" as part of a sham transaction. *In re Sharp Int'l Corp.*, 403 F.3d at 56; *Kaiser*, 722 F.2d at 1582; *see also S.E.C. v. Shainberg*, No. 07-cv-8814 (LLS), 2007 WL 4526520, at *4 (S.D.N.Y. Dec. 21, 2007) (finding badge satisfied when transferor "retained possession, use, and benefit of the apartment after the transfer"). Here, by contrast, the transferor – Tribune – conveyed the property the Trustee is seeking to recover – the Shareholder Transfers – in an arm's length exchange of shares for cash. (*FitzSimons* Compl. ¶ 94 (noting that thousands of persons "received transfers" in connection

with selling their shares).) Thus, by definition, the transferor corporation – *Tribune itself* – did not maintain possession of the cash constituting the Shareholder Transfers. Consequently, the third badge recognized under *Kaiser* has therefore not been satisfied.

### c. "Inadequacy of Consideration" and "Financial Condition" of Tribune

With respect to the first and fourth badges, the Trustee asserts that Tribune received "less than reasonably equivalent value" for the LBO and that the LBO rendered Tribune insolvent. (*FitzSimons* Compl. ¶ 380(c), (d).) It is true that Tribune did, in fact, become insolvent following the LBO. But the Trustee's allegations merely restate two of the required elements of a constructive fraudulent conveyance claim, *see* 11 U.S.C. § 548(a)(1)(B), and, without more, are insufficient to raise a strong inference of fraudulent intent. To hold otherwise would turn every constructive fraudulent conveyance claim into an actual fraudulent conveyance claim and thereby undermine the distinction between the two claims. Accordingly, these allegations are insufficient, standing alone, to support a strong inference of actual intent to hinder, delay, or defraud Tribune's creditors. *In re Refco*, 2009 WL 7242548, at *17 (noting that even though a transaction was a "bad deal" for the debtor, "it does not necessarily mean that fraud was afoot" and it did not sufficiently raise the requisite strong inference of scienter); *In re Marketxt Holdings Corp.*, 361 B.R. 369, 396–97 (Bankr. S.D.N.Y. 2007) (allegation that transfers "lacked adequate consideration" was insufficient to support claim of actual fraudulent intent where, as here, "there were no familial or personal relationships between the parties" and "[n]othing was done in secret").

### d. "Course of Conduct after the Incurring of Debt" and "General Chronology of Events and Transactions Under Inquiry"

With respect to the fifth and sixth badges, the Trustee contends that the Shareholder Transfers were not made in the "ordinary course of business," since they "were made at the same time as, or with the proceeds of, the incurrence of new debt." (Opp'n 36–37; *FitzSimons* Compl. ¶ 380(e), (f).) To be sure, the existence of "a secret and hasty transfer not in the usual course of business" may support a strong inference of fraudulent intent. *Amusement Indus., Inc. v. Midland Ave. Associates, LLC*, 820 F. Supp. 2d 510, 530 (S.D.N.Y. 2011). But as the Trustee readily admits, the LBO was the product of months of elaborate negotiations among sophisticated parties and received widespread publicity. (*FitzSimons* Compl. ¶¶ 9–20, 244–57.) Furthermore, the Trustee's allegations are, at best, superficial indicators of fraudulent intent because they simply describe the basic features of any LBO, which, by its nature, is not a transaction that is made in the ordinary course of business and invariably requires a company to incur debt as it restructures and goes private. *See MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 935 (rejecting actual fraudulent conveyance claim involving LBO that "was not secretive, nor . . . structured in a manner unusual for an LBO"). The Court declines to infer fraudulent intent on the Independent Directors' part merely from the fact that Tribune engaged in an LBO, which is "obviously a common securities transaction." *In re Resorts Int'l, Inc.*, 181 F.3d 505, 516 (3d Cir. 1999). To accept the Trustee's argument would mean that every LBO that ends in a bankruptcy within two years of its effectuation would subject transferring shareholders to an actual fraudulent conveyance claim.

