```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
                                      :      11md2296 (DLC)
                                      :      12cv2652 (DLC)
                                      :
In re: Tribune Company Fraudulent     :      OPINION AND ORDER
Conveyance Litigation                 :
                                      :
                                      :
                                      :
                                      :
--------------------------------------X
```

APPEARANCES

For the Trustee:
David M. Zensky
Mitchell P. Hurley
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

Robert J. Lack
Jeffrey R. Wang
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036

Liaison Counsel to the Shareholder Defendants Executive
Committee:
Andrew G. Devore
Joshua Y. Sturm
Ropes & Gray LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199

DENISE COTE, District Judge:

    The Litigation Trustee for the Tribune Litigation Trust

(the "Trustee") has moved for leave to file a Sixth Amended

Complaint ("6AC") in <u>Marc S. Kirschner, as Litigation Trustee</u>

<u>for the Tribune Litigation Trust v. Dennis FitzSimons, et al.,</u>

12cv2652 (the "FitzSimons Action") to add claims for
constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B)
("Federal CFT Claims") against former shareholders of the
Tribune Company (the "Shareholders" and "Tribune").  That motion
is denied.

## Background

This lawsuit arises out of the 2007 leveraged buyout
("LBO") of Tribune and its subsequent bankruptcy in 2008.  That
transaction and subsequent events are described in greater
detail in an Opinion of January 23, 2019.  In re Tribune Co.
Fraudulent Conveyance Litig., 11md2296 (DLC), 2019 WL 294807
(S.D.N.Y. Jan. 23, 2019).  The following facts and procedural
history are of particular relevance to the Trustee's motion to
amend.

In the two-step LBO, Tribune purchased all of its
outstanding stock from the Shareholders for about $8 billion.
In order to carry out Step One of that transaction, Tribune
transmitted the cash required to repurchase its shares in
connection with a tender offer to Computershare Trust Company,
N.A. ("CTC") pursuant to CTC's agreement to act as "Depositary."
CTC then accepted and held tendered shares on Tribune's behalf
and paid out $34 per share to the tendering Shareholders.  The
Step One tender offer was oversubscribed, and the remaining

outstanding shares were repurchased in Step Two at the same price.  In Step Two, CTC was engaged as an "Exchange Agent" to perform essentially the same function.

Soon after the LBO was completed, Tribune experienced serious financial difficulties.  As a result of this financial distress, Tribune and many of its subsidiaries filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on December 8, 2008.  On October 27, 2010, the Bankruptcy Court granted standing to the Official Committee of Unsecured Creditors of Tribune (the "Committee" or "UCC") to assert claims on behalf of Tribune's bankruptcy estate.  The UCC initiated the FitzSimons Action in the Bankruptcy Court on November 1, 2010 against Tribune's directors, officers, Shareholders, and financial advisors to claw back funds transferred during the LBO.  Of particular relevance to the current motion, Count One in the FitzSimons Action was a claim against the Shareholders for intentional fraudulent transfer pursuant to 5 U.S.C. § 548(a)(1)(A) (the "Federal IFT Claim").

On June 25, 2011, the Bankruptcy Court granted Tribune's creditors ("Creditors") relief from the automatic stay to allow them to pursue state law constructive fraudulent conveyance claims.  That order stated that "[b]ecause no state law constructive fraudulent conveyance claims against [the

3

Shareholders] were commenced by or on behalf of the Debtors'
estates before the expiration of the applicable statute of
limitations under 11 U.S.C. § 546(a), the Debtors' creditors
have regained the right, if any, to prosecute their respective
state law constructive fraudulent conveyance claims against [the
Shareholders]." The Creditors then filed numerous state law
actions against the Shareholders in venues across the country
(the "Creditor Actions"). On December 19, 2011, pursuant to 28
U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation
(the "MDL Panel") consolidated approximately forty federal and
state cases involving more than 5,000 defendants in the Southern
District of New York before the Honorable Richard Holwell. See
In re Tribune Co. Fraudulent Conveyance Litig., 831 F. Supp. 2d
1371 (J.P.M.L. 2011).

On March 20, 2012, the MDL Panel transferred the FitzSimons
Action to the Southern District of New York to proceed as part
of the MDL. On July 23, 2012, the Bankruptcy Court confirmed a
plan for Tribune's reorganization (the "Plan") which transferred
the UCC's claims to a Litigation Trust (the "Trust"). The Plan
defined the assets of the Litigation Trust to include

> (a) any and all LBO-related Causes of Action that the
> Tribune Entities or the Debtors' Estates may have or
> are entitled to assert on behalf of their respective
> Estates (whether or not asserted) against the Non-
> Settling Defendants under any provision of the
> Bankruptcy Code or any applicable nonbankruptcy law

> including, without limitation, any and all claims
> under chapter 5 of the Bankruptcy Code . . . .