The Trustee's reliance on *Moody v. Sec. Pac. Bus. Credit Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992) for the proposition that "failed leveraged buyouts merit close scrutiny under the fraudulent conveyance laws" is misplaced. (*See* Opp'n 36.) The Trustee ignores the Third Circuit's observation in that case that due to "the difficulty in proving intentional fraud, challenges to leveraged buyouts tend to be predicated on . . . constructive fraud," and "leveraged buyouts have been set aside under [the UFCA's] intentional fraud provisions" only in "few instances." *Moody*, 971 F.2d at 1064. Similarly, while the Trustee relies on an out-of-circuit bankruptcy judge's opinion that "an LBO is not a routine business transaction that should normally be given deference by the courts" (Opp'n 36 (quoting *In re Bay Plastics, Inc.*, 187 B.R. 315, 334 (Bankr. C.D. Cal. 1995))), that observation was made in the context of a constructive fraudulent conveyance claim, in which liability may be imposed without regard to intent. And while the Trustee is correct that an LBO may amount to an intentionally fraudulent conveyance where "everyone involved in the transaction . . . knew the transaction would render the company insolvent" (Opp'n 37), the Trustee has, for the reasons discussed at greater length in the next section, failed to raise a strong inference that the Independent Directors – the corporate actors who decided to effectuate the LBO – "knew" that the LBO would render Tribune insolvent.

e. "Concealment of Facts and False Pretenses by the Transferor"

Finally, the Trustee alleges that some of the Officer Defendants engaged in deceptive conduct, such as concealing the February Projections from certain officers who would likely have found the projections to be unreasonable. (*FitzSimons* Compl. ¶ 380(g).) Nevertheless, while an officer's intent may be imputed to the corporation under some circumstances – as discussed earlier – the Court here assesses whether the Trustee has pleaded badges of fraud with respect to the Independent Directors, who actually approved the transaction. *See In re Kaiser*, 722 F.2d at 1582 (explaining that the plaintiff must allege "concealment of facts and false pretenses" by the *transferor*). Here, the Trustee has not alleged that the Independent Directors were aware of the Officer Defendants' alleged deception, and the mere insistence that the Independent Directors "should have known" about this alleged deception is insufficient to support a strong inference of fraudulent intent. *See In re Lehman Bros. Holdings, Inc.*, 541 B.R. at 575 n.6; *Lippe*, 249 F. Supp. 2d at 375; *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 936.

\*     \*     \*

Taken together, the badges of fraud alleged by the Trustee are insufficient to raise a strong inference that the Independent Directors acted with an actual intent to hinder, delay, or defraud Tribune's creditors. *In re Refco*, 2009 WL 7242548, at \*17 ("[T]he case law does not establish that, for example, asserting two (or three, etc.) badges of fraud are enough to survive a motion to dismiss."). Accordingly, the Court concludes that the Trustee has failed to raise a strong inference of fraudulent intent with respect to the Independent Directors under the traditional badges-of-fraud analysis.

2. Securities Law Test

In the alternative, the Trustee argues that the *FitzSimons* Complaint alleges enough facts to withstand the tests commonly

employed by courts in this Circuit to determine the sufficiency of scienter allegations in securities-fraud suits. (Opp'n 27–34.) As noted above, courts applying these tests permit plaintiffs to raise a strong inference of fraudulent intent either by a showing of "motive and opportunity to commit fraud" or facts "constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." *In re Refco*, 2009 WL 7242548, at *8. But whether these tests are truly different from the badges analysis described above, or merely a different way to state the same standard, the facts alleged by the Trustee lead to the same result.