The preserved causes of action specifically excluded "the

Disclaimed State Law Avoidance Claims," which in turn are

defined as:

> any and all LBO-related Causes of Action arising under
> state fraudulent conveyance law that existed in favor
> of any Holder of a Claim that arose prior to the
> Petition Date against Selling Stockholders . . .
> [except] (i) any claims for intentional fraudulent
> conveyance [and] (ii) any and all LBO related causes
> of action [asserted in the FitzSimons action].

On June 4, 2013, the Trustee moved as the "successor

plaintiff" to the UCC in the FitzSimons Action to amend the

operative complaint, a motion which was granted on July 22,

2013.  On August 2, 2013, the Trustee filed the fifth amended

complaint in the FitzSimons Action ("FAC").[1]

On September 23, 2013, the Honorable Richard Sullivan, to

whom this litigation had been reassigned, granted the

defendants' motion to dismiss the Creditors' state-law

fraudulent conveyance claims brought in the Creditor Actions,

finding that Section 362(a)(1) of the Bankruptcy Code deprives

individual creditors of standing to challenge the same

---

[1] Although this was the fifth amendment of the FitzSimons
complaint, only the FAC made substantive changes to the
complaint.  The prior amendments made non-substantive changes
such as adding or dropping defendants, correcting the caption,
or fixing typographical errors.

transactions that the UCC was simultaneously seeking to avoid. In re Tribune Co. Fraudulent Conveyance Litig., 499 B.R. 310 (S.D.N.Y. 2013).  On September 30, 2013, the parties in those actions filed a joint notice of appeal, and on March 29, 2016, the Court of Appeals for the Second Circuit affirmed Judge Sullivan's decision on different grounds, holding that Section 362(a)(1) did not deprive the Creditors of standing, but that their state law fraudulent conveyance claims were preempted by the Section 546(e) safe harbor provision of the Bankruptcy Code. In re Tribune Co. Fraudulent Conveyance Litig., 818 F.3d 98 (2d Cir. 2016).  On July 22, 2016, the Second Circuit denied rehearing en banc, and the Second Circuit's mandate issued on August 1, 2016.  On September 9, 2016, the plaintiffs in the Creditor Actions filed a petition for a writ of certiorari with the United States Supreme Court.  See Deutsche Bank Tr. Co. Ams., et al. v. Robert R. McCormick Found., et al., No. 16-317.

On May 1, 2017, the Supreme Court granted certiorari in Merit Management Group, LP v. FTI Consulting, Inc., 137 S. Ct. 2092 (2017) (granting petition for a writ of certiorari).  In Merit Management, the Seventh Circuit held that "the section 546(e) safe harbor [does not] protect[] transfers that are simply conducted through financial institutions (or the other entities named in section 546(e)), where the entity is neither the debtor nor the transferee but only the conduit."  830 F.3d

690, 691 (7th Cir. 2016) (emphasis in original).  The law in the
Second Circuit at that time was that Section 546(e) applied to
any transaction involving one of the financial entities listed
in that section, "even as a conduit."  In re Quebecor World
(USA) Inc., 719 F.3d 94, 100 (2d Cir. 2013).  The law in the
Third Circuit, where the FitzSimons Action originated, was the
same.  See In re Plassein Int'l Corp., 590 F.3d 252, 256-57 (3d
Cir. 2009); In re Resorts Int'l, Inc., 181 F.3d 505, 516 (3d
Cir. 1999).

On January 6, 2017, Judge Sullivan granted the
Shareholders' motion to dismiss Count One of the FAC in the
FitzSimons Action, which sought to avoid billions of dollars
paid to Tribune's Shareholders during the LBO as actual
fraudulent conveyances under the Bankruptcy Code.  In re Tribune
Fraudulent Conveyance Litig., 11md2296 (RJS), 2017 WL 82391
(S.D.N.Y. Jan. 6, 2017).  The January 2017 Opinion declined to
impute the intent of Tribune's officers to Tribune for purposes
of the Trustee's actual fraudulent conveyance claim, and
determined that, although the Independent Directors' intent
could be imputed to the Company, the Trustee had not
sufficiently alleged that the Independent Directors acted with
fraudulent intent.  Id. at *11, *15.  Following the January 2017
Opinion, Judge Sullivan partially lifted the discovery stay to
allow document discovery to proceed.

7

On July 18, 2017, less than three months after the Supreme Court had granted certiorari in Merit Management, the Trustee sought permission to file a motion to amend the FAC to add the Federal CFT Claims, anticipating that the Supreme Court would reverse the Second and Third Circuit's interpretation of Section 546(e).  On August 24, 2017, Judge Sullivan rejected that request as premature because the claim was "presently barred by governing circuit precedent," and "the mere prospect of change in law is not a sufficient grounds for permitting the filing of an otherwise admittedly futile amended complaint."  Judge Sullivan's order also noted, however, that "[i]f, and when, the Supreme Court affirms the Seventh Circuit in [Merit Management], the Trustee would have a strong argument in support of amending his complaint to include the constructive fraudulent conveyance claim."