### a. Motive and Opportunity

The Trustee alleges that the Independent Directors had a motive and opportunity to hinder, delay, or defraud Tribune's creditors based on the fact that, as shareholders, they would receive consideration in exchange for their shares only if the LBO were consummated. (Opp'n 30–31.) Indeed, each Independent Director who voted to approve the LBO received between $295,732 and $586,441 for selling their shares. (*FitzSimons* Compl ¶¶ 39, 212.) It is well settled, however, that "[m]otives that are generally possessed by most corporate directors and officers do not suffice" to plead scienter under the "motive and opportunity" test. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Accordingly, the mere fact that the Independent Directors received Shareholder Transfers in connection with the LBO fails to support a strong inference of scienter, since "a corporate director's desire to realize personal benefits in connection with a merger" is a motive shared by "[e]very corporate director in America." *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 339 (S.D.N.Y. 2000), *aff'd*, 264 F.3d at 131.

As set forth earlier, the Trustee also fails to make any allegations of financial or other personal ties between the Independent Directors and the parties that received special incentives upon completion of the LBO that "could have affected the impartiality" of the Independent Directors. *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014); *cf. In re Ply Gem Indus., Inc. S'holders Litig.*, No. CIV.A 15779, 2001 WL 755133, at *7 (Del. Ch. June 26, 2001) (finding that the directors did not breach their duty of loyalty in approving a transaction when there was no allegation that they "obtained any improper benefit whatsoever from the merger other than from their entitlement, as shareholders, to receive the merger consideration" and they "received the merger consideration on the same terms as any other shareholder"). And as also noted earlier, the approximately $6 million collectively received by the seven Independent Directors for selling their shares was an infinitesimal portion of the nearly $11 billion transferred. (*FitzSimons* Compl. ¶¶ 39, 212.)

Accordingly, the Trustee has failed to raise a plausible – let alone strong – inference that the Independent Directors possessed a motive and opportunity to hinder, delay, or defraud Tribune's creditors.

### b. Conscious Misbehavior or Recklessness

The Court next considers whether the Trustee has sufficiently alleged "strong circumstantial evidence of conscious misbehavior or recklessness" on the Independent Directors' part. *See In re Saba Enterps., Inc.*, 421 B.R. at 642. Where, as here, a motive to commit fraud "is not apparent," the "strength of the circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly greater" in order to withstand dismissal.

*Kalnit*, 264 F.3d at 142. As discussed earlier, recklessness requires a "state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC*, 573 F.3d at 109; *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000); *accord In re Lehman Bros. Holdings Inc.*, 541 B.R. at 575 & n.6; *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 936. And in weighing the strength of the Trustee's allegations, the Court must, as discussed, account for "plausible opposing inferences" under Rule 9(b). *Loreley*, 797 F.3d at 177.

The Trustee principally avers that the Independent Directors acted at least recklessly in approving the LBO despite Tribune's declining financial performance, the "secular decline" of the newspaper industry, and the negative public reaction to the LBO. (*FitzSimons* Compl. ¶¶ 129, 214, 327.) Relatedly, the Trustee also asserts that the Independent Directors were, at a minimum, reckless in accepting management's aggressive February Projections and October Projections, which assumed – notwithstanding the challenges facing the newspaper industry and Tribune's past performance – that Tribune would significantly outperform 2006 in the latter part of 2007 and would continue to improve over a five-year time horizon. (*Id.* ¶¶ 171, 216, 261, 268–69; *see also id.* ¶ 125 (alleging that Tribune "was performing so poorly that there could have been no reasonable expectation that it would be able to satisfy the additional $8 billion of debt that it incurred in the LBO").) For the reasons set forth below, the Court concludes that the Trustee has failed to raise a strong inference of conscious misbehavior or recklessness based on these allegations.