On February 27, 2018, the Supreme Court unanimously affirmed the Seventh Circuit's decision in Merit Management. See Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883 (2018), holding that "the relevant transfer for purposes of § 546(e) safe-harbor inquiry is the overarching transfer . . . ." Id. at 893.  Shortly thereafter, on March 8, 2018, the Trustee renewed his request to file a motion to amend the FAC to add Federal CFT Claims to Count One against the Shareholder defendants.  On April 3, 2018, Justice Kennedy and Justice

Thomas issued a statement concerning the petition for certiorari in the Creditor Actions, advising the parties that

> consideration of the petition for certiorari [would] be deferred for an additional period of time . . . [to] allow the Court of Appeals or the District Court to consider whether to recall the mandate, entertain a Federal Rule of Civil Procedure 60(b) motion to vacate the earlier judgment, or provide any other available relief in light of [the Supreme Court's] decision in Merit Management . . . given the possibility that there might not be a quorum in the [Supreme] Court.

Deutsche Bank Tr. Co. Americas v. Robert R. McCormick Found., 138 S. Ct. 1162, 1162-63 (2018).  On May 15, 2018, the Second Circuit recalled the mandate in the Creditor Actions "in anticipation of further panel review."  On June 18, 2018, Judge Sullivan stayed the Trustee's request to amend pending further action by the Second Circuit in the Creditor Actions, noting that the Second Circuit is likely to rule on the applicability of Section 546(e) to the LBO in the related Creditor Actions.

The MDL was reassigned to this Court on December 1, 2018. An Opinion and Order of January 23, 2019 resolved the outstanding motions in this case and dismissed several claims asserted against various remaining defendants.  In re Tribune Co. Fraudulent Conveyance Litig., 11md2296 (DLC), 2019 WL 284807 (S.D.N.Y. Jan. 23, 2019).  The parties were provided with a window of two months to settle all surviving claims, with depositions to begin on March 25, 2019 and fact discovery to conclude on December 13.

On March 26, 2019, the Trustee and the remaining defendants filed a joint letter alerting the Court that a settlement in principle had been reached with respect to virtually all remaining claims,[2] leaving only the Trustee's request to amend to be addressed.  A telephone conference was held on March 27.  At that conference, the Court proposed a schedule for briefing the Trustee's motion to amend and the parties were directed to meet and confer regarding that schedule.  The parties adopted the Court's proposal and the Trustee filed his motion on April 4.  That motion became fully submitted on April 12.[3]

## Discussion

I. Judicial Estoppel

As a threshold matter, the Shareholders argue that the Trustee is barred from seeking amendment by the doctrine of judicial estoppel.  That argument is unpersuasive.

> The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that is successfully advanced in another proceeding.  Judicial estoppel will prevent a party who failed to disclose a

---

[2] The sole exception was Count Twenty-Three of the FAC.  Count Twenty-Three seeks recovery of a reimbursement paid to Morgan Stanley, pursuant to Section 547(b) and 550(a) of the Bankruptcy Code.  On March 29, counsel for the Trustee filed a letter with the Court indicating that the parties had reached a settlement in principle with respect to that claim as well.

[3] Subsets of Shareholders opposed the motion on grounds that are particular to them.  Because this motion is resolved on global grounds, those arguments are not addressed in this Opinion.

claim in bankruptcy proceedings from asserting that
claim after emerging from bankruptcy.

BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC, 859 F.3d
188, 192 (2d Cir. 2017) (citation omitted).  "Generally,
judicial estoppel will apply if: [A] a party's later position is
clearly inconsistent with its earlier position; [B] the party's
former position has been adopted in some way by the court in the
earlier proceeding; and [C] the party asserting the two
positions would derive an unfair advantage against the party
seeing estoppel."  Id. (citation omitted).

    "[T]he exact criteria for invoking judicial estoppel will
vary based on specific factual contexts."  Adelphia Recovery
Trust v. Goldman, Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014)
(citation omitted).  The purpose of the doctrine "is to protect
the integrity of the judicial process by prohibiting parties
from deliberately changing positions according to the exigencies
of the moment."  Id. (citation omitted).  "Because the rule is
intended to prevent improper use of judicial machinery, judicial
estoppel is an equitable doctrine invoked by a court at its
discretion."  New Hampshire v. Maine, 532 U.S. 742, 750 (2001)
(citation omitted).

    Judicial estoppel is not appropriate here.  The Trustee's
motion to amend is occasioned by an intervening change in
governing law.  Judicial estoppel is generally applied to

11

inconsistent factual positions.  BPP Illinois, 859 F.3d at 192.
Courts regularly allow plaintiffs to amend their pleadings when
there has been an intervening change in governing law during the
pendency of the litigation.  See, e.g., Elsevier Inc. v.
Grossman, 12cv5121 (KPF), 2017 WL 1843298, at *9 (S.D.N.Y. May
8, 2017) (collecting cases).