In fact, as the Complaint itself illustrates, the Special Committee did not blindly accept management's projections. The

Special Committee enlisted the expertise of a financial advisor, Morgan Stanley, to assist its review of management's plan. (*FitzSimons* Compl. ¶¶ 15, 155, 169, 336, 338.) As even the Trustee alleges, Morgan Stanley met with the Independent Directors on "numerous" occasions (*id.* ¶ 15), and participated in a comprehensive review of Valuation Research's solvency analysis with the Independent Directors and other members of the Board, including "the various tests used by [Valuation Research] in its solvency analysis, comprehensive transactions, case comparisons, and the assumptions [Valuation Research] relied upon in reaching its solvency determination" (*id.* ¶ 338). Although the Trustee claims that Morgan Stanley breached its fiduciary duties by failing to disclose its internal analysis that would have revealed that Tribune "would have a negative equity value" if it proceeded with Step Two of the LBO (*see id.* ¶ 339–40), he fails to allege that the Special Committee knew about this alleged breach or had any reason to doubt the legitimacy of Morgan Stanley's advice regarding the financial projections. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (finding that while allegations "strongly suggest[] that the defendants should have been more alert and more skeptical," nonetheless, "nothing alleged indicates that management was promoting a fraud"). Furthermore, the Trustee also concedes that Merrill Lynch and Citigroup, the Board's advisors, met with the Special Committee "on a near-weekly basis" to analyze the transaction in the lead-up to the Board's approval of the LBO (*FitzSimons* Compl. ¶ 167), which further undercuts the Trustee's argument that the Special Committee blindly adopted the Officers' projections without further inquiry.

As the Complaint also makes clear, the Independent Directors took other steps to assure themselves that Tribune would remain solvent following the effectuation of the LBO. Prior to the April 1, 2007 vote, Duff & Phelps issued a "viability opinion" to the Board, which concluded that "the fair market value of Tribune's assets would exceed the value of its liabilities on a post-transaction basis" and that Tribune "would be able to pay its debts as they became due." (*Id.* ¶¶ 188–89, 193.) While the Trustee makes much of the fact that Duff & Phelps initially refused to issue a solvency opinion (*FitzSimons* Compl. ¶¶ 187, 189, 215), there is no dispute that, had Duff & Phelps included Tribune's expected tax savings in its analysis, it would have concluded that Tribune would have been solvent after the LBO. (*Id.* ¶¶ 185–86, 189 (noting that Duff & Phelps found that "taking into account the S corporation tax shield, the Company will be able to pay its debts as they come due").) Not surprisingly, the Trustee also concedes that the viability opinion issued by Duff & Phelps "was the equivalent of a solvency opinion," except that it considered Tribune's expected tax savings. (*Id.* ¶¶ 189, 193.)

Furthermore, after the Independent Directors' vote, but before consummation of Steps One and Two, Valuation Research issued solvency opinions concluding that Tribune would remain solvent immediately after Steps One and Two were effectuated. (*Id.* ¶¶ 270–79, 306–26.) The Trustee argues that the Independent Directors, many of whom were experts in finance and accounting and were deemed "audit committee financial experts" under federal securities laws (*id.* ¶¶ 136, 220–21), "knew, or were reckless or grossly negligent in not knowing" that Valuation Research's reports were unreliable (*id.* ¶ 280). In particular, the Trustee faults Valuation Research for using

an allegedly non-standard definition of fair value in both solvency opinions and for choosing to omit Tribune's debt to be incurred at Step Two from its solvency opinion rendered at Step One. (*Id.* ¶¶ 271–72, 274–76.) But allegations regarding what the Special Committee members "should have known" are not particularly relevant to whether they had an actual intent to hinder, delay, or defraud. *See In re Lehman Bros. Holdings, Inc.*, 541 B.R. at 575 n.6; *Lippe*, 249 F. Supp. 2d at 375; *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 936. Furthermore, the Trustee fails to sufficiently explain why, based on several Independent Directors' status as "financial experts" for the purposes of federal securities laws, they knew or were consciously indifferent to the fact that Valuation Research's alleged methodological deficiencies rendered its solvency opinions unreliable.