The Shareholders argue that the Trustee's predecessor, the
UCC, took an "inconsistent position" in the Bankruptcy Court,
where it supported the lifting of the automatic stay to allow
the Creditors to pursue state law CFT claims.  Judicial estoppel
requires "a true inconsistency between the statements in the two
proceedings.  If the statements can be reconciled there is no
occasion to apply an estoppel."  Wight v. BankAmerica Corp., 219
F.3d 79, 90 (2d Cir. 2000) (citation omitted).  The UCC went to
great lengths in the Bankruptcy Court to distinguish the claims
it intended to pursue in the FitzSimons Action from the CFT
claims the Creditors sought to pursue.  These statements are
easily reconcilable with the position the Trustee now asserts.
At no point did the Trustee or his predecessor disclaim the
Federal CFT Claims.  Rather, the Trustee disclaimed only state
law CFT claims, which were then asserted by the Creditors.  It
is true that the Trustee and its predecessor were not always
precise about distinguishing between state and federal CFT
claims when arguing before the Bankruptcy Court.  Read in

12

context, however, these statements indicate that the Trustee and his predecessor disclaimed only state law CFT claims, while retaining any claims under federal law, including under Chapter 5 of the Bankruptcy Code.  The Bankruptcy Court's order lifting the automatic stay confirms this, as does the Plan.

The Shareholders further argue that the Bankruptcy Court "undoubtedly would have approached the proceedings differently" but for the UCC's and the Trustee's statements.  This contention is largely speculative, especially considering that both the lift stay order and the Plan clearly preserved the Federal CFT Claims for the Trustee.

II. Leave to Amend

Under Rule 15(a)(2), Fed. R. Civ. P., a party may amend its pleading only with the opposing party's written consent or the court's leave.  "The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, it remains "within the sound discretion of the district court to grant or deny leave to amend."  Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018) (citation omitted).  Leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  Id. (citation omitted).

Prejudice to the opposing party may occur if the new claim would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial;

13

(ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Pasternack v. Shrader, 863 F.3d 162, 174 (2d Cir. 2017) (citation omitted). Mere delay absent a showing of bad faith or undue prejudice is insufficient to deny the right to amend. Id. Nor can complaints of "the time, effort and money expended in litigating the matter," without more, constitute prejudice sufficient to warrant denial of leave to amend. Id. (citation omitted).

A proposed amendment is "futile when it could not withstand a motion to dismiss." F5 Capital v. Pappas, 856 F.3d 61, 89 (2d Cir. 2017) (citation omitted). "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 389 (2d Cir. 2015). On a motion to amend, like a motion to dismiss, all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. See Krys v. Pigott, 749 F.3d 117, 128, 134 (2d Cir. 2014).

"A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted). A court

may also consider documents that are "integral to the
complaint." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir.
2016). "A document is integral to the complaint where the
complaint relies heavily upon its terms and effect." Id. A
court may consider "documents that the plaintiffs either
possessed or knew about and upon which they relied in bringing
the suit . . . ." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir.
2000). A court may also take judicial notice of "relevant
matters of public record." Giraldo v. Kessler, 694 F.3d 161,
164 (2d Cir. 2012).

a. Bad Faith

The Shareholders contend that the Trustee's motion to amend
is brought in bad faith, because his predecessor made a tactical
decision to disavow the Federal CFT Claims in order to allow the
Creditors to pursue CFT claims under state law. This argument
is unpersuasive. The Trustee correctly notes that, both at the
time the FitzSimons Action was commenced, and at the time the
FAC was filed, it was settled law in both the Second Circuit and
the Third Circuit (where the action was initially commenced)
that Section 546(e) barred a bankruptcy trustee from pursuing a
Federal CFT Claim where the challenged transaction went through
a financial institution acting as an intermediary or conduit.
Merit Management reversed that holding and, in the Trustee's
view, opened the door for his Federal CFT Claims. This

15

intervening change in law gave the Trustee a good faith basis to pursue amendment of the FAC.

The Shareholders argue that the Trustee and his predecessor could have pursued his Federal CFT Claims earlier, notwithstanding controlling precedent in the Second and Third Circuits, by seeking en banc review or Supreme Court review of those precedents, and that he and his predecessor made a strategic decision not to do so.  It is unsurprising that the Trustee chose not to expend the resources of the Trust by pursuing a claim that was barred by governing law.  This does not support an inference that the Trustee's current motion to amend is brought in bad faith.

b. Undue Delay

Nor did the Trustee unduly delay seeking leave to amend. While <u>Merit Management</u> was pending, the Trustee diligently sought leave to amend in response to an anticipated change in governing law.  Judge Sullivan denied that request as premature because <u>Merit Management</u> had not yet been decided.  After <u>Merit Management</u> was decided, the Trustee promptly renewed his request for leave to amend.

c. Undue Prejudice

It is true, however, that the Shareholders will suffer substantial prejudice if the Trustee's proposed amendment is allowed.  It is of particular significance that, at this stage

16

in the litigation, the only claim against the Shareholders asserted in the FitzSimons Action has been dismissed for over two years, subject to appeal.  Because of the sheer size of this litigation, the number of defendants, and the number of claims asserted, the dismissal of the Federal IFT Claim against the Shareholders has not yet been reduced to judgment.  The Trustee should not be permitted take advantage of this fortuity to justify further delay, despite his diligence in promptly seeking to amend his complaint in response to a change in law.  Allowing the Trustee to add Federal CFT Claims against the Shareholders at this late hour would cause the Shareholders to "expend significant additional resources to conduct discovery and prepare for trial" and would "significantly delay the resolution of the dispute."  Pasternack, 863 F.3d at 174 (citation omitted).