Relatedly, the Trustee also argues that the Independent Directors "knew" or were "reckless . . . in not knowing" that Valuation Research's analysis, which was partly premised on the February and October Projections, was flawed because the Independent Directors had "up-to-date financial information showing Tribune's dismal performance." (*FitzSimons* Compl. ¶¶ 262, 269, 280; *see also id.* ¶¶ 170–174, 258–69.) Even so, "'[c]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook.'" *Teamsters Allied Benefit Funds v. McGraw*, No. 09-cv-140 (PGG), 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010) (quoting *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97-cv-1865 (HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998)). And while the Trustee specifically alleges that the directors

received a report on May 9, 2007 that showed the February Projections were "unrealistic" (*id.* ¶ 262), this report was distributed over five weeks *after* the Independent Directors voted to approve Zell's proposal on April 1, 2007 (*id.* ¶ 211), and many months before the Special Committee comprehensively reviewed Valuation Research's analysis with its financial advisor in advance of Step Two (*id.* ¶ 338). Thus, any inference of recklessness on the Independent Directors' part based merely on the fact that they received a negative financial outlook on May 9, 2007 is weak at best.

In any event, the Court is highly reluctant to infer scienter on the Board's part simply because it entered a risky transaction at a time when Tribune was struggling. *In re Lehman Bros. Holdings, Inc.*, 541 B.R. at 577 ("Indeed, there is nothing unlawful about a company transacting business during unusually difficult financial times in an attempt to prevent its own collapse. To find otherwise would place in question any contract executed during a financial downturn and invite upheaval in the financial markets."). To the extent that the Independent Directors were misguided in their belief that Tribune's financial condition might improve, that is clearly not enough to raise a strong inference of fraudulent intent. *See In re Refco*, 2009 WL 7242548, at *17 (noting that even though a transaction was a "bad deal" for the debtor, "it does not necessarily mean that fraud was afoot" and it did not sufficiently raise the requisite strong inference of scienter).

Next, the Trustee claims that the Independent Directors' fraudulent intent can be demonstrated by their alleged failure to conduct appropriate downside testing of the LBO. (*FitzSimons* Compl. ¶¶ 217–19, 379(d).) According to the Trustee, the

Independent Directors had insisted on more rigorous downside testing less than a year earlier when considering a leveraged recapitalization, a transaction that involved less leverage than the LBO. (*Id.* ¶ 218.) However, as even the Trustee concedes, the Independent Directors did in fact test the LBO against two downside cases presented by their financial advisor. (*Id.* ¶¶ 217, 219, 268.) Consequently, the Trustee's argument that the Independent Directors should have used different metrics to test the LBO again sounds in negligence and, thus, does not rise to the level of conscious misbehavior or recklessness, since there is no allegation that Morgan Stanley or any of the Board's other financial advisors informed them that these were inappropriate metrics. Here, as elsewhere, the Trustee's repeated attempts to equate "actual intent" with "presumed intent" or a standard based on foreseeability are insufficient to raise a strong inference that the Independent Directors acted with an actual intent to hinder, delay, or defraud Tribune's creditors. *See MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 936 (finding foreseeability standard "incompatible with the concept of actual fraud").

The Trustee also argues that the Independent Directors should have been suspicious of the LBO because when the Officer Defendants approached Houlihan Lokey, another finance firm, in late March 2007 to issue a solvency opinion, Houlihan Lokey concluded that it would be "tough" to find Tribune solvent after the LBO. (*FitzSimons* Compl. ¶¶ 197–98, 215.) However, the Complaint fails to allege that the Independent Directors were even aware of Houlihan Lokey's conclusion, rendering it peripheral, at best, to the Court's consideration of whether the Independent Directors acted with an actual intent to hinder, delay, or defraud Tribune's creditors.