As Judge Sullivan noted in his January 2017 decision, any further amendment

> would result in substantial prejudice to the
> Shareholder Defendants.  Given the strong presumption
> that stock transactions are final, the resulting
> prejudice is especially acute here.  More than 5,000
> Shareholder Defendants -- alleged to have done nothing
> more than receive payment for their shares in an LBO -
> - have been in limbo for almost a decade.  Any
> additional delay comes at a significant cost to the
> certainty, speed, finality, and stability of financial
> markets, a concern that animated Congress's drafting
> of the Bankruptcy Code and the Second Circuit's
> Opinion in [the Creditor Actions].

17

In re Tribune Fraudulent Conveyance Litig., 2017 WL 82391, at
*21.[4]  Those concerns have only become more acute in the
intervening twenty-eight months, and provide "good reason" for
denial of this motion.  See Kim, 884 F.3d at 105.  Although the
Trustee has a stronger basis for amending his complaint than he
did in January 2017 because of an intervening change in
governing law, that has little bearing on the prejudice that
will be suffered by the Shareholders if this litigation were to
continue on.  Standing alone, undue prejudice to the
Shareholders provides a sufficient basis upon which to deny the
Trustee's motion.

    D. Futility

        i. Relation Back

The statute of limitations for the Federal CFT Claims is
two years.  11 U.S.C. § 546(a).  The statute of limitations on
the Trustee's Federal CFT Claims therefore expired in December
2010.  Accordingly, the Federal CFT Claims are barred by the

---

[4] The Trustee wrongly suggests that the Supreme Court rejected
the argument that Section 546(e) was motivated by concerns about
finality of transactions and stability of financial markets.  In
fact, the Court rejected the contention that Section 546(e) was
meant to protect "component parts" of transactions, rather than
transactions by certain types of covered entities.  See Merit
Management, 138 S. Ct. at 895.  That has no bearing on the
overall policy of the statute or whether Tribune is such a
covered entity.

statute of limitations unless those claims relate back to the filing of the initial FitzSimons complaint in November 2010.

An amendment to a pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading . . . ." Fed. R. Civ. P. 15(c)(1)(B).  The Shareholders do not dispute that this standard is met here -- the Federal CFT Claims arise out of the same transaction that has been the subject of this litigation for nearly a decade.

The Shareholders argue, however, that the Federal CFT Claims cannot relate back because the only claim against the Shareholders -- the Federal IFT Claim in Count One -- has been dismissed.  This argument is unavailing.  Although the sole claim against the Shareholders has been dismissed, this action remains pending and the Federal CFT Claims relate back to the timely-filed IFT Claim.

ii. Section 546(e)

As an initial argument, the Trustee contends that the Shareholders' Section 546(e) defense cannot be adjudicated on this motion to amend because further factual development is necessary.  That argument is unavailing.  The application of Section 546(e) presents a straightforward question of statutory

interpretation of the type that is appropriately resolved on the pleadings.[5]

The Shareholders principally argue that the Trustee's proposed amendment would be futile because his Federal CFT Claims are barred by Section 546(e) notwithstanding the Supreme Court's holding in Merit Management.

Section 546(e) provides:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).  Of relevance to the analysis that follows, Section 546(e) bars a Trustee from asserting a claim for constructive fraudulent conveyance with respect to a "settlement

---

[5] The Trustee also notes that the application of Section 546(e) to the LBO is currently sub judice before the Second Circuit in the related Creditor Actions.  It is unduly prejudicial to all parties to further delay adjudication of this sole remaining question in the FitzSimons Action and entry of judgment.

payment . . . made by . . . [a] financial institution [or]
financial participant," or "a transfer made by . . . [a]
financial institution [or] financial participant . . . in
connection with a securities contract . . . ."  11 U.S.C. §
546(e).

There is no dispute that the transfers at issue here are
both "settlement payments" and "in connection with a securities
contract."  It is further undisputed that the transfers were
made "by" Tribune.  The parties disagree, however, whether
Tribune was an entity covered by Section 546(e), that is, either
a financial institution or a financial participant.[6]  The
Shareholders contend that Tribune itself is both a financial
institution and a financial participant, and that Section 546(e)
therefore bars the Trustee's Federal CFT Claims.