The Trustee likewise makes much of the fact that the Independent Directors "caus[ed]" Tribune's subsidiaries to guarantee the debt of the lenders that financed the LBO, which "ensured that the LBO Lenders would be paid in full" before Tribune's pre-LBO creditors. (*FitzSimons* Compl. ¶¶ 231–32; Opp'n 29.) From this guarantee, the Trustee argues that the Independent Directors must have known of Tribune's declining financial condition, and that "there is no question that the foreseeable and legal effect – and thus *presumed intent* – was to hinder and delay Tribune's creditors." (Opp'n 29–30 (emphasis added).) However, this allegation also fails to support a strong inference of fraudulent intent. First, a company's guarantee of new debt that subordinates old debt, a tool often used by companies, cannot, by itself, amount to an actual fraudulent conveyance. *See In re Owens Corning*, 419 F.3d 195, 212 (3d Cir. 2005) ("This kind of lending occurs every business day."); *see also In re Lehman Bros. Holdings, Inc.*, 541 B.R. at 575 (intent under Section 548(a)(1)(A) entails "something more than just an intent to prefer one creditor over another."); *In re Rubin Bros. Footwear, Inc.*, 119 B.R. 416, 423 (S.D.N.Y. 1990) (same). Nor does the existence of such an arrangement suggest that the Independent Directors knew that Tribune would be unable to satisfy its debt obligations following the LBO, particularly in light of Valuation Research's solvency opinions and Duff & Phelps's conclusion that, accounting for tax savings, Tribune would remain solvent after effectuating the LBO. The fact that Tribune guaranteed the LBO lenders' debt adds no more to an inference of fraud than the fact that Tribune incurred the additional debt itself.

The Trustee also relies heavily on a statement in Tribune's proxy statement accompanying the tender offer, which indicated that prior to the April 1, 2007 vote, the Independent Directors considered the negative trends in the newspaper industry and concluded that these trends weighed in favor of the LBO. (*Id.* ¶ 214.) The Trustee surmises from this statement that the Independent Directors knew, or turned a deliberately blind eye to, the fact that the LBO would render Tribune insolvent so that Tribune's shareholders and other insiders could be provided an opportunity to "get out while the getting was good." (*Id.*) But there is nothing in the proxy statement that contradicted the advice and analysis provided by Morgan Stanley, Valuation Research, and Duff & Phelps. The Trustee's argument is thus wholly conclusory and amounts to little more than a meatless assertion that the Independent Directors should have known better. More is required, since fraudulent intent "cannot be found based merely on suspicion, conjecture, or doubtful inference." *Lippe*, 249 F. Supp. 2d at 375; *see also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (noting that allegations of "fraud by hindsight" fail to meet the particularity requirement of Rule 9(b)).

In short, what matters for the purposes of assessing the Independent Directors' actual intent under Section 548(a)(1)(A) is whether the Independent Directors knew or were consciously indifferent to the fact that the LBO would render Tribune insolvent. The Trustee has failed to make such a showing here. To the contrary, both before approval of the LBO and before consummation of Step One and Step Two, the Special Committee took steps to assure itself that the LBO would not render Tribune insolvent. However erroneous or misguided the Independent Directors' conduct may perhaps seem in hindsight, the Trustee has failed to meet the high bar of alleging conscious

misbehavior or recklessness on the Special Committee's part.

\* \* \*

For all the reasons set forth above, the Court finds that the Trustee has failed to plead facts sufficient to allege that the Independent Directors possessed actual intent to hinder, delay, or defraud Tribune's creditors through the LBO. Accordingly, the Trustee has also failed to allege that Tribune entered the LBO "with actual intent to hinder, delay, or defraud" its creditors and fails to state a claim upon which relief may be granted as to the Shareholder Transfers.

## IV. LEAVE TO AMEND

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires." *McCarty v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Nevertheless, "it is within the sound discretion of the [court] to grant or deny leave to amend." *Id.* As an initial matter, "where a plaintiff clearly has expressed a desire to amend, a lack of a formal motion is not a sufficient ground for a district court to dismiss without leave to amend." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("[T]he permissive standard of Rule 15 is consistent with our strong preference for resolving disputes on the merits." (citation omitted)). However, a court may deny leave to amend based on "undue delay, bad faith," and "dilatory motive" of the plaintiff, or where "amendment would be futile" or prejudicial. *Loreley*, 797 F.3d at 190; *accord AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010).