"Section 546(e) is a very broadly-worded safe-harbor
provision that was enacted to minimize the displacement caused
in the commodities and securities markets in the event of a
major bankruptcy affecting those industries."  In re Bernard L.
Madoff Inv. Sec. LLC, 773 F.3d 411, 416 (2d Cir. 2014) (citation

---

[6] Several Shareholders have separately opposed this motion to
amend on the ground that they are also financial institutions or
financial participants, and thereby protected by Section 546(e).
Given the finding that Tribune is a financial institution, it is
unnecessary to address these contentions by certain
Shareholders.

omitted).  "The safe harbor limits this risk by prohibiting the avoidance of 'settlement payments' made by, to, or on behalf of a number of participants in the financial markets." Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651 F.3d 329, 334 (2d Cir. 2011).  "Congress enacted § 546(e) to ensure that honest investors will not be liable if it turns out that a leveraged buyout (LBO) or other standard business transaction technically rendered a firm insolvent." Peterson v. Somers Dublin Ltd., 729 F.3d 741, 748 (7th Cir. 2013) (Easterbrook, J.); see also, Grede v. FCStone, LLC, 746 F.3d 244, 252 (7th Cir. 2014) ("[T]he § 546(e) safe harbor protects the market from systemic risk and allows parties in the securities industry to enter into transactions with greater confidence."); Samuel P. Rothschild, Bad Guys in Bankruptcy: Excluding Ponzi Schemes From the Stockbroker Safe Harbor, 112 Colum. L. Rev. 1376, 1380-81 (2012) (exploring the legislative history of Section 546(e) in the context of stockbrokers).

Statutory interpretation "begins . . . with the text of the statute." Nat. Res. Def. Council, Inc. v. U.S. Food and Drug Admin., 760 F.3d 151, 172 (2d Cir. 2014).  "Where the statutory language provides a clear answer, our analysis ends there." Tanvir v. Tanzin, 894 F.3d 449, 459 (2d Cir. 2018) (citation omitted).  "If the statute is ambiguous, then we may resort to canons of statutory interpretation to resolve the ambiguity."

<u>Khalid v. Sessions</u>, 904 F.3d 129, 132 (2d Cir. 2018) (citation omitted).  Whether or not a statute is ambiguous is determined "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  <u>Id.</u> (citation omitted).

           1) Financial Participant

      The Bankruptcy Code defines a "financial participant" as

> <u>An entity that</u>, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, <u>has one or more transactions described in</u> <u>paragraph (1), (2), (3), (4), (5), or (6) of section</u> <u>561(a) with the debtor or any other entity (other than</u> <u>an affiliate)</u> of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition . . . .

11 U.S.C. § 101(22A)(A) (emphasis supplied).  In order to be considered a financial participant, an "entity" must have entered into a covered transaction with "the debtor or any other entity (other than an affiliate)."  The issue of statutory interpretation is whether the debtor -- here, Tribune -- may be the "entity" described at the beginning of this section.  The better reading of the statute is that it cannot.

The Shareholders contend that this definition covers any "entity" -- including the debtor -- who enters into a covered transaction with "any other entity." If the "entity" described in the first part of the definition could include the "debtor," the inclusion of the term "debtor" in the second part would be puzzling. It would be unusual if not impossible for the debtor to enter into the covered transactions with itself, and the Shareholders have not identified an example of a covered transaction in which that may occur. Further, if the term "entity" is meant to include the debtor, then it would be redundant to refer to "the debtor", distinguishing it from "any other entity" in the second part of the definition. "It is one of the most basic interpretive canons that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." Hedges v. Obama, 724 F.3d 170, 189 (2d Cir. 2013). The clear text of the statute thus forecloses the Shareholders' argument that Tribune is a "financial participant" as defined in 11 U.S.C. § 101(22A). Section 546(e) therefore cannot be applied to bar the Trustee's Federal CFT Claims on this basis.

2) Financial Institution

The Bankruptcy Code defines a "financial institution" to include not only traditional financial institutions, but also,

in defined circumstances, the customers of traditional financial institutions.  The definition includes:

> a Federal reserve bank, or <u>an entity that is a</u> commercial or savings bank, industrial savings bank, savings and loan association, <u>trust company</u>, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity <u>and</u>, <u>when any such</u> Federal reserve bank, receiver, liquidating agent, conservator or <u>entity is acting as</u> <u>agent or custodian for a customer</u> (whether or not a 'customer', as defined in section 741) <u>in connection</u> <u>with a securities contract</u> (as defined in section 741) <u>such customer</u> . . . .

11 U.S.C. § 101(22)(A).

It is undisputed that CTC is both a "bank" and a "trust company."  The issues of statutory construction that are presented are thus: (1) was Tribune a "customer" of CTC? (2) was CTC acting as Tribune's "agent or custodian"? and (3) was CTC acting "in connection with a securities contract"?  Because all three of these questions are answered in the affirmative, not only CTC but also Tribune qualifies as a "financial institution," as that term is defined in the Bankruptcy Code. The Trustee's Federal CFT Claims are therefore barred by Section 546(e).