Here, the Trustee makes a cursory request to amend in the final footnote of its opposition brief. (*See* Opp'n 40 n.18.) However, he has not attached a proposed amended complaint and gives "no clue as to how the [C]omplaint's defects would be cured." *Loreley*, 797 F.3d at 190; *see also Bankr. Trust of Gerard Sillam v. Refco Grp., LLC*, No. 05-cv-10072 (GEL), 2006 WL 2129786, at \*5 (noting that Rule 7(b) "generally requires a movant to supply a copy of the proposed amendment . . . so that both the Court and the opposing parties can understand the exact changes sought." (internal quotation marks omitted)). In other words, plaintiffs have "identified no additional facts or legal theories . . . they might assert if given leave to amend." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014). Moreover, "although this case certainly presents complex issues, . . . it is not the sort of situation in which [the Trustee's] pleading defects were 'latent, and easily missed or misperceived without full briefing and judicial resolution.'" *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 386 (S.D.N.Y. 2016) (quoting *Loreley*, 797 F.3d at 191). To the contrary, the Trustee is a sophisticated bankruptcy professional, advised by four teams of lawyers, with access to the discovery conducted by the Unsecured Creditors in the Bankruptcy Court, which resulted in discovery from over 30 entities and persons involved in the LBO, more than 30 depositions, 10 expert reports/opinions, and nearly 4.5 million pages of documents. (*See* Mot. 12 at 35; Bankr. Doc. 8173 at 13, 19.) Thus, "it is unlikely that the deficiencies raised with respect to the [Fifth] Amended Complaint were unforeseen by [the Trustee] when [he] amended." *City of Pontiac*, 752 F.3d at 188; *see also Billard v. Rockwell Int'l Corp.*, 683 F.2d 51, 57 (2d Cir. 1982) (affirming denial

of leave to amend where plaintiffs "had access to full discovery" in a related case).

Independently, the Court denies leave to amend because it would result in substantial prejudice to the Shareholder Defendants. *See State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (noting that the "resulting prejudice to the opposing party" in granting leave to amend is "perhaps [the] most important" consideration in a leave to amend analysis). Given the strong presumption that stock transactions are final, the resulting prejudice is especially acute here. More than 5,000 Shareholder Defendants – alleged to have done nothing more than receive payment for their shares in an LBO – have been in limbo for almost a decade. Any additional delay comes at a significant cost to the "certainty, speed, finality, and stability" of financial markets, a concern that animated Congress's drafting of the Bankruptcy Code and the Second Circuit's Opinion in March. *In re Tribune*, 818 F.3d at 122 ("[E]xposing investors to even very weak lawsuits involving millions of dollars would be a substantial deterrent to investing in securities."); *see also In re Tribune*, 499 B.R. at 313 ("Congress enacted Section 546(e) in order to provide certainty to securities transactions and, in so doing, to enhance the stability of the nation's financial markets.").

Accordingly, the Court denies the Trustee's request for leave to amend based on its futility and undue prejudice to Defendants.

### V. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT the Shareholder Defendants' motion to dismiss Count 1 of the *FitzSimons* Complaint is GRANTED. The Clerk of the Court is

respectfully directed to terminate the motion located at docket number 5948 in case number 11-md-2296 and the motion located at docket number 4470 in case number 12-cv-2652. The Clerk of the Court is also respectfully directed to terminate from this action those Shareholder Defendants who are not also named Defendants.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: January 6, 2017
New York, New York

\*       \*       \*

The Trustee is represented by David M. Zensky, Mitchell P. Hurley, and Deborah J. Newman of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036; Robert J. Lack, Hal Neier, and Amy C. Brown of Friedman Kaplan Seiler & Adelman LLP, 7 Times Square New York, New York 10036; Michael Waldman and Mark Hiller of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, 1801 K Street, N.W., Suite 411L, Washington, DC 20006; and Jeffrey T. Golenbock and Douglas L. Furth of Golenbock Eiseman Assor Bell & Peskoe LLP, 437 Madison Ave, New York, New York 10022.

The Shareholder Defendants are represented by D. Ross Martin and Joshua Y. Sturm, as Liaison Counsel to the Executive Committee, of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036.

27



USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/6/17