The allegations in the 6AC (and documents which may be relied on in resolving this motion) establish that Tribune was a "customer" of CTC.  Section 101, which contains the definition of financial institution, does not define "customer."  In the absence of a statutory definition, "we give the term its

ordinary meaning, starting our inquiry with contemporaneous dictionaries." Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc., 904 F.3d 208, 213 (2018); cf. UBS Fin. Servs., Inc. v. West Virginia Univ. Hosps., Inc., 660 F.3d 643, 650 (2d Cir. 2011) (applying the dictionary definition of the term "customer" where that term was not defined in the FINRA Code). The term "financial institution" was first added to Section 546(e) by the Bankruptcy Amendments Act of 1984, Pub. L. 98-353 (Jul. 10, 1984). Webster's New Twentieth Century Dictionary, published in 1983, defines "customer" as "a person who buys, especially one who buys regularly." Webster's New Twentieth Century Dictionary (2d ed. 1983). The current version of the Merriam-Webster dictionary defines a "customer" as "one that purchases a commodity or service." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/customer. The Fifth Edition of Black's Law Dictionary, published in 1979, defines "customer" in as "A buyer, purchaser, consumer, or patron," and "[i]n banking, any person having an account with a bank or for whom a bank has agreed to collect items." Black's Law Dictionary (5th ed. 1979). The current version similarly defines "customer" as "a buyer or purchaser of goods or services" and "a person having an account with a bank or for whom a bank has agreed to collect items." Black's Law Dictionary (10th ed. 2014).

Here, Tribune engaged the CTC's services as depositary in exchange for a fee.  SEC filings indicate that CTC was retained by Tribune to "act as Depositary in connection with the Tender Offer" at Step One.  It was a "purchaser" of CTC's "services." Tribune was CTC's customer in connection with the LBO transactions at issue here.

The Trustee attempts to limit the definition of "customer" by reference to statutory definitions in Sections 741 and 761 of the Bankruptcy Code, but that effort is contrary to the clear terms of the statute.  The definition of "financial institution" quoted above specifies that, in order to qualify as a "customer," a covered entity need not be a "customer" as defined in Section 741.  11 U.S.C. § 101(22)(A).  Section 741(2) defines "customer" for the purposes of the bankruptcy subchapter that deals with stockbroker liquidation.[7]  Section 761(9) defines

---

[7] Specifically, this Section defines "customer" to include "(A) [an] entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stock broker, from or for the securities account or accounts of such entity-- (i) for safekeeping; (ii) with a view to sale; (iii) to cover a consummated sale; (iv) pursuant to a purchase; (v) as collateral under a security agreement; or (vi) for the purpose of effecting registration of transfer," as well as "(B) [an] entity that has a claim against a person arising out of-- (i) a sale or conversion of a security received, acquired, or held as specified in subparagraph (A) . . . ; or (ii) a deposit of cash, a security, or other property with such person for the purpose

"customer" for the purpose of the subchapter that deals with commodity broker liquidation.[8]  Each of these sections is directed to a narrow issue; the transactions addressed in Section 546(e) are not so limited and the express disclaimer of a limited definition is both appropriate and understandable.

Second, CTC was acting as Tribune's "agent."[9]  "[I]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses."  DeKalb Cty. Pension Fund v. Transocean Ltd., 817 F.3d 393, 405 (2d Cir. 2016)

---

of purchasing or selling a security . . . ."  11 U.S.C. § 741(2).

[8] Specifically, this Section defines the term "customer" "(A) with respect to a futures commission merchant," "(B) with respect to a foreign futures commission merchant," "(C) with respect to a leverage transaction merchant" "(D) with respect to a clearing organization," and "(E) with respect to a commodity options dealer."  11 U.S.C. § 761(9).

[9] The definition of financial institution in Section 101(22) requires that CTC acted as Tribune's agent or custodian.  The term "custodian" is defined by 11 U.S.C. § 101(11) as "(A) a receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;  (B) assignee under a general assignment for the benefit of the debtor's creditors; or (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors."  The Shareholders do not contend that CTC was acting as Tribune's custodian.

(citation omitted).[10]  At common law, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act."  Restatement (Third) of Agency § 1.01 (2006).  Generally, the existence of a principal-agent relationship is a mixed question of law and fact.  See Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003).  "While the existence of an agency relationship often turns on questions of fact, the issue is properly resolved as a matter of law where, as here, the relevant facts are uncontroverted."  Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013).

---

[10] The Trustee suggests, in a footnote, that the term "agent" should not be construed more broadly than the term "custodian" because of the interpretive canon noscitur a sociis -- that a word in a statute "is known by the company it keeps."  See, e.g., Yates v. United States, 135 S. Ct. 1074, 1085 (2015).  The Trustee is mistaken.  Noscitur a sociis has limited application where, as here, there are just two words in a statutory phrase connected by a disjunctive "or."  That canon is more appropriately applied to "a string of statutory terms" or "items in a list."  Graham Cty. Soil and Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 288-289 (2010) (citation omitted).  A court must construe the terms "agent" and "custodian" to give each of them meaning, or else run afoul of the equally important maxim that "statutes should be read to avoid superfluity."  Marx v. Gen. Revenue Corp., 568 U.S. 371, 392 (2013).

The facts asserted in the 6AC, when read in combination with documents that are either judicially noticeable or are integral to the complaint, establish that CTC was acting as Tribune's agent.  CTC was entrusted with billions of dollars of Tribune cash and was tasked with making payments on Tribune's behalf to Shareholders upon the tender of their stock certificates to CTC.  This is a paradigmatic principal-agent relationship.[11]

Finally, CTC acted "in connection with a securities contract."  Section 741 defines the term "securities contract" broadly.  As relevant here, that definition includes "a contract for the purchase, sale, or loan of a security . . . including any repurchase . . . transaction on any such security."  11 U.S.C. § 741(7)(A)(i) (emphasis supplied).  It also includes "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph," and

---

[11] The Trustee also argues, in a footnote, that a customer qualifies as a financial institution only when the bank "is acting as an agent or custodian" at the time the avoidance claim is asserted.  This argument is without merit.  Both the definition of "financial institution" and Section 546(e) itself are couched in the present tense.  Incorporating the definition of "financial institution," Section 546(e) provides that the Trustee may not avoid, as constructively fraudulent, a transfer that "is a settlement payment" to a bank or trust company that "is acting as agent" for its customer, in connection with a securities contract.  The better reading of the statute is that the bank or trust company must be acting as agent at the time the transfer is made.

"<u>any</u> security agreement or arrangement or other credit
enhancement <u>related</u> to any agreement or transaction referred to
in this subparagraph." <u>Id.</u> at 741(7)(A)(vii), (xi) (emphasis
supplied). "Thus, the term 'securities contract' expansively
includes contracts for the purchase or sale of securities, as
well as any agreements that are <u>similar</u> or <u>related</u> to contracts
for the purchase or sale of securities." <u>In re Madoff</u>, 773 F.3d
at 418. The Second Circuit has described 11 U.S.C. §
741(7)(A)(vii) as a "catch-all" provision, noting that "[f]ew
words in the English language are as expansive as 'any' and
'similar.'" <u>Id.</u> at 419, 421.

There can be no question that Tribune's use of CTC to
repurchase Tribune stock from Shareholders at both steps of the
LBO involved the purchase of securities. This is sufficient to
establish that CTC's involvement in these LBO transactions was
"in connection with a securities contract."

The Trustee argues that such a holding is in conflict with
the January 2019 decision regarding the Trustee's claims against
the Independent Directors for violation of Delaware corporate
law. <u>See</u> <u>In re Tribune</u>, 2019 WL 294807, at *18-19. That
decision applied the independent legal significance doctrine
from Delaware law and held that since Step Two of the LBO was a
"merger" under Section 251 of the Delaware General Corporation
Law ("DGCL"), the Trustee could not pursue a claim against the

31

Independent Directors for the "purchase or redemption of stock" under DGCL Section 160.  Id. at *18.  That application of the doctrine of independent legal significance has no bearing on the statutory question presented here.  The Trustee has defined the transfer it seeks to avoid as Tribune's payment of cash to its Shareholders.  See, Merit Management, 138 S. Ct. at 894.  That transaction is a securities transaction and the Trustee "is not free to define the transfer it seeks to avoid in any way it chooses."  Id.

The Trustee next suggests that reading the definition of "financial institution" to cover an entity like Tribune would run counter to the spirit of the Supreme Court's decision in Merit Management, which rejected the idea that a bank or trust company acting as a "mere conduit" can be sufficient ground to invoke the safe harbor provision.  The tension suggested by the Trustee between the Shareholders' successful invocation of Section 546(e)'s safe harbor and Merit Management does not exist.  Among other things, in Merit Management the Supreme Court specifically declined to address the scope of the definition of "financial institution": "The parties here do not contend that either the debtor or petitioner in this case qualified as a 'financial institution' by virtue of its status as a 'customer' under § 101(22)(A) . . . .  We therefore do not address what impact, if any, § 101(22)(A) would have in the

application of the § 546(e) safe harbor." <u>Merit Management</u>, 138 S. Ct. at 890 n.2.

The text of Section 101(22)(A) compels the conclusion that Tribune itself was a "financial institution." The Trustee's Federal CFT claims are therefore barred by the safe harbor provided in Section 546(e). This result is consistent with Section 546(e)'s goal of promoting stability and finality in securities markets and protecting investors from claims precisely like these. The Trustee argues that Tribune was not a "systemically important" institution. But at the time of the LBO, Tribune was a publicly traded, Fortune 500 company. The Trustee sued over 5,000 Shareholders of Tribune -- whose only involvement in this transaction was receiving payment for their shares -- to unwind securities transactions. This is precisely the sort of risk that Section 546(e) was intended to minimize.

## Conclusion

Because the Trustee's Federal CFT Claims are barred by Section 546(e), his proposed amendment would be futile. Further, allowing the Trustee to amend his complaint at this stage of the litigation would result in undue prejudice to the Shareholders. The Trustee's April 4 motion to amend is denied.

Dated:    New York, New York
          April 23, 2019

_____
                DENISE COTE
        United States District Judge